# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MAGNACHIP SEMICONDUCTOR FINANCE COMPANY, *et al.*,[1] | ) | Case No. 09-12008 (PJW) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

---

## DISCLOSURE STATEMENT IN RESPECT OF JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR MAGNACHIP SEMICONDUCTOR FINANCE COMPANY, ET AL. AND UBS AG, STAMFORD BRANCH AS CREDIT AGREEMENT AGENT AND PRIORITY LIEN COLLATERAL AGENT

---

## IMPORTANT DATES

- Date by which ballots must be received: _____, at _:00 p.m. (prevailing Eastern time)

- Date by which objections to Confirmation of the Plan must be filed and served: _____, at _:00 p.m. (prevailing Eastern time)

- Hearing on Confirmation of the Plan: _____, at _:00 a.m. (prevailing Eastern time)

Dated: _____

Laura Davis Jones (Bar No. 2436)
Richard M. Pachulski (CA Bar No. 90073)
Debra Grassgreen (CA Bar No. 169978)
Joshua M. Fried (CA Bar No. 181541)
PACHULSKI STANG ZIEHL & JONES LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone: 302/652-4100
Facsimile: 302/652-4400
Email: ljones@pszjlaw.com
       rpachulski@pszjlaw.com
       dgrassgreen@pszjlaw.com
       jfried@pszjlaw.com
Counsel for the Debtors and Debtors in Possession

David Heller
Donald Schwartz
Josef S. Athanas
LATHAM AND WATKINS LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago IL 60606
Telephone: 312/876-7700
Facsimile: 312/993-9767

Counsel for Agent

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, and their respective addresses, are: MagnaChip Semiconductor Finance Company (4144), 787 N. Mary Avenue, Sunnyvale, CA 94085; MagnaChip Semiconductor LLC (5772), 787 N. Mary Avenue, Sunnyvale, CA 94085; MagnaChip Semiconductor SA Holdings LLC, 787 N. Mary Avenue, Sunnyvale, CA 94085; MagnaChip Semiconductor, Inc. (8632), 787 N. Mary Avenue, Sunnyvale, CA 94085; MagnaChip Semiconductor S.A. (9734), 74 Rue de Merl, B.P. 709, L-2017 Luxembourg; and MagnaChip Semiconductor B.V. (9827), 1043 BW Amsterdam, Naritaweg 165, the Netherlands.

**Table of Contents**

I.     PREFATORY STATEMENT AND DEFINITIONS ........................................................ 1

II.    INTRODUCTION AND OVERVIEW .................................................................... 1

     A.    Introduction.............................................................................................. 1

     B.    Disclaimers ............................................................................................. 2

     C.    An Overview of the Chapter 11 Process.................................................. 3

     D.    Plan Overview......................................................................................... 3

          1.    Unclassified Claims ................................................................... 5

          2.    Classified Claims ....................................................................... 5

     E.    Voting on the Plan .................................................................................. 7

          1.    Who May Vote............................................................................ 7

          2.    How to Vote. .............................................................................. 8

     F.    Confirmation of the Plan........................................................................ 8

          1.    Generally. ................................................................................... 8

          2.    Objections to Confirmation........................................................ 8

          3.    Hearing on Confirmation. .......................................................... 9

III.   HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTORS ...................... 9

     A.    Description of the Debtors ...................................................................... 9

     B.    The Debtors' Corporate Structure and Financial Performance............. 11

     C.    The Debtors' Principal Indebtedness .................................................... 12

     D.    Need for Bankruptcy Relief................................................................... 12

     E.    First Day Motions and Other Post-Petition Activities .......................... 13

          1.    Joint Administration.................................................................. 13

          2.    Employee Benefits. ................................................................... 13

          3.    Cash Management..................................................................... 14

          4.    Utilities..................................................................................... 14

          5.    Interim Compensation for Professionals................................... 15

          6.    Lease Rejection. ........................................................................ 15

          7.    Retention of Key Professionals................................................. 15

          8.    Cash Collateral Use.................................................................. 15

     F.    Appointment of Official Committee...................................................... 16

     G.    Bar Date for Filing Proofs of Claim and Administrative Proofs of Claims.......... 16

H.    Filing of Statements and Schedules .................................................................. 16

I.     Sale of the Debtors' Assets and the Assets of the Non-Debtor Affiliates ............ 16

IV.     DESCRIPTION OF THE PLAN ..................................................................... 18

A.    Summary of the Plan ....................................................................................... 18

B.    Treatment of Administrative Expenses and Tax Claims .................................. 18

     1.     Overview. ............................................................................................ 18

     2.     Administrative Expenses. .................................................................... 18

     3.     Superpriority Claims. .......................................................................... 19

     4.     Tax Claims. ......................................................................................... 19

C.    Classification and Treatment of Classified Claims and Interests ...................... 19

     1.     Overview. ............................................................................................ 19

     2.     Classification and Treatment of Claims and Interests. ........................ 20

         a.     Class 1 (A-F) – Priority Non-Tax Claims ..................................... 20

         b.     Class 2 (A-F) – Other Secured Claims .......................................... 20

         c.     Class 3 (A-F) – First Lien Lender Secured Claims ........................ 21

         d.     Classes 4 (A-F) – Second Lien Noteholder Claims ....................... 22

         e.     Class 5 (A-F) – General Unsecured Claims ................................... 22

         f.     Class 6 (A-F) – Subordinated Note Claims ................................... 23

         g.     Class 7 (A-F) – Intercompany Claims against the Debtors .......... 24

         h.     Class 8 (A-F) – Interests in the Debtors ........................................ 24

D.    Treatment of Executory Contracts and Unexpired Leases ................................. 24

     1.     Assumption and Rejection of Executory Contracts and
Unexpired Leases. ............................................................................... 24

     2.     Objections to Assumption of Executory Contracts and
Unexpired Leases. ............................................................................... 25

         a.     Objection Procedure Generally. ................................................... 25

         b.     Objection Based on Grounds Other Than "Cure" Amount. ......... 25

         c.     Objection Based on "Cure" Amount ............................................. 25

     3.     Payment Related to Assumption of Executory Contracts and
Unexpired Leases. ............................................................................... 25

     4.     Bar Date for Rejection Damages. ......................................................... 26

E.    Plan Provisions Regarding Distribution ............................................................ 26

     1.     Dates of Distribution. .......................................................................... 26

|      | 2.  | Cash Distributions. | 26 |
|      | 3.  | Rounding of Payments. | 27 |
|      | 4.  | Disputed Claims. | 27 |
|      | 5.  | Undeliverable and Unclaimed Distributions. | 27 |
|      | 6.  | Compliance With Tax Requirements. | 28 |
|      | 7.  | Record Date in Respect to Distributions. | 28 |
|      | 8.  | Reserves. | 28 |
|      | 9.  | Conditions to Receiving Distributions. | 29 |
|      | 10. | Subordination. | 29 |
| F.   | Plan Provisions Regarding Litigation, Objections to Claims, and Determination of Taxes. | | 29 |
|      | 1.  | Litigation; Objections to Claims; Objection Deadline. | 29 |
|      | 2.  | Temporary or Permanent Resolution of Disputed Claims. | 30 |
|      | 3.  | Release of Avoidance Actions. | 30 |
|      | 4.  | Preservation of Retained Rights of Action. | 30 |
| V. | ACCEPTANCE OR REJECTION OF PLAN | | 31 |
| A. | Classes Permitted and Not Permitted to Vote | | 31 |
| B. | Nonconsensual Confirmation | | 31 |
| VI. | MEANS FOR IMPLEMENTATION OF THE PLAN | | 31 |
| A. | Release of Liens/Secured Lien Guaranties/Subordinated Note Guaranties | | 32 |
|      | 1.  | Release of Liens on Purchased Assets. | 32 |
|      | 2.  | Release of Second Lien Guarantees. | 32 |
|      | 3.  | Release of Subordinated Note Guarantees. | 33 |
| B. | Continued Corporate Existence and Vesting of Assets | | 33 |
| C. | Retained Rights of Action | | 33 |
| D. | Claims Objections | | 33 |
| E. | Corporate Governance | | 33 |
| F. | Wind-Down | | 34 |
| G. | Funding for the Plan | | 34 |
| H. | Corporate Action/Dissolution | | 34 |
| I. | Interests in Affiliates and Subsidiaries | | 35 |
| J. | Payment of Plan Expenses | | 35 |
| K. | Dissolution of the Official Committee | | 35 |

| VII. | | EFFECT OF CONFIRMATION AND RELATED PROVISIONS | 35 |
|---|---|---|---|
| | A. | Effect of Confirmation | 35 |
| | | 1. Binding Effect of Plan. | 35 |
| | | 2. Business Transfer Agreement. | 35 |
| | B. | Injunction | 36 |
| | | 1. Generally. | 36 |
| | | 2. Injunction Related to Rights of Action and Terminated Claims, Administrative Expenses or Interests | 36 |
| | C. | Exculpation | 37 |
| | D. | Debtor Release | 37 |
| | E. | Third Party Release | 37 |
| | F. | Subsequent Discovery of Facts Does Not Affect Enforceability of Releases | 37 |
| VIII. | | REQUIREMENTS FOR CONFIRMATION | 38 |
| | A. | Acceptances Necessary to Confirm Plan | 38 |
| | B. | Best Interest of Creditors Test | 38 |
| | | 1. Chapter 7. | 39 |
| | | 2. Liquidation Alternative. | 39 |
| | C. | Feasibility of Plan | 40 |
| | D. | Classification | 40 |
| | E. | Confirmation of Plan Without Necessary Acceptances; Cramdown | 40 |
| | | 3. No Unfair Discrimination. | 41 |
| | | 4. Fair and Equitable Test. | 41 |
| | | a. Secured Claims | 41 |
| | | b. Unsecured Claims | 42 |
| | | c. Equity Interests | 42 |
| IX. | | EFFECT OF CONFIRMATION | 42 |
| | A. | Binding Effect of Confirmation | 42 |
| | B. | Good Faith | 42 |
| | C. | No Limitations on Effect of Confirmation | 42 |
| X. | | RISK FACTORS | 42 |
| | A. | Certain Federal Income Tax Consequences of the Plan | 43 |
| | | 1. Consequences to Debtors. | 43 |
| | | 2. Holders of Claims. | 44 |

|  |  | 3. | Non-United States Persons. | 44 |
|  |  | 4. | Importance of Obtaining Professional Tax Assistance. | 45 |
| XI. | ALTERNATIVES TO PLAN | | | 45 |
|  | A. | Liquidation Under Chapter 7 | | 45 |
|  | B. | Dismissal | | 45 |
|  | C. | Alternative Plan | | 45 |
|  | D. | No Res Judicata Effect | | 46 |
| XII. | CONCLUSION | | | 47 |

## Exhibits

| Exhibit | Description |
|---------|-------------|
| A | Proposed Sources and Uses of Cash on the Effective Date |
| B | Proponent's Liquidation Analysis |
| C | Flow of Funds Under Business Transfer Agreement |

# I.
## PREFATORY STATEMENT AND DEFINITIONS

Pursuant to Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), MagnaChip Semiconductor Finance Company; MagnaChip Semiconductor LLC; MagnaChip Semiconductor SA Holdings LLC; MagnaChip Semiconductor, Inc.; MagnaChip Semiconductor S.A.; and MagnaChip Semiconductor B.V. (collectively, the "Debtors"), hereby submit this disclosure statement (the "Disclosure Statement") in support of the *Joint Chapter 11 Plan of Liquidation Proposed by MagnaChip Semiconductor Finance Company, et al. and UBS AG, Stamford Branch, as Credit Agreement Agent and Priority Lien Collateral Agent* (the "Plan"). The definitions contained in the Bankruptcy Code are incorporated herein by this reference. The definitions set forth in the Plan shall also apply to capitalized terms used herein that are not otherwise defined. A copy of the definitions used in the Plan is appended hereto.

# II.
## INTRODUCTION AND OVERVIEW

### A.    Introduction

On June 12, 2009 (the "Petition Date"), the Debtors commenced the above-referenced bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions under Chapter 11 of the Bankruptcy Code.

This Disclosure Statement, submitted in accordance with section 1125 of the Bankruptcy Code, contains information regarding the Plan jointly proposed by the Debtors and UBS AG, Stamford Branch, (the "Agent" and, with the Debtors, the "Plan Proponents"). The Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan.

The Disclosure Statement contains information concerning, among other matters: (1) the Debtors' background, (2) the assets available for distribution under the Plan, and (3) a summary of the Plan. The Plan Proponents strongly urge you to review carefully the contents of this Disclosure Statement and the Plan (including any exhibits to each) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a creditor.

On _____, the Bankruptcy Court entered an order (the "Disclosure Statement Order") approving this Disclosure Statement as containing sufficient information to enable a hypothetical reasonable investor to make an informed judgment about the Plan. Under section 1125 of the Bankruptcy Code, this approval enabled the Plan Proponents to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not passed on the Plan itself or conducted a detailed investigation into the contents of this Disclosure Statement.

Your vote on the Plan is important. Absent acceptance of the Plan, the Debtors will likely be liquidated pursuant to a chapter 7 liquidation. These alternatives may not provide for

distribution of as much value to Holders of Allowed Claims as does the Plan. Accordingly, the Debtors urge you to accept the Plan by completing and returning the enclosed ballot(s) no later than _____, at 4:00 p.m. prevailing Eastern Time.

## B.    Disclaimers

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PROPOSED PLAN. PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF THE DEBTORS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. *SEE* 11 U.S.C. § 1125(a).

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING THE DEBTORS' FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED. MOREOVER, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE DEBTORS' FINANCIAL MATTERS, THE BOOKS AND RECORDS OF THE DEBTORS, UPON WHICH THIS DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE OR INACCURATE. HOWEVER, REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

PACHULSKI STANG ZIEHL & JONES LLP ("PSZ&J") IS GENERAL INSOLVENCY COUNSEL TO THE DEBTORS. LATHAM & WATKINS LLP ("L&W") IS COUNSEL TO THE AGENT. PSZ&J AND L&W HAVE RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT AND HAS NOT INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR

INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

## C.     An Overview of the Chapter 11 Process

Chapter 11 of the Bankruptcy Code contains numerous provisions, the general effect of which is to provide the debtor with "breathing space" within which to propose a restructuring of its obligations to third parties. The filing of a chapter 11 bankruptcy petition creates a bankruptcy "estate" comprising all of the property interests of the debtor. Unless a trustee is appointed by the Bankruptcy Court for cause (no trustee has been appointed in these Chapter 11 Cases), a debtor remains in possession and control of all its assets as a "debtor in possession." The debtor may continue to operate its business in the ordinary course on a day-to-day basis without Bankruptcy Court approval. Bankruptcy Court approval is only required for various enumerated kinds of transactions (such as certain financing transactions) and transactions out of the ordinary course of a debtor's business. The filing of the bankruptcy petition gives rise to what is known as the "automatic stay," which generally enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a Chapter 11 case.

