# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MAGNACHIP SEMICONDUCTOR FINANCE COMPANY, | ) ) | Case No. 09-12008 (PJW) |
| a Delaware corporation, et al., | ) | Jointly Administered |
| | ) | |
| Debtors.¹ | ) | **Ref. Docket No. 213** |

## OBJECTION OF UBS AG, STAMFORD BRANCH, AS AGENT FOR THE FIRST LIEN LENDERS, TO THE DISCLOSURE STATEMENT FILED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

UBS AG, Stamford Branch, in its capacity as administrative agent and collateral agent for the First Lien Lenders (defined below) party to the First Lien Credit Agreement (defined below) (in such capacity, the "First Lien Agent"), by and through the undersigned counsel, hereby submits this objection (the "Objection") to the *Disclosure Statement* (the "Committee's Disclosure Statement")² *in Respect of Chapter 11 Plan of Reorganization Proposed by the Official Committee of Unsecured Creditors* (the "Committee") *of Magnachip Semiconductor Finance Company, et al.* (the "Committee's Plan").

The Committee's Disclosure Statement fails to provide adequate information because (a) it fails to disclose any valuation for the equity to be distributed to creditors other than the First Lien Lenders, yet concludes that the value of the equity is "substantially higher" than the cash to be distributed to creditors under the Debtors' plan, and (b) it fails to disclose any projections or other information to enable creditors to determine whether the Committee's Plan is feasible.

---

¹ The Debtors in these cases are: MagnaChip Semiconductor Finance Company; MagnaChip Semiconductor LLC; MagnaChip Semiconductor, Inc.; MagnaChip Semiconductor SA Holdings LLC; MagnaChip Semiconductor S.A.; and MagnaChip Semiconductor B.V.

² Unless otherwise defined herein, defined terms shall have the meanings accorded them in the Committee's Disclosure Statement.

CH\1119528.6

The Committee's Disclosure Statement also fails to disclose that the Committee's Plan is unconfirmable on its face. The Committee's Plan cannot meet the confirmation requirements of Sections 1129(a) or 1129(b) of title 11 of the United States Code (the "Bankruptcy Code").

As described below, Debtors MagnaChip Semiconductor S.A., a Luxembourg corporation, and MagnaChip Semiconductor Finance Company, a Delaware corporation, as borrowers (the "Borrowers"), Debtors MagnaChip Semiconductor LLC, a Delaware limited liability company, MagnaChip Semiconductor, Inc., a Delaware corporation, MagnaChip Semiconductor SA Holdings LLC, a Delaware limited liability company, MagnaChip Semiconductor B.V., a Netherlands corporation, as guarantors (collectively, the "Debtor Guarantors"), and MagnaChip Semiconductor Limited, a company incorporated in England and Wales, MagnaChip Semiconductor, Inc., a Japanese corporation, MagnaChip Semiconductor, Ltd., a Taiwan corporation, MagnaChip Semiconductor Holding Company Limited, a British Virgin Islands corporation, MagnaChip Semiconductor Limited, a Hong Kong corporation, and MagnaChip Semiconductor, Ltd., a Korean corporation (collectively, the "Nondebtor Guarantors") are parties to a senior secured financing arrangement with the First Lien Agent and the First Lien Lenders.

The Committee's Plan does not comply with the applicable provisions of the Bankruptcy Code under Section 1129(a)(1) and is not feasible under Section 1129(a)(11) because it is predicated upon a permanent injunction prohibiting the First Lien Lenders from exercising their rights against the Nondebtor Guarantors. Such an injunction is contrary to Section 524(e) of the Bankruptcy Code and cannot be approved. Moreover, because virtually all of the assets securing the First Lien Agent's and First Lien Lenders' claims are owned by

Nondebtor Guarantors and are not property of the Debtors' estates, the Committee's Plan is not feasible in the absence of such an injunction.

