IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MAGNACHIP SEMICONDUCTOR FINANCE COMPANY, *et al.*,[1] | ) ) | Case No. 09-12008 (PJW) (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

## JOINT CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY MAGNACHIP SEMICONDUCTOR FINANCE COMPANY, ET AL. AND UBS AG, STAMFORD BRANCH, AS CREDIT AGREEMENT AGENT AND PRIORITY LIEN COLLATERAL AGENT

Laura Davis Jones (Delaware Bar No. 2436)
James E. O'Neill (Delaware Bar No. 4042)
Pachulski Stang Ziehl & Jones LLP
919 Market Street, 17th Floor | P.O. Box 8705
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Richard M. Pachulski (CA Bar No. 90073)
Debra I. Grassgreen (CA Bar No. 169978)
Joshua M. Fried (CA Bar No. 181541)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard, Suite 1100
Los Angeles, California 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

Counsel to Debtors and Debtors in Possession

Dated: August 31, 2009

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, and their respective addresses, are: MagnaChip Semiconductor Finance Company (4144), 787 N. Mary Avenue, Sunnyvale, CA 94085; MagnaChip Semiconductor LLC (5772), 787 N. Mary Avenue, Sunnyvale, CA 94085; MagnaChip Semiconductor SA Holdings LLC, 787 N. Mary Avenue, Sunnyvale, CA 94085; MagnaChip Semiconductor, Inc. (8632), 787 N. Mary Avenue, Sunnyvale, CA 94085; MagnaChip Semiconductor S.A. (9734), 74 Rue de Merl, B.P. 709, L-2017 Luxembourg; and MagnaChip Semiconductor B.V. (9827), 1043 BW Amsterdam, Naritaweg 165, the Netherlands.

# Table of Contents

**Page**

I. INTRODUCTION ........................................................................................... 1

II. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW ........................................................................ 2

    A.    Rules of Interpretation, Computation of Time, and Governing Law ..................... 2

    B.    Defined Terms ............................................................................................ 3

III. TREATMENT OF ADMINISTRATIVE EXPENSES AND TAX CLAIMS ...................... 13

    A.    Introduction ............................................................................................. 13

    B.    Administrative Expenses ........................................................................... 14

    C.    Superpriority Claims .................................................................................. 14

    D.    Tax Claims ............................................................................................... 14

IV. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ........................................................................................... 15

    A.    Summary ................................................................................................. 15

    B.    Classification and Treatment of Claims and Interests ........................................ 15

        1.    Class 1 (A-F) – Priority Non-Tax Claims ............................................... 15

        2.    Class 2 (A-F) – Other Secured Claims .................................................. 16

        3.    Class 3 (A-F) – First Lien Lender Secured Claims ................................... 16

        4.    Classes 4 (A-F) – Second Lien Noteholder Claims .................................. 17

        5.    Class 5 (A-F) – General Unsecured Claims ............................................ 17

        6.    Class 6 (A-F) – Subordinated Note Claims ............................................ 18

        7.    Class 7 (A-F) – Intercompany Claims against the Debtors ..................... 18

        8.    Class 8 (A-F) – Interests in the Debtors ................................................ 18

V. ACCEPTANCE OR REJECTION OF PLAN ........................................................ 19

    A.    Identification of Impaired Classes ............................................................... 19

| | 1. | Class 1 (A-F) – Priority Non-Tax Claims | 19 |
|---|---|---|---|
| | 2. | Class 2 (A-F) – Other Secured Claims | 19 |
| | 3. | Class 3 (A-F) – First Lien Lender Secured Claims | 19 |
| | 4. | Class 4 (A-F) – Second Lien Noteholder Claims | 19 |
| | 5. | Class 5 (A-F) – General Unsecured Claims | 19 |
| | 6. | Class 6 (A-F) – Subordinated Note Claims | 19 |
| | 7. | Class 7 (A-F) – Intercompany Claims against the Debtors | 19 |
| | 8. | Class 8 (A-F) – Interests in the Debtors | 19 |
| B. | | Classes Permitted and Not Permitted to Vote | 19 |
| C. | | Nonconsensual Confirmation | 19 |
| D. | | Postpetition Interest | 20 |

VI. MEANS FOR IMPLEMENTATION OF THE PLAN ............................ 20

| A. | | The Sale | 20 |
|---|---|---|---|
| B. | | Release of Liens/Secured Lien Guaranties/Subordinated Note Guaranties | 21 |
| | 1. | Release of Liens on Purchased Assets. | 21 |
| | 2. | Release of Second Lien Guarantees. | 21 |
| | 3. | Release of Subordinated Note Guarantees. | 21 |
| C. | | Continued Corporate Existence and Vesting of Assets | 21 |
| D. | | Retained Rights of Action | 22 |
| E. | | Claims Objections | 22 |
| F. | | Corporate Governance | 22 |
| G. | | Wind-Down | 22 |
| H. | | Funding for the Plan | 24 |
| I. | | Corporate Action/Dissolution | 24 |
| J. | | Interests in Affiliates and Subsidiaries | 25 |

K.      Payment of Plan Expenses .................................................................. 25

L.      Dissolution of the Official Committee................................................ 25

VII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES............. 25

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ........ 25

B.      Objections to Assumption of Executory Contracts and Unexpired Leases ......... 26

      1.      Objection Procedure Generally................................................ 26

      2.      Objection Based on Grounds Other Than "Cure" Amount. .................... 26

      3.      Objection Based on "Cure" Amount........................................ 26

C.      Payment Related to Assumption of Executory Contracts and Unexpired Leases................................................................................ 26

D.      Bar Date for Rejection Damages ...................................................... 27

VIII. DISTRIBUTIONS AND RELATED MATTERS ........................................ 27

A.      Dates of Distribution.................................................................. 27

B.      Cash Distributions..................................................................... 27

C.      Rounding of Payments ................................................................ 28

D.      Disputed Claims....................................................................... 28

E.      Undeliverable and Unclaimed Distributions........................................ 28

F.      Compliance With Tax Requirements ................................................. 29

G.      Record Date in Respect to Distributions............................................. 29

H.      Reserves ............................................................................... 29

I.      Conditions to Receiving Distributions................................................ 30

J.      Subordination.......................................................................... 30

IX. LITIGATION, OBJECTIONS TO CLAIMS, AND DETERMINATION OF TAXES ....... 30

A.      Litigation; Objections to Claims; Objection Deadline............................. 30

B.      Temporary or Permanent Resolution of Disputed Claims.................... 31

C.      Release of Avoidance Actions ....................................................... 31

D. Preservation of Retained Rights of Action .......................................................... 31

X. EFFECT OF CONFIRMATION AND RELATED PROVISIONS ...................................... 32

    A. Effect of Confirmation ........................................................................................ 32

        1. Binding Effect of Plan ............................................................................. 32

        2. Business Transfer Agreement ................................................................. 32

    B. Injunction ............................................................................................................ 32

        1. Generally ................................................................................................. 32

        2. Injunction Related to Rights of Action and  Terminated Claims, Administrative Expenses or Interests ....................................................... 33

    C. Exculpation ......................................................................................................... 33

    D. Debtor Release .................................................................................................... 34

    E. Third Party Release ............................................................................................. 34

    F. Subsequent Discovery of Facts Does Not Affect Enforceability of Releases .............................................................................................................. 34

XI. PENSION PLANS, OTHER RETIREE BENEFITS AND LABOR CONTRACTS ........... 34

XII. NO REGULATED RATE CHANGE WITHOUT GOVERNMENT APPROVAL ........... 35

XIII. EXEMPTION FROM CERTAIN TRANSFER TAXES .................................................. 35

XIV. RETENTION OF JURISDICTION AND MISCELLANEOUS MATTERS ................... 35

    A. Retention of Jurisdiction .................................................................................... 35

    B. Miscellaneous Matters ....................................................................................... 37

        1. Headings ................................................................................................. 37

        2. Services by and Fees for Professionals and Certain Parties ................... 37

        3. Bar Date for Administrative Expenses .................................................... 38

        4. Notices .................................................................................................... 38

        5. Successors and Assigns............................................................................ 39

        6. Severability of Plan Provisions ............................................................... 39

| | 7. | No Waiver | 39 |
|---|---|---|---|
| | 8. | Inconsistencies | 40 |

XV. CONDITIONS TO CONFIRMATION AND EFFECTIVENESS ... 40

    A.    Conditions Precedent to Plan Effectiveness ... 40

    B.    Effect of Non-Occurrence of Conditions to Effective Date ... 40

XVI. EFFECT OF CONFIRMATION ... 40

    A.    Binding Effect of Confirmation ... 40

    B.    Good Faith ... 41

    C.    No Limitations on Effect of Confirmation ... 41

XVII. MODIFICATION OR WITHDRAWAL OF PLAN ... 41

    A.    Modification of Plan ... 41

    B.    Withdrawal of Plan ... 41

XVIII. CONFIRMATION REQUEST ... 42

**Exhibits**

| Exhibit | Description |
|---|---|
| A | Business Transfer Agreement |
| B | Enforcement, Consent, Cash Collateral and Limited Forbearance Agreement |
| C | Assigned Contracts |

MagnaChip Semiconductor Finance Company; MagnaChip Semiconductor LLC; MagnaChip Semiconductor SA Holdings LLC; MagnaChip Semiconductor, Inc.; MagnaChip Semiconductor S.A.; and MagnaChip Semiconductor B.V. (collectively, the "Debtors"), and UBS AG, Stamford Branch ("Agent" and, with Debtors, "Plan Proponents"), hereby propose the following Joint Plan of Liquidation pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*:

# I.
# INTRODUCTION[1]

Following various continuing defaults under the First Lien Credit Agreement, the Debtors, the Non-Debtor Affiliates and the First Lien Lender Parties entered into negotiations that resulted in the execution of a Forbearance Agreement dated as of November 14, 2008, which has been amended and extended through the Eleventh Amendment dated as of June 5, 2009. In December 2008, the First Lien Lender Parties accelerated all of the obligations under the First Lien Credit Agreement and provided various payment blockage and acceleration notices to the Second Lien Noteholder Trustee and to the Subordinated Note Trustee, and the Sellers began to actively market the sale of their business, including the engagement of an investment banker to provide global exposure to likely investors or purchasers.

After a lengthy marketing process and parallel negotiations with various candidates, the Buyer was chosen as the highest and best bidder. Pursuant to those discussions, the Sellers and Buyer have executed the Business Transfer Agreement and subject to, among other things, confirmation of this Plan, the Sellers intend to sell the Acquired Assets and assign the Acquired Contracts and the Assumed Liabilities to the Buyer.

The Plan provides for the satisfaction of Claims against the Debtors and the enforcement of the First Lien Lender Secured Claims through (a) the authorization by the Debtors of the sale of substantially all of the assets of the Selling Non-Debtors, which are direct or indirect foreign subsidiaries of the Debtors, which sale will be conducted under applicable nonbankruptcy law, and (b) the sale of substantially all of the assets of Debtor MSA, certain assets of Debtor Luxco, and the assignment of certain non-disclosure agreements and other contracts listed on **Exhibit "C"** hereto owned by LLC through the Plan. The Sale Proceeds, together with the Debtors' available Cash as of the Effective Date, will be used to satisfy Claims, Plan Expenses and Case Expenses as provided under the Plan. Upon the Effective Date of the Plan, the liens of the First Lien Lender Parties and the Second Lien Noteholders on the Purchased Assets shall be released and extinguished, and the Second Lien Guarantees in favor of the Second Lien Noteholders from the Non-Korean Guarantors and the Subordinated Note Guaranties in favor of the Holders of the Subordinated Note Claims shall be released. Under the Plan, the First Lien Lender Parties will receive a *pro rata* distribution of the Net Sale Proceeds and the proceeds of certain other assets of the Debtors that are not being sold pursuant to the Business Transfer Agreement. If the Class of Second Lien Noteholders and the Class of Holders of General Unsecured Claims vote to accept the Plan,and the Korean Guarantee is released they will receive a *pro rata* distribution of the Unsecured Creditor Distribution (along with the Holders of Subordinated Note Claims), provided, however, that any distribution that would otherwise be made to Holders of Subordinated Note Claims will be paid to the Second Lien Noteholders pursuant to the

---

[1] Unless otherwise noted, capitalized terms used in this Plan have the meanings ascribed in Article II herein.

subordination provisions in the Subordinated Note Indenture. All Intercompany Claims against the Debtors and all Interests in the Debtors will be cancelled either upon the Effective Date of the Plan or in connection with the Wind-Down of the Debtors. Following the Effective Date, and in connection with a Wind-Down, each Debtor will be dissolved in accordance with terms of the Plan.

