**EXHIBIT A TO PLAN: BTA**

## BUSINESS TRANSFER AGREEMENT

This BUSINESS TRANSFER AGREEMENT (the "Agreement") is made and entered into effective as of June 11, 2009 (the "Effective Date"), by and among MagnaChip Semiconductor, Ltd., a Korean limited liability company ("MSK"), MagnaChip Semiconductor, Inc., a California corporation ("MSA"), MagnaChip Semiconductor Limited, a company incorporated in the United Kingdom, MagnaChip Semiconductor Inc., a company incorporated in Japan, MagnaChip Semiconductor Limited, a company incorporated in Hong Kong SAR, MagnaChip Semiconductor Limited, a company incorporated in Taiwan and MagnaChip Semiconductor S.A., a company incorporated in Luxembourg ("Luxco") (collectively, the "Sellers"), and KTB 2007 Private Equity Fund, a Korean registered limited partnership ("Buyer"), as represented by its general partner KTB Securities Co., Ltd., a Korean corporation ("KTB"). Sellers and Buyer are referred to herein individually as a "Party" and collectively as the "Parties."

### RECITALS

A.      Sellers are engaged in the business of designing, developing, and marketing semiconductor products in various countries that includes the Acquired Assets (as defined below), Assumed Liabilities (as defined below) and Acquired Contracts (as defined below) (such business and activities to be transferred to Buyer, as currently conducted by Sellers, and comprised of the Acquired Assets, Acquired Contracts and Assumed Liabilities, are hereinafter referred to as the "Business").

B.      Sellers are parties to a Credit Agreement, dated as of December 23, 2004 (as amended, the "Credit Agreement"), with the lenders party thereto (the "Lenders"), UBS AG, Stamford Branch, as administrative agent, collateral agent and, for purposes of the transactions contemplated by this Agreement, sub-agent for the Collateral Trustee (as defined in the Credit Agreement) (the "Agent"), UBS Securities LLC, as lead arranger, bookmanager, documentation agent and syndication agent, UBS Loan Finance LLC, as swingline lender, and Korea Exchange Bank, as issuing bank (the Agent, the Lenders, UBS Securities LLC, UBS Loan Finance LLC and Korea Exchange Bank are collectively referred to herein as the "Lender Parties") and Sellers have granted liens upon all, or substantially all, of their assets to secure their obligations to the Lender Parties arising under, or in connection with, the Credit Agreement.

C.      Events of Default have occurred and are continuing under, and as defined in, the Credit Agreement (the "Events of Default") and, as a result, the Agent and the Lenders have accelerated the obligations thereunder.

D.      As part of the enforcement of the Lender Parties' remedies against the Sellers as a result of the Events of Default, the Agent, on behalf of itself and the other Lender Parties, has entered into the Enforcement, Consent, Cash Collateral and Limited Forbearance Agreement dated as of the date hereof (as amended, the "Enforcement Agreement"), pursuant to which Sellers have agreed, among other things, to sell all of Sellers' interest in the Business for the Purchase Price (as defined below) and subject to the terms and conditions hereinafter set forth and to pay certain of the proceeds of such sale to or for the benefit of the Lender Parties.

E.      Buyer wishes to purchase from Sellers, and, in accordance with the terms of the Enforcement Agreement, Sellers wish to sell to Buyer, concurrently herewith, all of Sellers' interest in the Business for the Purchase Price (as defined below) and subject to the terms and conditions hereinafter set forth.

F.      In accordance with the terms herein, Buyer wishes to establish a new company incorporated under the laws of Korea ("Newco") and to form subsidiaries or branches of Newco (individually, a "New Subsidiary" and collectively, the "New Subsidiaries", and, together with Newco, the "New Entities") under the laws of California, the United Kingdom, Japan, Hong Kong SAR, and

1

Taiwan, respectively, to operate the Business in the corresponding jurisdictions of Sellers. Effective at the time of Closing (as defined in Section 2.1 below), Buyer wishes to novate all of its rights, interests, benefits and obligations arising from this Agreement to Newco and the New Subsidiaries.

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

## ARTICLE I

## SALE AND PURCHASE OF BUSINESS

1.1    Sale and Purchase.  Upon the closing of the transactions contemplated hereby (the "Closing") and pursuant to the terms and subject to the conditions hereof, Sellers hereby sell, transfer, convey, assign and deliver to Buyer or Newco and the respective New Subsidiaries designated by Buyer (collectively, the "Sale"), and Buyer hereby purchases and accepts from Sellers, all right, title and interest of Sellers in and to the Business.

1.2    Consideration.  The aggregate purchase price for the Business (the "Purchase Price") shall be (i) in the event that the Exchange Rate (as defined below) is less than or equal to KRW1,500/US$1, eighty million U.S. dollars (US$80,000,000), (ii) in the event that the Exchange Rate (as defined below) is between KRW1,500/US$1 and KRW1,575/US$1, the U.S. dollar equivalent of one hundred twenty billion Korean won (KRW120,000,000,000), as calculated at the Exchange Rate; or (iii) in the event that the Exchange Rate (as defined below) is greater than or equal to KRW1,575/US$1, seventy-six million, one hundred ninety thousand, four hundred seventy-six U.S. dollars (US$76,190,476).    For the avoidance of doubt, the maximum Purchase Price is US$80,000,000 and the minimum Purchase Price is US$76,190,476, subject to other adjustments as set forth in this Section 1.2 and in Section 6.5 below.  The Purchase Price shall be paid on the Closing Date in U.S. dollars in cash by wire transfer of immediately available funds to an account designated by Agent, which Purchase Price shall be applied by Agent, as follows: (a) a portion of the Purchase Price less the Chapter 11 Amounts set forth in the following clause (b), to the loans and other obligations outstanding under the Credit Agreement and as otherwise agreed by the Lender Parties (the Parties acknowledging that the Lender Parties' consent to the Sale is contingent upon a net recovery by them for application to the loans and other obligations outstanding under the Credit Agreement of at least $67.7 million[1] unless otherwise consented to in writing by Agent); and (b) pursuant to a letter of direction from Sellers to Agent (the "Letter of Direction"), a portion of the Purchase Price in an amount equal to the sum of (x) all unpaid administrative expenses arising from the chapter 11 cases of the Debtors (as defined below) (the "Chapter 11 Cases"), in an aggregate amount not to exceed, unless consented to in writing by Agent, the amounts set forth on Schedule 1.2 attached hereto (collectively, the "Chapter 11 Fees") that have not previously been paid, (y) distributions on account of all unpaid allowed chapter 11 claims as required by a confirmed joint chapter 11 plan of liquidation (the "Plan") filed by MagnaChip Semiconductor S.A., MagnaChip Semiconductor Finance Company, MagnaChip Semiconductor LLC, MagnaChip Semiconductor SA Holdings LLC, MagnaChip Semiconductor, Inc. and MagnaChip Semiconductor B.V. (collectively, the "Debtors"), and Agent on behalf of the Lender Parties, in an aggregate amount not to exceed US$1.0 million, unless consented to in writing by Agent, and (z) US$1.0 million, in each case, as accepted by the Lender Parties (such amounts for (x), (y) and (z) above, collectively, the "Chapter 11 Amounts"), shall be paid in U.S. dollars in cash by wire transfer of immediately available funds to an

---

[1] This number assumes an Exchange Rate less than or equal to KRW1,500/US$1.  In the event the Exchange Rate is greater than KRW1,500/US$1 and results in a reduction in the Purchase Price under Section 1.2 of this Agreement, this number shall be deemed reduced dollar-for-dollar by the amount of such reduction in the Purchase Price.

account designated by Sellers in such Letter of Direction for application to the Chapter 11 Amounts. The "Exchange Rate" of the Korean won is the telegraphic transfer dollar buying rate as quoted by Korea Exchange Bank on the opening of business in Seoul, Korea, one Korean banking business day before the Closing Date. Transfer taxes as set forth in Section 6.4 below shall not be deducted from the Purchase Price.

