**EXHIBIT B TO PLAN: ENFORCEMENT AGREEMENT**

ENFORCEMENT, CONSENT, CASH COLLATERAL
AND LIMITED FORBEARANCE AGREEMENT

dated as of June 11, 2009,

among

MAGNACHIP SEMICONDUCTOR S.A.

and

MAGNACHIP SEMICONDUCTOR FINANCE COMPANY,
as Borrowers,

MAGNACHIP SEMICONDUCTOR LLC

and

THE OTHER GUARANTORS PARTY HERETO,
as Guarantors,

UBS AG, STAMFORD BRANCH,
as Administrative Agent and Collateral Agent,

and

U.S. BANK NATIONAL ASSOCIATION,
as Collateral Trustee

## TABLE OF CONTENTS

Page

SECTION 1. Definitions. ........................................................................................................... 5

SECTION 2. Confirmation by Borrowers of Obligations and Specified Defaults and
Acknowledgment of Certain Additional Matters.......................................................... 11

SECTION 3. Enforcement........................................................................................................... 12

SECTION 4. Consent. ................................................................................................................ 12

SECTION 5. Use of Loan Party Cash by Loan Parties; Funding of Additional Working Capital............. 13

SECTION 6. Forbearance; Forbearance Default Rights and Remedies. ................................................... 15

SECTION 7. Supplemental Terms, Conditions and Covenants............................................................... 16

SECTION 8. General Release; Indemnity. ..................................................................................... 21

SECTION 9. Representations, Warranties and Covenants of Borrowers and Other Loan Parties............. 22

SECTION 10. Voluntary Turnover of Collateral................................................................................. 24

SECTION 11. Ratification of Liability. .......................................................................................... 24

SECTION 12. Reference to and Effect Upon the Credit Agreement. ..................................................... 25

SECTION 13. Costs And Expenses. ............................................................................................... 26

SECTION 14. Governing Law; Consent to Jurisdiction and Venue. ...................................................... 26

SECTION 15. Construction........................................................................................................... 27

SECTION 16. Counterparts........................................................................................................... 27

SECTION 17. Time of Essence ..................................................................................................... 27

SECTION 18. Further Assurances .................................................................................................. 27

SECTION 19. Section Headings .................................................................................................... 28

SECTION 20. Notices ................................................................................................................. 28

SECTION 21. Agreement Effectiveness .......................................................................................... 28

SECTION 22. Waivers by Borrowers and other Loan Parties................................................................ 29

SECTION 23. Assignments; No Third Party Beneficiaries.................................................................... 29

SECTION 24. Final Agreement...................................................................................................... 30

SECTION 25. Appointment of Agent .............................................................................................. 30

SECTION 26. Indemnity in favor of Collateral Trustee ...................................................................... 30

## Exhibits

| Exhibit A | - | Specified Defaults |
|-----------|---|---------------------|
| Exhibit B | - | Budget |
| Exhibit C | - | Form of Legal Counsel Acknowledgement |
| Exhibit D | - | Debtor Operating Expense Budget |
| Exhibit E | | Form of Business Transfer Agreement |
| Exhibit F | - | Accrued Amounts |
| Exhibit G | - | Representative Fees |
| Exhibit H | - | Case Expenses |
| Exhibit I | - | Form of Participation Agreement |
| Exhibit J | - | Form of Buyer Acknowledgment, Consent and Agreement |

## ENFORCEMENT, CONSENT, CASH COLLATERAL
## AND LIMITED FORBEARANCE AGREEMENT

This ENFORCEMENT, CONSENT, CASH COLLATERAL AND LIMITED FORBEARANCE AGREEMENT (this "Agreement") is entered into as of June 11, 2009, by and among MAGNACHIP SEMICONDUCTOR S.A., a *société anonyme*, organized and existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 10, rue de Vianden, L-2680 Luxembourg, Grand Duchy of Luxembourg, registered with the Luxembourg Register of commerce and companies under the number B 97,483 ("MagnaChip S.A."), MAGNACHIP SEMICONDUCTOR FINANCE COMPANY, a Delaware corporation ("MagnaChip Finance" and collectively with MagnaChip S.A., "Borrowers"), MAGNACHIP SEMICONDUCTOR LLC, a Delaware limited liability company ("Holdings"), the Subsidiary Guarantors listed on the signature pages hereto (such term and each other capitalized term used but not defined herein having the meaning given to it in Section 1) (together with the Borrowers and Holdings, the "Loan Parties"), UBS AG, STAMFORD BRANCH (the "Agent"), as Administrative Agent, Collateral Agent for the financial institutions party to the Credit Agreement (as hereinafter defined) as Lenders (collectively, the "Lenders") and, as set forth in Section 25 of this Agreement, sub-agent for the Collateral Trustee (as defined below), and U.S. BANK NATIONAL ASSOCIATION, as Collateral Trustee (the "Collateral Trustee").

## RECITALS

A.     Borrowers, Loan Parties, Agent, Lenders, UBS Securities LLC, as Lead Arranger, as Documentation Agent and as Syndication Agent, UBS Loan Finance LLC, as Swingline Lender, and Korea Exchange Bank, as Issuing Bank, are parties to that certain Credit Agreement, dated as of December 23, 2004 (as has been or may be further amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), pursuant to which, among other things, Lenders agreed, subject to the terms and conditions set forth in the Credit Agreement, to make certain loans and other financial accommodations to Borrowers.

B.     As of the date hereof, the Events of Default identified as "Current Defaults" on Exhibit A hereto have occurred and are continuing (the "Current Defaults") and the Events of Default identified as "Anticipated Defaults" on Exhibit A hereto are expected to occur prior to the expiration of the Forbearance Period (the "Anticipated Defaults," and together with the Current Defaults, the "Specified Defaults").

C.     As a result of the occurrence and continuation of the Specified Defaults, the Agent and the Lenders have accelerated the Obligations and the Agent, the Lenders and the Collateral Trustee (each, sometimes referred to herein individually as a "Lender Party," and collectively as the "Lender Parties") are entitled to exercise their default-related rights and remedies against the Borrowers and the other Loan Parties under the Credit Agreement and the other Loan Documents, including, without limitation, their right to enforce their Liens on the Collateral.

D.     In addition to the acceleration of the Obligations, the Agent and the Lenders have taken certain other enforcement actions, including the delivery to the Senior Secured Notes Trustee and the Loan Parties, pursuant to and in accordance with the Intercreditor Agreement (defined below), of a notice of payment blockage and entitlement to enforce Liens under the Intercreditor Agreement, dated December 15, 2008.

E.     Certain of the Specified Defaults arose and have continued since the fourth fiscal quarter of 2008 and, in connection therewith, the Agent, certain of the Lenders and the Loan Parties entered into that certain Forbearance Agreement to Credit Agreement, dated as of November 14, 2008 (as amended

through the Eleventh Amendment to Forbearance Agreement, dated as of June 5, 2009, the "Prior Forbearance Agreement"), pursuant to which the Agent and the Lenders agreed to (i) forbear from exercising certain of their default-related rights and remedies against the Borrowers and the other Loan Parties under the Credit Agreement and the other Loan Documents and, (ii) in lieu of foreclosing on the Collateral, enforce their rights by controlling the access to, and use of, all cash on deposit in the deposit accounts of Korean Opco and obtaining certain undertakings from the Loan Parties to the Agent and the Lenders, including, without limitation, the agreement of the Loan Parties, in cooperation with the Company Financial Advisors (as defined below), to take steps to market 100% of the Equity Interests of the Loan Parties or substantially all of the assets of the Loan Parties in both Korea and in the United States (the "Marketing Process") pursuant to a transaction containing terms acceptable to the Agent and the Lenders.

F.     Pursuant to the Collateral Trust Agreement, dated as of December 23, 2004, by and among Korean Opco, the Agent, the Bank of New York, as Trustee under the Indenture, and the Collateral Trustee, Korean Opco, the Agent and the Bank of New York appointed the Collateral Trustee to act as the trustee for the holders of the Priority Lien Obligations and the Parity Lien Obligations to hold the Liens granted by Korean Opco to secure the obligations of Korean Opco under, inter alia, the Korean Opco Bank Guarantee (collectively, the "Korean Opco Security").

G.     As the holder of the Korean Opco Security, the Collateral Trustee, and as the holder of the other Liens on the Collateral and guaranties of the Subsidiary Guarantors, the Collateral Agent, in each case pursuant to the instruction of the Agent, acting on behalf of the Required Lenders, are entitled, subject to the terms and conditions of that certain Intercreditor Agreement, dated as of December 23, 2004, by and among the Borrowers, the other Pledgors Party thereto from time to time, the Agent, the Bank of New York, as Trustee and Parity Lien Collateral Agent, and the Collateral Trustee (the "Intercreditor Agreement"), to enforce their respective rights under the Security Documents.

H.     In furtherance of the foregoing, the Loan Parties have concluded the Marketing Process and the Agent and the Lenders have determined to enforce certain of their default-related rights by (i) demanding payment from the Subsidiary Guarantors under the Guarantees, (ii) consenting to a sale of substantially all of the assets and liabilities of Korean Opco and certain assets of the other Loan Parties (the "Asset Sale Transaction") pursuant to the terms of the BTA (defined below) and (iii) requiring the distribution certain of the proceeds of the Asset Sale Transaction to the Collateral Trustee or the Agent, as applicable, for application to the repayment of the outstanding Obligations, all as permitted by and in accordance with the Intercreditor Agreement.

I.     To facilitate the enforcement of the Liens of the Lender Parties on the Collateral of the Debtor Loan Parties, the Debtor Loan Parties (defined below) intend to commence Chapter 11 cases by the filing of voluntary petitions for relief (collectively, the "Case") under Chapter 11 of the Bankruptcy Code (defined below) with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to a joint Chapter 11 plan of liquidation filed by the Debtor Loan Parties and the Agent on behalf of itself and the Lenders in the Case in form and substance satisfactory to the Agent (the "Plan"), and it is a condition to the Lender Parties' agreement to continue to forbear as contemplated herein that the Case be filed and continue as set forth below.

J.     The Lender Parties and the Loan Parties are entering into this Agreement to set forth the terms and conditions upon which (i) the Collateral Trustee will release its Lien on the Collateral, pursuant to the applicable provisions of the Intercreditor Agreement and the Collateral Trust Agreement, in connection with the enforcement thereof as contemplated hereby and (ii) the Agent and the Lenders will (a) enforce their Lien on the Collateral by consenting to the Asset Sale Transaction and requiring the application of certain of the proceeds thereof to the repayment of the Obligations, (b) consent to the terms

of the Asset Sale Transaction, (c) permit the use of Loan Party Cash (defined below) by the Loan Parties and (d) agree to temporarily forbear from exercising certain of those default-related remedies against the Borrowers and the other Loan Parties with respect to the Specified Defaults not exercised pursuant to the terms of this Agreement, each notwithstanding the existence of the Specified Defaults and subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing, the terms, covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

SECTION I. Definitions. Unless otherwise defined above or elsewhere in this Agreement, capitalized terms used herein, including in the preamble and recitals hereto, shall have the meanings assigned to them in the Credit Agreement. As used herein, including the preamble and the recitals hereto, the following terms shall have the respective meanings set forth below:

"Acceleration Notice" shall mean that certain notice, dated December 22, 2008, delivered by the Agent to the Borrowers and each other Loan Party pursuant to Section 8.01 of the Credit Agreement in connection with the Forbearance Defaults and Events of Default specified therein.

"Account Excess" shall have the meaning assigned to such term in Section 7(d).

"Accrued Amounts" shall have the meaning assigned to such term in Section 5(a).

"Agent" shall have the meaning assigned to such term in the preamble hereto.

"Aggregate Excess" shall have the meaning assigned to such term in Section 7(d).

"Agent Financial Advisor" shall have the meaning assigned to such term in Section 7(c).

"Agreement" shall have the meaning assigned to such term in the preamble hereto.

"Anticipated Default" shall have the meaning assigned to such term in the recitals hereto.

"Asset Sale Transaction" shall have the meaning assigned to such term in the recitals hereto.

"Bankruptcy Code" shall mean Title 11 of the United States Code entitled "Bankruptcy," as applicable to the Case, as now and hereafter in effect, or any applicable successor statute.

"Bankruptcy Court" shall have the meaning assigned to such term in the recitals hereto.

