# **EXHIBIT B**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MAGNACHIP SEMICONDUCTOR FINANCE | ) | Case No. 09-12008 (PJW) |
| COMPANY, *et al.*,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

---

## AMENDED DISCLOSURE STATEMENT IN RESPECT OF CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MAGNACHIP SEMICONDUCTOR FINANCE COMPANY, *ET AL.*

---

## IMPORTANT DATES

- Date by which ballots must be received:  September 21, 2009 at 4:00 p.m. (prevailing Eastern time)

- Date by which objections to Confirmation of the Committee's Plan must be filed and served: September 21, 2009 at 4:00 p.m. (prevailing Eastern time)

- Hearing on Confirmation of the Committee's Plan:  September 25, 2009 at 10:00 a.m. (prevailing Eastern time)

Dated:  September 11, 2009

| | | |
|---|---|---|
| **DRINKER BIDDLE & REATH LLP** | - and - | **LOWENSTEIN SANDLER PC** |
| Howard A. Cohen, Esq. | | Kenneth A. Rosen, Esq. |
| 1100 N. Market Street | | John K. Sherwood, Esq. |
| Wilmington, DE 19801-1254 | | 65 Livingston Avenue |
| Tel: (302) 467-4213 | | Roseland, New Jersey 07068 |
| Fax: (302) 467-4201 | | Tel: (973) 597-2500 |
| | | Fax: (973) 597-2400 |

*Co-Counsel to the Official Committee of Unsecured Creditors*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, and their respective addresses, are:  MagnaChip Semiconductor Finance Company (4144), 787 N. Mary Avenue, Sunnyvale, CA 94085; MagnaChip Semiconductor LLC (5772), 787 N. Mary Avenue, Sunnyvale, CA 94085; MagnaChip Semiconductor SA Holdings LLC, 787 N. Mary Avenue, Sunnyvale, CA 94085; MagnaChip Semiconductor, Inc. (8632), 787 N. Mary Avenue, Sunnyvale, CA 94085; MagnaChip Semiconductor S.A. (9734), 74 Rue de Merl, B.P. 709, L-2017 Luxembourg; and MagnaChip Semiconductor B.V. (9827), 1043 BW Amsterdam, Naritaweg 165, the Netherlands.

## Table of Contents

**Page**

I. PREFATORY STATEMENT AND DEFINITIONS .................................................................1

II. INTRODUCTION AND OVERVIEW ...........................................................................2

    A.       Introduction ...............................................................................................2

    B.       Disclaimers ...............................................................................................2

    C.       An Overview of the Chapter 11 Process .................................................3

    D.       Overview of the Committee's Plan ..........................................................4

           1.      Unclassified Claims .....................................................................6

           2.      Classified Claims .........................................................................7

    E.       Voting on the Committee's Plan .............................................................11

           1.      Who May Vote. .............................................................................11

           2.      How to Vote. ................................................................................11

    F.       Confirmation of the Committee's Plan ...................................................12

           1.      Generally. .....................................................................................12

           2.      Objections to Confirmation. ........................................................12

           3.      Hearing on Confirmation. ............................................................13

III. HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTORS ..............................13

    A.       Description of the Debtors .......................................................................13

    B.       The Debtors' Corporate Structure and Financial Performance ..............14

    C.       The Debtors' Principal Indebtedness ......................................................15

    D.       Need for Bankruptcy Relief .....................................................................16

    E.       First Day Motions and Other Post-Petition Activities ...........................17

           1.      Joint Administration. ....................................................................17

            2.      Employee Benefits. ......................................................................17

            3.      Cash Management. .......................................................................18

            4.      Utilities. .......................................................................................18

            5.      Interim Compensation for Professionals. ....................................18

            6.      Lease Rejection. ...........................................................................19

            7.      Retention of Key Professionals. ..................................................19

            8.      Cash Collateral Use. ....................................................................19

            9.      Adversary Proceeding ..................................................................20

F.    Bar Date for Filing Proofs of Claim and Administrative Proofs of Claims...........20

G.    Filing of Statements and Schedules .................................................................20

H.    The Debtors' Plan ...........................................................................................20

I.    The Committee's Plan ......................................................................................22

IV. DESCRIPTION OF THE Committee's PLAN .........................................................22

A.    Summary of the Committee's Plan ..................................................................23

B.    Treatment of Administrative Expenses and Tax Claims ......................................23

    1.    Overview. ..............................................................................................23

    2.    Administrative Expenses. .........................................................................23

    3.    Superpriority Claims. ..............................................................................24

    4.    Tax Claims. ...........................................................................................24

C.    Classification and Treatment of Classified Claims and Interests..........................24

    1.    Overview. ..............................................................................................24

    2.    Classification and Treatment of Claims and Interests.............................25

        a.    Class 1 (A-F) – Priority Non-Tax Claims ....................................25

        b.    Class 2 (A-F) – Other Secured Claims ........................................25

        c.    Class 3 (A-F) – First Lien Lender Secured Claims.......................26

        d.    Classes 4 (A-F) – Second Lien Noteholder Claims .....................27

        e.    Class 5 (A–F) - General Unsecured Claims.................................28

        f.    Class 6 (A–F) - Subordinated Note Claims .................................28

        g.    Class 7 (A–F) - Intercompany Claims against the Debtors ...........29

        h.    Class 8 (A–F) - Interests in the Debtors......................................30

D.    Treatment of Executory Contracts and Unexpired Leases....................................30

    1.    Assumption and Rejection of Executory Contracts and Unexpired
          Leases....................................................................................................30

    2.    Objections to Assumption of Executory Contracts and Unexpired
          Leases....................................................................................................31

        a.    Objection Procedure Generally. ..................................................31

        b.    Objection Based on Grounds Other Than "Cure" Amount...........31

        c.    Objection Based on "Cure" Amount............................................31

    3.    Payment Related to Assumption of Executory Contracts and
          Unexpired Leases....................................................................................31

    4.    Bar Date for Rejection Damages. .............................................................32

E.     Plan Provisions Regarding Distribution..............................................................32

    1.    Dates of Distribution...........................................................................32

    2.    Cash Distributions..............................................................................32

    3.    Rounding of Payments.........................................................................32

    4.    Disputed Claims..................................................................................32

    5.    Undeliverable and Unclaimed Distributions........................................33

    6.    Compliance With Tax Requirements. ...................................................33

    7.    Record Date in Respect to Distributions..............................................34

    8.    Conditions to Receiving Distributions.................................................34

    9.    Surrender of Instruments.....................................................................34

F.     Plan Provisions Regarding Litigation, Objections to Claims, and Determination of Taxes..................................................................................35

    1.    Litigation; Objections to Claims; Objection Deadline..........................35

    2.    Temporary or Permanent Resolution of Disputed Claims. ...................35

    3.    Release of Avoidance Actions..............................................................36

    4.    Preservation of Retained Rights of Action...........................................36

V. ACCEPTANCE OR REJECTION OF the committee's PLAN..........................................36

    A.    Classes Permitted and Not Permitted to Vote ......................................36

    B.    Nonconsensual Confirmation...............................................................37

VI. MEANS FOR IMPLEMENTATION OF THE Committee's PLAN....................................37

    A.    Restructuring and Other Transactions...................................................37

    1.    Intercompany Claims and Interests in Subsidiaries.................................37

    2.    Cancellation of Existing Securities and Agreements..............................37

    3.    Issuance of New Common Units, Warrants and Subscription Rights........38

    4.    Incurrence of New Indebtedness..........................................................38

    B.    Release of Liens/Secured Lien Guaranties/Subordinated Note Guarantees..........39

    1.    Release of Liens..................................................................................39

    2.    Release of Second Lien Guarantees.....................................................39

    3.    Release of Subordinated Note Guarantees............................................39

    4.    Release and Discharge of Debtors .......................................................39

    5.    Release and Discharge of Non-Debtor Subsidiaries ...............................40

    C.    Continued Corporate Existence ...........................................................40

    A.    The Offering........................................................................................40

| | 1. | Issuance of Subscription Rights | 40 |
|---|---|---|---|
| | 2. | Subscription Period | 41 |
| | 3. | Subscription Purchase Price | 42 |
| | 4. | Exercise of Subscription Rights | 42 |
| | 5. | Offering Procedures | 42 |
| | 6. | Transfer Restriction: Revocation | 43 |
| | 7. | Offering Backstop | 43 |
| | 8. | Backstop Fees and Expenses/Backstop Units | 44 |
| | 9. | Distribution of the New Common Units | 45 |
| | 10. | Backstop Purchaser's Minimum Allocation | 45 |
| | 11. | Private Placement Exemption | 45 |
| | 12. | Disputed Claims | 45 |
| | 13. | Validity of Exercise of Subscription Rights | 45 |
| | 14. | Indemnification of Backstop Purchaser | 46 |
| D. | | Retained Rights of Action | 47 |
| E. | | Claims Objections | 47 |
| F. | | Corporate Governance | 48 |
| | 1. | General | 48 |
| | 2. | Postconfirmation Board | 48 |
| | 3. | Filing of Postconfirmation Organizational Documents | 48 |
| | 4. | Long-Term Incentive Plan | 48 |
| G. | | Exemption from Securities Laws | 48 |
| H. | | Issuance and Resale of New Securities Under the Committee's Plan | 49 |
| I. | | Registration Rights Agreement | 49 |
| J. | | Interests in Affiliates and Subsidiaries | 50 |
| K. | | Payment of Plan Expenses | 50 |
| L. | | Dissolution of the Creditors' Committee | 50 |
| M. | | Actions in Korea | 50 |
| VII. EFFECT OF CONFIRMATION AND RELATED PROVISIONS | | | 50 |
| A. | | Effect of Confirmation | 50 |
| | 1. | Binding Effect of Plan. | 50 |
| B. | | Injunction | 51 |
| | 1. | Generally | 51 |

2.      Injunction Related to Rights of Action and Terminated Claims, Administrative Expenses or Interests................................................51

C.      Exculpation ................................................................................52

D.      Debtor Release ...........................................................................52

E.      Third-Party Release ...................................................................52

F.      Subsequent Discovery of Facts Does Not Affect Enforceability of Releases...................................................................................53

VIII. REQUIREMENTS FOR CONFIRMATION..................................................53

A.      Acceptances Necessary to Confirm Plan ...................................53

B.      Best Interest of Creditors Test....................................................54

1.      Chapter 7. ..........................................................................54

2.      Liquidation Alternative. ....................................................55

C.      Feasibility of Plan .....................................................................55

D.      Classification.............................................................................55

E.      Confirmation of the Committee's Plan Without Necessary Acceptances; Cramdown ..................................................................................56

1.      No Unfair Discrimination. .................................................56

2.      Fair and Equitable Test. .....................................................57

a.      Secured Claims ......................................................57

b.      Unsecured Claims ..................................................57

c.      Equity Interests ......................................................57

IX. EFFECT OF CONFIRMATION..................................................................57

A.      Binding Effect of Confirmation .................................................57

B.      Good Faith .................................................................................58

C.      No Limitations on Effect of Confirmation..................................58

X. RISK FACTORS......................................................................................58

A.      Certain Federal Income Tax Consequences of the Committee's Plan ....58

1.      Consequences to Debtors....................................................59

3.      United States Holders of Claims..........................................60

4.      Non-United States Persons .................................................63

8.      Importance of Obtaining Professional Tax Assistance ............67

XI. ALTERNATIVES TO COMMITTEE'S PLAN ...............................................67

A.      Alternative Plan ........................................................................67

B.     Liquidation Under Chapter 7 ................................................................68

C.     Dismissal ................................................................................................68

D.     No Res Judicata Effect .........................................................................68

XII. CONFIRMATION REQUEST ...........................................................................69

XIII. CONCLUSION ...............................................................................................70

**Exhibits**

| Exhibit | Description |
|---|---|
| A | Defined Terms |
| B | Liquidation Analysis |
| C | Chart Summarizing Treatment of Claims |
| D | Plan Feasibility |

# I.
## PREFATORY STATEMENT AND DEFINITIONS

Pursuant to Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101, *et seq.* (the "Bankruptcy Code"), the Official Committee of Unsecured Creditors (the "Creditors' Committee") of MagnaChip Semiconductor Finance Company; MagnaChip Semiconductor LLC; MagnaChip Semiconductor SA Holdings LLC; MagnaChip Semiconductor, Inc.; MagnaChip Semiconductor S.A.; and MagnaChip Semiconductor B.V. (collectively, the "Debtors"), hereby submits this disclosure statement (the "Committee's Disclosure Statement") in support of the *Chapter 11 Plan of Reorganization Proposed by the Official Committee of Unsecured Creditors of MagnaChip Semiconductor Finance Company, et al.* (the "Committee's Plan"). The definitions contained in the Bankruptcy Code are incorporated herein by this reference. The definitions set forth in the Committee's Plan shall also apply to capitalized terms used herein that are not otherwise defined.

On June 29, 2009, the Debtors filed the *Joint Chapter 11 Plan of Liquidation Proposed by MagnaChip Semiconductor Finance Company, et al. and UBS AG, Stamford Branch, As Creditor Agreement Agent and Priority Lien Collateral Agent* (the "Debtors' Plan"). On the same date, the Debtors filed the *Disclosure Statement in Respect of Joint Chapter 11 Plan of Liquidation Proposed by MagnaChip Semiconductor Finance Company, et al. and UBS AG, Stamford Branch, As Creditor Agreement Agent and Priority Lien Collateral Agent* (the "Debtors' Disclosure Statement"). The Debtors' Plan provides for the satisfaction of Claims against the Debtors and the enforcement of the First Lien Lender Secured Claims through (a) the authorization by the Debtors of the sale of substantially all of the assets of the Selling Non-Debtors, which are direct or indirect foreign subsidiaries of the Debtors, and (b) the sale of substantially all of the assets of Debtor MSA, certain assets of Debtor Luxco, and the assignment of certain non-disclosure agreements and other contracts hereto owned by LLC through the Debtors' Plan. Pursuant to the terms of the Debtors' Plan, the Sale Proceeds, together with the Debtors' available Cash as of the Effective Date, are to be used to satisfy Claims, Plan Expenses and Case Expenses as provided under the Debtors' Plan. On July 24, 2009, the Creditors' Committee filed an objection to the approval of the Debtors' Disclosure Statement based upon, among other things, the Creditors' Committee's belief that the total enterprise value of the Debtors' estate and the Assets of the Selling Non-Debtors justifies a return to general unsecured creditors far in excess of that provided under the Debtors' Plan. On July 31, 2009, the Bankruptcy Court approved the Debtors' Disclosure Statement but also indicated that it was prepared to terminate the Debtors' exclusive period to file a plan in order to enable the Creditors' Committee to file a competing plan. On August 3, 2009, the Debtors' exclusive period in which to file a plan was terminated as to the Creditors' Committee only.

By the Committee's Plan, the Creditors' Committee seeks to reorganize the Debtors' operations and provide for the satisfaction of Claims against the Debtors through (a) the issuance of a New Term Loan and payment of Cash in full and complete satisfaction of the First Lien Lender Claims, (b) the conversion of the Second Lien Noteholder Claims and Subordinated Note Claims to the Second Lien Noteholder Distribution and Subordinated Note Distribution, respectively, and (c) the Offering. **The Creditors' Committee believes that recoveries to all creditors under the Committee's Plan substantially exceed the recoveries to creditors under the Debtors' Plan.**

1

## II.
## INTRODUCTION AND OVERVIEW

### A.    Introduction

On June 12, 2009 (the "Petition Date"), the Debtors commenced the above-referenced bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions under Chapter 11 of the Bankruptcy Code.

This Disclosure Statement (the "Committee's Disclosure Statement"), submitted in accordance with section 1125 of the Bankruptcy Code, contains information regarding the Committee's Plan proposed by the Creditors' Committee (the "Plan Proponent").  The Committee's Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Committee's Plan.

The Committee's Disclosure Statement contains information concerning, among other matters:  (1) the Debtors' background, (2) the assets available for distribution under the Committee's Plan, (3) a summary of the Committee's Plan, and (4) a summary of the Debtors' Plan.  The Plan Proponent strongly urges you to review carefully the contents of the Committee's Disclosure Statement, the Committee's Plan (including any exhibits to each), and the Debtors' Plan before making a decision to accept or reject the Committee's Plan.  Particular attention should be paid to the provisions affecting or impairing your rights as a creditor.

On August 31, 2009 the Bankruptcy Court entered an order (the "Disclosure Statement Order") approving this Disclosure Statement as containing sufficient information to enable a hypothetical reasonable investor to make an informed judgment about the Committee's Plan. Under section 1125 of the Bankruptcy Code, this approval enabled the Creditors' Committee to send you this Disclosure Statement and solicit your acceptance of the Committee's Plan.  The Bankruptcy Court has not passed on the Committee's Plan itself or conducted a detailed investigation into the contents of this Disclosure Statement.

Your vote on the Committee's Plan is important.  Absent acceptance of the Committee's Plan, the Debtors will likely be liquidated pursuant to a chapter 7 liquidation or sold in exchange for minimal value pursuant to the Debtors' Plan.  These alternatives will not provide for distribution of as much value to Holders of Allowed Claims as does the Committee's Plan. Accordingly, the Creditors' Committee urges you to accept the Committee's Plan by completing and returning the enclosed ballot(s) no later than September 21, 2009 at 4:00 p.m. prevailing Eastern Time.

### B.    Disclaimers

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE CREDITORS' COMMITTEE'S PLAN.  PLEASE READ THIS DOCUMENT WITH CARE.  THE PURPOSE OF THE COMMITTEE'S DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF THE DEBTORS' BOOKS AND RECORDS, THAT

WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE COMMITTEE'S PLAN. *SEE* 11 U.S.C. § 1125(a).

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE COMMITTEE'S PLAN, BUT THE COMMITTEE'S PLAN ITSELF QUALIFIES ANY SUMMARY.  IF ANY INCONSISTENCY EXISTS BETWEEN THE COMMITTEE'S PLAN AND THE COMMITTEE'S DISCLOSURE STATEMENT, THE TERMS OF THE COMMITTEE'S PLAN ARE CONTROLLING.

ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THE COMMITTEE'S DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED.  MOREOVER, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE DEBTORS' FINANCIAL MATTERS, THE BOOKS AND RECORDS OF THE DEBTORS, UPON WHICH THIS DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE OR INACCURATE.  HOWEVER, REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

LOWENSTEIN SANDLER PC ("LOWENSTEIN") IS GENERAL INSOLVENCY COUNSEL TO THE CREDITORS' COMMITTEE.  LOWENSTEIN HAS RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT AND HAS NOT INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE.  EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

## C.    <u>An Overview of the Chapter 11 Process</u>

Chapter 11 of the Bankruptcy Code contains numerous provisions, the general effect of which is to provide the debtor with "breathing space" within which to propose a restructuring of its obligations to third parties.  The filing of a chapter 11 bankruptcy petition creates a bankruptcy "estate" comprising all of the property interests of the debtor.  Unless a trustee is appointed by the Bankruptcy Court for cause (no trustee has been appointed in these Chapter 11 Cases), a debtor remains in possession and control of all its assets as a "debtor in possession." The debtor may continue to operate its business in the ordinary course on a day-to-day basis without Bankruptcy Court approval.  Bankruptcy Court approval is only required for various enumerated kinds of transactions (such as certain financing transactions) and transactions out of the ordinary course of a debtor's business.  The filing of the bankruptcy petition gives rise to

what is known as the "automatic stay," which generally enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a Chapter 11 case.

The Bankruptcy Code authorizes the creation of one or more official committees to protect the interests of some or all creditors or interest holders. The fees and expenses of counsel and other professionals employed by such official committees and approved by the Bankruptcy Court are generally borne by a bankruptcy estate.

A chapter 11 debtor emerges from bankruptcy by successfully confirming a plan of reorganization, such as the Committee's Plan. Alternatively, the assets of a debtor may be sold and the proceeds distributed to creditors through a plan of liquidation, such as the Debtors' Plan. A plan may be either consensual or nonconsensual and provide, among other things, for the treatment of the claims of creditors and interests of shareholders and holders of options or warrants. The provisions of the Debtors' Plan and the Committee's Plan are summarized below.

**D.**     <u>**Overview of the Committee's Plan**</u>

The following is a brief overview of the material provisions of the Committee's Plan and is qualified in its entirety by reference to the full text of the Committee's Plan. The Committee's Plan is a plan of reorganization (as discussed below).

The Committee's Plan provides for the satisfaction of Claims against the Debtors through (a) the issuance of a New Term Loan and payment of Cash in full and complete satisfaction of the First Lien Lender Claims, (b) the conversion of the Second Lien Noteholder Claims and Subordinated Note Claims to the Second Lien Noteholder Distribution and Subordinated Note Distribution, respectively, and (c) the Offering. Upon the Effective Date of the Committee's Plan, the liens of the First Lien Lender Parties and the Second Lien Noteholders shall be released and extinguished, and the Second Lien Guarantees in favor of the Second Lien Noteholders from the Non-Korean Guarantors and the Subordinated Note Guaranties in favor of the Holders of the Subordinated Note Claims shall be released. In addition, the Korean Guarantee will be released as of the Effective Date.

The Committee's Disclosure Statement contains a discussion of the Debtors' history, a summary of the Debtors' assets and liabilities, a summary of what Holders of Claims and Interests will receive under the Committee's Plan, a discussion of certain alternatives to the Committee's Plan, and a summary of the procedures and voting requirements necessary for confirmation of the Committee's Plan. The Committee's Disclosure Statement is intended to provide Holders of Claims and Interests with information sufficient to enable such Holders to vote on the Committee's Plan. *All Claim Holders entitled to vote on the Committee's Plan are encouraged to carefully read the Disclosure Statement and the Committee's Plan before voting to accept or reject the Committee's Plan. No solicitation materials, other than the Disclosure Statement and related materials transmitted herewith and approved by the Bankruptcy Court, have been authorized for use in soliciting acceptance or rejection of the Committee's Plan.*

Taken together, the Committee's Plan proposes to fairly and efficiently reorganize the Debtors' operations in a manner that will allow these cases to be promptly resolved.

The Committee's Plan provides for the classification and treatment of Claims against and Interests in the Debtors. The Committee's Plan designates seven Classes of Claims and one Class of Interests. These Classes and plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests. Pursuant to the Committee's Plan, the Debtors will be reorganized and all existing Interests in the Debtors will be extinguished and cancelled.

## Summary of Classification and Treatment
## of Claims and Interests Under the Committee's Plan

The following chart briefly summarizes the treatment of Creditors and Interest Holders under the Committee's Plan.[2] Amounts listed below are estimated. Actual Claims and distributions will vary depending upon, among other things, recoveries on Distributable Assets.

---

[2] This chart is merely a summary of the classification and treatment of Claims and Interests under the Committee's Plan. References should be made to the entire Disclosure Statement and the Committee's Plan for a complete description of the classification and treatment of Claims and Interests.

### 1. Unclassified Claims

| Class No. | Description | Estimate of Claim Amounts Ultimately Allowable | Treatment |
|---|---|---|---|
| N/A | Administrative Expenses<br><br>Estimated Recovery: 100% | $4,700,000[3] (or such other amount as is necessary to pay accrued but unpaid professional fees that are approved by the Bankruptcy Court in full) | Each Holder of an Allowed Administrative Expense that has filed a timely request for payment shall receive payment in full in cash on the Effective Date unless otherwise agreed by such Holder and the Debtors. Certain different and additional requirements shall apply to Fee Claims as set forth in Article XIV(B)(2) of the Committee's Plan. |
| N/A | Superpriority Claims<br><br>Estimated Recovery: N/A | $0 million | No distribution to the First Lien Lender Parties shall be made on account of any Superpriority Claims except as set forth in Article IV(B)(3) of the Committee's Plan. |
| N/A | Tax Claims<br><br>Estimated Recovery: 100% | $0 million | Each Holder of an Allowed Tax Claim against any of the Debtors that is due and payable as of the Effective Date shall receive, at the sole option of the Debtors or the Reorganized Debtors, (i) on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to such Allowed Tax Claim or, (ii) commencing on the Effective Date, or as soon thereafter as is practicable, and continuing over a period not exceeding five (5) years from and after the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Tax Claim, together with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law as of the calendar month in which the Plan is confirmed, subject to the sole option of the Debtors or Reorganized Debtors to prepay the entire amount of the Allowed Tax Claim.<br><br>Any Allowed Tax Claim (or portion thereof) not yet due and payable as of the Effective Date will be paid by the Reorganized Debtors in the ordinary course of business as such obligations become due. Any Holder of an Allowed Tax Claim may agree to accept different treatment as to which the Debtors and such Holder have agreed upon in writing.<br><br>Upon request of any of the Debtors, the Bankruptcy Court shall determine the amount of any Disputed Claim for, or issues pertaining to, Tax Claims. |

---

[3] This number assumes no Fee Claims are paid during the Case. Inasmuch as it is expected that some fees will be paid through the interim compensation procedures that have been requested, this number will likely be much lower. The Administrative Expenses are estimated as follows: (i) $2.2 million for Debtors' professional fees and expenses; (ii) $1.5 million for Creditors' Committee professional fees and expenses; (iii) $500,000 for the Backstop Purchaser's fees and expenses, and (iv) $500,000 for miscellaneous fees and expenses.

