# **EXHIBIT B**

**FOURTH AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF**

**MAGNACHIP SEMICONDUCTOR LLC**

**A Delaware Limited Liability Company**

**Dated as of [＿＿＿＿＿＿＿＿＿], 2009**

THE SECURITIES REPRESENTED BY THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAWS AND, AS SUCH, THEY MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS THE SECURITIES HAVE BEEN QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS SUCH QUALIFICATION AND REGISTRATION IS NOT LEGALLY REQUIRED. TRANSFER OF THE SECURITIES REPRESENTED BY THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT MAY BE FURTHER SUBJECT TO THE RESTRICTIONS, TERMS AND CONDITIONS SET FORTH HEREIN.

# TABLE OF CONTENTS

**Page**

ARTICLE I ORGANIZATION.................................................................................1
    1.1    Formation; Effective Date.........................................................1
    1.2    Name .................................................................................1
    1.3    Registered Agent; Offices ......................................................1
    1.4    Purpose...............................................................................2
    1.5    Foreign Qualification ............................................................2

ARTICLE II MEMBERSHIP INTERESTS ............................................................2
    2.1    Existing Members; New Members. .........................................2
    2.2    Representations and Warranties .............................................4
    2.3    Membership Interests; Certification ......................................4
    2.4    Common Units .....................................................................5
    2.5    Information ..........................................................................5
    2.6    Liability to Third Parties ......................................................5
    2.7    Lack of Authority ................................................................5
    2.8    Withdrawal ..........................................................................5

ARTICLE III CAPITAL CONTRIBUTIONS ........................................................5
    3.1    Contributions.......................................................................5
    3.2    Additional Capital Contributions and Return of Contributions...........6
    3.3    Advances by Members ..........................................................6
    3.4    Capital Account...................................................................6

ARTICLE IV ALLOCATIONS AND DISTRIBUTIONS.........................................7
    4.1    Allocations. .........................................................................7
    4.2    Distributions.......................................................................10

ARTICLE V MANAGERS....................................................................................11
    5.1    The Board of Managers; Delegation of Authority and Duties............11
    5.2    Meetings of the Board of Managers......................................12
    5.3    Payments to Managers; Reimbursements .............................14
    5.4    Competitive Opportunity. ...................................................14

ARTICLE VI OFFICERS.....................................................................................14
    6.1    Designation and Appointment..............................................14
    6.2    Resignation and Removal ....................................................15
    6.3    Duties of Officers Generally ...............................................15
    6.4    President.............................................................................15
    6.5    Vice President(s) .................................................................15
    6.6    Secretary ............................................................................15
    6.7    Treasurer ............................................................................16

ARTICLE VII MEETINGS OF MEMBERS ........................................................16
    7.1    Meetings of Members ..........................................................16
    7.2    Notice ................................................................................16

|       | 7.3   | Quorum; Voting | 17 |
|       | 7.4   | Action by Written Consent | 17 |
|       | 7.5   | Record Date | 17 |
|       | 7.6   | Adjournment | 17 |
|       | 7.7   | Conversion | 17 |
|       | 7.8   | Merger and Consolidation | 18 |
|       | 7.9   | Sale of Assets | 18 |
| ARTICLE VIII | INDEMNIFICATION | | 18 |
|       | 8.1   | Right to Indemnification | 18 |
|       | 8.2   | Insurance and Other Indemnification | 20 |
| ARTICLE IX | TAXES | | 20 |
|       | 9.1   | Tax Returns | 20 |
|       | 9.2   | Tax Elections | 20 |
|       | 9.3   | Tax Allocations and Reports | 20 |
|       | 9.4   | Partnership for U.S. Federal Tax Purposes | 21 |
| ARTICLE X | BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS | | 21 |
|       | 10.1  | Books | 21 |
|       | 10.2  | Company Funds | 21 |
| ARTICLE XI | DISSOLUTION, LIQUIDATION, AND TERMINATION | | 21 |
|       | 11.1  | Dissolution | 22 |
|       | 11.2  | Liquidation and Termination | 22 |
|       | 11.3  | Deficit Capital Accounts | 23 |
|       | 11.4  | Certificate of Cancellation | 23 |
| ARTICLE XII | TRANSFER RESTRICTIONS | | 23 |
|       | 12.1  | Limitations on Transfers. | 23 |
|       | 12.2  | Drag-Along Rights | 24 |
| ARTICLE XIII | GENERAL PROVISIONS | | 25 |
|       | 13.1  | Offset | 25 |
|       | 13.2  | Notices | 25 |
|       | 13.3  | Entire Agreement | 26 |
|       | 13.4  | Effect of Waiver or Consent | 26 |
|       | 13.5  | Amendment | 26 |
|       | 13.6  | Binding Act | 26 |
|       | 13.7  | Governing Law | 26 |
|       | 13.8  | Consent to Exclusive Jurisdiction | 26 |
|       | 13.9  | Severability | 27 |
|       | 13.10 | Further Assurances | 27 |
|       | 13.11 | No Third Party Benefit | 27 |
|       | 13.12 | Counterparts | 27 |
|       | 13.13 | Construction | 27 |

**FOURTH AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**OF**

**MAGNACHIP SEMICONDUCTOR LLC**

**A Delaware Limited Liability Company**

THIS FOURTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement") of MAGNACHIP SEMICONDUCTOR LLC (the "Company") dated as of [_____], 2009 is entered into by and among the parties listed on <u>Exhibit A</u> attached hereto (the "<u>Existing Members</u>") and those other Persons (defined below) who become Members (defined below) of the Company from time to time, as hereinafter provided.  All capitalized terms used in this Agreement and not otherwise are defined herein are defined in <u>Annex I</u> hereto.

**ARTICLE I**
**ORGANIZATION**

**1.1**     ***Formation; Effective Date.***  The Company was organized as a Delaware limited liability company on November 26, 2003 by the filing of a certificate of formation (the "<u>Certificate</u>") with the Office of the Secretary of State of the State of Delaware under and pursuant to the Act (defined below).  The name of the Company was changed from "System Semiconductor Holding LLC" to "MagnaChip Semiconductor LLC" on August 31, 2004 by the filing of a Certificate of Amendment to the Certificate with the Office of the Secretary of State of the State of Delaware under and pursuant to the Act.  This Agreement amends and restates the Third Amended and Restated Limited Liability Company Operating Agreement of the Company dated as of October 6, 2004, which had amended and restated the First Amended and Restated Limited Liability Company Operating Agreement of the Company dated as of September 10, 2004, which had amended and restated the Operating Agreement of the Company dated as of June 8, 2004, and shall be deemed effective as of the date hereof.  To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provisions, this Agreement shall, to the extent permitted by the Act, control.  As used herein, "<u>Act</u>" means the Delaware Limited Liability Company Act (6 Del. C. § 18-101 *et seq.),* and any successor statute, as amended from time to time.

**1.2**     ***Name.*** The name of the Company is "MagnaChip Semiconductor LLC" and all Company business must be conducted in that name or in such other names that comply with applicable law as the Board of Managers of the Company (the "<u>Board of Managers</u>") may select from time to time.

**1.3**     ***Registered Agent; Offices***.  The registered agent and office of the Company required by the Act to be maintained in the State of Delaware shall be the Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801 or such other agent or office (which need not be a place of business of the Company) as the Board of

Managers may designate from time to time in the manner provided by applicable law. The principal office of the Company shall be located at such place within or without the State of Delaware, and the Company shall maintain such records, as the Board of Managers shall determine from time to time. The Company may have such other offices as the Board of Managers may designate from time to time.

1.4    ***Purpose***.

(a)    The nature or purpose of the business to be conducted or promoted by the Company is to (i) purchase from time to time and hold equity and/or debt investment interests in MagnaChip Semiconductor S.à.r.L, a company organized under the laws of Luxembourg ("<u>MagnaChip Luxembourg</u>"), and MagnaChip Semiconductor, Inc., a Delaware corporation ("<u>MagnaChip US</u>"), any successor to MagnaChip Luxembourg or MagnaChip US or any direct or indirect subsidiary of such entities; (ii) engage in the semiconductor industry or related industries or purchase from time to time and hold equity and/or debt investment interests in entities engaged in such industries; (iii) perform all duties and activities as a controlling stockholder of MagnaChip Luxembourg and MagnaChip US or their respective successors and manage the investments of the Company; (iv) hold for investment, distribute and/or otherwise dispose of cash or property distributed to the Company by MagnaChip Luxembourg or MagnaChip US or otherwise received by the Company in connection with its business; and (v) engage in any and all activities necessary, desirable or incidental to the accomplishment of the foregoing.  Notwithstanding anything herein to the contrary, nothing set forth herein shall be construed as authorizing the Company to possess any purpose or power, or to do any act or thing, forbidden by law to a limited liability company organized under the laws of the State of Delaware.

(b)    Subject to the provisions of this Agreement, the Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, convenient or incidental to, or for the furtherance of, the purposes set forth in Section 1.4(a).

1.5    ***Foreign Qualification***.  The Board of Managers shall cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company in any jurisdiction where the nature of its business makes such qualification necessary or desirable; <u>provided</u> <u>that</u> the Board of Managers shall provide to each Member such notice of its intention to so qualify in any jurisdiction outside the United States as is reasonably practicable, which such notice shall contain the name of the jurisdiction and the reason for such qualification to the extent reasonably practicable. Subject to the preceding sentence, at the request of the Board of Managers, each Member shall execute, acknowledge, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, or terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

## ARTICLE II
## <u>MEMBERSHIP INTERESTS</u>

2.1    ***Existing Members; New Members***.

(a)     The Existing Members of the Company are designated on <u>Exhibit A</u>. The number of Common Units owned by each Member, such Member's Percentage Interest (defined below) of each class of Membership Interests (defined below) and such Member's Capital Contributions as of the date hereof are set forth on <u>Exhibit A</u> opposite such Member's name. Each Member's Membership Interest shall be represented by Units of Membership Interest.

(b)     Subject to the approval by the Board of Managers, the Company shall have the right to issue or sell to any Person (including Members and affiliates of Members) any of the following (which for purposes of this Agreement shall be referred to as "<u>Additional Interests</u>"): (i) additional Common Units and (ii) warrants, options, or other rights to purchase or otherwise acquire Common Units.  Subject to the provisions of this Agreement and approval by the Board of Managers, the Company shall determine the number of each class or series of Units to be issued or sold and the contribution required in connection with the issuance of such Additional Interests. In order for a Person to be admitted as a new Member of the Company with respect to an Additional Interest, with respect to Membership Interests that have been transferred pursuant to this Agreement or otherwise:  such Person shall have delivered to the Company a written undertaking in a form acceptable to the Company to be bound by the terms and conditions of this Agreement and shall have delivered such documents and instruments as the Company reasonably determines to be necessary or appropriate in connection with the issuance of such Additional Interest to such Person or the transfer of Membership Interests to such Person or to effect such Person's admission as a Member.  Thereafter, the Secretary of the Company shall amend <u>Exhibit A</u> without the further vote, act or consent of any other Person to reflect such new Person as a Member and shall make available for review a copy of such amended <u>Exhibit A</u> to each Member. Upon the delivery of such documents and instruments, such Person shall be admitted as a Member and deemed listed as such on the books and records of the Company and thereupon shall be issued such Person's Membership Interest, including any Units that correspond to and are part of such Membership Interest.

(c)     As used herein, the following terms shall have the following meanings:

(i)     "<u>Member</u>" means (a) the Existing Members and (b) any Person hereafter admitted to the Company as a member as provided in this Agreement but does not include any Person who has ceased to be a member in the Company.

(ii)     "<u>Membership Interest</u>" means a Member's entire interest in the Company, including such Member's economic interest, the right to vote on or participate in the Company's management, and the right to receive information concerning the business and affairs of the Company, in each case, to the extent expressly provided in this Agreement or required by the Act.

(iii)     "<u>Percentage Interest</u>" means, with respect to any Member, the percentage of the total number of Units of the class of Units in question owned by such Member.

(iv)     "<u>Person</u>" shall mean an individual, a corporation, partnership, trust, limited liability company, organization, association, government or any department or agency thereof, or any other individual or entity.

**2.2** *Representations and Warranties*. Each Member hereby represents and warrants to the Company and each other Member that:

(a) Such Member has full legal right, power and authority (including the due authorization by all necessary corporate, limited liability company or partnership action in the case of corporate, limited liability company or partnership Members) to enter into this Agreement and to perform such Member's obligations hereunder without the need for the consent of any other Person; and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of such Member enforceable against such Member in accordance with the terms hereof.

(b) The Membership Interests are being received by such Member for investment and not with a view to any distribution thereof that would violate the United States Securities Act of 1933, as amended (the "Securities Act"), or the applicable securities laws of any state; and such Member will not distribute the Membership Interests in violation of the Securities Act or the applicable securities laws of any state.

(c) Such Member understands that the Membership Interests have not been registered under the Securities Act or the securities laws of any state and must be held indefinitely unless subsequently registered under the Securities Act and any applicable state securities laws or unless an exemption from such registration becomes or is available.

(d) Such Member is financially able to hold the Membership Interests for long-term investment, believes that the nature and amount of the Membership Interests being acquired are consistent with such Member's overall investment program and financial position, and recognizes that there are substantial risks involved in acquiring the Membership Interests.

(e) Such Member confirms that (i) such Member is familiar with the business of the Company, (ii) such Member has had the opportunity to ask questions about the Company and to obtain (and that such Member has received to its satisfaction) such information about the business and financial condition of the Company as such Member has reasonably requested, and (iii) such Member, either alone or with such Member's representative (as defined in Rule 501(h) promulgated under the Securities Act), if any, has such knowledge and experience in financial and business matters that such Member is capable of evaluating the merits and risks of the prospective investment in the Membership Interests.

(f) Such Member acknowledges and agrees that such Member's Membership Interests cannot be sold, assigned, transferred, exchanged or otherwise disposed of except in compliance with the terms of this Agreement to which such Member is bound.

**2.3** *Membership Interests; Certification*. The Membership Interests shall be divided into one class of Units consisting of units of Common Membership Interests (the "Common Units" or collectively, the "Units").  As of the date hereof, and after giving effect to the transactions contemplated hereby, there shall be authorized (i) [_____] Common Units, of which [_____] will be issued and outstanding.  The Company may, in its discretion, issue certificates to the Members representing the Units of Membership Interests held by each Member. To the extent that the holder of a Unit is required by the other provisions

of this Agreement to deliver or surrender such holder's certificates representing Units, then, in the event that the Units are not certificated by the Company, the Company will provide a form to be completed and delivered by such holder in lieu thereof.

**2.4** *Common Units*. Except as otherwise provided herein, all Common Units shall be identical and shall entitle the holders thereof to the same rights and privileges. The holders of Common Units shall have the general right to vote for all purposes, including the election of directors of the Board of Managers of the Company ("Managers"), as provided by applicable law. Each holder of Common Units shall be entitled to one vote for each unit thereof held.

**2.5** *Information*. The Company will provide or make available directly to each Member:

(a) As soon as available but in any event within 120 days after the end of each fiscal year, (A) audited consolidated annual financial statements (including an income statement, balance sheet and statement of cash flows) of the Company, accompanied by (B) a narrative discussion, prepared by the Company's management, comparing the operations of the current fiscal year and the previous fiscal year.

(b) As soon as available but in any event within 60 days after the end of each of the first three quarters of each fiscal year, unaudited quarterly consolidated financial statements (including an income statement, balance sheet and statement of cash flows (each unaudited)) of the Company.

(c) Notwithstanding anything to the contrary contained in this Section 2.5, the Company shall not be required to provide information rights pursuant to Section 2.5 to any Member who is a direct competitor of the Company or its Subsidiaries or to any Member whose Affiliate is a direct competitor of the Company or its Subsidiaries.

**2.6** *Liability to Third Parties*. Except as to any obligation it may have under the Act to repay funds that may have been wrongfully distributed to it, no Member or Manager shall be liable for the debts, obligations or liabilities of the Company, including under a judgment, decree or order of a court.

**2.7** *Lack of Authority*. No Member has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company; provided that, this Section 2.7 shall not limit the rights of any Manager who is also a Member to act in such Member's capacity as a Manager.

**2.8** *Withdrawal*. A Member does not have the right to withdraw from the Company as a Member (except in connection with a transfer of its Membership Units in accordance with this Agreement) and any attempt to violate the provisions hereof shall be legally ineffective.

**ARTICLE III**
**CAPITAL CONTRIBUTIONS**

**3.1** *Contributions*.

(a)     General. Each Member shall make or shall have made a Capital Contribution as provided for in this Article III. As used herein, "Capital Contribution" means any contribution by a Member to the capital of the Company; provided that upon the admission of a new Member after the date hereof, the Capital Contribution of each Member shall be deemed equal to the capital account of such Member as revalued pursuant to this Agreement. The Company may, in its discretion, issue certificates to the Members representing the Membership Interests held by each Member.

(b)     Initial Contributions.  On the date hereof, the Persons listed on Exhibit A hereto have made the contributions to the Company in exchange for the Units, in each case as set forth on Exhibit A hereto opposite their respective names.

**3.2     Additional Capital Contributions and Return of Contributions**. No Member shall be required to make any additional Capital Contributions to the Company or to restore any deficit in such Member's capital account.  A Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its capital account or its Capital Contributions. An unpaid Capital Contribution is not a liability of the Company or of any Member.

**3.3     Advances by Members**. With the consent of the Board of Managers, any Member may advance funds to or on behalf of the Company on terms approved by the Board of Managers. An advance described in this Section 3.3 constitutes a loan from the Member to the Company, and is not a Capital Contribution.