The Bankruptcy Code authorizes the creation of one or more official committees to protect the interests of some or all creditors or interest holders. The fees and expenses of counsel and other professionals employed by such official committees and approved by the Bankruptcy Court are generally borne by a bankruptcy estate.

A chapter 11 debtor emerges from bankruptcy by successfully confirming a plan of reorganization. Alternatively, the assets of a debtor may be sold and the proceeds distributed to creditors through a plan of liquidation, such as the Plan. A plan may be either consensual or nonconsensual and provide, among other things, for the treatment of the claims of creditors and interests of shareholders and holders of options or warrants. The provisions of the Plan are summarized below.

## D.     Plan Overview

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. The Plan is a plan of liquidation (as discussed below).

The Plan provides for the satisfaction of Claims against the Debtors and the enforcement of the First Lien Lender Secured Claims through (a) the authorization by the Debtors of the sale of substantially all of the assets of the Selling Non-Debtors, which are direct or indirect foreign subsidiaries of the Debtors, which sale will be conducted under applicable nonbankruptcy law, and (b) the sale of substantially all of the assets of Debtor MSA, certain assets of Debtor Luxco, and the assignment of certain non-disclosure agreements and other contracts listed on Exhibit "C" to the Plan owned by LLC through the Plan. The Sale Proceeds, together with the Debtors' available Cash as of the Effective Date, will be used to satisfy Claims, Plan Expenses, and Case Expenses as provided under the Plan. Upon the Effective Date of the Plan, the liens of the First

Lien Lender Parties and the Second Lien Noteholders on the Purchased Assets shall be released and extinguished, and the Second Lien Guarantees in favor of the Second Lien Noteholders from the Non-Korean Guarantors and the Subordinated Note Guaranties in favor of the Holders of the Subordinated Note Claims shall be released. Under the Plan, the First Lien Lender Parties will receive a *pro rata* distribution of the Net Sale Proceeds and the proceeds of certain other assets of the Debtors that are not being sold pursuant to the Business Transfer Agreement. If the Class of Second Lien Noteholders and the Class of Holders of General Unsecured Claims vote to accept the Plan and the Korean Guarantee is released, they will receive a pro rata distribution of the Unsecured Creditor Distribution (along with the Holders of Subordinated Note Claims), provided, however, that any distribution that would otherwise be made to Holders of Subordinated Note Claims will be paid to the Second Lien Noteholders pursuant to the subordination provisions in the Subordinated Note Indenture. All Intercompany Claims against the Debtors and all Interests in the Debtors will be cancelled either upon the Effective Date of the Plan or in connection with the Wind-Down of the Debtors. Following the Effective Date, and in connection with a Wind-Down, each Debtor will be dissolved in accordance with terms of the Plan.

This Disclosure Statement contains a discussion of the Debtors' history, a summary of the Debtors' assets and liabilities, a summary of what Holders of Claims and Interests will receive under the Plan, a discussion of certain alternatives to the Plan, and a summary of the procedures and voting requirements necessary for confirmation of the Plan. The Disclosure Statement is intended to provide Holders of Claims and Interests with information sufficient to enable such Holders to vote on the Plan. *All Claim Holders entitled to vote on the Plan are encouraged to carefully read the Disclosure Statement and the Plan before voting to accept or reject the Plan. No solicitation materials, other than the Disclosure Statement and related materials transmitted herewith and approved by the Bankruptcy Court, have been authorized for use in soliciting acceptance or rejection of the Plan.*

Taken together, the Plan proposes to fairly and efficiently allocate the Debtors' remaining assets in a manner that will allow these cases to be promptly resolved.

The Plan provides for the classification and treatment of Claims against and Interests in the Debtors. The Plan designates seven Classes of Claims and one Class of Interests. These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests. Pursuant to the Plan, the Debtors will ultimately be dissolved and all existing Interests in the Debtors will be extinguished and cancelled.

## Summary of Classification and Treatment of Claims and Interests Under the Plan

The following chart briefly summarizes the treatment of Creditors and Interest Holders under the Plan.[2] Amounts listed below are estimated. Actual Claims and distributions will vary depending upon, among other things, recoveries on Distributable Assets.

---

[2] This chart is merely a summary of the classification and treatment of Claims and Interests under the Plan. References should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.

## 1.    Unclassified Claims

| Class No. | Description | Estimate of Claim Amounts Ultimately Allowable | Treatment |
|---|---|---|---|
| N/A | Administrative Expenses<br><br>Estimated Recovery: 100% | $1,905,515[3] (inclusive of accrued but unpaid professional fees) | Each Holder of an Allowed Administrative Expense that has filed a timely request for payment shall receive payment in full in cash on the Effective Date unless otherwise agreed by such Holder and the Debtors.  Certain different and additional requirements shall apply to Fee Claims as set forth in Article XIV(B)(2) of the Plan. |
| N/A | Superpriority Claims<br><br>Estimated Recovery: N/A | $0 million | No distribution to the First Lien Lender Parties shall be made on account of any Superpriority Claims except as set forth in Article IV(B)(3) of the Plan.  Inasmuch as the Claims of the Second Lien Noteholders are deemed unsecured, the Second Lien Noteholders shall not have any Allowed Superpriority Claims. |
| N/A | Tax Claims<br><br>Estimated Recovery: 100% | $[0] | Each Holder of an Allowed Tax Claim against any of the Debtors that is due and payable as of the Effective Date shall receive payment in full in Cash on or as soon as practicable after the Effective Date.<br><br>Each Holder of an Allowed Tax Claim (or portion thereof) not yet due and payable as of the Effective Date will be paid by, as the case may be (i) the Buyer (in the case of any such Allowed Tax Claims against MSA or Luxco) or (ii) the Plan Representative (in the case of any such Allowed Tax Claims against any other Debtor) when due and payable under applicable nonbankruptcy law without regard to the commencement of the Chapter 11 Cases.<br><br>Upon request of any of the Debtors, the Bankruptcy Court shall determine the amount of any Disputed Claim for, or issues pertaining to, Tax Claims. |

## 2.    Classified Claims

| Class No. | Description | Estimate of Claim Amounts Ultimately Allowable | Treatment |
|---|---|---|---|
| 1 | Class 1 (A-F) Priority Non-Tax Claims<br><br>Estimated Recovery: 100% | $[0] | Priority Non-Tax Claims against the Selling Debtors shall be assumed by the Buyer pursuant to the Business Transfer Agreement.<br>Priority Non-Tax Claims against non-Selling Debtors shall be paid in full in cash on or as soon as practicable after the later of the Effective Date or the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim. |

---

[3] This number assumes no Fee Claims are paid during the Case.  Inasmuch as it is expected that some fees will be paid through the interim compensation procedures that have been requested, this number will likely be much lower.

| Class No. | Description | Estimate of Claim Amounts Ultimately Allowable | Treatment |
|---|---|---|---|
| 2 | Class 2 (A-F) Other Secured Claims<br><br>Estimated Recovery: 100% | $0 | If the collateral securing an Other Secured Claim is part of the Purchased Assets, the Buyer will assume the obligation to pay such Other Secured Claim and the Holder of such Claim shall retain its Lien on its collateral unless and until such Claim is paid in full or the collateral is subsequently sold by the Buyer and the proceeds of such sale, less costs and expenses of disposing of such collateral, shall be paid to such Holder in full satisfaction and release of such Allowed Other Secured Claim.<br>If the collateral is not part of the Purchased Assets, the collateral securing the Creditor's Other Secured Claim shall be abandoned to such Creditor, in full satisfaction and release of such Other Secured Claim. |
| 3 | Class 3 (A-F) First Lien Lender Claims<br><br>Estimated Recovery: 70.6% | $95 million | The First Lien Lender Parties shall receive, through payments to the Agent, each of the following: (i) the Net Sale Proceeds, (ii) all of the Distributable Cash and Claims of the Debtors other than the Cash of MSA, and (iii) any proceeds of any residual assets, if any, and when any such proceeds are collected by the Liquidating Trust. The Liens on the Purchased Assets and Distributable Assets securing the First Lien Lender Secured Claims will be released and extinguished as of the Effective Date and of no further force or effect; provided, however, that such Liens on the Purchased Assets shall attach to the proceeds thereof with the same priority as they attached to the Purchased Assets and the First Lien Lender Parties shall retain their Liens on all assets of Luxco, Finco and the First Lien Guarantors other than the Purchased Assets and Distributable Assets. |
| 4 | Class 4 (A-F) Second Lien Noteholder Claims<br><br>Estimated Recovery: 0.2% | $500 million | If Classes 4 (A–F) and Classes 5 (A–F) vote to accept the Plan, the Second Lien Noteholders shall receive their proportionate share, together with other unsecured creditors, of the Unsecured Creditor Distribution. The existing Liens securing the Second Lien Noteholder Claims shall be released and extinguished effective as of the Effective Date and of no further force or effect. If each of Classes 4 (A-F) and 5 (A-F) do not vote to accept the Plan, Holders of Class 4 (A-F) Claims will vote to accept on account of such Claims. |
| 5 | Class 5 (A-F) General Unsecured Claims<br><br>Estimated Recovery: 0.1% | $3.238 million | If each of Classes 4 (A–F) and Classes 5 (A–F) vote to accept the Plan, then each Holder of a Class 5 (A-F) Claim shall receive, in full satisfaction, settlement, and release of such Claim, a proportionate share, together with other unsecured creditors, of the Unsecured Creditor Distribution. In addition, Holders of General Unsecured Claims shall benefit from the Debtors' general release of Avoidance Claims set forth in Article IX(C) of the Plan. The First Lien Lender Parties will also waive any distribution of the Unsecured Creditor Distribution on account of their Deficiency Claims. If Classes 4 (A-F) and 5 (A-F) do not vote to accept the Plan, Holders of Class 5 (A-F) Claims will receive no distribution on account of their Claims. |

| Class No. | Description | Estimate of Claim Amounts Ultimately Allowable | Treatment |
|---|---|---|---|
| 6 | Class 6 (D and F) Subordinated Debt Claims<br><br>Estimated Recovery: 0% | $250 million | If each of Classes 4 (A–F) and 5 (A–F) vote to accept the Plan, then each Holder of a Class 6 (A-F) Claim shall receive its proportionate share, together with other unsecured creditors, of the Unsecured Creditor Distribution; provided, however, that in accordance with the subordination provisions in the Subordinated Note Indenture, all distributions to Holders of Class 6 (A-F) Claims shall be paid to the Second Lien Noteholder Trustee for distribution to Second Lien Noteholders. If Classes 4 (A-F) and 5 (A-F) do not vote to accept the Plan, Holders of Class 6 (A-F) Claims will receive no distribution on account of their Claims. |
| 7 | Class 7 (A-F) Intercompany Claims<br><br>Estimated Recovery: 0% | N/A | Holders of Intercompany Claims against the Debtors shall receive no distributions or recoveries on account of such Claims and such Claims shall be extinguished either on the Effective Date or thereafter in accordance with the Plan. |
| 8 | Class 8 (A-F) Interests in the Debtors<br><br>Estimated Recovery: 0% | N/A | Holders of Interests in the Debtors shall receive no distributions or recoveries on account of such Interests and such Interests shall be extinguished on the Effective Date. |

## E. Voting on the Plan

### 1. Who May Vote.

The Plan divides Allowed Claims and Interests into multiple Classes. Under the Bankruptcy Code, only Classes that are "impaired" by the Plan are entitled to vote (unless the Class receives no compensation or payment, in which event the Class is conclusively deemed not to have accepted the Plan). A Class is Impaired if legal, equitable, or contractual rights attaching to the Claims or Interests of the Class are modified, other than by curing defaults and reinstating maturities. Under the Plan, Administrative Claims, Superpriority Claims, and Priority Tax Claims are unclassified and are not entitled to vote. Classes 6, 7 and 8 receive nothing under the Plan and are therefore conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote under the Plan. Classes 1, 2, 3, 4 and 5 are Impaired and entitled to vote to accept or reject the Plan. Only those votes cast by Holders of Allowed Claims shall be counted in determining whether a sufficient number of acceptances have been received to obtain Plan Confirmation.

### 2. How to Vote.

All votes to accept or to reject the Plan must be cast by using the appropriate form of ballot. No votes other than ones using such ballots will be counted except to the extent ordered otherwise by the Bankruptcy Court. A form of ballot is being provided to Creditors in Classes 1, 2, 3, 4 and 5 by which Creditors in such Classes may vote their acceptance or rejection of the Plan. The ballot for voting on the Plan gives Holders of Classes 1, 2, 3, 4 and 5 Claims one important choice to make with respect to the Plan – you can vote for or against the Plan. To vote on the Plan, after carefully reviewing the Plan and this Disclosure Statement, please complete the ballot, as indicated thereon, (1) by indicating on the enclosed ballot that (a) you accept the Plan or (b) reject the Plan and (2) by signing your name and mailing the ballot in the envelope provided for this purpose.

IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED, AND RECEIVED BY THE BALLOTING AGENT, OMNI MANAGEMENT GROUP, NO LATER THAN 4:00 P.M. PREVAILING EASTERN TIME ON _____, AT THE FOLLOWING ADDRESS:

OMNI MANAGEMENT GROUP
16501 VENTURA BOULEVARD
SUITE 440
ENCINO, CA 94136-2088
ATTN: BRIAN OSBOURNE

IF YOUR BALLOT IS NOT PROPERLY COMPLETED, SIGNED, AND RECEIVED AS DESCRIBED, IT WILL NOT BE COUNTED. IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY REQUEST A REPLACEMENT BY MAKING A WRITTEN REQUEST TO THE ADDRESS SHOWN ABOVE. FACSIMILE OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE COUNTED.

### F. Confirmation of the Plan

#### 1. Generally.

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation. The timing, standards, and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed in Article XIX below.

#### 2. Objections to Confirmation.

Any objections to Confirmation of the Plan must be in writing and must be filed with the clerk of the Bankruptcy Court and served on counsel for the Debtors and the United States Trustee on or before the date set forth in the notice of the Confirmation Hearing sent to you with this Disclosure Statement and the Plan. Bankruptcy Rule 3007 governs the form of any such objection.