The First Lien Agent and First Lien Lenders will not vote for the Committee's Plan and the Committee cannot "cram up" the Committee's Plan as to the First Lien Lenders under Section 1129(b)(2). The Committee's Plan seeks to provide the First Lien Agent and First Lien Lenders a $95,000,000 five year non-amortizing term loan to the Borrowers with a 10% interest rate. The term loan is so speculative that for it to have a present value anywhere near $95,000,000, the interest rate would need to be astronomical.

The Committee's Plan is not feasible under Section 1129(a)(11) because, even if this Court found a 10% interest rate was appropriate under Section 1129(b)(2), the Committee's Plan leaves the Debtors and the Nondebtor Guarantors with insufficient liquidity to operate their business through the ups and downs of the volatile semiconductor market.

Finally, the Committee's Plan cannot meet the requirement of Section 1129(a)(3) that it is proposed in good faith and not by any means forbidden by law. The Committee is comprised of three members, two of whom are the Second Lien Trustee (as defined below), and the largest holder of the Second Lien Notes (as defined below). The actions of these two parties in directing the Committee to file the Committee's Plan and Committee's Disclosure Statement directly violate the valid and binding prepetition intercreditor agreement between the First Lien Agent and the Second Lien Trustee, and impermissibly interfere with the legitimate enforcement rights of the First Lien Agent and the First Lien Lenders.

## BACKGROUND

### A. The Debtors' Prepetition Credit Facilities

1. On December 23, 2004, the Borrowers entered into that certain Revolving Credit Agreement (the "First Lien Credit Agreement") by and between Borrowers, certain financial institutions party thereto as lenders (the "First Lien Lenders"), the Debtor Guarantors and the Nondebtor Guarantors (together with Borrowers and the Debtor Guarantors, the "Credit Parties"), the First Lien Agent, as administrative and collateral agent, and Korean Exchange Bank, as issuing bank.

2. As security for the obligations owing under the First Lien Credit Agreement, the Credit Parties (i) unconditionally guaranteed, jointly and severally, the payment of the obligations owing under the First Lien Credit Agreement, (ii) granted to the First Lien Agent, for the benefit of the First Lien Lenders, in each case via direct contract with each Credit Party, first-lien security interests in substantially all of the assets of the Credit Parties, and (iii) pledged to the First Lien Agent, for the benefit of the First Lien Lenders, the equity interests of each Credit Party in their direct and indirect subsidiaries (sections (i), (ii) and (iii) together, the "First Liens").

3. Also on December 23, 2004, Borrowers entered into that certain Indenture for Second Priority Senior Secured Notes (the "Second Lien Notes") with Bank of New York, as Trustee (the "Second Lien Trustee"). As security for the repayment of the Second Lien Notes, the Credit Parties granted to the Second Lien Trustee junior secured liens substantially similar in scope to the First Liens (the "Second Liens").

4. As a condition to entering into the First Lien Credit Agreement, the First Lien Agent and the Second Lien Trustee entered into an Intercreditor Agreement dated as of

December 23, 2004 (the "Intercreditor Agreement"), a copy of which is attached hereto as Exhibit A. Pursuant to the terms of the Intercreditor Agreement, the Second Lien Trustee agreed, on behalf of the holders of Second Lien Notes, that none of the holders of Second Lien Notes would request any judicial action to "hinder, delay, limit or prohibit" the lawful exercise of the enforcement rights of the First Lien Lenders. See Intercreditor Agreement at § 3.2(b).

B. **The Prepetition Marketing and Sale of the Debtors' Business**

5. In the fall of 2008, as the Borrowers struggled to meet their covenant tests and payment obligations under the First Lien Credit Agreement, the required First Lien Lenders agreed to forbear from exercising default-related rights and remedies against the Credit Parties in order to allow the Credit Parties to market their various manufacturing businesses (together, the "Business") for sale. The vast majority of the assets that make up the Business are owned by the Nondebtor Guarantors and are not property of the Debtors' estates.