The Disclosure Statement, distributed with this Plan, contains a discussion of the Debtors' history, a summary of the Debtors' assets and liabilities, a summary of what Holders of Claims and Interests will receive under the Plan, a discussion of certain alternatives to the Plan, and a summary of the procedures and voting requirements necessary for Confirmation of the Plan. The Disclosure Statement is intended to provide Holders of Claims and Interests with information sufficient to enable such Holders to vote on the Plan. *All Holders of Claims entitled to vote on this Plan are encouraged to carefully read the Disclosure Statement and this Plan before voting to accept or reject this Plan. No solicitation materials, other than the Disclosure Statement and related materials transmitted herewith and approved by the Bankruptcy Court, have been authorized for use in soliciting acceptance or rejection of this Plan.*

## II.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

### A. Rules of Interpretation, Computation of Time, and Governing Law

For purposes of the Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (b) any reference in the Plan to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified, or supplemented from time to time in accordance with the terms thereof and hereof; (c) unless otherwise specified, all references in the Plan to sections and exhibits are references to sections and exhibits of or to the Plan; (d) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (e) captions and headings to sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (f) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (g) any term used in capitalized form in the Plan that is not defined in the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

In computing any period of time prescribed or allowed by the Plan, the provisions of Federal Rule of Bankruptcy Procedure 9006(a) shall apply.

Except to the extent that the Bankruptcy Code, Bankruptcy Rules, or other federal law is applicable, and subject to the provisions of any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

**B.** **Defined Terms**

The following definitions shall apply to capitalized terms used in the Plan:

1. "Acquired Assets" has the meaning assigned to such term in the Business Transfer Agreement.

2. "Acquired Contracts" has the meaning assigned to such term in the Business Transfer Agreement.

3. "Adjusted Sale Proceeds" means the Sale Proceeds less the Non-Buyer Professional Expenses (as defined in the Business Transfer Agreement), if any, paid between February 1, 2009 and the Closing Date; provided that the amount of the Non-Buyer Professional Expenses will not include any accrued and unpaid amounts for such period provided for on Schedule 1.2 to the Business Transfer Agreement.

4. "Administrative Expense" means an unpaid administrative expense of the kind described in sections 503(b) and 507(a)(2) of the Bankruptcy Code against any of the Debtors (other than the Superpriority Claims), including, without limitation, (i) the actual, necessary costs and expenses of preserving the Estates of the Debtors, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Cases; (ii) compensation and reimbursement of expenses of professionals to the extent allowable under sections 327, 328, 330(a), 331, 503(b) or 1103 of the Bankruptcy Code; and (iii) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911 –1930, including the fees, if any, due to the United States Trustee.

5. "Agent" means UBS AG, Stamford Branch, in its capacity as administrative agent and collateral agent for the First Lien Lenders under the First Lien Credit Agreement.

6. "Allowed" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by any Debtor in its Schedules as other than disputed, contingent, or unliquidated that has not been superseded by a Filed proof of Claim and as to which a Debtor or any other party in interest has not Filed an objection; (b) a Claim that has been allowed by a Final Order; (c) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by a Debtor prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation of amount and nature of Claim executed by a Liquidating Debtor, as the case may be, on or after the Effective Date and, to the extent necessary, approved by the Bankruptcy Court; or (iii) in any contract, instrument, indenture, or other agreement entered into or assumed by a Debtor in connection with and in accordance with this Plan; (d) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law; or (e) a Claim that is allowed pursuant to the terms of this Plan.

7. "Assumed Liabilities" has the meaning assigned to such term in the Business Transfer Agreement.

8. "Avoidance Claims" means any Right of Action for the recovery of transfers arising under sections 510(c), 542, 543, 544, 547, 548, 549 or 550 of the Bankruptcy Code or applicable state law.

9. "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended, as set forth in title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as now in effect or hereafter amended.

10. "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court of competent jurisdiction as may be administering the Chapter 11 Cases or any part thereof.

11. "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure promulgated pursuant to 28 U.S.C. § 2075, as now in effect or hereinafter amended, together with the local rules of the Bankruptcy Court.

12. "Bar Date" means, when not otherwise specified, the date fixed by statute or pursuant to both Bankruptcy Rule 3003(c)(3) and a Final Order of the Bankruptcy Court as the deadline for filing proofs of Claims or Interests (whether or not each and every proof of Claim or Interest is subject to such deadline).

13. "Business Day" means any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

14. "Business Transfer Agreement" means that certain Business Transfer Agreement attached hereto as **Exhibit "A"** and incorporated herein by reference, dated as of June 11, 2009, together with all amendments or supplements thereto with the prior written consent of the Agent, by and among MSK; MSA; MagnaChip Semiconductor Limited, a company incorporated in the United Kingdom; MagnaChip Semiconductor Inc., a company incorporated in Japan; MagnaChip Semiconductor Limited, a company incorporated in Hong Kong SAR; MagnaChip Semiconductor Limited, a company incorporated in Taiwan; and Luxco; and the Buyer, as represented by its general partner KTB Securities Co., Ltd., a Korean corporation, pursuant to which the Buyer will acquire the Purchased Assets.

15. "Buyer" means KTB 2007 Private Equity Fund, a Korean registered limited partnership or its authorized assignee.

16. "Case Expenses" has the meaning assigned to such term in the Enforcement Agreement and limited to (a) the budgeted amounts set forth in Exhibit H to the Enforcement Agreement that are unpaid on the Closing Date plus (b) the difference between (i) $1,000,000 and (ii) the aggregate amount of Priority Claim Distributions (to the extent Priority Claim Distributions are less than $1,000,000).

17. "Cash" means currency of the United States of America and cash equivalents, including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire transfers and other similar forms of payment.

4

18.     "Chapter 11 Cases" means the cases commenced under chapter 11 of the Bankruptcy Code by each of the Debtors on the Petition Date and pending before the Bankruptcy Court.

19.     "Claim" means any claim against the Debtors, or any of them, within the meaning of section 101(5) of the Bankruptcy Code that is not an Administrative Expense or Superpriority Claim, including, without limitation, claims of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

20.     "Claims Agent" means Omni Management Group, in its capacity as claims agent for the Debtors.

21.     "Class" means each category of Claims or Interests classified in Section IV of the Plan pursuant to section 1122 of the Bankruptcy Code.

22.     "Closing Date" means the date upon which the transaction described in the Business Transfer Agreement is consummated.

23.     "Collateral Trustee" means U.S. Bank, National Association, in its capacity as collateral trustee under the Collateral Trust Agreement dated as of December 23, 2004, by and among the Agent, the Second Lien Noteholder Trustee and the Collateral Trustee.

24.     "Committee" means any official committee(s) of unsecured creditors of the Debtors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

25.     "Confirmation" means the approval by the Bankruptcy Court of the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code, as effectuated by the entry of the Confirmation Order.

26.     "Confirmation Date" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 11 Cases.

27.     "Confirmation Hearing" means the date or dates established by the Bankruptcy Court for the hearing(s) on confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as it may be adjourned or continued from time to time.

28.     "Confirmation Order" means the order entered by the Bankruptcy Court confirming (approving) the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code, in form and substance acceptable to the Plan Proponents.

29.     "Consummation" means substantial consummation of the Plan as that term is used in section 1127(b) of the Bankruptcy Code.

30.     "Creditor" means any Person who is the Holder of a Claim, Administrative Expense, or Superpriority Claim against any of the Debtors.

31.     "Debtors" means (i) Finco; (ii) LLC; (iii) Holdco; (iv) MSA; (v) Luxco; and (vi) Dutchco; in their corporate capacities, other capacities and, as appropriate, in their capacities as

5

debtors and debtors in possession under chapter 11 of the Bankruptcy Code in their Chapter 11 Cases and, when the context so requires, in their capacities as the Liquidating Debtors.

32.    "Deficiency Claims" means, with respect to any Claim secured by a valid Lien on any property of any Debtor having a value of less than the amount of such Claim (after taking into account other Liens of higher priority on such property), the portion of such Claim equal to the difference between (a) the amount of the Claim and (b) the Allowed amount of the secured portion of such Claim (which Allowed secured amount may be set pursuant to this Plan). All Claims secured by a Lien on the assets of the Debtors junior in priority to the Lien securing the First Lien Lender Secured Claims, including, without limitation, the Second Lien Noteholder Claims, shall constitute Deficiency Claims.

33.    "Disallowed" means, with respect to a Claim, Interest, or Administrative Expense, all or a portion thereof that it is determined is not allowed under the Bankruptcy Code either by a Final Order, the Plan, any Plan Document or under a stipulation or settlement with any of the Debtors entered into after the Effective Date.

34.    "Disclosure Statement" means the *Disclosure Statement in Support of Joint Chapter 11 Plan of Liquidation Proposed by MagnaChip Semiconductor Finance Company, et al. and UBS AG Stamford Branch,* as may be amended, modified, or supplemented from time to time in accordance with the terms hereof, submitted pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of the Plan.

35.    "Disputed Claim" means (i) a Claim, Interest, or Administrative Expense that is subject to a pending objection or for which the Bankruptcy Court's order allowing or disallowing such Claim, Interest, or Administrative Expense is on appeal; or (ii) until the Objection Deadline,

   a.    a Claim for which a corresponding Claim has not been listed in the Debtors' Schedules or for which the corresponding Claim is listed in the Debtors' Schedules with a differing amount (to the extent of such difference), with a differing classification, or as disputed, contingent, or unliquidated; and

   b.    a Claim that has not been Allowed either by a Final Order, the Plan, any Plan Document, or under a stipulation or settlement with any of the Debtors entered into after the Effective Date.

36.    "Distributable Assets" means, as to each Debtor, any assets of such Debtor that are not Purchased Assets or Net Sale Proceeds, including without limitation, any Distributable Cash and Claims.

37.    "Distributable Cash and Claims" means, as to each Debtor, any Cash, deposit accounts, reserves, and deposits remaining in the Estate of such Debtor as of the Effective Date, together with any Retained Rights of Action of such Debtor (including Intercompany Claims against Non-Debtor Affiliates), but excluding other real and personal property of such Debtor.

38.    "Dutchco" means MagnaChip Semiconductor B.V., a company incorporated in the Netherlands.

39.     "Effective Date" means the first Business Day after the Confirmation Date immediately following the first day upon which all of the conditions to the occurrence of the Effective Date have been satisfied or waived in accordance with the Plan.

40.     "Enforcement Agreement" means that certain Enforcement, Consent, Cash Collateral and Limited Forbearance Agreement, dated as of June 11, 2009, together with any amendments or supplements thereto with the prior written consent of the Agent, by and among Luxco, Finco, the First Lien Guarantors, the Agent and the Collateral Trustee, a copy of which is attached hereto as **Exhibit "B"** and incorporated herein by reference.

41.     "Entity" and "Entities" mean an entity as defined in section 101(5) of the Bankruptcy Code or more than one thereof.

42.     "Estate(s)" means each estate created pursuant to section 541(a) of the Bankruptcy Code upon the commencement of each Chapter 11 Case.

43.     "Exchange Rate" means the telegraphic transfer dollar buying rate as quoted by Korea Exchange Bank on the opening of business in Seoul, Korea, one Korean banking business day before the Sale Closing Date.

44.     "Fee Applications" mean applications of Professional Persons under sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Chapter 11 Cases.

45.     "Fee Claims" means Administrative Expenses for compensation and reimbursement of expenses of professionals to the extent allowable under sections 327, 328, 330(a), 331, 503(b) or 1103 of the Bankruptcy Code.

46.     "File" or "Filed" means filed of record and entered on the docket in the Chapter 11 Cases or, in the case of a proof of Claim, delivered to the Claims Agent.

47.     "Final Cash Collateral Order" means the *Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code Authorizing the Use of Cash Collateral Pursuant to the Enforcement Agreement and Granting Adequate Protection to First Lien Lenders and Second Lien Noteholders*, entered by the Bankruptcy Court in the Chapter 11 Cases on July 13, 2009.

48.     "Final Order" means a judgment, order, ruling, or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal, which judgment, order, ruling, or other decree has not been reversed, stayed, modified, or amended and as to which (a) the time to appeal or petition for review, rehearing, or certiorari has expired and as to which no appeal or petition for review, rehearing or certiorari is pending; or (b) any appeal or petition for review, rehearing, or certiorari has been finally decided and no further appeal or petition for review, rehearing, or certiorari can be taken or granted.

49.     "Final Resolution Date" means the date on which all Disputed Claims of Creditors shall have been resolved by Final Order or otherwise finally determined.

50.     "Finco" means MagnaChip Semiconductor Finance Company, a Delaware corporation.

7

51.    "First Lien Credit Agreement" means that Credit Agreement, dated as of December 23, 2004, by and among the First Lien Lender Parties; Luxco and Finco, as borrowers; and the First Lien Guarantors; and any ancillary documents issued in connection therewith or related thereto.