  1.3  Escrow Deposit. As part of the payment of the Purchase Price, Buyer shall make two deposits on the Effective Date in cash by wire transfer of immediately available funds to two separate escrow accounts in Korea, in each case with an escrow agent and pursuant to escrow arrangements, including, without limitation, escrow agreement(s), in form and substance reasonably satisfactory to Buyer, Sellers and Agent that include a provision that in no event will the escrow funds be expatriated outside Korea until released from escrow, as follows:

    (a) US Dollars in an amount equal to four million U.S. dollars (US$4,000,000) (the "Base Deposit"). The Base Deposit shall be applied to and credited against, and paid to Agent as part of, the Purchase Price at Closing. In the event that the Closing does not occur by the Longstop Date (as defined below) or this Agreement is otherwise terminated, in either case for any reason other than Buyer's breach of this Agreement or its failure to satisfy any of the conditions set forth in Section 3.2 (any such occurrence, a "Buyer Breach"), the Base Deposit shall be returned to Buyer. In the event of a Buyer Breach, the Base Deposit shall be paid to Agent on the date of such Buyer Breach for application in full to the loans and other obligations outstanding under the Credit Agreement. The Parties acknowledge and agree that the payment of the Base Deposit to Agent in the event of a Buyer Breach is not a penalty, but rather liquidated damages in a reasonable amount that will compensate Sellers, Agent and each other Lender Party for the diminution in value of the Business, the adverse affects on the business, assets, properties, results of operations or financial condition of the Business which may result during the pendency of this Agreement, the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and the expectation of consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision. The Parties hereby agree that the payment of the Base Deposit shall be the sole and exclusive remedy of Sellers and each Lender Party for any damages suffered or incurred as a result of the termination or cancellation of this Agreement as a result of a Buyer Breach, and in no event shall any Seller or any Lender Party seek to recover any other money damages or seek any equitable relief or equitable remedies of any kind whatsoever or any other remedy from Buyer as a result of the termination or cancellation of this Agreement as a result of a Buyer Breach, regardless of whether such monetary damages or other remedies are based on a claim in law or equity, and each Seller hereby waives all such claims. Notwithstanding the foregoing, the Parties hereby acknowledge and agree that the payment of the Seller's W/C Share, if any, to Agent pursuant to clause (b) below shall be in addition to the payment of the Base Deposit, if any, to Agent pursuant to this clause (a) and that the liquidated damages provisions included in this clause (a) shall not limit or relieve in any way the obligation of Buyer to pay, and Agent's right to receive, such Seller's W/C Share.

    (b) US Dollars in an amount equal to three million U.S. dollars (US$3,000,000) (the "Working Capital Deposit"). The Working Capital Deposit shall be applied to and credited against, and paid to Agent as part of, the Purchase Price at Closing. In the event (a "Deposit Return Event") that the Closing does not occur by the Longstop Date or this Agreement is otherwise terminated for any reason whatsoever, the Working Capital Deposit less the amount of any Seller's W/C Share (as defined in Annex A attached hereto) shall be returned to Buyer and the amount of any Seller's W/C Share shall be paid to Agent and shall be used to acquire a participation by Buyer in the loans and other obligations outstanding under the Credit Agreement, in each case on the date such Deposit Return Event shall have occurred and in accordance with the terms and conditions set forth in Annex A attached hereto.

  1.4  Acquired Assets. Upon Closing and pursuant to the terms and subject to the conditions hereof, Sellers hereby sell, transfer, convey, assign and deliver to Buyer, and Buyer hereby

purchases and accepts from Sellers all right, title and interest of Sellers in and to the assets listed as such on Schedule 1.4 hereto (the "Acquired Assets").

1.5 Acquired Contracts. Upon Closing and pursuant to the terms and subject to the conditions hereof, Sellers hereby assign to Buyer, and Buyer hereby assumes from Sellers the agreements, contracts, leases, licenses, and other instruments relating to the Business (including, but not limited to, the Acquired Assets) that are listed as such in Schedule 1.5 hereto (the "Acquired Contracts").

1.6 Assumed Liabilities. Upon Closing and pursuant to the terms and subject to the conditions hereof, Sellers hereby assign and transfer to Buyer, and Buyer hereby assumes and shall henceforth fully perform and discharge on a timely basis and in accordance with their respective terms, all liabilities (whether fixed, contingent, matured, unliquidated or otherwise) of Sellers other than those excluded liabilities (the "Excluded Liabilities") expressly listed as such on Schedule 1.6 hereto (all such liabilities other than any Excluded Liabilities, the "Assumed Liabilities").

1.7 Excluded Assets, Contracts and Liabilities.

(a) Notwithstanding anything else set forth herein, the Acquired Assets shall not include any assets not listed as Acquired Assets on Schedule 1.4 hereto.

(b) Notwithstanding anything else set forth herein, the Acquired Contracts shall not include any contracts not listed as Acquired Contracts on Schedule 1.5 hereto.

(c) Notwithstanding anything else set forth herein, the Assumed Liabilities shall include all liabilities of Sellers (including, without limitation, all liabilities relating to assets or contracts not constituting Acquired Assets or Acquired Contracts) other than those Excluded Liabilities listed on Schedule 1.6 hereto.

1.8 Further Assurances.

(a) Sellers shall work in good faith to obtain written consents to the transfer and assignment of the Acquired Assets, the Acquired Contracts and the Assumed Liabilities to Buyer and, at Sellers' option, the novation of Sellers, where the approval or other consent of any other person may be required for these actions. Buyer shall cooperate in good faith with Sellers (including, where necessary, entering into appropriate instruments of assumption as shall be agreed upon) to have Sellers released from all liabilities to third parties with respect to the Assumed Liabilities, and Buyer and Sellers will each solicit such releases concurrently in a manner acceptable to both Buyer and Sellers with the solicitation of consents from third parties to the transfer, assignment and novation of the Acquired Assets, the Acquired Contracts and the Assumed Liabilities; provided, that except as otherwise agreed, no Party shall be required to grant any additional consideration to any third party in order to obtain any such consent, novation, assumption or release. Failure to obtain any such consent (other than any consents required from the Lender Parties or any of them) shall not excuse performance of this Agreement. If any Seller is not released from any of the Assumed Liabilities as provided herein, or there shall be any Seller Liabilities (as defined on Schedule 1.6), Buyer hereby agrees that at all times until (i) such releases are obtained (in the case of the Assumed Liabilities), and (ii) such Seller Liabilities have been satisfied or discharged, it will, and shall cause each New Entity to, upon demand indemnify and hold such Seller (in the case of such Assumed Liabilities) and each Lender Party (in the case of such Seller Liabilities), harmless against any and all losses, claims, damages or liabilities to any such person in connection with or as a result of such Assumed Liabilities and such Seller Liabilities, respectively.

(b) From the Effective Date to Closing, Sellers shall act in good faith, in light of the resources available to them, to conduct and maintain the Business in a way consistent with its normal business operation (except to the extent arising from, or related to, the Bankruptcy Cases (as

4

defined below), any other bankruptcy, insolvency or similar proceedings, and the other transactions contemplated by this Agreement), and Sellers shall not, without the consent of Buyer, conduct any acts that would result in a Material Adverse Effect (as defined below). Sellers shall consult with Buyer prior to (i) making any material decision in relation to the operation of the Business (other than those contemplated by this Agreement (including, without limitation, the filing and prosecution of the Bankruptcy Cases, as well as any other bankruptcy, insolvency or similar proceedings which may be commenced) or required under the Credit Agreement, any other Loan Document (as defined in the Credit Agreement) or the Enforcement Agreement), (ii) effecting any capital expenditure that would exceed five million U.S. dollars (US$5,000,000) in the aggregate for all capital expenditures made from the Effective Date through and until Closing or (iii) entering into any contract material to the Business as a whole.

(c)     During the period from the Effective Date to the Closing Date, Sellers shall, to the extent permitted under applicable law, furnish all documents (including, but not limited to, permits, approvals, registrations, certificates, contracts, financial and tax statements), data and such other information, in each case in its possession relating to the Business and reasonably requested by Buyer (the "Requested Documents") at a time and in a manner reasonable to the nature and complexity of the request.

1.9     Allocation. Sellers shall prepare an allocation prior to Closing (the "Allocation") of the Purchase Price and the Assumed Liabilities, to the extent properly taken into account solely for tax purposes, among the Sellers, Acquired Assets and Acquired Contracts in accordance with applicable tax law in each relevant jurisdiction. In the event Buyer does not agree with the Allocation proposed by Sellers, Sellers and Buyer shall thereafter work in good faith to resolve any and all disagreements. If Sellers and Buyer are unable to resolve any differences with regard to the Allocation, any disputed matters will be finally and conclusively determined by an independent certified public accounting firm or independent certified appraisal firm mutually agreed upon by Buyer and Sellers.