"Bankruptcy Default" means, at any time on or after the Petition Date, the occurrence of any of the following:

(b) the Case shall be dismissed (or the Bankruptcy Court shall make a ruling requiring the dismissal of the Case), suspended or converted to a case under chapter 7 of the Bankruptcy Code, or any Loan Party shall file any pleading requesting any such relief; or a motion shall be filed by any Loan Party for the approval of, or there shall arise, (i) any other Claim having priority senior to or *pari passu* with the claims of the Lenders under the Loan Documents or any other claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than any carve-out agreed to pursuant to the Interim Order or the Final Order) or (ii) any Lien on

the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted in the Loan Documents, the Interim Order and the Final Order, except as expressly provided herein and in the Interim Order or the Final Order; or

(c) the Interim Order or the Final Order shall cease to be in full force and effect, (ii) the Loan Parties shall fail to comply with the terms of the Interim Order or the Final Order in any material respect or (iii) the Interim Order or the Final Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or any Loan Party shall apply for authority to do so) in any respect materially adverse to the Lenders without the written consent of the Required Lenders (or any Loan Party shall file, or otherwise support, any pleading seeking such relief described in this subparagraph); or

(d) the Bankruptcy Court shall enter an order appointing a trustee under chapter 11 of the Bankruptcy Code, or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of clause (a) of Section 1106 of the Bankruptcy Code) under clause (b) of Section 1106 of the Bankruptcy Code in the Case (or any Loan Party shall file, or otherwise support, any pleading seeking such relief described in this subparagraph); or

(e) the exclusive period that the Debtor Loan Parties have to file a plan of reorganization under the Case shall terminate or be otherwise lifted without the Debtor Loan Parties having filed the Plan; or

(f) the Loan Parties or any of their Subsidiaries shall support (in any such case (x) by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Loan Parties or any of their Subsidiaries or (y) otherwise) any other Person's opposition of any motion made in the Bankruptcy Court by the Lenders seeking confirmation of the amount of the Lenders' claim or the validity and enforceability of the Liens in favor of the Agent; or

(g) (i) the Loan Parties or any of their Subsidiaries shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Loan Parties or any of their Subsidiaries) any other Person's motion to, disallow in whole or in part the Lenders' claim in respect of the Obligations or to challenge the validity and enforceability of the Liens in favor of the Collateral Agent, (ii) such Liens and/or super-priority claims shall otherwise cease to be valid and perfected in all respects or (iii) such Liens and/or super-priority claims shall otherwise cease to be enforceable in any material respect.

"Borrowers" shall have the meaning assigned to such term in the preamble hereto.

"Borrowers' Representatives" shall mean Borrowers' agents, representatives, advisors, and consultants (including legal counsel retained by Borrowers).

"BTA" has the meaning assigned to such term in Section 3.

"Budget" shall mean the 20-week (and in any event through the projected termination of the Forbearance Period) cash flow forecast (with weekly detail) attached as Exhibit B to this Agreement prepared by the Borrowers and delivered to the Agent on June 9, 2009, which reflects the Borrowers' good faith projection of all cash receipts and disbursements in connection with the operation of the business of the Loan Parties for the 20-week period beginning on May 29, 2009, which is in form,

substance and level of detail (including, without limitation, timing of accruals and payments) acceptable to the Agent and the Required Lenders, and which may be amended by the Borrowers from time to time with the prior written consent of the Agent.

"Budgeted Amounts" shall have the meaning assigned to such term in Section 5(a).

"Buyer" shall have the meaning assigned to such term in the BTA.

"Case" shall have the meaning assigned to such term in the recitals hereto.

"Case Expenses" shall have the meaning assigned to such term in Section 5(a).

"Cash Collateral" shall have the meaning set forth in Section 363(a) of the Bankruptcy Code.

"Claims" shall have the meaning assigned to such term in Section 8(a).

"CMOS IP Sale Consent" means that certain Limited Consent, dated as of April 14, 2009, by and amount the Loan Parties, the Agent and the Lenders party thereto with respect to the sale by Korean Opco of Korean Opco's registered and pending patents related to Korean Opco's "CMOS" image sensor technology.

"Collateral Representative" shall have the meaning assigned to such term in Section 10.

"Company Financial Advisors" shall have the meaning assigned to such term in Section 7(a)(ii).

"Confirmation Order" shall mean an order of the Bankruptcy Court in form and substance satisfactory to the Agent confirming the Plan pursuant to Section 1129 of the Bankruptcy Code, approving the sale of substantially all of the assets of MagnaChip SA Holdings and the Equity Interests of MagnaChip Semiconductor Holding Company, directing the release of the Lien on the Collateral and containing factual findings as to the Marketing Process leading to the consummation of the Asset Sale Transaction and the values of the assets sold pursuant thereto, and releasing the Lender Parties from all rights, claims and causes of action of the Loan Parties or any other Person or entity of any kind or nature whatsoever in any way related to the Loan Parties or the Loan Documents.

"Credit Agreement" shall have the meaning assigned to such term in the recitals hereto.

"Current Amounts" shall have the meaning assigned to such term in Section 5(a).

"Current Default" shall have the meaning assigned to such term in the recitals hereto.

"Debtor Loan Parties" means, collectively, each of Holdings, each Borrower, MagnaChip SA Holdings, U.S. Sales Subsidiary and Dutch Holdco.

"Debtor Operating Expense Budget" shall mean the 4-month (and in any event through the projected termination of the Forbearance Period) cash flow forecast (with monthly detail) attached as Exhibit D to this Agreement prepared by the Borrowers and delivered to the Agent on June 9, 2009, which reflects the Borrowers' good faith projection of all cash receipts and disbursements in connection with the operation of the business of the Debtor Loan Parties for the 4-month period beginning on June 1, 2009, which is in form, substance and level of detail (including, without limitation, timing of accruals and payments) acceptable to the Agent and the Required Lenders, and which may be amended by the Borrowers from time to time with the prior written consent of the Agent.

7

"Disclosure Statement" shall mean the disclosure statement for the Plan, which shall be in form and substance satisfactory to the Agent.

"Effective Date" shall mean the date on which all conditions precedent set forth in Section 21 have been met or waived by the Agent, in either case as determined by the Agent in its sole discretion.

"Final Order" shall mean an order of the Bankruptcy Court entered in the Case after the Final Hearing as defined in the Interim Order, inter alia, confirming the terms of the Interim Order and the waiver of rights under Section 506(c) of the Bankruptcy Code, which order shall be in form and substance satisfactory to Agent.

"Forbearance Default" shall mean (a) the occurrence of any Event of Default other than the Specified Defaults, (b) the failure of either Borrower or any other Loan Party to timely comply with any term, condition, or covenant set forth in this Agreement, (c) the failure of any representation or warranty made by either Borrower or any other Loan Party under or in connection with this Agreement to be true and complete as of the date when made or any other breach of any such representation or warranty, (d) the occurrence of any creditor or group of creditors of a Borrower or any other Loan Party which claims to be owed in the aggregate at least $1.0 million (including, without limitation, trade creditors and senior and subordinated secured and unsecured creditors) taking any action whatsoever against a Borrower, any other Loan Party, the Collateral, the Other Collateral or any other property or assets of any Loan Party (including, without limitation, acceleration of indebtedness), (e) any occurrence, event or change in facts or circumstances occurring on or after the Effective Date, other than the filing or continuation of the Case, that would have a Material Adverse Effect on either Borrower or any other Loan Party, or their financial condition, business, prospects or assets, (f) the occurrence of any Bankruptcy Default, (g) the BTA is terminated for any reason, or the BTA is amended, supplemented or otherwise modified without the prior written consent of the Agent and the Required Lenders, (h) the Agent or Required Lenders have determined that the BTA will not likely be consummated during the Forbearance Period or that the Lender Parties will likely not be able to receive, retain and apply to their Obligations an aggregate net recovery from the BTA of at least US$67.7 million[1] unless otherwise consented to in writing by Agent, (i) the occurrence of any bankruptcy, insolvency, liquidation or similar proceedings (whether voluntary or involuntary) involving any of the Loan Parties as debtor thereunder other than the Case or (j) the invalidity, unenforceability or illegality of any provision or obligation under this Agreement in any jurisdiction.

"Forbearance Period" shall mean the period beginning on the Effective Date and ending on the earliest to occur of (the occurrence of any event described in clauses (a) through (m) or the proviso below, a "Termination Event"): (a) a Forbearance Default, (b) the date on which any payment of interest, fees, principal or other amount is made with respect to the Senior Secured Notes or Senior Subordinated Notes, (c) the date on which any Loan Party Cash or the cash proceeds of any Collateral, in each case, that are owned by Korean Opco, are not promptly (and in any event within one Business Day) deposited by or on behalf of Korean Opco in the Frozen Accounts, (d) the date on which, as of the close of business (Seoul time) on such date, and after giving effect to all permitted transfers to and withdrawals from the Frozen Accounts on such date, the aggregate amount of cash on deposit in the Frozen Accounts is less than the sum of the Reserved Amounts, (e) June 12, 2009[2], if, as of such date, the BTA shall not have been

---

[1] This number assumes an Exchange Rate (as defined in the BTA) less than or equal to KRW1,500/US$1. In the event the Exchange Rate is greater than KRW1,500/US$1 and results in a reduction in the Purchase Price (as defined in the BTA) under Section 1.2 of the BTA, this number shall be deemed reduced dollar-for-dollar by the amount of such reduction in the Purchase Price.

[2] The dates in clauses (e) through (m) may require adjustment once timing of BOK approval is known.

executed and delivered by each of the parties thereto, (f) October 7, 2009, if, as of such date, the Asset Sale Transaction has not been consummated in accordance with the BTA, (g) June 15, 2009, if as of such date, the Petition Date has not occurred, (h) June 18, 2009, if as of such date, the Interim Order has not been entered by the Bankruptcy Court, (i) June 29, 2009, if, as of such date, the Plan has not been filed with the Bankruptcy Court, (j) July 6, 2009, if as of such date, Agent shall not have received duly executed acknowledgments, each in the form of Exhibit C hereto, from the legal counsel to the Sellers (as defined in the BTA) in each jurisdiction (other than Korea) in which assets are being sold pursuant to the BTA with respect to the engagement of such legal counsel and the retainers paid to such legal counsel in connection with the anticipate liquidation or wind-down of the applicable Loan Parties, (k) July 17, 2009, if as of such date, the Final Order has not been entered by the Bankruptcy Court, (l) August 3, 2009, if, as of such date, the Disclosure Statement has not been approved by the Bankruptcy Court, (m) September 25, 2009, if, as of such date, the Confirmation Order has not been entered by the Bankruptcy Court and (n) 5:00 p.m. (New York time) on October 7, 2009.

"Frozen Accounts" shall mean the deposit accounts of Korean Opco maintained with Korean Exchange Bank that are subject to a perfected Lien in the name of the Collateral Trustee for the benefit of the Secured Parties and which have been frozen pursuant to the terms of the Acceleration Notice.

"Holdings" shall have the meaning assigned to such term in the preamble hereto.

"Interim Order" shall mean an order of the Bankruptcy Court, in a form mutually agreed to by the Debtor Loan Parties and the Agent, pursuant to Section 363 of the Bankruptcy Code (i) approving the terms of this Agreement, (ii) authorizing the receipt and use by the Debtor Loan Parties of transfers of Cash Collateral of the Lender Parties from the Non-Debtor Loan Parties to fund expenses related to the Case in accordance with this Agreement and the Budget, (iii) granting superpriority claims and security interests on all of the Debtor Loan Parties' assets as adequate protection to the Lender Parties, to the extent of any diminution in value, for the use of their Cash Collateral, and (iv) modifying the automatic stay to permit the Loan Parties to perform their obligations hereunder, to pay interest, fees and other amounts owing under the Loan Documents and to permit the Lender Parties to exercise their rights and remedies in accordance with this Agreement, and as to which order no stay has been entered and which order has not been reversed, vacated or overturned, and which order has not been amended, supplemented or otherwise modified in any respect adverse to the Lenders without the prior written consent of the Agent and from which order no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless the Agent waives such requirement.

"Intercreditor Agreement" shall have the meaning assigned to such term in the recitals hereto.

"KEB" shall have the meaning assigned to such term in Section 5(a).

"Lender Party" and "Lender Parties" shall have the meaning assigned to such term in the recitals hereto.

"Lenders" shall have the meaning assigned to such term in the preamble hereto.

"Loan Parties" shall have the meaning assigned to such term in the preamble hereto.

"Loan Party Cash" has the meaning assigned to such term in Section 5(a).

"Marketing Process" shall have the meaning assigned to such term in the recitals hereto.

"Material Adverse Effect" shall mean a (a) "Material Adverse Effect" as defined in the BTA; (b) material impairment of the ability of any Loan Party to perform any of its obligations under any Loan Document; (c) material impairment of the rights of or benefits or remedies available to the Lenders, Agent, Collateral Trustee or any Collateral Representative under any Loan Document; or (d) material adverse effect on the Collateral or the Liens in favor of the Collateral Agent or any other Collateral Representative (for its benefit and for the benefit of the other Secured Parties) on the Collateral or the priority of such Liens.

"Monthly Date" shall have the meaning assigned to such term in Section 7(i).

"Non-Debtor Loan Parties" shall mean all of the Loan Parties other than the Debtor Loan Parties.

"Other Collateral" shall have the meaning assigned to such term in Section 2(b).

"Payroll Amounts" shall have the meaning assigned to such term in Section 5(a).

"Petition Date" shall mean the date on which the Case is filed.

"Plan" shall have the meaning assigned to such term in the recitals hereto.

"Prior Forbearance Agreement" shall have the meaning assigned to such term in the recitals to this Agreement.

"Releasees" shall have the meaning assigned to such term in Section 8(a).

"Releasors" shall have the meaning assigned to such term in Section 8(a).

"Representative Fees" shall have the meaning assigned to such term in Section 5(a).

"Representatives" shall mean Agent's and Collateral Trustee's employees, agents, representatives, advisors, consultants and financing sources (including Agent Financial Advisor and any investment banker, financial advisor, accountant, legal counsel, advisor, appraiser, consultant, agent, representative or expert retained by or acting on behalf of Agent or Collateral Trustee).