## 2. Classified Claims

| Class No. | Description | Estimate of Claim Amounts Ultimately Allowable | Treatment |
|---|---|---|---|
| 1 | Class 1 (A-F) Priority Non-Tax Claims<br><br>Estimated Recovery: 100% | $0 | The Holder of each Priority Non-Tax Claim shall receive, in full satisfaction, settlement and release of such Priority Non-Tax Claim, a Cash payment equal to the Allowed amount of such Claim on or as soon as practicable after the later of the Effective Date or the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim. Any Holder of a Priority Non-Tax Claim may agree to accept different treatment as to which the Debtors and such Holder have agreed upon in writing. |
| 2 | Class 2 (A-F) Other Secured Claims<br><br>Estimated Recovery: 100% | $0 | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, at the sole option of the Debtors or the Reorganized Debtors, (i) on the Effective Date or as soon thereafter as is practicable, each Allowed Other Secured Claim shall be reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable. |

| Class No. | Description | Estimate of Claim Amounts Ultimately Allowable | Treatment |
|---|---|---|---|
| 3 | Class 3 (A-F) First Lien Lender Claims<br><br>Estimated Recovery: 70%- 100% | $95 million | On the Effective Date, in connection with the enforcement of the First Lien Lender Secured Claims, each First Lien Lender Party shall receive, at the election of each First Lien Lender Party, (i) a Cash payment equal to 72% of its First Lien Lender Secured Claim in full and complete satisfaction of such First Lien Lender Secured Claim ("Treatment A"), or (ii) a Cash payment equal to 35% of its First Lien Lender Secured Claim and its Pro Rata share of the New Term Loan in full and complete satisfaction of such First Lien Lender Secured Claim ("Treatment B"). All distributions to the First Lien Lender Parties under the Committee's Plan shall be effectuated through the Agent. In consideration for the distributions the First Lien Lender Parties are to receive hereunder, the Liens securing the First Lien Lender Secured Claims will be released and extinguished as of the Effective Date in accordance with section 5.1(a)(2) of the Intercreditor Agreement and of no further force or effect. As security for the New Term Loan, the First Lien Lenders shall receive a first lien on substantially all assets of the Reorganized Debtors and the Non-Debtor Subsidiaries. The First Lien Lender Secured Claims, together with any Deficiency Claims of the First Lien Lender Parties, are deemed Allowed in the full amount reflected on the Agent's books and records as of the Record Date. For Holders of First Lien Secured Claims that elect Treatment A, the existing Liens and the First Lien Guarantee securing such First Lien Lender Secured Claims shall be released and extinguished effective as of the Effective Date and of no further force or effect pursuant to the First Lien Credit Agreement. For Holders of First Lien Secured Claims that elect Treatment B, the existing Liens and the First Lien Guarantee securing such First Lien Lender Secured Claims shall not be released and will be subject to the injunction as described in Article X of the Committee's Plan. |

| Class No. | Description | Estimate of Claim Amounts Ultimately Allowable | Treatment |
|---|---|---|---|
| 4 | Class 4 (A-F) Second Lien Noteholder Claims<br><br>Estimated Recovery: 2% (plus the right to participate in the Offering) | $500 million | On the Effective Date, in full and complete satisfaction of its Second Lien Noteholder Claim, (i) each Second Lien Noteholder shall receive its Pro Rata share of 5% of the New Common Units, subject to dilution on account of the Long-Term Incentive Plan, and (ii) each Eligible Holder of a Second Lien Noteholder Claim shall be entitled to participate in the Offering pursuant to the terms of the Offering Procedures. However, to the extent that the Offering Participants do not exercise the Subscription Rights by the Subscription Expiration Date, the Backstop Purchaser, subject to the terms and conditions of the Backstop Commitment Agreement, shall subscribe for and purchase all Unsubscribed Units as of the Subscription Expiration Date.<br><br>Notwithstanding anything contained in the Committee's Plan, as described above, only Accredited Investors that are holders of Second Lien Noteholder Claims will be entitled to participate in the Offering. No payment in lieu of the Subscription Rights will be made to any holder of a Second Lien Noteholder Claim that is not an Accredited Investor and therefore unable to subscribe for New Common Units pursuant to the Offering.<br><br>Notwithstanding the foregoing, the Reorganized Debtors shall pay, on or as soon as reasonably practicable after the Effective Date, all Indenture Trustee Fees and Expenses arising under the Second Lien Notes Indenture, in full in Cash, without application to or approval of the Bankruptcy Court. All distributions to the Second Lien Noteholders under the Committee's Plan, except in connection with the Offering, shall be effectuated though the Second Lien Noteholder Trustee (*i.e.*, the Reorganized Debtors shall distribute the portion of the New Common Units payable to the Second Lien Noteholders to the Second Lien Noteholder Trustee and the Second Lien Noteholder Trustee shall make proportionate distributions thereof to the Second Lien Noteholders). Pursuant to section 5.1(a)(2) of the Intercreditor Agreement, the existing Liens securing the Second Lien Noteholder Claims shall be released and extinguished effective as of the Effective Date and of no further force or effect. Notwithstanding any subordination or intercreditor agreement applicable under nonbankruptcy law, the Holders of Second Lien Noteholder Claims shall receive the Second Lien Noteholder Distribution as described herein. In addition, the distributions to Holders of Second Lien Noteholder Claims and the surrender of Second Lien Notes to the Second Lien Noteholder Trustee, as described in Article VIII.I of the Committee's Plan, shall constitute a defeasance, satisfaction and discharge of the Second Lien Indenture section 12.05(d) of the Second Lien Indenture. |

| Class No. | Description | Estimate of Claim Amounts Ultimately Allowable | Treatment |
|---|---|---|---|
| 5 | Class 5 (A-F) General Unsecured Claims<br><br>Estimated Recovery: 10% | $3.238 million | The Holder of each Class 5 (A-F) Claim shall receive, as a gift from the Holders of Second Lien Noteholder Claims, in full satisfaction, settlement and release of such Class 5 (A-F) Claim, a Cash payment equal to 10% of the Allowed amount of such Claim on or as soon as practicable after the later of the Effective Date or the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim; provided, however, that the aggregate Cash payments to Holders of Class 5 (A-F) Claims shall not exceed $324,000. Any Holder of a Class 5 (A-F) Claim may agree to accept different treatment as to which the Debtors and such Holder have agreed upon in writing. |
| 6 | Class 6 (D and F) Subordinated Debt Claims<br><br>Estimated Recovery: 0.8% | $250 million | On the Effective Date, in connection with the enforcement of the Subordinated Note Claims, each Subordinated Noteholder shall receive, as a gift from the Second Lien Noteholders, (i) its Pro Rata share of 1% of the New Common Units, subject to dilution on account of the Long-Term Incentive Plan, and (ii) warrants to purchase 5% of the New Common Units with a strike price equivalent to a $600 million total enterprise value, in full and complete satisfaction of such Subordinated Noteholder Claim.<br><br>Notwithstanding the foregoing, the Reorganized Debtors shall pay, on or as soon as reasonably practicable after the Effective Date, all Indenture Trustee Fees and Expenses arising under the Subordinated Notes Indenture, in full in Cash, without application to or approval of the Bankruptcy Court. Notwithstanding any subordination or intercreditor agreement applicable under nonbankruptcy law, the Holders of Subordinated Note Claims shall receive the Subordinated Note Distribution as described herein as a gift from the Second Lien Noteholders. In addition, the distributions to holders of Subordinated Note Claims and the surrender of Subordinated Notes to the Subordinated Note Trustee, as described in Article VIII.I herein, shall constitute a defeasance, satisfaction and discharge of the Subordinated Note Indenture under section 12.05(d) of the Subordinated Note Indenture. |
| 7 | Class 7 (A-F) Intercompany Claims<br><br>Estimated Recovery: 100% | N/A | Notwithstanding anything to the contrary herein, Intercompany Claims, at the election of the Reorganized Debtors, shall be (i) adjusted, released, waived and/or discharged as of the Effective Date, (ii) contributed to the capital of the obligor, or (iii) reinstated and left Unimpaired. |
| 8 | Class 8 (A-F) Interests in the Debtors<br><br>Estimated Recovery: 0% | N/A | Holders of Interests in the Debtors shall receive no distributions or recoveries on account of such Interests and Interests on account of LLC shall be extinguished on the Effective Date. Interests of each Debtor, other than LLC, will continue to exist and not be extinguished. |

### E. **Voting on the Committee's Plan**

#### 1. **Who May Vote.**

The Committee's Plan divides Allowed Claims and Interests into multiple Classes. Under the Bankruptcy Code, only Classes that are "impaired" by the Committee's Plan are entitled to vote (unless the Class receives no compensation or payment, in which event the Class is conclusively deemed not to have accepted the Committee's Plan). A Class is Impaired if legal, equitable, or contractual rights attaching to the Claims or Interests of the Class are modified, other than by curing defaults and reinstating maturities. Under the Committee's Plan, Administrative Claims, Superpriority Claims, and Priority Tax Claims are unclassified and are not entitled to vote. Classes 1 and 2 are unimpaired and are therefore conclusively presumed to have accepted the Committee's Plan pursuant to section 1126(f) and are not entitled to vote under the Committee's Plan. Classes 7 and 8 receive nothing under the Committee's Plan and are therefore conclusively presumed to have rejected the Committee's Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote under the Committee's Plan. Classes 3, 4, 5 and 6 are Impaired and entitled to vote to accept or reject the Committee's Plan. Only those votes cast by Holders of Allowed Claims shall be counted in determining whether a sufficient number of acceptances have been received to obtain Plan Confirmation.

#### 2. **How to Vote.**

All votes to accept or to reject the Committee's Plan must be cast by using the appropriate form of ballot. No votes other than ones using such ballots will be counted except to the extent ordered otherwise by the Bankruptcy Court. A form of ballot is being provided to Creditors in Classes 3, 4, 5 and 6 by which Creditors in such Classes may vote their acceptance or rejection of the Committee's Plan. The ballot for voting on the Committee's Plan gives Holders of Classes 3, 4, 5 and 6 Claims four options with respect to the Committee's Plan – you can vote (i) in favor of the Committee's Plan, (ii) in favor of the Debtors' Plan, (iii) in favor of both Plans, in which case you must indicate a preference, or (iv) to reject both Plans. To vote on the Committee's Plan, after carefully reviewing the Committee's Plan and this Disclosure Statement, please complete the ballot, as indicated thereon, (1) by indicating on the enclosed ballot which, if any, plan you approve, and if you approve both plans, which plan you prefer, and (2) by signing your name and mailing the ballot in the envelope provided for this purpose.

IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED, AND RECEIVED BY THE BALLOTING AGENT, OMNI MANAGEMENT GROUP, NO LATER THAN 4:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 21, 2009 AT THE FOLLOWING ADDRESS:

OMNI MANAGEMENT GROUP
16501 VENTURA BOULEVARD
SUITE 440
ENCINO, CA  94136-2088
ATTN:  BRIAN OSBOURNE

IF YOUR BALLOT IS NOT PROPERLY COMPLETED, SIGNED, AND RECEIVED AS DESCRIBED, IT WILL NOT BE COUNTED. IF YOUR BALLOT IS DAMAGED OR

LOST, YOU MAY REQUEST A REPLACEMENT BY MAKING A WRITTEN REQUEST TO THE ADDRESS SHOWN ABOVE. FACSIMILE OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE COUNTED.

## F.     __Confirmation of the Committee's Plan__

### 1.     Generally.

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation. The timing, standards, and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed in Article XIX below.

### 2.     Objections to Confirmation.

Any objections to Confirmation of the Committee's Plan must be in writing and must be filed with the clerk of the Bankruptcy Court and served on counsel for the Creditors' Committee, the Debtors and the United States Trustee on or before the date set forth in the notice of the Confirmation Hearing sent to you with this Disclosure Statement and the Committee's Plan. Bankruptcy Rule 3007 governs the form of any such objection.

Counsel on whom objections must be served are:

| __Co-Counsel for the Creditors' Committee:__ | __Counsel for the Debtors__: |
|---|---|
| Drinker Biddle & Reath LLP<br>Howard A. Cohen, Esq.<br>1100 N. Market Street<br>Wilmington, DE 19801-1254<br>Tel: (302) 467-4213<br>Fax: (302) 467-4201 | Pachulski Stang Ziehl & Jones LLP<br>Laura Davis Jones, Esquire<br>James O'Neil, Esquire<br>919 North Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, DE  19899-8705 (Courier 19801) |
| Lowenstein Sandler PC<br>Kenneth A. Rosen, Esq.<br>John K. Sherwood, Esq.<br>65 Livingston Avenue<br>Roseland, New Jersey 07068<br>Telephone: (973) 597-2538<br>Facsimile: (973) 597-2539 | Pachulski Stang Ziehl & Jones LLP<br>Richard Pachulski, Esquire<br>Debra Grassgreen, Esquire<br>Joshua M. Fried, Esquire<br>10100 Santa Monica Boulevard, 11th Floor<br>Los Angeles,  CA 90067 |

__United States Trustee:__

Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Suite 2207
Lockbox 35
Wilmington, DE  19801
Attn:  Mark Kenney, Esquire

### 3. Hearing on Confirmation.

The Bankruptcy Court has set September 25, 2009 for a hearing (the "Confirmation Hearing") to determine whether the Committee's Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Committee's Plan have been satisfied. The Confirmation Hearing will be held in Courtroom 2, Wilmington, DE 19801, before the Honorable Judge Walsh, United States Bankruptcy Judge. The Confirmation Hearing may be continued from time to time and day to day without further notice. If the Bankruptcy Court confirms the Committee's Plan, it will enter the Confirmation Order.

### III.
### HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTORS

#### A. Description of the Debtors

The Debtors, along with their seven nondebtor affiliates (collectively, the "MagnaChip Entities" or "MagnaChip"), design and manufacture analog and mixed-signal semiconductor products for high-volume consumer applications, such as mobile phones, digital televisions, flat-panel displays, notebook computers and mobile multimedia devices. MagnaChip has a deep analog and mixed-signal semiconductor technology platform supported by their 29-year operating history, large portfolio of approximately 4,700 registered and pending patents, and extensive engineering and manufacturing process expertise. MagnaChip's wide variety of analog and mixed-signal semiconductor products and services, combined with their deep technology platform, allows them to address multiple high-growth end markets and to develop and introduce new products quickly.

MagnaChip's major manufacturing operations and design centers are located in Asia and provide the Debtors with close proximity to the global consumer electronics supply chain. MagnaChip also supplies and collaborates on product and technology development with leading innovators in the consumer electronics market. Some of MagnaChip's largest customers by revenue include LG Display Co., Ltd. ("LG Display"), Sharp Corporation ("Sharp"), and members of the Samsung Group ("Samsung"). MagnaChip sold over 2,635 distinct products to over 218 customers in the year ended December 31, 2008, with a substantial portion of revenues derived from a concentrated number of customers, including LG Display, Sharp and Samsung. MagnaChip's largest semiconductor manufacturing services customers include some of the fastest growing and leading semiconductor companies that design products for the consumer, computing, wireless, and industrial end markets.

Prior to the Petition Date, MagnaChip had thee main business lines: (1) Display Solutions, (2) Power Solutions, and (3) Semiconductor Manufacturing Services.

<u>Display Solutions Business</u>. The Display Solutions business offers flat-panel display drivers for a wide range of small to large panel displays used in digital televisions, mobile phones, LCD monitors, notebook computers, and mobile multimedia devices, such as handheld games. MagnaChip's products cover a broad range of interfaces, packages, and technologies, including active matrix organic light-emitting diode, low-temperature poly-crystalline silicon, and thin-film transistor technologies. Net sales from Display Solutions for the year ended

December 31, 2008, were $304.1 million, or approximately 45.6% of total net sales during this period.

Power Solutions Business. MagnaChip's Power Solutions business segment produces metal-oxide semiconductor field effect transistors (commonly called MOSFETs), analog switches, DC-DC converters, and linear regulators. The Power Solutions products are designed for consumer electronics applications such as mobile phones, LCD televisions, and desktop computers, and allow electronics manufacturers to achieve specific design goals of high efficiency and low standby-power consumption. MagnaChip commenced the Power Solutions business in November 2007 and expects to expand its power management product portfolio through the addition, for example, of more advanced DC-DC products. Net sales from Power Solutions for the year ended December 31, 2008, were $5.4 million, or approximately 0.8% of total net sales during this period.

Semiconductor Manufacturing Services. MagnaChip's Semiconductor Manufacturing Services business segment manufactures wafers for analog and mixed-signal semiconductor companies based on their design. The customers, most of which do not have their own manufacturing facilities, provide MagnaChip with their designs, and the company manufactures and sells the products to the customers based upon the designs. MagnaChip offers over 180 process flows to our manufacturing services customers, and often partners with key customers to jointly develop or customize specialized processes that enable customers to improve their products and allow MagnaChip to develop unique manufacturing expertise. Net sales from Semiconductor Manufacturing Services for the year ended December 31, 2008, were $287.1 million, or approximately 43.0% of total net sales during this period.

On October 6, 2008, MagnaChip announced the closure of a fourth business line, Imaging Solutions, except to provide support for existing customers. MagnaChip expects to continue manufacturing products for their customers until such products are discontinued or no longer sold by those customers, but expects to close the Imaging Solutions business segment in 2009. The Imaging Solutions segment produces image sensors for camera-equipped applications, such as mobile handsets, PCs, digital cameras, notebook computer, and security cameras. Net sales from the Imaging Solutions business segment for the year ended December 31, 2008, were $65.9 million, or approximately 9.9% of total net sales during this period.

## B. The Debtors' Corporate Structure and Financial Performance

The named Debtor for these Chapter 11 Cases is MagnaChip Semiconductor Finance Company ("Finco"). MagnaChip Semiconductor LLC ("LLC") is the parent company for all of the Debtors. MagnaChip's business was named "MagnaChip Semiconductor" when it was acquired from Hynix Semiconductor, Inc. ("Hynix") in October 2004 by Citigroup Venture Capital Equity Partners, L.P.; Francisco Partners, L.P.; certain investment funds advised by CVC Asia Pacific Limited or its affiliates; certain members of management; and other investors. As noted above, the Debtors and their nondebtor affiliates consist of thirteen separate entities incorporated and/or located in the United States, South Korea, Japan, Luxembourg, the Netherlands, Hong Kong, Taiwan, the United Kingdom, China, and the British Virgin Islands.

MagnaChip Semiconductor SA Holdings LLC ("Holdco") and MagnaChip Semiconductor, Inc. ("MSA") are each 100% owned by LLC. LLC owns 99% of MagnaChip Semiconductor S.A ("Luxco"), which is incorporated in Luxembourg. Holdco owns 1% of Luxco. Luxco, in turn, is the 100% owner of Finco and MagnaChip Semiconductor B.V. ("Dutchco"), which is incorporated in the Netherlands. In addition, Luxco owns, directly or indirectly through Dutchco, the seven nondebtor affiliates. Currently, all of the MagnaChip Entities' operations and manufacturing are done at MagnaChip Semiconductor, Ltd. (Korea) ("MSK"), while the MagnaChip Entities' design work is done at MSK and in Japan at MagnaChip Semiconductor Inc. (Japan). Dutchco owns 100% of the stock of MSK, which is incorporated in South Korea and which is not a debtor in these proceedings.

LLC currently has one class of outstanding convertible preferred Series B units (the "Series B Units"), of which 550,000 units were authorized and 93,997.4364 units are issued and outstanding as of the Petition Date, and one class of common units (the "Common Units") of which 65,000,000 units were authorized and 52,923,482.797 units were issued and outstanding as of the Petition Date. LLC's largest shareholders are Citigroup Venture Capital Equity Partners, L.P., and its respective affiliates (together, "CVC"); Francisco Partners, L.P., and its respective affiliates (together, "FP"); and CVC Capital Partners Asia Pacific II, L.P., and its respective affiliates (together, "CVC Asia"), who together own the majority of LLC's outstanding Common and Series B Units. CVC, FP and CVC Asia, own, respectively, approximately 34%, 34%, and 18% of the Common Units and 36%, 36%, and 19% of the Series B Units.

A significant portion of the MagnaChip Entities' sales are overseas, primarily in Korea and the Asia Pacific region. Approximately $510.4 million, or 76.5% of total net sales of the MagnaChip Entities for the year ended December 31, 2008, derived from Korea or the Asia Pacific region; approximately $80.8 million or 12.1% of net sales derived from Japan, and approximately $61.3 million, or 9.2%, of net sales derived from North America.

As of December 31, 2008, on an unaudited consolidated basis, MagnaChip reported total assets of approximately $425.4 million, including approximately $76.3 million in accounts receivable and $47.1 million in inventory, and $1,041 million in liabilities, which included $70.2 million in accounts payable and $750 million in the current portion of long-term debt, as discussed more fully below. For the 2008 fiscal year, the MagnaChip Entities, on an unaudited consolidated basis, reported net sales and losses of $601.7 million and $386.5 million, respectively.

## C.    The Debtors' Principal Indebtedness

As summarized below, the Debtors currently owe $845,000,000 in senior and junior secured debt and outstanding unsecured subordinated notes.

As of the Petition Date, the Debtors owed approximately $95,000,000 in First Lien Debt under the First Lien Credit Agreement.

As of the Petition Date, the Debtors have issued a total of approximately $500 million to the Second Lien Noteholders pursuant to the Second Lien Indenture.

The indebtedness owed to the First Lien Lenders (the "First Lien Debt") and the indebtedness owed to Second Lien Noteholders (the "Second Lien Noteholder Debt") are secured by substantially all of the Debtors' assets and the assets of MSK and certain other affiliates of the Debtors (the "Non-Korean Guarantors").

In addition to First Lien Debt and Second Lien Noteholder Debt, the Debtors owe approximately $250 million aggregate principal amount (the "Subordinated Notes") pursuant to the Subordinated Note Indenture.

In addition, the Debtors owe approximately $550,000 in trade debt and approximately $3,250,000 in other prepetition indebtedness.

## D.    **Need for Bankruptcy Relief**

MagnaChip was acquired in October 2004 in a leveraged buyout from Hynix, and in December 2004 refinanced its debt, issuing the $750 million in First Lien Debt, Second Lien Noteholder Debt, and Subordinated Notes.

Revenues decreased from 2005 to 2006 due to technology changes in the DRAM (dynamic random access memory) business that resulted in the phase-out of semiconductor manufacturing services performed for Hynix, and due to delays in new product development in MagnaChip's display and imaging businesses. The spin-off from Hynix resulted in a loss of core research talent that harmed MagnaChip's ability to win major customer projects.

From 2006 to 2007, revenues increased as MagnaChip divested an unprofitable division and brought in a new Chief Executive Officer, Sang Park. Mr. Park brought new focus on improving the development process, addressing quality issues, and increasing sales activities.

With improving revenues, MagnaChip made a decision in late 2007 to file for an initial public offering of its common stock, with an IPO target in the first quarter of 2008. However, declining customer demand due to an economic downturn, in particular slow sales of the LCD TVs and cell phones in which MagnaChip's products are used, and average selling price declines, all combined to cause a steep decline in MagnaChip's 2008 revenues, and MagnaChip began to experience cash shortfalls in the second fiscal quarter of 2008. MagnaChip attempted to remedy the shortfall through equity and debt financing, but the financial crisis that erupted in the U.S. markets expanded into a global economic recession, leading to a shutdown of equity markets and the delay of MagnaChip's IPO. MagnaChip was also unable to obtain debt financing.

MagnaChip experienced steep declines in revenues during 2008 due to contracting customer demand for MagnaChip's products and an overall deterioration in the global economic climate and markets in which MagnaChip operates. In addition, the current global economic recession led to a shut down of the capital markets, preventing MagnaChip from obtaining the necessary financing to continue their operations. The Imaging Solutions division was a substantial drain, historically, on earning and cash flow. The closure of this division and favorable exchange rates, coupled with cost cutting measures that may not be sustainable have greatly enhanced the financial prospects of the Company. The Committee believes that these actions, coupled with proceeds from the rights offering, will provide the Debtors the capital and

liquidity required to flourish. The Debtors believe that during the term of the Committee's Plan, they will need access to a revolving credit facility, particularly in light of unpredictable market conditions.

**E.**     <u>**First Day Motions and Other Post-Petition Activities**</u>

On the Petition Date, the Debtors sought approval from the Bankruptcy Court of certain motions and applications (collectively, the "First Day Motions"), which the Debtors filed simultaneously with, or around the same time as, their voluntary petitions. The Debtors sought this relief to minimize disruption of the Debtors' business operations as a result of the chapter 11 filing, to establish procedures in the Chapter 11 Cases regarding the administration of the Chapter 11 Cases and to facilitate reorganization efforts. Specifically, the First Day Motions and other critical motions during the Chapter 11 Cases addressed the following issues, among others:

    **1.**     **Joint Administration.**

On the Petition Date, the Debtors filed their *Debtors' Motion for Order Directing Joint Administration of Related Chapter 11 Cases* [Docket No. 2]. The six Debtors in these cases are affiliated entities. The Debtors' creditor matrices list approximately 800 potential creditors and parties in interest. The joint administration of the Debtors' Chapter 11 Cases permitted the clerk of the Bankruptcy Court to utilize a single general docket for these cases and combine notices to creditors of the Debtors' respective estates and other parties in interest, which resulted in significant savings to the estates.

On June 15, 2009, the Bankruptcy Court entered its order directing joint administration of these Chapter 11 Cases [Docket No. 22].

    **2.**     **Employee Benefits.**

On the Petition Date, the Debtors filed their *Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a), 363, and 507(a) for an Order Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation; (II) Remit Withholding Obligations; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests* [Docket No. 12] (the "Wages Motion").

As of the Petition Date, the Debtors employed approximately thirteen salaried employees. None of the Debtors' employees are subject to a collective bargaining agreement with the Debtors. The Wages Motion sought, among other things, to pay prepetition wages owed to the Debtors' employees, pay prepetition amounts owed in connection with certain employee benefits, and to continue to pay wages and administer employee benefits postpetition in the ordinary course of business.

On June 15, 2009, the Bankruptcy Court entered its order authorizing the payment of certain prepetition employee-related claims and the continuation of certain employee benefits on a postpetition basis [Docket No. 24].

3.     **Cash Management.**

On the Petition Date, the Debtors filed their *Motion of Debtors for Order Under 11 U.S.C. Sections 105, 363, 503(b), 1107 and 1108 Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management Systems, (IV) Providing Administrative Priority Status to Postpetition Intercompany Claims, and (V) Waiver of Section 345(b) Deposit and Investment Requirements* [Docket No. 4] (the "Cash Management Motion").

Prior to the commencement of these cases, certain of the Debtors, in the ordinary course of business, maintained bank accounts with various banks, including Wells Fargo and J.P. Morgan Chase. The Cash Management Motion sought to maintain the Debtors' existing cash management system and bank accounts in the ordinary course of business postpetition.

The Bankruptcy Court entered its interim order granting the relief requested by the Debtors in respect of their cash management system and related relief on June 15, 2009 [Docket No. 25]. On July 13, 2009, the Bankruptcy Court entered the final Order Granting Debtor's Request For Limited Waiver of Section 345(B) to Motion of Debtors for Order Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued use of Existing Cash Management Systems, (IV) Providing Administrative Priority Status to Postpetition Intercompany Claims, and (V) Waiver of Section 345(b) Deposit and Investment Requirements [Docket No. 117].

4.     **Utilities.**

On the Petition Date, the Debtors filed their *Motion of the Debtors for an Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment* [Docket No. 5].

On June 15, 2009, the Bankruptcy Court entered its interim order implementing the procedures proposed by the Debtors to ensure adequate assurance of future payment to utility service providers [Docket No. 26]. On July 9, 2009, the Bankruptcy Court entered the Final Order (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment [Docket No. 96].

5.     **Interim Compensation for Professionals.**

On the Petition Date, the Debtors filed their *Motion of the Debtors for an Administrative Order Establishing Procedures for Interim Monthly Compensation of Professionals* in order to obtain utility service during the pendency of the Debtors' Chapter 11 Cases [Docket No. 10].

The Debtor sought authority to implement procedures for the application, interim allowance, and payment of Professional Persons on a monthly basis. On July 9, 2009, the Bankruptcy Court entered the Administrative Order Establishing Procedures for Interim Compensation and Expense Reimbursement of Professionals and Committee Members [Docket No. 99].

6.     **Lease Rejection.**

On the Petition Date, the Debtors filed their *Motion for Order Under Sections 365(a) and 554(a) of the Bankruptcy Code Authorizing the Debtors to (1) Reject Unexpired Leases of Nonresidential Real Property Nunc Pro Tunc to the Petition Date, and (2) Abandon Any Personal Property Located at Such Premises* [Docket No. 13].  This motion seeks to reject certain nonresidential real property leases (the "Real Property Leases") that are no longer necessary for the Debtors' ordinary course business operations and have no value to the Debtors' estates.  The Debtors vacated and surrendered the premises leased under the Real Property Leases prior to the Petition Date, and the affected landlords were made aware of the Debtors' intent not to further occupy such premises.  On July 9, 2009, the Bankruptcy Court entered the Order Authorizing the Debtors to (1) Reject Unexpired Leases of Nonresidential Real Property Nunc Pro Tunc to the Petition Date, and (2) Abandon Any Personal Property Located at Such Premises  [Docket No. 100].

The Debtors also filed the:  (i) *Motion for Order Under Section 365 (a) of the Bankruptcy Code Authorizing the Debtors to Reject Executory Contracts Nunc Pro Tunc to Petition Date* [Docket No. 7].  This motion seeks to reject contracts that are no longer necessary to the Debtors' estates.  On July 9, 2009, the Bankruptcy Court entered the Order Authorizing the Debtors to Reject Executory Contracts Nunc Pro Tunc to Petition Date [Docket No. 97].

7.     **Retention of Key Professionals.**

The Debtors sought to employ and retain the firm of Pachulski Stang Ziehl & Jones LLP as their bankruptcy counsel with regard to the filing and prosecution of their Chapter 11 Cases.  On July 9, 2009, the Bankruptcy Court entered the Order Authorizing the Employment and Retention of Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date  [Docket No. 98].

8.     **Cash Collateral Use.**

On June 15, 2009, the Bankruptcy Court entered its Interim Order *(I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363 to First Lien Lenders and Second Lien Noteholders and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (b)* [Docket No. 27] (the "Cash Collateral Order").  The Cash Collateral Order authorized the Debtors, among other things, to use the cash collateral of the First Lien Lenders and Secured Lien Noteholders on an interim basis pursuant to the budget attached to the Cash Collateral Order.  On July 13, 2009, the Bankruptcy Court entered the Order (I) Authorizing Use Of Cash Collateral And (II) Granting Adequate Protection to First Lien Lenders and Second Lien Noteholders Appointment of Creditors' Committee [Docket No. 118].

On June 23, 2009, the Office of the United States Trustee appointed the official committee (the "Creditors' Committee") as the representative of the Debtors' general unsecured creditor constituency in these Chapter 11 Cases.  The Creditors' Committee is composed of: Avenue Special Situations Fund V, L.P., c/o Avenue Capital Management II, L.P.; Bank of New York Mellon; and Law Debenture Corporation.

9. **Adversary Proceeding**

On August 26, 2009, the Creditors' Committee initiated an adversary proceeding against the First Lien Lenders by filing a complaint (the "Complaint") seeking (i) extension of the automatic stay under section 362(a) of the Bankruptcy Code and/or (ii) injunctive relief under section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7065, to enjoin and restrain the Agent and the First Lien Lenders from pursuing any remedies against the Non-Debtor Subsidiaries without further order of the Bankruptcy Court.

F. **Bar Date for Filing Proofs of Claim and Administrative Proofs of Claims**

On June 12, 2009, the Debtors filed a motion requesting that the Bankruptcy Court set a deadline by which parties, including governmental units, must file proofs of claim (the "Bar Date Motion"). On June 25, 2009, the Bankruptcy Court entered an order granting the Bar Date Motion and fixed July 29, 2009, as the deadline for filing Claims with the Bankruptcy Court for any claims against the Debtors arising prior to the Petition Date (the "General Bar Date") and December 9, 2009, as the Governmental Units Bar Date. A schedule of the filed proofs of claim is maintained by Omni Management Group, the Debtors' claims agent.