**3.4     Capital Account.**

(a)     A capital account shall be established and maintained for each Member. Such capital accounts shall be subject to revaluation in accordance with Reg. § 1.704-l(b)(2)(iv)(f) at such time as the Board of Managers shall determine.

(b)     Each Member's capital account:

(i)     shall be increased by: (A) the amount of money contributed by that Member to the Company, (B) the fair market value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Code), and (C) allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Reg. § 1.704-l(b)(2)(iv)(g), but excluding income and gain described in Reg. § 1.704-l(b)(4)(i), and

(ii)     shall be decreased by (A) the amount of money distributed to that Member by the Company, (B) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under Section 752 of the Code), (C) allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Code, and (D) allocations of Company loss and deduction (or items thereof), including loss and deduction described in

Reg. § 1.704-l(b)(2)(iv)(g), but excluding items described in clause (b)(ii)(C) above and loss or deduction described in Reg. § 1.704-l(b)(4)(i) or § 1.704-l(b)(4)(iii). As used herein, "Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time, and "Reg." means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

(c)     The Members' capital accounts also shall be maintained and adjusted as permitted by the provisions of Reg. § 1.704-l(b)(2)(iv) (f) and as required by the other provisions of Reg. §§ 1.704-l(b)(2)(iv) and 1.704-l(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Reg. § 1.704-l(b)(2)(iv)(g).

(d)     Upon the exercise of a Warrant, the capital account of the exercising Warrant holder shall be credited with the amount of the exercise price, and the capital accounts of the exercising holder and all the other Members shall be adjusted in accordance with the rules set forth in Proposed Treasury Reg. § 1.704-1(b)(2)(iv)(s) so that the capital account associated with each Common Unit is equal to the capital account of each other Common Unit.  If Proposed Treasury Reg. § 1.704-1(b)(2)(iv)(s) is amended or replaced, these adjustments shall be made in accordance with any subsequent rules applicable to the maintenance of capital accounts upon the exercise of a noncompensatory option at the time of the exercise of the Warrant.

(e)     On the transfer of all or part of a Membership Interest, the capital account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Reg. § 1.704-l(b)(2)(iv)(l).

## ARTICLE IV
## ALLOCATIONS AND DISTRIBUTIONS

**4.1     *Allocations*.**

(a)     ***Profits.*** After giving effect to any special allocations set forth in this Section 4.1, all items of income and gain of the Company for any fiscal year (or portion thereof) shall be allocated:

(i)     first, to each Member, if any, with a negative capital account balance, in proportion to such negative balances, until any such negative balances have been eliminated;

(ii)     second, with respect to the holders of Common Units, if the positive balances in the Common Unit Capital Accounts of such Members is not in proportion to their relative Membership Interests, then to the holders of the Common Units in such manner so as to cause such positive balances (after taking into account all allocations to be made under this subsection) to be in proportion to such Membership Interests; and

(iii)    the balance, if any, to all holders of Common Units in proportion to their Membership Interests.

(b)    ***Losses***. After giving effect to any special allocations set forth in this Section 4.1, all items of loss and deduction of the Company shall be allocated:

(i)    first, with respect to holders of Common Units, if the positive balances in the Common Unit Capital Accounts of such Members is not in proportion to their relative Membership Interests, then to the holders of the Common Units in such manner so as to cause such positive balances (after taking into account all allocations to be made under this subsection) to be in proportion to such Membership Interests;

(ii)    second, with respect to holders of Common Units in proportion to the positive balances in their Common Unit Capital Accounts until such balances have been reduced to zero; and

(iii)    the balance, if any, to holders of Common Units in proportion to their Membership Interests.

(c)    ***Special Allocations***.  The following special allocations shall be made in the following order:

(i)    ***Limitation on Losses***.  The Losses allocated to any Member pursuant to Section 4.1(b) of this Agreement shall not exceed the maximum amount of Losses that can be so allocated without causing such person to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event some, but not all, of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 4.1(b), the limitation set forth in this Section 4.1(c)(i) shall be applied on a Member-by-Member basis so as to allocate the maximum permissible Losses to each Member under Reg. § 1.704-l(b)(2)(ii)(d).

(ii)    ***Qualified Income Allocation***.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Reg. §§ 1.704-l(b)(2)(ii)(d)(4), 1.704-l(b)(2)(ii)(d)(5), or 1.704-1 (b)(2)(ii)(d)(6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the deficit capital account balance of such Member as promptly as possible, provided, that, an allocation pursuant to this Section 4.1(c)(ii) shall be made if and only to the extent that such Member would have a deficit capital account balance after all other allocations provided for in this Section 4.1 have been tentatively made as if this Section 4.1(c)(ii) were not in this Agreement.

(iii)    ***Gross Income Allocation***.  In the event any Member has a deficit Capital Account at the end of any fiscal year which is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to this Agreement, if

any, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Reg. §§ 1.704-2(g)(l) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that, an allocation pursuant to this Section 4.1(c)(iii) shall be made if and only to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 4.1 have been tentatively made as if this Section 4.1(c)(iii) was not in the Agreement.

(iv) *Impact of Company Indebtedness*. In the event that the Company incurs indebtedness in any material amount, then the allocation provisions set forth herein shall be deemed to be further modified so as to reflect inclusion of a Company and, if applicable, Member minimum gain chargeback consistent with that set forth in Reg. §§ 1.704-2(f) and (i)(4), which allocations shall be applied before application of the other special allocation provisions set forth in this Section 4.1(c).

(v) *Curative Allocations.* The allocations set forth in this Section 4.1(c) (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations promulgated under Code Section 704(b). It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 4.1(c)(v). Therefore, notwithstanding any other provision of this Section 4.1 (other than the Regulatory Allocations), the Company shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's capital account balance is, to the extent possible, equal to the capital account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Sections 4.1(a) (other than Section 4.1(c)).

(d) *Transfers of Units.* All items of income, gain, loss, deduction and credit allocable to any Membership Interest that may have been transferred or otherwise disposed of shall be allocated between the transferor and the transferee based on the percentage of the calendar year during which each was recognized as owning that Membership Interest, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Code and the regulations thereunder.

(e) *Section 704(c) Allocations.* Solely for tax purposes, income, gain, loss and deduction with respect to any property contributed to the capital of the Company or for which the adjusted tax basis and book value differ shall be allocated among the Members so as to take account of any variation between adjusted tax basis and book value. The allocations provided in this Section 4.1 are intended to comply with the requirements of Section 704 of the Code and

Treasury Regulations thereunder and shall be interpreted (or modified, to the extent necessary) in such manner as is consistent with such requirements, as determined by the Company's Tax Matters Partner (defined below). For purposes of allocations under Section 704(c) of the Code, the Company shall use the allocation method or methods as determined by the Board of Managers.

(f) ***Allocations Upon Exercise of Warrants***. In accordance with Proposed Treasury Reg. § 1.704-1(b)(2)(s) and 1.704-1(b)(4)(ix) and solely for tax purposes, corrective allocations of income, gain, loss and deduction shall be made among the Members upon the exercise of a Warrant and thereafter. If these Proposed Treasury Regulations are amended or replaced, then such allocations shall be made in accordance with any subsequent rules applicable to maintenance of capital accounts and allocations resulting therefrom upon the exercise of a noncompensatory option at the time of the exercise of the Warrant. Any elections or other decisions relating to such allocations shall be made by the Board of Managers in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 4.1(f) are solely for purposes of federal, state and local taxes and shall not affect or in any way be taken into account in computing any Member's capital account or share of profits, losses other items or distributions to any provision of this Agreement.

(g) ***Definitions***. The following capitalized terms and phrases used in this Article IV (or otherwise in this Agreement) have the following meanings:

(i) "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's capital account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(1) Credit to such capital account any amounts which such Member is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate sentences of Reg. §§ 1.704-2(g)(l) and 1.704-2(i)(5); and

(2) Debit to such Capital Account the items described in Reg. §§ 1.704-l(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-l(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Reg. § 1.704-l(b)(2)(ii) (d) and shall be interpreted consistently therewith.

**4.2** ***Distributions***.

(a) ***Regular Distributions***. The Board of Managers shall have the authority to reinvest the Company's cash generated from operations and dispositions of assets, including the sale or other disposition of equity interests in a related company in which the Company invests directly or indirectly. Consequently, distributions to Members of the Company's cash or other assets shall be made only at such times and in such amounts as authorized by the Board of Managers and the Board of Managers shall have no obligation or duty to distribute cash or other assets to the Members prior to the dissolution and liquidation of the Company. Distributions, if

any, shall be made with respect to holders of Common Units, to all such Members in proportion to their Membership Interests.

    (b)    ***Tax Distributions***.

    (i)    Notwithstanding Section 4.2(a), with respect to each taxable period of the Company, the Company shall, to the extent of available funds, make a Tax Distribution to the Members; provided, that such distribution shall be made if and to the extent that the Board of Managers determines that the distribution does not violate or breach, or constitute a termination, cancellation or acceleration of, any obligation, contract, agreement or other instrument of the Company.

    (ii)    "Tax Distribution" means, for the applicable taxable period, an aggregate cash distribution to the Members equal to (1) the taxable income of the Company for the taxable period multiplied by (2) an assumed tax rate equal to (A) the maximum federal income tax rate for corporations in effect for the taxable period plus (B) six percent (6%). The amount of the Tax Distribution shall be determined by the Company's independent accounting firm.

    (iii)    Tax Distributions shall be distributed among the Members in accordance with their ownership of the Units in the same manner as provided for in Section 4.2(a).

    (iv)    Subject to Section 4.2(b)(i), the Company shall make the Tax Distribution, if any, for an applicable taxable period in four installments based on a reasonable estimate of the year's anticipated taxable income. Such installments shall be distributed no later than the tenth day of each of April, June, September and December of the year.

    (c)    ***Withholding***.  The Company shall be entitled to withhold and pay over any federal, state or foreign income taxes as required by applicable law and any such payments with respect to the income or distributions of a Member shall be treated as a distribution to the Member on whose behalf the withholding occurs.

## ARTICLE V
## MANAGERS

**5.1**    ***The Board of Managers; Delegation of Authority and Duties***

    (a)    Subject to the delegation of rights and powers provided for herein, the Board of Managers shall have the sole right to manage the business and affairs of the Company and shall have all powers and rights necessary, appropriate or advisable to effectuate and carry out the purposes and business of the Company, including, without limitation, the right to sell all or substantially all of the assets of the Company, to convert the Company to a corporation or to consummate a public offering of Securities.  The Board of Managers shall consist of such number of Managers as determined by the affirmative vote of the Managers appointed from time to time in accordance with this Agreement.  Notwithstanding the above, the Board of Managers shall initially consist of [seven (7)] Managers as follows: (i) [four (4)] Managers appointed by

Avenue Capital Management (the "Avenue Managers"), (ii) the President and Chief Executive Officer of the Company and (iii) two (2) Managers to be elected by the affirmative vote of the Required Interests (as defined in Section 7.1(c)). Unless otherwise determined by the Board of Managers, the President and Chief Executive Officer shall serve as the Chairman of the Board of Managers. Each Manager shall have one (1) vote with respect to any matters that come before the Board of Managers.

(b)     Other than with respect to the Avenue Managers, who may only be removed by Avenue Capital Management, no Manager may be removed without the affirmative vote of the Required Interests. Any vacancy created by any former Manager (other than the Avenue Managers) may be filled by the affirmative vote of the Required Interests or a majority of the Managers then in office. Any vacancy created by any former Avenue Manager may only be filled by Avenue Capital Management.

(c)     Subject to the foregoing, in the event a vacancy is created on the Board of Managers by reason of the death, disability, resignation or termination (with cause or without cause) of any Manager, each of the Members hereby agrees that such vacancy shall be filled in accordance with the procedures set forth in this ARTICLE V.

(d)     Other than the Avenue Managers, who shall be designated each year by Avenue Capital Management, the Managers shall be elected at any annual or special meeting of the Members (or by written consent in lieu of a meeting of the Members) and will serve until their successors are duly elected and qualified pursuant to the terms of this Agreement or until their earlier death, disability, resignation, termination (with cause or without cause) or other removal.

(e)     No Member, by reason of such Member's status as a Member, shall have any authority to act for or bind the Company but shall have only the right to vote on or approve the actions to be voted on or approved by such Member as specified in this Agreement or as required under The Act.

(f)     The officers of the Company shall be elected, removed and perform such functions as are provided herein. The Board of Managers may delegate to any officer of the Company or to any such other Person such authority to act on behalf of the Company as the Board of Managers may from time to time deem appropriate in its sole discretion.

(g)     The respective managers, or Persons performing similar functions, of each of the Company's Subsidiaries shall be elected or appointed, as applicable, in accordance with the provisions contained in this Section 5.1.

**5.2     *Meetings of the Board of Managers***

(a)     All meetings of the Board of Managers may be held at any place that has been designated from time to time by resolution of the Board of Managers or in any notice properly given with respect to such meeting. In the absence of such a designation, regular meetings shall be held at the principal place of business of the Company. Any meeting, regular or special, may be held by conference telephone or similar communication equipment; provided that all Managers participating in the meeting can hear one another, and all Managers

participating by telephone or similar communication equipment shall be deemed to be present in person at the meeting.

(b)     Regular meetings of the Board of Managers shall be held at such times and at such places as shall be fixed by approval of the Managers in accordance with the terms of this Agreement.

(c)     Special meetings of the Board of Managers for any purpose or purposes may be called at any time by any of the Managers.  Notice of the time and place of a special meeting shall be delivered personally to each Manager and sent by first class mail, by telegram, telecopy or email (or similar electronic means) or by nationally recognized overnight courier, charges prepaid, addressed to each Manager at that Manager's address as it is shown on the records of the Company.  If the notice is mailed, it shall be deposited in the United States mail at least five (5) Business Days before the date of the meeting.  If the notice is delivered personally or by telephone or by telegram, telecopy or email (or similar electronic means) or overnight courier, it shall be given at least twenty-four (24) hours before the time of the holding of the meeting.  Any oral notice given personally or by telephone may be communicated either to the Manager or to a Person designated by such Manager to receive such notice.  Any notice of a special meeting shall state generally the nature of the business to be transacted as such meeting.

(d)     A majority of the Managers shall constitute a quorum for the transaction of business.  Every act done or decision made by the affirmative vote of the Managers holding a majority of the votes present at a meeting duly held at which a quorum is present shall be regarded as the act of the Board of Managers, except to the extent that the vote of a higher number is required by this Agreement or Applicable Law.

(e)     Notice of any meeting need not be given to any Manager who either before or after the meeting signs a written waiver of notice, a consent to holding the meeting or an approval of the minutes.  The waiver of notice or consent shall specify the purpose of the meeting.  All such waivers, consents and approvals shall be filed with the records of the Company or be made a part of the minutes of the meeting.  Notice of a meeting shall also be deemed given to any Manager who attends the meeting without protesting at or prior to its commencement the lack of notice to that Manager.

(f)     Managers present at any meeting entitled to cast a majority of all votes entitled to be cast by such Managers, whether or not constituting a quorum, may adjourn any meeting to another time and place.  Notice of the time and place of holding an adjourned meeting need not be given unless the meeting is adjourned for more than forty-eight (48) hours, in which case notice of the time and place shall be given before the time of the adjourned meeting in the manner specified in Section 5.2(c) hereof.

(g)     Any action to be taken by the Board of Managers at a meeting may be taken without such meeting by the written consent of the Managers entitled to act at such meeting.  Any such written consent may be executed and given by telecopy, email or similar electronic means.  Such written consents shall be filed with the minutes of the proceedings of the Board of Managers.

**5.3** *Payments to Managers; Reimbursements*.  Except as otherwise determined by the Board of Managers (by the vote or written consent of a majority of the votes of the disinterested Managers then in office), no Manager shall be entitled to remuneration by the Company for services rendered in his or her capacity as a Manager (other than for reimbursement of reasonable out-of-pocket expenses of such Manager).  All Managers will be entitled to reimbursement of their reasonable out-of-pocket expenses incurred in connection with their attendance at Board of Managers meetings.

**5.4** *Competitive Opportunity.* The Members and the Company recognize that the Members, their Affiliates and the directors elected or appointed to the Board of Managers by the Members: (i) may have participated, directly or indirectly, and may continue to participate (including, without limitation, in the capacity of investor, manager, officer and employee) in businesses that are similar to or compete with the business (or proposed business) of the Company; (ii) may have interests in, participate with, aid and maintain seats on the board of directors of other such entities; and (iii) may develop opportunities for such entities (collectively, the "Position").  In such Position, the Members, their Affiliates and the Managers elected or appointed to the Board of Managers by the Members may encounter business opportunities that the Company or its Members may desire to pursue.  The Members and the Company agree that the Members, their Affiliates and the Managers elected or appointed by the Members to the Board of Managers shall have no obligation to the Company, the Members or to any other Person to present any such business opportunity to the Company before presenting and/or developing such opportunity with any other Persons, other than such opportunities specifically presented to any such Member or Manager for the Company's benefit in his or her capacity as a Member or Manager of the Company.  Each Member and the Company acknowledges and agrees that, in any such case, to the extent a court might hold that the conduct of such activity is a breach of a duty to the Company, such Member and the Company hereby waive any and all claims and causes of action that such Member and/or the Company believes that it may have for such activities.  Each Member and the Company further agrees that the waivers and agreements in this Agreement identify certain types and categories of activities which do not violate any duty of loyalty to the Company, and such types and categories are not manifestly unreasonable.  The waivers and agreements in this Agreement apply to activities conducted before and after the date hereof.