Counsel on whom objections must be served are:

**Counsel for the Debtors:**

Pachulski Stang Ziehl & Jones LLP
Laura Davis Jones, Esquire
James O'Neill, Esquire
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)

Pachulski Stang Ziehl & Jones LLP
Richard Pachulski, Esquire
Debra Grassgreen, Esquire
Joshua M. Fried, Esquire
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, CA 90067

**Counsel for the Agent:**

Latham & Watkins LLP
David Heller, Esquire
Donald Schwartz, Esquire
Josef Athanas, Esquire
233 W. Wacker Drive, Suite 5800
Chicago, IL 60606

**United States Trustee:**

Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801
Attn: Mark Kenney, Esquire

### 3. Hearing on Confirmation.

The Bankruptcy Court has set _____, at ____. (prevailing Eastern time) for a hearing (the "Confirmation Hearing") to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied. The Confirmation Hearing will be held in Courtroom _, Wilmington, DE 19801, before the Honorable _____, United States Bankruptcy Judge. The Confirmation Hearing may be continued from time to time and day to day without further notice. If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order.

### III.
### HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTORS

### A. Description of the Debtors

The Debtors, along with their seven nondebtor affiliates (collectively, the "MagnaChip Entities" or "MagnaChip"), design and manufacture analog and mixed-signal semiconductor products for high-volume consumer applications, such as mobile phones, digital televisions, flat-panel displays, notebook computers, mobile multimedia devices, and digital cameras. MagnaChip has a deep analog and mixed-signal semiconductor technology platform supported by their 29-year operating history, large portfolio of approximately 4,700 registered and pending patents, and extensive engineering and manufacturing process expertise. MagnaChip's wide

variety of analog and mixed-signal semiconductor products and services, combined with their deep technology platform, allows them to address multiple high-growth end markets and to develop and introduce new products quickly.

MagnaChip's major manufacturing operations and design centers are located in Asia and provide the Debtors with close proximity to the global consumer electronics supply chain. MagnaChip also supplies and collaborates on product and technology development with leading innovators in the consumer electronics market. Some of MagnaChip's largest customers by revenue include LG Display Co., Ltd. ("LG Display"), Sharp Corporation ("Sharp"), and members of the Samsung Group ("Samsung"). MagnaChip sold over 2,635 distinct products to over 218 customers in the year ended December 31, 2008, with a substantial portion of revenues derived from a concentrated number of customers, including LG Display, Sharp and Samsung. MagnaChip's largest semiconductor manufacturing services customers include some of the fastest growing and leading semiconductor companies that design products for the consumer, computing, wireless, and industrial end markets.

Prior to the Petition Date, MagnaChip had three main business lines: (1) Display Solutions, (2) Power Solutions, and (3) Semiconductor Manufacturing Services.

Display Solutions Business. The Display Solutions business offers flat-panel display drivers for a wide range of small to large panel displays used in digital televisions, mobile phones, LCD monitors, notebook computers, and mobile multimedia devices, such as handheld games. MagnaChip's products cover a broad range of interfaces, packages, and technologies, including active matrix organic light-emitting diode, low-temperature poly-crystalline silicon, and thin-film transistor technologies. Net sales from Display Solutions for the year ended December 31, 2008, were $304.1 million, or approximately 45.6% of total net sales during this period.

Power Solutions Business. MagnaChip's Power Solutions business segment produces metal-oxide semiconductor field effect transistors (commonly called MOSFETs), analog switches, DC-DC converters, and linear regulators. The Power Solutions products are designed for consumer electronics applications such as mobile phones, LCD televisions, and desktop computers, and allow electronics manufacturers to achieve specific design goals of high efficiency and low standby-power consumption. MagnaChip commenced the Power Solutions business in November 2007 and expects to expand its power management product portfolio through the addition, for example, of more advanced DC-DC products. Net sales from Power Solutions for the year ended December 31, 2008, were $5.4 million, or approximately 0.8% of total net sales during this period.

Semiconductor Manufacturing Services. MagnaChip's Semiconductor Manufacturing Services business segment manufactures wafers for analog and mixed-signal semiconductor companies based on their design. The customers, most of which do not have their own manufacturing facilities, provide MagnaChip with their designs, and the company manufactures and sells the products to the customers based upon the designs. MagnaChip offers over 180 process flows to our manufacturing services customers, and often partners with key customers to jointly develop or customize specialized processes that enable customers to improve their products and allow MagnaChip to develop unique manufacturing expertise. Net sales from

Semiconductor Manufacturing Services for the year ended December 31, 2008, were $287.1 million, or approximately 43.0% of total net sales during this period.

On October 6, 2008, MagnaChip announced the closure of a fourth business line, Imaging Solutions, except to provide support for existing customers. MagnaChip expects to continue manufacturing products for their customers until such products are discontinued or no longer sold by those customers, but expects to close the Imaging Solutions business segment in 2009. The Imaging Solutions segment produces image sensors for camera-equipped applications, such as mobile handsets, PCs, digital cameras, notebook computer, and security cameras. Net sales from the Imaging Solutions business segment for the year ended December 31, 2008, were $65.9 million, or approximately 9.9% of total net sales during this period.

## B.     The Debtors' Corporate Structure and Financial Performance

The named Debtor for these Chapter 11 Cases is MagnaChip Semiconductor Finance Company ("Finco"). MagnaChip Semiconductor LLC ("LLC") is the parent company for all of the Debtors. MagnaChip's business was named "MagnaChip Semiconductor" when it was acquired from Hynix Semiconductor, Inc. ("Hynix") in October 2004 by Citigroup Venture Capital Equity Partners, L.P.; Francisco Partners, L.P.; certain investment funds advised by CVC Asia Pacific Limited or its affiliates; certain members of management; and other investors. As noted above, the Debtors and their nondebtor affiliates consist of thirteen separate entities incorporated and/or located in the United States, South Korea, Japan, Luxembourg, the Netherlands, Hong Kong, Taiwan, the United Kingdom, China, and the British Virgin Islands.

MagnaChip Semiconductor SA Holdings LLC ("Holdco") and MagnaChip Semiconductor, Inc. ("MSA") are each 100% owned by LLC. LLC owns 99% of MagnaChip Semiconductor S.A ("Luxco"), which is incorporated in Luxembourg. Holdco owns 1% of Luxco. Luxco, in turn, is the 100% owner of Finco and MagnaChip Semiconductor B.V. ("Dutchco"), which is incorporated in the Netherlands. In addition, Luxco owns, directly or indirectly through Dutchco, the seven nondebtor affiliates. Currently, all of the MagnaChip Entities' operations and manufacturing are done at MagnaChip Semiconductor, Ltd. (Korea) ("MSK"), while the MagnaChip Entities' design work is done at MSK and in Japan at MagnaChip Semiconductor Inc. (Japan). Dutchco owns 100% of the stock of MSK, which is incorporated in South Korea and which is not a debtor in these proceedings.

Holdco currently has one class of outstanding convertible preferred Series B units (the "Series B Units"), of which 550,000 units were authorized and 93,997.4364 units are issued and outstanding as of the Petition Date, and one class of common units (the "Common Units") of which 65,000,000 units were authorized and 52,923,482.797 units were issued and outstanding as of the Petition Date. Holdco's largest shareholders are Citigroup Venture Capital Equity Partners, L.P., and its respective affiliates (together, "CVC"); Francisco Partners, L.P., and its respective affiliates (together, "FP"); and CVC Capital Partners Asia Pacific II, L.P., and its respective affiliates (together, "CVC Asia"), who together own the majority of Holdco's outstanding Common and Series B Units. CVC, FP and CVC Asia, own, respectively, approximately 34%, 34%, and 18% of the Common Units and 36%, 36%, and 19% of the Series B Units.

A significant portion of the MagnaChip Entities' sales are overseas, primarily in Korea and the Asia Pacific region. Approximately $510.4 million, or 76.5% of total net sales of the MagnaChip Entities for the year ended December 31, 2008, derived from Korea or the Asia Pacific region; approximately $80.8 million or 12.1% of net sales derived from Japan, and approximately $61.3 million, or 9.2%, of net sales derived from North America.

As of December 31, 2008, on an unaudited consolidated basis, MagnaChip reported total assets of approximately $425.4 million, including approximately $76.3 million in accounts receivable and $47.1 million in inventory, and $1,041 million in liabilities, which included $70.2 million in accounts payable and $750 million in the current portion of long-term debt, as discussed more fully below. For the 2008 fiscal year, the MagnaChip Entities, on an unaudited consolidated basis, reported net sales and losses of $601.7 million and $386.5 million, respectively.

## C.      The Debtors' Principal Indebtedness

As summarized below, the Debtors currently owe $845,000,000 in senior and junior secured debt and outstanding unsecured subordinated notes.

As of the Petition Date, the Debtors owed approximately $95,000,000 in First Lien Debt under the First Lien Credit Agreement.

As of the Petition Date, the Debtors have issued a total of approximately $500 million to the Second Lien Noteholders pursuant to the Second Lien Indenture.

The indebtedness owed to the First Lien Lenders (the "First Lien Debt") and the indebtedness owed to Second Lien Noteholders (the "Second Lien Noteholder Debt") are secured by substantially all of the Debtors' assets and the assets of MSK and certain other affiliates of the Debtors (the "Non-Korean Guarantors").

In addition to First Lien Debt and Second Lien Noteholder Debt, the Debtors owe approximately $250 million aggregate principal amount (the "Subordinated Notes") pursuant to the Subordinated Note Indenture.

In addition, the Debtors owe approximately $550,000 in trade debt and approximately $3,250,000 in other prepetition indebtedness.

## D.      Need for Bankruptcy Relief

MagnaChip was acquired in October 2004 in a leveraged buyout from Hynix, and in December 2004 refinanced its debt, issuing the $750 million in First Lien Debt, Second Lien Noteholder Debt, and Subordinated Notes.

Revenues decreased from 2005 to 2006 due to technology changes in the DRAM (dynamic random access memory) business that resulted in the phase-out of semiconductor manufacturing services performed for Hynix, and due to delays in new product development in MagnaChip's display and imaging businesses. The spin-off from Hynix resulted in a loss of core research talent that harmed MagnaChip's ability to win major customer projects.

From 2006 to 2007, revenues increased as MagnaChip divested an unprofitable division and brought in a new Chief Executive Officer, Sang Park. Mr. Park brought new focus on improving the development process, addressing quality issues, and increasing sales activities.

With improving revenues, MagnaChip made a decision in late 2007 to file for an initial public offering of its common stock, with an IPO target in the first quarter of 2008. However, declining customer demand due to an economic downturn, in particular slow sales of the LCD TVs and cell phones in which MagnaChip's products are used, and average selling price declines, all combined to cause a steep decline in MagnaChip's 2008 revenues, and MagnaChip began to experience cash shortfalls in the second fiscal quarter of 2008. MagnaChip attempted to remedy the shortfall through equity and debt financing, but the financial crisis that erupted in the U.S markets expanded into a global economic recession, leading to a shutdown of equity markets and the delay of MagnaChip's IPO. MagnaChip was also unable to obtain debt financing.

MagnaChip experienced steep declines in revenues during 2008 due to contracting customer demand for MagnaChip's products and an overall deterioration in the global economic climate and markets in which MagnaChip operates. In addition, the current global economic recession has led to a shut down of the capital markets, preventing MagnaChip from obtaining the necessary financing to continue their operations.

## E.   First Day Motions and Other Post-Petition Activities

On the Petition Date, the Debtors sought approval from the Bankruptcy Court of certain motions and applications (collectively, the "First Day Motions"), which the Debtors filed simultaneously with, or around the same time as, their voluntary petitions. The Debtors sought this relief to minimize disruption of the Debtors' business operations as a result of the chapter 11 filing, to establish procedures in the Chapter 11 Cases regarding the administration of the Chapter 11 Cases and to facilitate reorganization efforts. Specifically, the First Day Motions and other critical motions during the Chapter 11 Cases addressed the following issues, among others:

### 1.   Joint Administration.

On the Petition Date, the Debtors filed their *Debtors' Motion for Order Directing Joint Administration of Related Chapter 11 Cases* [Docket No. 2]. The six Debtors in these cases are affiliated entities. The Debtors' creditor matrices list approximately 800 potential creditors and parties in interest. The joint administration of the Debtors' Chapter 11 Cases permitted the clerk of the Bankruptcy Court to utilize a single general docket for these cases and combine notices to creditors of the Debtors' respective estates and other parties in interest, which resulted in significant savings to the estates.

On June 15, 2009, the Bankruptcy Court entered its order directing joint administration of these Chapter 11 Cases [Docket No. 22].

### 2.   Employee Benefits.

On the Petition Date, the Debtors filed their *Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a), 363, and 507(a) for an Order Authorizing the Debtors to (I) Pay*

*Prepetition Wages, Salaries, Employee Benefits, and Other Compensation; (II) Remit Withholding Obligations; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests* [Docket No. 12] (the "Wages Motion").

As of the Petition Date, the Debtors employed approximately thirteen salaried employees. None of the Debtors' Employees are subject to a collective bargaining agreement with the Debtors. The Wages Motion sought, among other things, to pay prepetition wages owed to the Debtors' Employees, pay prepetition amounts owed in connection with certain employee benefits, and to continue to pay wages and administer employee benefits postpetition in the ordinary course of business.

On June 15, 2009, the Bankruptcy Court entered its order authorizing the payment of certain prepetition Employee-related claims and the continuation of certain Employee benefits on a postpetition basis [Docket No. 24].

### 3.   Cash Management.

On the Petition Date, the Debtors filed their *Motion of Debtors for Order Under 11 U.S.C. Sections 105, 363, 503(b), 1107 and 1108 Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management Systems, (IV) Providing Administrative Priority Status to Postpetition Intercompany Claims, and (V) Waiver of Section 345(b) Deposit and Investment Requirements* [Docket No. 4] (the "Cash Management Motion").

Prior to the commencement of these cases, certain of the Debtors, in the ordinary course of business, maintained bank accounts with various banks, including Wells Fargo and J.P. Morgan Chase. The Cash Management Motion sought to maintain the Debtors' existing cash management system and bank accounts in the ordinary course of business postpetition.

The Bankruptcy Court entered its interim order granting the relief requested by the Debtors in respect of their cash management system and related relief on June 15, 2009 [Docket No. 25], and scheduled a final hearing on this motion for July 8, 2009.

### 4.   Utilities.

On the Petition Date, the Debtors filed their *Motion of the Debtors for an Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment* [Docket No. 5].

On June 15, 2009, the Bankruptcy Court entered its interim order implementing the procedures proposed by the Debtors to ensure adequate assurance of future payment to utility service providers [Docket No. 26] and scheduled a final hearing on this motion for July 8, 2009.

### 5. Interim Compensation for Professionals.

On the Petition Date, the Debtors filed their *Motion of the Debtors for an Administrative Order Establishing Procedures for Interim Monthly Compensation of Professionals* in order to obtain utility service during the pendency of the Debtors' Chapter 11 Cases [Docket No. 10].

The Debtor sought authority to implement procedures for the application, interim allowance, and payment of Professional Persons on a monthly basis. The Bankruptcy Court scheduled a hearing for this motion to take place on July 8, 2009.