6. The ensuing marketing process resulted in two final bidders for the Business: Avenue Capital, the largest holder of the Second Lien Notes; and KTB 2007 Private Equity Fund ("KTB"), a Korean company. Avenue Capital ultimately decided not to purchase the Business, and the Credit Parties agreed to sell the business to KTB for $80 million (approximately $70 million after adjustments), a price that would result in recovery to the First Lien lenders equal to approximately 70% of the obligations owing to them. On June 11, 2009, KTB and the Credit Parties executed a Business Transfer Agreement (the "BTA") setting forth the terms of the sale.

7. In furtherance of the closing of the sale of the Business to KTB, the required First Lien Lenders and the Credit Parties entered into the Enforcement, Consent, Cash Collateral and Limited Forbearance Agreement, dated as of June 11, 2009 (the "Enforcement Agreement"), a copy of which is attached hereto as Exhibit B. Pursuant to the terms of the Enforcement

5

Agreement, the First Lien Lenders agreed to forbear from exercising default-related rights and remedies against the Credit Parties under certain conditions, including, but not limited to: (i) a voluntary filing by the Debtors for Chapter 11 bankruptcy, (ii) submission by the Debtors of a plan of liquidation and related disclosure statement centering around the proposed sale to KTB, (iii) approval of such a disclosure statement on or before August 3, 2009, and (iv) confirmation of such a plan of reorganization on or before September 25, 2009.

8. In accordance with the terms of the Enforcement Agreement, the Debtors, among other things, (i) petitioned for voluntary relief under Chapter 11 of the United States Code (the "<u>Chapter 11 Cases</u>") on June 12, 2009 (the "<u>Petition Date</u>"), (ii) submitted a proposed plan of liquidation (the "<u>Debtors' Plan</u>") and accompanying disclosure statement (the "<u>Debtors' Disclosure Statement</u>") to this Court, and (iii) received this Court's approval of the Debtors' Disclosure Statement on August 3, 2009. Therefore, to the First Lien Agent's knowledge, the Debtors have met their obligations under the Enforcement Agreement to date.

**OBJECTION**

**I. The Committee's Disclosure Statement Fails to Provide Adequate Information.**

9. Section 1125 of the Bankruptcy Code requires that the court approve a disclosure statement before submitting a plan to a vote, including court approval that the disclosure statement contains "adequate information." 11 U.S.C. § 1125. The "adequate information" standard is designed to ensure that creditors have sufficient information to cast informed votes for or against the proposed plan. See <u>In re Phoenix Petroleum</u>, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) ("[T]he general purpose of the disclosure statement is to provide "adequate information" to enable "impaired" classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that

plan."); accord Century Glove Inc. v. First Am. Bank, 860 F.2d 94 (3d Cir. 1988). To provide information sufficient to merit court approval under section 1125, a disclosure statement must provide more than a mere summary of the plan of reorganization. See In re Adana Mortgage Bankers, Inc., 14 B.R. 29, 30 (Bankr. N.D. Ga. 1981).

10. Various courts have undertaken to list the types of materials and information required to meet the standard of "adequate information." See, e.g., In re United States Brass Corp, 194 B.R. 420, 424-25 (Bankr. E.D. Tex. 1996) (listing factors); In re Ferretti, 128 B.R. 16, 18-19 (Bankr. D.N.H. 1991) (same); In re Oxford Homes, 204 B.R. 264, 269 (Bankr. D. Me. 1997) (same); In re Cardinal Congregate I, 121 B.R. 760, 765 (S.D. Ohio 1990) (quoting In re Scioto Valley Mortg. Co., 88 B.R. 168, 170-71 (Bankr. S.D. Ohio 1988)) (same); In re Malek, 35 B.R. 443, 444 (Bankr. E.D. Mich. 1983) (listing similar factors). While not every listed item is required in every case, the Committee's Disclosure Statement wholly neglects to address two types of information consistently required by adequate information cases, including all of the cases cited above: (a) a valuation of the Debtors assets, and (b) financial projections and other information showing the feasibility of the plan.