52.    "First Lien Guarantors" means LLC; Dutchco; MSK; Holdco; MagnaChip Semiconductor Limited, a company incorporated in the United Kingdom; MagnaChip Semiconductor Holding Company Limited, a British Virgin Islands company; MagnaChip Semiconductor Inc., a company incorporated in Japan; MagnaChip Semiconductor Limited, a company incorporated in Hong Kong SAR; MagnaChip Semiconductor Limited, a company incorporated in Taiwan; and MSA.

53.    "First Lien Lender" means a "Lender" under and as defined in the First Lien Credit Agreement.

54.    "First Lien Lender Parties" means the Agent, the First Lien Lenders, UBS Securities LLC, as Arranger, Syndication Agent and Documentation Agent, UBS Loan Finance LLC, as Swingline Lender, and Korea Exchange Bank, as Issuing Bank.

55.    "First Lien Lender Secured Claims" means the Secured Claims of the First Lien Lender Parties arising under, in connection with or pursuant to the First Lien Credit Agreement and the Final Cash Collateral Order and all other documents, instruments, guarantees and other agreements related to either thereof.

56.    "General Unsecured Claim" means a Claim against any of the Debtors other than (a) an Administrative Expense, (b) a Superpriority Claim, (c) a Tax Claim, (d) a Priority Non-Tax Claim, (e) an Other Secured Claim, (f) a First Lien Lender Secured Claim, (g) a Second Lien Noteholder Claim, (h) a Subordinated Note Claim, and (i) an Intercompany Claim.  General Unsecured Claims include, without limitation, any Deficiency Claim of the First Lien Lender Parties and any Intercompany Trade Payables owing by any of the Debtors.

57.    "Holdco" means MagnaChip Semiconductor SA Holdings LLC, a Delaware limited liability company.

58.    "Holder" means the beneficial owner of any Claim, Interest, Administrative Expense, or Superpriority Claim.

59.    "Impaired" has the meaning set forth in section 1124 of the Bankruptcy Code.

60.    "Intercompany Claim" means any Claim or Administrative Claim asserted against a Debtor or Non-Debtor Affiliate by any other Debtor or Non-Debtor Affiliate, including, without limitation, any subrogation claim that has not been waived and any contribution claim, but excluding any Intercompany Trade Receivables and Intercompany Trade Payables.

61.    "Intercompany Trade Payables" means the Sellers' trade accounts payable to the Debtors and Non-Debtor Affiliates that are part of the Assumed Liabilities under the Business Transfer Agreement.

62. "Intercompany Trade Receivables" means the Sellers' trade accounts receivable from the Debtors and Non-Debtor Affiliates that are part of the Acquired Assets under the Business Transfer Agreement.

63. "Intercreditor Agreement" means that certain intercreditor agreement dated as of December 23, 2004, among Luxco, Finco, the First Lien Guarantors, the Agent, the Second Lien Noteholder Trustee, the Second Lien Collateral Agent and the Collateral Trustee.

64. "Interest" means an equity security of any Debtor within the meaning of section 101(16) of the Bankruptcy Code.

65. "Korean Guarantee" means the guarantee by MSK of Luxco's and Finco's obligations under the Second Lien Indenture and the notes executed pursuant to the Second Lien Indenture.

66. "Lenders" means, collectively, the First Lien Lenders and the Second Lien Noteholders.

67. "Lien" means any charge against or security interest in property to secure payment or performance of a Claim, debt, or obligation.

68. "Liquidating Debtors" means all or each of the Debtors from and after the Effective Date.

69. "LLC" means MagnaChip Semiconductor LLC, a Delaware limited liability company.

70. "Luxco" means MagnaChip Semiconductor S.A., a *société anonyme* and organized under the laws of Luxembourg.

71. "MSA" means MagnaChip Semiconductor, Inc., a California corporation.

72. "MSK" means MagnaChip Semiconductor, Ltd., a Korean limited liability company.

73. "Net Sale Proceeds" means the Adjusted Sale Proceeds less, an amount that equals the sum of the following, unless otherwise consented to in writing by the First Lien Lenders: (i) the Case Expenses, (ii) the Unsecured Creditor Distribution, and (iii) Priority Claim Distributions.

74. "Non-Debtor Affiliates" means the Selling Non-Debtors, MagnaChip Semiconductor Holding Company Limited, a company incorporated under the laws of the British Virgin Islands, and MagnaChip Semiconductor (Shanghai) Company Limited, a Chinese corporation.

75. "Non-Korean Guarantors" means all First Lien Guarantors other than MSK.

76. "Objection Deadline" means the deadline to object to Claims specified in Article IX(A) of the Plan.

9

77.     "Other Secured Claim" means any Secured Claim other than a First Lien Lender Secured Claim or a Second Lien Noteholder Claim.

78.     "Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, or other entity of whatever nature.

79.     "Petition Date" means the date on which each of the Debtors Filed their petitions for relief under chapter 11 of the Bankruptcy Code – June 12, 2009.

80.     "Plan" means this Joint Plan of Liquidation for the Debtors.

81.     "Plan Documents" means the Plan, the Disclosure Statement, and all exhibits and schedules to either of the foregoing.

82.     "Plan Expenses" means the expenses incurred by the Liquidating Debtors following the Effective Date (including the reasonable fees and costs of attorneys and other professionals) for the purpose of (i) resolving Disputed Claims, if any, and effectuating distributions to Creditors under the Plan, (ii) otherwise implementing the Plan, the Wind-Down, and closing the Chapter 11 Cases, or (iii) undertaking any other matter relating to the Plan.

83.     "Plan Proponents" means the Debtors and the Agent.

84.     "Plan Representative" means the individual selected to fill this role in accordance with Article VI(F) of the Plan.  John McFarland shall be the initial Plan Representative.

85.     "Priority Claim Distributions" shall mean distributions on account of all unpaid Allowed Tax Claims and Priority Non-Tax Claims as required by the Plan in an aggregate amount of up to $1,000,000.

86.     "Priority Non-Tax Claim" means any Claim, other than a Tax Claim, to the extent entitled to priority under section 507(a) of the Bankruptcy Code.

87.     "Pro Rata" means proportionately, so that with respect to any distribution, the ratio of (a) (i) the amount of property to be actually or theoretically distributed on account of a particular Claim and/or Interest or particular group of Claims and/or Interests to (ii) the amount of such particular Claim and/or Interest or group of Claims and/or Interests, is the same as the ratio of (b) (i) the amount of property to be actually or theoretically distributed on account of all Claims and/or Interests or groups of Claims and/or Interests sharing in such distribution to (ii) the amount of all Claims and/or Interests or groups of Claims and/or Interests sharing in such distribution.

88.     "Professional Person" shall mean Persons retained or to be compensated pursuant to sections 326, 327, 328, 330, 503(b), and 1103 of the Bankruptcy Code.

89.     "Purchased Assets" means the Acquired Assets and Acquired Contracts.

90.     "Record Date" means the Effective Date.

91.     "Released Parties" means the parties described in Article X(C) of the Plan.

92.     "Representative" means, as to the referenced Person, such Person's present and former officers, directors, shareholders, trustees, partners and partnerships, members, agents, employees, representatives, professionals, and successors or assigns, in each case solely in their capacity as such.

93.     "Retained Rights of Action" means all Rights of Action belonging to any of the Estates as of the Effective Date, other than those Rights of Action specifically released under the Plan, including Avoidance Claims released pursuant to Article IX(C) hereof.

94.     "Rights of Action" means any and all claims, demands, rights, defenses, actions, causes of action, suits, contracts, agreements, obligations, accounts, defenses, offsets, powers and privileges of any kind or character whatsoever, known or unknown, suspected or unsuspected, whether arising prior to, on, or after the Petition Date, in contract or in tort, at law or in equity, or under any other theory of law, held by any Person against any other Person.

95.     "Sale" means the sale of substantially all of the assets of the Selling Non-Debtors, together with the sale of substantially all the assets of MSA, certain assets of Luxco and the assignment of certain non-disclosure agreements and other contracts owned by LLC and listed on **Exhibit "C"** hereto, to Buyer pursuant to the Business Transfer Agreement and this Plan.

96.     "Sale Closing Date" means the effective date of the closing of the Sale.

97.     "Sale Proceeds" means (i) in the event that the Exchange Rate is less than or equal to KRW1,500/US$1, eighty million U.S. dollars (US$80,000,000), (ii) in the event that the Exchange Rate is between KRW1,500/US$1 and KRW1,575/US$1, the U.S. dollar equivalent of one hundred twenty billion Korean won (KRW120,000,000,000), as calculated at the Exchange Rate; or (iii) in the event that the Exchange Rate is greater than or equal to KRW1,575/US$1, seventy-six million, one hundred ninety thousand, four hundred seventy-six U.S. dollars (US$76,190,476).

98.     "Schedules" means the schedules Filed by the Debtors with the clerk of the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been or may be amended from time to time.

99.     "Second Lien Collateral Agent" means The Bank of New York, in its capacity as "Parity Lien Collateral Agent" as defined in the Second Lien Indenture.

100.    "Second Lien Guarantees" means the guarantees by the Second Lien Guarantors of Luxco's and Finco's obligations under the Second Lien Indenture and the notes executed pursuant to the Second Lien Indenture.

101.    "Second Lien Guarantors" means the Non-Korean Guarantors and MSK.

102.    "Second Lien Indenture" means that certain Indenture, dated as of December 23, 2004, providing for the issuance of *Floating Rate Second Priority Senior Secured Notes due 2011 and 6 7/8% Second Priority Senior Secured Notes due 2011,* by and among the Second

11

Lien Noteholder Trustee; the Collateral Trustee; Luxco and Finco, as issuers, and the Second Lien Guarantors.

103.   "Second Lien Noteholder Claim" means the Claims of the Second Lien Noteholder Trustee and the Second Lien Noteholders arising under, in connection with or pursuant to the Second Lien Indenture, the Final Cash Collateral Order and all other documents, instruments, guarantees and agreements related to either thereof.

104.   "Second Lien Noteholder Trustee" means Bank of New York, as trustee under the Second Lien Indenture.

105.   "Second Lien Noteholders" means the "Holders" under and as defined in the Second Lien Indenture.

106.   "Secured Claim" means any Claim of any Person that is secured by a Lien on property in which any of the Debtors or the Estates has an interest, which Lien is valid, perfected, and enforceable under applicable law or by reason of a Final Order, or that is subject to setoff under section 553 of the Bankruptcy Code, but only to the extent of the value, as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code, of any interest of the claimant in the property of the Estate securing such Claim or subject to setoff.

107.   "Sellers" means Selling Debtors and Selling Non-Debtors.

108.   "Selling Debtors" means Luxco and MSA.

109.   "Selling Non-Debtors" means MSK; MagnaChip Semiconductor Limited, a company incorporated in the United Kingdom; MagnaChip Semiconductor Inc., a company incorporated in Japan; MagnaChip Semiconductor Limited, a company incorporated in Hong Kong SAR; and MagnaChip Semiconductor Limited, a company incorporated in Taiwan.

110.   "Subordinated Note Claim" means any Claim of the Subordinated Note Trustee or any Subordinated Noteholder arising under, in connection with or pursuant to the Subordinated Note Indenture and any documents, instruments or agreements related thereto.

111.   "Subordinated Note Guarantors" means the Non-Korean Guarantors.

112.   "Subordinated Note Guarantees" means the guarantees by the Subordinated Note Guarantors of Luxco's and Finco's obligations under the Subordinated Note Indenture and the notes executed pursuant to the Subordinated Note Indenture.

113.   "Subordinated Note Indenture" means that certain Indenture dated as of December 23, 2004, providing for the issuance of *8% Senior Subordinated Notes due 2014*, by and among Luxco and Finco, as issuers; the Subordinated Note Trustee; and the Subordinated Note Guarantors.

114.   "Subordinated Note Trustee" means The Bank of New York, as trustee under the Subordinated Note Indenture.

115.   "Subordinated Noteholder" means each "Holder" under and as defined in the Subordinated Note Indenture.

116.   "Superpriority Claims" means administrative expenses with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(b), 726, 1113 and 1114.

117.   "Tax" means any tax, charge, fee, levy, impost, or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation, and withholding tax. "Tax" shall include any interest or additions attributable to, imposed on or with respect to such assessments.

118.   "Tax Claim" means any Claim for any Tax to the extent that it is entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

119.   "Timely Filed" means, with respect to a Claim, Interest, or Administrative Expense, that a proof of such Claim or Interest or request for payment of such Administrative Expense was Filed with the Bankruptcy Court or the Claims Agent, as applicable, within such applicable period of time fixed by the Plan, statute, or pursuant to both Bankruptcy Rule 3003(c)(3) and a Final Order (e.g., the Bar Date).