## ARTICLE II
## CLOSING

2.1     Closing. The Closing shall take place at the offices of MSK, 891 Daechi-dong, Gangnam-gu, Seoul 135-738 Korea, commencing at 10:00 a.m. (Korea time) or at such other time or place as the Parties may agree, on the fifth day which is not a Saturday, a Sunday or a public holiday in Korea following fulfillment or waiver of the conditions set out in Sections 3.1 to 3.3 (the "Closing Date"). The Closing shall be deemed to occur at 12:01 a.m. (Korea time) on the Closing Date. Subject to the provisions of Article III, failure to consummate the purchase and sale provided for in this Agreement on the date and time and at the place determined pursuant to this Section 2.1 will not result in the termination of this Agreement and will not relieve any party of any obligation under this Agreement. In such a situation, the Closing will occur as soon as practicable, subject to Article III.

2.2     Deliveries by Buyer. At Closing, Buyer shall deliver the following to Sellers unless waived in writing by Sellers (with the prior written consent of the Agent).

(a)     Payment. A payment of the Purchase Price (including the amount of deposits payable to Agent as part of the Purchase Price pursuant to Section 1.3) in cash by wire transfer of immediately available funds to an account maintained by the Agent in accordance with written wire instructions provided by Sellers (and countersigned by the Agent) to Buyer;

(b)     Ancillary Agreements. The Novation Agreement, the release of claims provided for in Section 6.7, such bills of sale, assignments and other instruments of transfer and assumption, and such other agreements as shall be necessary to effectuate the transactions contemplated by this Agreement (collectively, the "Ancillary Agreements"), in each case executed by Buyer and each applicable New Entity;

(c)      <u>BOD and Shareholders Resolution Minutes</u>.  A copy of the board of directors', shareholders' and investment committee's resolutions of Buyer and each New Entity, as required under any relevant laws and bylaws, in each case evidencing authorization of the execution, delivery and performance by Buyer and such New Entity, respectively, of this Agreement and the Ancillary Agreements and approval of Buyer's and such New Entity's respective purchase, acquisition or assumption of the Business in accordance with this Agreement and the Novation Agreement.

(d)      <u>Certificate</u>.  A Closing certificate dated as of the Closing Date duly executed by the representative directors of Buyer and each applicable New Entity pursuant to which Buyer or such New Entity, as the case may be, certifies to Seller that the conditions set forth in Section 3.2 hereof have been satisfied by Buyer, Newco or such New Subsidiary, as the case may be, as of the Closing Date.

2.3      <u>Deliveries by Sellers</u>.  At Closing, Sellers shall deliver the following to Buyer unless waived in writing by Buyer:

(a)      <u>Ancillary Agreements</u>.  The Ancillary Agreements executed by Sellers, as applicable;

(b)      <u>BOD and Shareholder/Unitholder Resolution Minutes</u>.  A copy of Sellers' respective board of directors' and shareholders' resolutions, as required under any relevant laws and bylaws, evidencing authorization of the execution, delivery and performance by each Seller of this Agreement and approval of each Seller's sale, transfer and assignment of the Business in accordance with this Agreement;

(c)      <u>Registration Documents</u>.  All documents, including, without limitation, a power of attorney or agent, in form and substance reasonably acceptable to Buyer, necessary to record or register the transfer, assignment and conveyance of the Acquired Assets as a result of the transactions contemplated herein at any competent governmental authorities; and

(d)      <u>Certificates</u>.  Closing certificates duly executed by the representative directors of Sellers pursuant to which Sellers certify to Buyer that (i) Sellers' representations and warranties to Buyer in this Agreement are true and correct as of the Closing Date as if then originally made (except for representations and warranties that relate to a specific date or time, which need only be true and correct as of such date or time), except to the extent such failure to be true or correct, would not have, individually or in the aggregate with all other failures to be true or correct, a Material Adverse Effect; (ii) all covenants required by the terms hereof to be performed by Sellers on or before the Closing Date have been so performed in all material respects; (iii) all documents required hereunder to be executed and delivered by Sellers at Closing have been executed and delivered by duly authorized officers of Sellers; and (iv) to the extent required by applicable law, Sellers have prepared and filed, or caused to be prepared and filed, with the appropriate authorities all tax returns, reports and forms ("<u>Tax Returns</u>") and have paid, or caused to be paid, when due, all material taxes covered by the Tax Returns relating to the Business attributable to any taxable period which ends on or prior to the Closing Date ("<u>Pre-Closing Tax Period</u>").

2.4      <u>Post-Closing Expenses</u>.  Buyer shall be responsible for payment of any and all expenses incurred in connection with the wind down of Sellers and, to the extent not a Seller, the Debtors (collectively, the "<u>Wind-Down Costs</u>") and for providing employees and all other necessary personnel, at no cost to Sellers or Debtors, to assist in winding down Sellers and Debtors after the Closing Date. Prior to Closing, Sellers and Debtors shall have established retainers in an amount estimated to cover such Wind-Down Costs (the "<u>Pre-Funded Retainers</u>") for the benefit of the professionals or other third parties entitled to receive payment in respect of such Wind-Down Costs pursuant to agreements reasonably acceptable to Buyer and Agent, which agreements shall also provide, among other things, that Buyer or the New Entities shall be responsible for paying the

amount of any Wind-Down Costs that exceed the amount of such Pre-Funded Retainers and that if there are any amounts remaining in the Pre-Funded Retainers after the payment of all Wind-Down Costs such amounts shall be returned to the Buyer or the New Entities, as the case may be.

# ARTICLE III

## CONDITIONS TO CLOSING AND TERMINATION

3.1     Conditions Precedent for Buyer and Sellers.  Closing and each Party's obligations with respect thereto are conditional on the following conditions being satisfied as of Closing, or waived in writing only as expressly provided below:

(a)  Unless waived in writing by Sellers (with the prior written consent of the Agent), Buyer shall have obtained all necessary governmental clearances, notices and approvals in connection with Buyer's acquisition of the Business from the Fair Trade Commission of Korea as required by Korean law;

(b)  Unless waived in writing by Buyer, Sellers, with the assistance of Buyer acting in good faith, shall have obtained any necessary governmental clearances, registrations and other authorizations required of Sellers in connection with its sale of the Business in the relevant overseas jurisdiction, and Buyer, with assistance of Sellers acting in good faith, shall have obtained any necessary governmental clearances, notices, consents, registrations and other authorizations required of Buyer in such overseas jurisdiction, in each case, in connection with the sale of the Business pursuant to this Agreement;

(c)  Each of the following events shall have occurred:  (i) a Qualified Confirmation Order (as defined below) shall have been entered and shall have become final, which order mandates, as of the effective date of the Chapter 11 plan of reorganization it confirms, (A) upon receipt of the Purchase Price by the Agent, the removal of all liens and encumbrances on the Acquired Assets of MSA and Luxco that secure any Secured Obligations (as defined below), and (B) upon receipt of the Purchase Price by the Agent, the execution and delivery of all Release Instruments (as defined below) necessary in connection with the release and removal of any liens or encumbrances on the Acquired Assets of MSK that secure any Secured Obligations and (ii) Sellers shall have obtained, and Buyer shall have received (or arrangements reasonably acceptable to Buyer shall have been made to assure that Buyer will promptly receive), Release Instruments sufficient, when filed or recorded in the appropriate jurisdiction(s), to cause the release and removal (upon receipt of the Purchase Price by Agent) of all other liens and encumbrances on any Acquired Assets that secure any of the Secured Obligations, completed in proper form, duly executed as necessary by the holders of such liens and encumbrances, their agents or other required signatories, and accompanied by any required ancillary notarizations, acknowledgments, apostilles, certificates or opinions.  For purposes of this Agreement, (i) "Qualified Confirmation Order" means an order of a United States Bankruptcy Court, entered in proceedings voluntarily commenced by the Debtors under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Cases"), confirming a chapter 11 plan of reorganization filed by or with the consent of such Debtors, (ii) "Release Instrument" means any certificate, opinion, document, or other instrument or court order reasonably required to cause, when filed or recorded in the appropriate jurisdiction(s), the release and removal of a lien or encumbrance that secures indebtedness, and (iii) "Secured Obligations" refers to all obligations of Sellers, as guarantors or otherwise, arising under or relating to either (A) the Credit Agreement or (B) the Indenture, dated December 23, 2004, as amended, with respect to the Floating Rate Second Priority Senior Secured Notes due 2011 and the 6 7/8% Second Priority Senior Secured Notes due 2011 (the "Indenture");

(d)  With respect to Sellers other than MSK, the Sellers' obligations under the Indenture are released pursuant to Section 12.05 thereof;

(e) The Enforcement Agreement shall be in full force and effect and shall not have been terminated by the Agent or any other Lender Party in accordance with the terms thereof; and

(f) The Closing Date shall have occurred on or before the earlier of (i) the date that is one year after the Effective Date and (ii) the date on which the Enforcement Agreement is terminated or, if sooner, the date that the Lender Parties withdraw their consent to a chapter 11 plan of reorganization filed by or with the consent of the Debtors (such earlier date, the "Longstop Date"), which date may be extended by mutual written agreement of the Parties (with the prior written consent of Agent).