"Reserved Amounts" shall mean cash on deposit in the Frozen Accounts in an aggregate amount equal to the sum, in each case then outstanding, of: (i) the aggregate amount of accrued and unpaid interest on the Loans required to be paid pursuant to Section 2.06 of the Credit Agreement (collectively and together with any increases in such amount required pursuant to Section 7(i), the "Reserved Interest Amounts"), (ii) the aggregate amount of accrued and unpaid Commitment Fees required to be paid pursuant to Sections 2.05(a) of the Credit Agreement (collectively and together with any increases in such amounts required pursuant to Section 7(i), the "Reserved Fee Amounts"), (iii) the aggregate amount of all Net Cash Proceeds from any Casualty Event (collectively, the "Reserved Collateral Proceeds Amounts"), (iv) the aggregate amount of all Net Cash Proceeds from the sale by Korean Opco of Korean Opco's registered and pending patents related to Korean Opco's "CMOS" image sensor technology (the "Reserved CMOS IP Proceeds") and (v) the aggregate amount set forth in the Budget for Case Expenses, less, at any time, the amount of such Case Expenses actually paid, plus $150,000 (the "Reserved Case Expenses").

"Reserved Case Expenses" shall have the meaning assigned to such term in the definition of "Reserved Amounts."

"Reserved Collateral Proceeds Amounts" shall have the meaning assigned to such term in the definition of "Reserved Amounts."

"Reserved CMOS IP Proceeds" shall have the meaning assigned to such term in the definition of "Reserved Amounts."

"Reserved Fee Amounts" shall have the meaning assigned to such term in the definition of "Reserved Amounts."

"Reserved Interest Amounts" shall have the meaning assigned to such term in the definition of "Reserved Amounts."

"Seller's W/C Share" shall have the meaning assigned to such term in Section 5(e).

"Specified Defaults" shall have the meaning assigned to such term in the recitals hereto.

"Termination Event" shall have the meaning assigned to such term in the definition of "Forbearance Period."

"Unreserved Amounts" shall mean, as of any date of determination, the aggregate amount of cash on deposit in the Frozen Accounts on such date less the Reserved Amounts on such date.

## SECTION 2. Confirmation by Borrowers of Obligations and Specified Defaults and Acknowledgment of Certain Additional Matters.

(a)     Each Borrower and each other Loan Party acknowledges and agrees that as of June 11, 2009, the aggregate principal balance of the outstanding Obligations under the Credit Agreement is at least $95,000,000.00, and that the respective principal balances of the various Loans and LC Exposure as of such date were not less than the following:

| | |
|---|---|
| Revolving Loans (excluding LC Exposure) | $95,000,000.00 |
| LC Exposure | $0 |

The foregoing amounts do not include interest, fees, expenses and other amounts which are chargeable or otherwise reimbursable under the Credit Agreement and the other Loan Documents. All of the Obligations, including those set forth above, are currently due and payable, and none of Borrowers or the other Loan Parties have any rights of offset, defenses, claims or counterclaims with respect to any of the Obligations.

(b)     Each Borrower and each other Loan Party acknowledges and agrees that (i) each of the Specified Defaults constitutes a material Event of Default that has occurred and is continuing as of the date hereof or is expected to occur during the Forbearance Period, as the case may be, (ii) the Current Defaults have not been cured as of the date hereof and the Anticipated Defaults will not be cured during the Forbearance Period, and (iii) except for the Specified Defaults, no other Events of Default have occurred and are continuing as of the date hereof, or are expected to occur during the Forbearance Period, as the case may be. Prior to the effectiveness of this Agreement, the Current Defaults (and the Anticipated Defaults upon their occurrence): (i) relieve the Lender Parties from any obligation to extend any Loan or provide other financial accommodations under the Credit Agreement or other Loan Documents, and (ii) permit the Lender Parties to, among other things, (A) suspend or terminate any commitment to provide Loans or make other extensions of credit under any or all of the Credit Agreement

and the other Loan Documents, (B) accelerate all or any portion of the Obligations, (C) charge the Default Rate with respect to any and all of the Obligations and terminate Borrowers' ability to obtain or maintain Eurodollar Borrowings, (D) commence any legal or other action to collect any or all of the Obligations from Borrowers, any other Loan Party and/or any Collateral or any other property as to which any other Person granted any or all of the Lender Parties a security interest therein as security for the Obligations or any guaranty thereof (collectively, the "Other Collateral"), (E) foreclose or otherwise realize on any or all of the Collateral and Other Collateral, and/or appropriate, set-off and apply to the payment of any or all of the Obligations, any or all of the Collateral and Other Collateral, and/or (F) take any other enforcement action or otherwise exercise any or all rights and remedies provided for by any or all of the Credit Agreement, the other Loan Documents or applicable law.

(c)     Each Subsidiary Guarantor hereby acknowledges that the Lender Parties have made proper formal demand on such Subsidiary Guarantor under its respective Guarantee for payment in full of the Obligations referred to in clause (a) above and that such Subsidiary Guarantor is fully obligated to repay such amount pursuant to the terms of such Guarantee.

(d)     Each of the Loan Parties hereby acknowledges, represents and warrants that the Loan Parties have been given sufficient time during the Forbearance Period (under and as defined in the Prior Forbearance Agreement) to conduct the Marketing Process, the Agent and the Lenders permitted the use of Loan Party Cash to pay the fees of the Company Financial Advisors during the Marketing Process, and the transaction contemplated by the BTA represents the highest and best offer made to the Loan Parties for the sale of the Equity Interests of assets of the Loan Parties and is in the best interests of the Loan Parties.

### SECTION 3. Enforcement.

(a)     The Agent, for itself and on behalf of the Lenders, and the Loan Parties, hereby agrees that, in lieu of foreclosure on the Collateral, the Agent and the Lenders have been and are continuing to enforce their rights after the occurrence of the Specified Defaults by maintaining certain controls over the Loan Party Cash, working with management of the Loan Parties and the Company Financial Advisors in connection with the Marketing Process and agreeing to consent, on the terms and subject to the conditions set forth in this Agreement, to the consummation of the Asset Sale Transaction.

(b)     The Loan Parties hereby agree that the Asset Sale Transaction shall be consummated strictly in accordance with the terms of a business transfer agreement in the form of Exhibit E hereto (with only such changes as the Agent may approve in writing in its sole discretion) (the "BTA").

(c)     The Loan Parties hereby further agree that the amounts payable to the Agent under Section 1.2 of the BTA shall be paid by the Buyer directly to the Agent, in both its role as Administrative Agent and as sub-agent for the Collateral Trustee, for application to the Obligations in accordance with the terms of the Credit Agreement and the other Loan Documents and to the Chapter 11 Amounts (as defined in the BTA) as specifically provided by the Letter of Direction delivered under Section 1.2(b) of the BTA.

### SECTION 4. Consent.

Subject to the satisfaction of each of the conditions to effectiveness set forth in Section 21 of this Agreement, provided that the Asset Sale Transaction is consummated (a) pursuant to and in accordance with the terms of the BTA and (b) during the Forbearance Period (and in any event prior to the occurrence of any Termination Event that has not been waived in writing by the Required Lenders), the Agent, for itself and on behalf of the Lenders, hereby consents to consummation of the Asset Sale Transaction and to the use of Cash Collateral in accordance with the Interim Order; provided, however, that in any event the Liens of the Lender Parties shall attach to the proceeds of the Asset Sale Transaction; provided, further, that that the Lender Parties shall receive, retain and apply to their Obligations an aggregate net recovery from the BTA of at least US$67.7 million[3] unless otherwise consented to in writing by Agent.

## SECTION 5. Use of Loan Party Cash by Loan Parties; Funding of Additional Working Capital.

(a)    Notwithstanding the terms of the Acceleration Notice, effective from May 29, 2009, each of the Agent and the Lenders agrees that, both prior to and after the Petition Date and until the expiration or termination of the Forbearance Period, (i) a portion of the Unreserved Amounts on deposit in the Frozen Accounts, in an aggregate amount not to exceed the lesser of (1) the Unreserved Amounts then on deposit in such Frozen Accounts and (2) the amount set forth in the Budget for funding (A) current payroll expenses of Korean Opco and each other Loan Party (the "Payroll Amount") and, without duplication, the other current expenses required to be paid by Korean Opco and each other Loan Party on or prior to May 29, 2009 in accordance with the Budget (the "Current Amounts"), (B) without duplication, the accrued and unpaid and not payable amounts set forth on Exhibit F attached hereto of Korean Opco and each other Loan Party on or prior to the date on which the Forbearance Period shall expire or be terminated pursuant to the terms of this Agreement (the "Accrued Amounts"), and (C) without duplication, payment of the fees and expenses of the Representatives and the Borrowers' Representatives set forth on Exhibit G attached hereto for the periods and in the estimated amounts set forth therein or such other invoiced amounts required to be paid by the Loan Parties for such periods pursuant to the Loan Documents (the "Representative Fees"); (the Payroll Amount, the Current Amounts, the Accrued Amounts, and the Representative Fees together with the Case Expenses as hereinafter defined, the "Budgeted Amounts"), may be released by Korean Exchange Bank ("KEB") to Korean Opco and each such applicable Loan Party; provided that the Agent and the Required Lenders shall have received and be satisfied with the Budget, and in the case of the Payroll Amount, such proceeds are to be used solely by Korean Opco and each such applicable Non-Debtor Loan Party to fund accrued payroll expenses (and any taxes due with respect thereto) which are due and payable on or prior to the date on which the Forbearance Period shall expire or be terminated pursuant to the terms of this Agreement to the employees of Korean Opco and each such applicable Non-Debtor Loan Party consistent with the Budget and prior customary practice, and, (ii) cash and amounts which are held on deposit by the Debtor Loan Parties shall be used only for payment of the expenses of the Debtor Loan Parties (without duplication of any amounts otherwise paid under the Budget and the Debtor Operating Expense Budget) (A) arising from the Case not to exceed the amounts set forth on Exhibit H attached hereto for the periods and in the estimated amounts set forth therein (the "Case Expenses") and (B) as set forth in the Debtor Operating Expense Budget in accordance with the Interim Order and the Final Order and (iii) no amount included in the amount funded by KEB pursuant to clause (i) or funded from the Cash Collateral of the Debtor Loan Parties shall be used to fund any bonuses or payments to employees outside the ordinary course of business or payroll or related taxes not yet due and owing by Korean Opco and each such applicable Loan Party or to fund any other amounts other than the Budgeted Amounts. In no event may any cash of any Loan Party, including all cash on deposit in any deposit account of the Loan Parties (collectively, the

---

[3] This number assumes an Exchange Rate (as defined in the BTA) less than or equal to KRW1,500/US$1. In the event the Exchange Rate is greater than KRW1,500/US$1 and results in a reduction in the Purchase Price (as defined in the BTA) under Section 1.2 of the BTA, this number shall be deemed reduced dollar-for-dollar by the amount of such reduction in the Purchase Price.

CH\1099490.14

"Loan Party Cash") be used to pay any claims for services rendered by any professional of any the Debtor Loan Parties or any creditors' committee in the Case in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration or similar relief: (x) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations or the liens and security interests of the Agent or the Collateral Trustee in any of the assets of any of the Loan Parties; or (y) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise by the Agent or the Collateral Trustee or any other Lender Party of any of its rights and remedies under the Loan Documents, the Interim Order, the Final Order and/or this Agreement, or the Agent's or the Collateral Trustee's enforcement or realization upon any of the liens on or security interests in any of the assets of any of the Loan Parties; provided, however, that an official committee of unsecured creditors may use up to $10,000 (or such other amount as may be agreed to by Agent in writing) of the Cash Collateral of the Debtor Loan Parties to investigate the validity, extent, priority, avoidability and enforceability of the Loan Documents. Anything in this Section 5 to the contrary notwithstanding, a portion of the Reserved Interest Amounts to be determined by the Agent may be used to pay interest and fees as and when the same becomes due and payable under the Credit Agreement.

(b)     The Loan Parties hereby agree that, prior to the consummation of the Asset Sale Transaction, the Loan Parties shall only be permitted to use cash in the Frozen Accounts in accordance with the foregoing clause (a).

(c)     On Wednesday of each week, the Loan Parties shall deliver to the Agent a comparison of actual expenses for the prior week against the budgeted expenses set forth in the Budget for such prior week. In no event shall (i) the actual expenses paid for any Representative Fee shown as a line item on Exhibit G hereto exceed the amounts provided for such Representative Fee through such date as set forth on Exhibit G hereto unless otherwise agreed to by Agent in writing, (ii) the actual expenses paid for any Case Expense shown as a line item on Exhibit H hereto exceed the amounts provided for such Case Expense through such date as set forth on Exhibit H hereto unless otherwise agreed to by Agent in writing, (iii) the actual payroll and bonus expenses (whether denominated on the Budget as a line item for salary, salary tax withholdings, severance payment or statutory and health benefits) in any week exceed the budgeted amount for such line item for such period unless otherwise agreed to by Agent in writing, (iv) the actual Hynix Facility Usage expenses in any week, together with all such actual expenses in the Budget for previous weeks, exceed one hundred ten percent (110%) of the budgeted amount for such period unless otherwise agreed to by Agent in writing, (v) the other actual expenses in the Budget in any week, together with all such actual expenses in the Budget for previous weeks, exceed one hundred ten percent (110%) of the budgeted amount for such expenses for such period, and (vi) the actual receipts in the Budget in any week, together with all actual receipts in the Budget for previous weeks, be less than ninety percent (90%) of the budgeted amount for such period. In addition, on Wednesday of each week, the Non-Debtor Loan Parties shall deliver to the Agent a report of all advances and other transfers made by such Non-Debtor Loan Party to any Debtor Loan Party during the previous week and during the period commencing on the Effective Date and ending on the last day of such previous week.