G. **Filing of Statements and Schedules**

On June 29, 2009, each of the Debtors filed their respective Schedules of Assets and Liabilities and Statements of Financial Affairs with the Bankruptcy Court, which set forth, *inter alia*, scheduled prepetition claims against the Debtors based on their books and records.

H. **The Debtors' Plan**

Prepetition, the Debtors and their advisors engaged in the marketing for the sale of substantially all of their assets and the assets of the certain Non-Debtor affiliates, including MSK's assets. Throughout October and November 2008, the Debtors attempted to obtain the necessary financing to fund a prepackaged chapter 11 case (the "Financing"), in exchange for which a potential acquirer (the "Potential Acquirer") would acquire new equity in the Reorganized Debtors. By December 2008, the Potential Acquirer indicated that it would not be willing to provide the Financing without a private equity partner with experience in the semiconductor industry.

The assets of the MagnaChip Entities have been marketed by the Debtors and their advisors since early December 2008. The Debtors and their advisors began the sale process for the MagnaChip Entities' assets by preparing an offering memorandum in December 2008, and by preparing a list of potential buyers, which included corporations, partnerships, and other entities that may have been interested in acquiring the MagnaChip Entities' assets. The Debtors and their advisors also prepared a separate management presentation that described the MagnaChip Entities' business, its operations, management, financial condition and other relevant information about the MagnaChip Entities in which a potential buyer would be interested.

The Debtors established an electronic data room (the "Data Room"), which was accessed to potential bidders upon the execution of an appropriate confidentiality agreement with the Debtors. The Data Room contains information describing, *inter alia*, the MagnaChip Entities'

assets, contracts and leases, information on the MagnaChip Entities' sales, its customers, employees, facilities, operations data, litigation, and other information available for access and review by a potential purchaser.

The Debtors and their advisors collectively identified a number of potential strategic or financial buyers for the MagnaChip Entities' assets and approached more than fifty-two potential buyers to solicit their interest in acquiring the operating assets of the MagnaChip Entities. The Debtors and their advisors addressed inquiries about the MagnaChip Entities' assets and provided responsive information to inquiring potential purchasers. Confidentiality agreements were executed by seventeen prospective buyers, and those parties received the offering memorandum and data room access. The Debtors and their advisors also arranged for prospective purchasers to meet with the MagnaChip Entities' management and tour MSK's facilities.

The Debtors subsequently received five nonbinding indications of interest. Ultimately, as described in greater detail below, the Debtors chose to pursue a sale with an investment group led by the Buyer.

The Buyer, on the one hand, and MSK; MSA; Luxco; MagnaChip Semiconductor Inc., a company incorporated in Japan; MagnaChip Semiconductor Limited, a company incorporated in Hong Kong SAR; MagnaChip Semiconductor Limited, a company incorporated in the United Kingdom; and MagnaChip Semiconductor Limited, a company incorporated in Taiwan (together, the "Sellers") are parties to the Business Transfer Agreement ("BTA") that provides for the Sale of substantially all of the Sellers' assets to the Buyer. Under the BTA, the Buyer will (i) pay to the Sellers a purchase price of $80 million, subject to certain adjustments for foreign exchange and certain professional fee expenses and (ii) assume certain liabilities of the Debtors.

The BTA provides for the Sale of the Purchased Assets to the Buyer in consideration of $80,000,000.[4] The Purchased Assets include, among other things, the Sellers' designated contracts, real property, leased and owned personal property, cash and cash equivalents, accounts receivable, inventories, intellectual property, business licenses and franchises and permits, which will be sold to the Buyer pursuant to the terms of and in accordance with the Debtors' Plan.

The First Lien Lenders, on the one hand, and Finco, Luxco, LLC, and certain debtor and nondebtor guarantors (collectively, the "Loan Parties"), on the other hand, are parties to an Enforcement Agreement. The Enforcement Agreement sets forth the terms and conditions upon which the First Lien Lenders will (i) enforce their liens on their collateral by consenting to the Sale and requiring the application of certain of the proceeds thereof to the repayment of the obligations owed to the First Lien Lenders, (ii) permit the use of cash by the Debtors and the other Loan Parties, and (iii) agree to temporarily forbear from exercising certain of those default-related remedies against the other Loan Parties with respect to certain defaults specified in the Enforcement Agreement.

---

[4] The purchase price under the BTA is subject adjustment for to currency fluctuations between the U.S. dollar and Korean Won and other deductions under the BTA.

The Debtors have not performed any recent valuations of the Sellers. The Debtors believe that the fair market value of the assets being sold pursuant to the BTA is reflected in the purchase price set forth under the BTA, which was the result of the Debtors' prepetition marketing efforts and attempts to obtain additional capital as described above.

The Creditors' Committee advised the Debtors that it believes that the marketing period for the sale of the Debtors' assets was not only short in duration, but also occurred at a time when the semiconductor industry was at an all time low. The Creditors' Committee asserts that the market for semiconductor companies has drastically improved since the execution of the BTA, and the financial performance of MSK in 2009 reflects that the value of the Debtors' business is far greater than the $80 million offer proposed by the Buyer. The Creditors' Committee also contends that while the purchase price is $80 million, the Debtors' projections show that MSK will have accumulated substantial cash at Plan confirmation, and the effective purchase price of the Debtors' assets is much lower than the $80 million proposed by the Buyer. The Creditors' Committee also asserts that the value implied by the Committee's Plan is significantly in excess of the sale price, which yields a recovery to the First Lien Lenders of only 70%. The Creditors' Committee's financial advisors have estimated that the value of the business is in excess of $225 million. The Debtors dispute this assertion.

The Debtors oppose the Committee's Plan because, *inter alia,* the Debtors do not believe they will be able to obtain a revolving credit facility (and therefore will not have sufficient liquidity during the full five year term of the Committee's Plan) with the New Term Loan in place. The First Lien Lenders have not consented to the Committee's Plan and the First Lien Lenders have indicated that if the Committee's Plan is confirmed, they will exercise their remedies in Korea. The Debtors and the First Lien Lenders also believe that the injunction against the First Lien Lenders' exercise of remedies sought in the Complaint cannot be granted. The Creditors' Committee disagrees with these contentions.

## I.    The Committee's Plan

As described in more detail below, the Creditors' Committee has proposed an alternative plan, pursuant to which the Debtors will reorganize as a going concern and restructure their obligations. By the Committee's Plan, Claims against the Debtors will be satisfied through (a) the payment of Cash and the issuance of a New Term Loan and payment of Cash in full and complete satisfaction of the First Lien Lender Claims, (b) the conversion of the Second Lien Noteholder Claims and Subordinated Note Claims to Interests in the Reorganized Debtors, and (c) the offering of up to $50 million in aggregate of New Common Units. The Creditors' Committee believes that the Committee's Plan provides significantly higher recoveries to all creditors than the Debtors' Plan, which permits KTB 2007 Private Equity to buy the Debtors' assets for a price that is significantly below their market value. The Debtors are expected to have $50.0 million of cash on hand at December 31, 2009, representing 62.5% of the gross proceeds.

**IV.**
**DESCRIPTION OF THE COMMITTEE'S PLAN**

A DISCUSSION OF THE PRINCIPAL PROVISIONS OF THE COMMITTEE'S PLAN AS THEY RELATE TO THE TREATMENT OF CLASSES OF ALLOWED CLAIMS AND INTERESTS IS SET FORTH IN ARTICLES IV THROUGH XI BELOW. THE DISCUSSION

OF THE COMMITTEE'S PLAN THAT FOLLOWS CONSTITUTES A SUMMARY ONLY, AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES.  YOU ARE URGED TO READ THE COMMITTEE'S PLAN IN FULL IN EVALUATING WHETHER TO ACCEPT OR REJECT THE PROPOSED PLAN OF LIQUIDATION.  IF ANY INCONSISTENCY EXISTS BETWEEN THIS SUMMARY AND THE COMMITTEE'S PLAN, THE TERMS OF THE COMMITTEE'S PLAN CONTROL.  ALL CAPITALIZED TERMS NOT OTHERWISE DEFINED HAVE THE MEANINGS ASCRIBED TO THEM IN THE COMMITTEE'S PLAN.

## A.    Summary of the Committee's Plan

The Committee's Plan provides for the satisfaction of Claims against the Debtors through (a) the issuance of a New Term Loan and payment of Cash in full and complete satisfaction of the First Lien Lender Claims (b) the conversion of the Second Lien Noteholder Claims and Subordinated Note Claims to the Second Lien Noteholder Distribution and Subordinated Note Distribution, respectively, and (c) the Offering.

The Committee's Plan categorizes the Claims against and Interests in each Debtor into distinct Classes.  In accordance with the Bankruptcy Code, Administrative Claims and Tax Claims are not classified into Classes.  The Committee's Plan also provides that expenses incurred by the Debtors during the Chapter 11 Cases will be paid in full (or as may otherwise be agreed by any such party) and specifies the manner in which Holders of Allowed Claims in each Class will be treated.  In the event there is any discrepancy between the description of the Committee's Plan's treatment of creditors in the Committee's Disclosure Statement from that set forth in the Committee's Plan, the terms of the Committee's Plan are controlling.

## B.    Treatment of Administrative Expenses and Tax Claims

### 1.    Overview.

As required by the Bankruptcy Code, Administrative Expenses, Superpriority Claims, and Tax Claims are not placed into voting Classes.  Instead, they are left unclassified, are not considered Impaired, do not vote on the Committee's Plan, and receive treatment specified by statute or agreement of the parties.  All postpetition payments by or on behalf of any of the Debtors in respect of an Administrative Expense or Tax Claim shall either reduce the Allowed amount thereof or reduce the amount to be paid under the Committee's Plan in respect of any Allowed amount thereof; and, unless the Bankruptcy Court has specified otherwise prior to Confirmation, the Debtors or the Reorganized Debtors shall, in their sole and absolute discretion, determine which such method of application to employ.

### 2.    Administrative Expenses.

Under the Committee's Plan, on the Effective Date, each Holder of an Allowed Administrative Expense will receive, in full satisfaction, settlement, and release of such Allowed Administrative Expense, Cash equal to the full amount of such Allowed Administrative Expense, unless such Holder and any of the Debtors have mutually agreed in writing to other terms, or an order of the Bankruptcy Court provides for other terms; provided, however, that (a) requests for payment of all Administrative Expenses must be Filed and served as described in Article XIV(B)(3) of the Committee's Plan and (b) certain different and additional requirements shall

apply to the Administrative Expenses that are Fee Claims as set forth in Article XIV(B)(2) of the Committee's Plan.

### 3. Superpriority Claims.

No distribution to the First Lien Lender Parties shall be made on account of any Superpriority Claims except as set forth in Article IV(B)(3) of the Committee's Plan.

### 4. Tax Claims.

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Tax Claims are not to be classified and thus Holders of Tax Claims are not entitled to vote to accept or reject the Committee's Plan.

As required by section 1129(a)(9) of the Bankruptcy Code, on or as soon as practicable after the Effective Date, each Holder of an Allowed Tax Claim against any of the Debtors will receive, at the sole option of the Debtors or the Reorganized Debtors, (i) on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to such Allowed Tax Claim or, (ii) commencing on the Effective Date, or as soon thereafter as is practicable, and continuing over a period not exceeding five (5) years from and after the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Tax Claim, together with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law as of the calendar month in which the Plan is confirmed, subject to the sole option of the Debtors or Reorganized Debtors to prepay the entire amount of the Allowed Tax Claim. Any Allowed Tax Claim (or portion thereof) not yet due and payable as of the Effective Date will be paid by the Reorganized Debtors in the ordinary course of business as such obligations become due. Any Holder of an Allowed Tax Claim may agree to accept different treatment as to which the Debtors and such Holder have agreed upon in writing.

## C. Classification and Treatment of Classified Claims and Interests

### 1. Overview.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and distribution pursuant to the Committee's Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes only to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

In accordance with section 1122 of the Bankruptcy Code, the Committee's Plan provides for the classification of seven Classes of Claims and/or Interests against each Debtor. For purposes of voting and distribution, each Debtor will be assigned a subclass of each Class as follows: (A) LLC, (B) Holdco, (C) MSA, (D) Luxco, (E) Finco, and (F) Dutchco. Administrative Expenses, Superpriority Claims, and Tax Claims have not been classified and are

excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code.

**2.      Classification and Treatment of Claims and Interests.**

The treatment of each Class of Claims and/or Interests is set forth below.  Unless the Bankruptcy Court has specified otherwise prior to Confirmation, the Debtors shall, in their sole and absolute discretion, determine whether a postpetition payment by or on behalf of any of the Debtors in respect of a Claim either (x) shall reduce the Allowed amount thereof or (y) shall reduce the amount to be paid under the Committee's Plan in respect of any Allowed amount thereof.

**a.      Class 1 (A-F) – Priority Non-Tax Claims**

i       <u>Classification</u>:  Classes 1 (A-F) consist of all Priority Non-Tax Claims against any of the Debtors.

ii      <u>Treatment</u>:  The Holder of each Priority Non-Tax Claim shall receive, in full satisfaction, settlement and release of such Priority Non-Tax Claim, a Cash payment equal to the Allowed amount of such Claim on or as soon as practicable after the later of the Effective Date or the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim.  Any Holder of a Priority Non-Tax Claim may agree to accept different treatment as to which the Debtors and such Holder have agreed upon in writing.

iii     *Impairment/Voting*:  Classes 1 (A-F) are impaired.  Holders of Class 1 (A-F) Claims are therefore entitled to vote to accept or reject the Committee's Plan.

**b.      Class 2 (A-F) – Other Secured Claims**

i       <u>Classification</u>:  Classes 2 (A-F) consist of all Other Secured Claims (if any such Claims exist) against any of the Debtors.

ii      <u>Treatment</u>:  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, at the sole option of the Debtors or the Reorganized Debtors, (i) on the Effective Date or as soon thereafter as is practicable, each Allowed Other Secured Claim shall be reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as

is practicable or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

iii    <u>Impairment/Voting</u>:  Classes 2 (A–F) are impaired.  Holders of Class 2 (A-F) Claims are therefore entitled to vote to accept or reject the Committee's Plan.

**c.    Class 3 (A-F) – First Lien Lender Secured Claims**

i    <u>Classification</u>:  Classes 3 (A-F) consist of the First Lien Lender Secured Claims against any of the Debtors.

ii    <u>Treatment</u>:  On the Effective Date, in connection with the enforcement of the First Lien Lender Secured Claims, each First Lien Lender Party shall receive, at the election of each First Lien Lender Party, (i) a Cash payment equal to 72% of its First Lien Lender Secured Claim in full and complete satisfaction of such First Lien Lender Secured Claim ("Treatment A"), or (ii) a Cash payment equal to 35% of its First Lien Lender Secured Claim and its Pro Rata share of the New Term Loan in full and complete satisfaction of such First Lien Lender Secured Claim ("Treatment B").  All distributions to the First Lien Lender Parties under the Committee's Plan shall be effectuated through the Agent.  In consideration for the distributions the First Lien Lender Parties are to receive hereunder, the Liens securing the First Lien Lender Secured Claims will be released and extinguished as of the Effective Date in accordance with section 5.1(a)(2) of the Intercreditor Agreement and of no further force or effect.  As security for the New Term Loan, the First Lien Lenders shall receive a first lien on substantially all assets of the Reorganized Debtors and the Non-Debtor Subsidiaries.  The First Lien Lender Secured Claims, together with any Deficiency Claims of the First Lien Lender Parties, are deemed Allowed in the full amount reflected on the Agent's books and records as of the Record Date. For Holders of First Lien Secured Claims that elect Treatment A, the existing Liens and the First Lien Guarantee securing such First Lien Lender Secured Claims shall be released and extinguished effective as of the Effective Date and of no further force or effect pursuant to the First Lien Credit Agreement.  For Holders of First

Lien Secured Claims that elect Treatment B, the existing Liens and the First Lien Guarantee securing such First Lien Secured Claims shall not be released and will be subject to the injunction as described in Article X of the Committee's Plan.

iii    Impairment/Voting:  Classes 3 (A-F) are Impaired.  Holders of Class 3 (A-F) Claims are therefore entitled to vote to accept or reject the Committee's Plan.

**d.**    **Classes 4 (A-F) – Second Lien Noteholder Claims**

i    Classification:  Classes 4 (A–F) consist of the Second Lien Noteholder Claims against any of the Debtors.

ii    Treatment:  On the Effective Date, in full and complete satisfaction of its Second Lien Noteholder Claim, each Second Lien Noteholder shall receive its Pro Rata share of 5% of the New Common Units, subject to dilution on account of the Long-Term Incentive Plan.  The Second Lien Noteholder Claims will be exchanged for the New Common Units in LLC and LLC will then receive PECs from Luxco in exchange for the cancellation of such Second Lien Noteholder Claims.  In addition, each Eligible Holder of a Second Lien Noteholder Claim shall be entitled to participate in the Offering pursuant to the terms of the Offering Procedures.  However, to the extent that the Offering Participants do not exercise the Subscription Rights by the Effective Date, the Backstop Purchaser, subject to the terms and conditions of the Backstop Commitment Agreement, shall subscribe for and purchase all Unsubscribed Units as of the Subscription Expiration Date.

Notwithstanding anything contained in the Committee's Plan, as described above, only Accredited Investors that are holders of Second Lien Noteholder Claims will be entitled to participate in the Offering.  No payment in lieu of the Subscription Rights will be made to any holder of a Second Lien Noteholder Claim that is not an Accredited Investor and therefore unable to subscribe for New Common Units pursuant to the Offering.

iii    Notwithstanding the foregoing, the Reorganized Debtors shall pay, on or as soon as reasonably practicable after the Effective Date, all Indenture Trustee Fees and Expenses arising under the Second Lien Notes Indenture, in full in Cash, without application to or approval of the Bankruptcy Court.  All distributions to the Second Lien Noteholders under the Committee's Plan, except in connection with the Offering, shall be effectuated though the Second Lien Noteholder Trustee (*i.e.*, the Reorganized Debtors

shall distribute the portion of the New Common Units payable to the Second Lien Noteholders to the Second Lien Noteholder Trustee and the Second Lien Noteholder Trustee shall make proportionate distributions thereof to the Second Lien Noteholders). Pursuant to section 5.1(a)(2) of the Intercreditor Agreement, the existing Liens securing the Second Lien Noteholder Claims shall be released and extinguished effective as of the Effective Date and of no further force or effect. Notwithstanding any subordination or intercreditor agreement applicable under nonbankruptcy law, the Holders of Second Lien Noteholder Claims shall receive the Second Lien Noteholder Distribution as described herein. In addition, the distributions to Holders of Second Lien Noteholder Claims and the surrender of Second Lien Notes to the Second Lien Noteholder Trustee, as described in Article VIII.I of the Committee's Plan, shall constitute a satisfaction and discharge of the Second Lien Indenture pursuant to section 12.05(d) of the Second Lien Indenture.

 iv <u>Impairment/Voting</u>:  Classes 4 (A-F) are Impaired.  Holders of Class 4 (A-F) Claims are therefore entitled to vote to accept or reject the Committee's Plan.

**e. Class 5 (A–F) - General Unsecured Claims**

 i <u>Classification</u>:  Classes 5 (A–F) consist of the General Unsecured Claims against any of the Debtors.

 ii <u>Treatment</u>:  The Holder of each Class 5 (A-F) Claim shall receive, as a gift from the Holders of Second Lien Noteholder Claims, in full satisfaction, settlement and release of such Class 5 (A-F) Claim, a Cash payment equal to 10% of the Allowed amount of such Claim on or as soon as practicable after the later of the Effective Date or the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim; <u>provided</u>, <u>however</u>, that the aggregate Cash payments to Holders of Class 5 (A-F) Claims shall not exceed $324,000.  Any Holder of a Class 5 (A-F) Claim may agree to accept different treatment as to which the Debtors and such Holder have agreed upon in writing.

 iii <u>Impairment/Voting</u>:  Classes 5 (A-F) are Impaired.  Holders of Class 5 (A-F) Claims are therefore entitled to vote to accept or reject the Committee's Plan.

**f. Class 6 (A–F) - Subordinated Note Claims**

 i <u>Classification</u>:  Classes 6 (A-F) consist of the Subordinated Note Claims against Debtors any of the Debtors.

ii     Treatment:  On the Effective Date, in connection with the enforcement of the Subordinated Note Claims, each Subordinated Noteholder shall receive, as a gift from the Second Lien Noteholders, (i) its Pro Rata share of 1% of the New Common Units, subject to dilution on account of the Long-Term Incentive Plan, and (ii) warrants to purchase 5% of the New Common Units with a strike price equivalent to a $600 million total enterprise value, in full and complete satisfaction of such Subordinated Noteholder Claim. The Subordinated Noteholder Claims will be exchanged for the New Common Units and Warrants in LLC and LLC will then receive PECs from Luxco in exchange for the cancellation of such Subordinated Noteholder Claims.

Notwithstanding the foregoing, the Reorganized Debtors shall pay, on or as soon as reasonably practicable after the Effective Date, all Indenture Trustee Fees and Expenses arising under the Subordinated Notes Indenture, in full in Cash, without application to or approval of the Bankruptcy Court. Notwithstanding any subordination or intercreditor agreement applicable under nonbankruptcy law, the Holders of Subordinated Note Claims shall receive the Subordinated Note Distribution as described herein as a gift from the Second Lien Noteholders. In addition, the distributions to holders of Subordinated Note Claims and the surrender of Subordinated Notes to the Subordinated Note Trustee, as described in Article VIII.I herein, shall constitute a satisfaction and discharge of the Subordinated Note Indenture under section 12.05(d) of the Subordinated Note Indenture

iii    Impairment/Voting:  Class 6 is Impaired. Holders of Class 6 Claims are therefore entitled to vote to accept or reject the Committee's Plan.

**g.    Class 7 (A–F) - Intercompany Claims against the Debtors**

i    Classification:  Classes 7 (A–F) consist of Intercompany Claims of Debtors and Non-Debtor Subsidiaries against the Debtors.

ii    Treatment:  Notwithstanding anything to the contrary herein, Intercompany Claims, at the election of the Reorganized Debtors, shall be (i) adjusted, released, waived and/or discharged as of the Effective Date, (ii) contributed to the capital of the obligor, or (iii) reinstated and left Unimpaired.

iii    Impairment/Voting:  Classes 7 (A-F) are Impaired. Because Holders of Class 7 (A-F) Claims receive no recovery on account of such Claims under the Committee's Plan, they are conclusively presumed to reject the Committee's Plan.

### h. Class 8 (A–F) - Interests in the Debtors

    i    <u>Classification</u>:  Classes 8 (A–F) consist of Interests in the Debtors.

    ii    <u>Treatment</u>:  Holders of Interests in the Debtors shall receive no distributions or recoveries on account of such Interests and Interests on account of LLC shall be extinguished on the Effective Date.  Interests of each Debtor, other than LLC, will continue to exist and not be extinguished.

    iii    <u>Impairment/Voting</u>:  Classes 8 (A–F) are Impaired.  Because Holders of Interests in Class 8 (A-F) receive no recovery on account of such Interests under the Committee's Plan, they are conclusively presumed to reject the Committee's Plan.

## D. <u>Treatment of Executory Contracts and Unexpired Leases</u>

### 1. Assumption and Rejection of Executory Contracts and Unexpired Leases.

Except for any executory contracts or unexpired leases: (i) that are listed as Rejected Contracts in the Plan Supplement to the *Chapter 11 Plan of Reorganization Proposed by the Official Committee of Unsecured Creditors of MagnaChip Semiconductor Finance Company, Et Al.*; (ii) that previously were assumed or rejected by an order of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code; (iii) as to which a motion for approval of the assumption or rejection of such contracts or leases has been Filed and served prior to Confirmation; or (iv) that constitute contracts of insurance in favor of, or that benefit, the Debtors or the Estates, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed assumed pursuant to section 365 of the Bankruptcy Code as of the Effective Date.  The Confirmation Order shall constitute an Order of the Bankruptcy Court approving such assumptions, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.  On the Effective Date, the Debtors shall pay any cure costs associated with any assumed contracts owned by the Debtors (*i.e.*, claims of non-Debtor contract parties against the Debtors for monetary damages for breaches of such assumed contracts) from the Cash of the Reorganized Debtors.

2. **Objections to Assumption of Executory Contracts and Unexpired Leases.**

   a. **Objection Procedure Generally.** Any party objecting to any Debtor's proposed assumption of an executory contract or unexpired lease based on a lack of adequate assurance of future performance or on any other ground including the adequacy of the "cure" amount set forth in the Plan Supplement shall file and serve a written objection to the assumption of such contract or lease by the deadline to object to Confirmation. Failure to timely file an objection shall constitute consent to the assumption and assignment of those contracts and leases, including an acknowledgment that the proposed assumption provides adequate assurance of future performance and that the applicable "cure" amount set forth in the Plan Supplement is proper and sufficient for purposes of section 365 of the Bankruptcy Code.

   b. **Objection Based on Grounds Other Than "Cure" Amount.** If any party timely and properly files an objection to assumption based on any ground other than the adequacy of the applicable "cure" amount set forth in the Plan Supplement and the Bankruptcy Court ultimately determines that any Debtor cannot assume the executory contract or then the unexpired lease or executory contract shall automatically thereupon be deemed to have been excluded from the Plan Supplement and shall be rejected.

   c. **Objection Based on "Cure" Amount.** If any party timely and properly files an objection to assumption based on the adequacy of the applicable "cure" amount set forth the Plan Supplement and such objection is not resolved between the Debtors and the objecting party, the Bankruptcy Court shall resolve such dispute at the Confirmation Hearing or another hearing date to be determined by the Bankruptcy Court. The resolution of such dispute shall not affect the assumption of the executory contract or lease that is the subject of such dispute but rather shall affect only the "cure" amount the Debtors must pay in order to assume such contract or lease. Notwithstanding the immediately preceding sentence, if the Debtors in their discretion determine that the amount asserted to be the necessary "cure" amount would, if ordered by the Bankruptcy Court, make the assumption of the executory contract or lease imprudent, then the Debtors may elect to (1) reject the executory contract or lease, or (2) request an expedited hearing on the resolution of the "cure" dispute, exclude assumption or rejection of the contract or lease from the scope of the Confirmation Order, and retain the right to reject the executory contract or lease pending the outcome of such dispute.

3. **Payment Related to Assumption of Executory Contracts and Unexpired Leases.**

   If not the subject of dispute as of the Confirmation Date, any monetary defaults under each executory contract and unexpired lease to be assumed under the Committee's Plan shall be satisfied by the Debtors from the Cash of MSA, pursuant to section 365(b) of the Bankruptcy Code: (i) by payment of (1) the applicable "cure" amount, (2) such other amount as ordered by the Bankruptcy Court, or (3) such other amount as agreed upon by the Debtors, in Cash within thirty (30) days following the Effective Date; or (ii) on such other terms as agreed to by the parties to such executory contract or unexpired lease. In the event of a dispute regarding the appropriate "cure" amount, payment of the amount otherwise payable hereunder shall be made following entry of a Final Order or agreement by the Debtors or Reorganized Debtors, as the case may be.

### 4. Bar Date for Rejection Damages.

If the rejection of an executory contract or unexpired lease pursuant to the Committee's Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors or their Estates unless a proof of Claim is Filed and served on the Debtors and their counsel within thirty days after the earlier of (a) Confirmation or (b) service of a notice that the executory contract or unexpired lease has been rejected. All such Claims for which proofs of Claim are required to be Filed, if Allowed, will be, and will be treated as, General Unsecured Claims, subject to the provisions of the Committee's Plan.

### E. Plan Provisions Regarding Distribution

### 1. Dates of Distribution.

The sections of the Committee's Plan on treatment of Administrative Expenses, Claims, and Interests specify the times for distributions. Whenever any payment or distribution to be made under the Committee's Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day. Distributions due on the Effective Date will be paid on such date or as soon as practicable thereafter, provided that if other provisions of the Committee's Plan require the surrender of securities or establish other conditions precedent to receiving a distribution, the distribution may be delayed until such surrender occurs or conditions are satisfied.

If, under the terms of the Committee's Plan, the resolution of a particular Disputed Claim, *e.g.*, it is Disallowed, entitles other Holders of Claims to a further distribution, either (a) the Reorganized Debtors may make such further distribution as soon practicable after the resolution of the Disputed Claim or (b) if the further distribution is determined in good faith, by the Reorganized Debtors to be less than $100 for any Creditor, then, in order to afford the Reorganized Debtors an opportunity to minimize costs and aggregate such distributions, the Reorganized Debtors may make such further distribution any time prior to sixty days after the Final Resolution Date.

### 2. Cash Distributions.

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors, except that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### 3. Rounding of Payments.