## ARTICLE VI
## OFFICERS

**6.1** *Designation and Appointment*. The Board of Managers may, from time to time, employ and retain persons as may be necessary or appropriate for the conduct of the Company's business (subject to the supervision and control of the Board of Managers), including employees, agents and other persons (any of whom may be a Member or Manager) who may be designated as Officers of the Company ("Officers"), with titles including but not limited to "chief executive officer," "president," "vice president," "treasurer," "Secretary," "general counsel," "director" and "chief financial officer," as and to the extent authorized by the Board of Managers. Any number of offices may be held by the same person. In the Board of Managers' discretion, the Board of Managers may choose not to fill any office for any period as it may deem advisable. Officers need not be residents of the State of Delaware or Members. Any Officer so designated shall have such authority and perform such duties as is customary for an officer of such type for

a corporation or as the Board of Managers may, from time to time, delegate to such Officer. The Board of Managers may assign titles to particular Officers. Each Officer shall hold office until his or her successor shall be duly designated and shall have qualified as an Officer or until his or her death or until he or she shall resign or shall have been removed in the manner hereinafter provided. The salaries or other compensation, if any, of the Officers of the Company shall be fixed from time to time by the Board of Managers.

**6.2** *Resignation and Removal*. Any Officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Board of Managers. The acceptance by the Board of Managers of a resignation of any Officer shall not be necessary to make such resignation effective, unless otherwise specified in such resignation. Any Officer may be removed as such, either with or without cause, at any time by the Board of Managers. Designation of any person as an Officer by the Board of Managers pursuant to the provisions of Section 6.1 shall not in and of itself vest in such person any contractual or employment rights with respect to the Company.

**6.3** *Duties of Officers Generally*. The Officers, in the performance of their duties as such, shall (i) owe to the Company duties of loyalty and due care of the type owed by the officers of a corporation to such corporation and its stockholders under the laws of the State of Delaware, and (ii) keep the Board of Managers reasonably apprised of material developments in the business of the Company.

**6.4** *President and Chief Executive Officer*.  The President and Chief Executive Officer shall, subject to the control of the Board of Managers, be responsible for the general supervision, direction and control of the business and the officers of the Company.  He or she shall have the general powers and duties of management usually vested in the office of President of a business entity and shall have such other powers and duties as may be prescribed by the Board of Managers or this Agreement.  The Board of Managers shall initially designate Sang Park as President and Chief Executive Officer of the Company.

**6.5** *Vice President(s)*. The vice president(s) of the Company shall perform such duties and have such other powers as the president of the Company or the Board of Managers may from time to time prescribe. A vice president may be designated as an executive vice president, a senior vice president, an assistant vice president, or a vice president with a functional title.

**6.6** *Secretary*. The Secretary shall keep or cause to be kept at the principal place of business of the Company, or such other place as the Board of Managers may direct, a book of minutes of all meetings and actions of the Board of Managers, committees or other delegates of the Board of Managers and the Members.  The Secretary shall keep or cause to be kept at the principal place of business of the Company a register or a duplicate register showing the names of all Members and their addresses, the class and equity interests in the Company held by each, the number and date of certificates issued for the same, if any, and the number and date of cancellation of every certificate surrendered for cancellation, if any.  The Secretary shall give or cause to be given notice of all meetings of the Members and of the Board of Managers (or committees or other delegates thereof) required to be given by this Agreement or by Applicable

Law and shall have such other powers and perform such other duties as may be prescribed by the Board of Managers or by this Agreement.

**6.7**     *Treasurer*.  The Treasurer shall be the chief financial officer of the Company and shall keep and maintain or cause to be kept and maintained adequate and correct books and records of accounts of the properties and business transactions of the Company.  The books of account shall at all reasonable times be open to inspection by any Manager.  The Treasurer shall deposit all monies and other valuables in the name and to the credit of the Company with such depositaries as may be designated by the Board of Managers.  He or she shall disburse the funds of the Company as may be ordered by the Board of Managers, shall render to the President and the Board of Managers, whenever they request it, an account of all of his or her transactions as chief financial officer and of the financial condition of the Company and shall have other powers and perform such other duties as may be prescribed by the Board of Managers or this Agreement.

**ARTICLE VII**
**MEETINGS OF MEMBERS**

**7.1**     *Meetings of Members*

(a)     All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of Delaware as shall be specified or fixed in the notices (or waivers of notice thereof). Except as otherwise required by law or as otherwise provided herein or in the Securityholders Agreements, if any, only holders of Common Units shall be entitled to notice of, to attend and to vote at meetings of the Members.

(b)     An annual meeting of the Members shall be held for the purpose of election of the Managers and for the transaction of such other business as may properly come before the meeting. Any meeting of Members shall be held on such date and at such time as the Board of Managers shall fix and set forth in the notice of the meeting.

(c)     Special meetings of the Members for any proper purpose or purposes may be called at any time by the Board of Managers or upon the request of a Required Interest (defined below). Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members. As used herein, "Required Interest" means one or more Members owning among them more than 50% of the then outstanding Common Units.

(d)     All meetings of the Members shall be presided over by the chairman of the meeting, who shall be a Manager designated by a majority of the Board of Managers. The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him or her in order.

**7.2**     *Notice*. Written notice stating the place, day and hour of any meeting of the Members and, with respect to a special meeting of the Members, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) nor more than sixty (60)

days before the date of such meeting by or at the direction of the Managers or person calling the meeting, to each Member entitled to vote at such meeting.

**7.3** *Quorum; Voting*

(a) Except as otherwise provided in the Certificate or this Agreement or required by applicable law, a quorum shall be present at a meeting of Members if the holders of a Required Interest are represented at the meeting in person or by proxy.

(b) A Member may vote either in person or by proxy executed in writing by the Member. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable. Except as otherwise provided in the Certificate or this Agreement or required by applicable law, with respect to any matter, the affirmative vote of a Required Interest at a meeting of Members at which a quorum is present shall be the act of the Members.

**7.4** *Action by Written Consent*. Any action which could be taken by the Members at an annual or special meeting of Members may be taken by the Members, without a meeting, without prior notice and without a vote, if a consent or consents in writing setting forth the action so taken is signed by the holders of a Required Interest (or holders of such higher aggregate percentage of Membership Interest as is required to authorize or take such action under the terms of the Certificate, this Agreement or Applicable Law). Any such written consent may be executed and ascribed to by facsimile or similar electronic means.

**7.5** *Record Date*. The Board of Managers may fix a record date for purposes of determining Members entitled to notice of or vote at a meeting of Members (including any adjournment thereof), Members entitled to consent to action by written consent, and Members entitled to receive payment of any dividend or other distribution or allotment of any rights, which such record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Managers and which such record date shall not be more than sixty nor less than ten days before the date of such meeting, consent or payment.

**7.6** *Adjournment*. The chairman of the meeting or the holders of a Required Interest shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Members, such time and place shall be determined by a vote of the holders of a Required Interest and no notice of the adjourned meeting need be given if such time and place are announced at the meeting at which the adjournment is taken. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

**7.7** *Conversion*.

(a) Immediately prior to the consummation of an IPO authorized by the Board of Managers, the Members and Board of Managers will take all necessary and desirable actions in consummation of any such IPO, and, if approved by the Board of Managers, effect a Solvent Reorganization of the Company into a corporation and/or an exchange of the Units into Securities of the Company or its Subsidiaries or distribution of Securities of the Company or its Subsidiaries in respect of Units (the "Reclassified Securities") the Board of Managers finds

acceptable; provided, that (i) the Reclassified Securities provide each Member with substantially similar economic interest, governance, priority, vesting and other rights and privileges as such Member had prior to such recapitalization and/or exchange (prior to giving effect to the effect of the IPO on the terms of this Agreement) and are consistent with the rights and preferences attendant to such Units as set forth in this Agreement or Applicable Law as in effect immediately prior to such IPO and (ii) except as otherwise provided herein, the provisions of this Agreement shall apply to the Reclassified Securities and the issuer thereof as such provisions apply to the Units and the Company, *mutatis mutandis.*

       **7.8**    ***Merger and Consolidation***.  Pursuant to an agreement of merger or consolidation, the Company may merge or consolidate with or into one or more limited liability companies or one or more other business entities (as defined in the Act) <u>provided</u> <u>that</u> such merger or consolidation is approved by the Board of Managers and authorized by the affirmative vote of the Required Interest taken at a special meeting of Members duly called for purposes of considering such merger or consolidation.

       **7.9**    ***Sale of Assets***.  Subject to the applicable provisions of any Securityholders Agreement, the Company may sell, lease or exchange all or substantially all of its property and assets upon such terms and conditions and for such consideration as the Board of Managers deems expedient and for the best interests of the Company, <u>provided</u> <u>that</u> such sale, lease or exchanges is approved by the Board of Managers and authorized by a resolution adopted by the Required Interest at a special meeting duly called for purposes of considering such sale, lease or exchange.

**ARTICLE VIII**
<u>**INDEMNIFICATION**</u>

       **8.1**    ***Right to Indemnification***.

       (a)    Except as otherwise provided under the Act, no Member, in such capacity, shall be liable for any debts, liabilities, contracts or any other obligations of the Company, whether arising in contract, tort, or otherwise, solely by reason of being a member or Manager of the Company.  No Member shall have any fiduciary or other duty to another Member with respect to the business and affairs of the Company.  No Member shall have any responsibility to restore any negative balance in his capital account or to contribute to or in respect of the liabilities or obligations of the Company or to return distributions made by the Company, except as required by the Act or other Applicable Law.

       (b)    No Manager of the Company shall be personally liable to the Company or to any Member or other person or entity who may become a party to or bound by this Agreement for any losses, claims, damages or liabilities arising from any act or omission performed or omitted by the manager of the Company in connection with this Agreement or the Company's business and affairs or for breach of any duties (including fiduciary duties) arising under or in connection with this Agreement or the Company, except for any losses, claims, damages or liabilities primarily attributable to the manager's willful misconduct, bad faith, recklessness or gross negligence, as finally determined by a court of competent jurisdiction, or as otherwise required by law.

(c)     No Member, Manager, officer, or any direct or indirect officer, director, Affiliate stockholder, member or partner of a Member (each, an "Indemnitee"), shall be liable, responsible or accountable in damages or otherwise to the Company or any Member for any act or failure to act by such Indemnitee in connection with the conduct of the business of the Company, or by any other such Indemnitee in performing or participating in the performance of the obligations of the Company, so long as such action or failure to act was not in material violation of this Agreement and did not constitute gross negligence or willful misconduct.

(d)     The Company shall indemnify and hold harmless each Indemnitee to the fullest extent permitted by Applicable Law against losses, damages, liabilities, costs or expenses (including reasonable attorneys' fees and expenses and amounts paid in settlement) incurred by any such Indemnitee in connection with any action, suit or proceeding to which such Indemnitee may be made a party or otherwise involved or with which it shall be threatened by reason of its being a Member, Manager, officer, or any direct or indirect officer, director, Affiliate stockholder or partner of a Member, or while acting as (or on behalf of) a Member on behalf of the Company or in the Company's interest.  Such attorneys' fees and expenses shall be paid by the Company as they are incurred upon receipt, in each case, of an undertaking by or on behalf of the Indemnitee to repay such amounts if it is ultimately determined that such Indemnitee is not entitled to indemnification with respect thereto.

(e)     The right of an Indemnitee to indemnification hereunder shall not be exclusive of any other right or remedy that a Member, Manager or officer may have pursuant to Applicable Law or this Agreement.

(f)     An Indemnitee shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Indemnitee reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Member might properly be paid.

(g)     To the extent that, at law or in equity, an Indemnitee has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Indemnitee, an Indemnitee acting within the scope of this Agreement shall not be liable to the Company or to any other Indemnitee for its good faith reliance on the provisions of this Agreement or any approval or authorization granted by the Company or any other Indemnitee.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of an Indemnitee otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Indemnitee.

(h)     The foregoing provisions of this Section 8.1 shall (a) survive any termination of this Agreement and (b) be contract rights, and no amendment, modification, supplement, restatement or repeal of this Section 8.1 shall have the effect of limiting or denying any such rights with respect to actions giving rise to losses, damages, liabilities, costs or expenses (including reasonable attorneys' fees and expenses and amounts paid in settlement) prior to any such amendment, modification, supplementation or repeal.

**8.2** *Insurance and Other Indemnification*. The Board of Managers shall have the power to (i) authorize the Company to purchase and maintain, at the Company's expense, insurance on behalf of the Company and on behalf of others to the extent that power to do so has not been prohibited by statute, (ii) create any fund of any nature, whether or not under the control of a trustee, or otherwise secure any of its indemnification obligations, and (iii) give other indemnification to the extent permitted by statute.

## ARTICLE IX
## <u>TAXES</u>

**9.1** *Tax Returns*. The Board of Managers shall cause the Company to prepare and file all necessary U.S. Federal, state, local and foreign tax returns for the Company including making the elections described in Section 9.2. Each Member shall furnish to the Company all pertinent information (including without limitation form W-8BEN, W-8ECI or W-8EXP, as applicable) in its possession relating to Company operations that is necessary to enable the Company's tax returns to be prepared and filed. Such tax returns will duly reflect the allocation of income, gain, loss and deduction set forth in Article IV of this Agreement.

**9.2** *Tax Elections*. To the extent permitted by applicable tax law, the Company shall make the following elections on the appropriate tax returns:

        (a)      to adopt the fiscal year ending December 31 as the Company's taxable year; and

        (b)      to adopt the accrual method of accounting and to keep the Company's books and records on the accrual basis method.

Neither the Company nor any Manager or Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law, and no provision of this Agreement shall be construed to sanction or approve such an election.

**9.3** *Tax Allocations and Reports*. The Company shall take reasonable efforts so that within three calendar months after the end of each fiscal year, the Board of Managers shall cause the Company to furnish each Member an Internal Revenue Service Form K-1, Form 5471 and any similar form required for the filing of state or local income tax returns for such Member for such fiscal year, which forms will duly reflect the allocation of income, gain, loss and deduction set forth in Article IV of this Agreement. Upon the written request of any such Member and at the expense of such Member, the Company will use reasonable efforts to deliver or cause to be delivered any additional information necessary for the preparation of any federal, state, local and foreign income tax return which must be filed by such Member.

        (a)      The Tax Matters Partner will determine whether to make or revoke any available election pursuant to the Code. Each Member will, upon request, supply the information necessary to give proper effect to any such election.

        (b)      The Board of Managers shall designate a Member to act as the "<u>Tax Matters Partner</u>" (as defined in Section 623l(a)(7) of the Code) in accordance with Sections 6221

through 6233 of the Code. Upon such designation, the Tax Matters Partner shall be authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith; provided that, the Tax Matters Partner may be removed and replaced by, and shall act in such capacity at the direction of, the Board of Managers. Each Member agrees to cooperate with the Tax Matters Partner and to do or refrain from doing any or all things reasonably requested by the Tax Matters Partner with respect to the conduct of such proceedings. Subject to the foregoing proviso, the Tax Matters Partner will have reasonable discretion to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any taxing authority. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes) will be paid by such Member, and if paid by the Company, will be recoverable from such Member (including by offset against distributions otherwise payable to such Member). Each Manager will be provided with a copy of all tax returns filed by the Company and the Tax Matters Partner will consult with and keep the Board of Managers fully informed about the status of all material tax examinations, controversies and proceedings.

9.4     *Partnership for U.S. Federal Tax Purposes*. Prior to the effective time of an affirmative election for the Company to be treated as a corporation for U.S. Federal income tax purposes or prior to the time the Company is converted to a corporation under Delaware (or other state) law, whether by operation of law, merger, or otherwise, for U.S. Federal tax purposes the parties agree to treat the Company as a partnership and to treat all Units as interests in such partnership and no party shall take any position inconsistent with this characterization in any tax return or otherwise.

## ARTICLE X
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

10.1     *Books*. The Company shall maintain complete and accurate books of account of the Company's affairs at the Company's principal office, which books shall be open to inspection by any Member (or its authorized representative) to the extent required by the Act.

10.2     *Company Funds*. Except as specifically provided in this Agreement or with the approval of the Board of Managers, the Company shall not pay to or use for, the benefit of any Member (except in any Member's capacity as a Manager, employee or independent contractor of the Company), funds, assets, credit, or other resources of any kind or description of the Company. Funds of the Company shall (i) be deposited only in the accounts of the Company in the Company's name, (ii) not be commingled with funds of any Member, and (iii) be withdrawn only upon such signature or signatures as may be designated in writing from time to time by the Board of Managers.

## ARTICLE XI
## DISSOLUTION, LIQUIDATION, AND TERMINATION

**11.1** *Dissolution*. The Company shall dissolve and its affairs shall be wound up on the first to occur of the following:

        (a)      the decision of the Board of Managers to dissolve and liquidate the Company;

        (b)      the written consent of Members owning a majority of the Common Units; and

        (c)      entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

The Company shall not be dissolved by the admission of Members in accordance with the terms of this Agreement. The death, insanity, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of an event that terminates the continued membership of a Member in the Company, shall not cause the Company to be dissolved and its affairs wound up so long as the Company at all times has at least one Member. Upon the occurrence of any such event, the business of the Company shall be continued without dissolution.