### 6. Lease Rejection.

On the Petition Date, the Debtors filed their *Motion for Order Under Sections 365(a) and 554(a) of the Bankruptcy Code Authorizing the Debtors to (1) Reject Unexpired Leases of Nonresidential Real Property Nunc Pro Tunc to the Petition Date, and (2) Abandon Any Personal Property Located at Such Premises* [Docket No. 13]. This motion seeks to reject certain nonresidential real property leases (the "Real Property Leases") that are no longer necessary for the Debtors' ordinary course business operations and have no value to the Debtors' estates. The Debtors vacated and surrendered the premises leased under the Real Property Leases prior to the Petition Date, and the affected landlords were made aware of the Debtors' intent not to further occupy such premises. The Bankruptcy Court has scheduled a hearing on this motion for July 8, 2009.

The Debtors also filed the: (i) *Motion for Order Under Section 365(a) of the Bankruptcy Code Authorizing the Debtors to Reject Executory Contracts Nunc Pro Tunc to Petition Date* [Docket No. 7]. This motion seeks to reject contracts that are no longer necessary to the Debtors' estates. The Bankruptcy Court has scheduled a hearing on this Motion to take place on July 8, 2009.

### 7. Retention of Key Professionals.

The Debtors sought to employ and retain the firm of Pachulski Stang Ziehl & Jones LLP as their bankruptcy counsel with regard to the filing and prosecution of their Chapter 11 Cases. The Bankruptcy Court has scheduled a hearing on this application for July 8, 2009.

### 8. Cash Collateral Use.

On June 15, 2009, the Bankruptcy Court entered its *Interim Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363 to First Lien Lenders and Second Lien Noteholders and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)* [Docket No. 27] (the "Cash Collateral Order"). The Cash Collateral Order authorized the Debtors, among other things, to use the cash collateral of the First Lien Lenders and Secured Lien Noteholders on an interim basis pursuant to the budget attached to the Cash Collateral Order. The Bankruptcy Court scheduled a final hearing on the Debtors' use of cash collateral for July 8, 2009.

**F.    Appointment of Official Committee**

On June 23, 2009, the Office of the United States Trustee appointed the official committee (the "Official Committee") as the representative of the Debtors' general unsecured creditor constituency in these Chapter 11 Cases. The Official Committee is composed of: Avenue Special Situations Fund V, L.P, c/o Avenue Capital Management II, L.P.; Bank of New York Mellon; and Law Debenture Corporation.

**G.    Bar Date for Filing Proofs of Claim and Administrative Proofs of Claims**

On June 12, 2009, the Debtors filed a motion requesting that the Bankruptcy Court set a deadline by which parties, including governmental units, must file proofs of claim (the "Bar Date Motion"). On June 25, 2009, the Bankruptcy Court entered an order granting the Bar Date Motion and fixed July 29, 2009, as the deadline for filing Claims with the Bankruptcy Court for any claims against the Debtors arising prior to the Petition Date (the "General Bar Date") and December 9, 2009, as the Governmental Units Bar Date. A schedule of the filed proofs of claim is maintained by Omni Management Group, the Debtors' claims agent.

**H.    Filing of Statements and Schedules**

On **[June 29, 2009]**, each of the Debtors filed their respective Schedules of Assets and Liabilities and Statements of Financial Affairs with the Bankruptcy Court, which set forth, *inter alia*, scheduled prepetition claims against the Debtors based on their books and records.

**I.    Sale of the Debtors' Assets and the Assets of the Non-Debtor Affiliates**

Prepetition, and in order to obtain the highest and best price for their assets for the benefit of their economic constituents, the Debtors and their advisors engaged in the marketing for the sale of substantially all of their assets and the assets of the certain Non-Debtor affiliates, including MSK's assets. Throughout October and November 2008, the Debtors attempted to obtain the necessary financing to fund a prepackaged chapter 11 case (the "Financing"), in exchange for which a potential acquirer (the "Potential Acquirer") would acquire new equity in the reorganized Debtors. By December 2008, the Potential Acquirer indicated that it would not be willing to provide the Financing without a private equity partner with experience in the semiconductor industry, and later indicated that it was not willing to provide the Financing even with a partner.

The assets of the MagnaChip Entities have been marketed by the Debtors and their advisors since early December 2008. The Debtors and their advisors began the sale process for the MagnaChip Entities' assets by preparing an offering memorandum in December 2008, and by preparing a list of potential buyers, which included corporations, partnerships, and other entities that may have been interested in acquiring the MagnaChip Entities' assets. The Debtors and their advisors also prepared a separate management presentation that described the MagnaChip Entities' business, its operations, management, financial condition and other relevant information about the MagnaChip Entities in which a potential buyer would be interested.

The Debtors established an electronic data room (the "Data Room"), which was accessed to potential bidders upon the execution of an appropriate confidentiality agreement with the

Debtors. The Data Room contains information describing, *inter alia*, the MagnaChip Entities' assets, contracts and leases, information on the MagnaChip Entities' sales, its customers, employees, facilities, operations data, litigation, and other information available for access and review by a potential purchaser.

The Debtors and their advisors collectively identified a number of potential strategic or financial buyers for the MagnaChip Entities' assets and approached more than forty-five potential buyers to solicit their interest in acquiring the operating assets of the MagnaChip Entities. The Debtors and their advisors addressed inquiries about the MagnaChip Entities' assets and provided responsive information to inquiring potential purchasers. Confidentiality agreements were executed by thirteen prospective buyers, and those parties received the offering memorandum and data room access. The Debtors and their advisors also arranged for prospective purchasers to meet with the MagnaChip Entities' management and tour MSK's facilities.

The Debtors subsequently received five nonbinding indications of interest. Ultimately, as described in greater detail below, the Debtors determined that an investment group led by the Buyer, provided the best opportunity to maximize the return on the sale of the MagnaChip Entities' assets.

The Buyer, on the one hand, and MSK; MSA; Luxco; MagnaChip Semiconductor Inc., a company incorporated in Japan; MagnaChip Semiconductor Limited, a company incorporated in Hong Kong SAR; MagnaChip Semiconductor Limited, a company incorporated in the United Kingdom; and MagnaChip Semiconductor Limited, a company incorporated in Taiwan (together, the "Sellers") are parties to the Business Transfer Agreement ("BTA") that provides for the Sale of substantially all of the Sellers' assets to the Buyer. Under the BTA, the Buyers will (i) pay to the Sellers a purchase price of $80 million, subject to certain adjustments for foreign exchange and certain professional fee expenses and (ii) assume certain liabilities of the Sellers.

The BTA provides for the Sale of the Purchased Assets to the Buyer in consideration of $80,000,000.[4] The Purchased Assets include, among other things, the Sellers' designated contracts, real property, leased and owned personal property, cash and cash equivalents, accounts receivable, inventories, intellectual property, business licenses and franchises and permits, which will be sold to the Buyer pursuant to the terms of and in accordance with the Plan.

The First Lien Lenders, on the one hand, and Finco, Luxco, LLC, and certain debtor and nondebtor guarantors (collectively, the "Loan Parties"), on the other hand, are parties to Enforcement Agreement. The Enforcement Agreement sets forth the terms and conditions upon which the First Lien Lenders will (i) enforce their liens on their collateral by consenting to the Sale and requiring the application of certain of the proceeds thereof to the repayment of the obligations owed to the First Lien Lenders, (ii) permit the use of cash by the Debtors and the other Loan Parties, and (iii) agree to temporarily forbear from exercising certain of those default-related remedies against the other Loan Parties with respect to certain defaults specified in the Enforcement Agreement.

---

[4] The purchase price under the BTA is subject adjustment for to currency fluctuations between the U.S. dollar and Korean Won and other deductions under the BTA.

# IV.
## DESCRIPTION OF THE PLAN

A DISCUSSION OF THE PRINCIPAL PROVISIONS OF THE PLAN AS THEY RELATE TO THE TREATMENT OF CLASSES OF ALLOWED CLAIMS AND INTERESTS IS SET FORTH IN ARTICLES IV THROUGH XI BELOW. THE DISCUSSION OF THE PLAN THAT FOLLOWS CONSTITUTES A SUMMARY ONLY, AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES. YOU ARE URGED TO READ THE PLAN IN FULL IN EVALUATING WHETHER TO ACCEPT OR REJECT THE PROPOSED PLAN OF LIQUIDATION. IF ANY INCONSISTENCY EXISTS BETWEEN THIS SUMMARY AND THE PLAN, THE TERMS OF THE PLAN CONTROL. ALL CAPITALIZED TERMS NOT OTHERWISE DEFINED HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

### A.    Summary of the Plan

The Plan provides for the satisfaction of Claims against the Debtors and the enforcement of the First Lien Lender Secured Claims through (a) the authorization by the Debtors of the sale of substantially all of the assets of the Selling Non-Debtors, which are direct or indirect foreign subsidiaries of the Debtors, which sale will be conducted under applicable nonbankruptcy law, and (b) the sale of substantially all of the assets of Debtor MSA, certain assets of Debtor Luxco, and the assignment of certain contracts owned by LLC through the Plan.

The Plan categorizes the Claims against and Interests in each Debtor into distinct Classes. In accordance with the Bankruptcy Code, Administrative Claims and Tax Claims are not classified into Classes. The Plan also provides that expenses incurred by the Debtors during the Chapter 11 Cases will be paid in full (or as may otherwise be agreed by any such party) and specifies the manner in which Holders of Allowed Claims in each Class will be treated. In the event there is any discrepancy between the description of the Plan's treatment of creditors in this Disclosure Statement from that set forth in the Plan, the terms of the Plan are controlling.

### B.    Treatment of Administrative Expenses and Tax Claims

#### 1.    Overview.

As required by the Bankruptcy Code, Administrative Expenses, Superpriority Claims, and Tax Claims are not placed into voting Classes. Instead, they are left unclassified, are not considered Impaired, do not vote on the Plan, and receive treatment specified by statute or agreement of the parties. All postpetition payments by or on behalf of any of the Debtors in respect of an Administrative Expense or Tax Claim shall either reduce the Allowed amount thereof or reduce the amount to be paid under the Plan in respect of any Allowed amount thereof; and, unless the Bankruptcy Court has specified otherwise prior to Confirmation, the Debtors or the Liquidating Debtors shall, in their sole and absolute discretion, determine which such method of application to employ.

#### 2.    Administrative Expenses.

Under the Plan, on the Effective Date, each Holder of an Allowed Administrative Expense will receive, in full satisfaction, settlement, and release of such Allowed Administrative

Expense, Cash equal to the full amount of such Allowed Administrative Expense, unless such Holder and any of the Debtors have mutually agreed in writing to other terms, or an order of the Bankruptcy Court provides for other terms; provided, however, that (a) requests for payment of all Administrative Expenses must be Filed and served as described in Article XIV(B)(3) of the Plan and (b) certain different and additional requirements shall apply to the Administrative Expenses that are Fee Claims as set forth in Article XIV(B)(2) of the Plan.

### 3. Superpriority Claims.

No distribution to the First Lien Lender Parties shall be made on account of any Superpriority Claims except as set forth in Article IV(B)(3) of the Plan. Inasmuch as the Claims of the Second Lien Noteholders are deemed unsecured, the Second Lien Noteholders shall not have any Allowed Superpriority Claims.

### 4. Tax Claims.

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Tax Claims are not to be classified and thus Holders of Tax Claims are not entitled to vote to accept or reject the Plan.

As required by section 1129(a)(9) of the Bankruptcy Code, on or as soon as practicable after the Effective Date, each Holder of an Allowed Tax Claim against any of the Debtors will receive, in full satisfaction, settlement, and release of such Allowed Tax Claim, Cash equal to the portion of the Allowed Tax Claim due and payable on or prior to the Effective Date according to applicable nonbankruptcy law. Any Allowed Tax Claim (or portion thereof) against MSA or Luxco not yet due and payable as of the Effective Date will be paid by the Buyer and any Allowed Tax Claim against any other Debtor shall be paid by the Plan Representative, no later than when due and payable under applicable nonbankruptcy law without regard to the commencement of the Chapter 11 Cases; provided that (1) any default prior to the Effective Date with respect to Tax Claims against any of the Debtors shall be deemed cured and (2) upon request of any of the Debtors, the Bankruptcy Court shall determine the amount of any Disputed Claim for, or issues pertaining to, Tax Claims. Any Holder of a Tax Claim may agree to accept different treatment as to which the Debtors and such Holder have agreed upon in writing.

### C. Classification and Treatment of Classified Claims and Interests

### 1. Overview.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes only to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for the

classification of seven Classes of Claims and/or Interests against each Debtor. For purposes of voting and distribution, each Debtor will be assigned a subclass of each Class as follows: (A) LLC, (B) Holdco, (C) MSA, (D) Luxco, (E) Finco, and (F) Dutchco. Administrative Expenses, Superpriority Claims, and Tax Claims have not been classified and are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code.

### 2. Classification and Treatment of Claims and Interests.

The treatment of each Class of Claims and/or Interests is set forth below. Unless the Bankruptcy Court has specified otherwise prior to Confirmation, the Debtors shall, in their sole and absolute discretion, determine whether a postpetition payment by or on behalf of any of the Debtors in respect of a Claim either (x) shall reduce the Allowed amount thereof or (y) shall reduce the amount to be paid under the Plan in respect of any Allowed amount thereof.

#### a. Class 1 (A-F) – Priority Non-Tax Claims

 i <u>Classification</u>: Classes 1 (A-F) consist of all Priority Non-Tax Claims against any of the Debtors.

 ii <u>Treatment</u>: The Holder of each Priority Non-Tax Claim shall receive, in full satisfaction, settlement, and release of such Priority Non-Tax Claim, either: (a) with respect to Priority Non-Tax Claims against the Selling Debtors, assumption of such Claim as part of the Assumed Liabilities under the Business Transfer Agreement, or (b) with respect to Priority Non-Tax Claims against the Debtors that are not Selling Debtors, a Cash payment equal to the Allowed amount of such Claim on or as soon as practicable after the later of the Effective Date or the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim. Any Holder of a Priority Non-Tax Claim may agree to accept different treatment as to which the Debtors and such Holder have agreed upon in writing.

 iii *Impairment/Voting*: Classes 1 (A-F) are impaired. Holders of Class 1 (A-F) Claims therefore are entitled to vote to accept or reject the Plan.