**A. The Committee's Disclosure Statement Contains No Valuation of the Debtors' Assets.**

11. A description of the assets of the Debtors and their valuation is a vital component of a disclosure statement. See, e.g., In re Phoenix Petroleum, 278 B.R. at 393 (including "the assets of the bankruptcy estate and their value" as a required element of a disclosure statement); In re Ferretti, 128 B.R. at 18 (including "complete description of the available assets and their value" as a material element of a disclosure statement); In re Malek, 35 B.R. at 444 (including a "statement of assets and liabilities together with a profit and loss analysis prior to the filing of [the] Chapter 11 petition); In re Metrocraft Publ'g. Servs., Inc., 39 B.R. 567, 569 (Bankr. N.D.

7

Ga. 1984) (denying approval of a disclosure statement on grounds of insufficient asset valuation).

12. The Committee's Disclosure Statement contains absolutely no valuation of the Debtors' assets. While the Committee stated in their *Objection of the Official Committee of Unsecured Creditors to Approval of the Disclosure Statement in Respect of Joint Chapter 11 Plan of Liquidation for Magnachip Semiconductor Finance Company, et al. and UBS AG, Stamford Branch as Credit Agreement Agent and Priority Lien Collateral Agent* filed July 24, 2009 [Docket No. 141], and orally at the hearing on July 30, 2009 that by the Committee's estimates the value of the assets of the Debtors "substantially exceeds" the valuation in the Debtors' plan, no support for the Committee's assertions appears anywhere in the Committee's Disclosure Statement. At the hearing before this Court on July 30, 2009, the stated basis for the Committee's belief that it should be permitted to file a competing plan was the Committee's ostensible conviction that the *current* value of the assets of the Debtors greatly exceeded the proposed valuation of the assets in the Debtors' Plan, such that creditors could receive a superior recovery under a plan proposed by the Committee. July 30, 2009 Tr. at 42. Without an asset valuation in the Committee's Disclosure Statement, creditors lack adequate information to assess the Committee's Plan, or compare the merits of the Committee's Plan with those of the Debtors' Plan.

**B. The Committee's Disclosure Statement Provides No Financial Projections or other Information Creditors May Use to Determine the Feasibility of the Committee's Plan.**

13. Similarly, the Committee's Disclosure Statement contains no financial projections or other information to enable creditors to make a decision as to the feasibility of Committee's Plan. Information regarding "the anticipated future of the debtor, with accompanying financial

projections" is a required element of a disclosure statement. In re Ferretti, 128 B.R. at 18; In re Malek, 35 B.R. at 444 (disclosure statement must "provide sufficient financial information to determine if the projections for operations subsequent to confirmation are feasible").

14. The Committee's Plan proposes that the First Lien Lenders accept a note that is not due for five full years and almost every other creditor class accept some amount of equity compensation for their claims. Yet, the Committee's Disclosure Statement provides no financial projections or other information that would enable the First Lien Lenders or any other creditors to assess the feasibility of the Committee's Plan. Creditors have no basis to determine whether the reorganized debtors will be able to service their post-reorganization debt on a going-forward basis, much less leave any value for the holders of new equity.

## II. The Committee's Disclosure Statement Fails to Disclose that the Committee's Plan is Unconfirmable on its Face.

15. "If the disclosure statement describes a plan that is so "fatally flawed" that confirmation is "impossible," the court should exercise its discretion to refuse to consider the adequacy of disclosures. . . . Such an exercise of discretion is appropriate because undertaking the burden and expense of plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never legally be confirmed." In re Phoenix Petroleum, 278 B.R. at 394 (internal citations omitted). While most objections to the confirmability of a proposed plan are appropriate for the confirmation hearing rather than the disclosure hearing, "where the plan's inadequacies are patent, they may, and should be addressed at the disclosure statement stage." Id, citing In re Unichem Corp., 72 B.R. 95, 98 (Bankr. N.D. Ill. 1987).