120.   "Unclaimed Property" means all Cash deemed to be "Unclaimed Property" pursuant to Article VIII(E) of the Plan.

121.   "Unimpaired" means, with respect to a Class of Claims or Interests, not Impaired.

122.   "Unsecured Creditor Distribution" means the one-time Cash distribution in the aggregate amount of $1,000,000 to be distributed, Pro Rata, to the Class 4, 5 and 6 Creditors, if Classes 4 and 5 accept the Plan.

123.   "Wind-Down" means the wind-down of the Debtors' and to the extent not a Debtor, the Seller's affairs in accordance with the Plan, as further described in Article VI(G) of the Plan.

124.   "Wind-Down Costs" includes, among other things, the Plan Expenses, and has the meaning set forth in the Business Transfer Agreement.

## III.
## TREATMENT OF ADMINISTRATIVE EXPENSES AND TAX CLAIMS

### A.   Introduction

As required by the Bankruptcy Code, Administrative Expenses, Superpriority Claims, and Tax Claims are not placed into voting Classes. Instead, they are left unclassified, are not considered Impaired, do not vote on the Plan, and receive treatment specified by statute or agreement of the parties. All postpetition payments by or on behalf of any of the Debtors in respect of an Administrative Expense or Tax Claim shall either reduce the Allowed amount

thereof or reduce the amount to be paid under the Plan in respect of any Allowed amount thereof; and, unless the Bankruptcy Court has specified otherwise prior to Confirmation, the Debtors or the Liquidating Debtors shall, in their sole and absolute discretion, determine which such method of application to employ.

**B.      Administrative Expenses**

Under the Plan, on the Effective Date, each Holder of an Allowed Administrative Expense will receive, in full satisfaction, settlement and release of such Allowed Administrative Expense, Cash equal to the full amount of such Allowed Administrative Expense, unless such Holder and any of the Debtors have mutually agreed in writing to other terms, or an order of the Bankruptcy Court provides for other terms; provided, however, that (a) requests for payment of all Administrative Expenses must be Filed and served as described in Article XIV(B)(3) of the Plan, and (b) certain different and additional requirements shall apply to the Administrative Expenses that are Fee Claims as set forth in Article XIV(B)(2) of the Plan.

**C.      Superpriority Claims**

No distribution to the First Lien Lender Parties shall be made on account of any Superpriority Claims except as set forth in Article IV(B)(3) of the Plan.  Inasmuch as the Claims of the Second Lien Noteholders are deemed unsecured, the Second Lien Noteholders shall not have any Allowed Superpriority Claims.

**D.      Tax Claims**

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Tax Claims are not to be classified and thus Holders of Tax Claims are not entitled to vote to accept or reject the Plan.

As required by section 1129(a)(9) of the Bankruptcy Code, on or as soon as practicable after the Effective Date, each Holder of an Allowed Tax Claim against any of the Debtors will receive, in full satisfaction, settlement and release of such Allowed Tax Claim, Cash equal to the portion of the Allowed Tax Claim due and payable on or prior to the Effective Date according to applicable nonbankruptcy law.  Any Allowed Tax Claim (or portion thereof) against MSA or Luxco not yet due and payable as of the Effective Date will be paid by the Buyer and any Allowed Tax Claim against any other Debtor shall be paid by the Plan Representative, no later than when due and payable under applicable non-bankruptcy law without regard to the commencement of the Chapter 11 Cases; provided that (1) any default prior to the Effective Date with respect to Tax Claims against any of the Debtors shall be deemed cured and (2) upon request of any of the Debtors, the Bankruptcy Court shall determine the amount of any Disputed Claim for, or issues pertaining to, Tax Claims.  Any Holder of a Tax Claim may agree to accept different treatment as to which the Debtors and such Holder have agreed upon in writing.

14

# IV.
## CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

### A. Summary

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes only to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for the classification of seven Classes of Claims and/or Interests against each Debtor. For purposes of voting and distribution, each Debtor will be assigned a subclass of each Class as follows: (A) LLC; (B) Holdco; (C) MSA; (D) Luxco; (E) Finco; and (F) Dutchco. Administrative Expenses, Superpriority Claims and Tax Claims have not been classified and are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code.

### B. Classification and Treatment of Claims and Interests

The treatment of each Class of Claims and/or Interests is set forth below. Unless the Bankruptcy Court has specified otherwise prior to Confirmation, the Debtors shall, in their sole and absolute discretion, determine whether a postpetition payment by or on behalf of any of the Debtors in respect of a Claim either (x) shall reduce the Allowed amount thereof or (y) shall reduce the amount to be paid under the Plan in respect of any Allowed amount thereof.

#### 1. Class 1 (A-F) – Priority Non-Tax Claims

a.   Classification: Classes 1 (A-F) consist of all Priority Non-Tax Claims against any of the Debtors.

b.   Treatment: The Holder of each Priority Non-Tax Claim shall receive, in full satisfaction, settlement and release of such Priority Non-Tax Claim, either: (a) with respect to Priority Non-Tax Claims against the Selling Debtors, assumption of such Claim as part of the Assumed Liabilities under the Business Transfer Agreement, or (b) with respect to Priority Non-Tax Claims against the Debtors that are not Selling Debtors, a Cash payment equal to the Allowed amount of such Claim on or as soon as practicable after the later of the Effective Date or the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim. Any Holder of a Priority Non-Tax Claim may agree to accept different treatment as to which the Debtors and such Holder have agreed upon in writing.

c.   Impairment/Voting: Classes 1 (A-F) are impaired. Holders of Class 1 (A-F) Claims therefore are entitled to vote to accept or reject the Plan.

15

## 2. Class 2 (A-F) – Other Secured Claims

a. <u>Classification</u>: Classes 2 (A-F) consist of all Other Secured Claims (if any such Claims exist) against any of the Debtors.

b. <u>Treatment</u>: On or as soon as practicable after the Effective Date, in full satisfaction, settlement and release of each Other Secured Claim, either: (i) if the collateral is part of the Purchased Assets, the Buyer will assume the obligation to pay such Other Secured Claim and the Holder of such Claim shall retain its Lien on its collateral unless and until Claim is paid in full or the collateral is subsequently sold by the Buyer and the proceeds of such sale, less costs and expenses of disposing of such collateral, shall be paid to such Holder in full satisfaction and release of such Allowed Other Secured Claim or (ii) if the collateral is not part of the Purchased Assets, the collateral securing the Creditor's Other Secured Claim shall be abandoned to such Creditor, in full satisfaction and release of such Other Secured Claim.

c. <u>Impairment/Voting</u>: Classes 2 (A–F) are Impaired. Holders of Class 2 (A–F) Claims are therefore entitled to vote to accept or reject the Plan.

## 3. Class 3 (A-F) – First Lien Lender Secured Claims

a. <u>Classification</u>: Classes 3 (A-F) consist of the First Lien Lender Secured Claims against any of the Debtors.

b. <u>Treatment</u>: On the Effective Date in connection with the enforcement of the First Lien Lender Secured Claims, each First Lien Lender Party shall receive a Pro Rata share (calculated as a percentage of First Lien Lender Secured Claims) of the Net Sale Proceeds to be paid directly to the Agent in its capacity as sub-agent for the Collateral Trustee and deemed distributed to the Agent on behalf of the First Lien Lender Parties in accordance with the Intercreditor Agreement and the First Lien Credit Agreement. In addition, on the Effective Date in connection with the enforcement of the First Lien Lender Secured Claim, the Agent shall receive for the benefit of the First Lien Lender Parties, based on their Pro Rata shares (calculated as a percentage of First Lien Lender Secured Claims), all of the Distributable Cash and Claims of all of the Debtors other than the Cash of MSA. Finally, from time to time in the discretion of the Plan Representative, but not less than once every three months if proceeds are available to warrant such a distribution, the Agent shall receive for the benefit of the First Lien Lender Parties, based on their Pro Rata shares (calculated as a percentage of First Lien Lender Secured Claims), any proceeds of any Distributable Assets of any of the Debtors other than the Distributable Cash and Claims. All distributions to the First Lien Lender Parties under the Plan shall be effectuated through the Agent. In consideration for the distributions the First Lien Lender Parties are to receive hereunder, the Liens on the Purchased Assets and Distributable Assets securing the First Lien Lender Secured Claims will be released and extinguished as of the Effective Date in accordance with section 5.1(a)(2) of the Intercreditor Agreement and of no further force or effect; provided, however, that such Liens on the Purchased Assets shall attach to the proceeds thereof with the same priority as they attached to the Purchased Assets and the First Lien Lender Parties shall retain their Liens on all assets of Luxco, Finco and the First Lien Guarantors other than the Purchased Assets and Distributable Assets. The First Lien Lender Secured Claims, together with any Deficiency Claims of the First Lien Lender Parties, are

deemed Allowed in the full amount reflected on the Agent's books and records as of the Record Date.

        c.      Impairment/Voting: Classes 3 (A-F) are Impaired. Holders of Class 3 (A-F) Claims are therefore entitled to vote to accept or reject the Plan.

### 4.      Classes 4 (A-F) – Second Lien Noteholder Claims

        a.      Classification: Classes 4 (A–F) consist of the Second Lien Noteholder Claims against any of the Debtors.

        b.      Treatment: If Classes 4 (A–F) and Classes 5 (A–F) vote to accept the Plan, then on or as soon as practicable after the Effective Date, each Second Lien Noteholder shall receive, in full satisfaction, settlement, and release of such Second Lien Noteholder Claim and in consideration for the release of the Korean Guarantee, a Pro Rata share (calculated as a percentage of Second Lien Noteholder Claims, General Unsecured Claims, and Subordinated Noteholder Claims, as of the Record Date), together with Holders of General Unsecured Claims and Holders of Subordinated Note Claims, of the Unsecured Creditor Distribution. All distributions to the Second Lien Noteholders under the Plan, if any, shall be effectuated through the Second Lien Noteholder Trustee (*i.e.*, the Debtors shall distribute the portion of the Unsecured Creditor Distribution payable to the Second Lien Noteholders to the Second Lien Noteholder Trustee and the Second Lien Noteholder Trustee shall make proportionate distributions thereof to the Second Lien Noteholders). Pursuant to section 5.1(a)(2) of the Intercreditor Agreement, the existing Liens securing the Second Lien Noteholder Claims shall be released and extinguished effective as of the Effective Date and of no further force or effect. If Classes 4 (A-F) and 5 (A-F) do not vote to accept the Plan, Holders of Class 4 (A-F) Claims will receive no distribution on account of such Claims.

        c.      Impairment/Voting: Classes 4 (A-F) are Impaired. Holders of Class 4 (A-F) Claims are therefore entitled to vote to accept or reject the Plan.

### 5.      Class 5 (A-F) – General Unsecured Claims

        a.      Classification: Classes 5 (A–F) consist of the General Unsecured Claims against any of the Debtors.

        b.      Treatment: If Classes 4 (A–F) and Classes 5 (A–F) vote to accept the Plan, then each Holder of a Class 5 (A-F) Claim shall receive, in full satisfaction, settlement, and release of such Claim, a Pro Rata Share, (calculated as a percentage of Second Lien Noteholder Claims, General Unsecured Claims, and Subordinated Noteholder Claims, as of the Record Date), together with Holders of Second Lien Noteholder Claims and Holders of Subordinated Note Claims, of the Unsecured Creditor Distribution. In addition, Holders of General Unsecured Claims shall benefit from the Debtors' general release of Avoidance Claims set forth in Article IX(C) of the Plan. The First Lien Lender Parties hereby waive any distribution of the Unsecured Creditor Distribution on account of their Deficiency Claims. If Classes 4 (A-F) and 5 (A-F) do not vote to accept the Plan, Holders of Class 5 (A-F) Claims will receive no distribution on account of their Claims.

c.     Impairment/Voting: Classes 5 (A-F) are Impaired.  Holders of Class 5 (A-F) Claims are therefore entitled to vote to accept or reject the Plan.

### 6.     Class 6 (A-F) – Subordinated Note Claims

a.     Classification: Classes 6 (A-F) consist of the Subordinated Note Claims against Debtors any of the Debtors.

b.     Treatment: If Classes 4 (A–F) and 5 (A–F) vote to accept the Plan, then each Holder of a Class 6 (A-F) Claim shall receive its Pro Rata share (calculated as a percentage of Second Lien Noteholder Claims, General Unsecured Claims, and Subordinated Noteholder Claims as of the Record Date), together with Holders of Second Lien Noteholder Claims and Holders of General Unsecured Claims, of the Unsecured Creditor Distribution; provided, however, that in accordance with the subordination provisions in the Subordinated Note Indenture, all distributions to Holders of Class 6 (A-F) Claims shall be paid to the Second Lien Noteholder Trustee for distribution to Second Lien Noteholders on a Pro Rata basis (calculated as a percentage of Second Lien Noteholder Claims).  If Classes 4(A-F) and 5(A-F) do not vote to accept the Plan, Holders of Class 6(A-F) claims will receive no distribution on account of their Claims.

c.     Impairment/Voting: Class 6 is Impaired.  Because Holders of Class 6 Claims shall receive no recovery on account of such Claims under the Plan, they are conclusively presumed to reject the Plan.