3.2     Sellers' Closing Conditions. Closing and Sellers' obligations with respect thereto are conditional on the following conditions being satisfied as of Closing:

(a) Buyer shall have established Newco under the laws of Korea and the New Subsidiaries under the laws of California, the United Kingdom, Japan, Hong Kong SAR, and Taiwan, respectively;

(b) Effective at the time of Closing, except to the extent the Parties otherwise agree (with the prior written consent of the Agent), Buyer shall have novated Buyer's rights, interests, benefits, and obligations arising from this Agreement to Newco and the New Subsidiaries in accordance with a novation agreement in the form as attached hereto as Exhibit A (the "Novation Agreement"), and Buyer shall have delivered to Sellers an executed copy the Novation Agreement; provided that Buyer shall remain jointly and severally liable under this Agreement until the date on which (x) Agent shall have received the Purchase Price in accordance with the terms of this Agreement and (y) the Business shall have been validly transferred to the New Entities in accordance with this Agreement, the Novation Agreement and applicable law.

(c) Buyer and each New Entity, shall have executed and delivered to Sellers the release of claims provided for in Section 6.7, effective as of the Closing Date;

(d) Buyer and each New Entity, as applicable, shall have delivered to Sellers all items required to be delivered by Buyer and each New Entity, as applicable, under Section 2.2 hereof;

(e) All covenants, agreements and obligations required by the terms of this Agreement to be performed by Buyer and each New Entity, as applicable, at or before the Closing Date shall have been duly and properly performed in all material respects, including, without limitation, the obligations of Buyer set forth in Section 1.8; and

(f) Buyer's representations and warranties to Sellers in this Agreement and each New Entity's representations and warranties to Sellers in the Novation Agreement, in each case shall be true and correct in all material respects as of the Closing Date as if then originally made (except for representations and warranties that relate to a specific date or time, which need only be true and correct as of such date or time);

3.3     Buyer's Closing Conditions. Closing and Buyer's obligations with respect thereto are conditional on the following conditions being satisfied as of Closing:

(a) Until the Closing Date, Sellers shall have worked in good faith to obtain all third-party consents reasonably necessary for the transfer and assignment of the Acquired Assets, the Acquired Contracts and the Acquired Liabilities to Buyer and each New Entity, as applicable;

(b)     All covenants, agreements and obligations required by the terms of this Agreement to be performed by Sellers at or before the Closing Date shall have been duly and properly performed in all material respects, including, without limitation, the obligations of Sellers set forth in Section 1.8;

(c)  Since the Effective Date, there shall not have occurred any Material Adverse Effect. A "Material Adverse Effect" means such state of facts, circumstances, event or change that has had a material adverse effect on the business, operations or financial condition of the Business, taken as a whole, but shall not include (a) facts, circumstances, events or changes (i) generally affecting the semiconductor industry or the segments thereof in which Sellers operate, (ii) reflecting or resulting from changes or proposed changes in law (including rules and regulations) or interpretation thereof or generally accepted accounting principles (or interpretations thereof), or (iii) resulting from actions of Sellers which Buyer has expressly requested or to which Buyer has expressly consented; or (b) any failure to meet internal or published projections, forecasts or revenue or earning predictions for any period (provided that the underlying causes of such decline or failure may, to the extent applicable and not excluded above, be considered in determining whether there is a Material Adverse Effect); or (c) any facts, circumstances, events or changes resulting from the announcement or the existence of, or compliance with, this Agreement and the transactions contemplated hereby, including, without limitation, the filing and prosecution of the Bankruptcy Cases; or (d) compliance by Sellers with the terms of the Enforcement Agreement and the exercise by the Lender Parties of any of their rights thereunder (other than the revocation of their consent to the sale of the Business pursuant to this Agreement);

(d)  Sellers shall have delivered to Buyer all items required to be delivered by Sellers under Section 2.3 hereof; and

(e)  Sellers' representations and warranties to Buyer in this Agreement shall be true and correct in all material respects as of the Closing Date as if then originally made (except for representations and warranties that relate to a specific date or time, which need only be true and correct as of such date or time), except to the extent such failure to be true or correct would not have, individually or in the aggregate with all other failures to be true or correct, a Material Adverse Effect.

3.4    Waiver and Termination.

(a)    If any of the conditions set forth in Sections 3.1, 3.2 or 3.3 above have not been satisfied as of the Closing Date, then the Party to which the benefit of the condition applies may (subject, in the case of Sellers, to the prior written consent of the Agent) (i) waive the condition then unsatisfied or (ii) terminate this Agreement; and

(b)    In the event that this Agreement is terminated pursuant to this Section 3.4, then all rights and obligations of the Parties under this Agreement shall cease immediately upon termination except for this Article III, Section 1.3, the release of the Lender Parties set forth in Section 6.7, Section 8.1 (Notices), Section 8.2 (Amendment), Section 8.3 (Entire Agreement; Assignment), Section 8.4 (Severability), Section 8.5 (No Consequential Damages), Section 8.6 (Governing Law; Arbitration), Section 8.7 (Language), Section 8.8 (Counterparts), and Section 8.10 (Third Party Beneficiaries), all of which shall remain in full force and effect.

3.5    Break-up Fee. In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, in the event that the Closing does not occur by the Longstop Date, MSK shall pay in cash by wire transfer of immediately available funds to Buyer a break-up fee ("Break-up Fee") in an amount equal to one million two hundred thousand U.S. dollars (US$1,200,000); provided, however, that in no event shall the Break-up Fee be payable to Buyer if this Agreement is terminated by Sellers pursuant to Section 3.4(a) or if Buyer (or Newco or any New Subsidiary) breaches any of the material terms of this Agreement. Sellers' obligation, if any, to pay the Break-up Fee shall survive termination of this Agreement. The Parties acknowledge and agree that the Break-up Fee is not a penalty, but rather liquidated damages in a reasonable amount that will compensate Buyer in the circumstances in which the Break-up Fee is payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and the expectation of consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with

precision. The Parties hereby agree that the payment of the Break-up Fee shall be the sole and exclusive remedy of Buyer for any damages suffered or incurred as a result of the termination or cancellation of this Agreement pursuant to the circumstances described in this Section 3.5, and in no event shall Buyer seek to recover any other money damages or seek any equitable relief or equitable remedies of any kind whatsoever or any other remedy from Sellers, Agent or any other Lender Party as a result of the termination or cancellation of this Agreement pursuant to the circumstances described in this Section 3.5, regardless of whether such monetary damages or other remedies are based on a claim in law or equity, and Buyer hereby waives all such claims.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers as follows:

4.1     Organization and Standing.  Buyer is a registered limited partnership (*hapja hoesa*) duly organized and validly existing under, and by virtue of, the laws of Korea. Buyer has the requisite power and authority to own and operate its properties and assets and to carry on its business as presently conducted.

4.2     Power and Authority.  Buyer has all requisite power and authority to execute and deliver this Agreement and to carry out and perform its obligations under the terms of this Agreement. All action on the part of Buyer, its directors and its shareholders necessary for the authorization, execution, delivery, and performance by Buyer of this Agreement has been taken. This Agreement constitutes a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as may be limited by any bankruptcy, insolvency, reorganization, fraudulent transfer or other similar laws, now or hereafter in effect, relating to or affecting the rights of creditors generally.

4.3     No Conflicts.  The execution, delivery, performance of and compliance with this Agreement have not resulted and will not result in any violation of, or conflict with, or constitute a default under, Buyer's Articles of Incorporation or Bylaws, or to the knowledge of Buyer, any of Buyer's material agreements or any applicable statute, rule, regulation, order or restriction of any governmental entity or agency thereof.

4.4     Sufficient Funding.  Buyer shall have established Newco and the New Subsidiaries in a timely manner in accordance with Section 3.2(a) above and shall have sufficient funding to perform all of its obligations of this Agreement in a timely manner in accordance with this Agreement, including without limitation, to establish Newco and the New Subsidiaries and to make payment of the Purchase Price.