(d)     Each of the Subsidiary Guarantors hereby directs the Buyer, upon the consummation of the Asset Sale Transaction, to pay that portion of the Purchase Price (as defined in the BTA) allocated to the assets sold by such Subsidiary Guarantor pursuant to the BTA to the Collateral Trustee in partial satisfaction of the obligations of each such Subsidiary Guarantor under its respective Guarantee, which proceeds shall be applied by the Collateral Trustee to the Obligations in accordance with the Credit Agreement and the other Loan Documents. Notwithstanding the foregoing, each Subsidiary Guarantor acknowledges and agrees that it shall be and remain liable to the Lender Parties for any portion of the

Obligations outstanding after giving effect to the foregoing sentence except to the extent modified or released under the Plan.

(e) From and after the effectiveness of the BTA through and including the earliest to occur of (i) the date on which the Closing Date (as defined in the BTA), (ii) the date on which the BTA is terminated or (iii) the date on which the Forbearance Period terminates, if the amount on deposit in the Frozen Accounts is less than or equal to the Reserved CMOS IP Proceeds and any of the Loan Parties requires additional funds to pay amounts then scheduled to be paid in accordance with the Budget, then such amounts shall be paid from funds on deposit in the Frozen Accounts constituting Reserved CMOS IP Proceeds; provided, that the aggregate amount of CMOS IP Proceeds that may be used to pay any such amounts shall not exceed $6,000,000.

(f) If the Asset Sale Transaction is not consummated or the BTA is otherwise terminated for any reason whatsoever, in either case by the date set forth in clause (f) of the definition of "Forbearance Period", then, upon notice from the Agent or the Buyer, the Lender Parties' Lien on the Working Capital Deposit (as defined in the BTA) shall be released and such Working Capital Deposit, less an amount equal to 50% of the amount of Reserved CMOS IP Proceeds used to pay amounts set forth in the Budget in accordance with the foregoing clause (e) (such amount, the "Seller's W/C Share"), shall be returned to Buyer and the residual 50% of the amount of such Reserved CMOS IP Proceeds used to pay amounts set forth in the Budget shall be paid to the Agent for the account of the Lenders and, upon receipt by Agent of such payment, Buyer shall automatically be deemed to have purchased from the Lenders a participation in their Loans and other Obligations in an aggregate principal amount equal to the Sellers' W/C Share, which purchase shall be effected pursuant to, and on the terms set forth in, a participation agreement or participation agreements in the form attached hereto as Exhibit I.

## SECTION 6. Forbearance; Forbearance Default Rights and Remedies.

(a) Effective as of the Effective Date, each of the Agent and the Lenders agrees that until the expiration or termination of the Forbearance Period, it will temporarily forbear from exercising its default-related rights and remedies against Borrowers or any other Loan Party solely with respect to the Specified Defaults other than the rights and remedies exercised by the Agent and the Lenders pursuant to Section 3 hereof; provided, however, (i) except as expressly provided for in this Agreement, the Lender Parties shall have no obligation to make any further Loans or other Credit Extensions to Borrowers or any other Loan Party, (ii) Borrowers shall not be entitled to make any request for Eurodollar Borrowings or elect to have any Loans converted into or be continued Eurodollar Borrowings, (iii) Borrowers and each other Loan Party shall comply with all limitations, restrictions or prohibitions that would otherwise be effective or applicable under the Credit Agreement or any of the other Loan Documents during the continuance of any Event of Default, including, without limitation, any limitations, restrictions or prohibitions against payments by (A) Borrowers or any other Loan Party, (B) any Affiliate of Borrowers or any other Loan Party, (C) any direct or indirect owner of an equity interest in the Borrowers, any other Loan Party or any Affiliate of any of the foregoing, (iv) nothing herein shall restrict, impair or otherwise affect any Lender Party's rights and remedies under any agreements (including, without limitation, the Senior Subordinated Notes, the Senior Secured Notes and the Intercreditor Agreement) containing subordination or other provisions in favor of any or all of the Lender Parties (including, without limitation, any rights or remedies available to the Lender Parties as a result of the occurrence or continuation of any Specified Default (such as the right to issue a Payment Blockage Notice under (and as defined in) the Senior Subordinated Notes Indenture)) or amend or modify any provision thereof, (v) nothing herein shall restrict, impair or otherwise affect Agent's right to file, record, publish or deliver a notice of default or document of similar effect under any state foreclosure law, and (vi) nothing herein shall restrict, impair or otherwise affect Agent's or any Collateral Representative's right to file, record, publish or deliver any notice, filing, statement or any other document under any Loan Document (including, without limitation,

15

this Agreement) or laws of any jurisdiction in connection with the creation, attachment, protection, preservation and/or perfection of any Liens of Agent or any Collateral Representative on any of the Collateral or Other Collateral. Any Forbearance Default shall constitute an immediate Event of Default under the Credit Agreement and the other Loan Documents.

(b) Upon the occurrence of a Termination Event, the agreement of the Lender Parties hereunder to forbear from exercising their respective default-related rights and remedies shall immediately terminate without the requirement of any demand, presentment, protest, or notice of any kind, all of which each Borrower and each other Loan Party hereby waives. Each Borrower and each other Loan Party agrees that any or all of the Lender Parties may at any time thereafter proceed to exercise any and all of their respective rights and remedies under any or all of the Credit Agreement, any other Loan Document and/or applicable law, including, without limitation, their respective rights and remedies with respect to the Specified Defaults. Without limiting the generality of the foregoing, upon the occurrence of a Termination Event, the Agent and the Lenders may, in their sole discretion and without the requirement of any demand, presentment, protest, or notice of any kind, (i) suspend or terminate any commitment to provide Loans or other Credit Extensions under any or all of the Credit Agreement and the other Loan Documents, (ii) charge interest on any or all of the Obligations at the Default Rate, (iii) commence any legal or other action to collect any or all of the Obligations from Borrowers, any other Loan Party, any Collateral and/or Other Collateral, (iv) foreclose or otherwise realize on any or all of the Collateral and Other Collateral, and/or appropriate, setoff or apply to the payment of any or all of the Obligations, any or all of the Collateral and Other Collateral, and (v) take any other enforcement action or otherwise exercise any or all rights and remedies provided for by any or all of the Credit Agreement, any other Loan Documents and/or applicable law, all of which rights and remedies are fully reserved by the Lender Parties.

(c) Any agreement by the Agent and the Lenders to extend the Forbearance Period or to waive any Termination Event, if any, must be set forth in writing and signed by a duly authorized signatory of each of Agent and the Required Lenders.

(d) Each Borrower and each other Loan Party acknowledges that the Lender Parties have not made any assurances concerning any possibility of an extension of the Forbearance Period, waiver of any Termination Event or any other forbearance.

(e) The parties hereto agree that the running of all statutes of limitation or doctrine of laches applicable to all claims or causes of action that any Lender Party may be entitled to take or bring in order to enforce its rights and remedies against Borrowers or any other Loan Party is, to the fullest extent permitted by law, tolled and suspended during the Forbearance Period (including, without limitation, during the "Forbearance Period" under and as defined in the Prior Forbearance Agreement).

(f) Each Borrower and each other Loan Party acknowledges and agrees that Agent and each other Lender Party are entering into this Agreement and agreeing to the provisions herein in reliance upon, and as consideration for, among other things, the general releases and indemnities contained in Section 8 hereof and the other covenants, agreements, representations and warranties of Borrowers and the other Loan Parties hereunder.

## SECTION 7. Supplemental Terms, Conditions and Covenants.

(a) The parties hereto hereby agree to comply with the following terms, conditions and covenants at all times from and after the Effective Date, in each case notwithstanding any provision to the contrary set forth in this Agreement, the Credit Agreement or any other Loan Document:

(i)     Agent Access.

(A)     Without limiting the Lender Parties' rights under the Credit Agreement and the other Loan Documents, Borrowers and the other Loan Parties hereby agree to: (A) give Agent and its Representatives reasonable access during normal business hours to the offices, properties, officers, employees, accountants, auditors, counsel and other representatives, books and records of Borrowers and the other Loan Parties, (B) furnish to Agent and its Representatives such financial, operating and property related data and other information as such persons reasonably request, and (C) instruct Borrowers' and any other Loan Party's employees and Company Financial Advisors to cooperate reasonably with Agent and its Representatives in respect of the aforementioned clauses (A) and (B)).

(B)     Each Borrower and each other Loan Party irrevocably authorizes, and shall cause, any financial advisors, consultants or investment bankers which are representing any or all of the Loan Parties, including, without limitation, Standard Chartered Securities (collectively, the "Company Financial Advisors"), to: (A) disclose fully and promptly to Agent and its Representatives all material developments in connection with and communications related to the Marketing Process, the BTA and the other efforts of Borrowers and Company Financial Advisors to consummate the Asset Sale Transaction, (B) regularly consult with, and respond to the inquiries of the Lender Parties and their respective Representatives concerning any and all matters relating to the affairs, finances and businesses of Borrowers or any other Loan Party, the assets and Equity Interests of Borrowers or any other Loan Party, any aspect of the BTA, the Asset Sale Transaction and/or Company Financial Advisors' activities related thereto (including, without limitation, communications outside the presence of any Representatives of Borrowers or any other Loan Party), and (C) provide Agent, Lenders and their respective Representatives copies of all non-confidential reports, analyses, materials (including, without limitation, any and all non-confidential memoranda or other work product provided by Company Financial Advisors to any or all of Borrowers, any other Loan Party, Lender Parties and their respective Representatives).

(ii)     Field Audits; Appraisals.  Agent may engage one or more field auditors and/or appraisers, including, without limitation, the Agent Financial Advisor and any other Representatives, to review each Loan Party's accounts and bank accounts and all other assets. If Agent elects to engage such field auditor(s) and/or appraiser(s), Borrowers and the other Loan Parties shall fully cooperate with Agent's field auditor(s) and/or appraiser(s) and promptly provide access and all information and materials requested by such auditor(s) and/or appraiser(s) and take all other action reasonably requested by the auditor(s) and/or appraiser(s) to enable them to complete their audit and/or appraisal, as applicable.

(iii)     Financial Advisor to Agent.  Each Loan Party hereby confirms its continuing consent to the current engagement by Latham & Watkins LLP of Macquarie Group Limited as the professional financial advisory firm to the Lender Parties (the "Agent Financial Advisor"), and Borrowers confirm and agree that they shall continue to reimburse Agent on demand for any and all reasonable fees and expenses of such Agent Financial Advisor.

(iv)     Confirmation of Interest Rates.  The Borrowers hereby confirm and agree that the interest rates applicable to the Obligations under the Prior Forbearance Agreement shall, from and after the date hereof, continue to apply to the Obligations on the same terms as set forth in the Prior Forbearance Agreement.

17

(v)    No Obligation to Make Loans.  Each Borrower and each other Loan Party acknowledges and agrees that, notwithstanding anything in this Agreement to the contrary, from and after December 19, 2008, neither the Agent nor any of the Lenders has had or shall have any obligation whatsoever to make any additional Loans or other Credit Extensions, extend any additional credit or otherwise make any further financial accommodations to Borrowers or any other Loan Party under the Credit Agreement, the other Loan Documents or otherwise except (i) as expressly set forth in Section 5 with respect to the release of cash in the Frozen Accounts or (ii) if Agent and Required Lenders expressly agree otherwise in writing.

(vi)    General Cooperation from Loan Parties' Board and Advisors.  The Borrowers and each other Loan Party shall, and shall cause their respective officers, directors, employees and advisors, including, without limitation, Company Financial Advisors, to cooperate fully with Agent in furnishing information as and when reasonably requested by Agent, any other Lender Party, Agent Financial Advisor and/or any other Representative regarding the Collateral, Other Collateral or Borrowers' or any other Loan Party's financial affairs, finances, financial condition, business and operations. Borrowers and each other Loan Party authorizes Agent, Agent Financial Advisor and any other Representative to meet and/or have discussions with any of their officers, directors, employees and advisors, including, without limitation, Company Financial Advisors, from time to time as reasonably requested by Agent to discuss any matters regarding the Collateral, Other Collateral or Borrowers' or any other Loan Party's financial affairs, finances, financial condition, business and operations, and shall direct and authorize all such persons and entities to fully disclose to Agent, Agent Financial Advisor or any other Representative all information reasonably requested by Agent, Agent Financial Advisor or any other Representative regarding the foregoing. Borrowers and the other Loan Parties each waives and releases any such officer, director, employee and advisor, including, without limitation, Company Financial Advisor, from the operation and provisions of any confidentiality agreement with Borrowers or other Loan Party, as the case may be, such that such person or entity is not prohibited from providing any of the foregoing information to Agent, any other Lender Party, Agent Financial Advisor, or any other Representative.

(vii)    Prohibition Against Payment of Other Indebtedness.  Each Borrower and each other Loan Party agrees that it shall not, nor shall it permit any Subsidiary to, pay, repay, prepay, redeem or repurchase any principal of, or interest or other amounts owing with respect to, any Indebtedness other than the Obligations during the Forbearance Period.