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

### 4. Disputed Claims.

Notwithstanding all references in the Committee's Plan to Claims that are Allowed, in undertaking the calculations concerning Allowed Claims or Allowed Administrative Expenses

under the Committee's Plan, including the determination of the amount or number of distributions due to the Holders of Allowed Claims and Allowed Administrative Expenses, each Disputed Claim shall be treated as if it were an Allowed Claim or Allowed Administrative Expense, except that if the Bankruptcy Court estimates the likely portion of a Disputed Claim to be Allowed or authorized or otherwise determines the amount or number that would constitute a sufficient reserve for a Disputed Claim (which estimates and determinations may be requested by the Debtors), such amount or number as determined by the Bankruptcy Court shall be used as to such Claim.

Distributions of non-Cash consideration due in respect of a Disputed Claim shall be held and not made pending resolution of the Disputed Claim.

After an objection to a Disputed Claim is withdrawn, resolved by agreement, or determined by Final Order, the distributions due on account of any resulting Allowed Claim, Allowed Interest, or Allowed Administrative Expense shall be made by the Reorganized Debtors. Such distribution shall be made within forty-five days of the date that the Disputed Claim becomes an Allowed Claim or Allowed Administrative Expense. No interest shall be due to a Holder of a Disputed Claim based on the delay attendant to determining the allowance of such Claim, Interest, or Administrative Expense.

## 5. Undeliverable and Unclaimed Distributions.

If any distribution under the Committee's Plan is returned to the Reorganized Debtors as undeliverable or the check or other similar instrument or distribution by the Reorganized Debtors remains uncashed or unclaimed, as applicable, for 120 days, such Cash shall be deemed to be "Unclaimed Property." Upon property becoming Unclaimed Property, it immediately shall be revested in the Reorganized Debtors.

Pending becoming Unclaimed Property, such Cash will remain in the possession of the Reorganized Debtors and, if the Reorganized Debtors are notified in writing of a new address for the relevant Holder, they shall cause distribution of the Cash within forty-five days thereafter.

Once there becomes Unclaimed Property for a Holder, no subsequent distributions for such Holder that may otherwise be due under the Committee's Plan will accrue or be held for such Holder, provided that, if the applicable agent is notified in writing of such Holder's then-current address and status as a Holder under the Committee's Plan, thereafter, the Holder will become entitled to its share of distributions, if any, which first become due after such notification.

## 6. Compliance With Tax Requirements.

The Reorganized Debtors shall comply with all withholding and reporting requirements imposed by federal, state, or local taxing authorities in connection with making distributions pursuant to the Committee's Plan.

In connection with each distribution with respect to which the filing of an information return (such as an IRS Form 1099 or 1042) or withholding is required, the Reorganized Debtors shall file such information return with the IRS and provide any required statements in connection

therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law. With respect to any Person from whom a tax identification number, certified tax identification number, or other tax information required by law to avoid withholding has not been received by the Reorganized Debtors, the Reorganized Debtors may, in their sole option, withhold the amount required and distribute the balance to such Person or decline to make such distribution until the information is received; provided, however, that the Reorganized Debtors shall not be obligated to liquidate any securities to perform such withholding.

### 7. Record Date in Respect to Distributions.

Except as set forth below, the record date and time for the purpose of determining which Persons are entitled to receive any and all distributions on account of any Allowed Claims or Interests, irrespective of the date of or number of distributions, shall be the same as the Record Date.

At the date and time of the Record Date, the Agent's registers with respect to the First Lien Lender Secured Claims shall be deemed closed for purposes of determining whether a Holder of a First Lien Lender Secured Claim is a record holder entitled to distributions under the Committee's Plan. Neither the Reorganized Debtors nor the Agent shall have any obligation to recognize, for purposes of distributions pursuant to or in any way arising under the Committee's Plan, any First Lien Lender Secured Claim or Claim arising therefrom or in connection therewith that is transferred after the time of the Record Date. Instead, they all shall be entitled to recognize and deal for distribution purposes with only those record holders of the First Lien Lender Secured Claims as of the Record Date irrespective of the number of distributions to be made under the Committee's Plan or the date of such distributions.

### 8. Conditions to Receiving Distributions.

As a condition to receiving any distribution under the Committee's Plan, each Holder of an Allowed Claim shall have executed and delivered such agreements, documents, and instruments as may be reasonably required by the Debtors or Reorganized Debtors. Any Holder of an Allowed Claim that fails to execute and deliver such agreements, documents, and instruments or fails to take such action as may be reasonably requested by the Debtors or Reorganized Debtors before the first anniversary of the later to occur of (a) the availability of the agreements, documents, and instruments required by the Debtors or the Reorganized Debtors and (b) the Effective Date may not participate in any distribution under the Committee's Plan with respect to such Allowed Claim. Any distribution forfeited hereunder shall be ratably reallocated among complying Holders of the applicable Class. The Debtors acknowledge that the First Lien Lender Parties have delivered all necessary agreements, documents, and instruments and have taken all necessary actions required pursuant to this Article VIII.I.

### 9. Surrender of Instruments

As a condition to receiving any distribution under the Committee's Plan (other than with respect to book entry securities), each Holder of Second Lien Notes or Subordinated Notes must either (a) surrender such (i) Second Lien Notes to the Second Lien Noteholder Trustee, or (ii) Subordinated Notes to the Subordinated Note Trustee, or (b) submit evidence satisfactory to (i)

the Second Lien Noteholder Trustee with respect to the Secured Lien Notes, and (ii) the Subordinated Note Trustee with respect to the Subordinated Notes.  Any Holder that fails to do either (a) or (b) above shall be deemed to have forfeited all rights and Claims and may not participate in any distribution under the Committee's Plan.

**F.      Plan Provisions Regarding Litigation, Objections to Claims, and Determination of Taxes**

**1.      Litigation; Objections to Claims; Objection Deadline.**

Except as may be expressly provided otherwise in the Committee's Plan, the Reorganized Debtors shall be responsible for any objection to the allowance of any Claim, and the determination of Tax issues and liabilities.

As of the Effective Date, the Reorganized Debtors shall have exclusive authority to file objections, settle, compromise, withdraw, or litigate to judgment objections to Claims.  Unless another date is established by the Bankruptcy Court (which may so act without notice or hearing) or is established by other provisions of the Committee's Plan, any objection to a Claim shall be Filed with the Bankruptcy Court and served on the Person holding such Claim within ninety days after the Effective Date (the "Objection Deadline"), provided that the Reorganized Debtors may seek extension(s) thereof subject to Bankruptcy Court approval.

In addition to any other available remedies or procedures with respect to Tax issues or liabilities, the Reorganized Debtors, at any time, may utilize (and receive the benefits of) section 505 of the Bankruptcy Code with respect to:  (1) any Tax issue or liability relating to an act or event occurring prior to the Effective Date or (2) any Tax liability arising prior to the Effective Date.  If the Reorganized Debtors utilize section 505(b) of the Bankruptcy Code:  (1) the Bankruptcy Court shall determine the amount of the subject Tax liability in the event that the appropriate governmental entity timely determines a Tax to be due in excess of the amount indicated on the subject return and (2) if the prerequisites are met for obtaining a discharge of Tax liability in accordance with section 505(b) of the Bankruptcy Code, the Reorganized Debtors shall be entitled to such discharge, which shall apply to any and all Taxes relating to the period covered by such return.

**2.      Temporary or Permanent Resolution of Disputed Claims.**

The Reorganized Debtors may request, at any time prior to the Effective Date or on and after the Effective Date, that the Bankruptcy Court estimate any contingent or unliquidated Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, irrespective of whether any party has previously objected to such Disputed Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain jurisdiction to estimate any contingent or unliquidated Disputed Claim at any time during litigation concerning any objection to the Disputed Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent or unliquidated Disputed Claim, that estimated amount would constitute either the Allowed amount of such Disputed Claim or a maximum limitation on such Disputed Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Disputed Claim, the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on account of

such Disputed Claim. In addition, the Reorganized Debtors may resolve or adjudicate any Disputed Claim in the manner in which the amount of such Claim, Interest, or Administrative Expense and the rights of the Holder of such Claim, Interest, or Administrative Expense would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced. All of the aforementioned objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another.

### 3. Release of Avoidance Actions.

Each of the Debtors, and the Reorganized Debtors, releases, waives, and agrees not to prosecute or pursue any Avoidance Claims. The list of prepetition transfers to creditors during the 90 days prior to the Petition Date and transfers to insiders within one year from the Petition Date (the "Prepetition Transfers") that could potentially constitute any Avoidance Claim was prepared by the Debtors and disclosed on the Schedules and Statement of Financial Affairs that were filed with the Bankruptcy Court on June 29, 2009.

### 4. Preservation of Retained Rights of Action.

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain and may exclusively enforce any Retained Rights of Action and the Confirmation Order shall be deemed a *res judicata* determination of such rights to retain and exclusively enforce such Retained Rights of Action. The Retained Rights of Action may be asserted or prosecuted before or after solicitation of votes on the Committee's Plan or before or after the Effective Date.

Absent an express waiver or release set forth in the Committee's Plan, nothing in the Committee's Plan shall (or is intended to) prevent, estop, or be deemed to preclude the Reorganized Debtors from utilizing, pursuing, prosecuting, or otherwise acting upon all or any of their Retained Rights of Action and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches shall apply to such Retained Rights of Action upon or after Confirmation or Consummation. Retained Rights of Action include, without limitation, all Intercompany Claims held by any Debtor against any non-debtor entity, including those claims set forth in the Schedules and identified in the Statements of Financial Affairs filed by each of the Debtors in the Bankruptcy Court.

## V.
## ACCEPTANCE OR REJECTION OF THE COMMITTEE'S PLAN

### A. Classes Permitted and Not Permitted to Vote

Classes 3, 4, 5, 6, 7 and 8 are Impaired. Holders of Claims in Classes 3, 4, 5 and 6 are permitted to vote to accept or reject the Committee's Plan. Holders of Class 7 Claims and Holders of Class 8 Interests are conclusively presumed to reject the Committee's Plan. Holders of Class 1 Claims and Class 2 Claims are conclusively presumed to accept the Committee's Plan. An Impaired Class of Claims that votes shall have accepted the Committee's Plan if (a) the Holders (other than any Holder designated by the Bankruptcy Court based on their vote or its solicitation not being in good faith under Bankruptcy Code section 1126(e)) of at least two-thirds

in amount of the Allowed Claims actually voting in such Class have voted to accept the Committee's Plan and (b) the Holders (other than any Holder designated under Bankruptcy Code section 1126(e)) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Committee's Plan.

**B.  Nonconsensual Confirmation**

In the event any Class of Claims votes to reject the Committee's Plan, the Creditors' Committee intends to request that the Bankruptcy Court confirm the Committee's Plan notwithstanding such rejection pursuant to section 1129(b) of the Bankruptcy Code on the basis that the Committee's Plan is fair and equitable and does not discriminate unfairly as to the Holders of any Class of Claims.

**VI.**
**MEANS FOR IMPLEMENTATION OF THE COMMITTEE'S PLAN**

**A.  Restructuring and Other Transactions**

**1.  Intercompany Claims and Interests in Subsidiaries**

Notwithstanding anything to the contrary herein, Intercompany Claims will be adjusted, continued, or discharged to the extent deemed appropriate by the Creditor's Committee.  Any such transaction may be effected on or subsequent to the Effective Date without any further action by the holders of Claims or Interests.  As of the Effective Date but only until the reorganization of the Reorganized Debtors, except as expressly provided in the Committee's Plan, the Reorganized Debtors shall retain any stock or interests they may hold in the Non-Debtor Subsidiaries or affiliates and retain any rights to which such Interests may be entitled under applicable law with respect to such shares or other interests.  Notwithstanding anything to the contrary herein, the Non-Debtor Subsidiaries may not sell, transfer or dispose of any assets without the consent of LLC.

**2.  Cancellation of Existing Securities and Agreements**

(a)      Except (i) as otherwise expressly provided in the Committee's Plan, (ii) with respect to executory contracts or unexpired leases that have been assumed by the Debtors, (iii) for purposes of evidencing a right to distributions under the Committee's Plan, or (iv) with respect to any Claim that is rendered Unimpaired under the Committee's Plan, on the Effective Date, the First Lien Credit Agreement, the Second Lien Indenture and Subordinated Note Indenture, all Interests of LLC and other instruments evidencing any Claims against the Debtors and Non-Debtor Subsidiaries shall be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors and Non-Debtor Subsidiaries thereunder shall be discharged; provided, however, the Second Lien Notes and the Subordinated Notes will be exchanged for the New Common Units in the LLC and the LLC will then receive PECs from the Luxco in exchange for the cancellation of such debt and the Holders thereof shall have no further rights or entitlements in respect thereof against the Debtors or Non-Debtor Subsidiaries except the rights to receive the distributions to be made to such Holders under the Committee's Plan and all guarantees or liens against Non-Debtor Subsidiaries shall be automatically released.  To the extent possible, distributions to be made

under the Committee's Plan to the beneficial owners of the Second Lien Indenture and the Subordinated Note Trustee shall be made through the Depository Trust Company and its participants. The Confirmation Order shall authorize the Reorganized Debtors, the Second Lien Noteholder Trustee, and the Subordinated Note Trustee to take whatever action may be necessary or appropriate, in its reasonable discretion, to deliver the distributions, including, without limitation, obtaining an order of the Bankruptcy Court.

(b)     On the Effective Date, the Second Lien Noteholder Trustee and the Subordinated Note Trustee and their respective agents shall be discharged of all their obligations associated with (i) the Second Lien Indenture, (ii) the Second Lien Noteholder Claims, (iii) the Subordinated Note Indenture, (iv) Subordinated Note Claims and (v) any related documents, and released from all Claims arising in the Reorganization Cases. As of the Effective Date, the Second Lien Indenture and the Subordinated Note Indenture shall be deemed fully satisfied, discharged and cancelled, except that such cancellation shall not impair the rights of the Holders of the Second Lien Noteholder Claims or the Subordinated Note Claims to receive distributions under the Committee's Plan, or the obligations of the Second Lien Noteholder Trustee or the Subordinated Note Trustee to discharge Liens, the Second Lien Guarantees and the Subordinated Note Guarantees. All Liens and Second Lien Guarantees in favor of the Second Lien Indenture for the benefit of the Holders of the Second Lien Claims or otherwise arising under the Second Lien Indenture shall be deemed released, satisfied and discharged. In addition, all Liens, if any, and Subordinated Note Guarantees in favor of the Subordinated Note Indenture for the benefit of the Holders of the Subordinated Note Claims or otherwise arising under the Subordinated Note Indenture shall be deemed released, satisfied and discharged.

### 3.     Issuance of New Common Units, Warrants and Subscription Rights

The issuance by LLC of the New Common Units, Warrants and Subscription rights on and after the Effective Date is hereby authorized without the need for any further corporate action and without any further action by holders of Claims or Interests. Such Interests shall be distributed as provided in Article IV.B.4 and Article IV.B.6 of the Committee's Plan. As provided in the Postconfirmation Organizational Documents, the New Common Units shall be subject to certain restrictions on transfer. As provided in the Postconfirmation Organizational Documents, which are incorporated herein by reference, New Common Units may be issued in more than one series, shall be identical in all respects, and shall have equal rights and privileges. In compliance with 1123(a)(6) of the Bankruptcy Code, the Postconfirmation Organizational Documents shall provide that the Reorganized Debtors shall not issue nonvoting equity securities to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code.

### 4.     Incurrence of New Indebtedness

The Reorganized Debtors' entry into the New Term Loans, and the incurrence of indebtedness thereunder on the Effective Date, is hereby authorized without the need for any further corporate action, except as set forth in the New Term Loans, and without any further action by holders of Claims or equity interests. The Debtors believe that certain Korean governmental approvals will be required in connection with the New Term Loan.

## B. Release of Liens/Secured Lien Guaranties/Subordinated Note Guarantees

### 1. Release of Liens

On the Effective Date, all Liens securing the First Lien Lender Claims and the Second Lien Noteholder Claims shall be deemed fully released. The Agent, the Second Lien Noteholder Trustee, the Second Lien Collateral Agent and the Collateral Trustee shall be authorized and directed to release any collateral or other property held by them on behalf of Holders of the Second Lien Noteholder Claims and to take such actions and execute and deliver such documents as may be requested by the Debtors or the Reorganized Debtors to evidence the release of all Liens securing the Second Lien Noteholder Claims, including, without limitation, the execution, delivery and filing or recording of such releases as may be requested by Debtors or the Reorganized Debtors, in lieu of delivery of the documents otherwise required pursuant to section 5.1(b) of the Intercreditor Agreement.

### 2. Release of Second Lien Guarantees

The Non-Korean Guarantors' obligations under the Second Lien Guarantees shall be deemed fully released on the Effective Date as a result of the Restructuring Transactions. The Second Lien Noteholder Trustee shall be authorized and directed to take any action and execute and deliver any documents as may be requested by the Debtors to release any collateral or other property of the Debtors held by the Second Lien Noteholder Trustee. In addition, the Korean Guarantee will be released on the Effective Date. The distributions to holders of Second Lien Noteholder Claims and the surrender of Second Lien Notes to the Second Lien Noteholder Trustee, as described in Article VIII.I of the Committee's Plan, shall constitute satisfaction and discharge of the Second Lien Indenture under section 12.05(d) of the Second Lien Indenture

### 3. Release of Subordinated Note Guarantees

The Subordinated Note Guarantors' obligations under the Subordinated Note Guarantees shall be deemed fully released on the Effective Date as a result of the disposition of all or substantially all of the assets of such Subordinated Note Guarantors pursuant to the Business Transfer Agreement in accordance with Section 12.05 of the Subordinated Note Indenture. The Subordinated Noteholder Trustee shall be authorized and directed to take any action and execute and deliver any documents as may be requested by the Debtor to acknowledge the release of any claims against the Non-Korean Guarantors on account of the Subordinated Note Guarantees. The distributions to holders of Subordinated Note Claims and the surrender of Subordinated Notes to the Subordinated Note Trustee, as described in Article VIII.I of the Committee's Plan, shall constitute satisfaction and discharge of the Subordinated Note Indenture under section 12.05(d) of the Subordinated Note Indenture.

### 4. Release and Discharge of Debtors

Upon the occurrence of the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims,

Interests, rights, and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtors.

### 5. Release and Discharge of Non-Debtor Subsidiaries

In addition to the terms of section B.4 above, each holder of a Secured Claim, the Second Lien Noteholder Trustee of the Second Lien Notes, the Subordinated Note Trustee of the Subordinated Notes, and any agent under the First Lien Credit Agreement, the Second Lien Indenture, the Subordinated Note Indenture shall be deemed to have forever waived, released, and discharged the Non-Debtor Subsidiaries of any Liens, Claims, claims, causes of action, rights, or liabilities arising from guarantees granted to the Holders of (i) the Second Lien Noteholder Claims under the Second Lien Indenture, (ii) the First Lien Lender Secured Claims under the First Lien Credit Agreement, (iii) the Subordinated Note Claims under the Subordinated Note Indenture, as well as any respective Deficiency Claims. In addition, the Confirmation Order shall authorize the Reorganized Debtors, Second Lien Noteholder Trustee and the Subordinated Note Trustee to take whatever action may be necessary or appropriate, in their reasonable discretion, to effectuate the foregoing, including, without limitation, providing a release of the Liens, the First Lien Guarantees, the Second Lien Guarantees, and the Subordinated Note Guarantees.

## C. Continued Corporate Existence

Except as otherwise provided in the Committee's Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except with respect to the Postconfirmation Organizational Documents (or other formation documents) that are amended by the Committee's Plan, the Committee's Plan Supplement or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Committee's Plan and require no further action or approval. Notwithstanding the foregoing, on or as of the Effective Date, or as soon as practicable thereafter, and without the need for any further action, the Reorganized Debtors may, subject to the consent of the Backstop Purchaser: (i) cause any or all of the Reorganized Debtors to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors, or (iii) engage in any other transaction in furtherance of the Committee's Plan.

## A. The Offering

### 1. Issuance of Subscription Rights

Each Offering Participant that identifies itself as an accredited investor to the Subscription Agent shall be entitled to receive Subscription Rights entitling such Offering Participant the right to subscribe for up to its Offering Pro Rata Share of New Common Units to

be issued pursuant to the Offering. After giving effect to the issuance of New Common Units pursuant to the Second Lien Noteholder Distribution, the Subordinated Note Distribution and the Standby Commitment Fee, but without giving effect to the Warrants to be issued to holders of Subordinated Note Claims, the amount of the equity ownership of LLC represented by the New Common Units to be offered pursuant to the exercise of Subscription Rights is 84% of the equity of LLC (the "Offering Available Equity"), subject to dilution on account of the Long-Term Incentive Plan; provided that, under the Backstop Commitment Agreement, the Minimum Allocation to be available for sale to the Backstop Purchaser is 67% of the Offering Available Equity, or approximately 56.28% of the New Common Units, subject to dilution on account of the Long-Term Incentive Plan. Accordingly, after giving effect to the Minimum Allocation, the percentage of the equity of LLC represented by the New Common Units available in the Offering to Offering Participants other than the Backstop Purchaser is approximately 27.72% of the New Common Units, subject to dilution on account of the Long-Term Incentive Plan. Since the Backstop Purchaser is entitled to a Minimum Allocation of 67% of the Subscription Rights, if more than 33% of the Subscription Rights are subscribed for by Eligible Holders other than the Backstop Purchaser, then the Subscription Rights to be purchased by each such Eligible Holder will be reduced on a pro rata basis so that the amount to be purchased by all such Eligible Holders equals 33% of the aggregate number of Subscription Rights. Each such Eligible Holder will be notified of the reduced subscription amount and the difference in payment will be refunded to such Eligible Holder without interest. Offering Participants have the right, but not the obligation, to participate in the Offering as provided herein.

However, to the extent that the Offering Participants do not exercise the Subscription Rights by the Subscription Expiration Date, the Backstop Purchaser, subject to the terms and conditions of the Backstop Commitment Agreement, shall subscribe for and purchase all Unsubscribed Units as of the Subscription Expiration Date. No payment in lieu of the Subscription Rights will be made to any holder of a Second Lien Noteholder Claim that is not an Accredited Investor and therefore unable to subscribe for New Common Units pursuant to the Offering.

## 2. Subscription Period

The Offering shall commence on the Subscription Commencement Date and shall expire on the Subscription Expiration Date. Each Offering Participant intending to participate in the Offering must affirmatively elect to exercise its Subscription Rights on or prior to the Subscription Expiration Date. After the Subscription Expiration Date, the Unsubscribed Units shall be treated as acquired by the Backstop Purchaser in accordance with and subject to the terms and conditions contained in the Backstop Commitment Agreement and the Committee's Plan, and any exercise of such Subscription Rights by any entity other than the Backstop Purchaser or any of its affiliates or any permitted assignee of the Backstop Purchaser's rights under the Backstop Commitment Agreement shall be null and void and there shall be no obligation to honor any such purported exercise received by the Subscription Agent after the Subscription Expiration Date, regardless of when the documents relating to such exercise were sent.

### 3. Subscription Purchase Price

Each Offering Participant choosing to exercise its Subscription Rights shall be required to pay such participant's Subscription Purchase Price for New Common Units.

### 4. Exercise of Subscription Rights

In order to exercise the Subscription Rights, each Offering Participant must return a duly completed Subscription Form and Subscription Agreement to the Subscription Agent so that such form is actually received by the Subscription Agent on or before the Subscription Expiration Date. Each such Offering Participant must tender the Offering Participant's Subscription Purchase Price to the Subscription Agent so that it is actually received by the Subscription Expiration Date. The Offering Participant's Subscription Purchase Price must be paid in accordance with the wire instructions set forth on the Subscription Form or by bank or cashier's check delivered to the Subscription Agent. Each Offering Participant may exercise all or any portion of such Offering Participant's Subscription Rights pursuant to the Subscription Form, but the exercise of any Subscription Rights shall be irrevocable. If the Subscription Agent for any reason does not receive from a given Offering Participant (a) a duly completed Subscription Form on or prior to the Subscription Expiration Date, and (b) immediately available funds in an amount equal to such Offering Participant's Subscription Purchase Price on or prior to the Subscription Expiration Date, such Offering Participant shall be deemed to have relinquished and waived its right to participate in the Offering. The payments made in accordance with the Offering shall be deposited and held by the Subscription Agent in a trust account, or similarly segregated account or accounts which shall be separate and apart from the Subscription Agent's general operating funds and any other funds subject to any lien or similar encumbrance and which segregated account or accounts will be maintained for the purpose of holding the money for administration of the Offering until the Effective Date, or such other later date, at the option of the Creditors' Committee, but not later than twenty (20) days after the Effective Date. The Subscription Agent shall not use such funds for any other purpose prior to such date and shall not encumber or permit such funds to be encumbered with any lien or similar encumbrance.

In order to facilitate the exercise of the Subscription Rights, on the Subscription Commencement Date, the Subscription Form will be provided by mail, electronic mail, or facsimile transmission to (i) each holder of a Second Lien Noteholder Claim that the Creditors' Committee knows to be an Eligible Holder and (ii) to each holder of a Second Lien Noteholder Claim who identifies itself to the Subscription Agent as an Eligible Holder, together with appropriate instructions for the proper completion, due execution and timely delivery of the Subscription Form, as well as instructions for the payment of the applicable Subscription Purchase Price for that portion of the Subscription Rights sought to be exercised by such Eligible Holder.

### 5. Offering Procedures

Notwithstanding anything contained herein to the contrary, the Creditors' Committee, with the consent of the Backstop Purchaser, may modify the procedures relating to the Offering or adopt such additional detailed procedures consistent with the provisions of this Article VI(D) to more efficiently administer the exercise of the Subscription Rights; provided, however, that

the Creditors' Committee shall be provided prompt written notice to the Offering Participants of any material modification to such procedures.

### 6.     Transfer Restriction: Revocation

The Subscription Rights are not transferable.  Any such transfer or attempted transfer will be null and void, and no purported transferee will be treated as the holder of any Subscription Rights.  Once an Offering Participant has properly exercised its Subscription Rights, such exercise cannot be revoked.

### 7.     Offering Backstop

Subject to the terms and conditions in the Backstop Commitment Agreement, the Backstop Purchaser has agreed to subscribe for and purchase on the Effective Date, at the aggregate Subscription Purchase Price therefor, its Backstop Commitment (as set forth on Schedule 1 to the Backstop Commitment Agreement) of all Unsubscribed Units as of the Subscription Expiration Date.  The Backstop Purchaser shall pay to the Subscription Agent, by wire transfer in immediately available funds on or prior to the Effective Date, Cash in an amount equal to the aggregate Subscription Purchase Price attributable to such Unsubscribed Units as provided in the Backstop Commitment Agreement.  The Subscription Agent shall deposit such payment into the same trust account into which were deposited the Subscription Purchase Price payments of Offering Participants on the exercise of their Subscription Rights. The Debtors and the Subscription Agent shall give the Backstop Purchaser by e-mail and electronic facsimile transmission written notification setting forth either (i) a true and accurate calculation of the number of Unsubscribed Units, and the aggregate Subscription Purchase Price therefor (a "Purchase Notice") or (ii) in the absence of any Unsubscribed Units, the fact that there are no Unsubscribed Units and that the Backstop Commitments are terminated (a "Satisfaction Notice") as soon as practicable after the Subscription Expiration Date. In addition, the Subscription Agent shall notify the Backstop Purchaser, on each Friday during the Subscription Period, on each Business Day during the five (5) Business Days prior to the Subscription Expiration Date (and any extensions thereto) or more frequently if requested by the Backstop Purchaser, of the aggregate number of Subscription Rights known by the Subscription Agent to have been exercised pursuant to the Offering as of the close of business on the preceding Business Day or the most recent practicable time before such request, as the case may be.  The Subscription Agent shall determine the number of Unsubscribed Units, if any, in good faith, and provide the Backstop Purchaser with a Purchase Notice or a Satisfaction Notice that accurately reflects the number of Unsubscribed Units as so determined.  On the Effective Date, the Backstop Purchaser will purchase only such number of Unsubscribed Units as are listed in the Purchase Notice, without prejudice to the rights of the Backstop Purchaser to seek later an upward or downward adjustment if the number of Unsubscribed Units in such Purchase Notice is inaccurate. Delivery of the Unsubscribed Units will be made to the account of the Backstop Purchaser (or to such other accounts as the Backstop Purchaser may designate) on the Effective Date against payment of the aggregate Subscription Purchase Price for the Unsubscribed Units by wire transfer of immediately available funds to a bank account in the United States specified by the Debtors to the Backstop Purchaser at least 24 hours in advance. All Unsubscribed Units will be delivered with any and all issue, stamp, transfer or similar taxes or duties payable in connection with such delivery duly paid by the Debtors or the Reorganized Debtors to the extent required under the

Confirmation Order or applicable law. Notwithstanding anything contained herein to the contrary, the Backstop Purchaser, in its sole discretion, may designate that some or all of the Unsubscribed Units be issued in the name of, and delivered to, one or more of its affiliates, or to other financial institutions reasonably acceptable to Debtors.