**11.2** *Liquidation and Termination*

        (a)      On dissolution of the Company, the Managers who have not wrongfully dissolved the Company shall act as liquidator or may appoint one or more Members as liquidator. The liquidator shall wind up the affairs of the Company as provided in the Act and shall have all the powers set forth in the Act. The costs of liquidation shall be a Company expense.

        (b)      Upon the winding up of the Company, the assets of the Company shall first be distributed to creditors, including Members and Managers who are creditors, to the extent otherwise permitted by applicable law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof) other than liabilities for which reasonable provision for payment has been made.

        (c)      Any assets remaining after the Company's liabilities and obligations have been paid (or reasonable provision for the payment thereof has been made) shall be distributed to the Members in accordance with the positive capital account balances of the Members, as determined after taking into account all capital account adjustments for the Company's taxable year during which such liquidation occurs (other than those made as a result of this Section), by the end of such taxable year or, if later, within 90 days after the date of such liquidation, except as permitted by Reg. § 1.704- l(b)(2)(ii)(b).

        (d)      If, at the discretion of the Board of Managers, any assets of the Company are distributed in-kind to the Members, such assets shall be valued on the basis of the fair market value thereof as determined by the Board of Managers in their reasonable discretion on the date of distribution. Without limiting the Board of Managers' discretion to make such a valuation or requiring that any such appraisal be made, the valuation of any asset by the Board of Managers on the basis of the determination of its fair market value by an independent appraiser shall be deemed to be a reasonable value for such asset and a reasonable exercise of such discretion.

Upon any such in-kind distribution to a Member, the capital accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss or deduction inherent in such property (that has not previously been reflected in the Members' capital accounts) would be allocated among the Members if there had been a taxable disposition of such property at its fair market value on the date of distribution. The capital accounts of the Members receiving a distribution in-kind shall then be reduced by the fair market value of the property distribution.

(e)  Nothing in this ARTICLE XI shall be construed to extend the time period prescribed under Section 11.2(c) above and Reg. § 1.704-l(b)(2)(ii)(b) for making liquidating distributions of the Company's assets. If the liquidator deems it impracticable to cause the Company to make distributions of the liquidating proceeds to the Members within the time period described under Reg. § 1.704-l(b)(2)(ii)(b), the liquidator may make any arrangement that is considered for federal income tax purposes to effectuate liquidating distributions of all of the Company's assets to the Members within the time period prescribed in such regulation and that will permit the sale of the non-cash assets considered so distributed in a manner that gives effect, to the extent possible, to the intent of the preceding provisions of this ARTICLE XI.

**11.3**  *Deficit Capital Accounts*. Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, upon dissolution of the Company, the deficit, if any, in the capital account of any Member, including any deficit that results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation) or distributions of assets pursuant to this Agreement to all Members, shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's capital account to zero.

**11.4**  *Certificate of Cancellation*. On the completion of the winding up of the Company following its dissolution, the Company is terminated, and the Board of Managers (or such other person or persons as the Act may require or permit) shall file a Certificate of Cancellation with the Office of the Secretary of State of the State of Delaware, and cancel any other filings made pursuant to Section 1.5.

### ARTICLE XII
### TRANSFER RESTRICTIONS

**12.1**  *Limitations on Transfers.*

(a)  No Member shall be permitted to Transfer any Units held by such Member except for (A) Transfers made in accordance with this Section 12.1, and (B) Transfers approved by the Board of Managers (such consent to be withheld in its sole discretion).

(b)  Notwithstanding anything set forth in this Agreement, or the compliance with any of the terms hereof, no Transfer of Units shall be effective, and any such Transfer of Units shall be deemed null and void, if, as a result of any such Transfer, the record number of stockholders and warrant holders of the Corporation (as determined in accordance with Rule 12g5-1 under the Exchange Act or any successor rule or interpretation) would exceed 350, unless the Transfer is approved by the Board of Managers.

(c)     The restrictions contained in this Section 12.1 are for the purpose of ensuring that the Company is not required to become a registrant under the Exchange Act due to the number of Members.

(d)     Any Transfer attempted to be made in violation of this Section 12.1 will be null and void.  The proposed transferee shall not be entitled to any rights of stockholders of the Corporation, including, but not limited to, the rights to vote or to receive dividends and liquidating distributions, with respect to the Units that were the subject of such attempted Transfer.

(e)     No Transfer of any Units shall become effective (A) unless prior written notice thereof has been delivered to the Board of Managers, (B) unless such Transfer complies with this Section 12.1, (C) until the Transferee (unless already party to this Agreement) executes and delivers to the Company a Joinder Agreement in the form attached hereto as <u>Exhibit B</u> and (D) upon request by the Board of Managers, the delivery of an opinion of counsel, in form and substance reasonably satisfactory to the Board of Managers, with respect to the compliance of the Transfer under Applicable Law and any other matters reasonably requested by the Board of Managers.  Upon such Transfer and such execution and delivery, the Transferee shall be bound by, and entitled to the benefits of, this Agreement with respect to the Transferred Units in the same manner as the Member effecting such Transfer.

**12.2    *Drag-Along Rights.***

(a)     At any time, if Avenue desires to effect a Drag-Along Sale, Avenue at its option may require all Members to sell their respective Units as Avenue desires to sell to any Transferee that is not affiliated with Avenue in such Drag Along Sale for the consideration determined in accordance with Section 12.2(d) and otherwise on the same terms and conditions as apply to those Units to be sold by Avenue.  A "<u>Drag-Along Sale</u>" shall mean (i) any merger or consolidation of the Company with any other Person, any sale of Units or any sale of the Company or (ii) any transfer of all or substantially all of the consolidated assets of the Company, in each case, through any transaction or series of related transactions.

(b)     Written notice of the Drag-Along Sale (the "<u>Drag-Along Sale Notice</u>") shall be provided by Avenue to all holders of Units.  Such Drag-Along Sale Notice shall disclose in reasonable detail the number and class of Units to be subject to the Drag-Along Sale (the "<u>Drag-Along Securities</u>"), an estimate of the proposed price, the other proposed terms and conditions of the proposed Drag-Along Sale (including copies of the definitive agreements relating thereto, if available) and the identity of the prospective purchaser.

(c)     With respect to any Drag-Along Sale, each Member agrees that it shall use its reasonable best efforts to effect the Drag-Along Sale as expeditiously as practicable, including delivering all documents necessary or reasonably requested in connection with such Drag-Along Sale, voting in support of such transaction and entering into any instrument, undertaking or obligation necessary or reasonably requested in connection with such Drag-Along Sale (as specified in the Drag-Along Sale Notice).  Subject to the terms and conditions of this Section 12.2(c) and without limiting the generality of the foregoing, the Company and each Member shall take or cause to be taken all actions, and do, or cause to be done, on behalf and in respect of

the Company any and all actions that may be reasonably requested consistent with this Section 12.2(c) in connection with any Drag-Along Sale.  In addition, each holder of Drag-Along Securities, in the case of a Drag-Along Sale, shall (i) pay its pro rata share (based on the aggregate proceeds) of the reasonable expenses (if any) incurred by the Company in connection with such Drag-Along Sale; and (ii) join on a pro rata basis (based on the aggregate proceeds), severally and not jointly, in any indemnification or other obligations that are specified in the Drag-Along Sale Notice, other than any such obligations which relate specifically to a particular holder such as indemnification with respect to representations and warranties given by a holder regarding such holder's title to and ownership of Units and other fundamental customary representations and warranties; provided that no holder shall be obligated under this clause in connection with such Transfer to agree to indemnify or hold harmless the Transferee or Transferees with respect to an amount in excess of the proceeds paid in respect of such holder's Units in connection with such Drag-Along Sale.

(d)     In the event of a Drag-Along Sale, each Member shall be required to Transfer such Units held by such holder as provided in the Drag-Along Sale Notice to the extent such Transfer is required under Section 12.2 hereof.  In the event of a Drag-Along Sale of all of the Units or a repurchase of Units by the Company pursuant to Section 12.2(e), the amount each Member will be entitled to receive in respect of any Units sold in such Drag-Along Sale will be the amount that would have been distributable pursuant to Section 4.2, assuming all proceeds of such Drag-Along Sale were received by the Company and distributed.

(e)     Notwithstanding anything to the contrary set forth in this Section 12.2, the Company or its designee shall have the option on a Drag-Along Sale to purchase, and each Member shall be required to sell, any Units held by such Member to the Company.

## ARTICLE XIII
## GENERAL PROVISIONS

**13.1     *Offset*.** Whenever the Company is to pay any sum to any Member, any amounts then due and payable from such Member to the Company may be deducted from that sum before payment.

**13.2     *Notices*.** Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be sent under this Agreement must be in writing and must be sent by registered mail, addressed to the recipient, postage paid, or by delivering that writing to the recipient in person, by internationally recognized express courier, or by facsimile transmission; and a notice, request, or consent sent under this Agreement is effective on receipt by the person to receive it. A notice, request or consent shall be deemed received when delivered if personally delivered, after a "good transmission" receipt is received, if sent via facsimile, or otherwise on the date of receipt by the recipient thereof. All notices, requests, and consents to be sent to a Member must be sent to or made at the address or facsimile number ascribed to that Member on the books of the Company or such other address or facsimile number as that Member may specify by notice to the Company and the other Members. Any notice, request, or consent to the Company must be sent to the Company at its principal office. Whenever any notice is required to be sent by law, the Certificate or this Agreement, a written

waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

**13.3    *Entire Agreement*.** This Agreement constitutes the entire agreement among the parties on the date hereof with respect to the subject matter hereof and supersedes all prior understandings, contracts or agreements among the parties with respect to the subject matter hereof, whether oral or written.

**13.4    *Effect of Waiver or Consent*.** The failure of a Member to insist on the strict performance of any covenant or duty required by the Agreement, or to pursue any remedy under the Agreement, shall not constitute a waiver of the breach or the remedy.

**13.5    *Amendment*.** This Agreement may be amended or modified, or any provision hereof may be waived, provided that such amendment, modification or waiver is set forth in a writing executed by (i) the Company and (ii) the Required Interest, except an amendment that materially and adversely affects any Member without similarly affecting the rights and obligations of all holders of the same class of Units shall be effective only if such Member executes such amendment. No course of dealing between or among any Persons having any interest in this Agreement will be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any Person under or by reason of this Agreement.

**13.6    *Binding Act*.** Subject to the restrictions on transfer set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.

**13.7    *Governing Law*.** All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware and the Act, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

**13.8    *Consent to Exclusive Jurisdiction*.** Each of the parties hereto agrees that any legal action or proceeding with respect to this Agreement or any agreement, certificate or other instrument entered into in contemplation of the transactions contemplated by this Agreement, or any matters arising out of or in connection with this Agreement or such other agreement, certificate or instrument, and any action for the enforcement of any judgment in respect thereof, shall be brought exclusively in the Chancery Court of New Castle County, Delaware or the courts of the United States of America for the District of Delaware, unless the parties to any such action or dispute mutually agree to waive this provision. By execution and delivery of this Agreement, each of the parties hereto irrevocably consents to service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, or by recognized express carrier or delivery service, to the applicable party at his, her or its address referred to herein. Each of the parties hereto irrevocably waives any objection which he, she or it may now or hereafter have to the laying of venue of any of the aforementioned actions or proceedings arising out of or in connection with this Agreement, or any related agreement, certificate or instrument referred to above, brought in

the courts referred to above and hereby further irrevocably waives and agrees, to the fullest extent permitted by applicable law, not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in any inconvenient forum. Nothing herein shall affect the right of any party to serve process in any other manner permitted by law.

**13.9** *Severability*. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein. The Members shall negotiate in good faith to replace any provision so held to be invalid or unenforceable so as to implement most effectively the transactions contemplated by such provision in accordance with the original intent of the Members signatory hereto.

**13.10** *Further Assurances*. In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

**13.11** *No Third Party Benefit*. The provisions hereof are solely for the benefit of the Company and its Members, Managers and Officers and are not intended to, and shall not be construed to, confer a right or benefit on any creditor of the Company or any other Person.

**13.12** *Counterparts*. This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

**13.13** *Construction*. Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine and neuter. All references to Articles and Sections refer to Articles and Sections of this Agreement, and all references to Exhibits are to Exhibits attached hereto, each of which is made a part hereof for all purposes.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.

_____

By:_____
Name:
Title:

## MEMBERS

| Member | Number of Common Units | Percentage Interest of Common Units | Aggregate Capital Contribution |
| --- | --- | --- | --- |
| | | | |

## JOINDER AGREEMENT

The undersigned is executing and delivering this Joinder Agreement pursuant to the Fourth Amended & Restated Limited Liability Company Operating Agreement dated [_____,] 2009, as amended, modified, restated or supplemented from time to time, (the "***Operating Agreement***"), of MagnaChip Semiconductor LLC, a Delaware limited liability company (the "***Company***").

By executing and delivering this Joinder Agreement to the Company, the undersigned hereby agrees to become a party to, to be bound by, and to comply with all of the provisions of the Operating Agreement in the same manner as if the undersigned were an original signatory to the Operating Agreement.

The undersigned agrees that the undersigned shall be a Member, as such term is defined in the Operating Agreement.

Accordingly, the undersigned has executed and delivered this Joinder Agreement as of _____.                                    .

_____
*Signature of Member*

_____
*Print Name of Member*

_____

_____

_____
*Address*

_____
*Facsimile*

_____
*Telephone*

## **DEFINITIONS**

"*Affiliate*" shall mean, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person.  For purposes of this definition, the terms "control," "controlling," "controlled by" and "under common control with," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"*Applicable Law*" shall mean, with respect to any Person, all provisions of laws, statutes, ordinances, rules, regulations, permits, certificates, judgments, decrees or orders of any Governmental Authority applicable to such Person.

"*Avenue*" shall mean Avenue Special Situations Fund V, L.P.

"*Business Day*" shall mean any day that is not a Saturday, Sunday, legal holiday or other day on which commercial banks in New York, New York are authorized or required by Applicable Law to close.

"*Commission*" shall mean the Securities and Exchange Commission and any other Governmental Authority at the time administering the Securities Act.

"*Governmental Authority*" shall mean any domestic or foreign government or political subdivision thereof, whether on a federal, state or local level and whether executive, legislative or judicial in nature, including any agency, authority, board, bureau, commission, court, department or other instrumentality thereof.

"*IPO*" shall mean the closing of the first public offering of and sale of Securities of the Company (or any other entity or entities created through any Solvent Reorganization or designated by the Board of Managers) (other than on Forms S-4 or S-8 or their equivalent), pursuant to an effective registration statement filed by the Company under the Securities Act.

"*IRS*" shall mean the Internal Revenue Service.

"*Person*" means any legal person, including any individual, corporation, investment fund, partnership, limited partnership, limited liability company, joint venture, joint stock company, association, trust, unincorporated entity or Governmental Authority.

"*Securities*" shall mean, with respect to any Person, all equity interests of such Person, all securities convertible into or exchangeable for equity interests of such Person, and all options, warrants, and other rights to purchase or otherwise acquire from such Person equity interests, including any equity appreciation or similar rights, contractual or otherwise.

"*Solvent Reorganization*" shall mean any solvent reorganization of the Company, including by merger, consolidation, recapitalization, Transfer or sale of shares or assets, or contribution of assets and/or liabilities, or any liquidation, exchange of Securities, conversion of entity, migration of entity, formation of new entity, or any other transaction or group of related transactions (in each case other than to or with an unaffiliated third party), in which:

(i)      all holders of the same class of Securities of the Company are offered the same amount of consideration in respect of such Securities; and

(ii)      all holders' economic interests in the Company, relative to each other and all other holders of Securities of the Company, are preserved.

"***Subsidiary***" shall mean, with respect to any Person, any corporation, association, partnership, limited liability company or other business entity of which 50% or more of the total voting power of equity interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, representatives or trustees thereof is at the time owned or controlled, directly or indirectly, by (a) such Person, (b) such Person and one or more subsidiaries of such Person, or (c) one or more subsidiaries of such Person.  For purposes of this definition, the terms "control," "controlling," "controlled by" and "under common control with," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"***Transfer***" shall mean, as applicable, (a) as to any Security or asset (the "***Subject Property***"), to sell, transfer, assign, gift, pledge, grant a security interest in, distribute, encumber, hypothecate or otherwise dispose of (including, without limitation, the foreclosure or other acquisition by any lender with respect to the Subject Property pledged to such lender by the holder of the Subject Property), whether directly or indirectly (including, without limitation, by means of a Transfer of any Security issued by a Person that holds, directly or indirectly, an interest in the Subject Property), such Subject Property, either voluntarily or involuntarily and with or without consideration or (b) the act of such sale, transfer, assignment, gift, pledge, grant of security interest, distribution, encumbrance, hypothecation or other disposition.

"***Transferee***" shall mean any Person to whom a Member shall Transfer Units in accordance with the terms of this Agreement.

"***Warrants***" shall mean the warrants issued by the Company entitling the holders thereof to purchase Common Units on the terms and subject to the conditions of that certain Warrant Agreement, dated as of [_____], 2009 by and between the Company and [_____], as warrant agent.

*******

# WARRANT AGREEMENT

THIS WARRANT AGREEMENT dated as of [_____ __], 2009 (this "***Agreement***") is by and between MAGNACHIP SEMICONDUCTOR, LLC, a Delaware limited liability company (the "***Company***"), and [_____], as warrant agent (in such capacity, the "***Warrant Agent***").

## RECITALS

WHEREAS, concurrently with the execution hereof, the Company is emerging from the protection of Chapter 11 of Title 11 of the United States Code pursuant to that certain Plan of Reorganization dated August 25, 2009, as the same may be modified or amended (the "***Plan***").