#### b. Class 2 (A-F) – Other Secured Claims

 i <u>Classification</u>: Classes 2 (A-F) consist of all Other Secured Claims (if any such Claims exist) against any of the Debtors.

 ii <u>Treatment</u>: On or as soon as practicable after the Effective Date, in full satisfaction, settlement and release of each Other Secured Claim, either: (i) if the collateral is part of the Purchased Assets, the Buyer will assume the obligation to pay such Other Secured Claim and the Holder of such Claim shall retain its Lien on its collateral unless and until Claim is paid in full or the collateral is

subsequently sold by the Buyer and the proceeds of such sale, less costs and expenses of disposing of such collateral, shall be paid to such Holder in full satisfaction and release of such Allowed Other Secured Claim or (ii) if the collateral is not part of the Purchased Assets, the collateral securing the Creditor's Other Secured Claim shall be abandoned to such Creditor, in full satisfaction and release of such Other Secured Claim.

iii    <u>Impairment/Voting</u>:  Classes 2 (A–F) are Impaired.  Holders of Class 2 (A–F) Claims are therefore entitled to vote to accept or reject the Plan.

**c.        Class 3 (A-F) – First Lien Lender Secured Claims**

i    <u>Classification</u>:  Classes 3 (A-F) consist of the First Lien Lender Secured Claims against any of the Debtors.

ii    <u>Treatment</u>:  On the Effective Date in connection with the enforcement of the First Lien Lender Secured Claims, each First Lien Lender Party shall receive a Pro Rata share (calculated as a percentage of First Lien Lender Secured Claims) of the Net Sale Proceeds to be paid directly to the Agent in its capacity as sub-agent for the Collateral Trustee and deemed distributed to the Agent on behalf of the First Lien Lender Parties in accordance with the Intercreditor Agreement and the First Lien Credit Agreement.  In addition, on the Effective Date in connection with the enforcement of the First Lien Lender Secured Claim, the Agent shall receive for the benefit of the First Lien Lender Parties, based on their Pro Rata shares (calculated as a percentage of First Lien Lender Secured Claims), all of the Distributable Cash and Claims of all of the Debtors other than the Cash of MSA.  Finally, from time to time in the discretion of the Plan Representative, but not less than once every three months if proceeds are available to warrant such a distribution, the Agent shall receive for the benefit of the First Lien Lender Parties, based on their Pro Rata shares (calculated as a percentage of First Lien Lender Secured Claims), any proceeds of any Distributable Assets of any of the Debtors other than the Distributable Cash and Claims.  All distributions to the First Lien Lender Parties under the Plan shall be effectuated through the Agent.  In consideration for the distributions the First Lien Lender Parties are to receive hereunder, the Liens on the Purchased Assets and Distributable Assets securing the First Lien Lender Secured Claims will be released and extinguished as of the Effective Date in accordance with section 5.1(a)(2) of the Intercreditor Agreement and of no further force or effect; provided, however, that such Liens on the Purchased Assets shall attach to the proceeds thereof with the same priority as they attached to the

Purchased Assets and the First Lien Lender Parties shall retain their Liens on all assets of Luxco, Finco and the First Lien Guarantors other than the Purchased Assets and Distributable Assets. The First Lien Lender Secured Claims, together with any Deficiency Claims of the First Lien Lender Parties, are deemed Allowed in the full amount reflected on the Agent's books and records as of the Record Date.

iii    <u>Impairment/Voting</u>: Classes 3 (A-F) are Impaired. Holders of Class 3 (A-F) Claims are therefore entitled to vote to accept or reject the Plan.

**d.    Classes 4 (A-F) – Second Lien Noteholder Claims**

i    <u>Classification</u>: Classes 4 (A–F) consist of the Second Lien Notcholder Claims against any of the Debtors.

ii    <u>Treatment</u>: If Classes 4 (A–F) and Classes 5 (A–F) vote to accept the Plan, then on or as soon as practicable after the Effective Date, each Second Lien Noteholder shall receive, in full satisfaction, settlement, and release of such Second Lien Noteholder Claim and in consideration for the release of the Korean Guarantee, a Pro Rata share (calculated as a percentage of Second Lien Noteholder Claims, General Unsecured Claims, and Subordinated Noteholder Claims, as of the Record Date), together with Holders of General Unsecured Claims and Holders of Subordinated Note Claims, of the Unsecured Creditor Distribution. All distributions to the Second Lien Noteholders under the Plan, if any, shall be effectuated through the Second Lien Noteholder Trustee (i.e., the Debtors shall distribute the portion of the Unsecured Creditor Distribution payable to the Second Lien Noteholders to the Second Lien Noteholder Trustee and the Second Lien Noteholder Trustee shall make proportionate distributions thereof to the Second Lien Noteholders). Pursuant to section 5.1(a)(2) of the Intercreditor Agreement, the existing Liens securing the Second Lien Noteholder Claims shall be released and extinguished effective as of the Effective Date and of no further force or effect. If Classes 4 (A-F) and 5 (A-F) do not vote to accept the Plan, Holders of Class 4 (A-F) Claims will receive no distribution on account of such Claims.

iii    <u>Impairment/Voting</u>: Classes 4 (A-F) are Impaired. Holders of Class 4 (A-F) Claims are therefore entitled to vote to accept or reject the Plan.

**e.    Class 5 (A-F) – General Unsecured Claims**

      i        <u>Classification</u>: Classes 5 (A–F) consist of the General Unsecured Claims against any of the Debtors.

      ii     <u>Treatment</u>: If Classes 4 (A–F) and Classes 5 (A–F) vote to accept the Plan, then each Holder of a Class 5 (A-F) Claim shall receive, in full satisfaction, settlement, and release of such Claim, a Pro Rata Share (calculated as a percentage of Second Lien Noteholder Claims, General Unsecured Claims, and Subordinated Noteholder Claims, as of the Record Date), together with Holders of Second Lien Noteholder Claims and Holders of Subordinated Note Claims, of the Unsecured Creditor Distribution. In addition, Holders of General Unsecured Claims shall benefit from the Debtors' general release of Avoidance Claims set forth in Article IX(C) of the Plan. The First Lien Lender Parties hereby waive any distribution of the Unsecured Creditor Distribution on account of their Deficiency Claims. If Classes 4 (A-F) and 5 (A-F) do not vote to accept the Plan, Holders of Class 5 (A-F) Claims will receive no distribution on account of their Claims.

      iii    <u>Impairment/Voting</u>: Classes 5 (A-F) are Impaired. Holders of Class 5 (A-F) Claims are therefore entitled to vote to accept or reject the Plan.

## f.    Class 6 (A-F) – Subordinated Note Claims

      i        <u>Classification</u>: Classes 6 (A-F) consist of the Subordinated Note Claims against Debtors any of the Debtors.

      ii     <u>Treatment</u>: If Classes 4 (A–F) and 5 (A–F) vote to accept the Plan, then each Holder of a Class 6 (A-F) Claim shall receive its Pro Rata share (calculated as a percentage of Second Lien Noteholder Claims, General Unsecured Claims, and Subordinated Noteholder Claims as of the Record Date), together with Holders of Second Lien Noteholder Claims and Holders of General Unsecured Claims, of the Unsecured Creditor Distribution; provided, however, that in accordance with the subordination provisions in the Subordinated Note Indenture, all distributions to Holders of Class 6 (A-F) Claims shall be paid to the Second Lien Noteholder Trustee for distribution to Second Lien Noteholders on a Pro Rata basis (calculated as a percentage of Second Lien Noteholder Claims). If Classes 4(A-F) and 5(A-F) do not vote to accept the Plan, Holders of Class 6(A-F) claims will receive no distribution on account of their Claims.

      iii    <u>Impairment/Voting</u>: Class 6 is Impaired. Because Holders of Class 6 Claims shall receive no recovery on account of such

Claims under the Plan, they are conclusively presumed to reject the Plan.

g.   **Class 7 (A–F) – Intercompany Claims against the Debtors**

   i   <u>Classification</u>: Classes 7 (A–F) consist of Intercompany Claims of Debtors and Non-Debtor Affiliates against the Debtors.

   ii  <u>Treatment</u>: Holders of Intercompany Claims against the Debtors shall receive no distributions or recoveries on account of such Claims and such Claims shall be extinguished on the Effective Date.

   iii <u>Impairment/Voting</u>: Classes 7 (A-F) are Impaired. Because Holders of Class 7 (A-F) Claims receive no recovery on account of such Claims under the Plan, they are conclusively presumed to reject the Plan.

h.   **Class 8 (A-F) – Interests in the Debtors**

   i   <u>Classification</u>: Classes 8 (A–F) consist of Interests in the Debtors.

   ii  <u>Treatment</u>: Holders of Interests in the Debtors shall receive no distributions or recoveries on account of such Interests and such Interests shall be extinguished on the Effective Date.

   iii <u>Impairment/Voting</u>: Classes 8 (A–F) are Impaired. Because Holders of Interests in Class 8 (A-F) receive no recovery on account of such Interests under the Plan, they are conclusively presumed to reject the Plan.

## D.   <u>Treatment of Executory Contracts and Unexpired Leases</u>

### 1.   **Assumption and Rejection of Executory Contracts and Unexpired Leases.**

Except for any executory contracts or unexpired leases: (i) that are listed as Assigned Contracts on Exhibit "C" to the Plan; (ii) that previously were assumed or rejected by an order of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code; (iii) as to which a motion for approval of the assumption or rejection of such contracts or leases has been Filed and served prior to Confirmation; or (iv) that constitute contracts of insurance in favor of, or that benefit, the Debtors or the Estates, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to section 365 of the Bankruptcy Code as of the Effective Date. The Assigned Contracts shall be assumed by the applicable Debtor and assigned to the Buyer on the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. On the Effective Date, the Debtors shall pay any cure costs associated with any Assigned Contracts owned by the Debtors (i.e., claims of non-Debtor contract parties

against the Debtors for monetary damages for breaches of such Assigned Contracts) from the Cash of MSA. There are no cure costs associated with the Assigned Contracts that belong to LLC.

## 2. Objections to Assumption of Executory Contracts and Unexpired Leases.

a. Objection Procedure Generally. Any party objecting to any Debtor proposed assumption of an executory contract or unexpired lease based on a lack of adequate assurance of future performance or on any other ground including the adequacy of the "cure" amount set forth on Exhibit "C" to the Plan shall file and serve a written objection to the assumption of such contract or lease by the deadline to object to Confirmation. Failure to timely file an objection shall constitute consent to the assumption and assignment of those contracts and leases, including an acknowledgment that the proposed assumption provides adequate assurance of future performance and that the applicable "cure" amount set forth on Exhibit "C" to the Plan is proper and sufficient for purposes of section 365 of the Bankruptcy Code.

b. Objection Based on Grounds Other Than "Cure" Amount. If any party timely and properly files an objection to assumption based on any ground other than the adequacy of the applicable "cure" amount set forth on Exhibit "C" to the Plan and the Bankruptcy Court ultimately determines that any Debtor cannot assume the executory contract or lease or that the Buyer cannot provide adequate assurance of future performance as proposed, then the unexpired lease or executory contract shall automatically thereupon be deemed to have been excluded from the Exhibit "C" to the Plan and shall be rejected.

c. Objection Based on "Cure" Amount. If any party timely and properly files an objection to assumption based on the adequacy of the applicable "cure" amount set forth Exhibit "C," and such objection is not resolved between the Debtors and the objecting party, the Bankruptcy Court shall resolve such dispute at the Confirmation Hearing or another hearing date to be determined by the Bankruptcy Court. The resolution of such dispute shall not affect the assumption and assignment of the executory contract or lease that is the subject of such dispute but rather shall affect only the "cure" amount the Debtors must pay in order to assume such contract or lease and assign it to the Buyer. Notwithstanding the immediately preceding sentence, if the Debtors and the Buyer in their discretion determine that the amount asserted to be the necessary "cure" amount would, if ordered by the Bankruptcy Court, make the assumption and assignment of the executory contract or lease imprudent, then the Debtors may elect to (1) reject the executory contract or lease, or (2) request an expedited hearing on the resolution of the "cure" dispute, exclude assumption or rejection of the contract or lease from the scope of the Confirmation Order, and retain the right to reject the executory contract or lease pending the outcome of such dispute.

## 3. Payment Related to Assumption of Executory Contracts and Unexpired Leases.

If not the subject of dispute as of the Confirmation Date, any monetary defaults under each executory contract and unexpired lease to be assumed under the Plan shall be satisfied by the Debtors from the Cash of MSA, pursuant to section 365(b) of the Bankruptcy Code: (i) by payment of (1) the applicable "cure" amount set forth in the schedule of Assigned Contracts, (2)

such other amount as ordered by the Bankruptcy Court, or (3) such other amount as agreed upon by MSA, in Cash within thirty days following the Effective Date; or (ii) on such other terms as agreed to by the parties to such executory contract or unexpired lease. In the event of a dispute regarding the appropriate "cure" amount, payment of the amount otherwise payable hereunder shall be made following entry of a Final Order or agreement by the Debtors or Liquidation Debtors, as the case may be.

### 4. Bar Date for Rejection Damages.

If the rejection of an executory contract or unexpired lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Liquidating Debtors, or their Estates unless a proof of Claim is Filed and served on the Debtors and their counsel within thirty days after the earlier of (a) Confirmation or (b) service of a notice that the executory contract or unexpired lease has been rejected. All such Claims for which proofs of Claim are required to be Filed, if Allowed, will be, and will be treated as, General Unsecured Claims, subject to the provisions of the Plan.

### E. Plan Provisions Regarding Distribution

### 1. Dates of Distribution.

The sections of the Plan on treatment of Administrative Expenses, Claims, and Interests specify the times for distributions. Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day. Distributions due on the Effective Date will be paid on such date or as soon as practicable thereafter; provided, that if other provisions of the Plan require the surrender of securities or establish other conditions precedent to receiving a distribution, the distribution may be delayed until such surrender occurs or conditions are satisfied.

If, under the terms of the Plan, the resolution of a particular Disputed Claim, e.g., it is Disallowed, entitles other Holders of Claims to a further distribution, either (a) the Liquidating Debtors may make such further distribution as soon practicable after the resolution of the Disputed Claim or (b) if the further distribution is determined in good faith, by the Liquidating Debtors to be less than $100 for any Creditor, then, in order to afford the Liquidating Debtors an opportunity to minimize costs and aggregate such distributions, the Liquidating Debtors may make such further distribution any time prior to sixty days after the Final Resolution Date.

### 2. Cash Distributions.

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Liquidating Debtors, except that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

In the event the Cash available for distribution is $1,000 or less, the Plan Representative may determine that making further distributions is not practical and may instead takes steps to

close the Estates and distribute the remaining Cash to an organization exempt from U.S. federal income tax under section 501(c) (3) of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code").

### 3. Rounding of Payments.

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent. To the extent Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as "Unclaimed Property" under the Plan.

### 4. Disputed Claims.

Notwithstanding all references in the Plan to Claims that are Allowed, in undertaking the calculations concerning Allowed Claims or Allowed Administrative Expenses under the Plan, including the determination of the amount or number of distributions due to the Holders of Allowed Claims and Allowed Administrative Expenses, each Disputed Claim shall be treated as if it were an Allowed Claim or Allowed Administrative Expense, except that if the Bankruptcy Court estimates the likely portion of a Disputed Claim to be Allowed or authorized or otherwise determines the amount or number that would constitute a sufficient reserve for a Disputed Claim (which estimates and determinations may be requested by the Debtors), such amount or number as determined by the Bankruptcy Court shall be used as to such Claim.