CH\1119528.6

**A. The Committee's Plan is Unconfirmable under Sections 1129(a)(1) and 1129(a)(11) of the Bankruptcy Code Because it is Predicated Upon a Permanent Injunction of Actions against the Nondebtor Guarantors that Cannot be Granted.**

16. The Committee's Plan is unconfirmable on its face under Sections 1129(a)(1) and 1129(a)(11) of the Bankruptcy Code because it is predicated upon a permanent injunction enjoining the First Lien Agent and First Lien Lenders from exercising their rights against the Nondebtor Guarantors that violates Section 524(e) of the Bankruptcy Code and cannot be granted. Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the Bankruptcy Code to be confirmable. Section 1129(a)(11) of the Bankruptcy Code requires that a plan not be likely to be followed by the liquidation or further financial reorganization of the debtor or any successor to be confirmable.

17. After September 25, 2009, if the Debtors' Plan has not been confirmed, the Debtors and the Nondebtor Guarantors will be in default under the Enforcement Agreement, whereupon the First Lien Lenders will have the right to take action to exercise their valid prepetition default-related rights and foreclose upon the assets of the Nondebtor Guarantors. Virtually all of the assets upon which the First Lien Agent and First Lien Lenders have liens are owned by Nondebtor Guarantors and are not property of the Debtors' estates. Without the assets of the Nondebtor Guarantors, the Committee's Plan for reorganization will have virtually no assets around which to reorganize, and the Debtors' business will have no continuing viability (i.e., the Committee's Plan will not be feasible).

18. The Committee is attempting an end-run around the First Lien Lenders' enforcement rights against Nondebtor Guarantors by adding a provision to the Committee's Plan permanently enjoining the First Lien Lenders from taking any action against the Nondebtor Guarantors. See Committee's Plan at § X(B)(1). Permanent injunctions and non-consensual

10

CH\1119528.6

releases of actions against non-debtors as part of a plan of reorganization are barred by Section 524(e) of the Bankruptcy Code, as affirmed by this Circuit and others. See In re PWS Holding Corp., 228 F.3d 224, 245-46 (3d Cir. 2000) (holding that section 524(e) "makes clear that a discharge in bankruptcy does not extinguish claims by third parties against guarantors or directors and officers of the debtor for the debt discharged in bankruptcy"); accord In re Applewood Chair Co., 203 F.3d 914, 918 (5th Cir. 2000) ("The general rule is that a discharge in bankruptcy does not affect a guarantor's liability"); In re Airidigm Communs., Inc., 519 F.3d 640, 656 (7th Cir. 2008) (noting that 524(e) allows that "a creditor can still seek to collect a debt from a co-debtor who did not participate in the reorganization--even if that debt was discharged as to the debtor in the plan"); Landsing Diversified Properties-II v. First Nat'l Bank & Trust Co. of Tulsa (In re Western Real Estate Fund, Inc.), 922 F.2d 592, 601 (10th Cir. 1990) (stay prohibiting a creditor's suit against a nondebtor during case "may not be extended post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its own liability to creditor"); Underhill v. Royal, 769 F.2d 1426, 1432 (9th Cir. 1985) ("The bankruptcy court has no power to discharge the liabilities of a nondebtor pursuant to the consent of creditors as part of a reorganization plan."); In re Coram Healthcare, 315 B.R. 321, 335-36 (Bankr. D. Del. 2004) (denying approval of the releases of third parties against non-debtors as part of a plan of reorganization); In re Craig, 325 B.R. 804 (Bankr. D. Iowa 2005) (holding that a discharge in bankruptcy, along with coextensive permanent injunction and fresh start, are exclusive to debtor and do not otherwise affect enforcement of any underlying debt or any non-debtor liability thereon). Accordingly, the Committee's Plan violates Section 524(e) of the Bankruptcy Code and, therefore, fails to comply with Section 1129(a)(1) of the Bankruptcy Code.