### 7.     Class 7 (A-F) – Intercompany Claims against the Debtors

a.     Classification: Classes 7 (A–F) consist of Intercompany Claims of Debtors and Non-Debtor Affiliates against the Debtors.

b.     Treatment: Holders of Intercompany Claims against the Debtors shall receive no distributions or recoveries on account of such Claims and such Claims shall be extinguished on the Effective Date.

c.     Impairment/Voting: Classes 7 (A-F) are Impaired.  Because Holders of Class 7 (A-F) Claims receive no recovery on account of such Claims under the Plan, they are conclusively presumed to reject the Plan.

### 8.     Class 8 (A-F) – Interests in the Debtors

a.     Classification: Classes 8 (A–F) consist of Interests in the Debtors.

b.     Treatment: Holders of Interests in the Debtors shall receive no distributions or recoveries on account of such Interests and such Interests shall be extinguished on the Effective Date.

c.     Impairment/Voting: Classes 8 (A–F) are Impaired.  Because Holders of Interests in Class 8 (A-F) receive no recovery on account of such Interests under the Plan, they are conclusively presumed to reject the Plan.

**V.**

**ACCEPTANCE OR REJECTION OF PLAN**

**A.**     **Identification of Impaired Classes**

       **1.**     **Class 1 (A-F) – Priority Non-Tax Claims**

       **2.**     **Class 2 (A-F) – Other Secured Claims**

       **3.**     **Class 3 (A-F) – First Lien Lender Secured Claims**

       **4.**     **Class 4 (A-F) – Second Lien Noteholder Claims**

       **5.**     **Class 5 (A-F) – General Unsecured Claims**

       **6.**     **Class 6 (A-F) – Subordinated Note Claims**

       **7.**     **Class 7 (A-F) – Intercompany Claims against the Debtors**

       **8.**     **Class 8 (A-F) – Interests in the Debtors**

**B.**     **Classes Permitted and Not Permitted to Vote**

       Classes 1 through 8 are Impaired. Holders of Claims in Classes 1, 2, 3, 4 and 5 are permitted to vote to accept or reject the Plan. Holders of Class 6 Claims, Holders of Class 7 Claims and Holders of Class 8 Interests are conclusively presumed to reject the Plan. An Impaired Class of Claims that votes shall have accepted the Plan if (a) the Holders (other than any Holder designated by the Bankruptcy Court based on their vote or its solicitation not being in good faith under Bankruptcy Code section 1126(e)) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under Bankruptcy Code section 1126(e)) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. An Impaired Class of Interests that votes shall have accepted the Plan if the Holders (other than any Holder designated under section 1126(e)) of at least two-thirds in amount of the Allowed Interests actually voting in such Class have voted to accept the Plan.

**C.**     **Nonconsensual Confirmation**

       In the event any Class of Claims or Interests votes to reject the Plan, the Debtors intend to request that the Bankruptcy Court confirm the Plan notwithstanding such rejection

pursuant to section 1129(b) of the Bankruptcy Code on the basis that the Plan is fair and equitable and does not discriminate unfairly as to the Holders of any Class of Claims or Interests.

19

### D.    Postpetition Interest

Except as set forth in the Final Cash Collateral Order, nothing in the Plan or the Disclosure Statement shall be deemed to entitle the Holder of a Claim to receive from any Debtor any postpetition interest on account of such Claim.

## VI.
## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    The Sale

The First Lien Lender Parties are enforcing their Liens through this Plan and, subject to the terms and conditions set forth in the Enforcement Agreement, will consent to the Sale in connection with such enforcement. The entry of the Confirmation Order shall act as an order (a) authorizing the Debtors, as direct and indirect owners of the Selling Non-Debtors, to authorize the Selling Non-Debtors to sell the Acquired Assets owned by the Selling Non-Debtors and assign the Acquired Contracts and the Assumed Liabilities owned by the Selling Non-Debtors to the Buyer pursuant to applicable non-bankruptcy law and (b) authorizing and approving the Sale (as to MSA and Luxco only) of the Acquired Assets owned by Debtors MSA and Luxco subject to Other Secured Claims and free and clear of all other Liens, Claims, and encumbrances (with such other Liens, Claims and encumbrances to attach to the proceeds of the Sale in accordance with the terms of this Plan), the assumption by Debtors MSA and LLC and assignment to Buyer of the Acquired Contracts owned by MSA and LLC, and the assignment by Debtors MSA to the Buyer of the Assumed Liabilities, and authorizing Debtor MSA and Luxco to perform the Business Transfer Agreement. On the Effective Date, the Business Transfer Agreement shall be binding upon and enforceable against MSA and Luxco, the Liquidating Debtors, and the Plan Representative. The Business Transfer Agreement and Enforcement Agreement are incorporated herein and shall control with respect to the subject matters addressed therein.

For purposes of clarification, nothing in this Plan shall alter, limit or expand the obligations of the Buyer under the Business Transfer Agreement, and the Buyer's sole obligations to MSA, Luxco, the Liquidating Debtors or the Holders of any Claims or Interests shall be those set forth in the Business Transfer Agreement without reference to this Plan, and nothing in this Plan shall be deemed to or shall impose upon Buyer any additional obligations.

The Adjusted Sale Proceeds will be paid on the Sale Closing Date to the Agent in its capacity as sub-agent for the Collateral Trustee. The Agent will apply the Net Sale Proceeds to payment of the loans and other obligations outstanding under the First Lien Credit Agreement and as otherwise agreed by the First Lien Lender Parties. In addition, the Agent shall make certain payments from the Adjusted Sale Proceeds to Debtor MSA from time to time as directed in writing by the Plan Representative when Claims are Allowed, in an aggregate amount not to exceed the sum of the following (unless otherwise agreed by Agent in writing): (i) the Case Expenses, (ii) the Unsecured Creditor Distribution and (iii) Priority Claim Distributions.

20

## B. Release of Liens/Secured Lien Guaranties/Subordinated Note Guaranties

### 1. Release of Liens on Purchased Assets.

On the Effective Date, all Liens securing the First Lien Lender Claims and the Second Lien Noteholder Claims on the Purchased Assets shall be deemed fully released as a result of the First Lien Lender Parties' enforcement of their Liens through this Plan in accordance with section 5.1(a)(2) of the Intercreditor Agreement; provided, however, that the Liens of the First Lien Lender Parties shall attach to the Adjusted Sale Proceeds in the same priority and to the same extent as they attached to the Purchased Assets. The Agent, the Second Lien Noteholder Trustee, the Second Lien Collateral Agent and the Collateral Trustee shall be authorized and directed to release any collateral or other property of the Sellers held by them on behalf of Holders of the Second Lien Noteholder Claims and to take such actions and execute and deliver such documents as may be requested by the Debtors, the Plan Representative or the Liquidating Debtors to evidence the release of all Liens securing the Second Lien Noteholder Claims, including, without limitation, the execution, delivery and filing or recording of such releases as may be requested by Debtors, the Plan Representative or the Liquidating Debtors, in lieu of delivery of the documents otherwise required pursuant to section 5.1(b) of the Intercreditor Agreement.

### 2. Release of Second Lien Guarantees.

The Non-Korean Guarantors' obligations under the Second Lien Guarantees shall be deemed fully released on the Effective Date as a result of the sale or disposition of substantially all of the assets of the Non-Korean Guarantors in accordance with section 12.05 of the Second Lien Indenture. The Second Lien Noteholder Trustee shall be authorized and directed to take any action and execute and deliver any documents as may be requested by the Debtors to release any collateral or other property of the Debtors held by the Second Lien Noteholder Trustee. In addition, if Classes 4 and 5 accept the Plan, the Korean Guarantee will be released on the Effective Date in consideration for the Unsecured Creditor Distribution.

### 3. Release of Subordinated Note Guarantees.

The Subordinated Note Guarantors' obligations under the Subordinated Note Guarantees shall be deemed fully released on the Effective Date as a result of the disposition of all or substantially all of the assets of such Subordinated Note Guarantors pursuant to the Business Transfer Agreement in accordance with Section 12.05 of the Subordinated Note Indenture. The Subordinated Noteholder Trustee shall be authorized and directed to take any action and execute and deliver any documents as may be requested by the Debtor to acknowledge the release of any claims against the Non-Korean Guarantors on account of the Subordinated Note Guarantees.

## C. Continued Corporate Existence and Vesting of Assets

The Debtors will, as the Liquidating Debtors, continue to exist on and after the Effective Date as separate corporate Entities, with all of the powers of corporations under the applicable nonbankruptcy law, and without prejudice to any right to alter or terminate their existence (whether by merger or otherwise), provided that the Liquidating Debtors' sole purpose from and after the Effective Date will be to make distributions to Creditors consistent with the Plan and to

21

otherwise effectuate the Wind-Down. Except as otherwise provided in the Plan, on and after the Effective Date, the Cash of MSA and all other Distributable Assets of the Debtors, except for Distributable Cash and Claims, will vest in the Liquidating Debtors free and clear of all Claims, Liens, charges, other encumbrances, and Interests; provided, however, that the Cash of MSA and proceeds of such other Distributable Assets of the Debtors shall be distributed only in accordance with this Plan.

## D. **Retained Rights of Action**

Unless a Right of Action is in writing, expressly waived, relinquished, released, compromised, or settled in the Plan, or in a Final Order, as of the Effective Date, all rights with respect to such Retained Right of Action are expressly preserved for the benefit of, and assigned and transferred to, the Agent for the benefit of the First Lien Lender Parties on account of the First Lien Lender Secured Claims arising from the First Lien Credit Agreement and the Final Cash Collateral Order.

## E. **Claims Objections**

Unless an objection to a Claim is in writing, expressly waived, relinquished, released, assigned, compromised, or settled in the Plan, or in a Final Order, all rights with respect to such Claim objection are expressly preserved for the benefit of, and fully vested in, the Liquidating Debtors. The Liquidating Debtors may pursue, or decline to pursue, objections to Claims, as appropriate, in the business judgment of the Plan Representative. The Liquidating Debtors may settle, release, sell, assign, otherwise transfer, or compromise objections to Claims without need for notice or order of the Bankruptcy Court.

## F. **Corporate Governance**

From and after the Effective Date, each of the Liquidating Debtors shall be managed and administered through the Plan Representative, who shall be appointed as sole officer of each of the Liquidating Debtors and shall have full authority to execute the provisions of the Plan. The initial Plan Representative shall be John McFarland, who is presently general counsel to each of the Debtors. The Plan Representative shall also be appointed as the sole officer of the Non-Debtor Affiliates and shall have full authority to oversee and administer the Wind-down of the Non-Debtor Affiliates. The Plan Representative may employ one or more persons or entities to assist him with performing his duties under the Plan.

## G. **Wind-Down**

The Liquidating Debtors, through the Plan Representative or his designee, shall oversee the Wind-down and shall make distributions to Creditors consistent with the Plan and otherwise hold and liquidate all MSA Cash, all other Distributable Assets except for Distributable Cash and Claims, and all other property of the Estates for the benefit of Creditors, in accordance with the provisions of the Plan. The Liquidating Debtors and the Plan Representative shall not be required to post a bond in favor of the United States.