4.5     Brokers and Finders.  Buyer has not retained any broker, finder, or investment banker in connection with this Agreement or any of the transactions contemplated hereby, nor does or will Buyer owe any fee or other amount to any other broker, finder or investment banker in connection with this Agreement or the transactions contemplated hereby.

4.6     No Other Representations and Warranties.  EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY BUYER IN ARTICLE IV, BUYER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, CONCERNING THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

10

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF SELLERS

Each of Sellers hereby represents and warrants to Buyer as follows:

5.1     Organization of Sellers. Each of Sellers is duly organized and validly existing under the laws as set forth on Schedule 5.1 hereto. Each of Sellers has the requisite power to own, lease, and operate their respective Acquired Assets and carry on the Business as presently conducted.

5.2     Power and Authority. Each of Sellers has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement by Sellers and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of Sellers. This Agreement has been duly executed and delivered by Sellers and constitutes the valid and binding obligation of Sellers enforceable against Sellers in accordance with its terms, except as may be limited by any bankruptcy, insolvency, reorganization, fraudulent transfer or other similar laws, now or hereafter in effect, relating to or affecting the rights of creditors generally.

5.3     No Conflicts. The execution and delivery of this Agreement by Sellers does not, and the consummation of the transactions contemplated hereby will not, conflict with, or result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any benefit under (a) any provision of the Articles of Incorporation of Sellers, or (b) to the knowledge of Sellers, any material mortgage, indenture, lease, contract or other agreement or instrument, permit, concession, franchise, license, judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Sellers which would result in a Material Adverse Effect on the ability of Sellers to consummate the transactions contemplated under this Agreement.

5.4     Requested Documents. The representations and warranties (in each case other than with respect to any projections or any other forward-looking statements contained therein), taken as a whole, made by Sellers herein and in the Requested Documents furnished or to be furnished by or on behalf of Sellers to Buyer in connection with this Agreement do not contain any untrue statement of a material fact, or omit to state a material fact necessary in order to make the representations or warranties contained herein or therein not materially misleading, in light of the circumstances that existed on the date on which such representations or warranties were made.

5.5     No Other Representations and Warranties. EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY SELLERS IN ARTICLE V, SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, CONCERNING THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EXCEPT FOR THE EXPRESS WARRANTIES OF SELLERS SET FORTH IN ARTICLE V, THE BUSINESS (INCLUDING, BUT NOT LIMITED TO, THE ACQUIRED ASSETS) IS BEING SOLD AND TRANSFERRED "AS IS" AND "WITH ALL FAULTS" IN ALL RESPECTS AND SELLERS SPECIFICALLY DISCLAIM ANY WARRANTY OF MERCHANTABILITY OR SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF BUYER, WHETHER OR NOT SELLERS HAVE BEEN MADE AWARE OF ANY SUCH PURPOSE, ALL OF WHICH BUYER SPECIFICALLY AND EXPRESSLY ACKNOWLEDGES AND AGREES.

## ARTICLE VI

## ADDITIONAL AGREEMENTS

6.1     Legal Requirements; Reasonable Actions.

(a)     Each Party will take all reasonable actions reasonably necessary to comply promptly with all legal requirements which may be imposed on such Party under this Agreement and will promptly cooperate with and furnish information to any other Party in connection with any such reasonable requirements imposed upon such other Party in connection herewith. Each Party, at the reasonable request of another Party, shall execute and deliver such other instruments and do and perform such other acts and things as may be reasonably necessary or desirable for effecting completely the consummation of the transactions contemplated by this Agreement.

6.2     Employee Matters.

(a)     Buyer will cause Newco and the New Subsidiaries to employ all employees of Sellers other than Luxco who are located in the corresponding jurisdictions of Newco and the New Subsidiaries, including, without limitation, those listed in Schedule 6.2 (all such employees described in this Section 6.2(a), the "Designated Employees"), and who agree to such employment, as its employees effective as of the Closing Date in accordance with the terms and conditions set forth in this Section 6.2.

(b)     Buyer agrees that it will cause Newco and the New Subsidiaries to employ the Designated Employees in the same positions and at the same salaries and substantially the same terms and conditions, including benefit plans, as those in effect immediately prior to the Closing Date.

(c)     Buyer shall cause Newco and the New Subsidiaries to be responsible for all liabilities, salaries, benefits, severance and similar employer obligations for all Designated Employees. Buyer shall cause Newco and the New Subsidiaries to be responsible for liabilities with respect to the termination of any Designated Employee by Newco or the New Subsidiaries subsequent to the Closing Date, including without limitation, health care continuation coverage with respect to plans established or maintained by Newco or the New Subsidiaries subsequent to the Closing Date, and damages or settlements arising out of any claims of wrongful or illegal termination, and for complying with the requirements of all applicable laws with respect to any such termination. Buyer shall cause Newco and the New Subsidiaries to assume all employee benefit obligations related to the Designated Employees, including employee loans and loan guarantees.

6.3     Public Disclosure.   Unless otherwise required by law (including applicable bankruptcy, insolvency and securities laws), no disclosure (whether or not in response to an inquiry) of the subject matter of this Agreement shall be made by any Party unless approved by Sellers prior to release.

6.4     Tax Matters.

(a)     Tax Definitions.   For purposes of this Agreement, "tax" or "taxes" shall mean all taxes, imposts, duties, withholdings, charges, fees, levies, or other assessments imposed by any governmental or taxing authority, whether domestic or foreign, (including but not limited to, income, excise, property, sales, use, transfer, conveyance, payroll or other employment related tax, license, *ad valorem*, value added, withholding, social security, national insurance (or other similar contributions or payments), franchise, estimated severance, stamp taxes, taxes based upon or measured by capital stock, net worth or gross receipts and other taxes) together with all interest, fines, penalties and additions attributable to or imposed with respect to such amounts and any obligations under any agreement or arrangements with any person with respect to such amounts.

(b)     Pre-Closing Tax Period.  To the extent legally required prior to the Closing Date, Sellers shall prepare and file, or cause to be prepared and filed, with the appropriate authorities all Tax Returns and shall pay, or cause to be paid, when due all taxes relating to the Business attributable to the Pre-Closing Tax Period.  Buyer shall prepare and file, or cause to be prepared and filed, with the appropriate authorities all other Tax Returns, and shall pay, or cause to be paid, when due all other taxes (including, without limitation, those relating to the Business attributable to taxable periods which are not part of the Pre-Closing Tax Period and, if and to the extent not paid by Sellers on or before the Closing Date, any taxes attributable to the Pre-Closing Tax Period).  If, in order to properly prepare its Tax Returns or other documents required to be filed with governmental authorities, it is necessary that a Party be furnished with additional information, documents or records relating to the Acquired Assets, both Sellers and Buyer agree to use commercially reasonable efforts to furnish or make available such non-privileged information at the recipient's request, cost, and expense provided, however, that no Party shall be entitled to review or examine the Tax Returns of the other Party.

(c)     Refunds and Credits.  Any refunds and credits attributable to the Business for the Pre-Closing Tax Period shall be for the account of Sellers, provided that Sellers will assign to Buyer or the New Entities, as the case may be, the rights to receive such refunds and credits, and any refunds and credits attributable to the period which is not part of the Pre-Closing Tax Period shall be for the account of Buyer or the New Entities, as the case may be.

(d)     Post-Closing Tax Period.  Buyer and each New Entity is responsible for and shall indemnify Sellers against all taxes arising by reason of or attributable to the Business (including, without limitation, the Acquired Assets, the Acquired Contracts and the Assumed Liabilities) or the operations, properties, activities and transactions of the Business during or with respect to any period after the Closing Date (the "Post-Closing Tax Period").

(e)     Transfer Taxes.  All transfer, documentary, sales, use, registration, value-added, real estate transfer, and any similar taxes and related fees incurred in connection with this Agreement, and the transactions contemplated hereby shall be borne by Buyer.  To the extent permitted by applicable law, Buyer, each New Entity and Sellers shall cooperate with each other to obtain exemptions from such taxes, provided that no Party shall be obligated to seek any exemption which could reasonably be expected to result in any governmental audit of its books and records.