(viii)    Changes to Interest Periods and Reserved Interest Amounts.  Each Borrower, each other Loan Party and each of the Agent and the Lenders hereby acknowledges and agrees that, in consideration of the agreement to forbear and the other agreements of the Agent and the Lenders provided in this Agreement, effective from and after the Effective Date and notwithstanding the provisions of Section 2.02 and Section 2.06(d) of the Credit Agreement to the contrary, (i) each Eurodollar Borrowing shall be automatically converted to an ABR Borrowing at the end of the Interest Period applicable thereto and no outstanding Borrowing may be converted or continued as a Eurodollar Borrowing, and (ii) (a) on the Effective Date, the Reserved Interest Amounts shall automatically be established in the Frozen Accounts from amounts then on deposit in the Frozen Accounts in the amount of $1,382,054.79, which reserve amount shall have been determined as of May 29, 2009 (but without in any way waiving, forgiving or otherwise discharging any accrued and unpaid interest on the Loans as of such date that may not be reflected therein), and (b) on the first Business Day of each month (each, a "Monthly Date") occurring after the Effective Date, the Reserved Interest Amounts shall automatically be increased by an amount necessary to equal the amount of all interest on the Loans that has accrued through such Monthly Date and that has not been paid prior to such Monthly Date

18

pursuant to Section 2.06 of the Credit Agreement (but without in any way waiving, forgiving or otherwise discharging any accrued and unpaid interest on the Loans as of such Monthly Date that may not be reflected therein).

(ix)     Changes to Reserved Fee Amounts. Each Borrower, each other Loan Party and each of the Agent and the Lenders hereby acknowledges and agrees that, in consideration of the agreement to forbear and the other agreements of the Agent and the Lenders provided in this Agreement, effective from and after the Effective Date and notwithstanding the provisions of Section 2.05(a) of the Credit Agreement to the contrary, (i) on the Effective Date, the Reserved Fee Amounts shall automatically be established in the Frozen Accounts from amounts then on deposit in the Frozen Accounts in the amount of $4,096.43, which reserve amount shall have been determined as of May 29, 2009 (but without in any way waiving, forgiving or otherwise discharging any accrued and unpaid Commitment Fees as of such date that may not be reflected therein), and (ii) on each Monthly Date occurring after the Effective Date, the Reserved Fee Amounts shall automatically be increased by an amount necessary to equal the aggregate amount of all Commitment Fees that have accrued through such Monthly Date and that have not been paid prior to such Monthly Date pursuant to Sections 2.05(a) of the Credit Agreement (but without in any way waiving, forgiving or otherwise discharging any accrued and unpaid Commitment Fees as of such Monthly Date that may not be reflected therein).

(x)     Asset Sales; Net Cash Proceeds from Asset Sales and Casualty Events. Each Borrower, each other Loan Party and each of the Agent and the Lenders hereby acknowledges and agrees that, in consideration of the agreement to forbear and the other agreements of the Agent and the Lenders provided in this Agreement, effective from and after the Effective Date and notwithstanding the provisions of the Credit Agreement to the contrary, (i) except as contemplated in this Agreement and except for the sale by Korean Opco of Korean Opco's registered and pending patents related to Korean Opco's "CMOS" image sensor technology so long as such sale is consummated in accordance with the terms of the CMOS IP Sale Consent, no Loan Party may complete any Asset Sale permitted pursuant to Sections 6.06(a), (b) and (e) of the Credit Agreement unless consented to by the Agent and the Required Lenders in their sole discretion, and (ii) any and all Net Cash Proceeds from any Casualty Events received on or after the Effective Date shall be promptly deposited into the Frozen Accounts as part of the Reserved Collateral Proceeds Amount (and, in any event, no later than one (1) Business Day following receipt thereof) and that the Borrowers shall be deemed to have complied with the requirements of Section 2.09(c)(i) and Section 2.09(f) of the Credit Agreement, respectively, upon such deposit unless otherwise required by the Required Lenders.

(b)     Prior Forbearance Agreement Provisions. The Loan Parties acknowledge that the foregoing provisions of this Section 7 are substantially similar to the covenants and agreements set forth in Section 4 of the Prior Forbearance Agreement, and that the Loan Parties agreed to comply with such provisions in the Prior Forbearance Agreement in connection with the Lender Parties' enforcement of their rights and remedies under the Loan Documents and represent and warrant that the Loan Parties have not violated the terms of any such provision in the Prior Forbearance Agreement.

(c)     Plan and Disclosure Statement. The Loan Parties hereby covenant and agree that the form of notice setting forth the deadlines and requirements for objections to the Plan and the Disclosure Statement shall be in form and substance satisfactory to the Agent.

(d)     Cash in Debtor Loan Party Accounts. The Loan Parties hereby covenant and agree that (i) prior to the filing of the Case, if at any time the amount of cash on deposit in all deposit accounts of any Debtor Loan Party (each such account, a "Debtor Loan Party Account") exceeds an amount equal to

19

the amount set forth below opposite such Debtor Loan Party's name (each such excess, a "Debtor Account Excess"), then, promptly (and in any event within three Business Days thereafter), the applicable Loan Parties shall cause an amount equal to the applicable Debtor Account Excess to be transferred from such Debtor Loan Party Account to the Frozen Accounts, (ii) following the filing of the Case, all cash on deposit in all Debtor Loan Party Accounts shall be subject to the Interim Order or Final Order, and (iii) no funds on deposit in or credited to the Frozen Accounts may be withdrawn or transferred to any Debtor Loan Party Account other than as required by the Interim Order or Final Order.

| Debtor Loan Party | Maximum Aggregate Account Balance |
|---|---|
| MagnaChip Semiconductor LLC | $200,000 |
| MagnaChip Semiconductor S.A. | $100,000 |
| MagnaChip Semiconductor B.V. | $100,000 |
| MagnaChip Semiconductor, Inc., a California corporation | $2,000,000 |
| All other Debtor Loan Parties | $0 |

(e)     Cash in Loan Party Accounts.  The Loan Parties hereby covenant and agree that, if at any time and from time to time the amount of cash on deposit in all deposit accounts of any Loan Party (other than the Frozen Accounts and the Debtor Loan Party Accounts) exceeds an amount equal to the amount set forth below opposite such Loan Party's name (each such excess, an "Account Excess"), then, promptly (and in any event within three Business Days thereafter), the applicable Loan Parties shall cause an amount equal to the applicable Account Excess to be transferred from such Loan Party's deposit accounts to the Frozen Accounts.

| Loan Party | Maximum Aggregate Account Balance |
|---|---|
| MagnaChip Semiconductor, Inc., a company organized under the laws of Japan | $2,000,000 |
| MagnaChip Semiconductor Limited, a company organized under the laws of Hong Kong | $1,000,000 |
| MagnaChip Semiconductor, Ltd., a company organized under the laws of Taiwan | $2,000,000 |
| MagnaChip Semiconductor Limited, a company incorporated in England and Wales | $1,000,000 |
| MagnaChip Semiconductor (Shanghai) Company Limited, a company organized under the laws of China | $150,000 |
| MagnaChip Semiconductor Holding Company Limited, a company organized under the laws of | $50,000 |

CH\1099490.14

| British Virgin Islands | |
|---|---|
| MagnaChip Semiconductor Limited, a company organized under the laws of Korea | $2,000,000 |
| All other Loan Parties (other than Korean Opco) | $0 |

In addition, if the aggregate amount on deposit in all deposit accounts of the Loan Parties (other than the Frozen Accounts and the Debtor Loan Party Accounts) exceeds $8,200,000 (such amount, the "Aggregate Excess"), then, promptly (and in any event within three Business Days thereafter), the Loan Parties shall cause an amount equal to applicable Aggregate Excess to be transferred from such deposit accounts to the Frozen Accounts.

(f)    Case Expenses. Korean Opco hereby covenants and agrees that Korean Opco shall not fund, and each Debtor Loan Party hereby covenants and agrees that such Debtor Loan Party shall not accept, any amounts to the Debtor Loan Parties to pay for Case Expenses unless such Case Expenses are due and payable within 3 days after the date of such funding.

(g)    BTA. The Loan Parties hereby covenant and agree that they shall not default in any obligation under the BTA and that they shall use good faith efforts to consummate the Asset Sale Transaction as promptly as possible.

## SECTION 8. General Release; Indemnity.

(a)    In consideration of, among other things, Agent's and Collateral Trustee's and execution and delivery of this Agreement, each Borrower and the other Loan Parties, on behalf of itself and its agents, representatives, officers, directors, advisors, employees, subsidiaries, affiliates, successors and assigns (collectively, "Releasors"), hereby forever agrees and covenants not to sue or prosecute against any Releasee (as hereinafter defined) and hereby forever waives, releases and discharges, to the fullest extent permitted by law, each Releasee (as hereinafter defined) from any and all claims (including, without limitation, crossclaims, counterclaims, rights of set-off and recoupment), actions, causes of action, suits, debts, accounts, interests, liens, promises, warranties, damages and consequential damages, demands, agreements, bonds, bills, specialties, covenants, controversies, variances, trespasses, judgments, executions, costs, expenses or claims whatsoever, but excluding claims for a breach of this Agreement and claims to the extent the liability of any Releasee is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Person's gross negligence or willful misconduct (collectively, the "Claims"), that such Releasor now has or hereafter may have, of whatsoever nature and kind, whether known or unknown, whether now existing or hereafter arising, whether arising at law or in equity, against any or all of the Lender Parties in any capacity and their respective affiliates, subsidiaries, shareholders and "controlling persons" (within the meaning of the federal securities laws), and their respective successors and assigns and each and all of the officers, directors, employees, agents, attorneys and other representatives of each of the foregoing (collectively, the "Releasees"), based in whole or in part on facts, whether or not now known, existing on or before the Effective Date, that relate to, arise out of or otherwise are in connection with: (i) any or all of the Loan Documents or transactions contemplated thereby or any actions or omissions in connection therewith, (ii) any aspect of the dealings or relationships between or among Borrowers and the other Loan Parties, on the one hand, and any or all of the Lender Parties, on the other hand, relating to any or all of the documents, transactions, actions or omissions referenced in clause (i) hereof, or (iii) any aspect of the dealings or relationships between or among any or all of the Sponsors, on the one hand, and the Lender Parties, on the other hand, but only to the extent such dealings or relationships relate to any or all of the documents, transactions, actions or

CH\1099490.14

omissions referenced in clause (i) hereof. To the extent Agent or any Lender makes any Loans, Credit Extensions or other financial accommodations (including, without limitation, the release of any cash on deposit in the Frozen Accounts) after the date hereof, the receipt by Borrower or any other Loan Party of such Loans or other financial accommodations (including, without limitation, the release of any cash on deposit in the Frozen Accounts) shall constitute a ratification, adoption, and confirmation by such party of the foregoing general release of all Claims against the Releasees which are based in whole or in part on facts, whether or not now known or unknown, existing on or prior to the date of receipt of any such Loans or other financial accommodations. In entering into this Agreement, each Borrower and each other Loan Party consulted with, and has been represented by, legal counsel and expressly disclaims any reliance on any representations, acts or omissions by any of the Releasees and hereby agrees and acknowledges that the validity and effectiveness of the releases set forth above do not depend in any way on any such representations, acts and/or omissions or the accuracy, completeness or validity hereof. The provisions of this Section shall survive the termination or expiration of the Forbearance Period, this Agreement, the Credit Agreement, the other Loan Documents and payment in full of the Obligations.

(b)     Each Borrower and each other Loan Party hereby agrees that it shall be jointly and severally obligated to indemnify and hold the Releasees harmless with respect to any and all liabilities, obligations, losses, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by the Releasees, or any of them, whether direct, indirect or consequential, as a result of or arising from or relating to any proceeding by, or on behalf of any Person, including, without limitation, the respective officers, directors, agents, trustees, creditors, partners or shareholders of Borrowers, any other Loan Party, or any of their respective Subsidiaries, whether threatened or initiated, in respect of any claim for legal or equitable remedy under any statue, regulation or common law principle arising from or in connection with the negotiation, preparation, execution, delivery, performance, administration and enforcement of the Credit Agreement, the other Loan Documents, this Agreement or any other document executed and/or delivered in connection herewith; provided, that neither Borrowers nor any other Loan Party shall have any obligation to indemnify or hold harmless any Releasee hereunder with respect to liabilities to the extent they result from the gross negligence or willful misconduct of that Releasee as finally determined by a court of competent jurisdiction. If and to the extent that the foregoing undertaking may be unenforceable for any reason, Borrowers and the other Loan Parties each agrees to make the maximum contribution to the payment and satisfaction thereof which is permissible under applicable law. The foregoing indemnity shall survive the termination or expiration of the Forbearance Period, this Agreement, the Credit Agreement, the other Loan Documents and the payment in full of the Obligations.