The obligations of the Backstop Purchaser are subject to certain conditions including, among other things, (i) the entry of an order of the Bankruptcy Court on or before September 25, 2009, in form and substance satisfactory to the Backstop Purchaser and its counsel, approving the Backstop Commitment Agreement and the Committee's Plan, which order shall become a final order not subject to stay, appeal or modification on or before October 5, 2009, and (ii) the absence, at closing, of any short or long term material adverse effect on the operations, performance, prospects, business, assets, properties, or condition (financial or otherwise) of the Debtors, taken as a whole, since June 12, 2009.

## 8. Backstop Fees and Expenses/Backstop Units

In consideration for its agreement to backstop the Offering, in the event the Committee's Plan is confirmed and the Effective Date occurs, the Backstop Purchaser shall receive the Standby Commitment Fee to be allocated in the manner set forth in the Backstop Commitment Agreement. The Standby Commitment Fee shall be deemed fully earned and payable in full on the date of the entry of the Backstop Approval Order and Confirmation Order by the Bankruptcy Court, regardless of whether the Offering is fully subscribed by eligible holders of the Second Lien Noteholder Claims.

Under the Backstop Commitment Agreement, in the event that the Backstop Purchaser has executed definitive documentation and waived all contingencies such that it is ready, willing and able to perform its obligations under the definitive documents for the Offering and the Creditors' Committee enters into a financing transaction with parties other than the Backstop Purchaser and the Creditors' Committee confirms a plan of reorganization other than the Committee's Plan (the "Alternative Plan"), the Alternative Plan shall provide for the payment to the Backstop Purchaser of an aggregate break up fee equal to 10.0% of the New Common Units, which fee shall be fully earned upon closing of a financing transaction with parties other than the Backstop Purchaser; provided, however, that if upon closing of an Alternative Plan the Reorganized Debtors shall have more than $100,000,000 in debt or preferred equity financing, the break up fee shall equal $6,000,000, which shall be fully earned and payable upon the Effective Date of such Alternative Committee Plan.

Under the Backstop Commitment Agreement, if the Committee's Plan is confirmed and becomes effective, the Reorganized Debtors shall pay the reasonable and documented fees, expenses, disbursements and charges of the Backstop Purchaser incurred after July 29, 2009 relating to the exploration and discussion of alternative financing structures to the Backstop Commitment or to the preparation and negotiation of the Backstop Commitment Agreement, the Committee's Plan Documents, the Postconfirmation Organizational Documents, and the proposed documentation and the transactions contemplated thereby, including, without limitation, the reasonable fees and expenses of counsel and financial advisors to the Backstop Purchasers.

9. **Distribution of the New Common Units**

On the Effective Date, the LLC shall distribute the New Common Units purchased by each Offering Participant that has properly exercised its Subscription Rights to such holder and to the Backstop Purchaser. If the exercise of a Subscription Right would result in the issuance of a fractional share of New Common Units, then the number of shares of New Common Units to be issued in respect of such Subscription Right will be rounded down to the closest unit.

10. **Backstop Purchaser's Minimum Allocation**

Notwithstanding anything to the contrary in Article VI(D) of the Committee's Plan, the Backstop Purchaser shall receive the Minimum Allocation of the New Common Units issued pursuant to the Offering.

11. **Private Placement Exemption**

The Creditor's Committee will only make the Offering available to Eligible Holders. Therefore, the New Common Units issued pursuant to the Offering to the Eligible Holders will be exempt from registration under the Securities Act by virtue of Section 4(2) thereof and Regulation D promulgated thereunder. Unlike the New Common Units issued to holders of Allowed Claims (Classes 4A-4F and Classes 6A-6F), such New Common Units issued to the Eligible Holders pursuant to the Offering will not be exempted under section 1145 of the Bankruptcy Code.

12. **Disputed Claims**

For all purposes of this Article VI(D), each Offering Participant is entitled to participate in the Rights Offering solely to the extent of its Offering Pro Rata Share, if any; provided, however, that the Backstop Purchaser shall receive a minimum allocation of two-thirds (2/3) of the New Common Units issued pursuant to the Offering.

13. **Validity of Exercise of Subscription Rights**

All questions concerning the timeliness, viability, form and eligibility of any exercise of Subscription Rights shall be determined by the Creditors' Committee, whose good faith determinations shall be final and binding. The Creditors' Committee, in its discretion, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights. Subscription Forms shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Creditors' Committee determines in its discretion. The Creditors' Committee will use commercially reasonable efforts to give notice to any Offering Participants regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such participant and, may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Creditors' Committee nor the Subscription Agent shall incur any liability for failure to give such notification

## 14.    Indemnification of Backstop Purchaser

Upon entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be (in such capacity, the "Indemnifying Parties") shall indemnify and hold harmless the Backstop Purchaser and each of its respective affiliates, members, partners, officers, directors, employees, agents, advisors, controlling persons and professionals (each an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and reasonable expenses, joint or several, to which any such Indemnified Person may become subject arising out of or in connection with any claim, challenge, litigation, investigation or proceeding with respect to the Offering, the Backstop Commitment Agreement, the Committee's Plan or the transactions contemplated hereby or thereby, including without limitation, distribution of the Standby Commitment Fee if any, distribution of the Subscription Rights, the purchase and sale of New Common Units in the Offering and purchase and sale of Unsubscribed Units pursuant to the Backstop Commitment Agreement, regardless of whether any of such Indemnified Persons is a party thereto, and to reimburse such Indemnified Persons for any reasonable legal or other reasonable out-of-pocket expenses as they are incurred in connection with investigating, responding to or defending any of the foregoing, provided that the foregoing indemnification will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or expenses to the extent that they are finally judicially determined to have resulted from gross negligence or willful misconduct on the part of such Indemnified Person. If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless, then the Indemnifying Parties shall contribute to the amount paid or payable by such Indemnified Person as a result of such loss, claim, damage, liability or expense in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Parties on the one hand and such Indemnified Person on the other hand but also the relative fault of the Indemnifying Parties, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations. The relative benefits to the Indemnifying Parties on the one hand and all Indemnified Persons on the other hand shall be deemed to be in the same proportion as (i) the total value received or proposed to be received by the Debtors pursuant to the sale of New Common Units contemplated by the Backstop Commitment Agreement bears to (ii) the fee paid or proposed to be paid to the Backstop Purchaser in connection with such sale. The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their exclusive or contributory negligence or otherwise to the Indemnifying Parties, any person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other person in connection with or as a result of the Offering or the transactions contemplated thereby, except as to any Indemnified Person to the extent that any losses, claims, damages, liability or expenses incurred by the Debtors are finally judicially determined to have resulted from gross negligence or willful misconduct of such Indemnified Person in performing the services that are the subject of the Backstop Commitment Agreement. The indemnity and reimbursement obligations of the Indemnifying Parties described in this Article VI(D) shall be in addition to any liability that the Indemnifying Parties may otherwise have to an Indemnified Person and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Indemnifying Parties and any Indemnified Person.

Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, litigation, investigation or proceeding relating to the backstop Agreement or any of the transactions contemplated thereby ("Proceedings"), such Indemnified Person will, if a claim is to

be made hereunder against the Indemnifying Parties in respect thereof, notify the Indemnifying Parties in writing of the commencement thereof; provided that (i) the omission so to notify the Indemnifying Parties will not relieve it from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (ii) the omission so to notify the Indemnifying Parties will not relieve it from any liability that it may have to an Indemnified Person otherwise than on account of the provisions described in this Article VI(D).  In case any such Proceedings are brought against any Indemnified Person and it notifies the Indemnifying Person of the commencement thereof, if the Indemnifying Parties commits in writing to fully indemnify and hold harmless the Indemnified Person with respect to such Proceedings without regard to whether the Effective Date occurs, the Indemnifying Parties will be entitled to participate in such Proceedings, and, to the extent that it may elect by written notice delivered to such Indemnified Person, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Person, provided that if the defendants in any such Proceedings include both such Indemnified Person and the Indemnifying Parties and such Indemnified Person shall have concluded that there may be legal defenses available to it that are different from or additional to those available to the Indemnifying Parties, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Proceedings on behalf of such Indemnified Person.  Upon receipt of such indemnification commitment from the Indemnifying Parties and notice from the Indemnifying Parties to such Indemnified Person of its election so to assume the defense of such Proceedings and approval by such Indemnified Person of counsel, the Indemnifying Parties shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the next preceding sentence (it being understood, however, that the Indemnifying Parties shall not be liable for the expenses of more than one separate counsel, representing the Indemnified Persons who are parties to such Proceedings), (ii) the Indemnifying Parties shall not have employed counsel reasonably satisfactory to such Indemnified Person to represent such Indemnified Person at the Indemnifying Parties' expense within a reasonable time after notice of commencement of the Proceedings or (iii) the Indemnifying Parties shall have authorized in writing the employment of counsel for such Indemnified Person.

## D.      Retained Rights of Action

Unless a Right of Action is in writing, expressly waived, relinquished, released, compromised, or settled in the Committee's Plan, or in a Final Order, as of the Effective Date, all rights with respect to such Retained Right of Action are expressly preserved for the benefit of the Reorganized Debtors.

## E.      Claims Objections

Unless an objection to a Claim is in writing, expressly waived, relinquished, released, assigned, compromised, or settled in the Committee's Plan, or in a Final Order, all rights with respect to such Claim objection are expressly preserved for the benefit of, and fully vested in, the Reorganized Debtors.  The Reorganized Debtors may pursue, or decline to pursue, objections to Claims, as appropriate, in the business judgment of the Committee's Plan Representative.  The

Reorganized Debtors may settle, release, sell, assign, otherwise transfer, or compromise objections to Claims without need for notice or order of the Bankruptcy Court.

## F. Corporate Governance

### 1. General

On the Effective Date, the management, control and operation of the Reorganized Debtors shall become the general responsibility of the Postconfirmation Board. The Backstop Purchaser has no current intention of changing current management or their current compensation.

### 2. Postconfirmation Board

The Postconfirmation Board shall consist of 8 members, including the chief executive officer of the Reorganized Debtors, each of whom shall be selected by the Backstop Purchaser. All directors shall stand for election annually.

### 3. Filing of Postconfirmation Organizational Documents

On the Effective Date, or as soon thereafter as practicable, to the extent necessary, the Reorganized Debtors shall file their Postconfirmation Organizational Documents, as required or deemed appropriate, with the appropriate Persons in their respective jurisdictions of incorporation or establishment.

### 4. Long-Term Incentive Plan

The Long-Term Incentive Plan will provide for a certain percentage of New Common Units, not to exceed 10% of the issued and outstanding New Common Units on the Effective Date, to be reserved for issuance as options, equity or equity-based grants in connection with the Reorganized Debtors' Long-Term Incentive Plan. The amount of New Common Units, if any, to be issued pursuant to the Long-Term Incentive Plan, and the terms thereof shall be determined by the Postconfirmation Board.

## G. Exemption from Securities Laws

Holders of Allowed Claims in Classes 4A-4F (Second Lien Noteholder Claims) will receive New Common Units and holders of Allowed Claims in Classes 6A-6F (Subordinated Note Claims) will receive New Common Units and Warrants pursuant to the Plan. Section 1145 of the Bankruptcy Code provides an exemption from the securities registration requirements of federal and state securities laws with respect certain distributions of securities under a plan of reorganization. Pursuant to the Committee's Plan, the New Common Units and Warrants issued to holders of Allowed Claims in Classes 4A-4F (Second Lien Noteholder Claims) and holders of Allowed Claims in Classes 6A-6F (Subordinated Note Claims) will be exempt from registration under otherwise applicable federal and state securities laws pursuant to section 1145 of the Bankruptcy Code.

As set forth in the Committee's Plan, the New Common Units issued pursuant to the Offering to the Offering Participants will be exempt from registration under the Securities Act by virtue of section 4(2) thereof and Regulation D promulgated thereunder.

## H. Issuance and Resale of New Securities Under the Committee's Plan

Section 1145(a) of the Bankruptcy Code generally exempts from registration under the Securities Act of 1933 (as amended, the "Securities Act") the offer or sale of a debtor's securities under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or an equity interest in, such debtor, and in the case of warrants so issued under a chapter 11 plan, also generally exempts the issuance of the securities issued upon exercise of such warrants. In reliance upon this exemption, the New Common Units and New Warrants will be issued on the Effective Date as provided in the Committee's Plan, and will be exempt from the registration requirements of the Securities Act, except to the extent described below. Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (ii) the restrictions, if any, on the transferability of such Securities and instruments set forth in the Stockholders Agreement; and (iii) applicable regulatory approval. However, recipients of securities issued under the Committee's Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

As set forth herein and in the Committee's Plan, the New Common Units issued pursuant to the Offering to the Offering Participants will be exempt from registration under the Securities Act by virtue of section 4(2) thereof and Regulation D promulgated thereunder. The New Common Units being issued in the offering are "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act and accordingly may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except in transactions that are exempt from, or in transactions not subject to, the registration requirements of the Securities Act and in compliance with any applicable state securities laws. The New Common Units issued in the Offering shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

## I. Registration Rights Agreement

Other than as provided in the Registration Rights Agreement, the Reorganized Debtors shall not be obligated to list the New Common Units on a national securities exchange. In order to ensure that the Reorganized Debtors will not become subject to the reporting requirements of the Exchange Act except in connection with a public offering, the Postconfirmation Organizational Documents will impose certain trading restrictions to limit the number of record holders thereof. On the Effective Date, the Reorganized Debtors expect to enter into a registration rights agreement (the "Registration Rights Agreement") with the Backstop Purchaser and the other Offering Participants who purchase their Offering Pro Rata Share of New Common Units in the Offering (the "Other Full Offering Participants"). Pursuant to the Registration

Rights Agreement, the Backstop Purchaser would have the right to require the Reorganized Debtors to effect registered, underwritten secondary offerings of the Backstop Purchaser's New Common Units on terms and conditions to be negotiated and reflected in such Registration Rights Agreement, with the number of demand registration rights to be determined and the Other Full Offering Participants would have certain piggy-back registration rights. A form of the Registration Rights Agreement will be included in the Committee's Plan Supplement.

**J.      Interests in Affiliates and Subsidiaries**

As of the Effective Date but only until the reorganization of the Reorganized Debtors, except as expressly provided in the Committee's Plan, the Reorganized Debtors shall retain any stock or interests they may hold in their subsidiaries or affiliates and retain any rights to which such stock or interests may be entitled under applicable law with respect to such shares or other interests. Notwithstanding anything to the contrary herein, the Non-Debtor Subsidiaries may not sell, transfer or dispose of any assets without the consent of LLC.

**K.      Payment of Plan Expenses**

The Reorganized Debtors may pay all reasonable Plan Expenses without further notice to Creditors or Holders of Interests or approval of the Bankruptcy Court.

**L.      Dissolution of the Creditors' Committee**

As of the Effective Date, the Creditors' Committee shall be dissolved, provided, however, that notwithstanding such dissolution, the Creditors' Committee's Professional Persons may seek payment of any unpaid Administrative Expenses pursuant to the Committee's Plan.

**M.      Actions in Korea**

The Debtors or the Reorganized Debtors, as the case may be, shall take whatever action necessary to implement the Confirmation Order in Korea.

**VII.**
**EFFECT OF CONFIRMATION AND RELATED PROVISIONS**

**A.      Effect of Confirmation**

**1.      Binding Effect of Plan.**

The provisions of the confirmed Plan shall bind the Debtors, the Reorganized Debtors, any entity acquiring property under the Committee's Plan, and any Creditor or Interest Holder, whether or not such Creditor or Interest Holder has Filed a proof of Claim or Interest in the Chapter 11 Cases, whether or not the Claim of such Creditor or the Interest of such Interest Holder is Impaired under the Committee's Plan, and whether or not such Creditor or Interest Holder has accepted or rejected the Committee's Plan. All Claims and debts shall be as fixed and adjusted pursuant to the Committee's Plan. With respect to any taxes of the kind specified in Bankruptcy Code section 1146(c), the Committee's Plan shall also bind any taxing authority, recorder of deeds or similar official for any county, state, or governmental unit or parish in which

any instrument related to under the Committee's Plan or related to any transaction contemplated under the Committee's Plan is to be recorded.

**B.**     **Injunction**

**1.**     **Generally**

Unless otherwise provided in the Committee's Plan or the Confirmation Order, all injunctions and stays provided for in the Chapter 11 Cases pursuant to sections 105 and 362 of the Bankruptcy Code or otherwise in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.  From and after the Effective Date, all Persons are permanently enjoined from, and restrained against, commencing or continuing in any court any suit, action, or other proceeding, or otherwise asserting any Claim or Interest, (a) seeking to hold (i) the Reorganized Debtors, (ii) the Plan Proponent, (iii) the Backstop Purchaser; (iv) the Second Lien Noteholder Trustee; (v) the Subordinated Noteholder Trustee or (vi) the property of the Reorganized Debtors, liable for any Claim, obligation, right, Interest, debt, or liability that has been satisfied, discharged or released pursuant the Committee's Plan.

From and after the Effective Date, the Agent, the Collateral Trustee and all Holders of Claims are permanently enjoined from and restrained against, commencing or continuing in any court any suit, action, or other proceeding, or otherwise asserting any Claim or Interest against the Non-Debtor Subsidiaries.  The Second Lien Noteholder Trustee, the Subordinated Note Trustee, the Second Lien Collateral Agent and the Collateral Trustee hereby release all Liens, the Second Lien Guarantee, and the Subordinated Note Guarantee.

**2.**     **Injunction Related to Rights of Action and Terminated Claims, Administrative Expenses or Interests**

Except as provided in the Committee's Plan or in the Confirmation Order, as of the Confirmation Date, all Entities that have held, currently hold or may hold a Claim, Administrative Expense, Superpriority Claim, Interest, or other debt or liability that is stayed, Impaired, or terminated pursuant to the terms of the Committee's Plan are permanently enjoined from taking any of the following actions either (x) against the Backstop Purchaser, the Second Lien Noteholder Trustee, the Subordinated Noteholder Trustee, the Debtors, the Reorganized Debtors, or their property on account of all or such portion of any such Claims, Administrative Expenses, Superpriority Claims, Interests, debts, or liabilities that are stayed, Impaired, or terminated or (y) against any Person with respect to any Right of Action or any objection to a Claim, Administrative Expense, Superpriority Claim, or Interest, which Right of Action or objection, under the Committee's Plan, is waived, released, assigned, or exclusively retained by any of the Debtors:  (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order, (c) creating, perfecting, or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the

Committee's Plan. To avoid any doubt, except as otherwise expressly noted in the Committee's Plan, nothing in the Committee's Plan or herein shall be construed or is intended to affect, enjoin, modify, release, or waive any claims, rights, and actions that a third party may have against a person other than the Plan Proponent, the Backstop Purchaser, the Second Lien Noteholder Trustee, the Subordinated Noteholder Trustee, the Debtors or the Reorganized Debtors, provided that such claims, rights, and actions are wholly separate and exist independently from any claims, rights, and actions of the Estates.

**C.**     <u>Exculpation</u>

As of and subject to the occurrence of the Effective Date, each of the Plan Proponent and its Representatives, the Backstop Purchaser, the Second Lien Noteholder Trustee, the Subordinated Noteholder Trustee, the Reorganized Debtors, and the members of the Committee (acting in such capacity), shall neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken, in connection with, or related to, the formulation, preparation, dissemination, implementation, administration, Confirmation or Consummation of the Committee's Plan or any contract, instrument, waiver, release, or other agreement or document created or entered into, in connection with the Committee's Plan, or any other act taken or omitted to be taken in connection with the Chapter 11 Cases; provided, however, that the foregoing provisions of this subsection shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

**D.**     <u>Debtor Release</u>

Each Debtor, for itself and its respective successors, assigns, transferees, those officers and directors, acting in such capacities as of the Petition Date, agents, members, financial advisors, attorneys, employees, partners, affiliates, representatives, in each case in their capacity as such, shall be deemed to have released any and all claims and causes of action against the Plan Proponent, the Backstop Purchaser, the Second Lien Noteholder Trustee, the Subordinated Noteholder Trustee and the Reorganized Debtors, and their respective officers, directors, managers, employees, agents, advisors, accountants, attorneys and representatives, and their respective property, arising prior to the Effective Date. The Creditors' Committee is not aware of the existence of any Rights of Action that are the subject of the release described under this Article VII.D. As of the date of the Committee's Disclosure Statement, the Creditors' Committee has not performed a formal investigation of the Rights of Action described in this Article VII.D.

**E.**     <u>Third-Party Release</u>

Each Creditor that does not elect to opt out of this release by checking the appropriate box on the ballot provided to such Creditor in connection with solicitation of such Creditors' vote to accept to reject the Committee's Plan, for itself and its respective successors, assigns, transferees, those officers and directors, acting in such capacities as of the Petition Date, agents, members, financial advisors, attorneys, employees, partners, affiliates, representatives, in each case in their capacity as such, shall, by virtue of its vote, be deemed to have released any and all claims and causes of action against the Plan

**Proponent, the Backstop Purchaser, the Second Lien Noteholder Trustee, the Subordinated Noteholder Trustee and the Reorganized Debtors, and their respective officers, directors, managers, employees, agents, advisors, accountants, attorneys and representatives, and their respective property, arising prior to the Effective Date. The Creditors' Committee is not aware of the existence of any Rights of Action that are the subject of the release described under this Article VII.E. As of the date of the Committee's Disclosure Statement, the Creditors' Committee has not performed a formal investigation of the Rights of Action described in this Article VII.E.**

**F.    Subsequent Discovery of Facts Does Not Affect Enforceability of Releases**

**Each releasing party under Article XIV.D. and Article XIV.E. of the Committee's Plan shall be deemed to have granted the releases set forth herein, notwithstanding that it may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such party expressly waives any and all rights that it may have under any statute or common law principle, including section 1542 of the California Civil Code, which would limit the effect of such releases to those Claims or causes of action actually known or suspected to exist at the time of Confirmation. Section 1542 of the California Civil Code generally provides as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor." The Creditors' Committee is not aware of the existence of any Rights of Action that are the subject of the release described under this Article VII.F. As of the date of the Committee's Disclosure Statement, the Creditors' Committee has not performed a formal investigation of the Rights of Action described in this Article VII.F.**

**VIII.**
**REQUIREMENTS FOR CONFIRMATION**

**A.    Acceptances Necessary to Confirm Plan**

At the Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether the Committee's Plan has been accepted by each Impaired Class. Under section 1126 of the Bankruptcy Code, an Impaired Class of Claims is deemed to have accepted a plan if a plan has been accepted by creditors of that class that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class held by creditors that have accepted or rejected the plan. Similarly, an Impaired Class of Interests is deemed to have accepted a plan if the plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed equity interests of such class held by holders of such interests that have accepted or rejected the plan.

Voting rights are set forth as follows:

| Class | Status | Voting Rights |
|---|---|---|
| Class 1 (A–F) – Priority Non–Tax Claims | Unimpaired | Not entitled to vote. |
| Class 2 (A–F) – Other Secured Claims | Unimpaired | Not entitled to vote. |
| Class 3 (A–F) – First Lien Lender Claims | Impaired | Entitled to vote. |

| Class | Status | Voting Rights |
|---|---|---|
| Class 4 (A–F) – Second Lien Noteholder Claims | Impaired | Entitled to vote. |
| Class 5 (A–F) – General Unsecured Claims | Impaired | Entitled to vote. |
| Class 6 (A–F) – Subordinated Debt Claims | Impaired | Entitled to vote. |
| Class 7 (A–F) – Intercompany Claims of the Debtors | Impaired | Not entitled to vote. |
| Class 8 (A–F) – Equity Interests | Impaired | Not entitled to vote. |

**B.     Best Interest of Creditors Test**

Confirmation requires, among other thing, that each Holder of a Claim in an Impaired class and each Holder of an equity Interest either:  (a) accepts the Committee's Plan; or (b) receives or retains under the Committee's Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is commonly referred to as the "best interests test."

**1.     Chapter 7.**

To determine the value that the Holders of Impaired Claims and Interests would receive if the Debtors were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  Section 704 of the Bankruptcy Code requires a chapter 7 trustee to collect and reduce to money the property of the estate as expeditiously as is compatible with the best interests of parties in interest.

Attached hereto as Exhibit "B" is the Creditors' Committee's liquidation analysis, incorporating the Debtors' liquidation analysis.  The Debtors' have assumed that the maximum Cash available in chapter 7 cases for satisfaction of Allowed Claims would consist of the proceeds resulting from the liquidation of the Debtors' estates, by consummating the Sale (as such term is defined in the Debtors' Plan), if a Trustee were to obtain the consent from the First Lien Lenders to consummate the Sale.  Of course, absent such consent, a Trustee would seek to liquidate the Debtor's piecemeal, and the Cash available would be reduced.  Any Cash amount recovered in a liquidation would then be reduced by the amount of any Claims secured by such assets such as the Secured Claims, the costs and expenses of the liquidation of the Assets, and such additional Administrative Claims, and other Priority Claims, that may result from the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 would include fees payable to trustee(s) in bankruptcy, as well as those that might be payable to the trustee's attorneys, and to other professionals that such trustee(s) may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases that would be allowed as a priority in the chapter 7 cases, such as compensation for attorneys, appraisers, accountants, or other professionals, and costs and expenses of the Debtors and the Creditors' Committee.  Such Administrative Expenses from the chapter 7 cases would have to be paid in Cash in full from the liquidation proceeds before the balance of those proceeds could be made available to pay prepetition Claims.

2. **Liquidation Alternative.**

Pursuant to Bankruptcy Code section 1129(a)(7), unless there is unanimous acceptance of the Committee's Plan by an Impaired Class, the Creditors' Committee must demonstrate and the Bankruptcy Court must determine that with respect to such Class, each Holder of a Claim will receive property of a value, as of the Effective Date of the Committee's Plan, that is not less than the amount that such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Committee's Plan.

As set forth on Exhibit B hereto, the Committee's Plan satisfies this standard. The Debtors' assets are secured by the liens of the Lenders. The Committee's Plan provides greater recovery to the Holders of Allowed Claims than such Holders would receive under a liquidation under chapter 7 because (i) the Debtors' operations are worth more as a going concern than in a distressed sale, (ii) the Committee's Plan avoids a layer of administrative expense associated with the appointment of a chapter 7 trustee, while increasing the efficiency of administering the Debtors' assets for the benefit of Creditors.

Moreover, in a chapter 7 case, the chapter 7 trustee would also be entitled to seek a sliding scale commission based upon the funds distributed by such trustee, even if the Debtors have already accumulated much of the funds and have already incurred many of the expenses associated with generating those funds. Accordingly, the Creditors' Committee believes that there is a reasonable likelihood that Creditors would "pay again" for the funds accumulated by the Debtors, since the chapter 7 trustee would be entitled to receive a commission in some amount for all funds distributed, including possibly substantial funds handed over to the chapter 7 trustee by the Debtors. It is also anticipated that a chapter 7 liquidation would result in delay in distributions to Creditors. Among other things, a chapter 7 case would trigger a new bar date for filing Claims that would be more than ninety days following conversion of the case to chapter 7. Fed. R. Bank. P. 3002(c). Hence, a chapter 7 liquidation would not only delay distributions, but raise the prospect of additional Claims that were not asserted in the Chapter 11 Cases. Based on the foregoing, the Committee's Plan provides an opportunity to bring the greatest return to Creditors.

C. **Feasibility of Plan**

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation, that the Bankruptcy Court find that confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the plan, unless such liquidation or reorganization is proposed under the plan. This requirement is called "feasibility." The Committee's Plan is feasible. Based on the review by the Creditors Committee of the Debtors' financial affairs, the projected cash on-hand on the Effective Date, the projected EBITDA, and the Offering contemplated under the Committee's Plan, there will be sufficient Cash on hand to satisfy all of the Debtors' obligations under the Committee's Plan.

D. **Classification**

In accordance with section 1122 of the Bankruptcy Code, the Committee's Plan provides for the classification of Claims. Section 1122(a) permits a plan to place a claim or equity interest

in a particular class only if the claim or equity interest is substantially similar to the other claims or interests in that class. The Committee believes that the classification of Claims and Interests under the Committee's Plan is appropriate and consistent with applicable law.