WHEREAS, the Company has entered into the Fourth Amended and Restated Limited Liability Company Agreement of the Company, dated [_____ __], 2009 (the "***LLC Agreement***").

WHEREAS, pursuant to the terms of, and subject to the conditions contained in, the Plan, the Company has agreed to issue to certain holders of subordinated note claims owed by the Company warrants (each, a "***Warrant***") entitling the holders thereof to purchase Common Units of the Company at the Exercise Price (as defined herein).

WHEREAS, the Company wishes the Warrant Agent to act on its behalf, and the Warrant Agent is willing to act on behalf of the Company, in connection with the issuance, exchange, transfer, substitution and exercise of the Warrants.

WHEREAS, the Company desires to enter into this Agreement to set forth the terms and conditions of the Warrants and the rights and obligations of the Company, the Warrant Agent and the registered holders of the Certificates evidencing Warrants (the "***Holders***").

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein and in the Plan, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and the Warrant Agent, intending to be legally bound, hereby agree as follows:

## ARTICLE I
### Definitions and Interpretation

***Section 1.01. Certain Defined Terms.*** Capitalized terms used in this Agreement shall have the following respective meanings, except as otherwise provided herein or as the context shall otherwise require:

"***Affiliate***" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such Person. The term "control" (including, with correlative meaning, the terms

"controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"***Agreement***" has the meaning specified in the introduction of this Agreement.

"***Board of Directors***" means the managers of the Company as set forth in the LLC Agreement.

"***Business Day***" means any day which is not a day on which banking institutions in New York City, New York are authorized or obligated by law or executive order to close.

"***Change of Control***" means if (i) any "person" or "group" (within the meaning of Sections 13(d) and 14(d)(2) of the Exchange Act, other than the current members of the Company, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the 1934 Act), directly or indirectly, of more than one-half of the then outstanding voting securities of the Company; (ii) there occurs a merger, consolidation or combination of the Company with any other entity, other than a merger, consolidation or combination which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) at least a majority of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger, consolidation or combination; (iii) any Person or Persons, other than the current members of the Company, has or have the right to designate a majority in number of the persons then serving on the Board of Directors or (iv) all or substantially all of the assets of the Company are sold to an unaffiliated third party or parties in one transaction or series of related transactions followed by the dissolution and winding up of the Company.

"***Common Unit***" means a unit of common membership interest in the Company, as set forth in the LLC Agreement, and which unit shall be uncertificated.

"***Commission***" means the Securities and Exchange Commission.

"***Company***" has the meaning specified in the introduction of this Agreement.

"***Current Market Value***" means, with respect to any security (including Common Units), as of a specified date (the "date of calculation"):

(i) if such security is not registered under the Exchange Act, the value of such security as determined in good faith by the Board of Directors of the Company; or

(ii) if such security is registered under the Exchange Act, the average of the daily market prices of such security for the 10 consecutive trading days ending three trading days before the earlier of the date of calculation and the day before the "ex" date with respect to the event requiring such calculation or, if such security has been registered under the Exchange Act for less than 10 consecutive trading days before such earlier date, then the

2

average of the daily market prices for all of the trading days before such earlier date for which daily market prices are available; *provided, however*, that if the market price cannot be calculated (as provided below), the Current Market Value of such security shall be determined as if such security were not registered under the Exchange Act.

For purposes of this Agreement, (x) the term "market price" means, with respect to any security for any trading day, (A) in the case of a security listed or admitted to trading on any national securities exchange, the closing sales price, regular way, on such day, or if no sale takes place on such day, the average of the closing bid and asked prices on such day on the principal national securities exchange on which such security is listed or admitted, (B) in the case of a security not then listed or admitted to trading on any national securities exchange, the last reported sales price on such day, or if no sale takes place on such day, the average of the closing bid and asked prices on such day, as reported by a reputable quotation source designated by the Company or (C) in the case of a security not then listed or admitted to trading on any national securities exchange and as to which no such reported sales price or bid and asked prices are available, the average of the reported high bid and low asked prices on such day, as reported by a reputable quotation service, or a newspaper of general circulation in the Borough of Manhattan, City and State of New York customarily published on each Business Day, designated by the Company, or, if there shall be no bid and asked prices on such day, the average of the high bid and low asked prices, as so reported, on the most recent day (not more than 30 days prior to the date in question) for which prices have been so reported and (y) the term "'ex' date," when used with respect to any distribution, shall mean the first date on which the security trades regular way on such exchange or in such market without the right to receive such distribution.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended, or any similar Federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time. Reference to a particular section of the Securities Exchange Act of 1934, as amended, shall include reference to the comparable section, if any, of any such similar Federal statute.

"***Exercise Price***" means $[    ]

"***Expiration Date***" means, with respect to any Warrant, [the fifth anniversary of the Original Issuance Date] or, if earlier, the date of the consummation of a Change of Control pursuant to which the cashless exercise provisions of Section 3.03 apply or such Change of Control is subject to the provisions of Section 4.01(c)(ii).

"***Governmental Authority***" means (i) any nation or government, (ii) any federal, state, county, province, city, town, municipality, local or other political subdivision thereof or thereto, (iii) any court, tribunal, department, commission, board, bureau, instrumentality, agency, council, arbitrator or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and (iv) any other governmental entity, agency or authority having or exercising jurisdiction over any relevant Person, item or matter.

"***Holders***" has the meaning specified in the Recitals of this Agreement.

"***Issue Date***" has the meaning specified in <u>Section 2.03</u> hereof.

"***Laws***" means all laws, statutes, rules, regulations, ordinances, orders, writs, injunctions or decrees and other pronouncements having the effect of law of any Governmental Authority.

"***Legended Warrant Certificate***" means any Warrant Certificate bearing the legend specified in <u>Section 2.02</u>.

"***LLC Agreement***" has the meaning specified in the Recitals of this Agreement.

"***Notice Date Press Release***" has the meaning specified in <u>Section 2.04(d)</u>.

"***Original Issuance Date***" means [_____ __], 2009, the effective date of the Plan.

"***Person***" means any individual, limited liability company, company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Authority or other entity or enterprise.

"***Plan***" has the meaning specified in the Recitals of this Agreement.

"***Securities Act***" means the Securities Act of 1933, as amended.

"***Transfer***" means any direct or indirect transfer, exchange, donation, bequest, sale, assignment, mortgage, pledge, lien, option, grant of a security interest or other encumbrance or disposition of record ownership (including, without limitation, by way of merger, operation of law, pursuant to any domestic relations or other court order, whether with or without consideration and whether voluntarily or involuntarily).

"***Transfer Notice***" means a written notice to the Board of Directors and, if there be one in office, the Secretary of the Company, at least five and not more than 20 Business Days prior to completion of a Transfer, which notice states (i) the name, address, facsimile number and e-mail address of the transferor and the transferee, (ii) the number of Warrants and underlying Common Units subject to the proposed Transfer and (iii) the proposed date of completion of the proposed Transfer.

"***Units***" means the Common Units.

"***Warrant***" has the meaning specified in the Recitals of this Agreement.

"***Warrant Agent***" has the meaning specified in the introduction of this Agreement.

"***Warrant Certificates***" has the meaning specified in <u>Section 2.01</u>.

4

***Section 1.02. Interpretation.*** In this Agreement, unless a clear contrary intention appears:

(a) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement;

(b) reference to any gender includes each other gender and the neuter;

(c) all terms defined in the singular shall have the same meanings in the plural and vice versa;

(d) reference to any Person includes such Person's heirs, executors, personal representatives, administrators, successors and assigns; *provided, however*, that nothing contained in this clause (d) is intended to authorize any assignment not otherwise permitted by this Agreement;

(e) reference to a Person in a particular capacity or capacities excludes such Person in any other capacity;

(f) reference to any contract or agreement means such contract or agreement as amended, supplemented or modified from time to time in accordance with the terms thereof;

(g) all references to Articles and Sections shall be deemed to be references to the Articles and Sections of this Agreement;

(h) all references to Exhibits shall be deemed to be references to the Exhibits attached hereto which are made a part hereof and incorporated herein by reference;

(i) the word "including" (and with correlative meaning "include") means including, without limiting the generality of any description preceding such term;

(j) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding";

(k) the captions and headings contained in this Agreement shall not be considered or given any effect in construing the provisions hereof if any question of intent should arise;

(l) reference to any Law means such Law as amended, modified, codified, reenacted, supplemented or superseded in whole or in part, and in effect from time to time;

(m) where any provision of this Agreement refers to action to be taken by any Person, which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person; and

(n) no provision of this Agreement shall be interpreted or construed against any Party solely because that Party or its legal representative drafted such provision.

**ARTICLE II**
**Original Issue Of Warrants**

**Section 2.01. Form of Warrant Certificates.** The Warrants shall be evidenced by certificates in registered form (the "*Warrant Certificates*"), substantially in the form attached hereto as Exhibit A, and may have such insertions, letters, numbers or other marks of identification and such legends and endorsements stamped, printed, lithographed or engraved thereon as may, consistently herewith, be determined to be necessary or appropriate by the officers of the Company executing such Warrant Certificates as evidenced by their execution of the Warrant Certificates, or as may be required to comply with any applicable Law or with any rule or regulation of any securities exchange or to conform to usage. Each Warrant shall represent the right, subject to the provisions of this Agreement and of the Warrant Certificate, to purchase one Common Unit at the Exercise Price, subject to adjustment pursuant to the provisions of Section 4.01. The definitive Warrant Certificates shall be typed, printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner permitted by applicable Law.

**Section 2.02. Legends.** Each Warrant Certificate originally issued to a Holder, or issued upon registration of transfer of, or upon exchange for or in lieu of, any Warrant Certificate bearing the following legend, shall bear the following legend:

"THE COMMON UNITS OF MAGNACHIP SEMICONDUCTOR, LLC (THE "COMMON UNITS") FOR WHICH THIS WARRANT IS EXERCISABLE ARE UNCERTIFICATED AND MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES ABSENT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND ANY APPLICABLE STATE SECURITIES LAWS OR AN APPLICABLE EXEMPTION FROM SUCH REGISTRATION REQUIREMENTS. ACCORDINGLY, NO HOLDER SHALL BE ENTITLED TO EXERCISE SUCH HOLDER'S WARRANTS AT ANY TIME UNLESS, AT THE TIME OF EXERCISE, (i) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT RELATING TO THE COMMON UNITS ISSUABLE UPON THE EXERCISE OF THIS WARRANT HAS BEEN FILED WITH, AND DECLARED EFFECTIVE BY, THE SECURITIES AND EXCHANGE COMMISSION (THE "COMMISSION"), AND NO STOP ORDER SUSPENDING THE EFFECTIVENESS OF SUCH REGISTRATION STATEMENT HAS BEEN ISSUED BY THE COMMISSION, OR (ii) THE ISSUANCE OF SUCH COMMON UNITS IS PERMITTED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS."

**Section 2.03. Execution, Issuance and Delivery of Warrant Certificates.** (a) Each Warrant Certificate, whenever issued, shall be dated as of the date of countersignature thereof by the Warrant Agent (the "*Issue Date*"), either upon initial issuance or upon exchange, substitution or transfer and shall be executed on behalf of the Company by its Chairman of the Board, Chief Executive Officer, President or any Vice President, either manually or by facsimile signature printed thereon. The Warrant Certificates shall be

countersigned by manual or facsimile signature of the Warrant Agent and shall not be valid for any purpose unless so countersigned. In the event that any officer of the Company whose signature shall have been placed upon any of the Warrant Certificates shall cease to be an officer of the Company before countersignature by the Warrant Agent and the issuance and delivery thereof, such Warrant Certificates may, nevertheless, be countersigned by the Warrant Agent and issued and delivered with the same force and effect as though such person had not ceased to be such officer of the Company.

(b) The Company shall instruct the Warrant Agent to countersign, issue and deliver, at the expense of the Company, Warrant Certificates evidencing Warrants to purchase an aggregate of up to [_____] Common Units at the times required by, and in accordance with the terms and conditions of, the Plan. The Warrant Agent shall, and is hereby authorized to, countersign, issue and deliver Warrants as and when so instructed by the Company. In addition, the Warrant Agent is hereby authorized to countersign, issue and deliver Warrant Certificates as required by Section 2.04, Section 3.03 or Article V.

*Section 2.04. Transfer and Exchange of Warrant Certificates.* (a) The Warrant Agent shall maintain books, subject to such reasonable regulations as it may prescribe, for the registration of Warrant Certificates and transfers and exchanges of Warrant Certificates as provided in this Agreement.

(b) Notwithstanding any other provisions of this Agreement, no Holder shall Transfer any such Warrants to any Person nor shall the Company effect the Transfer of any Warrants to any Person, if, at the time of such Transfer, the Company has more than 350 "holders of record" (as understood for purposes of Section 12(g) of the Exchange Act) of Common Units and/or Warrants. The limitations set forth in the immediately preceding sentence shall not prohibit: (i) a Transfer of Warrants by a Holder to another Person that, immediately prior to the Transfer, is a holder of record of Warrants, (ii) a Transfer of Warrants by a Holder to the Company, (iii) a Transfer of Warrants by the Company to a Person that, immediately prior to the Transfer, is a holder of record of Warrants, (iv) a Transfer of all Warrants owned by the proposed transferor to a single Person who is treated as a single record holder of Warrants under the Exchange Act or (v) a Transfer of Warrants so long as after giving effect to such Transfer the Company has no more than 350 holders of record of Common Units and/or Warrants. Any attempted Transfer that is prohibited by this Section and not approved by majority vote of the Board of Directors of the Company shall be null and void and shall not be effective to Transfer any Warrants, but only to the minimum extent necessary to prevent the Transfer from being a Transfer that is prohibited by this Section. The Company may institute legal proceedings to force rescission of a Transfer prohibited by this Section and to seek any other remedy available to it at law, in equity or otherwise, including an injunction prohibiting any such Transfer.

(c) By the fifth Business Day after the Company has 350 or more holders of record of Warrants and/or Common Units, the Company shall issue a press release stating the number of holders of record of Warrants and Common Units (the "***Notice Date Press Release***"). The Company shall notify the Warrant Agent of such issuance and provide a copy of the Notice Date Press Release to the Warrant Agent as provided in Section 8.15(b).

(d) A Transfer of Warrants that is completed or attempted after the Company issues a Notice Date Press Release with respect to the Warrants shall be null and void and not effective unless (i) the holder seeking to make such Transfer provides a Transfer Notice to the Company and (ii) such Transfer is approved in advance by majority vote of the Board of Directors. No Transfer Notice is required with respect to Warrants for Transfers that occur prior to the issuance by the Company of a Notice Date Press Release.

(f) All Warrants shall bear a conspicuous legend in substantially the following form:

"THE TRANSFER OF THE SECURITIES REPRESENTED HEREBY IS SUBJECT TO RESTRICTION PURSUANT TO SECTION 2.04 OF THE WARRANT AGREEMENT BETWEEN MAGNACHIP SEMICONDUCTOR, LLC AND [_____], AS WARRANT AGENT, AS AMENDED AND IN EFFECT FROM TIME TO TIME, A COPY OF WHICH MAY BE OBTAINED FROM THE COMPANY UPON REQUEST."

(g) Subject to Section 2.04(b) and Section 2.04(d), a Holder may Transfer its Warrant Certificates by written application to the Warrant Agent stating the name of the proposed transferee and otherwise complying with the terms of this Agreement and all applicable Laws and provided that the Warrant Agent has not received a Notice Date Press Release. No such Transfer shall be effected until, and such transferee shall succeed to the rights of a Holder only upon, final acceptance and registration of the transfer by the Warrant Agent in the register in accordance with this Agreement. Prior to due presentation for registration of transfer, the Company, the Warrant Agent and any agent of the Company may deem and treat the Person in whose name the Warrant Certificates are registered as the absolute owner thereof for all purposes (notwithstanding any notation of ownership or other writing thereon made by anyone), and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or an interest in any Warrants on the part of any other Person and shall not be liable for any registration of transfer of Warrant Certificates that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary unless made with actual knowledge that a fiduciary or nominee is committing a breach of trust in requesting such registration of transfer or with such knowledge of such facts that its participation therein amount to bad faith. When Warrant Certificates are presented to the Warrant Agent with a request to register the transfer thereof or to exchange them for an equal number of Warrant Certificates of other authorized denominations, the Warrant Agent shall register the transfer or make the exchange as requested solely in the case of any Legended Certificates if the requirements of this Agreement for such transaction are met. To permit registrations of transfers and exchanges, the Company shall execute Warrant Certificates at the Warrant Agent's request. No service charge shall be made for any registration of transfer or exchange of Warrant Certificates, but the Company or the Warrant Agent may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection with any registration of transfer of Warrant Certificates.

(h) Except as otherwise provided in this Section 2.04, all Warrant Certificates issued upon any registration of transfer or exchange of Warrants shall be the valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Agreement, as the Warrant Certificates surrendered for registration of transfer or exchange.

(i) The Board of Directors shall have the power to determine, in its sole and absolute discretion, all matters related to this Section, including matters necessary or desirable to administer or to determine compliance with this Section and, absent manifest error, the determinations of the Board of Directors shall be final and binding on the Company and the Holders.