Distributions of non-Cash consideration due in respect of a Disputed Claim shall be held and not made pending resolution of the Disputed Claim.

After an objection to a Disputed Claim is withdrawn, resolved by agreement, or determined by Final Order, the distributions due on account of any resulting Allowed Claim, Allowed Interest, or Allowed Administrative Expense shall be made by the Liquidating Debtors. Such distribution shall be made within forty-five days of the date that the Disputed Claim becomes an Allowed Claim or Allowed Administrative Expense. No interest shall be due to a Holder of a Disputed Claim based on the delay attendant to determining the allowance of such Claim, Interest, or Administrative Expense.

### 5. Undeliverable and Unclaimed Distributions.

If any distribution under the Plan is returned to the Liquidating Debtors as undeliverable or the check or other similar instrument or distribution by the Liquidating Debtors remains uncashed or unclaimed, as applicable, for 120 days, such Cash shall be deemed to be "Unclaimed Property." Upon property becoming Unclaimed Property, it immediately shall be revested in the Liquidating Debtors.

Pending becoming Unclaimed Property, such Cash will remain in the possession of the Liquidating Debtors and, if the Liquidating Debtors are notified in writing of a new address for the relevant Holder, they shall cause distribution of the Cash within forty-five days thereafter.

Once there becomes Unclaimed Property for a Holder, no subsequent distributions for such Holder that may otherwise be due under the Plan will accrue or be held for such Holder,

provided that, if the applicable agent is notified in writing of such Holder's then-current address and status as a Holder under the Plan, thereafter, the Holder will become entitled to its share of distributions, if any, which first become due after such notification.

**6.     Compliance With Tax Requirements.**

The Liquidating Debtors shall comply with all withholding and reporting requirements imposed by federal, state, or local taxing authorities in connection with making distributions pursuant to the Plan.

In connection with each distribution with respect to which the filing of an information return (such as an IRS Form 1099 or 1042) or withholding is required, the Liquidating Debtors shall file such information return with the IRS and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law. With respect to any Person from whom a tax identification number, certified tax identification number, or other tax information required by law to avoid withholding has not been received by the Liquidating Debtors, the Liquidating Debtors may, in their sole option, withhold the amount required and distribute the balance to such Person or decline to make such distribution until the information is received; provided, however, that the Liquidating Debtors shall not be obligated to liquidate any securities to perform such withholding.

**7.     Record Date in Respect to Distributions.**

Except as set forth below, the record date and time for the purpose of determining which Persons are entitled to receive any and all distributions on account of any Allowed Claims or Interests, irrespective of the date of or number of distributions, shall be the same as the Record Date.

At the date and time of the Record Date, the Agent's registers with respect to the First Lien Lender Secured Claims shall be deemed closed for purposes of determining whether a Holder of a First Lien Lender Secured Claim is a record holder entitled to distributions under the Plan. Neither the Liquidating Debtors nor the Agent shall have any obligation to recognize, for purposes of distributions pursuant to or in any way arising under the Plan, any First Lien Lender Secured Claim or Claim arising therefrom or in connection therewith that is transferred after the time of the Record Date. Instead, they all shall be entitled to recognize and deal for distribution purposes with only those record holders of the First Lien Lender Secured Claims as of the Record Date irrespective of the number of distributions to be made under the Plan or the date of such distributions.

**8.     Reserves.**

In making any distributions in respect of Claims under the Plan, the Liquidating Debtors shall reserve an appropriate and adequate amount of Cash on account of any unresolved Disputed Claims. The Liquidating Debtors shall make a corrective distribution following the successful resolution of any Disputed Claim on the earlier of the next regularly scheduled distribution date or each six-month anniversary of the Effective Date.

9.    **Conditions to Receiving Distributions.**

As a condition to receiving any distribution under the Plan, each Holder of an Allowed Claim shall have executed and delivered such agreements, documents, and instruments as may be reasonably required by the Debtors or Liquidating Debtors. Any Holder of an Allowed Claim that fails to execute and deliver such agreements, documents, and instruments or fails to take such action as may be reasonably requested by the Debtors or Liquidating Debtors before the first anniversary of the later to occur of (a) the availability of the agreements, documents, and instruments required by the Debtors or the Liquidating Debtors and (b) the Effective Date may not participate in any distribution under the Plan with respect to such Allowed Claim. Any distribution forfeited hereunder shall be ratably reallocated among complying Holders of the applicable Class. The Debtors acknowledge that the First Lien Lender Parties have delivered all necessary agreements, documents, and instruments and have taken all necessary actions required pursuant to this Article VIII.I.

10.    **Subordination.**

Pursuant to section 510(a) of the Bankruptcy Code, nothing herein shall be deemed to limit any subordination agreement or intercreditor agreement, including, without limitation, the Intercreditor Agreement and Article X of the Subordinated Note Indenture, that is otherwise enforceable under applicable nonbankruptcy law. Accordingly, distributions hereunder will be made subject to any enforceable subordination or intercreditor agreement known to the Debtors. Creditors that are parties to any such enforceable subordination or intercreditor agreements shall notify the Debtors of their existence in advance of the Effective Date and shall provide the Debtors with copies of such agreements, or identify such agreements if they are already in the Debtors' possession. Failure to do so shall be deemed a waiver of such rights.

**F.    Plan Provisions Regarding Litigation, Objections to Claims, and Determination of Taxes**

1.    **Litigation; Objections to Claims; Objection Deadline.**

Except as may be expressly provided otherwise in the Plan, the Liquidating Debtors shall be responsible for any objection to the allowance of any Claim, and the determination of Tax issues and liabilities.

As of the Effective Date, the Liquidating Debtors shall have exclusive authority to file objections, settle, compromise, withdraw, or litigate to judgment objections to Claims. Unless another date is established by the Bankruptcy Court (which may so act without notice or hearing) or is established by other provisions of the Plan, any objection to a Claim shall be Filed with the Bankruptcy Court and served on the Person holding such Claim within ninety days after the Effective Date (the "Objection Deadline"), provided that the Liquidating Debtors may seek extension(s) thereof subject to Bankruptcy Court approval.

In addition to any other available remedies or procedures with respect to Tax issues or liabilities, the Liquidating Debtors, at any time, may utilize (and receive the benefits of) section 505 of the Bankruptcy Code with respect to: (1) any Tax issue or liability relating to an act or event occurring prior to the Effective Date or (2) any Tax liability arising prior to the Effective

Date. If the Liquidating Debtors utilize section 505(b) of the Bankruptcy Code: (1) the Bankruptcy Court shall determine the amount of the subject Tax liability in the event that the appropriate governmental entity timely determines a Tax to be due in excess of the amount indicated on the subject return and (2) if the prerequisites are met for obtaining a discharge of Tax liability in accordance with section 505(b) of the Bankruptcy Code, the Liquidating Debtors shall be entitled to such discharge, which shall apply to any and all Taxes relating to the period covered by such return.

## 2.    Temporary or Permanent Resolution of Disputed Claims.

The Liquidating Debtors may request, at any time prior to the Effective Date or on and after the Effective Date, that the Bankruptcy Court estimate any contingent or unliquidated Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, irrespective of whether any party has previously objected to such Disputed Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any contingent or unliquidated Disputed Claim at any time during litigation concerning any objection to the Disputed Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Disputed Claim, that estimated amount would constitute either the Allowed amount of such Disputed Claim or a maximum limitation on such Disputed Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Disputed Claim, the Liquidating Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on account of such Disputed Claim. In addition, the Liquidating Debtors may resolve or adjudicate any Disputed Claim in the manner in which the amount of such Claim, Interest, or Administrative Expense and the rights of the Holder of such Claim, Interest, or Administrative Expense would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced. All of the aforementioned objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another.

## 3.    Release of Avoidance Actions.

Each of the Debtors releases, waives, and agrees not to prosecute or pursue any Avoidance Claims.

## 4.    Preservation of Retained Rights of Action.

In accordance with section 1123(b) of the Bankruptcy Code, the Agent, as the successor and assign of the Debtors, and any future assigns of the Agent, will retain and may exclusively enforce any Retained Rights of Action and the Confirmation Order shall be deemed a *res judicata* determination of such rights to retain and exclusively enforce such Retained Rights of Action. The Retained Rights of Action may be asserted or prosecuted before or after solicitation of votes on the Plan or before or after the Effective Date.

Absent an express waiver or release set forth in the Plan, nothing in the Plan shall (or is intended to) prevent, estop, or be deemed to preclude the Agent or its successors or assigns from utilizing, pursuing, prosecuting, or otherwise acting upon all or any of their Retained Rights of Action and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res*

*judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches shall apply to such Retained Rights of Action upon or after Confirmation or Consummation. Retained Rights of Action include, without limitation, all Intercompany Claims held by any Debtor against any non-debtor entity, including those claims set forth in the Schedules and identified in the Statements of Financial Affairs filed by each of the Debtors in the Bankruptcy Court.

## V.
## ACCEPTANCE OR REJECTION OF PLAN

### A.      Classes Permitted and Not Permitted to Vote

Classes 1 through 8 are Impaired. Holders of Claims in Classes 1, 2, 3, 4 and 5 are permitted to vote to accept or reject the Plan. Holders of Claims and Interests in Classes 6, 7 and 8 are conclusively presumed to reject the Plan. An Impaired Class of Claims that votes shall have accepted the Plan if (a) the Holders (other than any Holder designated by the Bankruptcy Court based on their vote or its solicitation not being in good faith under Bankruptcy Code section 1126(e)) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under Bankruptcy Code section 1126(e)) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. An Impaired Class of Interests that votes shall have accepted the Plan if the Holders (other than any Holder designated under section 1126(e)) of at least two-thirds in amount of the Allowed Interests actually voting in such Class have voted to accept the Plan.

### B.      Nonconsensual Confirmation

In the event any Class of Claims or Interests votes to reject the Plan, the Debtors intend to request that the Bankruptcy Court confirm the Plan notwithstanding such rejection pursuant to section 1129(b) of the Bankruptcy Code on the basis that the Plan is fair and equitable and does not discriminate unfairly as to the Holders of any Class of Claims or Interests.

## VI.
## MEANS FOR IMPLEMENTATION OF THE PLAN

The First Lien Lender Parties are enforcing their Liens through the Plan and, subject to the terms and conditions set forth in the Enforcement Agreement, will consent to the Sale in connection with such enforcement. The entry of the Confirmation Order shall act as an order (a) authorizing the Debtors, as direct and indirect owners of the Selling Non-Debtors, to authorize the Selling Non-Debtors to sell the Acquired Assets owned by the Selling Non-Debtors and assign the Acquired Contracts and the Assumed Liabilities owned by the Selling Non-Debtors to the Buyer pursuant to applicable nonbankruptcy law and (b) authorizing and approving the Sale (as to MSA and Luxco only) of the Acquired Assets owned by Debtors MSA and Luxco subject to Other Secured Claims and free and clear of all other Liens, Claims, and encumbrances (with such other Liens, Claims, and encumbrances to attach to the proceeds of the Sale in accordance with the terms of the Plan), the assumption by Debtors MSA and LLC and assignment to Buyer of the Acquired Contracts owned by MSA and LLC, and the assignment by Debtors MSA to the

Buyer of the Assumed Liabilities, and authorizing Debtor MSA and Luxco to perform the Business Transfer Agreement. On the Effective Date, the Business Transfer Agreement shall be binding upon and enforceable against MSA and Luxco, the Liquidating Debtors, and the Plan Representative. The Business Transfer Agreement and Enforcement Agreement are incorporated herein and shall control with respect to the subject matters addressed therein.

As is set forth on **Exhibit "C"** hereto, the Adjusted Sale Proceeds will be paid on the Sale Closing Date to the Agent in its capacity as sub-agent for the Collateral Trustee. The Agent will apply the Net Sale Proceeds to payment of the loans and other obligations outstanding under the First Lien Credit Agreement and as otherwise agreed by the First Lien Lender Parties. In addition, the Agent shall make certain payments from the Adjusted Sale Proceeds to Debtor MSA from time to time as directed in writing by the Plan Representative when Claims are Allowed, in an aggregate amount not to exceed the sum of the following (unless otherwise agreed by Agent in writing): (i) the Case Expenses, (ii) the Unsecured Creditor Distribution, and (iii) Priority Claim Distributions.

## A. Release of Liens/Secured Lien Guaranties/Subordinated Note Guarantees

### 1. Release of Liens on Purchased Assets.

On the Effective Date, all Liens securing the First Lien Lender Claims and the Second Lien Noteholder Claims on the Purchased Assets shall be deemed fully released as a result of the First Lien Lender Parties' enforcement of their Liens through the Plan in accordance with section 5.1(a)(2) of the Intercreditor Agreement; provided, however, that the Liens of the First Lien Lender Parties shall attach to the Adjusted Sale Proceeds in the same priority and to the same extent as they attached to the Purchased Assets. The Agent, the Second Lien Noteholder Trustee, the Second Lien Collateral Agent, and the Collateral Trustee shall be authorized and directed to release any collateral or other property of the Sellers held by them on behalf of Holders of the Second Lien Noteholder Claims and to take such actions and execute and deliver such documents as may be requested by the Debtors, the Plan Representative or the Liquidating Debtors to evidence the release of all Liens securing the Second Lien Noteholder Claims, including, without limitation, the execution, delivery and filing or recording of such releases as may be requested by the Debtors, the Plan Representative or the Liquidating Debtors, in lieu of delivery, of the documents otherwise required pursuant to section 5.1(b) of the Intercreditor Agreement.

### 2. Release of Second Lien Guarantees.

The Non-Korean Guarantors' obligations under the Second Lien Guarantees shall be deemed fully released on the Effective Date as a result of the sale or disposition of substantially all of the assets of the Non-Korean Guarantors in accordance with section 12.05 of the Second Lien Indenture. The Second Lien Noteholder Trustee shall be authorized and directed to take any action and execute and deliver any documents as may be requested by the Debtors to release any collateral or other property of the Debtors held by the Second Lien Noteholder Trustee. In addition, if Classes 4 and 5 accept the Plan, the Korean Guarantee will be released on the Effective Date in consideration for the Unsecured Creditor Distribution.

3. **Release of Subordinated Note Guarantees.**

The Subordinated Note Guarantors' obligations under the Subordinated Note Guarantees shall be deemed fully released on the Effective Date as a result of the disposition of all or substantially all of the assets of such Subordinated Note Guarantors pursuant to the Business Transfer Agreement in accordance with Section 12.05 of the Subordinated Note Indenture. The Subordinated Noteholder Trustee shall be authorized and directed to take any action and execute and deliver any documents as may be requested by the Debtor to acknowledge the release of any claims against the Non-Korean Guarantors on account of the Subordinated Note Guarantees.