11

CH\1119528.6

19. Because the injunction proposed in the Committee's Plan violates Section 524(e) of the Bankruptcy Code and cannot be granted, the Committee's Plan also fails the feasibility test in Section 1129(a)(11) of the Bankruptcy Code. After the First Lien Agent and First Lien Lenders exercise their rights against the Nondebtor Guarantors, the Debtors will be left with no business and virtually no assets, ensuring liquidation.

**B. The Committee's Plan Cannot be Confirmed as a "Cram-Up" over the Objections of the First Lien Lenders because the Committee Cannot Demonstrate that the Proposed Treatment of the First Lien Lenders Is "Fair and Equitable" under Section 1129(b)(2)(A).**

20. Because the First Lien Lenders will vote against the Committee's Plan, the Committee will be required to seek this Court's approval to "cram-up" the Committee's Plan over the objection of the First Lien Lenders, via Section 1129(b)(2)(A)(i), (ii) or (iii) of the Bankruptcy Code. The Committee's Plan proposes to compensate the First Lien Lenders for the First Lien Lender Secured Claims by providing them with a secured New Term Note in the same principal amount as the principal amount of the Credit Parties' prepetition obligations under the First Lien Credit Agreement - $95 million - to be repaid over five years at an interest rate of 10%.

21. A plan of reorganization is confirmable over the objection of a non-consenting class of creditors if the plan's treatment of that class' claims may be deemed "fair and equitable." See 11 U.S.C. §1129(b)(1). Treatment of a secured creditor is "fair and equitable" if each creditor in the non-consenting class both retains the liens securing its claim, and receives "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." 11 U.S.C. § 1129(b)(2)(A)(i)(II). To decide the proper interest/discount rate to be applied to render treatment "fair and equitable" under Section 1129(b)(2)(A)(i)(II), the United

12

States Supreme Court has suggested that courts apply the "market rate" upon determination that an "efficient market" exists, and apply a "formula approach", or interest rate premium to the national interest prime rate, upon a determination that efficient market does not exist. See Till v. SCS Credit Corp., 541 U.S. 465, 476 n.14, 478-79 (2004); accord Bank of Montreal v. Official Comm. of Unsecured Creditors (In re Am. Homepatient, Inc.), 420 F.3d 559, 568 (6th Cir. 2005). The formula-based approach consists of a "risk adjustment" above the national prime rate that is sufficient "to compensate a creditor for the real risk that the plan will fail." Till, 541 U.S. at 480; accord In re Cantwell, 336 B.R. 688, 693 (Bankr. D.N.J. 2006) (applying formula-based approach to determining interest rate in context of Chapter 11 and noting that the prime rate should be "adjusted to account for the greater risk of non-payment that bankruptcy debtors typically pose"). However, "[i]f the court determines that the likelihood of default is so high as to necessitate an 'eye-popping' interest rate, the plan probably should not be confirmed." Till, 541 U.S. at 480-81 (internal citations omitted); In re Am. Homepatient, 420 F.3d at 569 (same).

22. The First Lien Lenders will present evidence at the confirmation hearing that no efficient market exists for the New Term Loan and that a 10% interest rate - indeed, a rate many multiples of 10% - is insufficient to constitute "fair and equitable" treatment of the First Lien Lenders. The First Lien Lenders will present evidence at the confirmation hearing that both the First Lien Lenders and the Debtors marketed the Business extensively over a period of months prior to the Petition Date, and the $80 million sale price for the Business reached with KTB (approximately $70 million after adjustments) was the highest and best offer received. The First Lien Lenders will also present evidence at the confirmation hearing of the efforts of the First Lien Lenders to trade their first-lien debt to other banks or encourage a refinance of the Debtors' Business, each without success, as no financial institutions had interest in stepping into the First

13

Lien Lenders' position. The First Lien Lenders' debt, that nobody was willing to buy, even at a discount, is due now. The New Term Note that has the same collateral and is due in five years carries significantly more risk. The rate required to compensate the First Lien Lenders for the risk of default on the New Term Loan would have to be the 'eye-popping' interest rate described in Till. Therefore, the Committee's Plan should not be confirmed.