The Liquidating Debtors, acting through the Plan Representative, shall have the power and authority to perform the following acts, in addition to any powers granted by law or conferred by any other provision of the Plan and orders of the Bankruptcy Court; provided,

however, that enumeration of the following powers shall not be considered in any way to limit or control the power of the Liquidating Debtors or the Plan Representative to act as specifically authorized by any other provision of the Plan or orders of the Bankruptcy Court, and to act in such manner as the Plan Representative may deem necessary, or desirable to discharge all obligations assumed by the Liquidating Debtors as provided herein, and to conserve and protect the Distributable Assets, or to confer on Creditors the benefits intended to be conferred upon them by the Plan; including without limitation and by example only:

(1)     Determine Tax issues or liabilities in accordance with section 505 of the Bankruptcy Code;

(2)     Resolve any objections to the allowance or priority of Claims, Administrative Expenses, or Interests;

(3)     Resolve any dispute as to the treatment necessary to reinstate a Claim, Administrative Expense, or Interest pursuant to the Plan;

(4)     Distribute Distributable Assets to Creditors consistent with the terms of the Plan;

(5)     Perfect and secure the Liquidating Debtors' right, title, and interest to property of the Estates;

(6)     Recover and, to the extent possible, sell and convert the property of the Estates to Cash, and distribute the net proceeds consistent with the terms of the Plan;

(7)     Manage and protect property of the Estates and distribute the net proceeds consistent with the terms of the Plan;

(8)     Wind up the affairs of the Debtors' subsidiaries and affiliates (including the Non-Debtor Affiliates), including without limitation, commencing any appropriate action in any foreign jurisdiction necessary or required to liquidate any Debtor or any subsidiaries of any Debtors in accordance with applicable law;

(9)     Purchase or continue insurance to protect the Liquidating Debtors, the Plan Representative, and property of the Estates;

(10)    Deposit Estate funds, draw checks, and make disbursements thereof consistent with the terms of the Plan;

(11)    Employ, retain, and compensate, and discharge and dismiss, without further order of the Bankruptcy Court, Professional Persons as the Plan Representative may deem necessary or desirable to assist in fulfilling the purposes of the Plan, including the continued retention and payment of Professional Persons in connection with any ongoing litigation or other

23

matter pursued or conducted by the Debtors or the continued retention of the clams agent;

(12)     Commence or prosecute in the name of the Debtors (or any of them) any lawsuit or other legal or equitable action (except to the extent released or assigned pursuant to the terms of the Plan), including, without limitation, filing objections to or estimation of Claims, in any court of competent jurisdiction, that are necessary to carry out the terms and conditions of the Plan;

(13)     Settle, compromise, or adjust, pursuant to the standards of Bankruptcy Rule 9019 (which standards, but not a requirement for Bankruptcy Court approval, shall be deemed to apply to all post-Effective Date settlements), any disputes or controversies in favor of, or against, any Debtor;

(14)     Incur and pay all Plan Expenses and any reasonable costs and expenses incident to the performance of the duties of the Liquidating Debtors and the Plan Representative under the Plan, including, without limitation, rent for office space and storage, office supplies, travel and expense reimbursement, insurance, and other obligations;

(15)     Prepare and file tax returns, as mandated by applicable local, state, federal, and foreign law;

(16)     Seek entry of a final decree at the appropriate time; and

(17)     Take such other action as the Plan Representative may determine to be necessary or desirable to carry out the purpose of the Plan.

## H.     Funding for the Plan

The Debtors' obligations under the Plan and the fees and expenses of the Liquidating Debtors will be funded out of existing Cash in the Estate of MSA on the Effective Date and the payments to be made to MSA by the Agent, from the Adjusted Sale Proceeds, as set forth herein. The Buyer will pay the Wind-down Costs and provide employees as necessary to effect the Wind-down. Any unused Cash of MSA not needed to fund Plan Expenses, Wind-Down Costs, Case Expenses, cure costs associated with Assigned Contracts owned by the Debtors or distributions under the Plan shall be transferred to the Buyer prior to the entry of a Final Decree pursuant to the terms of the Business Transfer Agreement. Any Distributable Cash and Claims of the Debtors other than the Cash of MSA shall be distributed to the Agent for the benefit of the First Lien Lender Parties on the Effective Date in accordance with the terms of this Plan. The proceeds of any other Distributable Assets shall be distributed to the Agent for the benefit of the First Lien Lender Parties from time to time in accordance with the terms of this Plan.

## I.     Corporate Action/Dissolution

On the Effective Date, the matters under the Plan involving or requiring corporate action of the Debtors, including but not limited to, actions requiring a vote or other approval of the

24

board of directors or shareholders or execution of all documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers and directors of the Debtors. On the Effective Date, all officers and directors of the Debtors shall be deemed removed from such positions and the Debtors' organizational documents shall be deemed amended to prohibit (1) the issuance of nonvoting equity securities or (2) the existence of securities possessing an inappropriate distribution of voting power, all as more specifically required and described in section 1123(a)(6) of the Bankruptcy Code.

Upon entry of a final decree to the extent not previously dissolved, the Liquidating Debtors shall be deemed dissolved and wound up without any further action required by the Liquidating Debtors and the Debtors' shareholders or boards of directors.

### J.     Interests in Affiliates and Subsidiaries

As of the Effective Date but only until the dissolution of the Liquidating Debtors, except as expressly provided in the Plan, the Liquidating Debtors shall retain any stock or interests they may hold in their subsidiaries or affiliates and retain any rights to which such stock or interests may be entitled under applicable law with respect to such shares or other interests.

### K.     Payment of Plan Expenses

The Liquidating Debtors may pay all reasonable Plan Expenses without further notice to Creditors or Holders of Interests or approval of the Bankruptcy Court.

### L.     Dissolution of the Official Committee

As of the Effective Date, the Committee shall be dissolved, provided, however, that notwithstanding such dissolution, the Committee's Professional Persons may seek payment of any unpaid Administrative Expenses pursuant to the Plan.

### VII.
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.     Assumption and Rejection of Executory Contracts and Unexpired Leases

Except for any executory contracts or unexpired leases: (i) that are listed as Assigned Contracts on **Exhibit "C"** hereto; (ii) that previously were assumed or rejected by an order of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code; (iii) as to which a motion for approval of the assumption or rejection of such contracts or leases has been Filed and served prior to Confirmation; or (iv) that constitute contracts of insurance in favor of, or that benefit, the Debtors or the Estates, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to section 365 of the Bankruptcy Code as of the Effective Date. The Assigned Contracts shall be assumed by the applicable Debtor and assigned to the Buyer on the Effective Date. The Confirmation Order shall constitute an Order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. On the Effective Date, the Debtors shall pay any cure costs associated with any Assigned Contracts owned by the Debtors (i.e., claims of non-Debtor contract parties

25

against the Debtors for monetary damages for breaches of such Assigned Contracts) from the Cash of MSA. There are no cure costs associated with the Assigned Contracts that belong to LLC.

## B.     Objections to Assumption of Executory Contracts and Unexpired Leases

**1.     Objection Procedure Generally.** Any party objecting to any Debtor's proposed assumption of an executory contract or unexpired lease based on a lack of adequate assurance of future performance or on any other ground including the adequacy of the "cure" amount set forth on **Exhibit "C"** shall file and serve a written objection to the assumption of such contract or lease by the deadline to object to Confirmation. Failure to timely file an objection shall constitute consent to the assumption and assignment of those contracts and leases, including an acknowledgment that the proposed assumption provides adequate assurance of future performance and that the applicable "cure" amount set forth on **Exhibit "C"** is proper and sufficient for purposes of section 365 of the Bankruptcy Code.

**2.     Objection Based on Grounds Other Than "Cure" Amount.** If any party timely and properly files an objection to assumption based on any ground other than the adequacy of the applicable "cure" amount set forth on **Exhibit "C"** and the Bankruptcy Court ultimately determines that any Debtor cannot assume the executory contract or lease or that the Buyer cannot provide adequate assurance of future performance as proposed, then the unexpired lease or executory contract shall automatically thereupon be deemed to have been excluded from **Exhibit "C"** and shall be rejected.

**3.     Objection Based on "Cure" Amount.** If any party timely and properly files an objection to assumption based on the adequacy of the applicable "cure" amount set forth on **Exhibit "C"** and such objection is not resolved between the Debtors and the objecting party, the Bankruptcy Court shall resolve such dispute at the Confirmation Hearing or another hearing date to be determined by the Bankruptcy Court. The resolution of such dispute shall not affect the assumption and assignment of the executory contract or lease that is the subject of such dispute but rather shall affect only the "cure" amount the Debtors must pay in order to assume such contract or lease and assign it to the Buyer. Notwithstanding the immediately preceding sentence, if the Debtors and the Buyer in their discretion determine that the amount asserted to be the necessary "cure" amount would, if ordered by the Bankruptcy Court, make the assumption and assignment of the executory contract or lease imprudent, then the Debtors may elect to (1) reject the executory contract or lease, or (2) request an expedited hearing on the resolution of the "cure" dispute, exclude assumption or rejection of the contract or lease from the scope of the Confirmation Order, and retain the right to reject the executory contract or lease pending the outcome of such dispute.

## C.     Payment Related to Assumption of Executory Contracts and Unexpired Leases.

If not the subject of dispute as of the Confirmation Date, any monetary defaults under each executory contract and unexpired lease to be assumed under the Plan shall be satisfied by the Debtors from the Cash of MSA, pursuant to section 365(b) of the Bankruptcy Code: (i) by payment of (1) the applicable "cure" amount set forth in the schedule of Assigned Contracts, (2) such other amount as ordered by the Bankruptcy Court, or (3) such other amount as agreed upon by the Debtors, in Cash within thirty (30) days following the Effective Date; or (ii) on such other

terms as agreed to by the parties to such executory contract or unexpired lease. In the event of a dispute regarding the appropriate "cure" amount, payment of the amount otherwise payable hereunder shall be made following entry of a Final Order or agreement by the Debtors or Liquidation Debtors, as the case may be.

### D.     Bar Date for Rejection Damages

If the rejection of an executory contract or unexpired lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Liquidating Debtors or their Estates unless a proof of Claim is Filed and served on the Debtors and their counsel within thirty days after the earlier of (a) Confirmation or (b) service of a notice that the executory contract or unexpired lease has been rejected. All such Claims for which proofs of Claim are required to be Filed, if Allowed, will be, and will be treated as, General Unsecured Claims, subject to the provisions of the Plan.

## VIII.
## DISTRIBUTIONS AND RELATED MATTERS

### A.     Dates of Distribution

The sections of the Plan on treatment of Administrative Expenses, Claims, and Interests specify the times for distributions. Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day. Distributions due on the Effective Date will be paid on such date or as soon as practicable thereafter, provided that if other provisions of the Plan require the surrender of securities or establish other conditions precedent to receiving a distribution, the distribution may be delayed until such surrender occurs or conditions are satisfied.

If, under the terms of the Plan, the resolution of a particular Disputed Claim, *e.g.,* it is Disallowed, entitles other Holders of Claims to a further distribution, either (a) the Liquidating Debtors may make such further distribution as soon practicable after the resolution of the Disputed Claim or (b) if the further distribution is determined in good faith, by the Liquidating Debtors to be less than $100 for any Creditor, then, in order to afford the Liquidating Debtors an opportunity to minimize costs and aggregate such distributions, the Liquidating Debtors may make such further distribution any time prior to sixty days after the Final Resolution Date.

### B.     Cash Distributions

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Liquidating Debtors, except that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

In the event the Cash available for distribution is $1,000 or less, the Plan Representative may determine that making further distributions is not practical and may instead takes steps to close the estates and distribute the remaining cash to a not for profit qualified under section 501(c) (3) of the Internal Revenue Code.

27

## C. Rounding of Payments

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent. To the extent Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as "Unclaimed Property" under the Plan.

## D. Disputed Claims

Notwithstanding all references in the Plan to Claims that are Allowed, in undertaking the calculations concerning Allowed Claims or Allowed Administrative Expenses under the Plan, including the determination of the amount or number of distributions due to the Holders of Allowed Claims and Allowed Administrative Expenses, each Disputed Claim shall be treated as if it were an Allowed Claim or Allowed Administrative Expense, except that if the Bankruptcy Court estimates the likely portion of a Disputed Claim to be Allowed or authorized or otherwise determines the amount or number that would constitute a sufficient reserve for a Disputed Claim (which estimates and determinations may be requested by the Debtors), such amount or number as determined by the Bankruptcy Court shall be used as to such Claim.

Distributions of non-Cash consideration due in respect of a Disputed Claim shall be held and not made pending resolution of the Disputed Claim.

After an objection to a Disputed Claim is withdrawn, resolved by agreement, or determined by Final Order, the distributions due on account of any resulting Allowed Claim, Allowed Interest, or Allowed Administrative Expense shall be made by the Liquidating Debtors. Such distribution shall be made within forty-five days of the date that the Disputed Claim becomes an Allowed Claim or Allowed Administrative Expense. No interest shall be due to a Holder of a Disputed Claim based on the delay attendant to determining the allowance of such Claim, Interest, or Administrative Expense.

## E. Undeliverable and Unclaimed Distributions

If any distribution under the Plan is returned to the Liquidating Debtors as undeliverable or the check or other similar instrument or distribution by the Liquidating Debtors remains uncashed or unclaimed, as applicable, for 120 days, such Cash shall be deemed to be "Unclaimed Property." Upon property becoming Unclaimed Property, it immediately shall be revested in the Liquidating Debtors.

Pending becoming Unclaimed Property, such Cash will remain in the possession of the Liquidating Debtors, and, if the Liquidating Debtors are notified in writing of a new address for the relevant Holder, they shall cause distribution of the Cash within forty-five days thereafter.

Once there becomes Unclaimed Property for a Holder, no subsequent distributions for such Holder that may otherwise be due under the Plan will accrue or be held for such Holder, provided that, if the applicable agent is notified in writing of such Holder's then-current address and status as a Holder under the Plan, thereafter, the Holder will become entitled to its share of distributions, if any, which first become due after such notification.