6.5     Professional Expenses.  Schedule 6.5 attached hereto sets forth, on a monthly basis, professional expenses (collectively, the "Professional Expenses") (a) incurred and paid by Sellers for each month during the period from February 1, 2009 through the Effective Date and (b) expected to be incurred and paid by Sellers for each month during the period from the Effective Date through and including the Closing Date, in each case in connection with Sellers' efforts to sell the Business, including the name of each professional.  In the event that the aggregate amount payable by Sellers to the named professionals listed on Schedule 6.5 between February 1, 2009 and the Closing Date (excluding any and all success or similar fees, but not monthly fees, paid or required to be paid to Miller Buckfire & Co., LLC and/or Standard Chartered and/or any of their respective affiliates during such period to the extent in excess of US$4.0 million in the aggregate (such amount in excess of US$4.0 million, the "Excluded Professional Expenses")) exceeds five billion Korean won (KRW5,000,000,000), with such won amount determined at the Exchange Rate, then, subject to the proviso below, the Purchase Price shall be reduced by the U.S. dollar equivalent (based upon the Exchange Rate) of the amount of any excess of such Professional Expenses (for the avoidance of doubt, other than any Excluded Professional Expenses) above five billion Korean won (KRW5,000,000,000) (the amount of any such excess, the "Non-Buyer Professional Expenses"); provided that, notwithstanding the foregoing, the Parties acknowledge and agree that (x) the amount of any such Non-Buyer Professional Expenses that are included (i) in the Chapter 11 Amounts pursuant to Section 1.2(b)(x) and (ii) in the amount of any Pre-Funded Retainers pursuant to Section 2.4 shall not be deducted from the Purchase Price pursuant to this Section 6.5 and (y) the Lender Parties' consent to the Sale is contingent upon a net recovery by them for application to the loans and

other obligations outstanding under the Credit Agreement of at least $67.7 million[2] unless otherwise consented to in writing by Agent. Except as set forth in this Section 6.5, each Party shall be responsible for the fees of its own attorneys, accountants, investment bankers, advisors and other professionals incurred in connection with the transactions contemplated hereunder.

6.6     Establishment of Newco and the New Subsidiaries and Novation of Agreement. Buyer shall establish Newco under the laws of Korea and the New Subsidiaries under the laws of California, the United Kingdom, Japan, Hong Kong SAR, and Taiwan, respectively; and effective at the time of Closing, novate all of its rights, interests, benefits, and obligations arising from this Agreement to Newco and the New Subsidiaries in accordance with the Novation Agreement; provided that Buyer shall remain jointly and severally liable for each New Entity's obligations under the Novation Agreement and this Agreement until the date on which (x) Agent shall have received the Purchase Price in accordance with the terms of this Agreement and (y) the Business shall have been validly transferred to the New Entities in accordance with the Novation Agreement and applicable law.

6.7     Release. Buyer, for itself and on behalf of Buyer's parent entities, subsidiaries, affiliates, partners, equity holders, successors, predecessors, and assignees, including Newco and the New Subsidiaries (in such capacity, the "Releasing Party"), hereby irrevocably and unconditionally settles, waives, releases, remises, acquits and discharges any and all claims, demands, actions or causes of action, known or unknown, which the Releasing Parties may have or could claim against Sellers and the Lender Parties, and each of their respective parent entities, subsidiaries, affiliates, equity holders, successors, predecessors, and assignees, and all of their current and former employees, agents, attorneys, advisors, officers and directors, and all persons acting by, through, under or in concert with any of them or that might be claimed to be jointly or severally liable with them (collectively, the "Seller Released Parties") and the Releasing Party covenants not to sue or bring any action or proceeding against the Seller Released Parties with respect to such claims, demands, actions or causes of action. The Releasing Party recognizes that it is giving up all claims, demands, actions and causes of action, which it now may have, whether known or unknown, and whether specifically mentioned or not. The Releasing Party specifically waives any claim or right to assert that any cause of action or alleged cause of action or claim has been, through oversight or error, intentionally or unintentionally omitted from this Agreement. Without in any way affecting the effectiveness of the release set forth above, Buyer agrees to, and to cause each New Entity to, execute a release of claims substantially in the form as set forth in this Section 6.7 effective on the Closing Date.

## ARTICLE VII

## SURVIVAL OF REPRESENTATIONS AND WARRANTIES

7.1     Survival of Buyer Representations and Warranties. All of the representations and warranties of the Buyer contained herein shall expire with, and be terminated and extinguished upon, the Closing Date.

7.2     Survival of Sellers' Representations and Warranties. All of the representations and warranties of Sellers contained herein shall expire with, and be terminated and extinguished upon, the Closing Date.

---

[2] This number assumes an Exchange Rate less than or equal to KRW1,500/US$1. In the event the Exchange Rate is greater than KRW1,500/US$1 and results in a reduction in the Purchase Price under Section 1.2 of this Agreement, this number shall be deemed reduced dollar-for-dollar by the amount of such reduction in the Purchase Price.

**ARTICLE VIII**

**GENERAL PROVISIONS**

8.1    Notices. Any request, communication or other notice required or permitted hereunder shall be in writing and shall be deemed to have been duly given if sent by facsimile or delivered by recognized overnight courier service or personal delivery (as the situation may require) at the respective address or facsimile number of the Party receiving notice as set forth below. Any Party may, by notice so given, change its address or facsimile number for future notice hereunder. All such notices and other communications hereunder shall be deemed given (a) upon confirmation of delivery, if sent by facsimile, and (b) upon delivery, if sent by recognized overnight courier service or personal delivery.

(i)    if to Sellers, to:

MagnaChip Semiconductor, Ltd.
891 Daechi-dong, Gangnam-gu
Seoul 135-738 Korea
Attention: General Counsel
Telephone No.: 82-2-6903-3073
Facsimile No.: 82-2-6903-3898

With copies to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard
11th Floor
Los Angeles, CA 90067-4100
Attention: Richard M. Pachulski, Joshua M. Fried and Debra Grassgreen
Telephone No.: 1-310-277-6910
Facsimile No.: 1-310-201-0760

Kim & Chang
Seyang Building
223 Naeja-dong, Jongno-gu
Seoul 110-720, Korea
Attention: Do-Young Kim and Won Kyu Choi
Telephone No.: 82-2-3703-1114
Facsimile No.: 82-2-3703-1590

UBS AG, Stamford Branch
677 Washington Boulevard
Stamford, CT 06901
Attn: Thomas J. Donnelly
Telephone No.: 1-203-719-3683
Facsimile No.: 1-203-719-3162

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Attn: Christopher R. Plaut
Telephone No.: 1-212-906-1262
Facsimile No.: 1-212-751-4864

Lee & Ko
18th Fl., Hanjin Main Building
118, 2-Ka, Namdaemun-Ro, Chung-Ku

Seoul, Korea
Attn: Yong Jae Chang
Telephone No.: 82-2-772-4394
Facsimile No.: 82-2-772-4001/2

(ii)     if to Buyer or any New Entity, to:

KTB 2007 Private Equity Fund
c/o KTB Securities Co., Ltd.
15/F, KTBnetwork Bldg.
826-14 Yeoksam-dong, Gangnam-gu
Seoul 135-769, Korea
Attn: Hyun-il Cho
Telephone No.: 82-2-2184-2802
Facsimile No.: 82-2-2184-2106

With a copy to:

Jisung Horizon
The Korea Chamber of Commerce & Industry Building
11th Floor
45 Namdaemunro 4-ga, Jung-gu
Seoul 110-740, Korea
Attention: Sang-Jun Kim and Hyung J. Park
Telephone No.: 82-2-6050-1600
Facsimile No.: 82-2-6050-1700

8.2     Amendment. Except as is otherwise required by applicable law, this Agreement may only be amended or otherwise modified by the Parties at any time by execution of an instrument in writing signed by each of Sellers and Buyer and consented to in writing by Agent.

8.3     Entire Agreement; Assignment. This Agreement and the Ancillary Agreements (i) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings both written and oral, among the Parties with respect to the subject matter hereof, and (ii) are not intended to confer upon any other person any rights or remedies hereunder, other than as set forth in Section 8.10. This Agreement shall not be assigned by either Party or by operation of law or otherwise without the prior written consent of the other Party except that (i) Buyer may assign or novate this Agreement to Newco and the New Subsidiaries in accordance with this Agreement, and (ii) except as otherwise prohibited by law, Sellers may assign (as collateral security or otherwise) their rights hereunder to Agent, for the benefit of the Lender Parties (and Buyer hereby consents to such assignment), it being understood that in no event (whether before or after any such assignment) will any Lender Party have any obligations or liabilities hereunder, make any representations or warranties, or be required to perform any of the promises or undertakings of Sellers hereunder. Notwithstanding the foregoing, Buyer acknowledges that Sellers are bound by the terms of the Enforcement Agreement, the Credit Agreement and the other Loan Documents (as defined in the Credit Agreement) and Sellers shall not be deemed to be in default under this Agreement by virtue of their compliance with the terms of such Agreements.