(c)     Each Borrower and each other Loan Party, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with and in favor of each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged by Borrowers or any other Loan Party pursuant to Section 5(a) hereof. If either Borrower, any other Loan Party or any of their respective successors, assigns or other legal representatives violates the foregoing covenant, Borrowers and the other Loan Parties, each for itself and its successors, assigns and legal representatives, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

## SECTION 9. Representations, Warranties and Covenants of Borrowers and Other Loan Parties.

To induce Agent and Collateral Trustee to execute and deliver this Agreement, each of Borrowers and other Loan Parties represents, warrants and covenants that:

(a)     The execution, delivery and performance by Borrowers and the other Loan Parties of this Agreement and all documents and instruments delivered in connection herewith and the Credit Agreement and all other Loan Documents have been duly authorized by such Loan Parties' respective Boards of Directors, and this Agreement and all documents and instruments delivered in connection herewith and the Credit Agreement and all other Loan Documents are legal, valid and binding obligations of such Loan Parties enforceable against such Loan Parties in accordance with their respective terms, except as the enforcement thereof may be subject to (i) the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar law affecting creditors' rights generally and (ii) general principles of equity (regardless of whether such enforcement is sought in a proceeding in equity or at law);

(b)     Except with respect to the Specified Defaults, each of the representations and warranties contained in the Credit Agreement and the other Loan Documents is true and correct on and as of the date hereof as if made on the date hereof, except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, and each of the agreements and covenants in the Credit Agreement and the other Loan Documents is hereby reaffirmed with the same force and effect as if each were separately stated herein and made as of the date hereof;

(c)     Neither the execution, delivery and performance of this Agreement and all documents and instruments delivered in connection herewith nor the consummation of the transactions contemplated hereby or thereby does or shall contravene, result in a breach of, or violate (i) any provision of Borrowers' or any other Loan Party's corporate charter, bylaws, operating agreement, or other governing documents, (ii) any law or regulation, or any order or decree of any court or government instrumentality, or (iii) any indenture, mortgage, deed of trust, lease, agreement or other instrument to which Borrowers or any other Loan Party is a party or by which Borrowers or any other Loan Party or any of their respective property is bound;

(d)     As of the date hereof, except for the Current Defaults, no Default or Event of Default has occurred or is continuing under this Agreement, the Credit Agreement or any other Loan Document;

(e)     The Lender Parties' security interests in the Collateral and Other Collateral continue to be valid, binding, and enforceable first-priority security interests which secure the Obligations, in each case in accordance with the Credit Agreement and each other Loan Document, subject only to the Permitted Liens, no tax or judgment liens are currently of record against Borrowers or any other Loan Party, and all Equity Interests owned by Borrowers and each other Loan Party that are required to be pledged pursuant to the Security Documents have been pledged to the applicable Collateral Representative for the benefit of the Lender Parties in accordance with each applicable Security Document;

(f)     Except with respect to the Specified Defaults, any misrepresentation of Borrowers or any other Loan Party, or any failure of any such party to comply with the covenants, conditions and agreements contained in this Agreement, the Credit Agreement, any other Loan Document or in any other agreement, document or instrument at any time executed and/or delivered by Borrowers or any other Loan Party with, to or in favor of any Lender Party shall constitute an immediate Event of Default hereunder, under the Credit Agreement and the other Loan Documents;

(g)     The recitals to this Agreement are true and correct;

(h)     The Borrowers agree to deliver to Agent written notice promptly upon (and, in any event, within one Business Day of) the occurrence of any Forbearance Default;

(i)     Each Loan Party agrees that at all times during the Forbearance Period and thereafter it will fully cooperate with and keep the Agent, the Lenders and their Representatives promptly informed as to any progress or adverse developments in connection with the Asset Sale Transaction or the Case;

(j)     Each Loan Party irrevocably acknowledges and agrees that neither they nor any of their Affiliates will, without the prior consent of the Agent and the Required Lenders, provide, support or solicit any debtor-in-possession financing that would be senior to, or *pari passu* with, the Obligations;

(k)     The Borrowers hereby agree (i) to deliver to the Agent no later than 5:00 p.m. (New York time) on a daily basis from the Effective Date through the expiration or termination of the Forbearance Period a report of cash balances in the Frozen Accounts and (ii) to participate in weekly calls with the Lender Parties (and, in any event, no later than Tuesday of each week) from the Effective Date through the expiration or termination of the Forbearance Period to (x) update the Lender Parties as to the status of the Asset Sale Transaction and the Case and (y) present any variances between the actual performance of the business of the Loan Parties and the line items set forth in the Budget for the applicable period;

(l)     Consistent with the Acceleration Notice, the Loan Parties hereby acknowledge and agree that no funds on deposit in or credited to the Frozen Accounts may be withdrawn or transferred by, for the benefit of, or at the direction of any Loan Party unless otherwise permitted pursuant to the terms of this Agreement or consented to by the Agent in its sole discretion; and

(m)     Korean Opco hereby represents, warrants and covenants that (i) the legal predicates under Korean law to the filing of a rehabilitation proceeding for Korean Opco will not be satisfied after the consummation of the Asset Sale Transaction, (ii) in light of the Marketing Process carried out to date, the Asset Sale Transaction is the only option to maintain the business of Korean Opco as a going concern and, (iii) upon the consummation of the Asset Sale Transaction, Korean Opco shall promptly file a bankruptcy proceeding in Korea.

(n)     The Loan Parties hereby represent and warrant that (ii) they have, in coordination with the Company Financial Advisors, adequately marketed the Equity Interests and assets of the Loan Parties pursuant to the Marketing Process, (ii) the terms of the Asset Sale Transaction to be conducted pursuant to the BTA represent the highest and best offer that the Loan Parties are able to achieve on a going concern basis and (iii) no terms, provisions or arrangements with respect to the BTA or the Asset Sale transaction, including, without limitation, agreements with management of any of the Loan Parties, have been agreed that have not been disclosed to the Lender Parties.

## SECTION 10. Voluntary Turnover of Collateral.

If any Termination Event occurs, Borrowers and the other Loan Parties agree, upon the request of Agent, in accordance with the Loan Documents, to promptly turn over to Agent or the Collateral Trustee (or any of their designees (each, a "Collateral Representative")) possession of all Collateral and Other Collateral and to cooperate fully with Agent and its Representatives and each Collateral Representative in obtaining such possession. Borrowers and the other Loan Parties agree that Agent and Collateral Trustee have no adequate remedy at law regarding the agreement in this Section and may specifically enforce such agreement by injunctive relief, and that such parties will not contest any such injunctive relief sought by Agent or Collateral Trustee.

## SECTION 11. Ratification of Liability.

Each Borrower and each other Loan Party, as debtor, grantor, pledgor, guarantor, assignor, or in other similar capacities in which such Loan Parties grant liens or security interests in their properties or

otherwise act as accommodation parties or guarantors, as the case may be, under the Loan Documents, hereby ratifies and reaffirms all of its payment and performance obligations and obligations to indemnify, contingent or otherwise, under each of such Loan Documents to which such Loan Party is a party, and each such Loan Party hereby ratifies and reaffirms its grant of liens on or security interests in its properties pursuant to such Loan Documents to which it is a party as security for the Obligations under or with respect to the Credit Agreement and each other Loan Document, and confirms and agrees that such liens and security interests hereafter secure all of the Obligations, including, without limitation, all additional Obligations hereafter arising or incurred pursuant to or in connection with this Agreement, the Credit Agreement or any other Loan Document. Each Borrower and each other Loan Party further agrees and reaffirms that the Loan Documents to which it is a party now apply to all Obligations as defined in the Credit Agreement, (including, without limitation, all additional Obligations hereafter arising or incurred pursuant to or in connection with this Agreement, the Credit Agreement or any other Loan Document). Each such Loan Party (i) further acknowledges receipt of a copy of this Agreement and all other agreements, documents, and instruments executed and/or delivered in connection herewith, (ii) consents to the terms and conditions of same, and (iii) agrees and acknowledges that each of the Loan Documents remains in full force and effect and is hereby ratified and confirmed. Except as expressly provided herein, the execution of this Agreement shall not operate as a waiver of any right, power or remedy of any Lender Party, nor constitute a waiver of any provision of any of the Loan Documents nor constitute a novation of any of the Obligations under the Credit Agreement or the other Loan Documents.

## SECTION 12. Reference to and Effect Upon the Credit Agreement.

(a)     All terms, conditions, covenants, representations and warranties contained in the Credit Agreement and the other Loan Documents, and all rights of the Lender Parties and all of the Obligations, shall remain in full force and effect. Each of Borrowers and the other Loan Parties hereby confirms that the Credit Agreement and the other Loan Documents are in full force and effect and that neither Borrowers nor any other Loan Party has any right of setoff, recoupment or other offset or any defense, claim or counterclaim with respect to any of the Obligations, the Credit Agreement or any other Loan Document.

(b)     Except as expressly set forth herein, the execution, delivery and effectiveness of this Agreement shall not directly or indirectly (i) create any obligation to make any further Loans or other Credit Extensions or to continue to defer any enforcement action after the occurrence of any Default or Event of Default (including, without limitation, any Forbearance Default) other than the Specified Defaults, (ii) constitute a consent or waiver of any past, present or future violations of any provisions of the Credit Agreement or any other Loan Documents, (iii) amend, modify or operate as a waiver of any provision of the Credit Agreement or any other Loan Documents or any right, power or remedy of any Lender Party, (iv) constitute a consent to any merger or other transaction or to any sale, restructuring or refinancing transaction, (v) constitute a course of dealing or other basis for altering any Obligations or any other contract or instrument. Except as expressly set forth herein, each Lender Party reserves all of its rights, powers, and remedies under the Credit Agreement, the other Loan Documents and applicable law. All of the provisions of the Credit Agreement and the other Loan Documents, including, without limitation, the time of the essence provisions, are hereby reiterated, and if ever waived, are hereby reinstated.

(c)     From and after the Effective Date, the term "Loan Documents" in the Credit Agreement and the other Loan Documents shall include, without limitation, this Agreement and any agreements, instruments and other documents executed and/or delivered in connection herewith.

(d)     No Lender Party has waived, is by this Agreement waiving, and has no intention of waiving (regardless of any delay in exercising such rights and remedies), any Default or Event of Default

(including, without limitation, the Specified Defaults) which may be continuing on the date hereof or any Event of Default which may occur after the date hereof (whether the same or similar to the Specified Defaults or otherwise), and no Lender Party has agreed to forbear with respect to any of its rights or remedies concerning any Events of Default (other than, during the Forbearance Period, the Specified Defaults solely to the extent expressly set forth herein), which may have occurred or are continuing as of the date hereof, or which may occur after the date hereof.

(e) Each Borrower and each other Loan Party agrees and acknowledges that the Lender Parties' agreement to forbear from exercising certain of their default-related rights and remedies with respect to the Specified Defaults during the Forbearance Period does not in any manner whatsoever limit any Lender Party's right to insist upon strict compliance by Borrowers and the other Loan Parties with the Credit Agreement, this Agreement or any other Loan Document during the Forbearance Period, except as expressly set forth herein.

(f) This Agreement (and the provisions contained herein) shall not be deemed or construed to be (i) a satisfaction, reinstatement, novation or release of the Credit Agreement or any other Loan Document or (ii) a consent to any Refinancing or Restructuring.

## SECTION 13. Costs And Expenses.

In addition to (to the extent not otherwise provided in the Credit Agreement), and not in lieu of, the terms of the Credit Agreement and the other Loan Documents relating to the reimbursement of Lender Party fees and expenses, Borrowers shall reimburse each of the Agent and the other Lender Parties, as the case may be, promptly on demand for all fees, costs, charges and expenses, including the fees, costs, charges and expenses of any Representative of Agent or the Collateral Trustee, and other expenses, incurred in connection with this Agreement and the other agreements and documents executed and/or delivered in connection herewith. In addition, all fees, costs, charges, expenses and other amounts payable under Section 10.03 of the Credit Agreement shall be due on demand.

## SECTION 14. Governing Law; Consent to Jurisdiction and Venue.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO SUCH JURISDICTION'S CONFLICTS OF LAWS PRINCIPLES. EACH BORROWER AND EACH LOAN PARTY CONSENTS AND AGREES THAT THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN ANY OR ALL OF THE LOAN PARTIES AND THE LENDER PARTIES PERTAINING TO THIS AGREEMENT OR ANY MATTER ARISING OUT OF OR OTHERWISE RELATING TO THIS AGREEMENT; PROVIDED, THAT THE PARTIES HERETO ACKNOWLEDGE THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF THE STATE OF NEW YORK AND PROVIDED FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE ANY LENDER PARTY FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO COLLECT THE OBLIGATIONS, TO REALIZE ON THE COLLATERAL, OTHER COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE ANY JUDGMENT OR OTHER COURT ORDER IN FAVOR OF SUCH LENDER PARTY. EACH BORROWER AND EACH OTHER LOAN PARTY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND WAIVES ANY OBJECTION WHICH IT MAY HAVE BASED ON

CH\1099490.14

LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS, AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT. EACH BORROWER AND EACH OTHER LOAN PARTY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OR SUCH SUMMONS, COMPLAINTS AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO SUCH BORROWERS OR SUCH OTHER LOAN PARTY AT THE ADDRESS SET FORTH IN SECTION 10.01 OF THE CREDIT AGREEMENT. THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF SUCH LOAN PARTY'S ACTUAL RECEIPT THEREOF OR THREE (3) BUSINESS DAYS AFTER DEPOSIT IN THE U.S. MAIL, PROPER POSTAGE PRE-PAID.