### E. Confirmation of the Committee's Plan Without Necessary Acceptances; Cramdown

**A COURT MAY CONFIRM A PLAN, EVEN IF IT IS NOT ACCEPTED BY ALL IMPAIRED CLASSES, IF THE COMMITTEE'S PLAN HAS BEEN ACCEPTED BY AT LEAST ONE IMPAIRED CLASS OF CLAIMS, AND THE COMMITTEE'S PLAN MEETS THE "CRAMDOWN" REQUIREMENTS SET FORTH IN SECTION 1129(b) OF THE BANKRUPTCY CODE. SECTION 1129(b) OF THE BANKRUPTCY CODE REQUIRES THAT THE BANKRUPTCY COURT FIND THAT A PLAN IS "FAIR AND EQUITABLE," AND DOES NOT "DISCRIMINATE UNFAIRLY" WITH RESPECT TO EACH NON-ACCEPTING IMPAIRED CLASS OF CLAIMS OR INTERESTS. IN THE EVENT THAT ANY IMPAIRED CLASS REJECTS THE COMMITTEE'S PLAN, IN ACCORDANCE WITH SECTION 1129(a)(8) OF THE BANKRUPTCY CODE, AND AT LEAST ONE IMPAIRED CLASS HAS VOTED TO ACCEPT THE COMMITTEE'S PLAN, THE DEBTORS INTEND TO REQUEST THAT THE BANKRUPTCY COURT CONFIRM THE COMMITTEE'S PLAN IN ACCORDANCE WITH THE "CRAMDOWN" PROVISION OF SECTION 1129(b) OF THE BANKRUPTCY CODE, OR MODIFY THE COMMITTEE'S PLAN IN ACCORDANCE WITH THE TERMS THEREOF.**

The Committee's Plan provides for the possibility of invoking the "cramdown" provisions as defined in section 1129(a) of the Bankruptcy Code. Under this provision, the Bankruptcy Court has the authority to confirm the Committee's Plan even though a Class of Claims that is Impaired does not vote to accept the Committee's Plan, if another Class of Claims, which is also Impaired, votes to accept the Committee's Plan. This provision does not take into account the possibility that one large claimant or several claimants may arbitrarily vote not to accept the Committee's Plan that would be detrimental to other Creditors. In this instance the Bankruptcy Court, notwithstanding the negative vote, in the interest of being "fair and equitable," may confirm the Committee's Plan. Such determination, if necessary, would be addressed at the Confirmation Hearing.

### 1. No Unfair Discrimination.

With respect to a dissenting class of interests, the "fair and equitable" standard requires that the Committee's Plan contain one of two elements. It must provide either (i) that each holder of an interest in the class receive or retain property having a value, as of the effective date, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, or the value of such interests or (ii) that no holder of an interest in any junior class receive or retain any property on account of such interests. The strict requirement of the allocation of full value to dissenting classes before junior classes can receive distribution is known as the "absolute priority rule."

The Creditors' Committee believes that under the Committee's Plan: (i) all Impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests with which their legal rights are intertwined, if any, and (ii)

no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. The Committee believes that the Committee's Plan does not discriminate unfairly as to any Impaired Class.

### 2. Fair and Equitable Test.

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims and interests as follows:

#### a. Secured Claims

Either: (i) each holder of a secured claim (x) retains the lien securing its secured claim and receives on account of its allowed secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, or (y) realizes the "indubitable equivalent" of its allowed secured claim; or (ii) the property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds, and the liens against such proceeds are treated in accordance with clause (i).

#### b. Unsecured Claims

Either: (i) each holder of an unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims or the non-accepting class do not receive any property under the plan on account of such claims and interests.

#### c. Equity Interests

Either: (i) such holder of an interest receives or retains property of a value equal to the greater of any fixed liquidation preference or fixed redemption price to which such holder is entitled, or the value of the interest; or (ii) the holder of any interests junior to the interests in the impair class will not receive or retain any property under the plan.

The cramdown provisions of the Bankruptcy Code are complex and this summary is not intended to be a complete statement of the law in this area.

## IX.
## EFFECT OF CONFIRMATION

### A. Binding Effect of Confirmation

Confirmation will bind the Debtors, all Holders of Claims, Administrative Expenses, Superpriority Claims or Interests, and other parties in interest to the provisions of the Committee's Plan whether or not the Claim, Administrative Expense, Superpriority Claim or Interest of such Holder is Impaired under the Committee's Plan and whether or not the Holder of such Claim, Administrative Expense, Superpriority Claim, or Interest has accepted the Committee's Plan.

**B.**     <u>Good Faith</u>

        Confirmation of the Committee's Plan shall constitute a finding that: (i) the Committee's Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all Persons' solicitations of acceptances or rejections of the Committee's Plan and the offer, issuance, sale, or purchase of a security offered or sold under the Committee's Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

**C.**     <u>No Limitations on Effect of Confirmation</u>

        Nothing contained in the Committee's Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

**X.**

<u>**RISK FACTORS**</u>

        The principal risk associated with the Committee's Plan is that it may not be confirmed by the Bankruptcy Court, either because the requisite votes in favor of the Committee's Plan are not received or the Bankruptcy Court decides not to confirm the Committee's Plan on some other basis.

**A.**     <u>Certain Federal Income Tax Consequences of the Committee's Plan</u>

        The following discussion is a summary of certain U.S. federal income tax consequences of the Committee's Plan to Holders of Claims. The summary is subject to the completion of further due diligence by the Creditors' Committee and is subject to further revision. This discussion is based on the Internal Revenue Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Committee's Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. Further, legislative, judicial, or administrative changes may occur, perhaps with retroactive effect, that could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Holders of Claims.

        This discussion is for general information only and does not purport to address all aspects of U.S. federal income taxation that may be relevant the Holders of Claims in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers and dealers in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, regulated investment companies). This discussion only addresses the tax consequences to Holders of Claims who have held such Claims as capital assets within the meaning of the Internal Revenue Code. No aspect of foreign, state, local or estate and gift taxation is addressed. This discussion is subject to the completion of further due diligence by the Creditors' Committee. To the extent necessary, will update this discussion in the Plan Supplement once the due diligence is completed.

THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PERSONAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE COMMITTEE'S PLAN.

TO COMPLY WITH THE IRS CIRCULAR 230, IT IS NOTIFIED THAT (1) THE FOLLOWING SUMMARY IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE COMMITTEE'S PLAN, (2) IT CANNOT BE USED BY ANY PERSON FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE ASSERTED AGAINST THE PERSON UNDER THE INTERNAL REVENUE CODE, AND (3) HOLDERS OF CLAIMS OR INTERESTS SHOULD SEEK THEIR OWN ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISER.

1.      **Consequences to Debtors**

MagnaChip Semiconductor LLC is classified as a partnership for United States federal income tax purposes, and MagnaChip Semiconductor SA Holdings LLC (together with MagnaChip Semiconductor LLC, the "LLCs") is, for such purposes, disregarded as separate from MagnaChip Semiconductor LLC. Accordingly, (i) all items of income, gain, loss, deduction and credit of the LLCs for United States federal income tax purposes, including any such items (such as gains, losses and cancellation of indebtedness ("COD") income from effectuation of the Committee's Plan), will be taken into account by those members of the LLCs that held interests prior to the Reorganization and (ii) after the Reorganization the LLCs will, following implementation of the Committee's Plan, have no tax attributes in the nature of net operating losses from periods prior to effectuation of the Committee's Plan that would be available to shelter taxable income from its (or their) post-confirmation operations.

Of the remaining Debtors, MangaChip Semiconductor, Inc., MagnaChip Semiconductor Finance Company (each a "U.S. Corp") and MagnaChip Semiconductor S.A. are each classified as corporations for United States federal income tax purposes. MagnaChip Semiconductor B.V. is classified as a disregarded entity for such purposes. If either of MagnaChip Semiconductor, Inc., or MagnaChip Semiconductor Finance Company realize COD income as a result of the Committee's Plan, the U.S. Corps will generally be permitted to exclude such COD income but will be required to reduce its tax attributes including any net operating loss carryforwards, by the amount of COD excluded.

MagnaChip Semiconductor S.A. is likely to realize COD income under U.S. tax principles on account of the Committee's Plan. Such COD income should not be subject to United States federal income tax because MagnaChip Semiconductor S.A. is not engaged in a U.S. trade or business and under current law, although the matter is not free from doubt, it appears that such income will not be classified as subpart F income. The tax consequences to MagnaChip Semiconductor S.A. and MagnaChip Semiconductor B.V. will depend on the tax law in the jurisdiction in with they are incorporated. Based on analysis of Luxembourg and Dutch tax counsel, it appears there will be no cash tax cost to either MagnaChip Semiconductor S.A. or MagnaChip Semiconductor B.V. as a result of the implementation of the Committee Plan.

However, counsel will continue to explore the tax consequences of the Plan in Luxembourg and the Netherlands and we will supplement this disclosure if a different conclusion is reached.

## 2. Consequence to Holders of Claims

The United States federal income tax consequences of the distributions contemplated by the Committee's Plan to the Holders of Claims will depend upon a number of factors. The character and amount of income, gain, or loss recognized as a consequence of the Committee's Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a Holder acquired a Claim, (2) the length of time the Claim has been held, (3) whether the Claim was acquired at a discount, (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years, (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim, (6) the method of tax accounting of the Holder, and (7) whether the Claim is an installment obligation for United States federal income tax purposes.

For purposes of the following discussion, a "U.S. Holder" is any person (1) who is a citizen or resident of the United States; (2) that is a corporation or partnership created or organized in or under the laws of the United States or any state thereof or District of Columbia; (3) that is an estate, the income of which is subject to United States federal income taxation regardless of its source or; (4) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control or (b) that has elected to continue to be treated as a United States Person for United States federal income tax purposes. A "Non-U.S. Holder" is any person that is not a U.S. Holder. In the case of a partnership, the tax treatment of its partners will depend on the status of the partner and the activities of the partnership. Holders who are partnerships or partners in a partnership should consult their tax advisors.

Certain Holders of Claims (such as foreign persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers, and tax-exempt organizations) may be subject to special rules not addressed in this summary of United States federal income tax consequences. There also may be state, local, and/or foreign income or other tax considerations or United States federal estate and gift tax considerations applicable to Holders of Claims, which are not addressed herein. EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE COMMITTEE'S PLAN IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR WITH RESPECT TO DISTRIBUTIONS RECEIVED UNDER THE COMMITTEE'S PLAN.

## 3. United States Holders of Claims.

### (a) Tax Consequences of the Exchanges

Although the matter is not free from doubt, for United States federal income tax purposes, the Holders of Second Lien Noteholder Claims and Subordinated Noteholder Claims should be treated as exchanging their Claims for New Common Units, or Warrants, as applicable to the class in an exchange described in Section 721 of the Tax Code. In general, each Holder will not recognize gain or loss on the transfer. The Holder's aggregate tax basis in the New Common Units and the Warrants should equal its basis in such Claims immediately before the

exchange. **The allocation of the aggregate basis between the New Common Units and the Warrants received by the Holder in unclear and Holders are urged to consult their tax advisors.**

The amount, and the character of any gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss, will be determined by a number of factors, including, the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the Holder had previously claimed a bad debt deduction in respect of the Claim.

(b)      **Treatment of Holders of First Lien Lender Secured Claims**

A First Lien Lender Party that elects to receive a Cash payment equal to 72% of its First Lien Lender Secured Claim in full and complete satisfaction of such Claim will recognize gain or loss equal to the difference between (i) the amount of cash received  (to the extent not allocable to accrued interest not previously included in taxable income) and (ii) the Holder's adjusted tax basis in the First Lien Lender Secured Claims surrendered as of the Effective Date.

A First Lien Lender Party that elects to receive a Cash payment equal to 35% of its First Lien Lender Secured Claim and its Pro Rata share of the New Term Loan in full and complete satisfaction of such First Lien Lender Secured Claim will likely recognize gain or loss equal to the difference between (i) the amount of cash received plus the fair market value of the New Term Loan (to the extent not allocable to accrued interest not previously included in taxable income) and (ii) the Holder's adjusted tax basis in the First Lien Lender Secured Claims surrendered, provided that the First Lien Lender Secured Claim is not considered to be publicly traded within the meaning of Section 1273 of the Tax Code.  If the First Lien Lender Secured Claims are considered to be publicly traded within the meaning of Section 1273 of the Tax Code, the New Term Loan may be treated as having original issue discount. **Holders are urged to consult their tax advisors with respect to the tax consequences if the First Lien Lender Secured Claims are considered to be publicly traded.**

The First Lien Lender Secured Claims and the New Term Loans could be treated as securities for United States federal income tax purposes, although we do not believe that they would be characterized as such.  If the First Lien Lender Secured Claim and the New Term Loan are treated as a securities for purposes of Section 354 of the Tax Code, the transaction would be treated as a recapitalization exchange with boot.  **Holders are urged to consult their tax advisors with respect to the tax consequences if the transaction were so characterized.**

The amount, and the character of any gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss, will be determined by a number of factors, including, the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the Holder had previously claimed a bad debt deduction in respect of the Claim. **Holders are urged to consult their tax advisors with respect to the tax consequences if the transaction were so characterized.**

**(c)      Accrued but Unpaid Interest**

To the extent that a portion of the consideration received by a Holder in the exchange is allocable to accrued but unpaid interest not previously included by the recipient Holder in taxable income, such amount should be taxable to the Holder as interest income.  Conversely, a Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Claim or Interest was previously included in the Holder's gross income but was not paid (or treated as paid) in full by the Debtors.

Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the consideration paid pursuant to plans shall be allocated, pursuant to the Plan, first to the principal amount of such Claim as determined for federal income tax purposes and then to accrued interest, if any, with respect to such Claim.  Accordingly, in any case where a Holder receives distributions under a plan having a value less than the principal amount of its Claim, the Debtors will allocate the full amount of consideration transferred to such Holder to the principal amount of such obligation and will not treat any amount of the consideration to be received by such Holder as attributable to accrued interest.  There is no assurance that such allocation will be respected by the IRS for federal income tax purposes.

**(d)      Market Discount**

A Holder that purchased its Allowed Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code.  Under the "market discount" provisions of Sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a Holder of an Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the Allowed Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument (excluding "qualified stated interest") or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the Allowed Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

In addition, for Holders whose consideration is New Common Units or Warrants, under Section 108(e)(7) of the Tax Code, any gain recognized on the subsequent sale, exchange, redemption or other disposition of New Common Units or Warrants will be treated as ordinary income to the extent the Holder of the surrendered Claim previously claimed ordinary loss deductions with respect to the surrendered Claim.

**(e)      Bad Debt and/or Worthless Security Deduction**

A Holder who, under a plan, receives in respect of a Claim an amount less than the Holder's tax basis in the Claim may be entitled to a bad debt deduction in some amount under Section 166(a) of the Tax Code or a worthless security deduction under Section 165 of the Tax

Code. The rules governing character, timing and amount of bad debt or worthless security deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of a Claim therefore are urged to consult their tax advisors with respect to their ability to take such a deduction.

### 4.     Non-United States Persons

A Non-U.S. Holder of a Claim generally will not be subject to United States federal income tax with respect to any income or gain recognized upon the exchange of such Holder's Claim with Cash (or other property) pursuant to the Committee's Plan, unless (i) such Holder is engaged in a trade or business in the United States to which income, gain from the exchange is "effective connected" for United States federal income tax purposes, or (ii) if such Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

### 5.     Consequences of Holding New Common Units

Pursuant to the Committee's Plan, certain Holders will receive some combination of New Common Units and Warrants that, upon exercise, will convert into New Common Units. This following discussion summarizes certain U.S. federal income tax consequences of holding or disposing of New Common Units, whether acquired directly or by reason of exercise of the Warrants.

### (a)     Tax Classification of the Reorganized Debtor

Upon the Holders receipt of New Common Units, the Reorganized Debtor will be treated for federal (and perhaps state) income tax purposes as a partnership, and a holder of New Common Units will be treated as a partner thereof, unless and until either (a) the Reorganized Debtor elects to be treated as a corporation, or (b) the Reorganized Debtor becomes classified as a corporation pursuant to Section 7704 of the Tax Code by reason of the membership interests in the Reorganized Debtor being traded on an established securities market or treated as readily tradable on a secondary market (or the substantial equivalent thereof), provided that such classification would not attach if and while substantially all (90% or more) of the Reorganized Debtor's gross income meets the requirements of a special exception applicable to traded partnerships whose income is 90% or more qualifying income, including dividends and interest (other than interest received in the ordinary course of business by a financial institution or an insurance company).

In the event that, contrary to present expectations, the Reorganized Debtor elects to be treated as a corporation for federal (and applicable state) tax purposes, or is required to be so treated as a result of excessive trading of its membership interests in any case where the characteristics of its gross income would fail to qualify it for the exception under which its tax status as a partnership could continue, the Reorganized Debtor would be required to include its items of income, gain, loss, deduction and credit on its separate return and to pay any tax liability thereon, the holders of membership interests would be treated as shareholders (rather than partners) of the Reorganized Debtor, the consequences described in the following paragraphs would therefore be inapplicable, and such holders would be taxable on dividends or other

distributions, if any, received from the Reorganized Debtor, or upon disposition of membership interests, under tax rules normally applicable to shareholders in a corporate entity.

As it is currently expected that the desired classification for federal income tax purposes of the Reorganized Debtor is that of a partnership, the following discussion assumes the classification of the Reorganized Debtor as a partnership for federal income tax purposes.

**(b)** **Effects of Partnership Status**

Each Holder of New Common Units will generally be considered a partner in the Reorganized Debtor for federal (and possibly for applicable state) income tax purposes. Each such holder will be required to include its distributive share of the income, gains, losses, deductions and credits of the Reorganized Debtor on its own returns, whether or not any distributions are made, and will not be taxable on distributions when received except to the extent such distributions are in excess of the distributee's adjusted basis in the New Common Units. In general, a holder's adjusted basis in New Common Units will initially be equal to its basis in the Claims immediately before the Effective Date and minus any part of the pre-Effective Date basis of the Claims that is allocable to the Warrants and thereafter such basis will be increased by its additional capital contributions, if any, to the Reorganized Debtor and by such holder's distributive share of income or gains of the Reorganized Debtor, and the holder's adjusted basis in New Common Units will be decreased by the amount of distributions to such holder and such holder's distributive share of losses or deductions of the Reorganized Debtor.

The Reorganized Debtor's basis in Claims received from a Holder immediately after the Effective Date should be equal to such Holder's initial basis in its New Common Units. The Reorganized Debtor will be subject to Section 704(c) of the Tax Code upon any disposition of such Claims and any property received in exchange for Claims that has basis that is determined in whole or part by reference to the Reorganized Debtor's basis in the Claims. **The rules under Section 704(c) of the Tax Code are complex and holders of New Common Units are advised to speak with their tax advisor concerning the effect of such rules to them in light of their particular circumstances.**

The Reorganized Debtor's basis in the property it currently holds (including shares in MagnaChip Semiconductor S.A.) should not be affected by the implementation of the Committee Plan. However, it is possible that the IRS could attempt to recharacterize the acquisition by the Holders of New Common Units as a purchase of the units of the Reorganized Debtor currently held by its existing members. While we believe such a recharacterization is unlikely, if the IRS were to successfully assert such a position, the Reorganized Debtor's basis in its shares of MagnaChip Semiconductor S.A. would be reduced and its basis in the PECs would be different from that described n the preceding paragraph. **These rules are complex and Holders of New Common Units are advised to speak with their tax advisor concerning the effect of such rules to them in light of their particular circumstances.**

**(c)** Consequences of Contribution of Claims to MagnaChip S.A.

The Reorganized Debtor will not recognize gain or loss for United States federal income tax purposes on the exchange of Second Lien Noteholder Claims and Subordinated Noteholder

Claims for the PECs, provided the Second Lien Noteholder Claims and Subordinated Noteholder Claims are considered to be securities under Section 354 of the Tax Code, the PECs are considered to be equity for United States federal income tax purposes and no consideration received by the Reorganized Debtor is allocable to accrued interest on the Second Lien Noteholder Claims and Subordinated Noteholder Claims. To the extent the Second Lien Noteholder Claims and Subordinated Noteholder Claims are not classified as securities for purposes of Section 354 of the Tax Code, Holders, if any, who immediately before the Effective Date have Second Lien Noteholder Claims and Subordinated Noteholder Claims that have appreciated (i.e., Second Lien Noteholder Claims and Subordinated Noteholder Claims with a fair market value in excess of tax basis) might recognize gain on the exchange under Section 367(a) of the Tax Code. **The rules under Section 367(a) of the Code are complex and holders of New Common Units are advised to speak with their tax advisor concerning the effect of such rules to them in light of their particular circumstances.**

### (d)     Disposition of New Common Units

A holder will recognize gain or loss upon disposition of its New Common Units equal to the difference between the amount such holder realizes in connection with the disposition and such holder's adjusted tax basis for such New Common Units. Any gain or loss will generally be capital gain or loss (which will be long-term capital gain or loss if the New Common Unit has been held in excess of 12 months), subject to the application of certain "recapture" provisions that convert capital gain into ordinary income in certain circumstances. Under Section 751 of the Tax Code, gain recognized by a holder on the disposition of New Common Units will be treated as ordinary income to the extent of certain ordinary income generating assets held by the Reorganized Debtor at the time of the disposition including the shares of MagnaChip Semiconductors S.A. to extent of the earnings and profits of that company, including, for this purpose, the earnings and profits of all foreign entities owned by the company, except to the extent such earnings and profits have previously been subject to United States federal income tax under subpart F. The deductibility of capital losses is subject to limitations. The rules regarding gain or loss on the disposition of interests in partnerships are complex and Holders of Claims are advised to speak with their tax advisor concerning the effect of such rules to them in light of their particular circumstances.

### (e)     Controlled Foreign Corporation Rules

We anticipate that MagnaChip Semiconductor S.A. and MagnaChip Semiconductor Inc., a Japanese subsidiary, will be treated as "controlled foreign corporations" ("CFCs") which are subject to special anti-deferral rules under the United States federal income tax laws. All other foreign entities owned directly or indirectly by MagnaChip Semiconductors S.A. will be treated as disregarded entities for United States federal income tax purposes. Under the CFC rules, each U.S. Holder of New Common Units will generally be required to recognize its pro rata share of certain "Subpart F" income generated by the CFCs. Generally, Subpart F income consists of passive income such as interest, dividends and certain rents and royalties and income from the sale of property involving related persons and the provision of certain services with respect to related parties. Subpart F income is generally recognized by shareholders of a CFC on the last day of the CFC's taxable year. Accordingly, holders of New Common Units may be required to recognize Subpart F income even if no distributions are paid on the New Common Units and

even if the underlying CFC income were earned prior to the Effective Date of the Committee's Plan. The rules regarding CFCs and Subpart F income are complex and Holders of Claims are advised to speak with their tax advisor concerning the effect of such rules to them in light of their particular circumstances.

**6.      Holders of Warrants**

**(a)      Exercise of Warrants**

The Warrants received by the Claim Holders will constitute an option to acquire New Common Units of the Reorganized Debtor in accordance with the terms of the Warrants. The exercise of a Warrant should not result in a taxable event to the holder thereof or to the Reorganized Debtor, and the initial tax basis of New Common Units received as a result of the exercise of a Warrant should be equal to the sum of the Claim Holders' tax basis in the Warrant and the price paid, if any, to exercise the Warrant. The holding period for the New Common Units acquired through exercise of a Warrant will generally begin on the exercise date.

It is expected that the agreement governing the Reorganized Debtor will contain detailed provisions setting forth the proper tax accounting to be employed upon the exercise of the Warrants. In accordance with currently proposed Treasury Regulations, such provisions may operate to cause special or corrective allocations of taxable income (or loss), but not book income (or loss) or distributable cash, to be allocated to an exercising holder of Warrants to the extent the fair market value (at the time of exercise) of the holder's right to share in the capital of the Reorganized Debtor pursuant to the agreement exceeds (or is less than) the sum of the holder's basis in the Warrants plus the exercise price thereof. Each holder of Warrants should consult their own tax advisors as to the federal income tax consequences of exercise of Warrants prior to taking such action.

**(b)      Sale of Warrants**

A holder of Warrants will generally recognize gain or loss for federal income tax purposes on the sale of the Warrants received or treated as received pursuant to the Committee's Plan in an amount equal to the difference between the amount realized on the sale and the holder's tax basis in the Warrant. Gain or loss will be capital if the Warrants are capital assets in the holder's hands. If the holder's holding period in the Warrants is more than one year, then the gain or loss will be long-term capital gain or loss.

**(c)      Expiration or Lapse of Warrants**

A holder of Warrants that allows its Warrants to expire will generally recognize loss for federal income tax purposes to the extent of the holder's tax basis in the Warrants.

**7.      Foreign Tax Considerations**

We do expect that the implementation of the Committee Plan will require the Reorganized Debtor to modify the structure of MagnaChip Semiconductors S.A. and the companies it controls directly or indirectly.

**8.      Importance of Obtaining Professional Tax Assistance**

The United States federal income tax consequences to a Holder other than a Holder receiving Cash (or other property) in satisfaction of such Holder's Claim may be different from the tax consequences described above.  Holders of each such Claim should consult their tax advisers regarding the potential federal income tax consequences.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE COMMITTEE'S PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE COMMITTEE'S PLAN.

## XI.
## ALTERNATIVES TO COMMITTEE'S PLAN

The Committee believes that if the Committee's Plan is not confirmed, or is not confirmable, the alternatives to the Committee's Plan include:  (a) conversion of the Chapter 11 Cases to chapter 7, (b) dismissal of the Debtors' cases, or (c) an alternative plan of liquidation as proposed in the Debtors' Plan.

**A.      Alternative Plan**

The Creditors' Committee believe that any alternative plan would not result in as favorable of treatment of Claims and Interests as proposed under the Committee's Plan. Pursuant to the terms of the Debtors' Plan, the Debtors' Estates will receive substantially less than market value upon the sale of their assets.  The Debtors' Plan contemplates an approximate recovery to Holders of Class 3 Claims of 70%.  The Committee's Plan provides Holders of Class 3 Claims their Pro Rata Share of the New Term Loan that yields a 100% recovery to Holders of Class 3 Claims.  In addition, the Debtors' Plan provides Holders of Class 4 Claims a de minimis recovery, while  the Committee's Plan provides Eligible Holders of such Claims 5% of the New Common Units, and the right to participate in the Offering. Holders of Class 5 Claims receive a de minimis recovery under the Debtors' Plan, and receive a 10% recovery under the Committee's Plan.  Finally, Holders of Class 6 Claims receive a de minimis recovery under the Debtors' Plan, and receive 1% of the New Common Units pursuant to the Committee's Plan, plus warrants for 5% of the New Common Units with a strike price equivalent to a $600 million total enterprise value.

The Debtors do not believe that the Committee's Plan results in a more favorable treatment of Claims and Interests than the Debtors' Plan.  Among other things, the Debtors do not believe that the Committee's Plan is feasible and therefore, holders of Claims and Interests

will not receive the benefits of the consideration that is promised under the Committee's Plan. The Creditors' Committee disagrees with these contentions.

## B.     Liquidation Under Chapter 7

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code.  For the reasons previously discussed above, the Commitee believes that Confirmation of the Committee's Plan will provide Creditors with a recovery that is expected to be substantially more than could be achieved in a liquidation under chapter 7 of the Bankruptcy Code.

## C.     Dismissal

Dismissal of the Chapter 11 Cases would leave the Debtors' secured creditors in position to exercise their state law rights under their existing security interests, including foreclosure of such liens.  The Debtors do not believe that this alternative is in the best interests of the Estates.

## D.     No Res Judicata Effect

Notwithstanding anything to the contrary in the Committee's Plan or in this Disclosure Statement, the provisions of this Disclosure Statement and the Committee's Plan, which permits the Reorganized Debtors to enter into settlements and compromises of any potential litigation, shall not have and are not intended to have any *res judicata* effect with respect to any prepetition Claims and causes of action that are not otherwise treated under the Committee's Plan, and shall not be deemed a bar to asserting such Claims and causes of action.

## XII.
## CONFIRMATION REQUEST

The Creditors' Committee requests that the Bankruptcy Court confirm the Committee's Plan and that it do so, if applicable, pursuant to section 1129(b) of the Bankruptcy Code notwithstanding the rejection of the Committee's Plan by any Impaired Class.

# XIII.
# CONCLUSION

The Creditors' Committee believes that the Committee's Plan is in the best interest of Creditors and urges Creditors to vote to accept the Committee's Plan.

Official Committee of Unsecured Creditors:

By:  /s/  Howard A. Cohen

**DRINKER BIDDLE & REATH LLP**
Howard A. Cohen (DE 4082)
1100 N. Market Street, Suite 1000
Wilmington, DE 19801-1254
Tel: (302) 467-4200
Fax: (302) 467-4201

- and -

**LOWENSTEIN SANDLER PC**
John K. Sherwood, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2538
Fax: (973) 597-2539

*Co-Counsel for the Official  Committee of Unsecured Creditors*

# EXHIBIT A

## Defined Terms

The following definitions shall apply to capitalized terms used in the Committee's Plan:

1.    "Accredited Investor" means an accredited investor as defined in Rule 501(a) of Regulation D under the Securities Act, as of the Offering Record Date.