*Section 2.05. Surrender and Cancellation of Warrant Certificates.* Any Warrant Certificate surrendered for registration of transfer, exchange or exercise of the Warrants represented thereby or pursuant to Section 6.02 shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly canceled by the Warrant Agent and shall not be reissued by the Company or the Warrant Agent (except as provided in the Plan in connection with the Reallocation Procedure) and, except as provided in Section 2.04 (in the case of a transfer or exchange), Section 3.03 (in the case of the exercise of less than all the Warrants represented by the surrendered Warrant Certificate), Article V (in the case of a lost, stolen, destroyed or mutilated Warrant Certificate) or in connection with the Reallocation Procedure, no Warrant Certificate shall be issued hereunder in lieu thereof. On request of the Company, the Warrant Agent, provided that any retention periods established by the Commission have expired, shall destroy canceled Warrant Certificates held by it and shall deliver its certificates of destruction to the Company. The Warrant Agent shall destroy all canceled Warrant Certificates in accordance with its normal procedures.

## ARTICLE III
## Exercise Price; Exercise Of Warrants

*Section 3.01. Exercise Price.* Each Warrant Certificate shall, when countersigned by the Warrant Agent, entitle the Holder thereof, subject to the provisions of this Agreement and such Warrant Certificate, to purchase one Common Unit (subject to adjustment as provided herein) for each Warrant represented thereby at the Exercise Price per Common Unit (subject to adjustment as provided herein), payable in full at the time of purchase.

*Section 3.02. Exercise; Restrictions on Exercise.* Each outstanding Warrant may be exercised on any Business Day which is on or after its Issue Date and on or before the Expiration Date, but only if (solely in the case of any Legended Warrant Certificate) the exercise of such Warrants is exempt from the registration requirements of the Securities Act. Any Warrants not exercised by 5:00 p.m., New York City time, on the Expiration Date (or, if applicable, immediately prior to consummation of the applicable Change of Control) shall expire and all rights thereunder and all rights in respect thereof under this Agreement shall automatically terminate at such time.

*Section 3.03. Method of Exercise; Payment of Exercise Price.* (a) In order to exercise any of the Warrants, the Holder thereof must surrender the Warrant Certificate evidencing such Warrants to the Warrant Agent at its corporate trust office set forth in Section 9.04 (with (i) the Subscription Form set forth in the Warrant Certificate and (ii) the Form of Joinder set forth in the LLC Agreement completed and duly executed), together with payment in full of the Exercise Price then in effect for each Common Unit as to which a Warrant is exercised and any

documentary, stamp or transfer tax, or other applicable tax or governmental charges. Payment of the Exercise Price shall be made by the Holder by check payable to the order of [Warrant Agent]; *provided, however*, that in lieu of exercising any Warrants by payment of cash, if the Company has provided notice under <u>Section 4.04(a)</u> in connection with any sale of all or substantially all of the Company's properties, assets or business or any consolidation, combination or merger of the Company with or into another company, where the Company is not the surviving company, in each case resulting in a Change of Control, in which the consideration receivable upon consummation of such Change of Control by a holder of Common Units consists of consideration that is not solely cash, the Holder may elect to exercise its Warrants conditioned upon the occurrence of such Change of Control, to be effective immediately prior to the time such Change of Control is consummated, in which event the Company shall issue (or have been deemed to issue) to the Holder upon exercise a number of Common Units immediately prior to such Change of Control, computed using the following formula:

$$X = Y \times (A-B)/A$$

where:

$X$ = the number of Common Units to be issued to the Holder;

$Y$ = the number of Common Units with respect to which a Warrant is being exercised;

$A$ = the Current Market Value of a Common Unit determined as of the date the Change of Control is consummated; and

$B$ = the Exercise Price plus applicable taxes.

Upon the exercise of any Warrant, the Warrant Agent shall promptly provide written notice of such exercise to the Company, including notice of the number of Common Units to be issued upon the exercise of such Warrant, and deliver all payments received upon exercise of such Warrant to the Company in such manner as the Company shall instruct in writing.

(b) A Holder may exercise all or any number of whole Warrants represented by a Warrant Certificate. If less than all of the Warrants represented by a Warrant Certificate are exercised, such Warrant Certificate shall be surrendered and a new Warrant Certificate executed by the Company of the same tenor and for the number of Warrants which were not exercised shall be issued by the Warrant Agent. The Warrant Agent shall (i) countersign such Warrant Certificate, (ii) register such Warrant Certificate in such name or names as may be directed in writing by the Holder and (iii) deliver such Warrant Certificate to the Person or Persons entitled to receive the same.

(c) Upon the exercise of any Warrant and the surrender of the Warrant Certificate evidencing such Warrant in conformity with the foregoing provisions, the Warrant Agent shall, subject to <u>Section 9.02</u>, (i) transfer promptly to or upon the written order of the Holder of such Warrant Certificate, appropriate evidence of ownership of any Common Units or other securities or property (including money) to which it is entitled, registered or otherwise placed in such name or names as may be directed in writing by the Holder, and (ii) deliver such evidence of ownership and any other securities or property (including money) to the

Person or Persons entitled to receive the same (together with an amount in cash in lieu of any fractional Unit as provided in Section 4.05).

(d) Upon the exercise of any Warrant, the Warrant Agent is hereby authorized and directed to notify any transfer agent of the Common Units upon the exercise of any Warrant. Upon such notification, such transfer agent (and all such transfer agents are hereby irrevocably authorized to comply with this Section 3.03(d)) shall register on its books the necessary number of Common Units to which the Holder of such Warrant is entitled upon such exercise; *provided*, that such Holder shall have completed and duly executed the Subscription Form set forth in the Warrant Certificate and the Form of Joinder Agreement set forth in the LLC Agreement.

(e) Except for exercises in connection with and conditioned upon a Change of Control, any Warrant which is exercised hereunder shall be deemed to have been exercised immediately prior to the close of business on the date of the surrender, as provided above, of the Warrant Certificate representing such Warrant, together with payment in full of the Exercise Price and any documentary, stamp or transfer tax, or other applicable tax or governmental charges (unless settlement is on a cashless basis in connection with and conditioned upon a Change of Control), and, for purposes of this Agreement, the Person entitled to receive any Common Units or other securities or property deliverable upon such exercise shall, as between such Person and the Company, be deemed to be the Holder of such Common Units or other securities or property of record as of the close of business on such date and shall be entitled to receive, and the Company shall deliver or cause to be delivered to such Person, any money, Common Units or other securities or property to which he would have been entitled had he been a record holder on such date.

## ARTICLE IV
### Adjustments

**Section 4.01. Adjustments.** The number of Common Units issuable upon exercise of each Warrant shall be subject to adjustment from time to time as follows:

(a) Upon Dividends, Subdivisions or Splits. If, at any time after the Original Issuance Date, the number of Common Units outstanding is increased by a dividend or distribution on the outstanding Common Units payable in Common Units or by a subdivision or split-up of Common Units, other than, in any such case, upon a capital reorganization, reclassification, consolidation or merger to which Section 4.01(c) applies or a Change of Control pursuant to which a Holder may exercise its Warrants pursuant to the cashless exercise provisions of Section 3.03, then, following the record date for the determination of holders of Common Units entitled to receive such dividend, or to be affected by such subdivision or split-up, the number of Common Units purchasable on exercise of the Warrants shall be increased in proportion to such increase in outstanding Common Units. The adjustment made pursuant to this clause (a) shall become effective (x) in the case of any such dividend or distribution, immediately after the close of business on the record date for the determination of holders of Common Units entitled to receive such dividend or distribution or (y) in the case of such

11

subdivision or split-up, at the close of business on the day upon which such corporate action becomes effective.

(b) <u>Upon Combinations or Reverse Splits</u>. If, at any time after the Original Issuance Date, the number of Common Units outstanding is decreased by a combination or reverse split of the outstanding Common Units into a smaller number of Common Units, other than, in any such case, upon a capital reorganization, reclassification, consolidation or merger to which <u>Section 4.01(c)</u> applies or a Change of Control pursuant to which a Holder may exercise its Warrants pursuant to the cashless exercise provisions of <u>Section 3.03</u>, then the number of Common Units purchasable on the exercise of each Warrant immediately prior to the date of such combination or reverse split shall be decreased in proportion to such decrease in outstanding Common Units. The adjustment made pursuant to this clause (b) shall become effective at the close of business on the day upon which such combination or reverse split becomes effective. For purposes of <u>Section 4.01(a)</u> and <u>Section 4.01(b)</u>, the number of Common Units at any time outstanding shall not include any Common Units then owned or held by or for the account of the Company.

(c) <u>Upon Reclassifications, Reorganizations, Consolidations or Mergers</u>.

(i) In the event of any capital reorganization of the Company, any reclassification of any of the Common Units, or any consolidation, combination or merger of the Company with or into another company, in each case not resulting in a Change of Control, where the Company is not the surviving company or where there is a change in or distribution with respect to the Units, each Warrant, effective at the close of business on the date such reorganization, reclassification, consolidation, or merger shall become effective, shall thereafter be exercisable for the kind and number of membership interests or other securities or property (including cash) receivable upon the consummation of such reorganization, reclassification, consolidation or merger, by a holder of the number of Common Units deliverable (immediately prior to the time of such reorganization, reclassification, consolidation or merger) upon exercise of such Warrant and, except as specified in <u>Section 4.01(h)</u>, otherwise shall have the same terms and conditions applicable immediately prior to such time of such reorganization, reclassification, consolidation or merger. The provisions of this clause (i) shall similarly apply to successive reorganizations, reclassifications, consolidations, or mergers.

(ii) In the event of any capital reorganization of the Company, any reclassification of any of the Common Units, any sale of all or substantially all of the Company's assets or any consolidation, combination or merger of the Company with or into another company, in each case resulting in a Change of Control, where the Company is not the surviving company or where there is a change in or distribution with respect to the Units, the Company shall not effect any such reorganization, reclassification, sale of assets, consolidation or merger, unless solely in the case of a Change of Control in which the consideration receivable upon consummation of such Change of Control by a holder of

Common Units consists solely of cash, simultaneously with the consummation thereof, the Company shall pay to each Holder of a Warrant Certificate evidencing a number of Warrants an amount in cash equal to (A) the amount in cash that would be received upon such consummation by a holder of the number of Common Units deliverable (immediately prior to such consummation) upon exercise of such Warrants less (B) the aggregate Exercise Price therefor.

(d) <u>Deferral in Certain Circumstances</u>. If the Company shall take a record of the holders of its Units for the purpose of entitling them to receive a dividend or distribution, and shall thereafter, and before the distribution to such holders thereof, legally abandon its plan to pay or deliver such dividend or distribution, then thereafter no adjustment in the number of Common Units purchasable upon exercise of the Warrants granted by this <u>Section 4.01</u> or in the Exercise Price then in effect shall be required by reason of the taking of such record and, as to any Warrants that remain outstanding, any adjustment previously made in respect thereof shall be rescinded and annulled. In any case in which the provisions of this <u>Article 4</u> shall require that an adjustment shall become effective immediately after a record date of an event, the Company may defer, until the occurrence of such event, issuing to the holder of any Warrant exercised after such record date and before the occurrence of such event the membership interests issuable upon such exercise by reason of the adjustment required by such event and issuing to such holder only the membership interests issuable upon such exercise before giving effect to such adjustments, and paying to such holder any amount in cash in lieu of any fractional Common Units pursuant to <u>Section 4.05</u>; *provided, however*, that the Company shall deliver to such holder an appropriate instrument or due bill evidencing such holder's right to receive such additional Common Units and such cash on the date of the occurrence of such event.

(e) <u>De Minimis Adjustments</u>. No adjustment in the number of Common Units purchasable upon the exercise of any Warrant shall be required unless such adjustment would require an increase or decrease of at least 1% in the number of Common Units purchasable upon the exercise of such Warrant; *provided, however*, that any adjustments which are not required to be made by reason of this <u>Section 4.01(f)</u> shall be carried forward and taken into account in any subsequent adjustment. All calculations under this <u>Section 4.01(f)</u> shall be made to the nearest one-thousandth of a Unit.

(f) <u>Determination of Current Market Value</u>. If at any time the Current Market Value of any security is required to be calculated pursuant to the terms of this Agreement, the determination of such Current Market Value, if calculated in accordance with the terms of this Agreement, absent manifest error, shall be conclusive and binding on all Persons.

(g) <u>Warrant Price Adjustment</u>. Whenever the number of Common Units into which a Warrant is exercisable is adjusted as provided in Sections <u>4.01(a)</u>, <u>(b)</u> or <u>(d)</u>, the Exercise Price payable upon exercise of the Warrant shall simultaneously be adjusted by multiplying such Exercise Price immediately prior to such adjustment by a fraction, the numerator of which shall be the number of Common Units into which such Warrant was exercisable immediately prior to such adjustment, and the denominator of which shall be the number of Common Units into which such Warrant was exercisable immediately thereafter.

***Section 4.02. Notice of Adjustment.*** Whenever the number of Common Units or other securities or property purchasable upon the exercise of each Warrant is required to be adjusted pursuant to Section 4.01, the Company shall deliver to the Warrant Agent a certificate setting forth (a) the number of Common Units or other securities or property purchasable upon the exercise of each Warrant and the Exercise Price therefor after such adjustment, (b) a brief statement of the facts requiring such adjustment and (c) the computation by which such adjustment was made. Such certificate shall be conclusive evidence of the correctness of such adjustment absent manifest error. The Warrant Agent shall not be deemed to have knowledge of such adjustment unless and until it shall have received such certificate. Upon receipt of such certificate, the Warrant Agent shall mail notice of the adjustment described in such certificate to each Holder at the expense of the Company. The Warrant Agent shall be entitled to rely on such certificate and shall be under no duty or responsibility with respect to any such certificate, except to exhibit the same, from time to time, to any Holder desiring to inspect such certificate during reasonable business hours. The Warrant Agent shall not at any time be under any duty or responsibility to any Holder to determine whether any facts exist which may require any adjustment of the Exercise Price or the number of Common Units or other securities or property purchasable upon exercise of any Warrant, or with respect to the nature or extent of any such adjustment when made, or with respect to the method employed in making such adjustment, or the validity or value (or the kind or amount) of any Common Units or other securities or property that may be purchasable on exercise of any Warrant. The Warrant Agent shall not be responsible for any failure of the Company to make any cash payment or to issue, transfer or deliver any Common Units or other securities or property upon the exercise of any Warrant.

***Section 4.03. Statement on Warrants.*** The form of Warrant Certificate need not be changed because of any adjustment made pursuant to Section 4.01, and Warrant Certificates issued after such adjustment may state the same Exercise Price and the same number and kind of Common Units as are stated in the Warrant Certificates initially issued pursuant to this Agreement. The Company may, however, at any time in its sole discretion (which shall be conclusive), make any change in the form of Warrant Certificate that it may deem appropriate to reflect any such adjustment and that does not affect the substance thereof and any Warrant Certificate thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form so changed.

***Section 4.04. Notice of Consolidation, Merger or Sale of Substantially All Assets, Etc.*** In the event that, at any time after the date hereof and prior to 5:00 p.m., New York City time (or, if applicable, immediately prior to consummation of the applicable Change of Control), on the Expiration Date, (a) the Company shall consummate a Change of Control transaction to which it is a party or otherwise consolidate or combine with another company, merge with or into another company or sell, transfer or otherwise dispose of all or substantially all of its properties, assets or business or (b) the Company shall dissolve, liquidate or wind-up its operations, then in any one or more of such cases, the Company shall cause to be mailed to the Warrant Agent and each Holder, at the earliest practicable time (and, in any event, not less than 20 calendar days before any record date or, if no record date

14

applies, before any date set for definitive action), notice of the date on which such Change of Control, consolidation, combination, merger, sale, dissolution, liquidation or winding up shall take place, as the case may be. Such notice shall also set forth such facts as shall indicate the effect of such action (to the extent such effect may be known at the date of such notice), if any, on the kind and amount of Common Units and other securities, money and other property deliverable upon exercise of the Warrants. Such notice shall also specify the date, if any, as of which the holders of record of Common Units or other securities or property issuable upon exercise of the Warrants shall be entitled to exchange their interests for securities, money or other property deliverable upon such consolidation, combination, merger, sale, dissolution, liquidation or winding up, as the case may be.

*Section 4.05. Fractional Interests.* Notwithstanding anything to the contrary contained in this Agreement, if the number of Common Units purchasable on the exercise of each Warrant is adjusted pursuant to the provisions of Section 4.01, the Company shall not be required to issue any fraction of a Common Unit upon any subsequent exercise of any Warrant. If Warrant Certificates evidencing more than one Warrant shall be surrendered for exercise at the same time by the same Holder, the number of full Common Units that shall be issuable upon such exercise thereof shall be computed on the basis of the aggregate number of Warrants evidenced by Warrant Certificates so surrendered. If any fraction of a Common Unit would, except for the provisions of this Section 4.05, be issuable on the exercise of any Warrant (or specified portion thereof), in lieu of the issuance of such fractional Common Unit, the Company shall pay the Holder of such Warrant an amount in cash equal to the then Current Market Value per Common Unit multiplied by such fraction (computed to the nearest whole cent). The Holders, by their acceptance of the Warrant Certificates, expressly waive their right to receive any fraction of a Common Unit instead of such cash.

*Section 4.06. Concerning All Adjustments.* Notwithstanding anything to the contrary contained in this Agreement, if an adjustment is made under any provision of Article IV on account of any event, transaction, circumstance, condition or happening, no additional adjustment shall be made under any other provision of Article IV on account of such event, transaction, circumstance, condition or happening. Unless otherwise expressly provided in this Article IV, all determinations and calculations required or permitted under this Article IV shall be made by the Company or its Board of Directors, as appropriate, and all such calculations and determinations shall be conclusive and binding in the absence of manifest error.