**B.     Continued Corporate Existence and Vesting of Assets**

The Debtors will, as the Liquidating Debtors, continue to exist on and after the Effective Date as separate corporate Entities, with all of the powers of corporations under the applicable nonbankruptcy law, and without prejudice to any right to alter or terminate their existence (whether by merger or otherwise), provided that the Liquidating Debtors' sole purpose from and after the Effective Date will be to make distributions to Creditors consistent with the Plan and to otherwise effectuate the Wind-Down. Except as otherwise provided in the Plan, on and after the Effective Date, the Cash of MSA and all other Distributable Assets of the Debtors, except for Distributable Cash and Claims, will vest in the Liquidating Debtors free and clear of all Claims, Liens, charges, other encumbrances, and Interests; provided, however, that the Cash of MSA and proceeds of such other Distributable Assets of the Debtors shall be distributed only in accordance with the Plan.

**C.     Retained Rights of Action**

Unless a Right of Action is in writing, expressly waived, relinquished, released, compromised, or settled in the Plan, or in a Final Order, as of the Effective Date, all rights with respect to such Retained Right of Action are expressly preserved for the benefit of, and assigned and transferred to, the Agent for the benefit of the First Lien Lender Parties on account of the First Lien Lender Secured Claims arising from the First Lien Credit Agreement and the Final Cash Collateral Order.

**D.     Claims Objections**

Unless an objection to a Claim is in writing, expressly waived, relinquished, released, assigned, compromised, or settled in the Plan, or in a Final Order, all rights with respect to such Claim objection are expressly preserved for the benefit of, and fully vested in, the Liquidating Debtors. The Liquidating Debtors may pursue, or decline to pursue, objections to Claims, as appropriate, in the business judgment of the Plan Representative. The Liquidating Debtors may settle, release, sell, assign, otherwise transfer, or compromise objections to Claims without need for notice or order of the Bankruptcy Court.

**E.     Corporate Governance**

From and after the Effective Date, each of the Liquidating Debtors shall be managed and administered through the Plan Representative, who shall be appointed as sole officer of each of

the Liquidating Debtors and shall have full authority to execute the provisions of the Plan. The initial Plan Representative shall be John McFarland, who is presently general counsel to each of the Debtors. The Plan Representative shall also be appointed as the sole officer of the Non-Debtor Affiliates and shall have full authority to oversee and administer the Wind-down of the Non-Debtor Affiliates. The Plan Representative may employ one or more persons or entities to assist him with performing his duties under the Plan.

### F.    Wind-Down

The Liquidating Debtors, through the Plan Representative or his designee, shall oversee the Wind-Down and shall make distributions to Creditors consistent with the Plan and otherwise hold and liquidate all MSA Cash, all other Distributable Assets except for Distributable Cash and Claims, and all other property of the Estates for the benefit of Creditors, in accordance with the provisions of the Plan. The Liquidating Debtors and the Plan Representative shall not be required to post a bond in favor of the United States. The powers and authority of the Liquidating Debtors, through the Plan Representative are set forth in the Plan.

### G.    Funding for the Plan

The Debtors' obligations under the Plan and the fees and expenses of the Liquidating Debtors will be funded out of existing Cash in the Estate of MSA on the Effective Date and the payments to be made to MSA by the Agent, from the Adjusted Sale Proceeds, as set forth herein. **Exhibit "A"** hereto sets forth the proposed sources and uses of cash on the Effective Date. The Buyer will pay the Wind-Down Costs and provide employees as necessary to effect the Wind-Down. Any unused Cash of MSA not needed to fund Plan Expenses, Wind-Down Costs, Case Expenses, cure costs associated with Assigned Contracts owned by the Debtors or distributions under the Plan shall be transferred to the Buyer prior to the entry of a Final Decree pursuant to the terms of the Business Transfer Agreement. Any Distributable Cash and Claims of the Debtors other than the Cash of MSA shall be distributed to the Agent for the benefit of the First Lien Lender Parties on the Effective Date in accordance with the terms of the Plan. The proceeds of any other Distributable Assets shall be distributed to the Agent for the benefit of the First Lien Lender Parties from time to time in accordance with the terms of the Plan.

### H.    Corporate Action/Dissolution

On the Effective Date, the matters under the Plan involving or requiring corporate action of the Debtors, including but not limited to, actions requiring a vote or other approval of the board of directors or shareholders or execution of all documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers and directors of the Debtors. On the Effective Date, all officers and directors of the Debtors shall be deemed removed from such positions and the Debtors' organizational documents shall be deemed amended to prohibit (1) the issuance of nonvoting equity securities or (2) the existence of securities possessing an inappropriate distribution of voting power, all as more specifically required and described in section 1123(a)(6) of the Bankruptcy Code.

Upon entry of a final decree to the extent not previously dissolved, the Liquidating Debtors shall be deemed dissolved and wound up without any further action required by the Liquidating Debtors and the Debtors' shareholders or boards of directors.

## I.     Interests in Affiliates and Subsidiaries

As of the Effective Date but only until the dissolution of the Liquidating Debtors, except as expressly provided in the Plan, the Liquidating Debtors shall retain any stock or interests they may hold in their subsidiaries or affiliates and retain any rights to which such stock or interests may be entitled under applicable law with respect to such shares or other interests.

## J.     Payment of Plan Expenses

The Liquidating Debtors may pay all reasonable Plan Expenses without further notice to Creditors or Holders of Interests or approval of the Bankruptcy Court.

## K.     Dissolution of the Official Committee

As of the Effective Date, the Official Committee shall be dissolved, provided, however, that notwithstanding such dissolution, the Official Committee's Professional Persons may seek payment of any unpaid Administrative Expenses pursuant to the Plan.

## VII.

## EFFECT OF CONFIRMATION AND RELATED PROVISIONS

## A.     Effect of Confirmation

### 1.     Binding Effect of Plan.

The provisions of the confirmed Plan shall bind the Debtors, the Liquidating Debtors, any entity acquiring property under the Plan, and any Creditor or Interest Holder, whether or not such Creditor or Interest Holder has Filed a proof of Claim or Interest in the Chapter 11 Cases, whether or not the Claim of such Creditor or the Interest of such Interest Holder is Impaired under the Plan, and whether or not such Creditor or Interest Holder has accepted or rejected the Plan. All Claims and debts shall be as fixed and adjusted pursuant to the Plan. With respect to any taxes of the kind specified in Bankruptcy Code section 1146(c), the Plan shall also bind any taxing authority, recorder of deeds or similar official for any county, state, or governmental unit or parish in which any instrument related to under the Plan or related to any transaction contemplated under the Plan is to be recorded.

### 2.     Business Transfer Agreement.

Upon satisfaction of the conditions to effectiveness of the Plan set forth in Article XV(A) of the Plan, (i) the Debtors shall be deemed to have authorized and directed the Selling Non-Debtors (and any officers, directors and employees thereof) to perform their obligations under the Business Transfer Agreement; (ii) the Buyer and the Sellers shall be bound by the Business

Transfer Agreement to the extent provided therein; (iii) MSA and Luxco (including any officers, directors and employees thereof) are authorized and directed to perform their obligations under the Business Transfer Agreement and to take such steps as are necessary, reasonable, or convenient to effect the closing thereof; and (iv) notwithstanding anything in any prepetition agreement to the contrary, each of the Agent, the Second Lien Noteholder Trustee, the Second Lien Collateral Agent, and the Collateral Trustee is authorized and directed to take such steps as reasonably necessary to effect the release of liens in accordance with the terms and conditions hereof. Subject to the terms of the Confirmation Order and to any conditions to the closing that remain to be satisfied, the Business Transfer Agreement and the transactions contemplated therein are approved.

**B.** **Injunction**

      **1.** **Generally.**

      **Unless otherwise provided in the Plan or the Confirmation Order, all injunctions and stays provided for in the Chapter 11 Cases pursuant to sections 105 and 362 of the Bankruptcy Code or otherwise in effect on the Confirmation Date shall remain in full force and effect until the Effective Date. From and after the Effective Date, all Persons are permanently enjoined from, and restrained against, commencing or continuing in any court any suit, action, or other proceeding, or otherwise asserting any Claim or Interest, (a) seeking to hold (i) the Liquidating Debtors or (ii) the property of the Liquidating Debtors, liable for any Claim, obligation, right, Interest, debt, or liability that has been satisfied, discharged or released pursuant the Plan.**

      **2.** **Injunction Related to Rights of Action and Terminated Claims, Administrative Expenses or Interests.**

      **Except as provided in the Plan or in the Confirmation Order, as of the Confirmation Date, all Entities that have held, currently hold or may hold a Claim, Administrative Expense, Superpriority Claim, Interest, or other debt or liability that is stayed, Impaired, or terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions either (x) against the Debtors, the Liquidating Debtors, or their property on account of all or such portion of any such Claims, Administrative Expenses, Superpriority Claims, Interests, debts, or liabilities that are stayed, Impaired, or terminated or (y) against any Person with respect to any Right of Action or any objection to a Claim, Administrative Expense, Superpriority Claim, or Interest, which Right of Action or objection, under the Plan, is waived, released, assigned, or exclusively retained by any of the Debtors: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order, (c) creating, perfecting, or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan. To avoid any doubt, except as otherwise expressly noted in the Plan, nothing in the Plan or herein shall be construed or is intended to affect, enjoin, modify, release, or waive any claims, rights, and actions that a**

third party may have against a person other than the Debtors or the Liquidating Debtors, provided that such claims, rights, and actions are wholly separate and exist independently from any claims, rights, and actions of the Estates.

## C.    Exculpation

As of and subject to the occurrence of the Effective Date, each of the Plan Proponents and their Representatives, the Liquidating Debtors, the Plan Representative, and the members of the Committee (acting in such capacity), shall neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken, in connection with, or related to, the formulation, preparation, dissemination, implementation, administration, Confirmation or Consummation of the Plan or any contract, instrument, waiver, release, or other agreement or document created or entered into, in connection with the Plan, or any other act taken or omitted to be taken in connection with the Chapter 11 Cases; provided, however, that the foregoing provisions of this subsection shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

## D.    Debtor Release

Each Debtor, for itself and its respective successors, assigns, transferees, those officers and directors, acting in such capacities as of the Petition Date, agents, members, financial advisors, attorneys, employees, partners, affiliates, representatives, in each case in their capacity as such, shall be deemed to have released any and all claims and causes of action against the Plan Proponents, the First Lien Lender Parties and the Liquidating Debtors, and their respective officers, directors, managers, employees, agents, advisors, accountants, attorneys and representatives, and their respective property, arising prior to the Effective Date.

## E.    Third-Party Release

Each Creditor that does not elect to opt out of this release by checking the appropriate box on the ballot provided to such Creditor in connection with solicitation of such Creditors' vote to accept to reject the Plan, for itself and its respective successors, assigns, transferees, those officers and directors, acting in such capacities as of the Petition Date, agents, members, financial advisors, attorneys, employees, partners, affiliates, representatives, in each case in their capacity as such, shall, by virtue of its vote, be deemed to have released any and all claims and causes of action against the Plan Proponents, the First Lien Lender Parties, and the Liquidating Debtors, and their respective officers, directors, managers, employees, agents, advisors, accountants, attorneys and representatives, and their respective property, arising prior to the Effective Date.

## F.    Subsequent Discovery of Facts Does Not Affect Enforceability of Releases

Each releasing party under Article XIV.D. and Article XIV.E. of the Plan shall be deemed to have granted the releases set forth herein, notwithstanding that it may hereafter discover facts in addition to, or different from, those which it now knows or believes to be

true, and without regard to the subsequent discovery or existence of such different or additional facts, and such party expressly waives any and all rights that it may have under any statute or common law principle, including section 1542 of the California Civil Code, which would limit the effect of such releases to those Claims or causes of action actually known or suspected to exist at the time of Confirmation. Section 1542 of the California Civil Code generally provides as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

# VIII.
# REQUIREMENTS FOR CONFIRMATION

## A. Acceptances Necessary to Confirm Plan

At the Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by each Impaired Class. Under section 1126 of the Bankruptcy Code, an Impaired Class of Claims is deemed to have accepted a plan if a plan has been accepted by creditors of that class that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class held by creditors that have accepted or rejected the plan. Similarly, an Impaired Class of Interests is deemed to have accepted a plan if the plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed equity interests of such class held by holders of such interests that have accepted or rejected the plan.

Voting rights are set forth as follows:

| Class | Status | Voting Rights |
|---|---|---|
| Class 1 (A–F) – Priority Non-Tax Claims | Impaired | Entitled to vote. |
| Class 2 (A–F) – Other Secured Claims | Impaired | Entitled to vote. |
| Class 3 (A–F) – First Lien Lender Claims | Impaired | Entitled to vote. |
| Class 4 (A–F) – Second Lien Noteholder Claims | Impaired | Entitled to vote. |
| Class 5 (A–F) – General Unsecured Claims | Impaired | Entitled to vote. |
| Class 6 (A–F) – Subordinated Debt Claims | Impaired | Not entitled to vote. |
| Class 7 (A–F) – Intercompany Claims of the Debtors | Impaired | Not entitled to vote. |
| Class 8 (A–F) – Equity Interests | Impaired | Not entitled to vote. |

## B. Best Interest of Creditors Test

Confirmation requires, among other thing, that each Holder of a Claim in an Impaired class and each Holder of an equity Interest either: (a) accepts the Plan; or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is commonly referred to as the "best interests test."

1. **Chapter 7.**

To determine the value that the Holders of Impaired Claims and Interests would receive if the Debtors were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. Section 704 of the Bankruptcy Code requires a chapter 7 trustee to collect and reduce to money the property of the estate as expeditiously as is compatible with the best interests of parties in interest.

Attached hereto as **Exhibit "B"** is the Proponent's liquidation analysis. The Proponents have assumed that the maximum Cash available in chapter 7 cases for satisfaction of Allowed Claims would consist of the proceeds resulting from the liquidation of the Debtors' estates, by consummating the Sale, if a Trustee were to obtain the consent from the First Lien Lenders to consummate the Sale. Of course, absent such consent, a Trustee would seek to liquidate the Debtor's piecemeal, and the Cash available would be reduced. Any such Cash amount would then be reduced by the amount of any Claims secured by such assets such as the Secured Claims, the costs and expenses of the liquidation of the Assets, and such additional Administrative Claims, and other Priority Claims, that may result from the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 would include fees payable to trustee(s) in bankruptcy, as well as those that might be payable to the trustee's attorneys, and to other professionals that such trustee(s) may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases that would be allowed as a priority in the chapter 7 cases, such as compensation for attorneys, appraisers, accountants, or other professionals, and costs and expenses of the Debtors and the Official Committee. Such Administrative Expenses from the chapter 7 cases would have to be paid in Cash in full from the liquidation proceeds before the balance of those proceeds could be made available to pay prepetition Claims.