    **C.    The Committee's Plan is Unconfirmable on its Face Because it Leaves the Debtors with Insufficient Liquidity to Operate through the Ups and Downs of the Semiconductor Market.**

23. Even if the Court were to find that a 10% interest rate were "fair and equitable" compensation for the First Lien Lenders, the First Lien Lenders will present evidence at confirmation that payments even at a rate of 10% over 5 years on a $95 million note would render the Committee's Plan infeasible under § 1129(a)(11) because it will leave the Debtors with insufficient liquidity to survive the ups and downs of the volatile semiconductor industry. When determining a plan's feasibility, courts look to the following factors: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. See, e.g., In re Sound Radio Inc., 93 B.R. 849, 856 (Bankr. D.N.J. 1988); accord In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 227 (Bankr. D.N.J. 2000), citing In re Landmark at Plaza Park, Ltd., 7 B.R. 653, 659 (Bankr. D.N.J. 1980); In re Machne Menachem, Inc., 371 B.R. 63, 72 (Bankr. M.D. Pa. 2006). "All income projections indicating financial progress must be based on concrete evidence of financial progress, and must not be speculative, conjectural or unrealistic." Sound Radio, 93 B.R. at 856; see also In re Frascella Enters., 360 B.R. 435, 454 (Bankr. E.D. Pa. 2007) ("The purpose behind

the statutory requirement of feasibility is to prevent confirmation of visionary schemes which promise creditor and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.") (internal citations omitted).

24. The Debtors' EBITDA less capital expenditures over the past eight quarters set forth on Exhibit C shows the extreme volatility of the Debtors' business and the Debtors' inability to perform under the Committee's Plan. Moreover, during the past eight quarters, in an effort to preserve cash, the Debtors decreased quarterly capital expenditures from $40 million in the third quarter of 2007 to $700,000 in the second quarter of 2009.[3] Likewise, the Debtors decreased R&D expenses from $33.4 million in the third quarter of 2007 to $16 million in the second quarter of 2009.[4] These decreases in capital expenditures and R&D expenses are not sustainable. At a normal capital expenditure level of $20 million per quarter and a normal R&D level of $35 million per quarter, the Debtors' seemingly good results in the second quarter of 2009 decline from EBITDA less capital expenditures of $24.9 million to EBITDA less capital expenditures of negative $4.4 million. When the Debtors inevitably increase their capital expenditures and R&D expenses to normal levels, the Debtors will be unable to meet their interest obligations under the New Term Note and the lack of feasibility of the Committee's Plan will become immediately apparent.

**D. The Committee's Plan Cannot Meet the Requirement of Section 1129(a)(3) that a Plan be Proposed in Good Faith.**

25. The vast majority of the "unsecured" claims represented by the Committee are claims of holders of Second Lien Notes. Two of the three constituents sitting on the Committee

---

[3] Capital expenditures (in millions) for Q307=$40.0, Q407=$21.6, Q108=10.0, Q208=11.2, Q308=4.7, Q408=3.8, Q109=1.5, Q209=0.7.

[4] R&D expenses (in millions) for Q307=$33.4, Q407=$37.8, Q108=36.3, Q208=35.5, Q308=32.3, Q408=22.4, Q109=16.9, Q209=16.0.

15

are the Second Lien Trustee, the indenture trustee for the Second Lien Notes, and Avenue Capital, the largest holder of Second Lien Notes. Even if the Committee's Plan is found to be confirmable under Section 1129(b) of the Bankruptcy Code, by directing the Committee to file the Committee's Plan and Committee's Disclosure Statement, the Second Lien Trustee and the holders of Second Lien Notes have directly violated the terms of the Intercreditor Agreement.