**F.**     **Compliance With Tax Requirements**

The Liquidating Debtors shall comply with all withholding and reporting requirements imposed by federal, state, or local taxing authorities in connection with making distributions pursuant to the Plan.

In connection with each distribution with respect to which the filing of an information return (such as an IRS Form 1099 or 1042) or withholding is required, the Liquidating Debtors shall file such information return with the IRS and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law. With respect to any Person from whom a tax identification number, certified tax identification number, or other tax information required by law to avoid withholding has not been received by the Liquidating Debtors, the Liquidating Debtors may, in their sole option, withhold the amount required and distribute the balance to such Person or decline to make such distribution until the information is received; provided, however, that the Liquidating Debtors shall not be obligated to liquidate any securities to perform such withholding.

**G.**     **Record Date in Respect to Distributions**

Except as set forth below, the record date and time for the purpose of determining which Persons are entitled to receive any and all distributions on account of any Allowed Claims or Interests, irrespective of the date of or number of distributions, shall be the same as the Record Date.

At the date and time of the Record Date, the Agent's registers with respect to the First Lien Lender Secured Claims shall be deemed closed for purposes of determining whether a Holder of a First Lien Lender Secured Claim is a record holder entitled to distributions under the Plan. Neither the Liquidating Debtors nor the Agent shall have any obligation to recognize, for purposes of distributions pursuant to or in any way arising under the Plan, any First Lien Lender Secured Claim or Claim arising therefrom or in connection therewith that is transferred after the time of the Record Date. Instead, they all shall be entitled to recognize and deal for distribution purposes with only those record holders of the First Lien Lender Secured Claims as of the Record Date irrespective of the number of distributions to be made under the Plan or the date of such distributions.

**H.**     **Reserves**

In making any distributions in respect of Claims under this Plan, the Liquidating Debtors shall reserve an appropriate and adequate amount of Cash on account of any unresolved Disputed Claims. The Liquidating Debtors shall make a corrective distribution following the successful resolution of any Disputed Claim on the earlier of the next regularly scheduled distribution date or each six month anniversary of the Effective Date.

## I. Conditions to Receiving Distributions

As a condition to receiving any distribution under the Plan, each Holder of an Allowed Claim shall have executed and delivered such agreements, documents and instruments as may be reasonably required by the Debtors or Liquidating Debtors. Any Holder of an Allowed Claim that fails to execute and deliver such agreements, documents, and instruments or fails to take such action as may be reasonably requested by the Debtors or Liquidating Debtors before the first anniversary of the later to occur of (a) the availability of the agreements, documents and instruments required by the Debtors or the Liquidating Debtors and (b) the Effective Date may not participate in any distribution under the Plan with respect to such Allowed Claim. Any distribution forfeited hereunder shall be ratably reallocated among complying Holders of the applicable Class. The Debtors acknowledge that the First Lien Lender Parties have delivered all necessary agreements, documents and instruments and have taken all necessary actions required pursuant to this Article VIII.I.

## J. Subordination

Pursuant to section 510(a) of the Bankruptcy Code, nothing herein shall be deemed to limit any subordination agreement or intercreditor agreement, including, without limitation, the Intercreditor Agreement and Article X of the Subordinated Note Indenture, that is otherwise enforceable under applicable nonbankruptcy law. Accordingly, distributions hereunder will be made subject to any enforceable subordination or intercreditor agreement known to the Debtors. Creditors that are parties to any such enforceable subordination or intercreditor agreements shall notify the Debtors of their existence in advance of the Effective Date and shall provide the Debtors with copies of such agreements, or identify such agreements if they are already in the Debtors' possession. Failure to do so shall be deemed a waiver of such rights.

# IX.
# LITIGATION, OBJECTIONS TO CLAIMS, AND DETERMINATION OF TAXES

## A. Litigation; Objections to Claims; Objection Deadline

Except as may be expressly provided otherwise in the Plan, the Liquidating Debtors shall be responsible for any objection to the allowance of any Claim, and the determination of Tax issues and liabilities.

As of the Effective Date, the Liquidating Debtors shall have exclusive authority to file objections, settle, compromise, withdraw, or litigate to judgment objections to Claims. Unless another date is established by the Bankruptcy Court (which may so act without notice or hearing) or is established by other provisions of the Plan, any objection to a Claim shall be Filed with the Bankruptcy Court and served on the Person holding such Claim within ninety days after the Effective Date (the "Objection Deadline"), provided that the Liquidating Debtors may seek extension(s) thereof subject to Bankruptcy Court approval.

In addition to any other available remedies or procedures with respect to Tax issues or liabilities, the Liquidating Debtors, at any time, may utilize (and receive the benefits of) section 505 of the Bankruptcy Code with respect to: (1) any Tax issue or liability relating to an act or event occurring prior to the Effective Date or (2) any Tax liability arising prior to the Effective

Date. If the Liquidating Debtors utilize section 505(b) of the Bankruptcy Code: (1) the Bankruptcy Court shall determine the amount of the subject Tax liability in the event that the appropriate governmental entity timely determines a Tax to be due in excess of the amount indicated on the subject return and (2) if the prerequisites are met for obtaining a discharge of Tax liability in accordance with section 505(b) of the Bankruptcy Code, the Liquidating Debtors shall be entitled to such discharge, which shall apply to any and all Taxes relating to the period covered by such return.

## B. Temporary or Permanent Resolution of Disputed Claims

The Liquidating Debtors may request, at any time prior to the Effective Date or on and after the Effective Date, that the Bankruptcy Court estimate any contingent or unliquidated Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, irrespective of whether any party has previously objected to such Disputed Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any contingent or unliquidated Disputed Claim at any time during litigation concerning any objection to the Disputed Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Disputed Claim, that estimated amount would constitute either the Allowed amount of such Disputed Claim or a maximum limitation on such Disputed Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Disputed Claim, the Liquidating Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on account of such Disputed Claim. In addition, the Liquidating Debtors may resolve or adjudicate any Disputed Claim in the manner in which the amount of such Claim, Interest, or Administrative Expense and the rights of the Holder of such Claim, Interest, or Administrative Expense would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced. All of the aforementioned objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another.

## C. Release of Avoidance Actions

Each of the Debtors releases, waives and agrees not to prosecute or pursue any Avoidance Claims.

## D. Preservation of Retained Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Agent, as the successor and assign of the Debtors, and any future assigns of the Agent, will retain and may exclusively enforce any Retained Rights of Action and the Confirmation Order shall be deemed a *res judicata* determination of such rights to retain and exclusively enforce such Retained Rights of Action. The Retained Rights of Action may be asserted or prosecuted before or after solicitation of votes on the Plan or before or after the Effective Date.

Absent an express waiver or release set forth in the Plan, nothing in the Plan shall (or is intended to) prevent, estop, or be deemed to preclude the Agent or its successors or assigns from utilizing, pursuing, prosecuting, or otherwise acting upon all or any of their Retained Rights of Action and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or

31

otherwise), or laches shall apply to such Retained Rights of Action upon or after Confirmation or Consummation.

## X.
## EFFECT OF CONFIRMATION AND RELATED PROVISIONS

### A.  Effect of Confirmation

### 1.  Binding Effect of Plan

The provisions of the confirmed Plan shall bind the Debtors, the Liquidating Debtors, any entity acquiring property under the Plan, and any Creditor or Interest Holder, whether or not such Creditor or Interest Holder has Filed a proof of Claim or Interest in the Chapter 11 Cases, whether or not the Claim of such Creditor or the Interest of such Interest Holder is impaired under the Plan, and whether or not such Creditor or Interest Holder has accepted or rejected the Plan. All Claims and debts shall be as fixed and adjusted pursuant to this Plan. With respect to any taxes of the kind specified in Bankruptcy Code section 1146(c), this Plan shall also bind any taxing authority, recorder of deeds or similar official for any county, state, or governmental unit or parish in which any instrument related to under this Plan or related to any transaction contemplated under this Plan is to be recorded.

### 2.  Business Transfer Agreement

Upon satisfaction of the conditions to effectiveness of the Plan set forth in Article XV(A) hereof, (i) the Debtors shall be deemed to have authorized and directed the Selling Non-Debtors (and any officers, directors and employees thereof) to perform their obligations under the Business Transfer Agreement, (ii) the Buyer and the Sellers shall be bound by the Business Transfer Agreement to the extent provided therein, (iii) MSA and Luxco (including any officers, directors and employees thereof) are authorized and directed to perform their obligations under the Business Transfer Agreement and to take such steps as are necessary, reasonable or convenient to effect the closing thereof, and (iv) notwithstanding anything in any prepetition agreement to the contrary, each of the Agent, the Second Lien Noteholder Trustee, the Second Lien Collateral Agent and the Collateral Trustee is authorized and directed to take such steps as reasonably necessary to effect the release of liens in accordance with the terms and conditions hereof. Subject to the terms of the Confirmation Order and to any conditions to the closing that remain to be satisfied, the Business Transfer Agreement and the transactions contemplated therein are approved.

### B.  Injunction

### 1.  Generally

**Unless otherwise provided in the Plan or the Confirmation Order, all injunctions and stays provided for in the Chapter 11 Cases pursuant to sections 105 and 362 of the Bankruptcy Code or otherwise in effect on the Confirmation Date shall remain in full force and effect until the Effective Date. From and after the Effective Date, all Persons are permanently enjoined from, and restrained against, commencing or continuing in any court any suit, action, or other proceeding, or otherwise asserting any Claim or interest, (a) seeking to hold (i) the Liquidating Debtors or (ii) the property of the Liquidating Debtors,**

32

liable for any Claim, obligation, right, interest, debt, or liability that has been satisfied, discharged or released pursuant the Plan.

2. **Injunction Related to Rights of Action and Terminated Claims, Administrative Expenses or Interests**

Except as provided in the Plan or in the Confirmation Order, as of the Confirmation Date, all Entities that have held, currently hold or may hold a Claim, Administrative Expense, Superpriority Claim, Interest, or other debt or liability that is stayed, Impaired, or terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions either (x) against the Debtors, the Liquidating Debtors, or their property on account of all or such portion of any such Claims, Administrative Expenses, Superpriority Claims, Interests, debts, or liabilities that are stayed, Impaired, or terminated or (y) against any Person with respect to any Right of Action or any objection to a Claim, Administrative Expense, Superpriority Claim, or Interest, which Right of Action or objection, under the Plan, is waived, released, assigned or exclusively retained by any of the Debtors: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order, (c) creating, perfecting, or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability, or obligation due; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan. To avoid any doubt, except as otherwise expressly noted in the Plan, nothing in the Plan or herein shall be construed or is intended to affect, enjoin, modify, release, or waive any claims, rights, and actions that a third party may have against a person other than the Debtors or the Liquidating Debtors, provided that such claims, rights, and actions are wholly separate and exist independently from any claims, rights, and actions of the Estates.

C. **Exculpation**

As of and subject to the occurrence of the Effective Date, each of the Plan Proponents and their Representatives, the Liquidating Debtors, the Plan Representative, and the members of the Committee (acting in such capacity), shall neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken, in connection with, or related to, the formulation, preparation, dissemination, implementation, administration, Confirmation or Consummation of the Plan or any contract, instrument, waiver, release or other agreement or document created or entered into, in connection with the Plan, or any other act taken or omitted to be taken in connection with the Chapter 11 Cases; provided, however, that the foregoing provisions of this subsection shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

33

**D.   Debtor Release**

Each Debtor, for itself and its respective successors, assigns, transferees, those officers and directors, acting in such capacities as of the Petition Date, agents, members, financial advisors, attorneys, employees, partners, affiliates, representatives, in each case in their capacity as such, shall be deemed to have released any and all claims and causes of action against the Plan Proponents, the First Lien Lender Parties and the Liquidating Debtors, and their respective officers, directors, managers, employees, agents, advisors, accountants, attorneys and representatives, and their respective property, arising prior to the Effective Date.

**E.   Third Party Release**

Each Creditor that does not elect to opt out of this release by checking the appropriate box on the ballot provided to such Creditor in connection with solicitation of such Creditors' vote to accept to reject the Plan, for itself and its respective successors, assigns, transferees, those officers and directors, acting in such capacities as of the Petition Date, agents, members, financial advisors, attorneys, employees, partners, affiliates, representatives, in each case in their capacity as such, shall, by virtue of its vote, be deemed to have released any and all claims and causes of action against the Plan Proponents, the First Lien Lender Parties and the Liquidating Debtors, and their respective officers, directors, managers, employees, agents, advisors, accountants, attorneys and representatives, and their respective property, arising prior to the Effective Date.