8.4     Severability. In the event that any provision of this Agreement or the application thereof becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the Parties. The Parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

16

8.5    <u>No Consequential Damages</u>. No Party shall be liable for any indirect, special, punitive, consequential, or incidental damages, lost savings, lost revenue, loss or profits or goodwill, or other such damages, regardless of the form of action, in connection with any aspect of the transactions contemplated by this Agreement or the Ancillary Agreements, even if advised of the possibility of such damages.

8.6    <u>Governing Law; Arbitration</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the Republic of Korea, without regards to conflicts of laws of provisions. All actions and proceedings arising out of or relating to this Agreement shall be finally settled by arbitration utilizing the rules of the International Chamber of Commerce ("<u>ICC</u>") by three arbitrators appointed in accordance with ICC rules. The arbitration shall be conducted in Seoul, Korea, and the language used in the proceedings shall be English. The award rendered by the arbitrator shall be final and binding on the Parties concerned and may be entered in any court of competent jurisdiction for execution.

8.7    <u>Language</u>.    For purposes of interpretation or resolving ambiguities, this Agreement, as executed in English, will prevail over any translation.

8.8    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Party, it being understood that all Parties need not sign the same counterpart.

8.9    <u>Bulk Transfer Laws</u>. Buyer hereby waives compliance by any of the Sellers with the provisions of any so-called bulk transfer laws of any jurisdiction in connection with the sale of the Acquired Assets held by MSA.

8.10    <u>Third Party Beneficiaries</u>. Nothing in this Agreement confers any rights on any person except the Parties and their respective successors and permitted assigns. Notwithstanding anything to the contrary in this Agreement, the Lender Parties shall be third-party beneficiaries of this Agreement and shall have the right to directly enforce their rights hereunder and the provisions hereof.

*[Signature Page Follows]*

17

IN WITNESS WHEREOF, Sellers and Buyer have caused this Agreement to be executed effective as of the Effective Date.

**"SELLERS"**

**MAGNACHIP SEMICONDUCTOR, LTD.,**
a Korea limited liability company

By: _____
Name: _____
Title: _____
SANG PARK PRESIDENT DIRECTOR and CEO

**MAGNACHIP SEMICONDUCTOR, INC.**
a California corporation

By: _____
Name: JOHN MCFARLAND
Title: CORP SEC

**MAGNACHIP SEMICONDUCTOR LIMITED,**
a United Kingdom company

By: _____
Name: JOHN MCFARLAND
Title: CORP SEC

**MAGNACHIP SEMICONDUCTOR INC.,**
a Japan company

By: _____
Name: Margaret Sakan
Title: Director

**MAGNACHIP SEMICONDUCTOR LIMITED,**
a Hong Kong SAR company

By: _____
Name: Margaret Sakan
Title: Director

**MAGNACHIP SEMICONDUCTOR LIMITED,**
a Taiwan company

By: _____
Name: _____Margaret Sakaw_____
Title: _____Director_____


**MAGNACHIP SEMICONDUCTOR S.A.**
a Luxembourg company

By: _____
Name: _____JOHN MCFARLANN_____
Title: _____DIRECTOR_____


**"BUYER"**

**KTB 2007 PRIVATE EQUITY FUND**

서울·강남구 역삼동 826~14 케이티비네트워크빌딩
**케이티비이천칠사모투자전문회사**
By:_____
Name:_표사원 케이더비투자증권주식회사
Title:_____

*[Signature Page to Business Transfer Agreement]*

19

## FIRST AMENDMENT TO
## BUSINESS TRANSFER AGREEMENT

This First Amendment to Business Transfer Agreement (this *"First Amendment"*) is dated as of June 25, 2009, by and among MagnaChip Semiconductor, Ltd., a Korean limited liability company, MagnaChip Semiconductor, Inc., a California corporation, MagnaChip Semiconductor Limited, a company incorporated in the United Kingdom, MagnaChip Semiconductor Inc., a company incorporated in Japan, MagnaChip Semiconductor Limited, a company incorporated in Hong Kong SAR, MagnaChip Semiconductor Limited, a company incorporated in Taiwan and MagnaChip Semiconductor S.A., a company incorporated in Luxembourg (collectively, the *"Sellers"*), and KTB 2007 Private Equity Fund, a Korean registered limited partnership (*"Buyer"*), as represented by its general partner KTB Securities Co., Ltd., a Korean corporation. In this First Amendment, Buyer and Sellers are sometimes collectively referred to as the *"Parties."*

## RECITALS

A.     The Parties have entered into that certain Business Transfer Agreement dated as of June 11, 2009 (the *"BTA"*), pursuant to which Sellers have agreed to sell, and Buyer has agreed to purchase, all of Sellers' interest in the Business.

B.     Section 8.2 of the BTA provides that the BTA may be amended by an instrument in writing signed by each of Sellers and Buyer and consented to in writing by Agent.

C.     The Parties desire to amend the BTA as set forth below.

## AGREEMENT

**NOW, THEREFORE,** in consideration of and subject to the premises and mutual agreements, terms and conditions herein contained, the benefits to be derived therefrom and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.     <u>Definitions</u>. For the purposes of this First Amendment, all capitalized terms not otherwise defined herein shall have the meanings assigned to them in the BTA.

2.     <u>Amendments to BTA</u>.

a.     Recital D of the BTA is hereby amended by adding the word "Gross" immediately before the words "Purchase Price".

b.     Recital E of the BTA is hereby amended by adding the word "Gross" immediately before the words "Purchase Price".

c.     Section 1.2 of the BTA is hereby amended and restated in its entirety as set forth below:

"1.2 **Consideration**. The adjusted purchase price (the "<u>Purchase Price</u>") for the Business shall be (a) the gross purchase price for the Business (the "<u>Gross Purchase Price</u>"), which shall be (i) in the event that the Exchange Rate (as defined below) is less than or equal to KRW1,500/US$1, eighty million U.S. dollars (US$80,000,000), (ii) in the event that the Exchange Rate (as defined below) is between KRW1,500/US$1 and KRW1,575/US$1, the U.S. dollar equivalent of one hundred twenty billion Korean won (KRW120,000,000,000), as calculated at the Exchange Rate; or (iii) in the event that the Exchange Rate (as defined below) is greater than or equal to KRW1,575/US$1, seventy-six million, one hundred ninety thousand, four hundred seventy-six U.S. dollars (US$76,190,476); less (b) the Non-Buyer Professional Expenses. For the avoidance of doubt, the maximum Gross Purchase Price is US$80,000,000 and the minimum Gross Purchase Price is US$76,190,476. The entire Purchase Price shall be paid on the Closing Date in U.S. dollars in cash by wire transfer of immediately available funds to an account designated by Agent and shall be applied by Agent, as follows: (a) a portion of the Purchase Price equal to $67.0 million[1] (or such lesser amount consented to in writing by the Agent), shall be immediately applied by the Agent to the loans and other obligations outstanding under the Credit Agreement and as otherwise agreed in writing by the Lender Parties (the Parties acknowledging that the Lender Parties' consent to the Sale is contingent upon a Purchase Price equal to the sum of (i) a net recovery by them for application to the loans and other obligations outstanding under the Credit Agreement of at least $67.0 million plus (ii) a reserve for the Chapter 11 Amounts equal to at least $2 million plus the aggregate amount set forth on <u>Schedule 1.2</u> (less amounts paid prior to the Closing Date) unless otherwise consented to in writing by Agent); (b) pursuant to one or more letters of direction that the Sellers may give to the Agent from time to time (collectively, the "<u>Letter of Direction</u>"), a portion of the Purchase Price in an amount equal to the sum of (x) distributions on account of all unpaid allowed priority tax claims and priority non-tax claims as required by the Plan in an aggregate amount not to exceed, unless consented to in writing by Agent, US$1.0 million ("<u>Priority Claim Distributions</u>"), (y) all unpaid administrative expenses arising from the chapter 11 cases of the Debtors (as defined below) (the "<u>Chapter 11 Cases</u>"), in an aggregate amount not to exceed, unless consented to in writing by Agent, the sum of (I) the amounts set forth on <u>Schedule 1.2</u> attached hereto, plus (II) the difference between US$1.0 million and the amount of the Priority Claim Distributions (to the extent the Priority Claim Distributions are less than $1 million), minus (III) all administrative expenses arising from the chapter 11 cases of the Debtors and paid or prepaid prior to the Closing Date (collectively, the "<u>Chapter 11 Fees</u>"), and (z) distributions on account of all unpaid allowed non-priority unsecured chapter 11 claims as classified and required by a confirmed joint chapter 11 plan of liquidation (the "<u>Plan</u>") filed by MagnaChip Semiconductor S.A., MagnaChip Semiconductor Finance Company, MagnaChip Semiconductor LLC, MagnaChip Semiconductor SA Holdings LLC, MagnaChip Semiconductor, Inc. and MagnaChip Semiconductor B.V. (collectively, the "<u>Debtors</u>"), and Agent on behalf of the Lender Parties, in an aggregate amount not to exceed US$1.0 million, unless consented to in writing by Agent (such amounts for (x), (y) and (z) above, collectively, the "<u>Chapter 11 Amounts</u>"), shall be paid by Agent in U.S. dollars in cash by wire transfer of immediately available funds to an account designated by Sellers in such Letter of Direction for application to the Chapter 11 Amounts; and (c) any remainder of the Purchase Price