### SECTION 15. Construction

This Agreement and all other agreements and documents executed and/or delivered in connection herewith have been prepared through the joint efforts of all of the parties hereto. Neither the provisions of this Agreement or any such other agreements and documents nor any alleged ambiguity therein shall be interpreted or resolved against any party on the ground that such party or its counsel drafted this Agreement or such other agreements and documents, or based on any other rule of strict construction. Each of the parties hereto represents and declares that such party has carefully read this Agreement and all other agreements and documents executed in connection therewith, and that such party knows the contents thereof and signs the same freely and voluntarily. The parties hereto acknowledge that they have been represented by legal counsel of their own choosing in negotiations for and preparation of this Agreement and all other agreements and documents executed in connection herewith and that each of them has read the same and had their contents fully explained by such counsel and is fully aware of their contents and legal effect. If any matter is left to the decision, right, requirement, request, determination, judgment, opinion, approval, consent, waiver, satisfaction, acceptance, agreement, option or discretion of one or more Lender Parties or their respective employees, counsel, or agents in the Credit Agreement or any other Loan Documents, such action shall be deemed to be exercisable by such Lender Parties or such other Person in its sole and absolute discretion and according to standards established in its sole and absolute discretion. Without limiting the generality of the foregoing, "option" and "discretion" shall be implied by the use of the words "if" and "may."

### SECTION 16. Counterparts.

This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument, and all signatures need not appear on any one counterpart. Any party hereto may execute and deliver a counterpart of this Agreement by delivering a signature page of this Agreement signed by such party by facsimile or other electronic transmission, and any such facsimile or other electronic signature shall be treated in all respects as having the same effect as an original signature. Any party delivering by facsimile or other electronic transmission a counterpart executed by it shall promptly thereafter also deliver a manually signed counterpart of this Agreement.

### SECTION 17. Time of Essence.

Time is of the essence in the performance of each of the obligations of Borrowers and the other Loan Parties hereunder and with respect to all conditions to be satisfied by such parties.

### SECTION 18. Further Assurances.

CH\1099490.14

Each Borrower and each other Loan Party agrees to, and to cause any other Loan Party to, take all further actions and execute all further documents as Agent may, and at the request of the Required Lenders shall, from time to time reasonably request to carry out the transactions contemplated by this Agreement and all other agreements executed and delivered in connection herewith.

## SECTION 19. Section Headings.

Section headings in this Agreement are included herein for convenience of reference only and shall not constitute part of this Agreement for any other purpose.

## SECTION 20. Notices.

All notices, requests, and demands to or upon the respective parties hereto (other than the Collateral Trustee) shall be given in accordance with the Credit Agreement. All notices, requests, and demands to or upon the Collateral Trustee shall be given in accordance with the Collateral Trust Agreement.

## SECTION 21. Agreement Effectiveness.

This Agreement shall become effective on the date (the "Effective Date") on which all of the following conditions precedent have been met (or waived) as determined by Agent in its sole discretion:

(a)    Agreement; Acknowledgment and Consent. Agent shall have received duly executed signature pages to this Agreement signed by Agent, Collateral Trustee, Borrowers, the other Loan Parties and the Buyer, and Agent shall have received a duly executed acknowledgment and consent, in the form of Exhibit J hereto, from the Buyer, pursuant to which the Buyer, *inter alia*, acknowledge receipt of a copy of this Agreement, consent to the terms set forth herein and agree to comply with the provisions of Section 5 hereof.

(b)    Due Authorization. Each Loan Party shall have delivered to Agent (i) evidence of its corporate (or similar) authority to execute, deliver and perform its respective obligations under this Agreement and, as applicable, all other agreements and documents executed in connection herewith, and (ii) such other documents and instruments as Agent may require, all of the foregoing of which shall be in form and substance acceptable to Agent.

(c)    Representations and Warranties. The representations and warranties contained herein shall be true and correct, and no Forbearance Default, Default, Event of Default or event which with notice, the passage of time or both would constitute a Forbearance Default and/or an Event of Default, other than the Specified Defaults, shall exist on the date hereof or on the Effective Date.

(d)    Other Corporate Proceedings. All corporate proceedings taken in connection with the transactions contemplated by this Agreement and all documents, instruments, and other legal matters incident thereto shall be satisfactory to Agent.

(e)    Authorization and Approval of Asset Sale Transaction. The Loan Parties shall have delivered to Agent copies of duly authorized resolutions of the board of directors (or similar governing body) of each of the Loan Parties, which resolutions shall (i) irrevocably authorize and approve the terms of the BTA and the consummation of the Asset Sale Transaction in accordance with such terms (subject to reasonable modifications thereto agreed to by the management of the Loan Parties and deemed to be reasonably necessary to consummate the Asset Sale Transaction), and (ii) explicitly provide that the Lender Parties shall be entitled to rely on such resolutions.

(f)  Fees and Expenses.  Agent shall have received payment of all fees and expenses (including, without limitation, the invoiced legal fees and expenses of Latham & Watkins LLP, special counsel to the Agent, the invoiced legal fees and expenses of Thompson Hine LLP, counsel for the Collateral Trustee, the fees and expenses of Agent Financial Advisor, and the invoiced fees and expenses of any local counsel, foreign counsel and any other Representative) outstanding as of the Effective Date.

## SECTION 22. Waivers by Borrowers and other Loan Parties.

EACH BORROWER AND EACH OTHER LOAN PARTY HEREBY WAIVES (a) THE RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE CREDIT AGREEMENT, ANY OF THE OTHER LOAN DOCUMENTS, THE OBLIGATIONS, THE COLLATERAL OR THE OTHER COLLATERAL; (b) PRESENTMENT, DEMAND AND PROTEST, AND NOTICE OF PRESENTMENT, PROTEST, DEFAULT, NONPAYMENT, MATURITY, RELEASE WITH RESPECT TO ALL OR ANY PART OF THE OBLIGATIONS OR ANY COMMERCIAL PAPER, ACCOUNTS, CONTRACT RIGHTS, DOCUMENTS, INSTRUMENTS, CHATTEL PAPER AND GUARANTIES AT ANY TIME HELD BY ANY LENDER PARTY ON WHICH EITHER BORROWER OR ANY OTHER LOAN PARTY MAY IN ANY WAY BE LIABLE AND HEREBY RATIFIES AND CONFIRMS WHATEVER SUCH LENDER PARTY MAY DO IN THIS REGARD; (c) NOTICE PRIOR TO TAKING POSSESSION OR CONTROL OF THE COLLATERAL, THE OTHER COLLATERAL OR ANY BOND OR SECURITY WHICH MIGHT BE REQUIRED BY ANY COURT PRIOR TO ALLOWING ANY LENDER PARTY TO EXERCISE ANY OF THEIR RESPECTIVE RIGHTS AND REMEDIES; (d) THE BENEFIT OF ALL VALUATION, APPRAISEMENT AND EXEMPTION LAWS AND ALL RIGHTS WAIVABLE UNDER ARTICLE 9 OF THE UNIFORM COMMERCIAL CODE; (e) ANY RIGHT BORROWERS OR ANY OTHER LOAN PARTY MAY HAVE UPON PAYMENT IN FULL OF THE OBLIGATIONS TO REQUIRE ANY LENDER PARTY TO TERMINATE ITS SECURITY INTEREST IN THE COLLATERAL, OTHER COLLATERAL OR IN ANY OTHER PROPERTY OF BORROWERS OR ANY OTHER LOAN PARTY UNTIL TERMINATION OF THE CREDIT AGREEMENT IN ACCORDANCE WITH ITS TERMS AND THE EXECUTION BY BORROWERS, AND BY ANY PERSON WHO PROVIDES FUNDS TO BORROWERS WHICH ARE USED IN WHOLE OR IN PART TO SATISFY THE OBLIGATIONS, OF AN AGREEMENT INDEMNIFYING ANY OR ALL OF THE LENDER PARTIES FROM ANY LOSS OR DAMAGE ANY SUCH PARTY MAY INCUR AS THE RESULT OF DISHONORED CHECKS OR OTHER ITEMS OF PAYMENT RECEIVED BY SUCH LENDER PARTY FROM BORROWERS, OR ANY ACCOUNT DEBTOR AND APPLIED TO THE OBLIGATIONS AND RELEASING AND INDEMNIFYING, IN THE SAME MANNER AS DESCRIBED IN SECTION 5 OF THIS AGREEMENT, THE RELEASEES FROM ALL CLAIMS ARISING ON OR BEFORE THE DATE OF SUCH TERMINATION STATEMENT; AND (vi) NOTICE OF ACCEPTANCE HEREOF, AND EACH BORROWER AND EACH OTHER LOAN PARTY ACKNOWLEDGES THAT THE FOREGOING WAIVERS ARE A MATERIAL INDUCEMENT TO AGENT'S ENTERING INTO THIS AGREEMENT AND THAT SUCH PARTIES ARE RELYING UPON THE FOREGOING WAIVERS IN THEIR FUTURE DEALINGS WITH BORROWERS AND THE OTHER LOAN PARTIES. BORROWERS AND THE OTHER LOAN PARTIES EACH WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THE FOREGOING WAIVERS WITH ITS LEGAL COUNSEL AND HAS KNOWINGLY AND VOLUNTARILY WAIVED ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

## SECTION 23. Assignments; No Third Party Beneficiaries.

CH\1099490.14

This Agreement shall be binding upon and inure to the benefit of Borrowers, the other Loan Parties, the Lender Parties and their respective successors and assigns; provided, that neither Borrower nor any other Loan Party shall be entitled to delegate any of its duties hereunder and shall not assign any of its rights or remedies set forth in this Agreement without the prior written consent of Agent in its sole discretion. No Person other than the parties hereto, and in the case of Section 8 hereof, the Releasees, shall have any rights hereunder or be entitled to rely on this Agreement and all third-party beneficiary rights (other than the rights of the Releasees under Section 8 hereof) are hereby expressly disclaimed.

## SECTION 24. Final Agreement.

This Agreement, the Credit Agreement, the other Loan Documents, and the other written agreements, instruments, and documents entered into in connection therewith (collectively, the "Borrowers/Lender Documents") set forth in full the terms of agreement between the parties hereto and thereto and are intended as the full, complete, and exclusive contracts governing the relationship between such parties, superseding all other discussions, promises, representations, warranties, agreements, and understandings between the parties with respect thereto. No term of the Borrowers/Lender Documents may be modified or amended, nor may any rights thereunder be waived, except in a writing signed by the party against whom enforcement of the modification, amendment, or waiver is sought (provided that the Loan Documents may be amended as provided in Section 10.02 of the Credit Agreement). Any waiver of any condition in, or breach of, any of the foregoing in a particular instance shall not operate as a waiver of other or subsequent conditions or breaches of the same or a different kind. Agent's or any Lender's exercise or failure to exercise any rights or remedies under any of the foregoing in a particular instance shall not operate as a waiver of its right to exercise the same or different rights and remedies in any other instances. There are no oral agreements among the parties hereto.

## SECTION 25. Appointment of Agent.

Pursuant to Section 4.2 of the Collateral Trust Agreement, the Collateral Trustee hereby appoints the Agent as its agent for purposes of receiving and applying funds that are proceeds of Collateral in accordance with the BTA. The Loan Parties each acknowledge and agree that the Agent is an agent of the Collateral Trustee for this limited purpose and consequently is entitled to certain rights and benefits under the Collateral Trust Agreement (including, without limitation, the benefit of the indemnity provisions set forth in Section 6.8 of the Collateral Trust Agreement).

## SECTION 26. Indemnity in favor of Collateral Trustee.

Without prejudice to the right of the Collateral Trustee to be indemnified and held harmless by each Borrower and each other Loan Party pursuant to Section 8 hereof, the Agent agrees that it shall, to the extent not promptly paid by a Loan Party, be obligated to indemnify and hold the Collateral Trustee harmless with respect to any and all liabilities, obligations, claims, losses, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by the Collateral Trustee, whether direct, indirect or consequential, as a result of, or arising from or relating to, or in connection with, the negotiation, preparation, execution, delivery, performance, administration or enforcement of this Agreement or any other document executed and/or delivered in connection herewith; provided, that the Agent shall not have any obligation to indemnify or hold harmless the Collateral Trustee hereunder with respect to liabilities to the extent they result from the gross negligence or willful misconduct of the Collateral Trustee as finally determined by a court of competent jurisdiction. If and to the extent that the foregoing undertaking may be unenforceable for any reason, the Agent agrees to make the maximum contribution to the payment and satisfaction thereof which is permissible under applicable law. The foregoing indemnity shall survive the termination or expiration of the Forbearance Period, this Agreement, the Credit Agreement, the other Loan Documents and the payment in full of the Obligations.

[Signature pages to follow]

IN WITNESS WHEREOF, this Forbearance Agreement has been executed by the parties hereto as of the date first written above.

**MAGNACHIP SEMICONDUCTOR S.A,** a company organized under the laws of Luxembourg, as Borrower

By: _____

Name: _____SHN MCFARLANA____

Title: _____DIRECTOR_____

**MAGNACHIP SEMICONDUCTOR LLC,** a Delaware limited liability company, as Holdings

By: _____

Name: _____Margaret Saken_____

Title: _____CFO_____

**MAGNACHIP SEMICONDUCTOR FINANCE COMPANY,** a Delaware limited liability company, as Borrower

By: _____

Name: _____Margaret Saken_____

Title: _____CFO_____

**MAGNACHIP SEMICONDUCTOR, INC.,** a
California corporation,
as Subsidiary Guarantor

By: _____

Name: ___ JOHN MCFARLAND

Title: ___ CERP SEC.