2.    "Administrative Expense" means an unpaid administrative expense of the kind described in sections 503(b) and 507(a)(2) of the Bankruptcy Code against any of the Debtors (other than the Superiority Claims), including, without limitation, (i) the actual, necessary costs and expenses of preserving the Estates of the Debtors, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Cases; (ii) compensation and reimbursement of expenses of professionals to the extent allowable under sections 327, 328, 330(a), 331, 503(b) or 1103 of the Bankruptcy Code (including the reasonable fees and expenses of the legal and financial advisors to the Creditors' Committee); and (iii) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911 –1930, including the fees, if any, due to the United States Trustee.

3.    "Agent" means UBS AG, Stamford Branch, in its capacity as administrative agent and collateral agent for the First Lien Lenders under the First Lien Credit Agreement.

4.    "Allowed" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by any Debtor in its Schedules as other than disputed, contingent, or unliquidated that has not been superseded by a Filed proof of Claim and as to which a Debtor or any other party in interest has not Filed an objection; (b) a Claim that has been allowed by a Final Order; (c) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by a Debtor prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation of amount and nature of Claim executed by a Reorganized Debtor, as the case may be, on or after the Effective Date and, to the extent necessary, approved by the Bankruptcy Court; or (iii) in any contract, instrument, indenture, or other agreement entered into or assumed by a Debtor in connection with and in accordance with the Committee's Plan; (d) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law; or (e) a Claim that is allowed pursuant to the terms of the Committee's Plan.

5.      "Avoidance Claims" means any Right of Action for the recovery of transfers arising under sections 510(c), 542, 543, 544, 547, 548, 549 or 550 of the Bankruptcy Code or applicable state law.

6.      "Backstop Approval Order" means that order, in form and substance satisfactory to the Backstop Purchasers, authorizing and approving the Backstop Commitment Agreement.

7.      "Backstop Commitment Agreement" means that certain agreement, dated August 21, 2009, among the Debtors and the Backstop Purchaser, as amended, annexed hereto as Exhibit A.

8.      "Backstop Purchaser" means Avenue Special Situations Fund V, L.P., which has agreed to backstop the Offering pursuant to the terms of the Backstop Commitment Agreement.

9.      "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended, as set forth in title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*., as now in effect or hereafter amended.

10.     "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court of competent jurisdiction as may be administering the Chapter 11 Cases or any party thereof.

11.     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure promulgated pursuant to 28 U.S.C. § 2075, as now in effect or hereinafter amended, together with the local rules of the Bankruptcy Court.

12.     "Bar Date" means, July 29, 2009, the date set as the deadline for filing proofs of Claims or Interests (whether or not each and every proof of Claim or Interest is subject to such deadline) pursuant to the *Order (A) Fixing the Procedures and Deadlines to File Proofs of Claim, (B) Approving the Form and Manner of Notice of Bar Dates, and (C) Granting Related Relief* entered on June 25, 2009 by the Bankruptcy Court.

13.     "Business Day" means any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

14.     "Cash" means currency of the United States of America and cash equivalents, including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire transfers and other similar forms of payment.

15.     "Chapter 11 Cases" means the cases commenced under chapter 11 of the Bankruptcy Code by each of the Debtors on the Petition Date and pending before the Bankruptcy Court.

16.     "Claim" means any claim against the Debtors, or any of them, within the meaning of section 101(5) of the Bankruptcy Code that is not an Administrative Expense or

Superpriority Claim, including, without limitation, claims of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

17. "Claims Agent" means Omni Management Group, in its capacity as claims agent for the Debtors.

18. "Class" means each category of Claims or Interests classified in Section IV of the Committee's Plan pursuant to section 1122 of the Bankruptcy Code.

19. "Collateral Trustee" means U.S. Bank, National Association, in its capacity as collateral trustee under the Collateral Trust Agreement dated as of December 23, 2004, by and among the Agent, the Second Lien Noteholder Trustee and the Collateral Trustee.

20. "Committee's Disclosure Statement" means the *Disclosure Statement in Support of Chapter 11 Plan of Reorganization Proposed by the Official Committee of Unsecured Creditors of MagnaChip Semiconductor Finance Company*, as may be amended, modified, or supplemented from time to time in accordance with the terms hereof, submitted pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of the Committee's Plan.

21. "Committee's Plan" means this Plan of Reorganization for the Debtors.

22. "Confirmation" means the approval by the Bankruptcy Court of the Committee's Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code, as effectuated by the entry of the Confirmation Order.

23. "Confirmation Date" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 11 Cases.

24. "Confirmation Hearing" means the date or dates established by the Bankruptcy Court for the hearing(s) on confirmation of the Committee's Plan pursuant to section 1129 of the Bankruptcy Code, as it may be adjourned or continued from time to time.

25. "Confirmation Order" means the order entered by the Bankruptcy Court confirming (approving) the Committee's Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code, in form and substance acceptable to the Creditors' Committee and the Backstop Purchaser.

26. "Consummation" means substantial consummation of the Committee's Plan as that term is used in section 1127(b) of the Bankruptcy Code.

27. "Creditor" means any Person who is the Holder of a Claim, Administrative Expense, or Superpriority Claim against any of the Debtors.

28. "Creditors' Committee" means the official committee of unsecured creditors of the Debtors appointed in the Chapter 11 Cases pursuant to section 1102 of the

Bankruptcy Code. The Creditors' Committee is comprised of the following entities: Avenue Special Situations Fund V, L.P.; Bank of New York Mellon; and Law Debenture Corporation.

29. "Debtors" means (i) Finco; (ii) LLC; (iii) Holdco; (iv) MSA; (v) Luxco; and (vi) Dutchco; in their corporate capacities, other capacities and, as appropriate, in their capacities as debtors and debtors in possession under chapter 11 of the Bankruptcy Code in their Chapter 11 Cases and, when the context so requires, in their capacities as the Reorganized Debtors.

30. "Deficiency Claims" means, with respect to any Claim secured by a valid Lien on any property of any Debtor having a value of less than the amount of such Claim (after taking into account other Liens of higher priority on such property), the portion of such Claim equal to the difference between (a) the amount of the Claim and (b) the Allowed amount of the secured portion of such Claim (which Allowed secured amount may be set pursuant to the Committee's Plan).

31. "Disallowed" means, with respect to a Claim, Interest, or Administrative Expense, all or a portion thereof that it is determined is not allowed under the Bankruptcy Code either by a Final Order, the Committee's Plan, any Plan Document or under a stipulation or settlement with any of the Debtors entered into after the Effective Date.

32. "Disputed Claim" means (i) a Claim, Interest, or Administrative Expense that is subject to a pending objection or for which the Bankruptcy Court's order allowing or disallowing such Claim, Interest, or Administrative Expense is on appeal; or (ii) until the Objection Deadline,

a. a Claim for which a corresponding Claim has not been listed in the Debtors' Schedules or for which the corresponding Claim is listed in the Debtors' Schedules with a differing amount (to the extent of such difference), with a differing classification, or as disputed, contingent, or unliquidated; and

b. a Claim that has not been Allowed either by a Final Order, the Committee's Plan, any Plan Document, or under a stipulation or settlement with any of the Debtors entered into' after the Effective Date.

33. "Distributable Cash and Claims" means, as to each Debtor, any Cash, deposit accounts, reserves, and deposits remaining in the Estate of such Debtor as of the Effective Date, together with any Retained Rights of Action of such Debtor (including Intercompany Claims against Non-Debtor Subsidiaries), but excluding other real and personal property of such Debtor.

34. "Dutchco" means MagnaChip Semiconductor B.V., a company incorporated in the Netherlands.

35. "Effective Date" means the first Business Day after the Confirmation Date immediately following the first day upon which all of the conditions to the

occurrence of the Effective Date have been satisfied or waived in accordance with the Committee's Plan.

36. "Eligible Holder" means a holder of a Second Lien Noteholder Claim as of the Offering Record Date who is an Accredited Investor.

37. "Entity" and "Entities" mean an entity as defined in section 101(5) of the Bankruptcy Code or more than one thereof.

38. "Estate(s)" means each estate created pursuant to section 541(a) of the Bankruptcy Code upon the commencement of each Chapter 11 Case.

39. "Fee Applications" mean applications of Professional Persons under sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Chapter 11 Cases.

40. "Fee Claims" means Administrative Expenses for compensation and reimbursement of expenses of professionals to the extent allowable under sections 327, 328, 330(a), 331, 503(b) or 1103 of the Bankruptcy Code.

41. "File" or "Filed" means filed of record and entered on the docket in the Chapter 11 Cases or, in the case of a proof of Claim, delivered to the Claims Agent.

42. "Final Cash Collateral Order" means the *Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code Authorizing the Use of Cash Collateral Pursuant to the Enforcement Agreement and Granting Adequate Protection to First Lien Lenders and Second Lien Noteholders*, entered by the Bankruptcy Court in the Chapter 11 Cases on July 13, 2009.

43. "Final Allocation" means with respect to any Offering Participant that has elected to exercise its Rights, such holder's Pro Rata Share of the Rights after taking into account the Minimum Allocation.

44. "Final Order" means a judgment, order, ruling, or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal, which judgment, order, ruling, or other decree has not been reversed, stayed, modified, or amended and as to which (a) the time to appeal or petition for review, rehearing, or certiorari has expired and as to which no appeal or petition for review, rehearing or certiorari is pending; or (b) any appeal or petition for review, rehearing, or certiorari has been finally decided and no further appeal or petition for review, rehearing, or certiorari can be taken or granted.

45. "Final Resolution Date" means the date on which all Disputed Claims of Creditors shall have been resolved by Final Order or otherwise finally determined.

46. "Finco" means MagnaChip Semiconductor Finance Company, a Delaware corporation.

47. "First Lien Credit Agreement" means that Credit Agreement, dated as of December 23, 2004, by and among the First Lien Lender Parties; Luxco and Finco, as borrowers; and the First Lien Guarantors; and any ancillary documents issued in connection therewith or related thereto.

48. "First Lien Guarantee" means the guarantee by the First Lien Guarantors of the obligations of the First Lien Lender Parties, Luxco and Finco under the First Lien Credit Agreement.

49. "First Lien Guarantors" means LLC; Dutchco; MSK; Holdco; MagnaChip Semiconductor Limited, a company incorporated in the United Kingdom; MagnaChip Semiconductor Holding Company Limited, a British Virgin Islands company; MagnaChip Semiconductor Inc., a company incorporated in Japan; MagnaChip Semiconductor Limited, a company incorporated in Hong Kong SAR; MagnaChip Semiconductor Limited, a company incorporated in Taiwan; and MSA.

50. "First Lien Lender" means a "Lender" under and as defined in the First Lien Credit Agreement.

51. "First Lien Lender Parties" means the Agent, the First Lien Lenders, UBS Securities LLC, as Arranger, Syndication Agent and Documentation Agent, UBS Loan Finance LLC, as Swingline Lender, and Korea Exchange Bank, as Issuing Bank.

52. "First Lien Lender Secured Claims" means the Secured Claims of the First Lien Lender Parties arising under, in connection with or pursuant to the First Lien Credit Agreement and the Final Cash Collateral Order and all other documents, instruments, guarantees and other agreements related to either thereof.

53. "General Unsecured Claim" means a Claim against any of the Debtors other than (a) an Administrative Expense, (b) a Superpriority Claim, (c) a Tax Claim, (d) a Priority Non-Tax Claim, (e) an Other Secured Claim, (f) a First Lien Lender Secured Claim, (g) a Second Lien Noteholder Claim, (h) a Subordinated Note Claim, and (i) an Intercompany Claim. General Unsecured Claims include, without limitation, and any Deficiency Claim of the First Lien Lender Parties.

54. "Holdco" means MagnaChip Semiconductor SA Holdings LLC, a Delaware limited liability company.

55. "Holder" means the beneficial owner of any Claim, Interest, Administrative Expense, or Superpriority Claim.

56. "Impaired" has the meaning set forth in section 1124 of the Bankruptcy Code.

57. "Indenture Trustee Fees and Expenses" means any and all fees, expenses, disbursements and advances of each Indenture Trustee (and its counsel, agents and advisors) that are provided for under the Second Lien Notes Indenture and the

Subordinated Note Indenture (including, without limitation, in connection with service on the Creditors' Committee and in connection with distributions under the Committee's Plan), which are incurred at any time prior to or after the Effective Date.

58. "Intercompany Claim" means any Claim or Administrative Claim asserted against a Debtor or Non-Debtor Affiliate by any other Debtor or Non-Debtor Affiliate, including, without limitation, any subrogation claim that has not been waived and any contribution claim.

59. "Intercreditor Agreement" means that certain intercreditor agreement dated as of December 23, 2004, among Luxco, Finco, the First Lien Guarantors, the Agent, the Second Lien Noteholder Trustee, the Second Lien Collateral Agent and the Collateral Trustee.

60. "Interest" means an equity security of any Debtor within the meaning of section 101(16) of the Bankruptcy Code.

61. "Korean Guarantee" means the guarantee by MSK of Luxco's and Finco's obligations under the Second Lien Indenture and the notes executed pursuant to the Second Lien Indenture.

62. "Lenders" means, collectively, the First Lien Lenders and the Second Lien Noteholders.

63. "Lien" means any charge against or security interest in property to secure payment or performance of a Claim, debt, or obligation, against Debtor or Non-Debtor Subsidiaries.

64. "LLC" means MagnaChip Semiconductor LLC, a Delaware limited liability company.

65. "Long-Term Incentive Plan" means an incentive Plan for management, selected employees and directors of the Reorganized Debtors, the terms of which are described in Article VI.G.4 of the Committee' Plan.

66. "Luxco" means MagnaChip Semiconductor S.A., a *société anonyme* and organized under the laws of Luxembourg.

67. "Minimum Allocation" means 67% of the New Common Unit that is issued pursuant to the Offering.

68. "MSA" means MagnaChip Semiconductor, Inc., a California corporation.

69. "MSK" means MagnaChip Semiconductor, Ltd., a Korean limited liability company.

70.     "New Term Loan" means the new secured term loan to be issued on the Effective Date in the initial aggregate amount of $0-$61.75 million, the material terms of which are set forth on Schedule 1 of the Committee's Plan. The amount of the New Term Loan will be filed on the Effective Date and will be based upon the elections of the First Lien Lenders pursuant to Section IV.B.3.6. hereof.

71.     "New Common Units" means the common units of LLC to be issued on the Effective Date pursuant to the Committee's Plan.

72.     "Non-Debtor Subsidiaries" means MSK, MagnaChip Semiconductor Limited (Hong Kong), MagnaChip Semiconductor Inc. (Japan), MagnaChip Semiconductor Limited (Taiwan), MagnaChip Semiconductor Limited (U.K.), MagnaChip Semiconductor Holding Company Limited, a company incorporated under the laws of the British Virgin Islands, and MagnaChip Semiconductor (Shanghai) Company Limited, a Chinese corporation.

73.     "Non-Korean Guarantors" means all First Lien Guarantors other than MSK.

74.     "Objection Deadline" means the deadline to object to Claims specified in Article IX(A) of the Committee's Plan.

75.     "Offering" means the offering of no less than $35 million and no more than $50 million in aggregate New Common Units, such aggregate offering amount to be determined on or before the Subscription Commencement Date based upon the treatment elected by the First Lien Lenders under the Committee's Plan, (i) on a pro rata basis to each Eligible Holder of Second Lien Noteholder Claims and (ii) to the extent less than the full Offering Amount is issued to the Eligible Holders of Second Lien Noteholder Claim, to the Backstop Purchaser; provided, however, that the Backstop Purchaser shall receive the Minimum Allocation of the Offering Amount pursuant to the Offering; provided, further, that the Offering shall be subject to the New Common Units issued to the Backstop Purchaser for the Standby Commitment Fee and the Long-Term Incentive Plan.  The Offering will only be made to accredited investors in a fashion that will be exempt from registration under the Securities Act of 1933.

76.     "Offering Amount" means no less than $35 million and no more than $50 million depending upon the cash required to be paid to the First Lien Lender Parties under the elections offered to the First Lien Lender Parties under the Committee's Plan. For example, if the Holders of 100% of the First Lien Lenders elect to receive (i) Cash equal to 35% of their First Lien Lenders and (ii) their Pro Rata share of the New Term Loan, the Offering Amount shall equal $35 million (with $33.25 million being used to pay the cash required under this treatment and the $1.75 million going to the Debtors for working capital purposes).  If the Holders of 50% of the aggregate First Lien Lenders elect to receive (i) Cash equal to 35% of their First Lien Lender Secured Claims and (ii) their Pro Rata share of the New Term Loan, the Offering Amount shall equal $42.5 million (the cash required under this option is $50.825 million and the remaining $8.325 million would come from the

Debtors' cash on hand).  If the Holders of 100% of the First Lien Lender Secured Claims elect to receive to receive a Cash payment equal to 72% of their First Lien Lender Secured Claims, the Offering Amount shall equal $50 million (and the $18.4 million required to pay the $68.4 million payout under this option would come from the Debtors). The Offering Amount shall be straight line interpolated between $35 million and $50 million based upon the First Lien Lender Parties' elections.

77.     "Offering Participant" means an Eligible Holder of a Second Lien Noteholder Claim as of the Offering Record Date, including the Backstop Purchaser.

78.      "Offering Procedures" means those certain rights offering procedures, setting forth the terms and conditions of the Offering, as more fully described in Article VI(D) hereof.

79.     "Offering Pro Rata Share" means with respect to the Subscription Rights of each Offering Participant, the ratio (expressed as a percentage) of such participant's Offering Participation Claim Amount to the aggregate amount of all Offering Participation Claim Amounts, determined as of the Subscription Expiration Date.

80.      "Offering Record Date" means the date for determining which holders of Claims are entitled to receive the Committee's Disclosure Statement and vote to accept or reject the Committee's Plan, as applicable, which date is the date the Order approving the Committee's Disclosure Statement is entered.

81.     "Other Secured Claim" means any Secured Claim other than a First Lien Lender Secured Claim or a Second Lien Noteholder Claim.

82.     "PECs" means preferred equity certificates to be issued by Luxco in an amount and upon terms that are similar to the terms of the Second Lien Notes and the Subordinated Notes but without guarantees or Liens being granted by any Person.

83.     "Per Unit Price" means the price per Unit for each New Common Unit purchased in the Offering, which price is equal to 1,680,000 divided by the final Offering Amount.

84.     "Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, or other entity of whatever nature.

85.     "Petition Date" means June 12, 2009, the date on which each of the Debtors Filed their petitions for relief under chapter 11 of the Bankruptcy Code.

86.      "Plan Documents" means the Committee's Plan, the Disclosure Statement, and all exhibits and schedules to either of the foregoing.

87.     "Plan Expenses" means the expenses incurred by the Reorganized Debtors following the Effective Date (including the reasonable fees and costs of attorneys and other professionals) for the purpose of (i) resolving Disputed Claims, if any, and effectuating distributions to Creditors under the Committee's Plan, (ii) otherwise implementing the Committee's Plan and closing the Chapter 11 Cases, or (iii) undertaking any other matter relating to the Committee's Plan.

88.     "Plan Proponent" means the Creditors' Committee.

89.     "Plan Supplement" means the supplement or supplements to the Committee's Plan containing certain documents relevant to the implementation of the Committee's Plan specified in section XIV.9 of the Committee's Plan; provided, however, that the Committee's Plan Supplement and the documents contained therein shall be in form, scope and substance satisfactory to the Backstop Purchaser.

90.     "Postconfirmation Board" means the board of directors of the Reorganized Debtors which shall be disclosed in the Committee's Plan Supplement and acceptable to the Backstop Purchaser.

91.     "Postconfirmation Organizational Documents" means the certificate of formation, limited liability company agreement, certificate of incorporation, bylaws, and other organizational documents for the Reorganized Debtors, the forms of which shall be reasonably satisfactory to the Backstop Purchaser and consistent with Section 1123(a)(6) of the Bankruptcy Code.  The Postconfirmation Organizational Documents shall be included in the Committee's Plan Supplement.

92.     "Priority Claim Distributions" shall mean distributions on account of all unpaid Allowed Tax Claims and Priority Non-Tax Claims as required by the Committee's Plan.

93.     "Priority Non-Tax Claim" means any Claim, other than a Tax Claim, to the extent entitled to priority under section 507(a) of the Bankruptcy Code.

94.     "Pro Rata" means proportionately, so that with respect to any distribution, the ratio of (a) (i) the amount of property to be actually or theoretically distributed on account of a particular Claim and/or Interest or particular group of Claims and/or Interests to (ii) the amount of such particular Claim and/or Interest or group of Claims and/or Interests, is the same as the ratio of (b) (i) the amount of property to be actually or theoretically distributed on account of all Claims and/or Interests or groups of Claims and/or Interests sharing in such distribution to (ii) the amount of all Claims and/or Interests or groups of Claims and/or Interests sharing in such distribution.

95.     "Professional Person" shall mean Persons retained or to be compensated pursuant to sections 326, 327, 328, 330, 503(b), and 1103 of the Bankruptcy Code.

96.     "Record Date" means the Effective Date.

97. "Released Parties" means the parties described in Article X(C) of the Committee's Plan.

98. "Reorganized Debtors" means all or each of the Debtors from and after the Effective Date.

99. "Representative" means, as to the referenced Person, such Person's present and former officers, directors, shareholders, trustees, partners and partnerships, members, agents, employees, representatives, professionals, and successors or assigns, in each case solely in their capacity as such.

100. "Restructuring Transactions" means those transactions described in Article VI(A) of the Committee's Plan.

101. "Reorganized Debtors" means all or each of the Debtors from and after the Effective Date.

102. "Retained Rights of Action" means all Rights of Action belonging to any of the Estates as of the Effective Date, other than those Rights of Action specifically released under the Committee's Plan, including Avoidance Claims released pursuant to Article IX(C) hereof.

103. "Rights of Action" means any and all claims, demands, rights, defenses, actions, causes of action, suits, contracts, agreements, obligations, accounts, defenses, offsets, powers and privileges of any kind or character whatsoever, known or unknown, suspected or unsuspected, whether arising prior to, on, or after the Petition Date, in contract or in tort, at law or in equity, or under any other theory of law, held by any Person against any other Person.

104. "Schedules" means the schedules Filed by the Debtors with the clerk of the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been or may be amended from time to time.

105. "Second Lien Collateral Agent" means The Bank of New York Mellon, As successor to The Bank of New York, in its capacity as "Parity Lien Collateral Agent" as defined in the Second Lien Indenture.

106. "Second Lien Guarantees" means the guarantees by the Second Lien Guarantors of Luxco's and Finco's obligations under the Second Lien Indenture and the notes executed pursuant to the Second Lien Indenture.

107. "Second Lien Guarantors" means the Non-Korean Guarantors and MSK.

108. "Second Lien Indenture" means that certain Indenture, dated as of December 23, 2004, providing for the issuance of *Floating Rate Second Priority Senior Secured Notes due 2011 and 6 7/8% Second Priority Senior Secured Notes due 2011*, by and among the Second Lien Noteholder Trustee; the Collateral Trustee; Luxco and Finco, as issuers, and the Second Lien Guarantors.

109. "Second Lien Notes" means the senior secured notes issued under the Second Lien Indenture.

110. "Second Lien Noteholder Claim" means the Claims of the Second Lien Noteholder Trustee and the Second Lien Noteholders arising under, in connection with or pursuant to the Second Lien Indenture, the Final Cash Collateral Order and all other documents, instruments, guarantees and agreements related to either thereof.

111. "Second Lien Noteholder Distribution" means the distribution made to Holders of Second Lien Noteholder Claims pursuant to Article IV(B)(4) of the Committee's Plan.

112. "Second Lien Noteholder Trustee" means Bank of New York, as trustee under the Second Lien Indenture.

113. "Second Lien Noteholders" means the "Holders" under and as defined in the Second Lien Indenture.

114. "Secured Claim" means any Claim of any Person that is secured by a Lien on property in which any of the Debtors or the Estates has an interest, which Lien is valid, perfected, and enforceable under applicable law or by reason of a Final Order, or that is subject to setoff under section 553 of the Bankruptcy Code, but only to the extent of the value, as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code, of any interest of the claimant in the property of the Estate securing such Claim or subject to setoff.

115. "Standby Commitment Fee" means the 10% of the New Common Units to be issued to the Backstop Purchaser pursuant to and in accordance with the terms of the Backstop Commitment Agreement.

116. "Subordinated Note Claim" means any Claim of the Subordinated Note Trustee or any Subordinated Noteholder arising under, in connection with or pursuant to the Subordinated Note Indenture and any documents, instruments or agreements related thereto.

117. "Subordinated Note Distribution" means the distribution, which shall be gifted by the Holders of Second Lien Noteholder Claims, to the Holders of Subordinated Note Claims pursuant to Article IV(B)(6) of the Committee's Plan.

118. "Subordinated Note Guarantors" means the Non-Korean Guarantors.

119. "Subordinated Note Guarantees" means the guarantees by the Subordinated Note Guarantors of Luxco's and Finco's obligations under the Subordinated Note Indenture and the notes executed pursuant to the Subordinated Note Indenture.

120. "Subordinated Note Indenture" means that certain Indenture dated as of December 23, 2004, providing for the issuance of *8% Senior Subordinated Notes*

*due 2014*, by and among Luxco and Finco, as issuers; the Subordinated Note Trustee; and the Subordinated Note Guarantors.

121. "Subordinated Note Trustee" means Law Debenture Corporation, as trustee under the Subordinated Note Indenture.

122. "Subordinated Notes" means the senior subordinated notes issued under the Subordinated Note Indenture.

123. "Subordinated Noteholder" means each "Holder" under and as defined in the Subordinated Note Indenture.

124. "Subscription Agent" means Omni Management Group, LLC, in its capacity as a subscription agent in connection with the Offering.

125. "Subscription Commencement Date" means the date on which Subscription Forms are mailed to Holders of Second Lien Noteholder Claims, which date shall be no sooner than the Confirmation Date.

126. "Subscription Expiration Date" means the date set forth in the Subscription Form as the expiration date for the Offering, which date shall be no later than one Business Days prior to the Effective Date, subject to the Creditor's Committee's right to extend such date, and which shall be the final date by which an Offering Participant may elect to subscribe to the Offering.

127. "Subscription Form" means the form to be used by an Offering Participant pursuant to which such holder may exercise such Subscription Rights, which shall be in form and substance acceptable to the Creditors' Committee.

128. "Subscription Purchase Price" means, for each Offering Participant, such Offering Participant's Final Allocation multiplied by the Per Unit Price, with the amount of New Common Units such Offering Participant is entitled to subscribe for being subject to rounding as provided in section D.9 of this Plan.

129. "Subscription Rights" means the non-transferable, non-certified subscription rights to purchase New Common Units in connection with the Offering on the terms and subject to the conditions set forth in Article VI(D) of the Committee's Plan.

130. "Superpriority Claims" means administrative expenses with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(b), 726, 1113 and 1114.

131. "Tax" means any tax, charge, fee, levy, impost, or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits,

license, use, ad valorem, estimated, severance, stamp, occupation, and withholding tax. "Tax" shall include any interest or additions attributable to, imposed on or with respect to such assessments.

132.    "Tax Claim" means any Claim for any Tax to the extent that it is entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

133.    "Tax Code" means the Internal Revenue Code of 1986, as amended.

134.    "Timely Filed" means, with respect to a Claim, Interest, or Administrative Expense, that a proof of such Claim or Interest or request for payment of such Administrative Expense was Filed with the Bankruptcy Court or the Claims Agent, as applicable, within such applicable period of time fixed by the Committee's Plan, statute, or pursuant to both Bankruptcy Rule 3003(c)(3) and a Final Order (e.g., the Bar Date).

135.    "Unclaimed Property" means all Cash deemed to be "Unclaimed Property" pursuant to Article VIII(E) of the Committee's Plan.

136.    "Unimpaired" means, with respect to a Class of Claims or Interests, not Impaired, as defined in Section 1124 of the Bankruptcy Code.

137.    "Unsubscribed Units" means those New Common Units to be issued in connection with the Offering that are not subscribed for pursuant to the Offering prior to the Subscription Expiration Date.

138.    "Warrants" means the warrants described in Article IV(B)(6) of the Committee's Plan.