## ARTICLE V
### Loss, Theft, Destruction Or Mutilation of Warrant Certificates

Upon receipt by the Company and the Warrant Agent of evidence satisfactory to them of the ownership and the loss, theft, destruction or mutilation of any Warrant Certificate, and an indemnity bond in form and amount and with corporate surety satisfactory to them, and (in the case of mutilation) upon surrender and cancellation thereof, then, in the absence of notice to the Company or the Warrant Agent that the Warrants represented thereby have been acquired by a bona fide purchaser, the Company shall issue and the Warrant Agent shall countersign and deliver to the Holder of the lost, stolen, destroyed or mutilated Warrant

Certificate, in exchange and substitution for or in lieu thereof, a new Warrant Certificate of the same tenor and representing an equivalent number of Warrants. Upon the issuance of any new Warrant Certificate under this <u>Article V</u>, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and other expenses (including the fees and expenses of the Warrant Agent) in connection therewith. Every new Warrant Certificate executed and delivered pursuant to this <u>Article V</u> in lieu of any lost, stolen, destroyed or mutilated Warrant Certificate shall constitute an original contractual obligation of the Company, whether or not the allegedly lost, stolen, destroyed or mutilated Warrant Certificates shall be at any time enforceable by anyone, and shall be entitled to the benefits of this Agreement equally and proportionately with any and all other Warrant Certificates duly executed and delivered hereunder. The provisions of this <u>Article V</u> are exclusive and shall preclude (to the extent lawful) all other rights or remedies with respect to the replacement of lost, stolen, destroyed or mutilated Warrant Certificates.

## ARTICLE VI
### Authorization and Reservation of Common Units; Purchase of Warrants

*Section 6.01. Reservation of Authorized Common Units.* The Company shall at all times reserve and keep available for issue upon the exercise of Warrants, such number of its authorized but unissued Common Units or other securities deliverable upon exercise of Warrants as will be sufficient to permit the exercise in full of all outstanding Warrants and shall take all action required to increase the authorized number of Common Units if necessary to permit the conversion of all outstanding Warrants. The Company will cause appropriate evidence of ownership of such Common Units or other securities to be delivered to the Warrant Agent upon its request for delivery upon the exercise of Warrants, and all such Common Units will, at all times, be duly approved for listing subject to official notice of issuance on each securities exchange, interdealer quotation system or market, if any, on which such Common Units is then listed. The Company covenants that all Common Units or other securities that may be issued upon the exercise of the Warrants will, upon issuance, be duly authorized, validly issued, fully paid and non-assessable (except as non-assessability may be affected by Section 18-607 or Section 18-804 of the Delaware Limited Liability Company Act), and free from preemptive rights and all taxes, liens, charges, encumbrances and security interests.

*Section 6.02. Purchase of Warrants by the Company.* The Company shall have the right, except as limited by law or other agreement, to purchase or otherwise acquire Warrants at such times, in such manner and for such consideration as it may deem appropriate. In the event the Company shall purchase or otherwise acquire Warrants, the related Warrant Certificates shall thereupon be delivered to the Warrant Agent for cancellation; *provided, however*, that unless and until the Warrant Certificates evidencing such Warrants are surrendered by the Company to the Warrant Agent for cancellation, such purchase or acquisition shall not operate as a redemption or termination of the right represented by such Warrants. Any Warrants purchased or otherwise acquired by the Company shall not be outstanding for any purpose.

## ARTICLE VII
## Warrant Holders Not Deemed Members

Prior to the exercise of any Warrant and completion and execution of the Form of Joinder set forth in the LLC Agreement, nothing contained in this Agreement or any Warrant Certificate shall be construed as conferring on the Holder of any Warrant or Warrant Certificate any rights whatsoever as a member of the Company, either at law or in equity, including the right to vote on or to consent to any action of the members, to receive dividends or other distributions, to exercise any preemptive right or to receive any notice of meetings of members and, except as otherwise provided in this Agreement, shall not be entitled to receive any notice of any proceedings of the Company.

## ARTICLE VIII
## The Warrant Agent

*Section 8.01. Appointment and Acceptance of Agency.* The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Agreement and the Warrant Agent hereby accepts the agency established by this Agreement and agrees to perform the same on the terms and conditions herein set forth.

*Section 8.02. Correctness of Statements; Distribution of Warrants.* The statements contained herein and in each Warrant Certificate shall be taken as statements of the Company, and the Warrant Agent assumes no responsibility for the correctness of any of the same except as describe the Warrant Agent or any action taken by it. The Warrant Agent assumes no responsibility with respect to the distribution of the Warrants except as herein otherwise provided.

*Section 8.03. Use of Agents.* The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty thereunder either itself (through its employees) or by or through its attorneys or agents (which shall not include its employees) and shall not be responsible for the misconduct or negligence of any agent appointed, provided that due care had been exercised in the appointment and continued employment thereof.

*Section 8.04. Proof of Actions Taken.* Whenever in the performance of its duties under this Agreement, the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking or suffering any action hereunder, such fact or matter (unless such evidence in respect thereof be herein specifically prescribed) may, in the absence of bad faith on the part of the Warrant Agent, be deemed to be conclusively proved and established by a certificate signed by the Chairman of the Board, President, Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, any Vice President, the Treasurer or Secretary of the Company and delivered to the Warrant Agent; and such certificate, in the absence of bad faith on the part of the Warrant Agent, shall be full authorization to the Warrant Agent for any action taken, suffered or omitted by it under the provisions of this Agreement in reliance upon such certificate.

***Section 8.05. Compensation; Indemnity.*** The Company agrees to pay the Warrant Agent compensation for all services rendered by the Warrant Agent in the performance of its duties under this Agreement. The Company agrees to reimburse the Warrant Agent for all expenses, taxes and governmental charges and other charges of any kind and nature incurred by the Warrant Agent (including reasonable fees and expenses of the Warrant Agent's counsel and agents) in the performance of its duties under this Agreement. The Company also agrees to indemnify the Warrant Agent for, and to hold it harmless against, any loss, liability or expenses incurred without negligence or willful misconduct on the part of the Warrant Agent, for anything done or omitted by the Warrant Agent in connection with the acceptance and administration of this Agreement, including the costs and expenses of defending against any claim of liability in the premises. The indemnity provided for herein shall survive the expiration of the Warrants and the termination of this Agreement. The costs and expenses incurred in enforcing this right of indemnification shall be paid by the Company. Notwithstanding anything in this Agreement to the contrary, in no event shall the Warrant Agent be liable for special, indirect or consequential loss or damage of any kind whatsoever (including lost profits), even if the Warrant Agent has been advised of the likelihood of such loss or damage and regardless of the form of the action.

***Section 8.06. Legal Proceedings.*** The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more Holders shall furnish the Warrant Agent with reasonable security and indemnity satisfactory to the Warrant Agent for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity. All rights of action under this Agreement or under any of the Warrants may be enforced by the Warrant Agent without the possession of any of the Warrants or the production thereof at any trial or other proceeding relative thereto, and any such action, suit or proceeding instituted by the Warrant Agent shall be brought in its name as Warrant Agent, and any recovery of judgment shall be for the ratable benefit of the Holders, as their respective rights or interests may appear.

***Section 8.07. Other Transactions Involving the Company.*** The Warrant Agent and any stockholder, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Company or become pecuniarily interested in any transactions in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Agreement or such director, officer or employee. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity including acting as transfer agent or as a lender to the Company or an affiliate thereof.

***Section 8.08. Actions as Agent.*** The Warrant Agent shall act hereunder solely as agent, and its duties shall be determined solely by the provisions of this Agreement. No implied duties or obligations shall be read into this Agreement against the Warrant Agent. The Warrant Agent shall not be liable for anything which it may do or refrain from doing in connection with this Agreement except for its own gross negligence or willful misconduct.

***Section 8.09. Liability of Warrant Agent.*** The Warrant Agent may conclusively rely upon and shall be protected by the Company and shall not incur any liability or responsibility to the Company or to any Holder for or in respect of any action taken, suffered or omitted by it (a) in connection with its administration of this Agreement or (b) in reliance on any Warrant Certificate or other securities of the Company, instrument of assignment or transfer, power of attorney, endorsement, affidavit, letter, direction, statement, notice, resolution, waiver, consent, order, certificate or other paper, document or instrument reasonably believed by it to be genuine and to have been signed, executed, sent, presented and, where necessary, verified or acknowledged, by the proper party or parties.

***Section 8.10. Validity of Agreement.*** The Warrant Agent shall not be under any responsibility in respect of the validity of this Agreement or the execution and delivery hereof (except the due execution and delivery hereof by the Warrant Agent) or in respect of the validity or execution of any Warrant (except its counter-signature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant Certificate; nor shall the Warrant Agent by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any underlying securities (or other membership interests) to be issued pursuant to this Agreement or any Warrant, or as to whether any underlying securities (or other membership interests) will, when issued, be validly issued, fully paid and non-assessable, or as to the Exercise Price or the number or amount of underlying securities or other securities or other property issuable upon exercise of any Warrant.

***Section 8.11. Acceptance of Instructions.*** The Warrant Agent is hereby authorized and directed to accept instructions with respect to the performance of its duties hereunder from the Chairman of the Board, President, Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, any Vice President or Secretary of the Company, and to apply to such officers for advice or instructions in connection with its duties, and shall not be liable for any action taken or suffered by it in good faith in accordance with instructions of any such officer or officers or for any delay in acting while waiting for those instructions. Any application by the Warrant Agent for written instructions from the Company may, at the option of the Warrant Agent, set forth in writing any action proposed to be taken or omitted by the Warrant Agent under this Agreement and the date on or after which such action shall be taken or such omission shall be effective. The Warrant Agent shall not be liable for any action taken by, or omission of, the Warrant Agent in accordance with a proposal included in any such application on or after the date specified in such application (which date shall not be less than 10 Business Days after the date any officer of the Company actually receives such application, unless any such officer shall have consented in writing to an earlier date) unless prior to taking any such action (or the effective date in the case of an omission), the Warrant Agent shall have received written instructions in response to such application subject to the proposed action or omission and/or specifying the action to be taken or omitted.

***Section 8.12. Right to Consult and Rely Upon Counsel.*** Before the Warrant Agent acts or refrains from acting, it may at any time consult with legal counsel (who may be legal counsel for the Company), and the opinion or advice of such counsel shall be full and

complete authorization and protection to the Warrant Agent and the Warrant Agent shall incur no liability or responsibility to the Company or to any Holder for any action taken, suffered or omitted by it in good faith in accordance with the opinion or advice of such counsel.

**Section 8.13. Change of Warrant Agent.** (a) The Warrant Agent, or any successor to it hereafter appointed, may resign from its position as such and be discharged from all further duties and liabilities hereunder (except liabilities arising as a result of the Warrant Agent's own gross negligence or willful misconduct), after giving 30 days' prior written notice to the Company, upon (but only upon) a duly appointed successor Warrant Agent having been appointed and having accepted such appointment in writing. The Company may remove the Warrant Agent upon not less than 30 days' prior written notice specifying the date when such discharge shall take effect, and the Warrant Agent shall thereupon in like manner be discharged from all further duties and liabilities hereunder (except liabilities arising as a result of the Warrant Agent's own gross negligence or willful misconduct), upon (but only upon) a duly appointed successor Warrant Agent having been appointed and having accepted such appointment in writing. The Company shall cause to be mailed, at the expense of the Company, to each Holder a copy of said notice of resignation or notice of removal, as the case may be. Upon such resignation or removal the Company shall appoint in writing a successor to the Warrant Agent. If the Company shall fail to make such appointment within a period of 30 days after it has been notified in writing of such resignation by the resigning Warrant Agent or after such removal, then the existing Warrant Agent or the Holder of any Warrant may apply to any court of competent jurisdiction for the appointment of a successor to the Warrant Agent. Pending appointment of a successor to the original Warrant Agent, either by the Company or by such a court, the duties of the Warrant Agent shall be carried out by the Company.

(b) Any successor to the Warrant Agent, whether appointed by the Company or by a court, shall be a bank (or subsidiary thereof) or trust company doing business under the laws of the United States or any state thereof, in good standing and having a combined capital and surplus of not less than $50,000,000. The combined capital and surplus of any such successor to the Warrant Agent shall be deemed to be the combined capital and surplus as set forth in the most recent annual report of its condition published by such successor to the Warrant Agent prior to its appointment; *provided* that such reports are published at least annually pursuant to law or to the requirements of a federal or state supervising or examining authority. After acceptance in writing of such appointment by the successor to the Warrant Agent, it shall be vested with the same authority, powers, rights, immunities, duties and responsibilities as its predecessor Warrant Agent, without any further assurance, conveyance, act or deed; *provided, however*, the predecessor Warrant Agent shall in all events deliver and transfer to the successor Warrant Agent all property, if any, at the time held hereunder by the predecessor Warrant Agent and if for any reason it shall be necessary or expedient to execute and deliver any further assurance, conveyance, act or deed, the same shall be done at the expense of the Company and shall be legally and validly executed and delivered by the resigning or removed Warrant Agent. As soon as practicable after such appointment, the Company shall give notice thereof to the predecessor Warrant Agent and the Holders. Failure to give any notice provided for in this Section 8.13, however, or any defect therein, shall not

affect the legality or validity of the resignation or removal of the Warrant Agent or the appointment of the successor Warrant Agent, as the case may be.

**Section 8.14. Successor Warrant Agent.** Any company into which the Warrant Agent may be merged or with which it may be consolidated, or any company resulting from any merger or consolidation to which the Warrant Agent shall be a party, shall be the successor Warrant Agent under this Agreement without any further act; *provided, however*, that such company would be eligible for appointment as a successor to the Warrant Agent under the provisions of <u>Section 8.13</u> hereof. Any such successor Warrant Agent shall promptly cause notice of its succession as Warrant Agent to be mailed to the Company and the Holders.

**Section 8.15. Other.** (a) No provision of this Agreement shall require the Warrant Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of its rights if there shall be reasonable grounds for believing that repayment of such funds or adequate indemnification against such risk or liability is not reasonably assured to it.

(b) The Warrant Agent shall not be required to take notice or be deemed to have notice of any fact, event or determination (including any dates or events defined in this Agreement or the designation of any Person as an acquiring Person or Affiliate) under this Agreement unless and until the Warrant Agent shall be specifically notified in writing by the Company of such fact, event or determination as provided in <u>Section 9.04</u>.

## ARTICLE IX
## Miscellaneous

**Section 9.01. Money Deposited with the Warrant Agent.** The Warrant Agent shall not be required to pay interest on any moneys deposited pursuant to the provisions of this Agreement, except such as it shall agree in writing with the Company to pay thereon. Any moneys, securities or other property which at any time shall be deposited by the Company or on its behalf with the Warrant Agent pursuant to this Agreement shall be and are hereby assigned, transferred and set over to the Warrant Agent in trust for the purpose for which such moneys, securities or other property shall have been deposited; but such moneys, securities or other property need not be segregated from other funds, securities or other property except to the extent required by law.

**Section 9.02. Payment of Taxes.** All Common Units or other securities issuable upon the exercise of Warrants shall be validly issued, fully paid and non-assessable (except as non-assessability may be affected by Section 18-607 or Section 18-804 of the Delaware Limited Liability Company Act). The Company shall pay all expenses in connection with, and each Holder shall pay all taxes and other governmental charges that may be imposed with respect to the issuance or delivery of any Common Units issuable upon the exercise of the Warrants. Without limiting the foregoing, the Company shall not be required to pay any tax or other charge imposed in connection with any transfer involved in the issuance of any Common Units or other securities or property issuable upon the exercise of the Warrants in any name other than that of the holder of the Certificates evidencing such Warrants, and in such case

the Warrant Agent and the Company shall not be required to issue any interests or pay any cash until such tax or other charge has been paid or it has been established to the Warrant Agent's and the Company's reasonable satisfaction that no such tax or charge is due.

**Section 9.03. Merger, Consolidation or Sale of Assets of the Company.** The Company will not merge into or consolidate or combine with any other Person, or sell or otherwise transfer all or substantially all of its property, assets or business to any Person (other than a merger, consolidation, combination or sale (i) contemplated by <u>Section 4.01(c)(ii)</u> hereof in which the consideration payable to the holders of Common Units in exchange for their Common Units consists solely of cash or (ii) that constitutes a Change of Control pursuant to which a Holder may exercise its Warrants pursuant to the cashless exercise provisions of <u>Section 3.03</u>), unless the Person resulting from such merger, consolidation or combination, or transferee of such property, assets or business, as the case may be, executes with the Warrant Agent a supplemental agreement providing for the express assumption by such Person of the due and punctual performance and observance of each and every covenant and condition of this Agreement to be performed and observed by the Company.

**Section 9.04. Notices.** (a) Any notice, request, demand or report (each, a "**Communication**") required or permitted to be given or made by this Agreement shall be in writing.