2. **Liquidation Alternative.**

Pursuant to Bankruptcy Code section 1129(a)(7), unless there is unanimous acceptance of the Plan by an Impaired Class, the Debtors must demonstrate and the Bankruptcy Court must determine that with respect to such Class, each Holder of a Claim will receive property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Plan.

The Plan satisfies this standard. The Debtors' assets are secured by the liens of the Lenders. Because the indebtedness owed to the Lenders exceeds the value of the Debtors' assets, there would be no proceeds to distribute to Unsecured Creditors even if a Chapter 7 Trustee were to liquidate the Debtors' assets. The Plan provides greater recovery to the Holders of Allowed Claims than such Holders would receive under a liquidation under chapter 7 primarily because the Plan avoids a layer of administrative expense associated with the appointment of a chapter 7 trustee, while increasing the efficiency of administering the Debtors' assets for the benefit of Creditors, provides the Unsecured Creditor Distribution to Holders of Class 4 and 5 claims, and provides for the release of avoidance actions.

Moreover, in a chapter 7 case, the chapter 7 trustee would also be entitled to seek a sliding scale commission based upon the funds distributed by such trustee, even though the Debtors have already accumulated much of the funds and have already incurred many of the expenses associated with generating those funds. Accordingly, the Proponents believe that there is a reasonable likelihood that Creditors would "pay again" for the funds accumulated by the Debtors, since the chapter 7 trustee would be entitled to receive a commission in some amount for all funds distributed, including possibly substantial funds handed over to the chapter 7 trustee by the Debtors. It is also anticipated that a chapter 7 liquidation would result in delay in distributions to Creditors. Among other things, a chapter 7 case would trigger a new bar date for filing Claims that would be more than ninety days following conversion of the case to chapter 7. Fed. R. Bankr. P. 3002(c). Hence, a chapter 7 liquidation would not only delay distributions, but raise the prospect of additional Claims that were not asserted in the Chapter 11 Cases. Based on the foregoing, the Plan provides an opportunity to bring the greatest return to Creditors.

## C.     Feasibility of Plan

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation, that the Bankruptcy Court find that confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the plan, unless such liquidation or reorganization is proposed under the plan. This requirement is called "feasibility." Attached hereto as **Exhibit "A"** is a list of the sources and uses of Effective Date Cash, which demonstrates that the Debtors have sufficient Cash to satisfy obligations as required by the Plan.

The Plan is feasible because the Debtors have or will have sufficient Cash on hand to satisfy all of the Debtors' obligations under the Plan.

## D.     Classification

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for the classification of Claims. Section 1122(a) permits a plan to place a claim or equity interest in a particular class only if the claim or equity interest is substantially similar to the other claims or interests in that class. The Debtors believe that the classification of Claims and Interests under the Plan is appropriate and consistent with applicable law.

## E.     Confirmation of Plan Without Necessary Acceptances; Cramdown

A COURT MAY CONFIRM A PLAN, EVEN IF IT IS NOT ACCEPTED BY ALL IMPAIRED CLASSES, IF THE PLAN HAS BEEN ACCEPTED BY AT LEAST ONE IMPAIRED CLASS OF CLAIMS, AND THE PLAN MEETS THE "CRAMDOWN" REQUIREMENTS SET FORTH IN SECTION 1129(b) OF THE BANKRUPTCY CODE. SECTION 1129(b) OF THE BANKRUPTCY CODE REQUIRES THAT THE BANKRUPTCY COURT FIND THAT A PLAN IS "FAIR AND EQUITABLE," AND DOES NOT "DISCRIMINATE UNFAIRLY" WITH RESPECT TO EACH NON-ACCEPTING IMPAIRED CLASS OF CLAIMS OR INTERESTS. IN THE EVENT THAT ANY IMPAIRED CLASS REJECTS THE PLAN, IN ACCORDANCE WITH SECTION 1129(a)(8) OF THE BANKRUPTCY CODE, AND AT LEAST ONE

**IMPAIRED CLASS HAS VOTED TO ACCEPT THE PLAN, THE DEBTORS INTEND TO REQUEST THAT THE BANKRUPTCY COURT CONFIRM THE PLAN IN ACCORDANCE WITH THE "CRAMDOWN" PROVISION OF SECTION 1129(b) OF THE BANKRUPTCY CODE, OR MODIFY THE PLAN IN ACCORDANCE WITH THE TERMS THEREOF.**

The Plan provides for the possibility of invoking the "cramdown" provisions as defined in section 1129(a) of the Bankruptcy Code. Under this provision, the Bankruptcy Court has the authority to confirm the Plan even though a Class of Claims that is Impaired does not vote to accept the Plan, if another Class of Claims, which is also Impaired, votes to accept the Plan. This provision does not take into account the possibility that one large claimant or several claimants may arbitrarily vote not to accept the Plan that would be detrimental to other Creditors. In this instance the Bankruptcy Court, notwithstanding the negative vote, in the interest of being "fair and equitable," may confirm the Plan. Such determination, if necessary, would be addressed at the Confirmation Hearing.

1.      **No Unfair Discrimination.**

With respect to a dissenting class of interests, the "fair and equitable" standard requires that the Plan contain one of two elements. It must provide either (i) that each holder of an interest in the class receive or retain property having a value, as of the effective date, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, or the value of such interests or (ii) that no holder of an interest in any junior class receive or retain any property on account of such interests. The strict requirement of the allocation of full value to dissenting classes before junior classes can receive distribution is known as the "absolute priority rule."

The Proponents believe that under the Plan: (i) all Impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests with which their legal rights are intertwined, if any, and (ii) no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. The Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class.

2.      **Fair and Equitable Test.**

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims and interests as follows:

a.      **Secured Claims**

Either: (i) each holder of a secured claim (x) retains the lien securing its secured claim and receives on account of its allowed secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, or (y) realizes the "indubitable equivalent" of its allowed secured claim; or (ii) the property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds, and the liens against such proceeds are treated in accordance with clause (i).

### b. Unsecured Claims

Either: (i) each holder of an unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims or the non-accepting class do not receive any property under the plan on account of such claims and interests.

### c. Equity Interests

Either: (i) such holder of an interest receives or retains property of a value equal to the greater of any fixed liquidation preference or fixed redemption price to which such holder is entitled, or the value of the interest; or (ii) the holder of any interests junior to the interests in the impair class will not receive or retain any property under the plan.

The cramdown provisions of the Bankruptcy Code are complex and this summary is not intended to be a complete statement of the law in this area.

## IX.
## EFFECT OF CONFIRMATION

### A. Binding Effect of Confirmation

Confirmation will bind the Debtors, all Holders of Claims, Administrative Expenses, Superpriority Claims or Interests, and other parties in interest to the provisions of the Plan whether or not the Claim, Administrative Expense, Superpriority Claim or Interest of such Holder is Impaired under the Plan and whether or not the Holder of such Claim, Administrative Expense, Superpriority Claim, or Interest has accepted the Plan.

### B. Good Faith

Confirmation of the Plan shall constitute a finding that: (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all Persons' solicitations of acceptances or rejections of the Plan and the offer, issuance, sale, or purchase of a security offered or sold under the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

### C. No Limitations on Effect of Confirmation

Nothing contained in the Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

## X.
## RISK FACTORS

The principal risk associated with the Plan is that it may not be confirmed by the Bankruptcy Court, either because the requisite votes in favor of the Plan are not received or the Bankruptcy Court decides not to confirm the Plan on some other basis.

## A.    Certain Federal Income Tax Consequences of the Plan

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan to Holders of Claims. This discussion is based on the Internal Revenue Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. Further, legislative, judicial, or administrative changes may occur, perhaps with retroactive effect, that could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Holders of Claims.

This discussion is for general information only and does not purport to address all aspects of U.S. federal income taxation that may be relevant the Holders of Claims in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers and dealers in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, regulated investment companies). This discussion only addresses the tax consequences to Holders of Claims who have held such Claims as capital assets within the meaning of the Internal Revenue Code. No aspect of foreign, state, local or estate and gift taxation is addressed.

THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PERSONAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

TO COMPLY WITH THE IRS CIRCULAR 230, IT IS NOTIFIED THAT (1) THE FOLLOWING SUMMARY IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE PLAN, (2) IT CANNOT BE USED BY ANY PERSON FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE ASSERTED AGAINST THE PERSON UNDER THE INTERNAL REVENUE CODE, AND (3) HOLDERS OF CLAIMS OR INTERESTS SHOULD SEEK THEIR OWN ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISER.

### 1.    In General.

The United States federal income tax consequences of the distributions contemplated by the Plan to the Holders of Claims will depend upon a number of factors. The character and amount of income, gain, or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a Holder acquired a Claim, (2) the length of time the Claim has been held, (3) whether the Claim was acquired at a discount, (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years, (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim, (6) the

method of tax accounting of the Holder, and (7) whether the Claim is an installment obligation for United States federal income tax purposes.

For purposes of the following discussion, a "U.S. Holder" is any person (1) who is a citizen or resident of the United States; (2) that is a corporation or partnership created or organized in or under the laws of the United States or any state thereof or District of Columbia; (3) that is an estate, the income of which is subject to United States federal income taxation regardless of its source or; (4) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control or (b) that has elected to continue to be treated as a United States Person for United States federal income tax purposes. A "Non-U.S. Holder" is any person that is not a U.S. Holder. In the case of a partnership, the tax treatment of its partners will depend on the status of the partner and the activities of the partnership. Holders who are partnerships or partners in a partnership should consult their tax advisors.

Certain Holders of Claims (such as foreign persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers, and tax-exempt organizations) may be subject to special rules not addressed in this summary of United States federal income tax consequences. There also may be state, local, and/or foreign income or other tax considerations or United States federal estate and gift tax considerations applicable to Holders of Claims, which are not addressed herein. EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR WITH RESPECT TO DISTRIBUTIONS RECEIVED UNDER THE PLAN.

### 2.     U.S. Holders of Claims.

A U.S. Holder should generally recognize capital gain or loss for United States income tax purposes in an amount equal to the difference between the amount of Cash (and other consideration received) under the Plan in respect to such Holder's Claim and the Holder's adjusted tax basis in the Claim. However, to the extent a U.S. Holder received any Cash (or other consideration) in satisfaction of any accrued and unpaid interest, such Holder may recognize ordinary income or loss to the extent that such Cash (or other consideration) is allocable to the accrued and unpaid interest, unless such Holder has previously included the accrued interest in such Holder's taxable income.

### 3.     Non-U.S. Holder of Claims.

A Non-U.S. Holder of a Claim generally will not be subject to United States federal income tax with respect to any income or gain recognized upon the exchange of such Holder's Claim with Cash (or other property) pursuant to the Plan, unless (i) such Holder is engaged in a trade or business in the United States to which income, gain from the exchange is "effective connected" for United States federal income tax purposes, or (ii) if such Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met. To the extent any Cash (or other consideration) is distributed for accrued and unpaid interest, however, a Non-U.S. Holder may be subject to United States withholding taxes (at 30%) unless such Holder is qualified for the so-

called "portfolio interest exemption" or eligible to claim a reduction or exemption under any applicable treaty and complies with certain required certification procedure.

4. **Importance of Obtaining Professional Tax Assistance.**

The United States federal income tax consequences to a Holder other than a Holder receiving Cash (or other property) in satisfaction of such Holder's Claim may be different from the tax consequences described above. Holders of each such Claim should consult their tax advisers regarding the potential federal income tax consequences.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## XI.
## ALTERNATIVES TO PLAN

The Debtors believe that if the Plan is not confirmed, or is not confirmable, the alternatives to the Plan include: (a) conversion of the Chapter 11 Cases to chapter 7, (b) dismissal of the Debtors' cases, or (c) an alternative plan of reorganization.

**A.   Liquidation Under Chapter 7**

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. For the reasons previously discussed above, the Debtors believe that Confirmation of the Plan will provide Creditors with a recovery that is expected to be substantially more than could be achieved in a liquidation under chapter 7 of the Bankruptcy Code.

**B.   Dismissal**

Dismissal of the Chapter 11 Cases would leave the Debtors' secured creditors in position to exercise their state law rights under their existing security interests, including foreclosure of such liens. The Debtors do not believe that this alternative is in the best interests of the Estates.

**C.   Alternative Plan**

The Debtors believe that any alternative plan would not result in as favorable of treatment of Claims and Interests as proposed under the Debtors' Plan.

**D.    No Res Judicata Effect**

Notwithstanding anything to the contrary in the Plan or in this Disclosure Statement, the provisions of this Disclosure Statement and the Plan, which permits the Liquidating Debtors to enter into settlements and compromises of any potential litigation, shall not have and are not intended to have any *res judicata* effect with respect to any prepetition Claims and causes of action that are not otherwise treated under the Plan, and shall not be deemed a bar to asserting such Claims and causes of action.

## XVIII.
## CONFIRMATION REQUEST

The Plan Proponents request that the Bankruptcy Court confirm the Plan and that it do so, if applicable, pursuant to section 1129(b) of the Bankruptcy Code notwithstanding the rejection of the Plan by any Impaired Class.

_____
MagnaChip Semiconductor Finance Company

_____
MagnaChip Semiconductor LLC

_____
MagnaChip Semiconductor SA Holdings LLC

_____
MagnaChip Semiconductor, Inc.

_____
MagnaChip Semiconductor S.A.

_____
MagnaChip Semiconductor B.V.

_____
UBS AG, Stamford Branch

# XII.
## CONCLUSION

The Proponents believe that the Plan is in the best interest of Creditors and urges Creditors to vote to accept the Plan.

_____

MagnaChip Semiconductor Finance Company

_____

MagnaChip Semiconductor LLC

_____

MagnaChip Semiconductor SA Holdings LLC

_____

MagnaChip Semiconductor, Inc.

_____

MagnaChip Semiconductor S.A.

_____

MagnaChip Semiconductor B.V.

_____

UBS AG, Stamford Branch as Agent
David Kalal
Executive Director

JOHN A. SIRICO
DIRECTOR + Counsel

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
Richard M. Pachulski (CA Bar No. 90073)
Debra Grassgreen (CA Bar No. 169978)
Joshua M. Fried (CA Bar No. 181541)
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone: 302/652-4100
Facsimile: 302/652-4400

Counsel to Debtors and Debtors in Possession

and

LATHAM AND WATKINS LLP
David Heller
Donald Schwartz
Josef S. Athanas
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago IL 60606
Telephone: 312/876-7700
Facsimile: 312/993-9767

Counsel for Agent