26. While the Bankruptcy Code does not define "good faith," courts have interpreted the phrase to mean that a plan must be consistent with the objectives of the Bankruptcy Code, and be proposed with honesty, good intentions, and with a reasonable basis for expecting that reorganization can be achieved. See Stonington Partners v. Official Comm. Of Unsecured Creditors (In re Lernout & Hauspie Speech Prods.), 308 B.R. 672, 675 (D. Del. 2004) (reviewing case precedent for interpretation of "good faith"); accord In re Genesis Health Ventures Inc., 266 B.R. 591, 609 (Bankr. D. Del. 2001).

27. Good faith is lacking when "no realistic possibility of an effective reorganization exists" and it is evident that the plan proponent "seeks to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." In re Sound Radio, 93 B.R. at 853, citing In re Pikes Peak Water Co., 779 F.2d 1456, 1460 (10th Cir. 1985). In this case, the Committee's Plan provides no realistic possibility of an effective reorganization, as shown above. The Committee's Plan is simply an attempt to frustrate the legitimate efforts of the First Lien Lenders to enforce their rights against the Nondebtor Guarantors. Moreover, those enforcement rights are directly preserved vis-à-vis the holders of the Second Lien Notes by the terms of the Intercreditor Agreement.

28. The terms of the Intercreditor Agreement explicitly prohibit judicial actions by the holders of Second Lien Notes that run counter to the interests of the First Lien Lenders. By

16

the terms of the Intercreditor Agreement, the Second Lien Trustee, on behalf of the holders of Second Lien Notes agreed that holders of Second Lien Notes would not:

> request judicial relief, in an Insolvency or Liquidation Proceeding or in any other court or administrative tribunal, that would hinder, delay, limit or prohibit the lawful exercise or enforcement of any right or remedy otherwise available to the [First Lien Lenders] in respect of the [First Liens] or that would limit, invalidate, avoid or set aside any [First Lien] or subordinate the [First Liens] to the [Second Liens] or grant the [Second Liens] equal ranking to the [First Liens.]

Intercreditor Agreement § 3.2(b).

29. The obligations of the First Lien Lenders and the holders of Second Lien Notes under the Intercreditor Agreement have in no way been voided or altered as a result of the Debtors' bankruptcy filings with this Court. To the contrary, intercreditor agreements by nature set forth the respective rights of creditors in the event a common borrower should become insolvent and are expressly enforceable under Section 510 of the Bankruptcy Code. See In re Citibank N.A. v. Smith Jones, Inc., 17 B.R. 128, 131 (Bankr. D. Minn. 1982) (intercreditor agreements governed by section 510 of the Bankruptcy Code). The Committee, acting at the direction of Second Lien Trustee and the holders of Second Lien Notes, has filed a plan that frustrates the legitimate efforts of the First Lien Lenders to enforce their valid prepetition rights against the Nondebtor Guarantors and the Debtors.

## **CONCLUSION**

30. Based on the foregoing, the First Lien Agent respectfully requests that the Court (i) deny approval of the Committee's Disclosure Statement, and (ii) grant further relief as the Court deems appropriate.

Dated: August 27, 2009
       Wilmington, Delaware

DUANE MORRIS, LLP

*/s/ Richard W. Riley*
Richard W. Riley (DE 4052)
Duane Morris LLP
1100 N. Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 657-4900
Facsimile: (302) 657-4901

Josef S. Athanas, Esq.
Caroline A. Reckler, Esq.
LATHAM & WATKINS LLP
233 S. Wacker Dr., Suite 5800
Chicago, IL 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

Counsel for UBS AG, Stamford Branch, as Administrative Agent and Collateral Agent for the First Lien Lenders

CH\1119528.6