**F.   Subsequent Discovery of Facts Does Not Affect Enforceability of Releases**

Each releasing party under Article X.D. and Article X.E. of this Plan shall be deemed to have granted the releases set forth herein, notwithstanding that it may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such party expressly waives any and all rights that it may have under any statute or common law principle, including section 1542 of the California Civil Code, which would limit the effect of such releases to those Claims or causes of action actually known or suspected to exist at the time of Confirmation. Section 1542 of the California Civil Code generally provides as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

**XI.**
**PENSION PLANS, OTHER RETIREE BENEFITS AND LABOR CONTRACTS**

The Debtors are not obligated pursuant to section 1129(a)(13) of the Bankruptcy Code to pay any "retiree benefits" (as that term is defined in section 1114(a) of the Bankruptcy Code).

# XII.
## NO REGULATED RATE CHANGE WITHOUT GOVERNMENT APPROVAL

The Debtors do not charge any rates for purposes of section 1129(a)(6) that are regulated by any governmental regulatory commission with jurisdiction under applicable nonbankruptcy law.

# XIII.
## EXEMPTION FROM CERTAIN TRANSFER TAXES

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers by the Debtors or the Liquidating Debtors pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar Tax or governmental assessment.

# XIV.
## RETENTION OF JURISDICTION AND MISCELLANEOUS MATTERS

### A.   Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and any of the proceedings related to the Chapter 11 Cases pursuant to section 1142 of the Bankruptcy Code and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purpose and intent of the Plan are carried out. Without limiting the generality of the foregoing, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(1) establish the priority or secured or unsecured status of, allow, disallow, determine, liquidate, classify, or estimate any Claim, Administrative Expense or Interest (including, without limitation and by example only, determination of Tax issues or liabilities in accordance with section 505 of the Bankruptcy Code), resolve any objections to the allowance or priority of Claims, Administrative Expense or Interests, or resolve any dispute as to the treatment necessary to reinstate a Claim, Administrative Expense or Interest pursuant to the Plan;

(2) grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(3) resolve any matters related to the rejection of any executory contract or unexpired lease to which any of the Debtors is a party or with respect to which any of the Debtors may be liable, and to hear, determine, and, if necessary, liquidate any Claims or Administrative Expenses arising therefrom;

(4)     ensure that distributions to Holders of Allowed Claims, Administrative Expenses, or Interests are made pursuant to the provisions of the Plan, and to effectuate performance of the provisions of the Plan;

(5)     decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending before the Effective Date or that may be commenced thereafter as provided in the Plan;

(6)     enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, except as otherwise provided in the Confirmation Order or in the Plan, including, without limitation, any stay orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(7)     resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or the Confirmation Order;

(8)     subject to the restrictions on modifications provided in any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

(9)     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan or the Confirmation Order;

(10)     consider and act on the compromise and settlement of any Claim against the Debtors;

(11)     enter such orders as may be necessary or appropriate in connection with the recovery of the assets of the Debtors wherever located;

54302-001\DOCS_SF:65521.15

(12)     hear and determine any motions or contested matters involving Tax Claims or Taxes either arising prior (or for periods including times prior) to the Effective Date or relating to the administration of the Chapter 11 Cases, including, without limitation (i) matters involving federal, state and local Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, (ii) matters concerning Tax refunds due for any period including times prior to the Effective Date, and (iii) any matters arising prior to the Effective Date affecting Tax attributes of the Debtors;

(13)     determine such other matters as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(14)     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings issued or entered in connection with the Chapter 11 Cases or the Plan;

(15)     remand to state court any claim, cause of action, or proceeding involving the Debtors that was removed to federal court in whole or in part in reliance upon 28 U.S.C. § 1334;

(16)     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, except as otherwise provided in the Plan;

(17)     determine any other matter not inconsistent with the Bankruptcy Code; and

(18)     enter an order or final decree concluding the Chapter 11 Cases.

## B.     Miscellaneous Matters

### 1.     Headings

The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

### 2.     Services by and Fees for Professionals and Certain Parties

Reasonable fees and expenses for the Professional Persons retained by the Debtors or the Committee for services rendered and costs incurred after the Petition Date and prior to the Effective Date will be fixed by the Bankruptcy Court after notice and a hearing and such fees and expenses will be paid by the Liquidating Debtors (less deductions for any and all amounts thereof already paid to such Persons with respect thereto) after a Final Order of the Bankruptcy Court approving such fees and expenses. Without limiting the Liquidating Debtors' obligations after the Effective Date under applicable law, from and after the Effective Date, the Liquidating Debtors shall, in the ordinary course of business and without the necessity for any approval by

37

the Bankruptcy Court, pay from the Cash on hand of MSA, the reasonable fees and expenses of the Professional Persons thereafter incurred by the Liquidating Debtors related to: (a) the implementation or consummation of the Plan and the Wind-Down or (b) the prosecution of any objections to Claims, Administrative Expenses, or Interests.

## 3. Bar Date for Administrative Expenses

Requests for payment of all Administrative Expenses, other than for those for which a request and/or proof of Claim has previously been Filed, must be Filed and served on the Debtors and the United States Trustee no later than thirty days after the Effective Date. The Debtors shall have until sixty days after the Effective Date to bring an objection to a Timely Filed request for payment of an Administrative Expense. Nothing in the Plan shall prohibit the Debtors from paying Administrative Expenses in the ordinary course in accordance with applicable law during or after the Chapter 11 Cases, but after the Effective Date, the Liquidating Debtors' obligation to pay an Administrative Expense will depend upon the claimant's compliance with this section and such Administrative Expense being Allowed under the provisions of the Plan. Notwithstanding the foregoing provisions of this Section, but except as may be expressly provided in other sections of the Plan, Professional Persons or other entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered or expenses incurred after the Petition Date and prior to the Effective Date must file and serve, on all parties entitled to notice thereof, an application for final allowance of compensation and reimbursement of expenses in accordance with the various orders of the Bankruptcy Court establishing procedures for submission and review of such applications; provided that, if no last date is set in such procedures for filing such applications, they must be Filed no later than sixty days after the Effective Date and any objections to such applications must be made in accordance with applicable rules of the Bankruptcy Court.

## 4. Notices

All notices and requests in connection with the Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

> Counsel for Debtors:
> PACHULSKI STANG ZIEHL & JONES LLP
> Richard M. Pachulski, Esq.
> Debra I. Grassgreen, Esq.
> Joshua M. Fried, Esq.
> 10100 Santa Monica Boulevard, 11th Floor
> Los Angeles, CA 90067
> Telephone: (310) 277-6910
> Facsimile: (310) 201-0760
>
> Counsel for Agent:
> LATHAM AND WATKINS LLP
> David Heller, Esq.
> Donald Schwartz, Esq.
> Josef S. Athanas, Esq.
> Sears Tower, Suite 5800
> 233 South Wacker Drive

Chicago IL 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

All notices and requests to any Person holding of record any Claim, Administrative Expense, or Interest shall be sent to such Person at the Person's last known address or to the last known address of the Person's attorney of record. Any such Person may designate in writing any other address for purposes of this Section of the Plan, which designation will be effective on receipt.

## 5. Successors and Assigns

The rights, duties and obligations of any Person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person.

## 6. Severability of Plan Provisions

If, prior to Confirmation, any nonmaterial term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to their terms.

## 7. No Waiver

Neither the failure of the Debtors to list a Claim in the Debtors' Schedules; the failure of the Debtors to object to any Claim or Interest for purposes of voting; the failure of the Debtors to object to a Claim, Administrative Expense, or Interest prior to Confirmation or the Effective Date; the failure of the Debtors to assert a Retained Right of Action prior to Confirmation or the Effective Date; the absence of a proof of Claim having been Filed with respect to a Claim; nor any action or inaction of the Debtors or any other party with respect to a Claim, Administrative Expense, Interest, or Retained Right of Action other than a legally effective express waiver or release shall be deemed a waiver or release of the right of the Debtors or their successors or assigns, before or after solicitation of votes on the Plan or before or after Confirmation or the Effective Date, to (a) object to or examine such Claim, Administrative Expense, or Interest, in whole or in part or (b) assign to the Agent (and for the Agent to subsequently assign or exclusively assert, pursue, prosecute, utilize, otherwise act, or otherwise enforce) any Retained Rights of Action.

39

8. **Inconsistencies**

In the event the terms or provisions of the Plan are inconsistent with the terms and provisions of the exhibits to the Plan or documents executed in connection with the Plan, the terms of the Plan shall control.

## XV.
## CONDITIONS TO CONFIRMATION AND EFFECTIVENESS

**A.    Conditions Precedent to Plan Effectiveness**

The Plan will not be consummated and the Effective Date will not occur unless and until (A) the Confirmation Order is in a form acceptable to the Plan Proponents and is entered by the Bankruptcy Court; (B) the Confirmation Order shall either be a Final Order or, if an appeal has been Filed, no stay has been obtained; (C) no unwaived Termination Event (as defined in the Enforcement Agreement) shall have occurred; (D) the Net Sale Proceeds distributed to the First Lien Lender Parties shall be at least $67 million and (E) all conditions to closing the Sale have been satisfied or waived. The foregoing conditions may be waived by the Plan Proponents (such waiver shall not require any notice, Bankruptcy Court order, or any further action).

**B.    Effect of Non-Occurrence of Conditions to Effective Date**

Each of the conditions to the Effective Date must be satisfied or duly waived, as provided above, within ninety days after the Confirmation Date. If each condition to the Effective Date has not been satisfied or duly waived, as described above, within ninety days after the Confirmation Date, then upon motion by the Debtors made before the time that each of such conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order shall be vacated by the Bankruptcy Court. Notwithstanding the filing of such motion, however, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated for failure to satisfy a condition to the Effective Date, the Plan shall be deemed null and void in all respects.

## XVI.
## EFFECT OF CONFIRMATION

**A.    Binding Effect of Confirmation**

Confirmation will bind the Debtors; all Holders of Claims, Administrative Expenses, Superpriority Claims, or Interests; and other parties in interest to the provisions of the Plan whether or not the Claim, Administrative Expense, Superpriority Claim, or Interest of such Holder is Impaired under the Plan and whether or not the Holder of such Claim, Administrative Expense, Superpriority Claim, or Interest has accepted the Plan.

**B.      Good Faith**

Confirmation of the Plan shall constitute a finding that: (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code and (ii) all Persons' solicitations of acceptances or rejections of the Plan and the offer, issuance, sale, or purchase of a security offered or sold under the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

**C.      No Limitations on Effect of Confirmation**

Nothing contained in the Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

## XVII.
## MODIFICATION OR WITHDRAWAL OF PLAN

**A.      Modification of Plan**

The Plan Proponents may seek to amend or modify the Plan at any time prior to its Confirmation in the manner provided by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise order, and except as otherwise set forth herein, the Plan Proponents reserve the right to amend the terms of the Plan or waive any conditions to its Confirmation, effectiveness or consummation if the Plan Proponents determine that such amendments or waivers are necessary or desirable to confirm, effectuate or consummate the Plan.

After Confirmation of the Plan, but prior to the Effective Date, the Plan Proponents may apply to the Bankruptcy Court, pursuant to section 1127 of the Bankruptcy Code, to modify the Plan. After the Effective Date, the Liquidating Debtors and the Agent may apply to remedy defects or omissions in the Plan or to reconcile inconsistencies in the Plan.

**B.      Withdrawal of Plan**

The Plan Proponents reserve the right to revoke and withdraw the Plan at any time prior to the Effective Date, in which case the Plan will be deemed to be null and void.

41

# XVIII.
## CONFIRMATION REQUEST

The Plan Proponents request that the Bankruptcy Court confirm the Plan and that it do so, if applicable, pursuant to section 1129(b) of the Bankruptcy Code notwithstanding the rejection of the Plan by any Impaired Class.


/s/_____
MagnaChip Semiconductor Finance Company


/s/_____
MagnaChip Semiconductor LLC


/s/_____
MagnaChip Semiconductor SA Holdings LLC


/s/_____
MagnaChip Semiconductor, Inc.


/s/_____
MagnaChip Semiconductor S.A.


/s/_____
MagnaChip Semiconductor B.V.


/s/_____
UBS AG, Stamford Branch

54302-001\DOCS_SF:65521.15

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
Richard M. Pachulski (CA Bar No. 90073)
Debra I. Grassgreen (CA Bar No. 169978)
James E. O'Neill (Bar No. 4042)
Joshua M. Fried (CA Bar No. 181541)
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone: 302/652-4100
Facsimile: 302/652-4400

Counsel to Debtors and Debtors in Possession

and

LATHAM AND WATKINS LLP
David Heller
Donald Schwartz
Josef S. Athanas
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago IL 60606
Telephone: 312/876-7700
Facsimile: 312/993-9767

Counsel for Agent