remaining after the applications set forth in clauses (a) and (b) above shall be applied to the loans and other obligations outstanding under the Credit Agreement and as otherwise agreed in writing by the Lender Parties. The "Exchange Rate" of the Korean won is the telegraphic transfer dollar buying rate as quoted by Korea Exchange Bank on the opening of business in Seoul, Korea, one Korean banking business day before the Closing Date. Transfer taxes as set forth in Section 6.4 below shall not be deducted from the Gross Purchase Price."

[Footnote 1:] "[1] This number assumes an Exchange Rate less than or equal to KRW1,500/US$1. In the event the Exchange Rate is greater than KRW1,500/US$1 and results in a reduction in the Gross Purchase Price under Section 1.2 of this Agreement, this number shall be deemed reduced dollar-for-dollar by the amount of such reduction in the Gross Purchase Price."

d.      Section 1.3 of the BTA is hereby amended by adding the word "Gross" immediately before the words "Purchase Price" appearing in the first sentence thereof.

e.      Section 1.9 of the BTA is hereby amended by adding the word "Gross" immediately before the words "Purchase Price" appearing in the first sentence thereof.

f.      Section 4.4 of the BTA is hereby amended by adding the word "Gross" immediately before the words "Purchase Price".

g.      Section 6.5 of the BTA is hereby amended and restated in its entirety as set forth below:

"6.5    Professional Expenses. Schedule 6.5 attached hereto sets forth, on a monthly basis, professional expenses (collectively, the "Professional Expenses") (a) incurred and paid by Sellers for each month during the period from February 1, 2009 through the Effective Date and (b) expected to be incurred and paid by Sellers for each month during the period from the Effective Date through and including the Closing Date, in each case in connection with Sellers' efforts to sell the Business, including the name of each professional. In the event that the aggregate amount payable by Sellers to the named professionals listed on Schedule 6.5 between February 1, 2009 and the Closing Date (excluding any and all success or similar fees, but not monthly fees, paid or required to be paid to Miller Buckfire & Co., LLC and/or Standard Chartered and/or any of their respective affiliates during such period to the extent in excess of US$4.0 million in the aggregate (such amount in excess of US$4.0 million, the "Excluded Professional Expenses")) exceeds five billion Korean won (KRW5,000,000,000), with such won amount determined at the Exchange Rate, then, subject to the proviso below, the Gross Purchase Price shall be reduced by the U.S. dollar equivalent (based upon the Exchange Rate) of the amount of any excess of such Professional Expenses paid as of the Closing Date (for the avoidance of doubt, other than any Excluded Professional Expenses) above five billion Korean won (KRW5,000,000,000) (the amount of any such excess, the "Non-Buyer Professional Expenses"); provided that, notwithstanding the foregoing, the Parties acknowledge and agree that (x) the amount of any such Non-Buyer Professional Expenses that are included (i) in the Chapter 11 Amounts pursuant to Section 1.2(b)(y) and (ii) in the amount of any Pre-Funded Retainers pursuant to Section 2.4 shall not be deducted from the Gross Purchase Price pursuant to this Section 6.5 and (y) the Lender Parties' consent to the Sale is contingent upon a net recovery by them for application to the loans and other obligations outstanding under the Credit Agreement of at least $67.0 million[2] unless otherwise consented to in writing by Agent. Except as set forth in

this Section 6.5, each Party shall be responsible for the fees of its own attorneys, accountants, investment bankers, advisors and other professionals incurred in connection with the transactions contemplated hereunder."

[Footnote 2:] "[2] This number assumes an Exchange Rate less than or equal to KRW1,500/US$1. In the event the Exchange Rate is greater than KRW1,500/US$1 and results in a reduction in the Gross Purchase Price under Section 1.2 of this Agreement, this number shall be deemed reduced dollar-for-dollar by the amount of such reduction in the Gross Purchase Price."

h.     Schedule 1.4 of the BTA is hereby amended by adding the word "Gross" immediately before the words "Purchase Price" appearing after the words "Notwithstanding the foregoing, the following assets are expressly excluded from the definition of the Acquired Assets".

3.     Miscellaneous

a.     Except as herein expressly amended, all terms, covenants and provisions of the BTA are and shall remain in full force and effect. In the event of a conflict between the terms of the BTA and this First Amendment, this First Amendment shall control.

b.     Nothing in this First Amendment confers any rights on any person except the Parties and their respective successors and permitted assigns. Notwithstanding anything to the contrary in this First Amendment, the Lender Parties shall be third-party beneficiaries of this First Amendment and shall have the right to directly enforce their rights hereunder and the provisions hereof.

c.     This First Amendment may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the Parties and the Agent and delivered to the other Party and to the Agent with respect to the Parties, it being understood that all Parties and the Agent need not sign the same counterpart.

d.     This First Amendment shall be governed by, and construed in accordance with, the laws of the Republic of Korea, without regards to conflicts of laws of provisions. All actions and proceedings arising out of or relating to this First Amendment shall be finally settled by arbitration utilizing the rules of the International Chamber of Commerce ("*ICC*") by three arbitrators appointed in accordance with ICC rules. The arbitration shall be conducted in Seoul, Korea, and the language used in the proceedings shall be English. The award rendered by the arbitrator shall be final and binding on the Parties concerned and may be entered in any court of competent jurisdiction for execution

e.     For purposes of interpretation or resolving ambiguities, this First Amendment, as executed in English, will prevail over any translation.

IN WITNESS WHEREOF, the Parties hereto have executed this First Amendment as of the date first above written.

**"SELLERS"**

MAGNACHIP SEMICONDUCTOR, LTD.,
a Korea limited liability company

By: _____
Name: _____
Title: _____

SANG PARK PRESIDENT DIRECTOR and CEO

MAGNACHIP SEMICONDUCTOR, INC.
a California corporation

By: _____
Name: ~~JOHN MCFARLAND~~
Title: ~~CORP SEC~~

MAGNACHIP SEMICONDUCTOR LIMITED,
a United Kingdom company

By: _____
Name: ~~JOHN MCFARLAND~~
Title: ~~SEC~~

MAGNACHIP SEMICONDUCTOR INC.,
a Japan company

By: _____
Name: ~~Margaret Sakai~~
Title: ~~Director~~

MAGNACHIP SEMICONDUCTOR LIMITED,
a Hong Kong SAR company

By: _____
Name: ~~Margaret Sakai~~
Title: ~~Director~~

*Signature Page to First Amendment to Business Transfer Agreement*

**MAGNACHIP SEMICONDUCTOR LIMITED,**
a Taiwan company

By: _____
Name: _____ Margaret Sakai
Title: _____ Director


**MAGNACHIP SEMICONDUCTOR S.A.**
a Luxembourg company

By: _____
Name: _____ JOHN MCFARLAND
Title: _____ DIRECTOR


**"BUYER"**                    **KTB 2007 PRIVATE EQUITY FUND**



서울 · 강남구 역삼동 826-14 케이티비네트워크빌딩
By: _____
Name: _____ 케이티비이천칠사모투자전문회사
Title: _____ 대표사원 케이티비투자증권주식회사

*Signature Page to First Amendment to Business Transfer Agreement*

54302-002\DOCS_LA:203964.2

**THE UNDERSIGNED HEREBY CONSENTS TO THE FOREGOING AMENDMENTS TO THE BTA:**

**UBS AG, STAMFORD BRANCH**

By: _____

Name: _____

Title: _____

Marie A. Haddad
Associate Director
Banking Products
Services, US

By: _____

Name: _____

Title: _____

Irja R. Otsa
Associate Director
Banking Products
Services, US

*Signature Page to First Amendment to Business Transfer Agreement*