**MAGNACHIP SEMICONDUCTOR
LIMITED,** a company incorporated in England
and Wales with registered number 05232381,
as Subsidiary Guarantor

By: _____

Name: ___ JOHN MCFARLAND

Title: ___ SEC.

**MAGNACHIP SEMICONDUCTOR, LTD.,** a
company organized under the laws of Taiwan,
as Subsidiary Guarantor

By: _____

Name: ___ Margaret Sakai

Title: ___ Director

**MAGNACHIP SEMICONDUCTOR
HOLDING COMPANY LIMITED,** a company
organized under the laws of British Virgin Islands,
as Subsidiary Guarantor

By: _____

Name: ___ JOHN MCFARLAND

Title: ___ DIRECTOR

**MAGNACHIP SEMICONDUCTOR SA
HOLDINGS LLC,** a Delaware limited liability
company,
as Subsidiary Guarantor

By: _____

Name: ___ Margaret Sakai

Title: ___ CFO

**MAGNACHIP SEMICONDUCTOR, INC.,** a
company organized under the laws of Japan,
as Subsidiary Guarantor

By: _____

Name: ___ Margaret Sakai

Title: ___ Director

**MAGNACHIP SEMICONDUCTOR B.V.,**
a company organized under the laws of
Netherlands,
as Subsidiary Guarantor

By: _____

Name: ___ Margaret Sakai

Title: ___ CFO

**MAGNACHIP SEMICONDUCTOR, LTD.,** a
company organized under the laws of Korea,
as Subsidiary Guarantor

By: ___ MAGNACHIP SEMICONDUCTOR,LTD.

Name: _____

Title: ___ SANG PARK PRESIDENT DIRECTOR and CE

**MAGNACHIP SEMICONDUCTOR
LIMITED**, a company organized under the laws
of Hong Kong,
as Subsidiary Guarantor

By: _____

Name: _____Margaret Sakan_____

Title: _____Director_____

**UBS AG, STAMFORD BRANCH,**
as Agent

By: _____

Name: _____David J. Kalai_____
　　　　　　　Executive Director

Title: _____

William A. Roche
Executive Director

U.S. BANK NATIONAL ASSOCIATION,
as Collateral Trustee

By: _____

Name: ___Thomas E. Tabor___
         **Vice President**
Title: _____

## FIRST OMNIBUS AMENDMENT

THIS FIRST OMNIBUS AMENDMENT (this "Amendment") is dated as of June 25, 2009, by and among UBS AG, STAMFORD BRANCH, in its capacity as Agent under and as defined in the Enforcement Agreement and the Escrow Agreement (each, as hereinafter defined) (the "Agent"), MAGNACHIP SEMICONDUCTOR, LTD., a Korean limited liability company, MAGNACHIP SEMICONDUCTOR, INC., a California corporation, MAGNACHIP SEMICONDUCTOR LIMITED, a company incorporated in the United Kingdom, MAGNACHIP SEMICONDUCTOR INC., a company incorporated in Japan, MAGNACHIP SEMICONDUCTOR LIMITED, a company incorporated in Hong Kong SAR, MAGNACHIP SEMICONDUCTOR LIMITED, a company incorporated in Taiwan, and MAGNACHIP SEMICONDUCTOR S.A., a company incorporated in Luxembourg ("Luxco") (collectively, the "Sellers"), solely with respect to Sections II and III of this Amendment, MAGNACHIP SEMICONDUCTOR FINANCE COMPANY, a Delaware corporation (together with Luxco, "Borrowers"), solely with respect to Sections II and III of this Amendment, MAGNACHIP SEMICONDUCTOR LLC ("Holdings"), a Delaware limited liability company, and the Subsidiary Guarantors solely with respect to those Sections of this Amendment if and as specified on the signature pages hereto (as defined in the Enforcement Agreement) listed on the signature pages hereto (collectively with Borrowers, Holdings, and the Sellers, the "Loan Parties"), solely with respect to Sections II and III of this Amendment, U.S. BANK NATIONAL ASSOCIATION, in its capacity as Collateral Trustee under and as defined in the Enforcement Agreement, and, solely with respect to Sections I and III of this Amendment, KTB 2007 PRIVATE EQUITY FUND, a Korean limited partnership, as represented by its general partner KTB SECURITIES CO, LTD, a Korean corporation (collectively, the "Buyer") and KOREA EXCHANGE BANK, as escrow agent and bank under the Escrow Agreement (in each such capacity, the "Escrow Agent"). Capitalized terms used herein without definition shall have the same meanings herein as set forth in the Enforcement Agreement after giving effect to this Amendment.

### W I T N E S S E T H:

WHEREAS, the Agent, on behalf of itself and the other Lender Parties, the Collateral Trustee and the Loan Parties have entered into that certain Enforcement, Consent, Cash Collateral and Limited Forbearance Agreement dated as of June 11, 2009 (the "Enforcement Agreement"), pursuant to which the Lender Parties have agreed, among other things, to consent to the Asset Sale Transaction among the Sellers and the Buyer on the terms and conditions set forth in the Enforcement Agreement;

WHEREAS, the Buyer and the Sellers have entered into that certain Business Transfer Agreement dated as of June 11, 2009 (as amended as of the date hereof, the "Transfer Agreement"), pursuant to which the Buyer has agreed to purchase, and the Sellers have agreed to sell, the Business (as defined in the Transfer Agreement) pursuant to the terms and conditions set forth in the Transfer Agreement;

WHEREAS, the Buyer, the Agent, the Escrow Agent, and the Sellers have entered into that certain Escrow Agreement dated as of June 11, 2009 (the "Escrow Agreement"), pursuant to which the Buyer has agreed to fund the Base Deposit and the Working Capital Deposit (each, as defined in the Escrow Agreement) into escrow and the Escrow Agent has agreed to hold in escrow and distribute the Escrow Property (as defined in the Escrow Agreement) pursuant to the terms and conditions set forth in the Escrow Agreement; and

WHEREAS, as of the date hereof certain amendments are being made to the Transfer Agreement as set forth in Annex A attached hereto (the "Transfer Agreement Amendment") and the Sellers and the

other Loan Parties have requested that the Agent, the Collateral Trustee, the Escrow Agent and the Buyer, as the case may be, agree to amend certain provisions in the Enforcement Agreement and the Escrow Agreement to conform to certain changes being made to the Transfer Agreement as set forth in such Transfer Agreement Amendment;

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION I.  AMENDMENT TO THE ESCROW AGREEMENT

A.    The third recital to the Escrow Agreement is hereby amended by adding the word "Gross" immediately before the words "Purchase Price" appearing therein.

## SECTION II.  AMENDMENTS TO THE ENFORCEMENT AGREEMENT

A.    The definition of "Forbearance Default" in Section 1 of the Enforcement Agreement is hereby amended by replacing the reference to "US$67.7 million" appearing in clause (h) thereof with "US$67.0 million."

B.    Section 4 of the Enforcement Agreement is hereby amended by replacing the reference to "US$67.7 million" appearing in the second proviso thereof with "US$67.0 million."

C.    Footnote 1 in the Enforcement Agreement is hereby amended by adding the word "Gross" immediately before the words "Purchase Price" appearing therein.

D.    Footnote 3 in the Enforcement Agreement is hereby amended by adding the word "Gross" immediately before the words "Purchase Price" appearing therein.

## SECTION III.  MISCELLANEOUS

A.    Except as herein expressly amended, all terms, covenants and provisions of the Escrow Agreement and the Enforcement Agreement are and shall remain in full force and effect. In the event of a conflict between the terms of the Escrow Agreement and this Amendment or the terms of the Enforcement Agreement and this Amendment, in each case this Amendment shall control.

B.    Nothing in this Amendment confers any rights on any person except the undersigned parties and their respective successors and permitted assigns.

C.    This Amendment may be executed in one or more counterparts, all of which shall be considered one and the same agreement. Section I of this Amendment shall become effective when one or more counterparts of this Amendment have been signed by each of the Agent, the Escrow Agent, the Buyer and each of the Sellers and delivered to each other such party, Section II of this Amendment shall become effective when one or more counterparts have been signed by each of the Agent, the Collateral Trustee and each of the Loan Parties and delivered to each other such party, and Section III of this Amendment shall become effective when one or more counterparts of this Amendment have been signed by each of the undersigned parties and delivered to each other undersigned party, it being understood that, in each case, all undersigned parties need not sign the same counterpart.

D.    Section I of this Amendment shall be governed by, and construed in accordance with, the laws of the Republic of Korea, without regard to conflicts of laws provisions. All actions and proceedings arising out of or relating to Section I of this Amendment shall be finally settled by arbitration

utilizing the rules of the International Chamber of Commerce ("*ICC*") by three arbitrators appointed in accordance with ICC rules. The arbitration shall be conducted in Seoul, Korea, and the language used in the proceedings shall be English. The award rendered by the arbitrator shall be final and binding on the undersigned parties concerned and may be entered in any court of competent jurisdiction for execution.

E.     Section II of this Amendment shall be governed by, and construed in accordance with, the internal laws of State of New York, without regard to such jurisdiction's conflicts of laws principles.

F.     For purposes of interpretation or resolving ambiguities, this Amendment, as executed in English, will prevail over any translation.

IN WITNESS WHEREOF, this Amendment has been executed by the parties hereto as of the date first written above.

**MAGNACHIP SEMICONDUCTOR S.A.**, a company organized under the laws of Luxembourg, as Borrower

By: _____

Name: _____JOHN MCFARLAND_____

Title: _____DIRECTOR_____

**MAGNACHIP SEMICONDUCTOR FINANCE COMPANY**, a Delaware corporation, as Borrower (SOLELY WITH RESPECT TO SECTIONS II AND III OF THIS AMENDMENT)

By: _____

Name: _____Margaret Sakai_____

Title: _____CFO_____

**MAGNACHIP SEMICONDUCTOR LLC**, a Delaware limited liability company, as Holdings (SOLELY WITH RESPECT TO SECTIONS II AND III OF THIS AMENDMENT)

By: _____

Name: _____Margaret Sakai_____

Title: _____CFO_____

**MAGNACHIP SEMICONDUCTOR, INC.**, a
California corporation,
as Subsidiary Guarantor

By: _____

Name: JOHN MCFARLAND

Title: CORP. SEC

**MAGNACHIP SEMICONDUCTOR
LIMITED**, a company incorporated in England
and Wales with registered number 05232381,
as Subsidiary Guarantor

By: _____

Name: JOHN MCFARLAND

Title: SEC.

**MAGNACHIP SEMICONDUCTOR, LTD.**, a
company organized under the laws of Taiwan,
as Subsidiary Guarantor

By: _____

Name: Margaret Sakai

Title: Director

**MAGNACHIP SEMICONDUCTOR
HOLDING COMPANY LIMITED**, a company
organized under the laws of British Virgin Islands,
as Subsidiary Guarantor (SOLELY WITH
RESPECT TO SECTIONS II AND III OF THIS
AMENDMENT)

By: _____

Name: Margaret Sakai

Title: Director

**MAGNACHIP SEMICONDUCTOR SA
HOLDINGS LLC**, a Delaware limited liability
company, as Subsidiary Guarantor (SOLELY
WITH RESPECT TO SECTIONS II AND III OF
THIS AMENDMENT)

By: _____

Name: Margaret Sakai

Title: CFO

**MAGNACHIP SEMICONDUCTOR, INC.**, a
company organized under the laws of Japan,
as Subsidiary Guarantor

By: _____

Name: Margaret Sakai

Title: Director

**MAGNACHIP SEMICONDUCTOR B.V.**,
a company organized under the laws of
Netherlands, as Subsidiary Guarantor (SOLELY
WITH RESPECT TO SECTIONS II AND III OF
THIS AMENDMENT)

By: _____

Name: Margaret Sakai

Title: CFO

**MAGNACHIP SEMICONDUCTOR, LTD.**, a
company organized under the laws of Korea,
as Subsidiary Guarantor

MAGNACHIP SEMICONDUCTOR,LTD.

By: _____

Name: _____

Title: SANG PARK PRESIDENT DIRECTOR and CEO

**MAGNACHIP SEMICONDUCTOR
LIMITED**, a company organized under the laws
of Hong Kong,
as Subsidiary Guarantor

By: _____

Name: _____ *Margaret Sakai*

Title: _____ *Director*

**UBS AG, STAMFORD BRANCH,**
as Agent

By: _____

Name: _____

Title: _____

Marie A. Haddad
Associate Director
Banking Products
Services. US

Irja R. Otsa
Associate Director
Banking Products
Services. US

**SOLELY WITH RESPECT TO SECTIONS I AND III OF THIS AMENDMENT:**

**KTB 2007 PRIVATE EQUITY FUND,**
as Buyer

서울·강남구 역삼동 826-14 케이티비네트워크빌딩

By: 케이티비어쎈철사모투자전문회사

Name:

Title: 대표사원 케이티비투자증권주식회사

**SOLELY WITH RESPECT TO SECTIONS I AND III OF THIS AMENDMENT:**

**KOREA EXCHANGE BANK**
as Escrow Agent

By: _____

Name: _Ch, hwa - won_

Title: _Senior Manager_

**SOLELY WITH RESPECT TO SECTIONS II AND III OF THIS AMENDMENT:**

**U.S. BANK NATIONAL ASSOCIATION**
as Collateral Trustee

By: _____
Name:    Thomas E. Tabor
Title:    Vice President