**EXHIBIT C**

| | | | | | |
|---|---|---|---|---|---|
|  | **MAGNACHIP SEMICONDUCTOR FINANCE COMPANY, ET AL. – TREATMENT OF CLAIMS** |
| **Class No.** | **Description** | **Treatment Under Debtors' Plan** | **Estimated Recovery Under Debtor's Plan** | **Treatment Under Committee's Plan** | **Estimated Recovery Under Committee's Plan** |
| N/A | **Administrative Expenses**[1] | Each Holder of an Allowed Administrative Expense that has filed a timely request for payment shall receive payment in full in cash on the Effective Date unless otherwise agreed by such Holder and the Debtors. Certain different and additional requirements shall apply to Fee Claims as set forth in Article XIV(B)(2) of the Committee's Plan. | 100% | Each Holder of an Allowed Administrative Expense that has filed a timely request for payment shall receive payment in full in cash on the Effective Date unless otherwise agreed by such Holder and the Debtors. Certain different and additional requirements shall apply to Fee Claims as set forth in Article XIV(B)(2) of the Committee's Plan. | Same |
| N/A | **Superpriority Claims** | No distribution to the First Lien Lender Parties shall be made on account of any Superpriority Claims except as set forth in Article IV(B)(3) of the Committee's Plan. | N/A | No distribution to the First Lien Lender Parties shall be made on account of any Superpriority Claims except as set forth in Article IV(B)(3) of the Committee's Plan. | Same |

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the (i) *Joint Chapter 11 Plan of Liquidation Proposed by MagnaChip Semiconductor Finance Company, et al. and UBS AG, Stamford Branch, As Creditor Agreement Agent and Priority Lien Collateral Agent* (the "Debtors' Plan") and (ii) *Chapter 11 Joint Plan of Reorganization Proposed by the Official Committee of Unsecured Creditors of MagnaChip Semiconductor Finance Company, et al.* (the "Committee's Plan").

| | | | | | |
|---|---|---|---|---|---|
|  | **MAGNACHIP SEMICONDUCTOR FINANCE COMPANY, ET AL. – TREATMENT OF CLAIMS** |
| **Class No.** | **Description** | **Treatment Under Debtors' Plan** | **Estimated Recovery Under Debtor's Plan** | **Treatment Under Committee's Plan** | **Estimated Recovery Under Committee's Plan** |
| N/A | **Tax Claims** | Each Holder of an Allowed Tax Claim against any of the Debtors that is due and payable as of the Effective Date shall receive payment in full in Cash on or as soon as practicable after the Effective Date.<br><br>Each Holder of an Allowed Tax Claim (or portion thereof) not yet due and payable as of the Effective Date will be paid by, as the case may be (i) the Buyer (in the case of any such Allowed Tax Claims against MSA or Luxco) or (ii) the Plan Representative (in the case of any such Allowed Tax Claims against any other Debtor) when due and payable under applicable nonbankruptcy law without regard to the commencement of the Chapter 11 Cases.<br><br>Upon request of any of the Debtors, the Bankruptcy Court shall determine the amount of any Disputed Claim for, or issues pertaining to, Tax Claims. | 100% | Each Holder of an Allowed Tax Claim against any of the Debtors that is due and payable as of the Effective Date shall receive, at the sole option of the Debtors or the Reorganized Debtors, (i) on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to such Allowed Tax Claim or, (ii) commencing on the Effective Date, or as soon thereafter as is practicable, and continuing over a period not exceeding five (5) years from and after the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Tax Claim, together with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law as of the calendar month in which the Plan is confirmed, subject to the sole option of the Debtors or Reorganized Debtors to prepay the entire amount of the Allowed Tax Claim.<br><br>Any Allowed Tax Claim (or portion thereof) not yet due and payable as of the Effective Date will be paid by the Reorganized Debtors in the ordinary course of business as such obligations become due. Any Holder of an Allowed Tax Claim may agree to accept different treatment as to which the Debtors and such Holder have agreed upon in writing.<br><br>Upon request of any of the Debtors, the Bankruptcy Court shall determine the amount of any Disputed Claim for, or issues pertaining to, Tax Claims. | Same |

| MAGNACHIP SEMICONDUCTOR FINANCE COMPANY, ET AL. – TREATMENT OF CLAIMS | | | | | |
|---|---|---|---|---|---|
| Class No. | Description | Treatment Under Debtors' Plan | Estimated Recovery Under Debtor's Plan | Treatment Under Committee's Plan | Estimated Recovery Under Committee's Plan |
| 1 | Class 1 (A-F) Priority Non-Tax Claims | Priority Non-Tax Claims against the Selling Debtors shall be assumed by the Buyer pursuant to the Business Transfer Agreement. Priority Non-Tax Claims against non-Selling Debtors shall be paid in full in cash on or as soon as practicable after the later of the Effective Date or the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim. | 100% | The Holder of each Priority Non-Tax Claim shall receive, in full satisfaction, settlement and release of such Priority Non-Tax Claim, a Cash payment equal to the Allowed amount of such Claim on or as soon as practicable after the later of the Effective Date or the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim. Any Holder of a Priority Non-Tax Claim may agree to accept different treatment as to which the Debtors and such Holder have agreed upon in writing. | Same |

| MAGNACHIP SEMICONDUCTOR FINANCE COMPANY, ET AL. – TREATMENT OF CLAIMS | | | | | |
|---|---|---|---|---|---|
| Class No. | Description | Treatment Under Debtors' Plan | Estimated Recovery Under Debtor's Plan | Treatment Under Committee's Plan | Estimated Recovery Under Committee's Plan |
| 2 | Class 2 (A-F) Other Secured Claims | If the collateral securing an Other Secured Claim is part of the Purchased Assets, the Buyer will assume the obligation to pay such Other Secured Claim and the Holder of such Claim shall retain its Lien on its collateral unless and until such Claim is paid in full or the collateral is subsequently sold by the Buyer and the proceeds of such sale, less costs and expenses of disposing of such collateral, shall be paid to such Holder in full satisfaction and release of such Allowed Other Secured Claim.  If the collateral is not part of the Purchased Assets, the collateral securing the Creditor's Other Secured Claim shall be abandoned to such Creditor, in full satisfaction and release of such Other Secured Claim. | 100% | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, at the sole option of the Debtors or the Reorganized Debtors, (i) on the Effective Date or as soon thereafter as is practicable, each Allowed Other Secured Claim shall be reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable. | Same |

| MAGNACHIP SEMICONDUCTOR FINANCE COMPANY, ET AL. – TREATMENT OF CLAIMS | | | | | |
|---|---|---|---|---|---|
| Class No. | Description | Treatment Under Debtors' Plan | Estimated Recovery Under Debtor's Plan | Treatment Under Committee's Plan | Estimated Recovery Under Committee's Plan |
| 3 | Class 3 (A-F) First Lien Lender Claims | The First Lien Lender Parties shall receive, through payments to the Agent, each of the following:  (i) the Net Sale Proceeds, (ii) all of the Distributable Cash and Claims of the Debtors other than the Cash of MSA, and (iii) any proceeds of any residual assets, if any, and when any such proceeds are collected by the Liquidating Trust.  The Liens on the Purchased Assets and Distributable Assets securing the First Lien Lender Secured Claims will be released and extinguished as of the Effective Date and of no further force or effect; provided, however, that such Liens on the Purchased Assets shall attach to the proceeds thereof with the same priority as they attached to the Purchased Assets and the First Lien Lender Parties shall retain their Liens on all assets of Luxco, Finco and the First Lien Guarantors other than the Purchased Assets and Distributable Assets. | 70.6% | On the Effective Date, in connection with the enforcement of the First Lien Lender Secured Claims, each First Lien Lender Party shall receive, at the election of each First Lien Lender Party, (i) a Cash payment equal to 72% of its First Lien Lender Secured Claim in full and complete satisfaction of such First Lien Lender Secured Claim ("Treatment A"), or (ii) a Cash payment equal to 35% of its First Lien Lender Secured Claim and its Pro Rata share of the New Term Loan in full and complete satisfaction of such First Lien Lender Secured Claim ("Treatment B").[2] | 100% |

---

2 All distributions to the First Lien Lender Parties under the Committee's Plan shall be effectuated through the Agent.  In consideration for the distributions the First Lien Lender Parties are to receive hereunder, the Liens securing the First Lien Lender Secured Claims will be released and extinguished as of the Effective Date in accordance with section 5.1(a)(2) of the Intercreditor Agreement and of no further force or effect.  As security for the New Term Loan, the First Lien Lenders shall receive a first lien on substantially all assets of the Reorganized Debtors and the Non-Debtor Subsidiaries.  The First Lien Lender Secured Claims, together with any Deficiency Claims of the First Lien Lender Parties, are deemed Allowed in the full amount reflected on the Agent's books and records as of the Record Date.  For Holders of First Lien Secured Claims that elect Treatment A, the existing Liens and the First Lien Guarantee securing such First Lien Lender Secured Claims shall be released and extinguished effective as of the Effective Date and of no further force or effect pursuant to the First Lien Credit Agreement.  For Holders of First Lien Secured Claims that elect Treatment B, the existing Liens and the First Lien Guarantee securing such First Lien Lender Secured Claims shall not be released and will be subject to the injunction as described in Article X of the Committee's Plan.

| MAGNACHIP SEMICONDUCTOR FINANCE COMPANY, ET AL. – TREATMENT OF CLAIMS | | | | | |
|---|---|---|---|---|---|
| Class No. | Description | Treatment Under Debtors' Plan | Estimated Recovery Under Debtor's Plan | Treatment Under Committee's Plan | Estimated Recovery Under Committee's Plan |
| 4 | Class 4 (A-F) Second Lien Noteholder Claims | If Classes 4 (A-F) and Classes 5 (A-F) vote to accept the Plan, the Second Lien Noteholders shall receive their proportionate share, together with other unsecured creditors, of the Unsecured Creditor Distribution. The existing Liens securing the Second Lien Noteholder Claims shall be released and extinguished effective as of the Effective Date and of no further force or effect. If each of Classes 4 (A-F) and 5 (A-F) do not vote to accept the Plan, Holders of Class 4 (A-F) Claims will receive no distribution on account of such Claims. | 0.2% | On the Effective Date, in full and complete satisfaction of its Second Lien Noteholder Claim, (i) each Second Lien Noteholder shall receive its Pro Rata share of 5% of the New Common Units, subject to dilution on account of the Long-Term Incentive Plan, and (ii) each Eligible Holder of a Second Lien Noteholder Claim shall be entitled to participate in the Offering pursuant to the terms of the Offering Procedures. However, to the extent that the Offering Participants do not exercise the Subscription Rights by the Subscription Expiration Date, the Backstop Purchaser, subject to the terms and conditions of the Backstop Commitment Agreement, shall subscribe for and purchase all Unsubscribed Units as of the Subscription Expiration Date.[3] | Substantially Higher |

---

3 Notwithstanding anything contained in the Committee's Plan, as described above, only Accredited Investors that are holders of Second Lien Noteholder Claims will be entitled to participate in the Offering. No payment in lieu of the Subscription Rights will be made to any holder of a Second Lien Noteholder Claim that is not an Accredited Investor and therefore unable to subscribe for New Common Units pursuant to the Offering. Notwithstanding the foregoing, the Reorganized Debtors shall pay, on or as soon as reasonably practicable after the Effective Date, all Indenture Trustee Fees and Expenses arising under the Second Lien Notes Indenture, in full in Cash, without application to or approval of the Bankruptcy Court. All distributions to the Second Lien Noteholders under the Committee's Plan, except in connection with the Offering, shall be effectuated though the Second Lien Noteholder Trustee (i.e., the Reorganized Debtors shall distribute the portion of the New Common Units payable to the Second Lien Noteholders to the Second Lien Noteholder Trustee and the Second Lien Noteholder Trustee shall make proportionate distributions thereof to the Second Lien Noteholders). Pursuant to section 5.1(a)(2) of the Intercreditor Agreement, the existing Liens securing the Second Lien Noteholder Claims shall be released and extinguished effective as of the Effective Date and of no further force or effect. Notwithstanding any subordination or intercreditor agreement applicable under nonbankruptcy law, the Holders of Second Lien Noteholder Claims shall receive the Second Lien Noteholder Distribution as described herein. In addition, the distributions to Holders of Second Lien Noteholder Claims and the surrender of Second Lien Notes to the Second Lien Noteholder Trustee, as described in Article VIII.I of the Committee's Plan, shall constitute a defeasance, satisfaction and discharge of the Second Lien Indenture section 12.05(d) of the Second Lien Indenture.

| MAGNACHIP SEMICONDUCTOR FINANCE COMPANY, ET AL. – TREATMENT OF CLAIMS | | | | | |
|---|---|---|---|---|---|
| Class No. | Description | Treatment Under Debtors' Plan | Estimated Recovery Under Debtor's Plan | Treatment Under Committee's Plan | Estimated Recovery Under Committee's Plan |
| 5 | **Class 5 (A-F) General Unsecured Claims** | If each of Classes 4 (A-F) and Classes 5 (A-F) vote to accept the Plan, then each Holder of a Class 5 (A-F) Claim shall receive, in full satisfaction, settlement, and release of such Claim, a proportionate share, together with other unsecured creditors, of the Unsecured Creditor Distribution.  In addition, Holders of General Unsecured Claims shall benefit from the Debtors' general release of Avoidance Claims set forth in Article IX(C) of the Plan.  The First Lien Lender Parties will also waive any distribution of the Unsecured Creditor Distribution on account of their Deficiency Claims.  If Classes 4 (A-F) and 5 (A-F) do not vote to accept the Plan, Holders of Class 5 (A-F) Claims will receive no distribution on account of their Claims. | 0.1% | The Holder of each Class 5 (A-F) Claim shall receive, as a gift from the Holders of Second Lien Noteholder Claims, in full satisfaction, settlement and release of such Class 5 (A-F) Claim, a Cash payment equal to 10% of the Allowed amount of such Claim on or as soon as practicable after the later of the Effective Date or the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim; provided, however, that the aggregate Cash payments to Holders of Class 5 (A-F) Claims shall not exceed $324,000. Any Holder of a Class 5 (A-F) Claim may agree to accept different treatment as to which the Debtors and such Holder have agreed upon in writing | 10% |

| MAGNACHIP SEMICONDUCTOR FINANCE COMPANY, ET AL. – TREATMENT OF CLAIMS | | | | | |
|---|---|---|---|---|---|
| Class No. | Description | Treatment Under Debtors' Plan | Estimated Recovery Under Debtor's Plan | Treatment Under Committee's Plan | Estimated Recovery Under Committee's Plan |
| 6 | Class 6 (D and F) Subordinated Debt Claims | If each of Classes 4 (A-F) and 5 (A-F) vote to accept the Plan, then each Holder of a Class 6 (A-F) Claim shall receive its proportionate share, together with other unsecured creditors, of the Unsecured Creditor Distribution; provided, however, that in accordance with the subordination provisions in the Subordinated Note Indenture, all distributions to Holders of Class 6 (A-F) Claims shall be paid to the Second Lien Noteholder Trustee for distribution to Second Lien Noteholders.  If Classes 4 (A-F) and 5 (A-F) do not vote to accept the Plan, Holders of Class 6 (A-F) Claims will receive no distribution on account of their Claims. | 0% | On the Effective Date, in connection with the enforcement of the Subordinated Note Claims, each Subordinated Noteholder shall receive, as a gift from the Second Lien Noteholders, (i) its Pro Rata share of 1% of the New Common Units, subject to dilution on account of the Long-Term Incentive Plan, and (ii) warrants to purchase 5% of the New Common Units with a strike price equivalent to a $600 million total enterprise value, in full and complete satisfaction of such Subordinated Noteholder Claim.[4] | Higher |
| 7 | Class 7 (A-F) Intercompany Claims | Holders of Intercompany Claims against the Debtors shall receive no distributions or recoveries on account of such Claims and such Claims shall be extinguished either on the Effective Date or thereafter in accordance with the Plan. | 0% | Notwithstanding anything to the contrary herein, Intercompany Claims, at the election of the Reorganized Debtors, shall be (i) adjusted, released, waived and/or discharged as of the Effective Date, (ii) contributed to the capital of the obligor, or (iii) reinstated and left Unimpaired. | Same |

---

4 Notwithstanding the foregoing, the Reorganized Debtors shall pay, on or as soon as reasonably practicable after the Effective Date, all Indenture Trustee Fees and Expenses arising under the Subordinated Notes Indenture, in full in Cash, without application to or approval of the Bankruptcy Court.  Notwithstanding any subordination or intercreditor agreement applicable under nonbankruptcy law, the Holders of Subordinated Note Claims shall receive the Subordinated Note Distribution as described herein as a gift from the Second Lien Noteholders.  In addition, the distributions to holders of Subordinated Note Claims and the surrender of Subordinated Notes to the Subordinated Note Trustee, as described in Article VIII.I herein, shall constitute a defeasance, satisfaction and discharge of the Subordinated Note Indenture under section 12.05(d) of the Subordinated Note Indenture.

| MAGNACHIP SEMICONDUCTOR FINANCE COMPANY, ET AL. – TREATMENT OF CLAIMS | | | | | |
|---|---|---|---|---|---|
| Class No. | Description | Treatment Under Debtors' Plan | Estimated Recovery Under Debtor's Plan | Treatment Under Committee's Plan | Estimated Recovery Under Committee's Plan |
| 8 | **Class 8 (A-F) Interests in the Debtors** | Holders of Interests in the Debtors shall receive no distributions or recoveries on account of such Interests and such Interests shall be extinguished on the Effective Date. | 0% | Holders of Interests in the Debtors shall receive no distributions or recoveries on account of such Interests and Interests on account of LLC shall be extinguished on the Effective Date.  Interests of each Debtor, other than LLC, will continue to exist and not be extinguished. | Same |

**Chapter 7 Liquidation**

| | Book Value | Recovery Estimate | Recovery Value | Basis and Considerations |
|---|---|---|---|---|
| Cash | $ 38.5 | 100% | $ 38.5 | Per Debtors' forecast |
| Accounts Receivable | 89.8 | 75% | 67.4 | Consistent with typical borrowing base standards |
| Inventory | 46.3 | 45% | 20.8 | Consistent with typical borrowing base standards |
| Property Plant and Equipment, net | 165.5 | 20% | 33.1 | Discounted OLV value prepared by Duff & Phelps, LLC, August 2008 by approximately $20M |
| Gross Proceeds | | | $ 159.8 | |
| Trustee Fees | | | (4.8) | 3% of Gross Proceeds |
| Korean Statutory Severance Liability | | | (30.0) | Per Debtors Plan |
| Liquidation related costs | | | (16.0) | Estimated at 10% of Gross Proceeds (legal, commissions and wind-down expenses) |
| Administrative Costs and Expenses Costs and Expenses | | | (5.0) | Estimated inclusive of KTB break-up fee of $1.2 million |
| Cash Available for Distribution | | | $ 104.0 | |
| Less: Senior Secured Claims | | | (95.0) | |
| Available to Second Lien Noteholders | | | $9.0 | |
| Available to Unsecured Creditors | | | $0.0 | |

**Assumptions:**
 - Have not considered the complexity of the various intercompany arrangements and balances
 - Have not considered the impact of Korean (or other country insolvency law) where substantially all of the assets are located other than Employee Severance in Korea
 - Liquidation would be completed on an ordinary liquidation basis, beginning October 1, 2009
 - No recovery was assumed for other and intangible assets, although some recovery is likely

**Committee's Plan**

| | Claims Amount | Recovery Amount | Recovery % | |
|---|---|---|---|---|
| Senior Secured Claims | $ 95.0 | $ 95.0 | 100% | Full satisfaction in exchange for the New Term Loan |
| **Remaining Creditors** | | | | |
| Priority Claims | 1.0 | 1.0 | 100% | Full satisfaction in cash |
| Second Lien Noteholder Claims | 500.0 | 9.8 | 2.0% | 5% of estimated preliminary Total Enterprise Value less Net Debt, excludes rights offering |
| Unsecured Noteholder Claims | 250.0 | 2.0 | 0.8% | 1% of estimated preliminary Total Enterprise Value less Net Debt |
| Other Unsecured Claims | 3.2 | 0.3 | 10% | Cash payment of approximately $0.3 million |
| Total | $ 754.2 | $ 13.1 | | |

**Assumptions:**
 - Estimated Total Enterprise Value of at least $225 million based on preliminary estimates
 - Unsecured Noteholders Claims exclude value of warrants, if any
 - Recovery value for Second Lien Noteholders excludes potential value from purchasing stock rights, which could equal $171.1 million which based on:
　　　　Preliminary estimated minimum TEV of $225 less the cost of the rights offering of $25M les Net Debt of $28.9M. Thus the value to the second line holders is much higher.
 - Net Debt at December 31, 2009 = $28.9M based on $95.0M of Senior Secured Claims less expected cash on hand at December 31, 2009 of $66.1 million.
 - Cash on hand at December 31, 2009 = Company estimate of $51.1 million plus $25.0 million rights offering less $10M of Plan related Expenses

**EXHIBIT D**

**Plan Feasibility**

      The Debtors and the Committee disagree regarding whether the Plan is feasible. At the Confirmation Hearing, the Court will have to determine that the Plan is feasible in order to enter the Confirmation Order. The basis for the Committee's assessment of feasibility and the Debtors' response thereto are set forth below:

**Committee's Views of Feasibility:**

In order to determine whether the Plan is feasible, an assessment of the Debtors' ability to generate cash flow sufficient to service interest and principal during the five year term of the New Term Loan was performed by the Committee. In performing this assessment the Committee assumed that the entire $95.0 million of principal will be paid in full at the end of the term. The Committee believes this assumption is conservative because the cash needed to service interest payments is higher compared to an assumption that some principal is paid during the term or an assumption that some or all of the New Term Loan is refinanced in the future. The Committee believes that both assumptions, however, are realistic options the Debtors will have available to them.

      Under the Committee's Plan, the Committee projects that the Debtors will likely have $66.1 million of cash on hand at December 31, 2009.[1] To put this liquidity into perspective, at the same point in 2008, the Debtors had only $15.8 million of liquidity. This expected amount of cash alone at December 31, 2008 is 72% of the New Term Loan. Additionally, the Debtors expect to have $108.1 million of accounts receivable

---

[1] .Calculated by taking the Debtors' expected cash on hand of $51.1 million at December 31, 2009 (per the Debtors current forecast), plus $25.0 million of proceeds from the rights offering, less an estimated $10.0 million of Plan related expenses not currently in the Debtors' financial projections.

and $45.8 million of inventory on hand at December 31, 2009, substantial liquid assets backing the New Term Loan.

Beyond this immediate asset coverage, given the assumptions discussed above, on a non-discounted basis, the Committee believes that the net amount of after tax[2] cash the Debtors need between January 1, 2009 and the end of the New Term Loan will be $63.3 million ("Net Cash Requirement").[3]

In order to determine whether the Debtors will have sufficient cash to pay the Net Cash Requirement, the Committee compared the $63.3 million Net Cash Requirement to (a) the Debtors' historical unlevered free cash flow, excluding the impact of the Debtors' ISD division which was closed in October 2008 and, (b) an estimate, using the average of three scenarios, of unlevered free cash flow during the term of the New Term Loan.

**Historical Cash Flow**:  As the Committee's analysis below indicates, between 2006 through July 31, 2009, the Debtors' unlevered free cash flow totaled $223.9 million (excluding the negative EBITDA and CAPX associated with the ISD division). From this historical perspective, this unlevered free cash flow is 3.5x more than the Net Cash Requirement of $63.3 million.  In fact, during this period, the Debtors were able to pay $155.3 million in interest alone (or 2.5x the Net Cash Requirement).

---

[2] Assumed tax benefit at the Korean statutory rate of 27.5%
[3] Principal plus after tax interest less expected cash on hand at December 31, 2009.

| MagnaChip<br>Historical Unlevered Cash Flow Analysis | | | | | |
|---|---|---|---|---|---|
| ($'s in millions) | **2006A** | **2007A** | **2008A** | **7 Months**<br>**2009A** | **Total** |
| Net Cash provided by (used in) operating activities | $   30.5 | $  (23.7) | $(23.1) | $   20.0 | $    3.6 |
| Net Cash provided by (used in) investing activities | (33.4) | (81.8) | (26.1) | 7.6 | (133.6) |
| Net Cash Flow before financing activities | $   (2.9) | $ (105.5) | $(49.2) | $   27.6 | $ (130.1) |
| Effect of exchange rates on cash and cash equivalents | $    5.9 | $    0.5 | $(14.0) | $    2.3 | $   (5.4) |
| Plus: Cash Interest | 56.0 | 57.5 | 37.4 | 4.4 | 155.3 |
| **Unlevered Free Cash Flow** | **$   59.0** | **$  (47.5)** | **$(25.8)** | **$   34.3** | **$   19.9** |
| Plus: ISD EBITDA | $   55.3 | $   62.4 | $ 43.3 | $      - | $  160.9 |
| Plus: ISD CAPX | 7.1 | 28.2 | 7.7 | - | 43.1 |
| **Pro Forma Unlevered Free Cash Flow (w/o ISD)** | **$  121.4** | **$   43.1** | **$ 25.2** | **$   34.3** | **$  223.9** |

Sources:
10-K, Internal Financial Statements, Debtors Divisional EBITDA and CAPX, Debtors 2009 Forecast and other information
provided by the Debtors Management

**Future Cash Flow**:  The Debtors did not prepare financial projections beyond 2009; as such, an estimate of the future cash flow was prepared by the Committee based on what the Committee believes are sound forecasting practices.  These practices include: reviewing historical material cash flow drivers, reviewing significant industry and Comparable Company ("Comp") information[4] to determine future trends, performing various statistical analyses with respect to expected future outcomes, and discussing assumptions with Management, among others.  Based on the results of these analyses, three scenarios were developed by the Committee[5], the average of which is indicated in the table below, to estimate a range of cash flow until the New Term Loan matures.

---

[4] Comps includes, Novatek Microelectronics Corp., Himax Technologies, Inc., Vanguard International, Semiconductor Corporation, United Microelectronics Corporation, Chartered Semiconductor, Manufacturing Ltd., Semtech Corporation, Maxim Integrated Products, Inc., Semiconductor Manufacturing International Corporation, Tower Semiconductor Ltd., Intersil Corporation.  In selecting the Comps, size, as measured by revenue, end market influence, including display and foundry services, and identification by the Debtors or their professionals, were considered

[5] Primary differences between the scenarios included:  Scenario 1 is based on the Debtors 2009 Forecast, subject to certain adjustments, projected into future periods.  Scenario 2 utilizes expected growth rates of the Comps to project future financial performance.  Scenario 3 utilizes a statistical model to predict future financial performance.

| Expected Future Cash Flow | 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 7 month (A) | 5 Month (P) | 2010 | 2011 | 2012 | 2013 | 2014 | Total CF |
| Beginning Cash | $15.8 | $45.9 | $66.8 | $84.9 | $108.2 | $135.1 | $164.2 | $45.9 |
| EBITDA | 32.1 | 39.8 | 77.8 | 82.7 | 85.1 | 85.1 | 85.1 | 455.6 |
| CAPX | (2.4) | (7.0) | (34.0) | (36.1) | (37.2) | (37.2) | (37.2) | (188.6) |
| WC | (0.1) | (18.1) | (6.9) | (4.3) | (2.1) | 0.0 | 0.0 | (31.4) |
| Other | 4.7 | (7.0) | (12.0) | (12.0) | (12.0) | (12.0) | (12.0) | (67.0) |
| Unlevered Free Cas | $34.3 | $7.6 | $25.0 | $30.2 | $33.8 | $35.9 | $35.9 | $168.5 |
| Rights Offering | $0.0 | $25.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $25.0 |
| BK Related Costs | 0.0 | (10.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (10.0) |
| Interest, net of tax | (4.2) | (1.7) | (6.9) | (6.9) | (6.9) | (6.9) | (5.2) | (34.4) |
| Principal | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (95.0) | (95.0) |
| Ending Cash | $45.9 | $66.8 | $84.9 | $108.2 | $135.1 | $164.2 | $99.9 | $99.9 |

*Note: Millions*

The results of this analysis, based on the average of the three scenarios, yielded expected cash flow of $99.9 million AFTER all interest and principal associated with the New Term Loan are made.

**Committee's Conclusion**:

The Committee believes that the Debtors have demonstrated the ability to generate cash flow sufficient to service the New Term Loan (excluding the effects of the ISD division), and that multiple scenarios of expected cash flow indicate the Debtors will continue to have this ability. Accordingly, the Committee believes that the current Plan is Feasible.

**Debtors' Views Regarding Feasibility.**

While the Committee scenario is possible, the Debtors believe that it is extremely unlikely because the analysis is based on flawed assumptions. The Committee assumes that the semiconductor industry and MagnaChip will enjoy stable growth over the next five years. The semiconductor industry, however, is a highly cyclical business that has never demonstrated stable growth. It has always been cyclical. MagnaChip's growth has likewise been cyclical.

MagnaChip, like many other semiconductor companies, needs revolver coverage during industry down cycles and during any period in which capital expenditures, e.g., technology upgrades, may exceed our available cash during any specific period. Additionally, it is possible that MagnaChip's liquidity may be affected by adverse exchange rates for the Korean won.

The Committee's plan would preclude the Reorganized Debtors from obtaining a new revolving credit line that the Debtors believe they must have as coverage against possible cash flow problems.