(b) Any Communication authorized by this Agreement to be given or made by the Warrant Agent or by any Holder to or on the Company shall be sufficiently given or made if sent by registered or certified mail and shall be deemed given upon receipt, or by facsimile or electronic mail, addressed (until another address is filed by the Company with the Warrant Agent) as follows:

> Magnachip Semiconductor, LLC
> **[                ]**
> **[                ]**
> Attn: **[        ]**
> Fax: **[        ]**

(c) Any Communication authorized by this Agreement to be given or made by the Company or by any Holder to or on the Warrant Agent shall be sufficiently given or made if sent by registered or certified mail and shall be deemed given upon receipt, or by facsimile or electronic mail, addressed (until another address is filed by the Warrant Agent with the Company) as follows:

> **[Warrant Agent]**
> **[                ]**
> **[                ]**
> Attn: **[        ]**
> Fax: **[        ]**

(d) Any Communication authorized by this Agreement to be given or made by the Company or the Warrant Agent to any Holder shall be sufficiently given or made if sent by first-class mail, postage prepaid, or by facsimile or electronic mail, addressed to such Holder at the address of such Holder as shown on the registry books of the Company. The Company shall deliver a copy of any notice or demand it delivers to any Holder to the Warrant Agent and the Warrant Agent shall deliver a copy of any notice or demand it delivers to any Holder to the Company.

**Section 9.05. Governing Law.** THE VALIDITY, INTERPRETATION AND PERFORMANCE OF THIS AGREEMENT AND THE WARRANT CERTIFICATES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

**Section 9.06. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the Company and the Warrant Agent and their respective successors and assigns, and the Holders from time to time of the Warrants. Nothing in this Agreement is intended or shall be construed to confer upon any Person, other than the Company, the Warrant Agent and the Holders of the Warrants, any right, remedy or claim under or by reason of this Agreement or any part hereof.

**Section 9.07. Counterparts.** This Agreement may be executed manually or by facsimile in any number of counterparts, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

**Section 9.08. Amendments.** (a) The Warrant Agent may, without the consent or concurrence of the Holders, enter into one or more supplemental agreements or amendments with the Company for the purpose of (i) evidencing the rights of the Holders upon consolidation, merger, sale, transfer, reclassification, liquidation or dissolution under Section 4.01(c)(i), (ii) making any changes or corrections in this Agreement that are required to cure any ambiguity, to correct or supplement any provision contained herein that may be defective or inconsistent with any other provision herein or any clerical omission or mistake or manifest error herein contained, (iii) making such other provisions in regard to matters or questions arising under this Agreement as shall not adversely affect the interest of the Holders or be inconsistent with this Agreement or any supplemental agreement or amendment or (iv) adding further covenants and agreements of the Company in this Agreement or surrendering any rights or power reserved to or conferred upon the Company in this Agreement.

(b) With the consent of the Holders of Warrant Certificates evidencing at least a majority in number of the Warrants at the time outstanding, the Company and the Warrant Agent may at any time and from time to time by supplemental agreement or amendment add any provisions to or change in any manner or eliminate any of the provisions of this Agreement or of any supplemental agreement or amendment or modify in any manner the rights and obligations of the Holders and the Company; *provided, however*, that no such supplemental agreement or amendment shall, without the consent of the Holder of the Warrant Certificate evidencing each outstanding Warrant affected thereby, (i) alter the provisions of this

Agreement so as to adversely affect in any material respect the terms upon which Warrants are exercisable, (ii) decrease the number of underlying securities (other than pursuant to adjustments made in accordance with Article IV hereof) or (iii) amend the provisions of this Section 9.08. Notwithstanding anything to the contrary contained in this Agreement, no supplement agreement or amendment that changes the rights and duties of the Warrant Agent under this Agreement shall be effective against the Warrant Agent without the written consent of the Warrant Agent.

**Section 9.09. Common Units.** The Common Units issuable upon exercise of any Warrant are uncertificated. In the event a Holder exercises any Warrant and completes and executes the Form of Joinder set forth in the LLC Agreement, (i) such Holder shall be deemed to have (w) agreed to be bound by the terms of the LLC Agreement, (x) represented that it has the capacity, power and authority to enter into the LLC Agreement, and (y) made the consents and waivers required of members of the Company contained in the LLC Agreement; (ii) the Company shall admit such Holder as a member of the Company with respect to the Common Units acquired upon exercise and (iii) the Company shall record such admission on its books.

**Section 9.10. Third Party Beneficiaries.** The Holders shall be third party beneficiaries to the agreements made hereunder between the Company, on the one hand, and the Warrant Agent, on the other hand. All rights of action in respect of this Agreement are vested in the respective Holders of the Warrant Certificates; *provided, however*, that no Holder of any Warrant Certificate shall have the right to enforce, institute or maintain any suit, action or proceeding against the Company to enforce, or otherwise act in respect of, the Warrants evidenced by such Warrant Certificate, unless (i) such Holder shall have previously given written notice to the Company of the substance of such dispute, and Holders of at least 25% of the then outstanding Warrants shall have given written notice to the Company of their support for the institution of such proceeding to resolve such dispute, (ii) written notice of the substance of such dispute and of the support for the institution of such proceeding by such Holders shall have been provided by the Company to the Warrant Agent and (iii) the Warrant Agent shall not have instituted appropriate proceedings with respect to such dispute within 30 days following the date of such written notice to the Warrant Agent, it being understood and intended that no one or more Holders of Warrant Certificates shall have the right in any manner whatever by virtue of, or by availing of, any provision of this Agreement to affect, disturb or prejudice the rights of any other Holders of Warrant Certificates, or to obtain or to seek to obtain priority in preference over any other Holders or to enforce any right under this Agreement, except in the manner herein provided for the equal and ratable benefit of all Holders of Warrant Certificates. Except as provided in this Section 9.09, no Holder of a Warrant Certificate shall have the right to enforce, institute or maintain any suit, action or proceeding to enforce, or otherwise act in respect of, the Warrants.

**Section 9.11. Waivers.** The Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if (i) the Company has obtained the written consent of Holders of Warrant Certificates evidencing a majority of the then outstanding Warrants and (ii) any consent required pursuant to Section 9.08 has been obtained.

**Section 9.12. Inspection.** The Warrant Agent shall cause a copy of this Agreement to be available at all reasonable times at the office of the Warrant Agent for inspection by the Holder of any Warrant Certificate. The Warrant Agent may require such Holder to submit his Warrant Certificate for inspection by it.

**Section 9.13. Headings.** The descriptive headings of the several Sections of this Agreement are inserted for convenience and shall not control or affect the meaning or construction of any of the provisions hereof.

**Section 9.14. Entire Agreement.** This Agreement sets forth the entire agreement of the parties hereto as to the subject matter hereof and supersedes all previous, agreements among all or some of the parties hereto with respect thereto, whether written, oral or otherwise.

*[Signature page follows.]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed, as of the day and year first above written.

MAGNACHIP SEMICONDUCTOR, LLC

_____
Name:
Title:

[Warrant Agent], as Warrant Agent

_____
Name:
Title:

Form Of Warrant Certificate

MAGNACHIP SEMICONDUCTOR, LLC

No._____

[_____] Warrants

WARRANTS TO PURCHASE COMMON UNITS

THE COMMON UNITS OF MAGNACHIP SEMICONDUCTOR, LLC (THE "COMMON UNITS") FOR WHICH THIS WARRANT IS EXERCISABLE ARE UNCERTIFICATED AND MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES ABSENT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND ANY APPLICABLE STATE SECURITIES LAWS OR AN APPLICABLE EXEMPTION FROM SUCH REGISTRATION REQUIREMENTS. ACCORDINGLY, NO HOLDER SHALL BE ENTITLED TO EXERCISE SUCH HOLDER'S WARRANTS AT ANY TIME UNLESS, AT THE TIME OF EXERCISE, (i) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT RELATING TO THE COMMON UNITS ISSUABLE UPON THE EXERCISE OF THIS WARRANT HAS BEEN FILED WITH, AND DECLARED EFFECTIVE BY, THE SECURITIES AND EXCHANGE COMMISSION (THE "COMMISSION"), AND NO STOP ORDER SUSPENDING THE EFFECTIVENESS OF SUCH REGISTRATION STATEMENT HAS BEEN ISSUED BY THE COMMISSION, OR (ii) THE ISSUANCE OF SUCH COMMON UNITS IS PERMITTED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THE TRANSFER OF THE SECURITIES REPRESENTED HEREBY IS SUBJECT TO RESTRICTION PURSUANT TO SECTION 2.04 OF THE WARRANT AGREEMENT BETWEEN MAGNACHIP SEMICONDUCTOR, LLC AND [_____], AS WARRANT AGENT, AS AMENDED AND IN EFFECT FROM TIME TO TIME, A COPY OF WHICH MAY BE OBTAINED FROM THE COMPANY UPON REQUEST.

This certifies that _____, or its registered assigns, is the owner of the number of Warrants set forth above, each of which represents the right to purchase, commencing [_____ __], 2009, from Magnachip Semiconductor, LLC, a Delaware limited liability company (the "**Company**"), one Common Unit (the "**Common Unit**") of the Company (subject to adjustment as provided in the Warrant Agreement hereinafter referred to) at the purchase price (the "***Exercise Price***") of $[____] per Common Unit (subject to adjustment as provided in the Warrant Agreement), upon surrender hereof at the office of [Warrant Agent] or to its successor as the warrant agent under the Warrant Agreement (any such warrant agent being herein called the "***Warrant Agent***"), with the Subscription Form on the reverse hereof completed and duly executed, with signature guaranteed as therein specified and simultaneous payment in full by check payable to the order of [Warrant Agent] of the purchase price for the Common Units as to which the Warrant(s) represented by this Warrant Certificate are exercised, all subject to the terms and conditions hereof and of the

Warrant Agreement. This Warrant Certificate may be exercised as to all or any whole number of the Warrants evidenced hereby.

This Warrant Certificate is issued under and in accordance with a Warrant Agreement dated as of [_____ __], 2009 (the "***Warrant Agreement***") by and between the Company and **[**Warrant Agent**]**, as Warrant Agent, and is subject to the terms and provisions contained therein, all of which terms and provisions the Holder of this Warrant Certificate consents to by acceptance hereof. The Warrant Agreement is hereby incorporated herein by reference and made a part hereof. Reference is hereby made to the Warrant Agreement for a full description of the rights, limitations of rights, obligations, duties and immunities thereunder of the Company and the Holders of the Warrants. The summary of the terms of the Warrant Agreement contained in this Warrant Certificate is qualified in its entirety by express reference to the Warrant Agreement. All capitalized terms used in this Warrant Certificate that are defined in the Warrant Agreement shall have the meanings assigned to them in the Warrant Agreement.

Copies of the Warrant Agreement are on file at the office of the Warrant Agent and may be obtained by writing to the Warrant Agent at the following address:

**[Warrant Agent]**
**[**                    **]**
**[**                    **]**
Attn: **[**          **]**
Fax: **[**            **]**

The number of Common Units purchasable upon the exercise of each Warrant is subject to adjustment as provided in the Warrant Agreement. In the event of any capital reorganization or reclassification of any of the Common Units or any consolidation, combination or merger of the Company with or into another company (where the Company is not the surviving company or where there is a change in or distribution with respect to the Units), except in the case of a merger, consolidation or combination constituting a change of control in the Company, each Warrant will, upon exercise, entitle the Holder thereof to receive the number of Common Units or other securities or the amount of money and other property which the holder of a Common Unit is entitled to receive upon completion of such reorganization, recapitalization, merger, consolidation or combination.

As to any final fraction of a Common Unit which the same Holder of one or more Warrants would otherwise be entitled to purchase upon exercise thereof in the same transaction, the Company shall pay the cash value thereof determined as provided in the Warrant Agreement.

All Common Units or other securities issuable upon the exercise of Warrants shall be validly issued, fully-paid and non-assessable (except as non-assessability may be affected by Section 18-607 or Section 18-804 of the Delaware Limited Liability Company Act), and the Company shall pay all expenses in connection with, and the holder shall pay all taxes and other governmental charges that may be imposed with respect to the issuance or delivery of any Common Unit issuable upon the exercise of the Warrants. Without limiting the

foregoing, the Company shall not be required to pay any tax or other charge imposed in connection with any transfer involved in the issue of any Common Units or other securities or property issuable upon the exercise of the Warrants in any name other than that of the holder of the Warrant Certificates evidencing such Warrants, and in such case the Warrant Agent and the Company shall not be required to issue or deliver any interests or other property until such tax or other charge has been paid or it has been established to the Warrant Agent's and the Company's reasonable satisfaction that no tax or other charge is due.

Provided the Company has not issued a Notice Date Press Release suspending the transfer of Warrants, this Warrant Certificate and all rights hereunder are transferable by the registered Holder hereof, in any whole number of Warrants, in accordance with the provisions of the Warrant Agreement, on the register maintained by the Warrant Agent for such purpose at its office in **[Warrant Agent's office location]**, upon surrender of this Warrant Certificate duly endorsed, or accompanied by a written instrument of transfer form satisfactory to the Company and the Warrant Agent completed and duly executed, with signatures guaranteed as specified in the attached Form of Assignment, by the registered Holder hereof or his attorney duly authorized in writing and upon payment of any necessary transfer tax or other governmental charge imposed upon such transfer. Upon any partial transfer, the Warrant Agent will issue and deliver to such Holder a new Warrant Certificate with respect to any portion not so transferred. Each taker and Holder of this Warrant Certificate, by taking and holding the same, consents and agrees that prior to the registration of transfer as provided in the Warrant Agreement, the Company and the Warrant Agent may treat the Person in whose name the Warrants are registered as the absolute owner hereof for any purpose and as the Person entitled to exercise the rights represented hereby, any notice to the contrary notwithstanding.

This Warrant Certificate may be exchanged, in accordance with the terms of the Warrant Agreement, at the office of the Warrant Agent maintained for such purpose in **[Warrant Agent's office location]** for Warrant Certificates representing the same aggregate number of Warrants, each new Warrant Certificate to represent such number of Warrants as the Holder hereof shall designate at the time of such exchange.

Prior to the exercise of the Warrants represented hereby, the Holder of this Warrant Certificate, as such, shall not be entitled to any rights of a member of the Company, including, without limitation, the right to vote or to consent to any action of the members, to receive dividends or other distributions, to exercise any preemptive right or to receive any notice of meetings of Unit holders, and shall not be entitled to receive any notice of any proceedings of the Company except as provided in the Warrant Agreement. In the event a Holder exercises any Warrant and completes and duly executes the attached Subscription Form and the Form of Joinder attached to the LLC Agreement, such Holder shall have agreed to be bound by the terms of the Second Amended and Restated Limited Liability Company Agreement of the Company, dated **[_____ __]**, 2009, as it may be amended or modified from time to time, the Company shall admit such Holder as a member of the Company and the Company shall record such admission on its books.

This Warrant Certificate shall be void and all rights evidenced hereby shall cease on the Expiration Date.

This Warrant Certificate shall not be valid for any purpose until it shall have been countersigned by the Warrant Agent.

_____
Dated

MAGNACHIP SEMICONDUCTOR, LLC

_____
Name:
Title:

Countersigned:

[Warrant Agent], as Warrant Agent

_____
Name:
Title:

# FORM OF REVERSE OF WARRANT CERTIFICATE
## SUBSCRIPTION FORM
### (to be executed only upon exercise of Warrants)

To:

_____

The undersigned hereby irrevocably exercises _____ of the Warrants represented by the within Warrant Certificate for the purchase of one (subject to adjustment) Common Unit of Magnachip Semiconductor, LLC, a Delaware limited liability company (the "**Company**"), for each Warrant exercised, and herewith (check one, if election is available; otherwise complete first line below):

☐     makes payment of $_____ (such payment being by check payable to the order of **[Warrant Agent]** equal to the Exercise Price of the Warrants being exercised); or

☐     elects to make payment by cashless exercise, contingent upon and effective immediately prior to the consummation of the Change of Control (as defined in the Warrant Agreement) referred to in the Company's notice, dated _____, 20__ given pursuant to Section 4.04(a) of the Warrant Agreement,

all at the exercise price and on the terms and conditions specified in the Warrant Certificate and the Warrant Agreement therein referred to, and hereby surrenders this Warrant Certificate and all right, title and interest therein and directs that the Common Units due upon the exercise of such Warrants be registered or placed in the name and the address specified below.

_____
Dated

_____
(Signature of Owner)

_____
(Street Address)

_____
(City) (State) (Zip Code)

_____
Signature Guaranteed By[1]

_____

[1]   The Holder's signature must be guaranteed by a member firm of a registered national securities exchange or of the National Association of Securities Dealers, Inc., a commercial bank or trust company having an office or correspondent in the United States or an "eligible guarantor institution" as defined by Rule 17Ad-15 under the Exchange Act.

Securities and/or check to be issued to:_____

Please insert social security or identifying number:_____

_____

Name

_____
Street Address

_____
City, State and Zip Code

## FORM OF ASSIGNMENT

FOR VALUE RECEIVED, the undersigned registered holder of the within Warrant Certificate hereby sells, assigns and transfers unto the Assignee(s) named below (including the undersigned with respect to any Warrants constituting a part of the Warrants evidenced by the within Warrant Certificate not being assigned hereby) all of the rights of the undersigned under the within Warrant Certificate, with respect to the whole number of Warrants set forth below:

_____
Name(s) of Assignee(s):

_____
Address:

_____
No. of Warrants:

Please insert social security or other identifying number of assignee(s):
_____

and does hereby irrevocably constitute and appoint _____
the undersigned's attorney to make such transfer on the books of _____
maintained for such purposes, with full power of substitution in the premises.

_____
Dated

_____
(Signature of Owner)

_____
(Street Address)

_____
(City) (State) (Zip Code)

_____
Signature Guaranteed By[2]

_____
[2] The Holder's signature must be guaranteed by a member firm of a registered national securities exchange or of the National Association of Securities Dealers, Inc., a commercial bank or trust company having an office or correspondent in the United States or an "eligible guarantor institution" as defined by Rule 17Ad-15 under the Exchange Act.