IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MAGNACHIP SEMICONDUCTOR FINANCE | ) | Case No. 09-12008 (PJW) |
| COMPANY, *et al.*,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

**SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MAGNACHIP SEMICONDUCTOR FINANCE COMPANY, *ET AL.***

**DRINKER BIDDLE & REATH LLP**     - and -     **LOWENSTEIN SANDLER PC**

Howard A. Cohen, Esq.                    Kenneth A. Rosen, Esq.
1100 N. Market Street                      John K. Sherwood, Esq.
Wilmington, DE 19801-1254             65 Livingston Avenue
Tel: (302) 467-4213                          Roseland, New Jersey 07068
Fax: (302) 467-4201                          Tel: (973) 597-2500
                                                       Fax: (973) 597-2400

*Co-Counsel to the Official Committee of Unsecured Creditors*

Dated:  September 23, 2009

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, and their respective addresses, are:  MagnaChip Semiconductor Finance Company (4144), 787 N. Mary Avenue, Sunnyvale, CA 94085; MagnaChip Semiconductor LLC (5772), 787 N. Mar Avenue, Sunnyvale, CA 94085; MagnaChip Semiconductor SA Holdings LLC, 787 N. Mary Avenue, Sunnyvale, CA 94085; MagnaChip Semiconductor, Inc. (8632), 787 N. Mary Avenue, Sunnyvale, CA 94085; MagnaChip Semiconductor SA (9734), 74 Rue de Merl, B.P. 709, L-2017 Luxembourg; and MagnaChip Semiconductor B.V. (9827), 1043 BW Amsterdam, Naritaweg 165, the Netherlands.

# Table of Contents

<strong><em>Page</em></strong>

I. INTRODUCTION ..................................................................................................1

II. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
AND GOVERNING LAW ..................................................................................2

    A.    Rules of Interpretation, Computation of Time, and Governing Law .....................2

    B.    Defined Terms .............................................................................................2

III.    14

TREATMENT OF ADMINISTRATIVE EXPENSES AND TAX CLAIMS ...............................14

    A.    Introduction................................................................................................14

    B.    Administrative Expenses ...........................................................................15

    C.    Superpriority Claims ..................................................................................15

    D.    Tax Claims ................................................................................................15

IV. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND
INTERESTS .....................................................................................................15

    A.    Summary ...................................................................................................15

    B.    Classification and Treatment of Claims and Interests...................................16

        1.    Class 1 (A-F) –Priority Non-Tax Claims .................................16

        2.    Class 2 (A-F) – Other Secured Claims .....................................16

        3.    Class 3 (A-F) – First Lien Lender Secured Claims....................17

        4.    Classes 4 (A-F) – Second Lien Noteholder Claims ...................17

        5.    Class 5 (A-F) – General Unsecured Claims...............................18

        6.    Class 6 (A-F) – Subordinated Note Claims ...............................19

        7.    Class 7 (A-F) – Intercompany Claims against the Debtors ........19

        8.    Class 8 (A-F) – Interests in the Debtors....................................19

    A.    Identification of Classes.............................................................................20

        1.    Class 1 (A-F) – Priority Non-Tax Claims .................................20

        2.    Class 2 (A-F) – Other Secured Claims .....................................20

        3.    Class 3 (A-F) – First Lien Lender Secured Claims....................20

        4.    Class 4 (A-F) – Second Lien Noteholder Claims ......................20

        5.    Class 5 (A-F) – General Unsecured Claims...............................20

        6.    Class 6 (A-F) – Subordinated Note Claims ...............................20

        7.    Class 7 (A-F) – Intercompany Claims against the Debtors ........20

8.      Class 8 (A-F) – Interests in the Debtors....................................................20

B.      Classes Permitted and Not Permitted to Vote ......................................................20

C.      Nonconsensual Confirmation...............................................................................20

D.      Postpetition Interest .............................................................................................21

VI. MEANS FOR IMPLEMENTATION OF THE PLAN ...........................................................21

A.      Restructuring and Other Transactions..................................................................21

1.      Intercompany Claims and Interests in Subsidiaries .................................21

2.      Cancellation of Existing Securities and Agreements and Related Indentures/Discharge of Second Lien Noteholder Trustee and Subordinated Note Trustee.........................................................................21

3.      Issuance of New Common Units, Warrants and Subscription Rights........22

4.      Incurrence of New Indebtedness..............................................................23

B.      Release of Second Liens/Second Lien Guaranties/Subordinated Note Guaranties ...........................................................................................................23

1.      Release of Liens.......................................................................................23

2.      Release of Second Lien Guarantees.........................................................23

3.      Release of Subordinated Note Guarantees................................................24

C.      Continued Corporate Existence ...........................................................................25

D.      The Offering.........................................................................................................25

1.      Issuance of Subscription Rights...............................................................25

2.      Subscription Period..................................................................................26

3.      Subscription Purchase Price.....................................................................26

4.      Exercise of Subscription Rights...............................................................26

5.      Offering Procedures ................................................................................27

6.      Transfer Restriction: Revocation .............................................................27

7.      Offering Backstop...................................................................................27

8.      Backstop Fees and Expenses/Backstop Units...........................................28

9.      Distribution of the New Common Units....................................................29

10.      Backstop Purchaser's Minimum Allocation .............................................29

11.      Private Placement Exemption ..................................................................29

12.      Disputed Claims......................................................................................29

13.      Validity of Exercise of Subscription Rights..............................................29

14.      Indemnification of Backstop Purchaser....................................................30

E.    Retained Rights of Action ................................................................31

F.    Claims Objections ..........................................................................32

G.    Corporate Governance ...................................................................32

    1.    General .................................................................................32

    2.    Postconfirmation Board .......................................................32

    3.    Filing of Postconfirmation Organizational Documents .........32

    4.    Long-Term Incentive Plan ...................................................32

H.    Exemption from Securities Laws ......................................................32

I.    Issuance and Resale of New Securities Under the Committee's Plan ..................33

J.    Registration Rights Agreement .........................................................33

K.    Payment of Plan Expenses ..............................................................34

L.    Dissolution of the Official Committee ...............................................34

M.    Actions in Korea ...........................................................................34

VII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................34

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ..........34

B.    Objections to Assumption of Executory Contracts and Unexpired Leases ..........35

C.    Payment Related to Assumption of Executory Contracts and Unexpired Leases ................................................................................35

D.    Bar Date for Rejection Damages .....................................................36

E.    Insurance Policies ..........................................................................36

VIII. DISTRIBUTIONS AND RELATED MATTERS ...............................................36

A.    Dates of Distribution ......................................................................36

B.    Cash Distributions ..........................................................................37

C.    Rounding of Payments ....................................................................37

D.    Disputed Claims ............................................................................37

E.    Undeliverable and Unclaimed Distributions ......................................37

F.    Compliance With Tax Requirements .................................................38

G.    Record Date in Respect to Distributions ..........................................38

H.    Conditions to Receiving Distributions ...............................................39

I.    Surrender of Instruments .................................................................39

IX. LITIGATION, OBJECTIONS TO CLAIMS, AND DETERMINATION OF TAXES ..........39

A.    Litigation: Objections to Claims; Objection Deadline ..........................39

B.    Temporary or Permanent Resolution of Disputed Claims .....................40

C.      Release of Avoidance Actions........................................................................40

D.      Preservation of Retained Rights of Action.................................................40

X. EFFECT OF CONFIRMATION AND RELATED PROVISIONS .........................................41

    A.      Effect of Confirmation ......................................................................................41

         1.      Binding Effect of Plan .......................................................................41

    B.      Injunction ............................................................................................................41

         1.      Generally.............................................................................................41

         2.      Injunction Related to Rights of Action and Terminated Claims, Administrative Expenses or Interests..................................................42

         3.      Exculpation ........................................................................................42

    C.      Debtor Release ...................................................................................................43

    D.      Third Party Release............................................................................................43

    E.      Subsequent Discovery of Facts Does Not Affect Enforceability of Releases...............................................................................................................43

XI. PENSION PLANS, OTHER RETIREE BENEFITS AND LABOR CONTRACTS.............44

XII. NO REGULATED RATE CHANGE WITHOUT GOVERNMENT APPROVAL ...............44

XIII. EXEMPTION FROM CERTAIN TRANSFER TAXES.........................................................44

XIV. RETENTION OF JURISDICTION AND MISCELLANEOUS MATTERS ......................44

    A.      Retention of Jurisdiction ..................................................................................44

    B.      Miscellaneous Matters ......................................................................................47

         1.      Headings .............................................................................................47

         2.      Services by and Fees for Professionals and Certain Parties ....................47

         3.      Bar Date for Administrative Expenses...............................................47

         4.      Notices ...............................................................................................48

         5.      Successors and Assigns.....................................................................48

         6.      Severability of Plan Provisions.................................................................49

         7.      No Waiver ...........................................................................................49

         8.      Inconsistencies...................................................................................49

         9.      Plan Supplement ................................................................................49

XV. CONDITIONS TO CONFIRMATION AND EFFECTIVENESS .........................................50

    A.      Conditions Precedent to Plan Effectiveness ..................................................50

    B.      Effect of Non-Occurrence of Conditions to Effective Date.................................50

XVI. EFFECT OF CONFIRMATION.............................................................................................50

A.     Binding Effect of Confirmation ............................................................................50

B.     Good Faith ............................................................................................................51

C.     No Limitations on Effect of Confirmation.............................................................51

XVII. MODIFICATION OR WITHDRAWAL OF PLAN .............................................................51

A.     Modification of Plan .............................................................................................51

B.     Withdrawal of Plan ...............................................................................................51

XVIII. CONFIRMATION REQUEST..............................................................................................52

**Exhibits**

| Exhibit | Description |
|---------|-------------|
| A | Backstop Commitment Agreement |

The Official Committee of Unsecured Creditors (the "Creditors' Committee") of MagnaChip Semiconductor Finance Company; MagnaChip Semiconductor LLC; MagnaChip Semiconductor SA Holdings LLC; MagnaChip Semiconductor, Inc.; MagnaChip Semiconductor S.A.; and MagnaChip Semiconductor B.V. (collectively, the "Debtors"), appointed in the Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code, hereby propose the following Plan of Reorganization pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Committee's Plan"):

# I.
# INTRODUCTION[1]

The Committee's Plan provides for the satisfaction of Claims against the Debtors through (a) the issuance of a New Term Loan in full and complete satisfaction of the First Lien Lender Claims, (b) the conversion of the Second Lien Noteholder Claims and Subordinated Note Claims to the Second Lien Noteholder Distribution and the Subordinated Note Distribution, respectively, and (c) the Offering. Upon the Effective Date of the Committee's Plan, the liens of the First Lien Lender Parties and the Second Lien Noteholders shall be released and extinguished, and the Second Lien Guarantees in favor of the Second Lien Noteholders from the Non-Korean Guarantors and the Subordinated Note Guaranties in favor of the Holders of the Subordinated Note Claims shall be released; provided, however, that the Liens securing the First Lien Lender Secured Claims shall remain in effect for the sole purpose of securing the New Term Loan. In addition, the Korean Guarantee shall be released as of the Effective Date.

The Committee's Disclosure Statement, distributed with the Committee's Plan, contains a discussion of the Debtors' history, a summary of the Debtors' assets and liabilities, a summary of what Holders of Claims and Interests will receive under the Committee's Plan and the *Joint Chapter 11 Plan of Liquidation Proposed by MagnaChip Semiconductor Finance Company, et al. and UBS AG, Stamford Branch, As Creditor Agreement Agent and Priority Lien Collateral Agent* (the "Debtors' Plan"), a discussion of certain alternatives to the Committee's Plan, and a summary of the procedures and voting requirements necessary for Confirmation of the Committee's Plan. The Disclosure Statement is intended to provide Holders of Claims and Interests with information sufficient to enable such Holders to vote on the Committee's Plan and the Debtors' Plan. *All Holders of Claims entitled to vote on the Committee's Plan are encouraged to carefully read the Committee's Disclosure Statement and the Committee's Plan before voting to accept or reject the Committee's Plan. No solicitation materials, other than the Committee's Disclosure Statement and related materials transmitted herewith and approved by the Bankruptcy Court, have been authorized for use in soliciting acceptance or rejection of the Committee's Plan.*

---

[1] Unless otherwise noted, capitalized terms used in the Committee's Plan have the meanings ascribed in Article II herein.

# II.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

**A.**     <u>**Rules of Interpretation, Computation of Time, and Governing Law**</u>

For purposes of the Committee's Plan:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (b) any reference in the Committee's Plan to an existing document or exhibit filed, or to be filed, shall mean such document or exhibit, as it may have been or may be amended, modified, or supplemented from time to time in accordance with the terms thereof and hereof; (c) unless otherwise specified, all references in the Committee's Plan to sections and exhibits are references to sections and exhibits of or to the Committee's Plan; (d) the words "herein" and "hereto" refer to the Committee's Plan in its entirety rather than to a particular portion of the Committee's Plan; (e) captions and headings to sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Committee's Plan; (f) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (g) any term used in capitalized form in the Committee's Plan that is not defined in the Committee's Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

In computing any period of time prescribed or allowed by the Committee's Plan, the provisions of Federal Rule of Bankruptcy Procedure 9006(a) shall apply.

Except to the extent that the Bankruptcy Code, Bankruptcy Rules, or other federal law is applicable, and subject to the provisions of any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Committee's Plan, the rights and obligations arising under the Committee's Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

**B.**     <u>**Defined Terms**</u>

The following definitions shall apply to capitalized terms used in the Committee's Plan:

1.     "Accredited Investor" means an accredited investor as defined in Rule 501(a) of Regulation D under the Securities Act, as of the Offering Record Date.

2.     "Administrative Expense" means an unpaid administrative expense of the kind described in sections 503(b) and 507(a)(2) of the Bankruptcy Code against any of the Debtors (other than the Superpriority Claims), including, without limitation, (i) the actual, necessary costs and expenses of preserving the Estates of the Debtors, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Cases; (ii) compensation and reimbursement of expenses of professionals to the extent allowable under sections 327, 328, 330(a), 331, 503(b) or 1103 of the Bankruptcy Code (including the reasonable fees and expenses of the legal and financial advisors to the Creditors' Committee); and (iii) all fees and charges

assessed against the Estates under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911 –1930, including the fees, if any, due to the United States Trustee.

3. "Agent" means UBS AG, Stamford Branch, in its capacity as administrative agent and collateral agent for the First Lien Lenders under the First Lien Credit Agreement.

4. "Allowed" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by any Debtor in its Schedules as other than disputed, contingent, or unliquidated that has not been superseded by a Filed proof of Claim and as to which a Debtor or any other party in interest has not Filed an objection; (b) a Claim that has been allowed by a Final Order; (c) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by a Debtor prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation of amount and nature of Claim executed by a Reorganized Debtor, as the case may be, on or after the Effective Date and, to the extent necessary, approved by the Bankruptcy Court; or (iii) in any contract, instrument, indenture, or other agreement entered into or assumed by a Debtor in connection with and in accordance with the Committee's Plan; (d) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law; or (e) a Claim that is allowed pursuant to the terms of the Committee's Plan.

5. "Avoidance Claims" means any Right of Action for the recovery of transfers arising under sections 510(c), 542, 543, 544, 547, 548, 549 or 550 of the Bankruptcy Code or applicable state law.

6. "Backstop Approval Order" means that order, in form and substance satisfactory to the Backstop Purchasers, authorizing and approving the Backstop Commitment Agreement.

7. "Backstop Commitment Agreement" means that certain agreement, dated August 21, 2009, among the Creditors' Committee and the Backstop Purchaser, as amended, annexed hereto as Exhibit A.

8. "Backstop Purchaser" means Avenue Capital Management II, L.P., solely in its capacity as its investment advisor to Avenue  Investments, L.P., Avenue International Master, L.P.,  Avenue Special Situations Fund IV, L.P., Avenue Special Situations Fund V, L.P., and Avenue CDP-Global Opportunities Fund, L.P.

9. "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended, as set forth in title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*., as now in effect or hereafter amended.

10. "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court of competent jurisdiction as may be administering the Chapter 11 Cases or any party thereof.

11. "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure promulgated pursuant to 28 U.S.C. § 2075, as now in effect or hereinafter amended, together with the local rules of the Bankruptcy Court.

12. "Bar Date" means, July 29, 2009, the date set as the deadline for filing proofs of Claims or Interests (whether or not each and every proof of Claim or Interest is subject to such deadline) pursuant to the *Order (A) Fixing the Procedures and Deadlines to File Proofs of Claim, (B) Approving the Form and Manner of Notice of Bar Dates, and (C) Granting Related Relief* entered on June 25, 2009 by the Bankruptcy Court.

13. "Business Day" means any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

14. "Cash" means currency of the United States of America and cash equivalents, including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire transfers and other similar forms of payment.

15. "Chapter 11 Cases" means the cases commenced under chapter 11 of the Bankruptcy Code by each of the Debtors on the Petition Date and pending before the Bankruptcy Court.

16. "Claim" means any claim against the Debtors, or any of them, within the meaning of section 101(5) of the Bankruptcy Code that is not an Administrative Expense or Superpriority Claim, including, without limitation, claims of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

17. "Claims Agent" means Omni Management Group, in its capacity as claims agent for the Debtors.

18. "Class" means each category of Claims or Interests classified in Section IV of the Committee's Plan pursuant to section 1122 of the Bankruptcy Code.

19. "Collateral Trustee" means U.S. Bank, National Association, in its capacity as collateral trustee under the Collateral Trust Agreement dated as of December 23, 2004, by and among the Agent, the Second Lien Noteholder Trustee and the Collateral Trustee.

20. "Committee's Disclosure Statement" means the *Disclosure Statement in Support of Chapter 11 Plan of Reorganization Proposed by the Official Committee of Unsecured Creditors of MagnaChip Semiconductor Finance Company*, as may be amended, modified, or supplemented from time to time in accordance with the terms hereof, submitted pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of the Committee's Plan.

21. "Committee's Plan" means this Plan of Reorganization for the Debtors.

22. "Confirmation" means the approval by the Bankruptcy Court of the Committee's Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code, as effectuated by the entry of the Confirmation Order.

23. "Confirmation Date" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 11 Cases.

24.     "Confirmation Hearing" means the date or dates established by the Bankruptcy Court for the hearing(s) on confirmation of the Committee's Plan pursuant to section 1129 of the Bankruptcy Code, as it may be adjourned or continued from time to time.

25.     "Confirmation Order" means the order entered by the Bankruptcy Court confirming (approving) the Committee's Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code, in form and substance acceptable to the Creditors' Committee and the Backstop Purchaser.

26.     "Consummation" means substantial consummation of the Committee's Plan as that term is used in section 1127(b) of the Bankruptcy Code.

27.     "Creditor" means any Person who is the Holder of a Claim, Administrative Expense, or Superpriority Claim against any of the Debtors.

28.     "Creditors' Committee" means the official committee of unsecured creditors of the Debtors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code. The Creditors' Committee is comprised of the following entities: Avenue Special Situations Fund V, L.P.; Bank of New York Mellon; and Law Debenture Corporation.

29.     "Debtors" means (i) Finco; (ii) LLC; (iii) Holdco; (iv) MSA; (v) Luxco; and (vi) Dutchco; in their corporate capacities, other capacities and, as appropriate, in their capacities as debtors and debtors in possession under chapter 11 of the Bankruptcy Code in their Chapter 11 Cases and, when the context so requires, in their capacities as the Reorganized Debtors.

30.     "Deficiency Claims" means, with respect to any Claim secured by a valid Lien on any property of any Debtor having a value of less than the amount of such Claim (after taking into account other Liens of higher priority on such property), the portion of such Claim equal to the difference between (a) the amount of the Claim and (b) the Allowed amount of the secured portion of such Claim (which Allowed secured amount may be set pursuant to the Committee's Plan).

31.     "Disallowed" means, with respect to a Claim, Interest, or Administrative Expense, all or a portion thereof that it is determined is not allowed under the Bankruptcy Code either by a Final Order, the Committee's Plan, any Plan Document or under a stipulation or settlement with any of the Debtors entered into after the Effective Date.

32.      "Disputed Claim" means (i) a Claim, Interest, or Administrative Expense that is subject to a pending objection or for which the Bankruptcy Court's order allowing or disallowing such Claim, Interest, or Administrative Expense is on appeal; or (ii) until the Objection Deadline,

a.     a Claim for which a corresponding Claim has not been listed in the Debtors' Schedules or for which the corresponding Claim is listed in the Debtors' Schedules with a differing amount (to the extent of such difference), with a differing classification, or as disputed, contingent, or unliquidated; and

b.      a Claim that has not been Allowed either by a Final Order, the Committee's Plan, any Plan Document, or under a stipulation or settlement with any of the Debtors entered into' after the Effective Date.

33.      "Distributable Cash and Claims" means, as to each Debtor, any Cash, deposit accounts, reserves, and deposits remaining in the Estate of such Debtor as of the Effective Date, together with any Retained Rights of Action of such Debtor (including Intercompany Claims against Non-Debtor Subsidiaries), but excluding other real and personal property of such Debtor.

34.      "Dutchco" means MagnaChip Semiconductor B.V., a company incorporated in the Netherlands.

35.      "Effective Date" means the first Business Day after the Confirmation Date immediately following the first day upon which all of the conditions to the occurrence of the Effective Date have been satisfied or waived in accordance with the Committee's Plan.

36.      "Eligible Holder" means a holder of a Second Lien Noteholder Claim as of the Offering Record Date who is an Accredited Investor.

37.      "Entity" and "Entities" mean an entity as defined in section 101(5) of the Bankruptcy Code or more than one thereof.

38.      "Estate(s)" means each estate created pursuant to section 541(a) of the Bankruptcy Code upon the commencement of each Chapter 11 Case.

39.      "Fee Applications" mean applications of Professional Persons under sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Chapter 11 Cases.

40.      "Fee Claims" means Administrative Expenses for compensation and reimbursement of expenses of professionals to the extent allowable under sections 327, 328, 330(a), 331, 503(b) or 1103 of the Bankruptcy Code.

41.      "File" or "Filed" means filed of record and entered on the docket in the Chapter 11 Cases or, in the case of a proof of Claim, delivered to the Claims Agent.

42.      "Final Cash Collateral Order" means the *Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code Authorizing the Use of Cash Collateral Pursuant to the Enforcement Agreement and Granting Adequate Protection to First Lien Lenders and Second Lien Noteholders*, entered by the Bankruptcy Court in the Chapter 11 Cases on July 13, 2009.

43.      "Final Allocation" means with respect to any Offering Participant that has elected to exercise its Rights, such holder's Pro Rata Share of the Rights after taking into account the Minimum Allocation.

44.      "Final Order" means a judgment, order, ruling, or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal, which judgment, order, ruling, or other decree has not been reversed, stayed, modified, or amended and as to

which (a) the time to appeal or petition for review, rehearing, or certiorari has expired and as to which no appeal or petition for review, rehearing or certiorari is pending; or (b) any appeal or petition for review, rehearing, or certiorari has been finally decided and no further appeal or petition for review, rehearing, or certiorari can be taken or granted.

45.     "Final Resolution Date" means the date on which all Disputed Claims of Creditors shall have been resolved by Final Order or otherwise finally determined.

46.     "Finco" means MagnaChip Semiconductor Finance Company, a Delaware corporation.

47.     "First Lien Credit Agreement" means that Credit Agreement, dated as of December 23, 2004, by and among the First Lien Lender Parties; Luxco and Finco, as borrowers; and the First Lien Guarantors; and any ancillary documents issued in connection therewith or related thereto.

48.     "First Lien Guarantee" means the guarantee by the First Lien Guarantors of the obligations of the First Lien Lender Parties, Luxco and Finco under the First Lien Credit Agreement.

49.     "First Lien Guarantors" means LLC; Dutchco; MSK; Holdco; MagnaChip Semiconductor Limited, a company incorporated in the United Kingdom; MagnaChip Semiconductor Holding Company Limited, a British Virgin Islands company; MagnaChip Semiconductor Inc., a company incorporated in Japan; MagnaChip Semiconductor Limited, a company incorporated in Hong Kong SAR; MagnaChip Semiconductor Limited, a company incorporated in Taiwan; and MSA.

50.     "First Lien Lender" means a "Lender" under and as defined in the First Lien Credit Agreement.

51.     "First Lien Lender Parties" means the Agent, the First Lien Lenders, UBS Securities LLC, as Arranger, Syndication Agent and Documentation Agent, UBS Loan Finance LLC, as Swingline Lender, and Korea Exchange Bank, as Issuing Bank.

52.     "First Lien Lender Secured Claims" means the Secured Claims, including accrued and unpaid interest, fees and costs, of the First Lien Lender Parties arising under, in connection with or pursuant to the First Lien Credit Agreement and the Final Cash Collateral Order and all other documents, instruments, guarantees and other agreements related to either thereof.

53.     "General Unsecured Claim" means a Claim against any of the Debtors other than (a) an Administrative Expense, (b) a Superpriority Claim, (c) a Tax Claim, (d) a Priority Non-Tax Claim, (e) an Other Secured Claim, (f) a First Lien Lender Secured Claim, (g) a Second Lien Noteholder Claim, (h) a Subordinated Note Claim, and (i) an Intercompany Claim.  General Unsecured Claims include, without limitation, and any Deficiency Claim of the First Lien Lender Parties.

54.     "Holdco" means MagnaChip Semiconductor SA Holdings LLC, a Delaware limited liability company.

55. "Holder" means the beneficial owner of any Claim, Interest, Administrative Expense, or Superpriority Claim.

56. "Impaired" has the meaning set forth in section 1124 of the Bankruptcy Code.

57. "Indenture Trustee Fees and Expenses" means any and all fees, expenses, disbursements and advances of each Indenture Trustee (and its counsel, agents and advisors) that are provided for under the Second Lien Notes Indenture and the Subordinated Note Indenture (including, without limitation, in connection with service on the Creditors' Committee and in connection with distributions under the Committee's Plan), which are incurred at any time prior to or after the Effective Date.

58. "Intercompany Claim" means any Claim or Administrative Claim asserted against a Debtor or Non-Debtor Affiliate by any other Debtor or Non-Debtor Affiliate, including, without limitation, any subrogation claim that has not been waived and any contribution claim.

59. "Intercreditor Agreement" means that certain intercreditor agreement dated as of December 23, 2004, among Luxco, Finco, the First Lien Guarantors, the Agent, the Second Lien Noteholder Trustee, the Second Lien Collateral Agent and the Collateral Trustee.

60. "Interest" means an equity security of any Debtor within the meaning of section 101(16) of the Bankruptcy Code.

61. "Korean Guarantee" means the guarantee by MSK of Luxco's and Finco's obligations under the Second Lien Indenture and the notes executed pursuant to the Second Lien Indenture.

62. "Lenders" means, collectively, the First Lien Lenders and the Second Lien Noteholders.

63. "Lien" means any charge against or security interest in property to secure payment or performance of a Claim, debt, or obligation, against Debtor or Non-Debtor Subsidiaries.

64. "LLC" means MagnaChip Semiconductor LLC, a Delaware limited liability company.

65. "Long-Term Incentive Plan" means an incentive Plan for management, selected employees and directors of the Reorganized Debtors, the terms of which are described in Article VI.G.4 of the Committee' Plan.

66. "Luxco" means MagnaChip Semiconductor S.A., a *société anonyme* and organized under the laws of Luxembourg.

67. "Minimum Allocation" means 67% of the New Common Unit that is issued pursuant to the Offering.

68. "MSA" means MagnaChip Semiconductor, Inc., a California corporation.

69.     "MSK" means MagnaChip Semiconductor, Ltd., a Korean limited liability company.

70.     "New Term Loan" means the new secured term loan to be issued on the Effective Date in the initial aggregate amount of $0-$61.75 million, the material terms of which are set forth on Schedule 1 of the Committee's Plan. The amount of the New Term Loan will be filed on the Effective Date and will be based upon the elections of the First Lien Lenders pursuant to Section IV.B.3.6. hereof.

71.     "New Common Units" means the common units of LLC to be issued on the Effective Date pursuant to the Committee's Plan.

72.     "Non-Debtor Subsidiaries" means MSK, MagnaChip Semiconductor Limited (Hong Kong), MagnaChip Semiconductor Inc. (Japan), MagnaChip Semiconductor Limited (Taiwan), MagnaChip Semiconductor Limited (U.K.), MagnaChip Semiconductor Holding Company Limited, a company incorporated under the laws of the British Virgin Islands, and MagnaChip Semiconductor (Shanghai) Company Limited, a Chinese corporation.

73.     "Non-Korean Guarantors" means all First Lien Guarantors other than MSK.

74.     "Objection Deadline" means the deadline to object to Claims specified in Article IX(A) of the Committee's Plan.

75.     "Offering" means the offering of $35 million in aggregate New Common Units, (i) on a pro rata basis to each Eligible Holder of Second Lien Noteholder Claims and (ii) to the extent less than the full Offering Amount is issued to the Eligible Holders of Second Lien Noteholder Claim, to the Backstop Purchaser; provided, however, that the Backstop Purchaser shall receive the Minimum Allocation of the Offering Amount pursuant to the Offering; provided, further, that the Offering shall be subject to the New Common Units issued to the Backstop Purchaser for the Standby Commitment Fee and the Long-Term Incentive Plan.  The Offering will only be made to accredited investors in a fashion that will be exempt from registration under the Securities Act of 1933.

76.     "Offering Amount" means $35 million.

77.     "Offering Participant" means an Eligible Holder of a Second Lien Noteholder Claim as of the Offering Record Date, including the Backstop Purchaser.

78.      "Offering Procedures" means those certain rights offering procedures, setting forth the terms and conditions of the Offering, as more fully described in Article VI(D) hereof.

79.     "Offering Pro Rata Share" means with respect to the Subscription Rights of each Offering Participant, the ratio (expressed as a percentage) of such participant's Offering Participation Claim Amount to the aggregate amount of all Offering Participation Claim Amounts, determined as of the Subscription Expiration Date.

80.      "Offering Record Date" means the Confirmation Date.

81. "Other Secured Claim" means any Secured Claim other than a First Lien Lender Secured Claim or a Second Lien Noteholder Claim.

82. "PECs" means preferred equity certificates to be issued by Luxco in an amount and upon terms that are similar to the terms of the Second Lien Notes and the Subordinated Notes but without guarantees or Liens being granted by any Person.

83. "Per Unit Price" means the price per Unit for each New Common Unit purchased in the Offering.

84. "Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit, or other entity of whatever nature.

85. "Petition Date" means June 12, 2009, the date on which each of the Debtors Filed their petitions for relief under chapter 11 of the Bankruptcy Code.

86. "Plan Documents" means the Committee's Plan, the Disclosure Statement, and all exhibits and schedules to either of the foregoing.

87. "Plan Expenses" means the expenses incurred by the Reorganized Debtors following the Effective Date (including the reasonable fees and costs of attorneys and other professionals) for the purpose of (i) resolving Disputed Claims, if any, and effectuating distributions to Creditors under the Committee's Plan, (ii) otherwise implementing the Committee's Plan and closing the Chapter 11 Cases, or (iii) undertaking any other matter relating to the Committee's Plan.

88. "Plan Proponent" means the Creditors' Committee.

89. "Plan Supplement" means the supplement or supplements to the Committee's Plan containing certain documents relevant to the implementation of the Committee's Plan specified in section XIV.9 of the Committee's Plan; provided, however, that the Committee's Plan Supplement and the documents contained therein shall be in form, scope and substance satisfactory to the Backstop Purchaser.

90. "Postconfirmation Board" means the board of directors of the Reorganized Debtors which shall be disclosed in the Committee's Plan Supplement and acceptable to the Backstop Purchaser.

91. "Postconfirmation Organizational Documents" means the certificate of formation, limited liability company agreement, certificate of incorporation, bylaws, and other organizational documents for the Reorganized Debtors, the forms of which shall be reasonably satisfactory to the Backstop Purchaser and consistent with Section 1123(a)(6) of the Bankruptcy Code. The Postconfirmation Organizational Documents shall be included in the Committee's Plan Supplement.

92. "Priority Claim Distributions" shall mean distributions on account of all unpaid Allowed Tax Claims and Priority Non-Tax Claims as required by the Committee's Plan.

93. "Priority Non-Tax Claim" means any Claim, other than a Tax Claim, to the extent entitled to priority under section 507(a) of the Bankruptcy Code.

94. "Pro Rata" means proportionately, so that with respect to any distribution, the ratio of (a) (i) the amount of property to be actually or theoretically distributed on account of a particular Claim and/or Interest or particular group of Claims and/or Interests to (ii) the amount of such particular Claim and/or Interest or group of Claims and/or Interests, is the same as the ratio of (b) (i) the amount of property to be actually or theoretically distributed on account of all Claims and/or Interests or groups of Claims and/or Interests sharing in such distribution to (ii) the amount of all Claims and/or Interests or groups of Claims and/or Interests sharing in such distribution.

95. "Professional Person" shall mean Persons retained or to be compensated pursuant to sections 326, 327, 328, 330, 503(b), and 1103 of the Bankruptcy Code.

96. "Record Date" means the Effective Date.

97. "Released Parties" means the parties described in Article X(C) of the Committee's Plan.

98. "Reorganized Debtors" means all or each of the Debtors from and after the Effective Date.

99. "Representative" means, as to the referenced Person, such Person's present and former officers, directors, shareholders, trustees, partners and partnerships, members, agents, employees, representatives, professionals, and successors or assigns, in each case solely in their capacity as such.

100. "Restructuring Transactions" means those transactions described in Article VI(A) of the Committee's Plan.

101. "Reorganized Debtors" means all or each of the Debtors from and after the Effective Date.

102. "Retained Rights of Action" means all Rights of Action belonging to any of the Estates as of the Effective Date, other than those Rights of Action specifically released under the Committee's Plan, including Avoidance Claims released pursuant to Article IX(C) hereof.

103. "Rights of Action" means any and all claims, demands, rights, defenses, actions, causes of action, suits, contracts, agreements, obligations, accounts, defenses, offsets, powers and privileges of any kind or character whatsoever, known or unknown, suspected or unsuspected, whether arising prior to, on, or after the Petition Date, in contract or in tort, at law or in equity, or under any other theory of law, held by any Person against any other Person.

104. "Schedules" means the schedules Filed by the Debtors with the clerk of the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been or may be amended from time to time.

105.    "Second Lien Collateral Agent" means The Bank of New York Mellon, As successor to The Bank of New York, in its capacity as "Parity Lien Collateral Agent" as defined in the Second Lien Indenture.

106.    "Second Lien Guarantees" means the guarantees by the Second Lien Guarantors of Luxco's and Finco's obligations under the Second Lien Indenture and the notes executed pursuant to the Second Lien Indenture.

107.    "Second Lien Guarantors" means the Non-Korean Guarantors and MSK.

108.    "Second Lien Indenture" means that certain Indenture, dated as of December 23, 2004, providing for the issuance of *Floating Rate Second Priority Senior Secured Notes due 2011 and 6 7/8% Second Priority Senior Secured Notes due 2011*, by and among the Second Lien Noteholder Trustee; the Collateral Trustee; Luxco and Finco, as issuers, and the Second Lien Guarantors.

109.    "Second Lien Notes" means the senior secured notes issued under the Second Lien Indenture.

110.    "Second Lien Noteholder Claim" means the Claims of the Second Lien Noteholder Trustee and the Second Lien Noteholders arising under, in connection with or pursuant to the Second Lien Indenture, the Final Cash Collateral Order and all other documents, instruments, guarantees and agreements related to either thereof.

111.    "Second Lien Noteholder Distribution" means the distribution made to Holders of Second Lien Noteholder Claims pursuant to Article IV(B)(4) of the Committee's Plan.

112.    "Second Lien Noteholder Trustee" means Bank of New York, as trustee under the Second Lien Indenture.

113.    "Second Lien Noteholders" means the "Holders" under and as defined in the Second Lien Indenture.

114.    "Secured Claim" means any Claim of any Person that is secured by a Lien on property in which any of the Debtors or the Estates has an interest, which Lien is valid, perfected, and enforceable under applicable law or by reason of a Final Order, or that is subject to setoff under section 553 of the Bankruptcy Code, but only to the extent of the value, as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code, of any interest of the claimant in the property of the Estate securing such Claim or subject to setoff.

115.    "Standby Commitment Fee" means the 10% of the New Common Units to be issued to the Backstop Purchaser pursuant to and in accordance with the terms of the Backstop Commitment Agreement.

116.    "Subordinated Note Claim" means any Claim of the Subordinated Note Trustee or any Subordinated Noteholder arising under, in connection with or pursuant to the Subordinated Note Indenture and any documents, instruments or agreements related thereto.

117. "Subordinated Note Distribution" means the distribution, which shall be gifted by the Holders of Second Lien Noteholder Claims, to the Holders of Subordinated Note Claims pursuant to Article IV(B)(6) of the Committee's Plan.

118. "Subordinated Note Guarantors" means the Non-Korean Guarantors.

119. "Subordinated Note Guarantees" means the guarantees by the Subordinated Note Guarantors of Luxco's and Finco's obligations under the Subordinated Note Indenture and the notes executed pursuant to the Subordinated Note Indenture.

120. "Subordinated Note Indenture" means that certain Indenture dated as of December 23, 2004, providing for the issuance of *8% Senior Subordinated Notes due 2014*, by and among Luxco and Finco, as issuers; the Subordinated Note Trustee; and the Subordinated Note Guarantors.

121. "Subordinated Note Trustee" means Law Debenture Corporation, as trustee under the Subordinated Note Indenture.

122. "Subordinated Notes" means the senior subordinated notes issued under the Subordinated Note Indenture.

123. "Subordinated Noteholder" means each "Holder" under and as defined in the Subordinated Note Indenture.

124. "Subscription Agent" means Omni Management Group, LLC, in its capacity as a subscription agent in connection with the Offering.

125. "Subscription Commencement Date" means the date on which Subscription Forms are mailed to Holders of Second Lien Noteholder Claims, which date shall be no sooner than the Confirmation Date.

126. "Subscription Expiration Date" means the date set forth in the Subscription Form as the expiration date for the Offering, which date shall be no later than one Business Days prior to the Effective Date, subject to the Creditor's Committee's right to extend such date, and which shall be the final date by which an Offering Participant may elect to subscribe to the Offering.

127. "Subscription Form" means the form to be used by an Offering Participant pursuant to which such holder may exercise such Subscription Rights, which shall be in form and substance acceptable to the Creditors' Committee.

128. "Subscription Purchase Price" means, for each Offering Participant, such Offering Participant's Final Allocation multiplied by the Per Unit Price, with the amount of New Common Units such Offering Participant is entitled to subscribe for being subject to rounding as provided in section D.9 of this Plan.

129. "Subscription Rights" means the non-transferable, non-certified subscription rights to purchase New Common Units in connection with the Offering on the terms and subject to the conditions set forth in Article VI(D) of the Committee's Plan.

130. "Superpriority Claims" means administrative expenses with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(b), 726, 1113 and 1114.

131. "Tax" means any tax, charge, fee, levy, impost, or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation, and withholding tax. "Tax" shall include any interest or additions attributable to, imposed on or with respect to such assessments.

132. "Tax Claim" means any Claim for any Tax to the extent that it is entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

133. "Tax Code" means the Internal Revenue Code of 1986, as amended.

134. "Timely Filed" means, with respect to a Claim, Interest, or Administrative Expense, that a proof of such Claim or Interest or request for payment of such Administrative Expense was Filed with the Bankruptcy Court or the Claims Agent, as applicable, within such applicable period of time fixed by the Committee's Plan, statute, or pursuant to both Bankruptcy Rule 3003(c)(3) and a Final Order (e.g., the Bar Date).

135. "Unclaimed Property" means all Cash deemed to be "Unclaimed Property" pursuant to Article VIII(E) of the Committee's Plan.

136. "Unimpaired" means, with respect to a Class of Claims or Interests, not Impaired, as defined in Section 1124 of the Bankruptcy Code.

137. "Unsubscribed Units" means those New Common Units to be issued in connection with the Offering that are not subscribed for pursuant to the Offering prior to the Subscription Expiration Date.

138. "Warrants" means the warrants described in Article IV(B)(6) of the Committee's Plan.

**III.**
**TREATMENT OF ADMINISTRATIVE EXPENSES AND TAX CLAIMS**

## A.    Introduction

As required by the Bankruptcy Code, Administrative Expenses, Superpriority Claims, and Tax Claims are not placed into voting Classes. Instead, they are left unclassified, are not considered Impaired, do not vote on the Committee's Plan, and receive treatment specified by statute or agreement of the parties. All postpetition payments by or on behalf of any of the Debtors in respect of an Administrative Expense or Tax Claim shall either reduce the Allowed amount thereof or reduce the amount to be paid under the Committee's Plan in respect of any Allowed amount thereof; and, unless the Bankruptcy Court has specified otherwise prior to

Confirmation, the Debtors or the Reorganized Debtors shall, in their sole and absolute discretion, determine which such method of application to employ.

**B.**       <u>Administrative Expenses</u>

Under the Committee's Plan, on the Effective Date, each Holder of an Allowed Administrative Expense will receive, in full satisfaction, settlement and release of such Allowed Administrative Expense, Cash equal to the full amount of such Allowed Administrative Expense, unless such Holder and any of the Debtors have mutually agreed in writing to other terms, or an order of the Bankruptcy Court provides for other terms; provided, however, that (a) requests for payment of all Administrative Expenses must be filed and served as described in Article XIV(B)(3) of the Committee's Plan, and (b) certain different and additional requirements shall apply to the Administrative Expenses that are Fee Claims as set forth in Article XIV(B)(2) of the Committee's Plan.

**C.**       <u>Superpriority Claims</u>

No distributions to the First Lien Lender Parties shall be made on account of any Superpriority Claims except as set forth in Article IV(B)(3) of the Committee's Plan.

**D.**       <u>Tax Claims</u>

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Tax Claims are not to be classified and thus Holders of Tax Claims are not entitled to vote to accept or reject the Committee's Plan.

As required by section 1129(a)(9) of the Bankruptcy Code, on or as soon as practicable after the Effective Date, each Holder of an Allowed Tax Claim against any of the Debtors will receive, at the sole option of the Debtors or the Reorganized Debtors, (i) on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to such Allowed Tax Claim or, (ii) commencing on the Effective Date, or as soon thereafter as is practicable, and continuing over a period not exceeding five (5) years from and after the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Tax Claim, together with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law as of the calendar month in which the Plan is confirmed, subject to the sole option of the Debtors or Reorganized Debtors to prepay the entire amount of the Allowed Tax Claim. Any Allowed Tax Claim (or portion thereof) not yet due and payable as of the Effective Date will be paid by the Reorganized Debtors in the ordinary course of business as such obligations become due. Any Holder of an Allowed Tax Claim may agree to accept different treatment as to which the Debtors and such Holder have agreed upon in writing.

## IV.
## CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**A.**       <u>Summary</u>

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation and distribution pursuant to the Committee's Plan and

pursuant to sections 1122 and 1123(a)(l) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies with the description of that Class and is classified in other Classes only to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

In accordance with section 1122 of the Bankruptcy Code, the Committee's Plan provides for the classification of seven Classes of Claims and/or Interests against each Debtor. For purposes of voting and distribution, each Debtor will be assigned a subclass of each Class as follows: (A) LLC; (B) Holdco; (C) MSA; (D) Luxco; (E) Finco; and (F) Dutchco. Administrative Expenses, Superpriority Claims and Tax Claims have not been classified and are excluded from the following Classes in accordance with section 1123(a)(I) of the Bankruptcy Code.

**B.**      **Classification and Treatment of Claims and Interests**

The treatment of each Class of Claims and/or Interests is set forth below. Unless the Bankruptcy Court has specified otherwise prior to Confirmation, the Debtors shall, in their sole and absolute discretion, determine whether a postpetition payment by or on behalf of any of the Debtors in respect of a Claim either (x) shall reduce the Allowed amount thereof or (y) shall reduce the amount to be paid under the Committee's Plan in respect of any Allowed amount thereof.

     **1.**      **Class 1 (A-F) –Priority Non-Tax Claims**

         a.      Classification: Classes 1 (A-F) consist of all Priority Non-Tax Claims against any of the Debtors.

         b.      Treatment: The Holder of each Priority Non-Tax Claim shall receive, in full satisfaction, settlement and release of such Priority Non-Tax Claim, a Cash payment equal to the Allowed amount of such Claim on or as soon as practicable after the later of the Effective Date or the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim. Any Holder of a Priority Non-Tax Claim may agree to accept different treatment as to which the Debtors and such Holder have agreed upon in writing.

         c.      Impairment/Voting: Classes 1 (A-F) are impaired. Holders of Class 1 (A-F) Claims therefore are therefore entitled to vote to accept or reject the Committee's Plan.

     **2.**      **Class 2 (A-F) – Other Secured Claims**

         a.      Classification: Classes 2 (A-F) consist of all Other Secured Claims (if any such Claims exist) against any of the Debtors.

         b.      Treatment: Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, at the sole option of the Debtors or the Reorganized Debtors, (i) on the Effective Date or as soon thereafter as is practicable, each

Allowed Other Secured Claim shall be reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

      c.    <u>Impairment Voting</u>:  Classes 2 (A-F) are impaired.  Holders of Class 2 (A-F) Claims are therefore entitled to vote to accept or reject the Committee's Plan.

    **3.**    <u>**Class 3 (A-F) – First Lien Lender Secured Claims**</u>

      a.    <u>Classification</u>:  Classes 3 (A-F) consist of the First Lien Lender Secured Claims against any of the Debtors.

      b.    <u>Treatment</u>:  On the Effective Date, in connection with the enforcement of the First Lien Lender Secured Claims, each First Lien Lender Party shall receive a Cash payment equal to 35% of its First Lien Lender Secured Claim, plus its Pro Rata share of the New Term Loan, in full and complete satisfaction of such First Lien Lender Secured Claim.  All distributions to the First Lien Lender Parties under the Committee's Plan shall be effectuated through the Agent.  The Liens securing the First Lien Lender Secured Claims will remain in effect and will secure the New Term Loan.  The First Lien Lender Secured Claims, together with any Deficiency Claims of the First Lien Lender Parties, are deemed Allowed in the full amount reflected on the Agent's books and records as of the Record Date.

      c.    <u>Impairment/Voting</u>:  Classes 3 (A-F) are Impaired.  Holders of Class 3 (A-F) Claims are therefore entitled to vote to accept or reject the Committee's Plan.

    **4.**    <u>**Classes 4 (A-F) – Second Lien Noteholder Claims**</u>

      a.    <u>Classification</u>:  Classes 4 (A-F) consist of the Second Lien Noteholder Claims against any of the Debtors.

      b.    <u>Treatment</u>:  On the Effective Date, in full and complete satisfaction of its Second Lien Noteholder Claim, each Second Lien Noteholder shall receive its Pro Rata share of 5% of the New Common Units, subject to dilution on account of the Long-Term Incentive Plan. The Second Lien Noteholder Claims will be exchanged for the New Common Units in LLC and LLC will then receive PECs from Luxco in exchange for the cancellation of such Second Lien Noteholder Claims.  In addition, each Eligible Holder of a Second Lien Noteholder Claim shall be entitled to participate in the Offering pursuant to the terms of the Offering Procedures. However, to the extent that the Offering Participants do not exercise the Subscription Rights by the Effective Date, the Backstop Purchaser, subject to the terms and conditions of the Backstop

Commitment Agreement, shall subscribe for and purchase all Unsubscribed Units as of the Subscription Expiration Date.

Notwithstanding anything contained in the Committee's Plan, as described above, only Accredited Investors that are holders of Second Lien Noteholder Claims will be entitled to participate in the Offering. No payment in lieu of the Subscription Rights will be made to any holder of a Second Lien Noteholder Claim that is not an Accredited Investor and therefore unable to subscribe for New Common Units pursuant to the Offering.

Notwithstanding the foregoing, the Reorganized Debtors shall pay, on or as soon as reasonably practicable after the Effective Date, all Indenture Trustee Fees and Expenses arising under the Second Lien Notes Indenture, in full in Cash, without application to or approval of the Bankruptcy Court. All distributions to the Second Lien Noteholders under the Committee's Plan, except in connection with the Offering, shall be effectuated though the Second Lien Noteholder Trustee (*i.e.*, the Reorganized Debtors shall distribute the portion of the New Common Units payable to the Second Lien Noteholders to the Second Lien Noteholder Trustee and the Second Lien Noteholder Trustee shall make proportionate distributions thereof to the Second Lien Noteholders). Pursuant to section 5.1(a)(2) of the Intercreditor Agreement, the existing Liens securing the Second Lien Noteholder Claims shall be released and extinguished effective as of the Effective Date and of no further force or effect. Notwithstanding any subordination or intercreditor agreement applicable under nonbankruptcy law, the Holders of Second Lien Noteholder Claims shall receive the Second Lien Noteholder Distribution as described herein. In addition, the distributions to Holders of Second Lien Noteholder Claims and the surrender of Second Lien Notes by Luxco to the Second Lien Noteholder Trustee, as described in Article VIII.I herein, shall constitute a satisfaction and discharge of the Second Lien Indenture pursuant to section 12.05(d) of the Second Lien Indenture.

Impairment/Voting: Classes 4 (A-F) are Impaired. Holders of Class 4 (A-F) Claims are therefore entitled to vote to accept or reject the Committee's Plan.

### 5. Class 5 (A-F) – General Unsecured Claims

a. Classification: Classes 5 (A-F) consist of the General Unsecured Claims against any of the Debtors.

b. Treatment: The Holder of each Class 5 (A-F) Claim shall receive, as a gift from the Holders of Second Lien Noteholder Claims, in full satisfaction, settlement and release of such Class 5 (A-F) Claim, a Cash payment equal to 10% of the Allowed amount of such Claim on or as soon as practicable after the later of the Effective Date or the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim; provided, however, that the aggregate Cash payments to Holders of Class 5 (A-F) Claims shall not exceed $324,000. Any Holder of a Class 5 (A-F) Claim may agree to accept different treatment as to which the Debtors and such Holder have agreed upon in writing.

c. Impairment/Voting: Classes 5 (A-F) are Impaired. Holders of Class 5 (A-F) Claims are therefore entitled to vote to accept or reject the Committee's Plan.

6. **Class 6 (A-F) – Subordinated Note Claims**

a. **Classification**:  Classes 6 (A-F) consist of the Subordinated Note Claims against any of the Debtors.

Treatment:  On the Effective Date, in connection with the enforcement of the Subordinated Note Claims, each Subordinated Noteholder shall receive, as a gift from the Second Lien Noteholders, (i) its Pro Rata share of 1% of the New Common Units, subject to dilution on account of the Long-Term Incentive Plan, and (ii) warrants to purchase 5% of the New Common Units with a strike price equivalent to a $600 million total enterprise value, in full and complete satisfaction of such Subordinated Noteholder Claim.  The Subordinated Noteholder Claims will be exchanged for the New Common Units and Warrants in LLC and LLC will then receive PECs from Luxco in exchange for the cancellation of such Subordinated Noteholder Claims.

Notwithstanding the foregoing, the Reorganized Debtors shall pay, on or as soon as reasonably practicable after the Effective Date, all Indenture Trustee Fees and Expenses arising under the Subordinated Notes Indenture, in full in Cash, without application to or approval of the Bankruptcy Court.  Notwithstanding any subordination or intercreditor agreement applicable under nonbankruptcy law, the Holders of Subordinated Note Claims shall receive the Subordinated Note Distribution as described herein as a gift from the Second Lien Noteholders. In addition, the distributions to holders of Subordinated Note Claims and the surrender of Subordinated Notes by Luxco to the Subordinated Note Trustee, as described in Article VIII.I herein, shall constitute a satisfaction and discharge of the Subordinated Note Indenture under section 12.05(d) of the Subordinated Note Indenture.

b. **Impairment/Voting**:  Class 6 is Impaired.  Holders of Class 6 Claims are therefore entitled to vote to accept or reject the Committee's Plan.

7. **Class 7 (A-F) – Intercompany Claims against the Debtors**

a. **Classification**:  Classes 7 (A-F) consist of Intercompany Claims of Debtors and Non-Debtor Subsidiaries against the Debtors.

b. **Treatment**:  Notwithstanding anything to the contrary herein, Intercompany Claims, at the election of the Reorganized Debtors, shall be (i) adjusted, released, waived and/or discharged as of the Effective Date, (ii) contributed to the capital of the obligor, or (iii) reinstated and left Unimpaired; provided, however, that Intercompany Claims of the Debtors, the Non-Debtor Subsidiaries, and the Reorganized Debtors shall at all times remain subordinated to the security interests of the holders of the New Term Loan.

c. **Impairment/Voting**:  Classes 7 (A-F) are Impaired.  Because Holders of Class 7 (A-F) Claims receive no recovery on account of such Claims under the Committee's Plan, they are conclusively presumed to reject the Committee's Plan.

8. **Class 8 (A-F) – Interests in the Debtors**

a. **Classification**:  Classes 8 (A-F) consist of Interests in the Debtors.

    b.  <u>Treatment</u>:  Holders of Interests in the Debtors shall receive no distributions or recoveries on account of such Interests and Interests on account of LLC shall be extinguished on the Effective Date.  Interests of each Debtor, other than LLC, will continue to exist and not be extinguished.

    c.  <u>Impairment/Voting</u>:  Classes 8 (A-F) are Impaired.  Because Holders of Interests in Class 8 (A-F) receive no recovery on account of such Interests under the Committee's Plan, they are conclusively presumed to reject the Committee's Plan.

**V.**
**ACCEPTANCE OR REJECTION OF PLAN**

**A.**  **<u>Identification of Classes</u>**

   **1.**  **<u>Class 1 (A-F) – Priority Non-Tax Claims</u>**

   **2.**  **<u>Class 2 (A-F) – Other Secured Claims</u>**

   **3.**  **<u>Class 3 (A-F) – First Lien Lender Secured Claims</u>**

   **4.**  **<u>Class 4 (A-F) – Second Lien Noteholder Claims</u>**

   **5.**  **<u>Class 5 (A-F) – General Unsecured Claims</u>**

   **6.**  **<u>Class 6 (A-F) – Subordinated Note Claims</u>**

   **7.**  **<u>Class 7 (A-F) – Intercompany Claims against the Debtors</u>**

   **8.**  **<u>Class 8 (A-F) – Interests in the Debtors</u>**

**B.**  **<u>Classes Permitted and Not Permitted to Vote</u>**

   Classes 3, 4, 5, 6, 7 and 8 are Impaired.  Holders of Claims in Classes 3, 4, 5 and 6 are permitted to vote to accept or reject the Committee's Plan.  Holders of Class 7 Claims and Holders of Class 8 Interests are conclusively presumed to reject the Committee's Plan.  Holders of Class 1 Claims and Class 2 Claims are conclusively presumed to accept the Committee's Plan.  An Impaired Class of Claims that votes shall have accepted the Committee's Plan if (a) the Holders (other than any Holder designated by the Bankruptcy Court based on their vote or its solicitation not being in good faith under Bankruptcy Code section 1126(e)) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Committee's Plan and (b) the Holders (other than any Holder designated under Bankruptcy Code section 1126(e)) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Committee's Plan.

**C.**  **<u>Nonconsensual Confirmation</u>**

   In the event any Class of Claims votes to reject the Committee's Plan, the Creditors' Committee intends to request that the Bankruptcy Court confirm the Committee's Plan

notwithstanding such rejection pursuant to section 1129(b) of the Bankruptcy Code on the basis that the Committee's Plan is fair and equitable and does not discriminate unfairly as to the Holders of any Class of Claims.

### D. Postpetition Interest

Except as set forth in the Final Cash Collateral Order, nothing in the Committee's Plan or the Disclosure Statement shall be deemed to entitle the Holder of a Claim to receive from any Debtor any postpetition interest on account of such Claim.

## VI.
## MEANS FOR IMPLEMENTATION OF THE PLAN

### A. Restructuring and Other Transactions

#### 1. Intercompany Claims and Interests in Subsidiaries

Notwithstanding anything to the contrary herein, Intercompany Claims will be adjusted, continued, or discharged to the extent deemed appropriate by the Creditors' Committee. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the holders of Claims or Interests. As of the Effective Date but only until the reorganization of the Reorganized Debtors, except as expressly provided in the Committee's Plan, the Reorganized Debtors shall retain any stock or interests they may hold in the Non-Debtor Subsidiaries or affiliates and retain any rights to which such Interests may be entitled under applicable law with respect to such shares or other interests. Notwithstanding anything to the contrary herein, the Non-Debtor Subsidiaries may not sell, transfer or dispose of any assets without the consent of LLC.

#### 2. Cancellation of Existing Securities and Agreements and Related Indentures/Discharge of Second Lien Noteholder Trustee and Subordinated Note Trustee

(a) Except (i) as otherwise expressly provided in the Committee's Plan, (ii) with respect to executory contracts or unexpired leases that have been assumed by the Debtors, (iii) for purposes of evidencing a right to distributions under the Committee's Plan, or (iv) with respect to any Claim that is rendered Unimpaired under the Committee's Plan, on the Effective Date, the First Lien Credit Agreement, the Second Lien Indenture and Subordinated Note Indenture, all Interests of LLC and other instruments evidencing any Claims against the Debtors and Non-Debtor Subsidiaries shall be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors and Non-Debtor Subsidiaries thereunder shall be discharged; provided, however, the Second Lien Notes and the Subordinated Notes will be exchanged for the New Common Units in the LLC and the LLC will then receive PECs from the Luxco in exchange for the cancellation of such debt and the Holders thereof shall have no further rights or entitlements in respect thereof against the Debtors or Non-Debtor Subsidiaries except the rights to receive the distributions to be made to such Holders under the Committee's Plan and all guarantees or liens against Non-Debtor Subsidiaries shall be automatically released. Distributions to be made under the Committee's Plan to the beneficial owners of the Second Lien Indenture and the Subordinated Note Indenture

shall be made to the Indenture Trustee for the benefit of such holders. The Indenture Trustee shall, in turn, administer the distributions of New Common Units and Warrants to holders of Second Lien Noteholder Claims and Subordinated Note Claims in accordance with the terms of the Indenture. The Confirmation Order shall authorize the Reorganized Debtors, the Second Lien Noteholder Trustee, and the Subordinated Note Trustee to take whatever action may be necessary or appropriate, in its reasonable discretion, to deliver the distributions, without further application to or order of the Bankruptcy Court.

(b)     On the Effective Date, the Second Lien Noteholder Trustee and the Subordinated Note Trustee and their respective agents shall be discharged of all their obligations associated with (i) the Second Lien Indenture, (ii) the Second Lien Noteholder Claims, (iii) the Subordinated Note Indenture, (iv) Subordinated Note Claims and (v) any related documents, and released from all Claims arising in the Reorganization Cases, except to the extent necessary to allow the Second Lien Noteholder Trustee and the Subordinated Note Trustee to receive distributions pursuant to the Plan and make distributions under the Indenture on account of allowed Claims based upon the Indenture. As of the Effective Date, the Second Lien Indenture and the Subordinated Note Indenture shall be deemed fully satisfied, discharged and cancelled, except that such cancellation shall not impair the rights of the Holders of the Second Lien Noteholder Claims or the Subordinated Note Claims to receive distributions under the Committee's Plan, or the obligations of the Second Lien Noteholder Trustee or the Subordinated Note Trustee to discharge Liens, the Second Lien Guarantees and the Subordinated Note Guarantees. All Liens and Second Lien Guarantees in favor of the Second Lien Indenture for the benefit of the Holders of the Second Lien Claims or otherwise arising under the Second Lien Indenture shall be deemed released, satisfied and discharged. In addition, all Liens, if any, and Subordinated Note Guarantees in favor of the Subordinated Note Indenture for the benefit of the Holders of the Subordinated Note Claims or otherwise arising under the Subordinated Note Indenture shall be deemed released, satisfied and discharged.

3.     **Issuance of New Common Units, Warrants and Subscription Rights**

The issuance by LLC of the New Common Units, Warrants and Subscription Rights on and after the Effective Date is hereby authorized without the need for any further corporate action and without any further action by holders of Claims or Interests. Such Interests shall be distributed as provided in Article IV.B.4 and Article IV.B.6 herein.

All of the New Common Units and Subscription Rights issued pursuant to the Plan shall be duly authorized, validly issued and, if applicable, fully paid and non-assessable. Each distribution and issuance referred to in Article VIII hereof shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Holder receiving such distribution or issuance. Such Interests shall be distributed as provided in Article IV.B.4 and Article IV.B.6 herein. As provided in the Postconfirmation Organizational Documents, the New Common Units shall be subject to certain restrictions on transfer. Any New Common Units issued in connection with the Warrants shall be subject to the terms of the LLC Agreement. As provided in the Postconfirmation Organizational Documents, the New Common Units shall be subject to certain restrictions on transfer. As provided in the Postconfirmation Organizational Documents, which are incorporated herein by

reference, New Common Units may be issued in more than one series, shall be identical in all respects, and shall have equal rights and privileges. In compliance with 1123(a)(6) of the Bankruptcy Code, the Postconfirmation Organizational Documents shall provide that the Reorganized Debtors shall not issue nonvoting equity securities to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code.

Upon the Effective Date, the amended and restated limited liability company operating agreement of LLC (the "LLC Agreement") and the Registration Rights Agreement shall each be deemed to become valid, binding and enforceable in accordance with its respective terms, and each holder of New Common Units shall be bound thereby, in each case, without need for execution by any party thereto other than the Backstop Purchaser and LLC, to the extent required. Also upon the Effective Date, the Warrant Agreement shall be deemed to become valid, binding and enforceable in accordance with its terms, and each holder of a Warrant shall be bound thereby, in each case, without need for execution by any party thereto other than the Backstop Purchaser and LLC.

## 4. **Incurrence of New Indebtedness**

The Reorganized Debtors' entry into the New Term Loan, and the incurrence of indebtedness thereunder on the Effective Date, is hereby authorized without the need for any further corporate action, except as set forth in the New Term Loan, and without any further action by holders of Claims or equity interests.

## B. **Release of Second Liens/Second Lien Guaranties/Subordinated Note Guaranties**

### 1. **Release of Liens**

On the Effective Date, all Liens securing the Second Lien Noteholder Claims shall be deemed fully released. The Second Lien Noteholder Trustee, the Second Lien Collateral Agent and the Collateral Trustee shall be authorized and directed to release any collateral or other property held by them on behalf of Holders of the Second Lien Noteholder Claims and to take such actions and execute and deliver such documents as may be requested by the Creditors' Committee or the Reorganized Debtors to evidence the release of all Liens securing the Second Lien Noteholder Claims, including, without limitation, the execution, delivery and filing or recording of such releases as may be requested by Debtors or the Reorganized Debtors, in lieu of delivery of the documents otherwise required pursuant to section 5.1(b) of the Intercreditor Agreement.

### 2. **Release of Second Lien Guarantees**

The Non-Korean Guarantors' obligations under the Second Lien Guarantees shall be deemed fully released on the Effective Date as a result of the Restructuring Transactions. The Second Lien Noteholder Trustee shall be authorized and directed to take any action and execute and deliver any documents as may be requested by the Debtors to release any collateral or other property of the Debtors held by the Second Lien Noteholder Trustee. In addition, the Korean Guarantee shall be released as of the Effective Date. The distributions to holders of Second Lien Noteholder Claims and the surrender of Second Lien Notes to the Second Lien Noteholder

Trustee, as described in Article VIII.I herein, shall constitute a satisfaction and discharge of the Second Lien Indenture under section 12.05(d) of the Second Lien Indenture.

### 3. Release of Subordinated Note Guarantees

The Subordinated Note Guarantors' obligations under the Subordinated Note Guarantees shall be deemed fully released on the Effective Date. The Subordinated Noteholder Trustee shall be authorized and directed to take any action and execute and deliver any documents as may be requested by the Debtor to acknowledge the release of any claims against the Non-Korean Guarantors on account of the Subordinated Note Guarantees. The distributions to holders of Subordinated Note Claims and the surrender of Subordinated Notes to the Subordinated Note Trustee, as described in Article VIII.I herein, shall constitute a satisfaction and discharge of the Subordinated Note Indenture under section 12.05(d) of the Subordinated Note Indenture.

### 4. Release and Discharge of Debtors

Upon the occurrence of the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtors.

### 5. Release and Discharge of Non-Debtor Subsidiaries

In addition to the terms of section B.4 above, each Holder of a Secured Claim, the Second Lien Noteholder Trustee of the Second Lien Notes, the Subordinated Note Trustee of the Subordinated Notes, any agent under the First Lien Credit Agreement, the Second Lien Indenture, the Subordinated Note Indenture shall be deemed to have forever waived, released, and discharged the Non-Debtor Subsidiaries of any Liens, Claims, claims, causes of action, rights, or liabilities arising from guarantees granted to the Holders of (i) the Second Lien Noteholder Claims under the Second Lien Indenture, (ii) the First Lien Lender Secured Claims under the First Lien Credit Agreement, or (iii) the Subordinated Note Claims under the Subordinated Note Indenture, as well as any respective Deficiency Claims; provided, however, that the Liens securing the First Lien Lender Secured Claims shall remain in effect for the sole purpose of securing the New Term Loan.

In addition, the Confirmation Order shall authorize the Reorganized Debtors, Second Lien Noteholder Trustee and the Subordinated Note Trustee to take whatever action may be necessary or appropriate, in their reasonable discretion, to effectuate the foregoing, including, without limitation, providing a release of the Liens, the First Lien Guarantees, the Second Lien Guarantees, and the Subordinated Note Guarantees; provided, however, that the Liens securing the First Lien Lender Secured Claims shall remain in effect for the sole purpose of securing the New Term Loan.

## C.    Continued Corporate Existence

Except as otherwise provided in the Committee's Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except with respect to the Postconfirmation Organizational Documents (or other formation documents) that are amended by the Committee's Plan, the Committee's Plan Supplement or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Committee's Plan and require no further action or approval.  Notwithstanding the foregoing, on or as of the Effective Date, or as soon as practicable thereafter, and without the need for any further action, the Reorganized Debtors may, subject to the consent of the Backstop Purchaser: (i) cause any or all of the Reorganized Debtors to be merged into one or more of the Reorganized Debtors of Non-Debtor Subsidiaries, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors or Non-Debtor Subsidiaries, or (iii) engage in any other transaction in furtherance of the Committee's Plan.

## D.    The Offering

### 1.    Issuance of Subscription Rights

Each Offering Participant that identifies itself as an accredited investor to the Subscription Agent shall be entitled to receive Subscription Rights entitling such Offering Participant the right to subscribe for up to its Offering Pro Rata Share of New Common Units to be issued pursuant to the Offering.  After giving effect to the issuance of New Common Units pursuant to the Second Lien Noteholder Distribution, the Subordinated Note Distribution and the Standby Commitment Fee, but without giving effect to the Warrants to be issued to holders of Subordinated Note Claims, the amount of the equity ownership of LLC represented by the New Common Units to be offered pursuant to the exercise of Subscription Rights is 84% of the equity of LLC (the "Offering Available Equity"), subject to dilution on account of the Long-Term Incentive Plan; provided that, under the Backstop Commitment Agreement, the Minimum Allocation to be available for sale to the Backstop Purchaser is 67% of the Offering Available Equity, or approximately 56.28% of the New Common Units, subject to dilution on account of the Long-Term Incentive Plan.  Accordingly, after giving effect to the Minimum Allocation, the percentage of the equity of LLC represented by the New Common Units available in the Offering to Offering Participants other than the Backstop Purchaser is approximately 27.72% of the New Common Units, subject to dilution on account of the Long-Term Incentive Plan.  Since the Backstop Purchaser is entitled to a Minimum Allocation of 67% of the Subscription Rights, if more than 33% of the Subscription Rights are subscribed for by Eligible Holders other than the Backstop Purchaser, then the Subscription Rights to be purchased by each such Eligible Holder will be reduced on a pro rata basis so that the amount to be purchased by all such Eligible Holders equals 33% of the aggregate number of Subscription Rights.  Each such Eligible Holder will be notified of the reduced subscription amount and the difference in payment will be refunded to such Eligible Holder without interest.  Offering Participants have the right, but not the obligation, to participate in the Offering as provided herein.

However, to the extent that the Offering Participants do not exercise the Subscription Rights by the Subscription Expiration Date, the Backstop Purchaser, subject to the terms and conditions of the Backstop Commitment Agreement, shall subscribe for and purchase all Unsubscribed Units as of the Subscription Expiration Date.  No payment in lieu of the Subscription Rights will be made to any holder of a Second Lien Noteholder Claim that is not an Accredited Investor and therefore unable to subscribe for New Common Units pursuant to the Offering.

**2.**          **Subscription Period**

The Offering shall commence on the Subscription Commencement Date and shall expire on the Subscription Expiration Date.  Each Offering Participant intending to participate in the Offering must affirmatively elect to exercise its Subscription Rights on or prior to the Subscription Expiration Date.  After the Subscription Expiration Date, the Unsubscribed Units shall be treated as acquired by the Backstop Purchaser in accordance with and subject to the terms and conditions contained in the Backstop Commitment Agreement and the Committee's Plan, and any exercise of such Subscription Rights by any entity other than the Backstop Purchaser or any of its affiliates or any permitted assignee of the Backstop Purchaser's rights under the Backstop Commitment Agreement shall be null and void and there shall be no obligation to honor any such purported exercise received by the Subscription Agent after the Subscription Expiration Date, regardless of when the documents relating to such exercise were sent.

**3.**          **Subscription Purchase Price**

Each Offering Participant choosing to exercise its Subscription Rights shall be required to pay such participant's Subscription Purchase Price for New Common Units.

**4.**          **Exercise of Subscription Rights**

In order to exercise the Subscription Rights, each Offering Participant must return a duly completed Subscription Form and Subscription Agreement to the Subscription Agent so that such form is actually received by the Subscription Agent on or before the Subscription Expiration Date.  Each such Offering Participant must tender the Offering Participant's Subscription Purchase Price to the Subscription Agent so that it is actually received by the Subscription Expiration Date. The Offering Participant's Subscription Purchase Price must be paid in accordance with the wire instructions set forth on the Subscription Form or by bank or cashier's check delivered to the Subscription Agent.  Each Offering Participant may exercise all or any portion of such Offering Participant's Subscription Rights pursuant to the Subscription Form, but the exercise of any Subscription Rights shall be irrevocable.  If the Subscription Agent for any reason does not receive from a given Offering Participant (a) a duly completed Subscription Form on or prior to the Subscription Expiration Date, and (b) immediately available funds in an amount equal to such Offering Participant's Subscription Purchase Price on or prior to the Subscription Expiration Date, such Offering Participant shall be deemed to have relinquished and waived its right to participate in the Offering.  The payments made in accordance with the Offering shall be deposited and held by the Subscription Agent in a trust account, or similarly segregated account or accounts which shall be separate and apart from the Subscription Agent's

general operating funds and any other funds subject to any lien or similar encumbrance and which segregated account or accounts will be maintained for the purpose of holding the money for administration of the Offering until the Effective Date, or such other later date, at the option of the Creditors' Committee, but not later than twenty (20) days after the Effective Date. The Subscription Agent shall not use such funds for any other purpose prior to such date and shall not encumber or permit such funds to be encumbered with any lien or similar encumbrance.

In order to facilitate the exercise of the Subscription Rights, on the Subscription Commencement Date, the Subscription Form will be provided by mail, electronic mail, or facsimile transmission to (i) each holder of a Second Lien Noteholder Claim that the Creditors' Committee knows to be an Eligible Holder and (ii) to each holder of a Second Lien Noteholder Claim who identifies itself to the Subscription Agent as an Eligible Holder, together with appropriate instructions for the proper completion, due execution and timely delivery of the Subscription Form, as well as instructions for the payment of the applicable Subscription Purchase Price for that portion of the Subscription Rights sought to be exercised by such Eligible Holder.

## 5.                        Offering Procedures

Notwithstanding anything contained herein to the contrary, the Creditors' Committee, with the consent of the Backstop Purchaser, may modify the procedures relating to the Offering or adopt such additional detailed procedures consistent with the provisions of this Article VI(D) to more efficiently administer the exercise of the Subscription Rights; provided, however, that the Creditors' Committee shall be provided prompt written notice to the Offering Participants of any material modification to such procedures.

## 6.                     Transfer Restriction: Revocation

The Subscription Rights are not transferable. Any such transfer or attempted transfer will be null and void, and no purported transferee will be treated as the holder of any Subscription Rights. Once an Offering Participant has properly exercised its Subscription Rights, such exercise cannot be revoked.

## 7.                         Offering Backstop

Subject to the terms and conditions in the Backstop Commitment Agreement, the Backstop Purchaser has agreed to subscribe for and purchase on the Effective Date, at the aggregate Subscription Purchase Price therefor, its Backstop Commitment (as set forth on Schedule 1 to the Backstop Commitment Agreement) of all Unsubscribed Units as of the Subscription Expiration Date. The Backstop Purchaser shall pay to the Subscription Agent, by wire transfer in immediately available funds on or prior to the Effective Date, Cash in an amount equal to the aggregate Subscription Purchase Price attributable to such Unsubscribed Units as provided in the Backstop Commitment Agreement. The Subscription Agent shall deposit such payment into the same trust account into which were deposited the Subscription Purchase Price payments of Offering Participants on the exercise of their Subscription Rights. The Debtors and the Subscription Agent shall give the Backstop Purchaser by e-mail and electronic facsimile transmission written notification setting forth either (i) a true and accurate calculation of the

number of Unsubscribed Units, and the aggregate Subscription Purchase Price therefor (a "Purchase Notice") or (ii) in the absence of any Unsubscribed Units, the fact that there are no Unsubscribed Units and that the Backstop Commitments are terminated (a "Satisfaction Notice") as soon as practicable after the Subscription Expiration Date. In addition, the Subscription Agent shall notify the Backstop Purchaser, on each Friday during the Subscription Period, on each Business Day during the five (5) Business Days prior to the Subscription Expiration Date (and any extensions thereto) or more frequently if requested by the Backstop Purchaser, of the aggregate number of Subscription Rights known by the Subscription Agent to have been exercised pursuant to the Offering as of the close of business on the preceding Business Day or the most recent practicable time before such request, as the case may be. The Subscription Agent shall determine the number of Unsubscribed Units, if any, in good faith, and provide the Backstop Purchaser with a Purchase Notice or a Satisfaction Notice that accurately reflects the number of Unsubscribed Units as so determined. On the Effective Date, the Backstop Purchaser will purchase only such number of Unsubscribed Units as are listed in the Purchase Notice, without prejudice to the rights of the Backstop Purchaser to seek later an upward or downward adjustment if the number of Unsubscribed Units in such Purchase Notice is inaccurate. Delivery of the Unsubscribed Units will be made to the account of the Backstop Purchaser (or to such other accounts as the Backstop Purchaser may designate) on the Effective Date against payment of the aggregate Subscription Purchase Price for the Unsubscribed Units by wire transfer of immediately available funds to a bank account in the United States specified by the Debtors to the Backstop Purchaser at least 24 hours in advance. All Unsubscribed Units will be delivered with any and all issue, stamp, transfer or similar taxes or duties payable in connection with such delivery duly paid by the Debtors or the Reorganized Debtors to the extent required under the Confirmation Order or applicable law. Notwithstanding anything contained herein to the contrary, the Backstop Purchaser, in its sole discretion, may designate that some or all of the Unsubscribed Units be issued in the name of, and delivered to, one or more of its affiliates, or to other financial institutions reasonably acceptable to Debtors.

The obligations of the Backstop Purchaser are subject to certain conditions including, among other things, the entry of an order of the Bankruptcy Court on or before September 25, 2009, in form and substance satisfactory to the Backstop Purchaser and its counsel, approving the Backstop Commitment Agreement and the Committee's Plan, which order shall become a final order not subject to stay, appeal or modification on or before October 7, 2009.

## 8. <u>Backstop Fees and Expenses/Backstop Units</u>

In consideration for its agreement to backstop the Offering, in the event the Committee's Plan is confirmed and the Effective Date occurs, the Backstop Purchaser shall receive the Standby Commitment Fee to be allocated in the manner set forth in the Backstop Commitment Agreement. The Standby Commitment Fee shall be deemed fully earned and payable in full on the Effective Date and following the entry of the Backstop Approval Order and Confirmation Order by the Bankruptcy Court, regardless of whether the Offering is fully subscribed by eligible holders of the Second Lien Noteholder Claims.

Under the Backstop Commitment Agreement, if the Committee's Plan is confirmed and becomes effective, on the Effective Date, the Reorganized Debtors shall pay the reasonable and documented fees, expenses, disbursements and charges of the Backstop Purchaser incurred after

July 29, 2009 relating to the exploration and discussion of alternative financing structures to the Backstop Commitment or to the preparation and negotiation of the Backstop Commitment Agreement, the Committee's Plan Documents, the Postconfirmation Organizational Documents, and the proposed documentation and the transactions contemplated thereby, including, without limitation, the reasonable fees and expenses of counsel and financial advisors to the Backstop Purchasers.

### 9. Distribution of the New Common Units

On the Effective Date, the LLC shall distribute the New Common Units purchased by each Offering Participant that has properly exercised its Subscription Rights to such holder and to the Backstop Purchaser. If the exercise of a Subscription Right would result in the issuance of a fractional share of New Common Units, then the number of shares of New Common Units to be issued in respect of such Subscription Right will be rounded down to the closest unit.

### 10. Backstop Purchaser's Minimum Allocation

Notwithstanding anything to the contrary in Article VI(D) of the Committee's Plan, the Backstop Purchaser shall receive the Minimum Allocation of the New Common Units issued pursuant to the Offering.

### 11. Private Placement Exemption

The Creditor's Committee will only make the Offering available to Eligible Holders. Therefore, the New Common Units issued pursuant to the Offering to the Eligible Holders will be exempt from registration under the Securities Act by virtue of Section 4(2) thereof and Regulation D promulgated thereunder. Unlike the New Common Units issued to holders of Allowed Claims (Classes 4A-4F and Classes 6A-6F), such New Common Units issued to the Eligible Holders pursuant to the Offering will not be exempted under section 1145 of the Bankruptcy Code.

### 12. Disputed Claims

For all purposes of this Article VI(D), each Offering Participant is entitled to participate in the Rights Offering solely to the extent of its Offering Pro Rata Share, if any; provided, however, that the Backstop Purchaser shall receive a minimum allocation of two-thirds (2/3) of the New Common Units issued pursuant to the Offering.

### 13. Validity of Exercise of Subscription Rights

All questions concerning the timeliness, viability, form and eligibility of any exercise of Subscription Rights shall be determined by the Creditors' Committee, whose good faith determinations shall be final and binding. The Creditors' Committee, in its discretion, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights. Subscription Forms shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Creditors' Committee determines in its discretion. The Creditors' Committee will use commercially reasonable efforts to give notice to any Offering

Participants regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such participant and, may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Creditors' Committee nor the Subscription Agent shall incur any liability for failure to give such notification

## 14. <u>Indemnification of Backstop Purchaser</u>

Upon the Effective Date of the Committee's Plan, the Debtors or the Reorganized Debtors, as the case may be (in such capacity, the "Indemnifying Parties") shall indemnify and hold harmless the Backstop Purchaser and each of its respective affiliates, members, partners, officers, directors, employees, agents, advisors, controlling persons and professionals (each an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and reasonable expenses, joint or several, to which any such Indemnified Person may become subject arising out of or in connection with any claim, challenge, litigation, investigation or proceeding with respect to the Offering, the Backstop Commitment Agreement, the Committee's Plan or the transactions contemplated hereby or thereby, including without limitation, distribution of the Standby Commitment Fee if any, distribution of the Subscription Rights, the purchase and sale of New Common Units in the Offering and purchase and sale of Unsubscribed Units pursuant to the Backstop Commitment Agreement, regardless of whether any of such Indemnified Persons is a party thereto, and to reimburse such Indemnified Persons for any reasonable legal or other reasonable out-of-pocket expenses as they are incurred in connection with investigating, responding to or defending any of the foregoing, provided that the foregoing indemnification will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or expenses to the extent that they are finally judicially determined to have resulted from gross negligence or willful misconduct on the part of such Indemnified Person. If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless, then the Indemnifying Parties shall contribute to the amount paid or payable by such Indemnified Person as a result of such loss, claim, damage, liability or expense in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Parties on the one hand and such Indemnified Person on the other hand but also the relative fault of the Indemnifying Parties, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations.  The relative benefits to the Indemnifying Parties on the one hand and all Indemnified Persons on the other hand shall be deemed to be in the same proportion as (i) the total value received or proposed to be received by the Debtors pursuant to the sale of New Common Units contemplated by the Backstop Commitment Agreement bears to (ii) the fee paid or proposed to be paid to the Backstop Purchaser in connection with such sale. The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their exclusive or contributory negligence or otherwise to the Indemnifying Parties, any person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other person in connection with or as a result of the Offering or the transactions contemplated thereby, except as to any Indemnified Person to the extent that any losses, claims, damages, liability or expenses incurred by the Debtors are finally judicially determined to have resulted from gross negligence or willful misconduct of such Indemnified Person in performing the services that are the subject of the Backstop Commitment Agreement.  The indemnity and reimbursement obligations of the Indemnifying Parties described in this Article VI(D) shall be in addition to any liability that the Indemnifying Parties may otherwise have to an Indemnified Person and shall be binding upon

and inure to the benefit of any successors, assigns, heirs and personal representatives of the Indemnifying Parties and any Indemnified Person.

Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, litigation, investigation or proceeding relating to the backstop Agreement or any of the transactions contemplated thereby ("Proceedings"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Parties in respect thereof, notify the Indemnifying Parties in writing of the commencement thereof; provided that (i) the omission so to notify the Indemnifying Parties will not relieve it from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (ii) the omission so to notify the Indemnifying Parties will not relieve it from any liability that it may have to an Indemnified Person otherwise than on account of the provisions described in this Article VI(D). In case any such Proceedings are brought against any Indemnified Person and it notifies the Indemnifying Person of the commencement thereof, if the Indemnifying Parties commits in writing to fully indemnify and hold harmless the Indemnified Person with respect to such Proceedings without regard to whether the Effective Date occurs, the Indemnifying Parties will be entitled to participate in such Proceedings, and, to the extent that it may elect by written notice delivered to such Indemnified Person, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Person, provided that if the defendants in any such Proceedings include both such Indemnified Person and the Indemnifying Parties and such Indemnified Person shall have concluded that there may be legal defenses available to it that are different from or additional to those available to the Indemnifying Parties, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Proceedings on behalf of such Indemnified Person. Upon receipt of such indemnification commitment from the Indemnifying Parties and notice from the Indemnifying Parties to such Indemnified Person of its election so to assume the defense of such Proceedings and approval by such Indemnified Person of counsel, the Indemnifying Parties shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the next preceding sentence (it being understood, however, that the Indemnifying Parties shall not be liable for the expenses of more than one separate counsel, representing the Indemnified Persons who are parties to such Proceedings), (ii) the Indemnifying Parties shall not have employed counsel reasonably satisfactory to such Indemnified Person to represent such Indemnified Person at the Indemnifying Parties' expense within a reasonable time after notice of commencement of the Proceedings or (iii) the Indemnifying Parties shall have authorized in writing the employment of counsel for such Indemnified Person.

## E. <u>Retained Rights of Action</u>

Unless a Right of Action is in writing, expressly waived, relinquished, released, compromised, or settled in the Committee's Plan, or in a Final Order, as of the Effective Date, all rights with respect to such Retained Right of Action are expressly preserved for the benefit of the Reorganized Debtors.

**F. Claims Objections**

Unless an objection to a Claim is in writing, expressly waived, relinquished, released, assigned, compromised, or settled in the Committee's Plan, or in a Final Order, all rights with respect to such Claim objection are expressly preserved for the benefit of, and fully vested in, the Reorganized Debtors. The Reorganized Debtors may pursue, or decline to pursue, objections to Claims, as appropriate, in the business judgment of the Reorganized Debtors and in consultation with the Plan Proponent. The Reorganized Debtors may settle, release, sell, assign, otherwise transfer, or compromise objections to Claims without need for notice or order of the Bankruptcy Court.

**G. Corporate Governance**

**1. General**

On the Effective Date, the management, control and operation of the Reorganized Debtors shall become the general responsibility of the Postconfirmation Board. The Backstop Purchaser has no current intention of changing current management or their current compensation.

**2. Postconfirmation Board**

The Postconfirmation Board of each of the Reorganized Debtors shall consist of 5 members, including the chief executive officer of the Reorganized Debtors, each of whom shall be selected by the Backstop Purchaser. All directors shall stand for election annually.

**3. Filing of Postconfirmation Organizational Documents**

On the Effective Date, or as soon thereafter as practicable, to the extent necessary, the Reorganized Debtors shall file their Postconfirmation Organizational Documents, as required or deemed appropriate, with the appropriate Persons in their respective jurisdictions of incorporation or establishment.

**4. Long-Term Incentive Plan**

The Long-Term Incentive Plan will provide for a certain percentage of New Common Units, not to exceed 10% of the issued and outstanding New Common Units on the Effective Date, to be reserved for issuance as options, equity or equity-based grants in connection with the Reorganized Debtors' Long-Term Incentive Plan. The amount of New Common Units, if any, to be issued pursuant to the Long-Term Incentive Plan, and the terms thereof shall be determined by the Postconfirmation Board.

**H. Exemption from Securities Laws**

Holders of Allowed Claims in Classes 4A-4F (Second Lien Noteholder Claims) will receive New Common Units and holders of Allowed Claims in Classes 6A-6F (Subordinated Note Claims) will receive New Common Units and Warrants pursuant to the Plan. Section 1145 of the Bankruptcy Code provides an exemption from the securities registration requirements of

federal and state securities laws with respect certain distributions of securities under a plan of reorganization. Pursuant to the Committee's Plan, the New Common Units and Warrants issued to holders of Allowed Claims in Classes 4A-4F (Second Lien Noteholder Claims) and holders of Allowed Claims in Classes 6A-6F (Subordinated Note Claims) will be exempt from registration under otherwise applicable federal and state securities laws pursuant to section 1145 of the Bankruptcy Code.

As set forth herein, the New Common Units issued pursuant to the Offering to the Offering Participants will be exempt from registration under the Securities Act by virtue of section 4(2) thereof and Regulation D promulgated thereunder.

## I.       **Issuance and Resale of New Securities Under the Committee's Plan**

Section 1145(a) of the Bankruptcy Code generally exempts from registration under the Securities Act of 1933 (as amended, the "Securities Act") the offer or sale of a debtor's securities under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or an equity interest in, such debtor, and in the case of warrants so issued under a chapter 11 plan, also generally exempts the issuance of the securities issued upon exercise of such warrants. In reliance upon this exemption, the New Common Units and New Warrants will be issued on the Effective Date as provided in the Committee's Plan, and will be exempt from the registration requirements of the Securities Act, except to the extent described below. Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (ii) the restrictions, if any, on the transferability of such Securities and instruments set forth in the Stockholders Agreement; and (iii) applicable regulatory approval. However, recipients of securities issued under the Committee's Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

As set forth herein and in the Committee's Plan, the New Common Units issued pursuant to the Offering to the Offering Participants will be exempt from registration under the Securities Act by virtue of section 4(2) thereof and Regulation D promulgated thereunder. The New Common Units being issued in the offering are "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act and accordingly may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except in transactions that are exempt from, or in transactions not subject to, the registration requirements of the Securities Act and in compliance with any applicable state securities laws. The New Common Units issued in the Offering shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

## J.       **Registration Rights Agreement**

Other than as provided in the Registration Rights Agreement, the Reorganized Debtors shall not be obligated to list the New Common Units on a national securities exchange. In order

to ensure that the Reorganized Debtors will not become subject to the reporting requirements of the Exchange Act except in connection with a public offering, the Postconfirmation Organizational Documents will impose certain trading restrictions to limit the number of record holders thereof. On the Effective Date, the Reorganized Debtors expect to enter into a registration rights agreement (the "Registration Rights Agreement") with the Backstop Purchaser and the other Offering Participants who purchase their Offering Pro Rata Share of New Common Units in the Offering (the "Other Full Offering Participants"). Pursuant to the Registration Rights Agreement, the Backstop Purchaser would have the right to require the Reorganized Debtors to effect registered, underwritten secondary offerings of the Backstop Purchaser's New Common Units on terms and conditions to be negotiated and reflected in such Registration Rights Agreement, with the number of demand registration rights to be determined and the Other Full Offering Participants would have certain piggy-back registration rights. A form of the Registration Rights Agreement will be included in the Committee's Plan Supplement.

## K.        Payment of Plan Expenses

The Reorganized Debtors may pay all reasonable Plan Expenses without further notice to Creditors or Holders of Interests or approval of the Bankruptcy Court.

## L.        Dissolution of the Official Committee

As of the Effective Date, the Committee shall be dissolved, provided, however, that notwithstanding such dissolution, the Committee's Professional Persons may seek payment of any unpaid Administrative Expenses pursuant to the Committee's Plan.

## M.        Actions in Korea

The Debtors or the Reorganized Debtors, as the case may be, shall take whatever action necessary to implement the Confirmation Order in Korea.

## VII.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## A.        Assumption and Rejection of Executory Contracts and Unexpired Leases

Except for any executory contracts or unexpired leases: (i) that are listed as Rejected Contracts in the Plan Supplement (ii) that previously were assumed or rejected by an order of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code; (iii) as to which a motion for approval of the assumption or rejection of such contracts or leases has been Filed and served prior to Confirmation; or (iv) that constitute contracts of insurance in favor of, or that benefit, the Debtors or the Estates, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed assumed pursuant to section 365 of the Bankruptcy Code as of the Effective Date. The Confirmation Order shall constitute an Order of the Bankruptcy Court approving such assumptions, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. On the Effective Date, the Debtors shall pay any cure costs associated with any assumed contracts owned by the Debtors (*i.e.*, claims of non-Debtor contract parties against the Debtors for

monetary damages for breaches of such assumed contracts) from the Cash of the Reorganized Debtors.

**B.      Objections to Assumption of Executory Contracts and Unexpired Leases**

### 1.      Objection Procedure Generally

Any party objecting to any Debtor's proposed assumption of an executory contract or unexpired lease based on a lack of adequate assurance of future performance or on any other ground including the adequacy of the "cure" amount set forth in the Plan Supplement shall file and serve a written objection to the assumption of such contract or lease by the deadline to object to Confirmation.  Failure to timely file an objection shall constitute consent to the assumption and assignment of those contracts and leases, including an acknowledgment that the proposed assumption provides adequate assurance of future performance and that the applicable "cure" amount set forth in the Plan Supplement is proper and sufficient for purposes of section 365 of the Bankruptcy Code.

### 2.      Objection Based on Grounds Other Than "Cure" Amount

If any party timely and properly files an objection to assumption based on any ground other than the adequacy of the applicable "cure" amount set forth in the Plan Supplement and the Bankruptcy Court ultimately determines that any Debtor cannot assume the executory contract or then the unexpired lease or executory contract shall automatically thereupon be deemed to have been excluded from the Plan Supplement and shall be rejected.

### 3.      Objection Based on "Cure" Amount

If any party timely and properly files an objection to assumption based on the adequacy of the applicable "cure" amount set forth in the Plan Supplement and such objection is not resolved between the Debtors and the objecting party, the Bankruptcy Court shall resolve such dispute at the Confirmation Hearing or another hearing date to be determined by the Bankruptcy Court.  The resolution of such dispute shall not affect the assumption of the executory contract or lease that is the subject of such dispute but rather shall affect only the "cure" amount the Debtors must pay in order to assume such contract or lease.  Notwithstanding the immediately preceding sentence, if the Debtors in their discretion determine that the amount asserted to be the necessary "cure" amount would, if ordered by the Bankruptcy Court, make the assumption of the executory contract or lease imprudent, then the Debtors may elect to (1) reject the executory contract or lease, or (2) request an expedited hearing on the resolution of the "cure" dispute, exclude assumption or rejection of the contract or lease from the scope of the Confirmation Order, and retain the right to reject the executory contract or lease pending the outcome of such dispute.

**C.      Payment Related to Assumption of Executory Contracts and Unexpired Leases.**

If not the subject of dispute as of the Confirmation Date, any monetary defaults under each executory contract and unexpired lease to be assumed under the Committee's Plan shall be satisfied by the Debtors from the Cash of MSA, pursuant to section 365(b) of the Bankruptcy Code: (i) by payment of (1) the applicable "cure" amount, (2) such other amount as ordered by the Bankruptcy Court, or (3) such other amount as agreed upon by the Debtors, in Cash within

thirty (30) days following the Effective Date; or (ii) on such other terms as agreed to by the parties to such executory contract or unexpired lease. In the event of a dispute regarding the appropriate "cure" amount, payment of the amount otherwise payable hereunder shall be made following entry of a Final Order or agreement by the Debtors or Reorganized Debtors, as the case may be.

**D.     Bar Date for Rejection Damages**

If the rejection of an executory contract or unexpired lease pursuant to the Committee's Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors or their Estates unless a proof of Claim is Filed and served on the Debtors and their counsel within thirty days after the earlier of (a) Confirmation or (b) service of a notice that the executory contract or unexpired lease has been rejected. All such Claims for which proofs of Claim are required to be Filed, if Allowed, will be, and will be treated as, General Unsecured Claims, subject to the provisions of the Committee's Plan.

**E.     Insurance Policies**

Unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies which are executory, if any, and any agreements, documents or instruments relating thereto, shall be assumed under the Committee's Plan. Nothing contained in this section shall constitute or be deemed a waiver of any cause of action that the Debtors or Reorganized Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

**VIII.**
**DISTRIBUTIONS AND RELATED MATTERS**

**A.     Dates of Distribution**

The sections of the Committee's Plan on treatment of Administrative Expenses, Claims, and Interests specify the times for distributions. Whenever any payment or distribution to be made under the Committee's Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day. Distributions due on the Effective Date will be paid on such date or as soon as practicable thereafter, provided that if other provisions of the Committee's Plan require the surrender of securities or establish other conditions precedent to receiving a distribution, the distribution may be delayed until such surrender occurs or conditions are satisfied.

If, under the terms of the Committee's Plan, the resolution of a particular Disputed Claim, *e.g.*, it is Disallowed, entitles other Holders of Claims to a further distribution, either (a) the Reorganized Debtors may make such further distribution as soon as practicable after the resolution of the Disputed Claim or (b) if the further distribution is determined in good faith, by the Reorganized Debtors to be less than $100 for any Creditor, then, in order to afford the Reorganized Debtors an opportunity to minimize costs and aggregate such distributions, the Reorganized Debtors may make such further distribution any time prior to sixty days after the Final Resolution Date.

**B.**     **Cash Distributions**

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors, except that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**C.**     **Rounding of Payments**

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

**D.**     **Disputed Claims**

Notwithstanding all references in the Committee's Plan to Claims that are Allowed, in undertaking the calculations concerning Allowed Claims or Allowed Administrative Expenses under the Committee's Plan, including the determination of the amount or number of distributions due to the Holders of Allowed Claims and Allowed Administrative Expenses, each Disputed Claim shall be treated as if it were an Allowed Claim or Allowed Administrative Expense, except that if the Bankruptcy Court estimates the likely portion of a Disputed Claim to be Allowed or authorized or otherwise determines the amount or number that would constitute a sufficient reserve for a Disputed Claim (which estimates and determinations may be requested by the Debtors), such amount or number as determined by the Bankruptcy Court shall be used as to such Claim.

Distributions of non-Cash consideration due in respect of a Disputed Claim shall be held and not made pending resolution of the Disputed Claim.

After an objection to a Disputed Claim is withdrawn, resolved by agreement, or determined by Final Order, the distributions due on account of any resulting Allowed Claim, Allowed Interest, or Allowed Administrative Expense shall be made by the Reorganized Debtors. Such distribution shall be made within forty-five days of the date that the Disputed Claim becomes an Allowed Claim or Allowed Administrative Expense. No interest shall be due to a Holder of a Disputed Claim based on the delay attendant to determining the allowance of such Claim, Interest, or Administrative Expense.

**E.**     **Undeliverable and Unclaimed Distributions**

If any distribution under the Committee's Plan is returned to the Reorganized Debtors as undeliverable or the check or other similar instrument or distribution by the Reorganized Debtors remains uncashed or unclaimed, as applicable, for 120 days, such Cash shall be deemed to be "Unclaimed Property." Upon property becoming Unclaimed Property, it immediately shall be revested in the Reorganized Debtors.

Pending becoming Unclaimed Property, such Cash will remain in the possession of the Reorganized Debtors, and, if the Reorganized Debtors are notified in writing of a new address for the relevant Holder, they shall cause distribution of the Cash within forty-five days thereafter.

Once there becomes Unclaimed Property for a Holder, no subsequent distributions for such Holder that may otherwise be due under the Committee's Plan will accrue or be held for such Holder, provided that, if the applicable agent is notified in writing of such Holder's then current address and status as a Holder under the Committee's Plan, thereafter, the Holder will become entitled to its share of distributions, if any, which first become due after such notification.

**F.    Compliance With Tax Requirements**

The Reorganized Debtors shall comply with all withholding and reporting requirements imposed by federal, state, or local taxing authorities in connection with making distributions pursuant to the Committee's Plan.

In connection with each distribution with respect to which the filing of an information return (such as an IRS Form 1099 or 1042) or withholding is required, the Reorganized Debtors shall file such information return with the IRS and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law.  With respect to any Person from whom a tax identification number, certified tax identification number, or other tax information required by law to avoid withholding has not been received by the Reorganized Debtors, the Reorganized Debtors may, in their sole option, withhold the amount required and distribute the balance to such Person or decline to make such distribution until the information is received; provided, however, that the Reorganized Debtors shall not be obligated to liquidate any securities to perform such withholding.

**G.    Record Date in Respect to Distributions**

Except as set forth below, the record date and time for the purpose of determining which Persons are entitled to receive any and all distributions on account of any Allowed Claims or Interests, irrespective of the date of or number of distributions, shall be the same as the Record Date.

At the date and time of the Record Date, the Agent's registers with respect to the First Lien Lender Secured Claims, the Second Lien Noteholder Claim and the Subordinated Note Claim shall be deemed closed for purposes of determining whether a Holder of a First Lien Lender Secured Claim, a Second Lien Noteholder Claim or a Subordinated Note Claim is a record holder entitled to distributions under the Committee's Plan.  Neither the Reorganized Debtors nor the Agent shall have any obligation to recognize, for purposes of distributions pursuant to or in any way arising under the Committee's Plan, any First Lien Lender Secured Claim Lender Secured Claim, a Second Lien Noteholder Claim or a Subordinated Note Claim, or Claim arising therefrom or in connection therewith that is transferred after the time of the Record Date.  Instead, they all shall be entitled to recognize and deal for distribution purposes with only those record holders of the First Lien Lender Secured Claims, the Second Lien Noteholder Claim or the Subordinated Note Claim as of the Record Date irrespective of the number of distributions to be made under the Committee's Plan or the date of such distributions.

## H. Conditions to Receiving Distributions

As a condition to receiving any distribution under the Committee's Plan, each Holder of an Allowed Claim shall have executed and delivered such agreements, documents and instruments as may be reasonably required by the Debtors or Reorganized Debtors. Any Holder of an Allowed Claim that fails to execute and deliver such agreements, documents, and instruments or fails to take such action as may be reasonably requested by the Debtors or Reorganized Debtors before the first anniversary of the later to occur of (a) the availability of the agreements, documents and instruments required by the Debtors or the Reorganized Debtors and (b) the Effective Date may not participate in any distribution under the Committee's Plan with respect to such Allowed Claim. Any distribution forfeited hereunder shall be ratably reallocated among complying Holders of the applicable Class. The Debtors acknowledge that the First Lien Lender Parties have delivered all necessary agreements, documents and instruments and have taken all necessary actions required pursuant to this Article VIII.H.

## I. Surrender of Instruments

As a condition to receiving any distribution under the Committee's Plan, each Holder of Second Lien Notes or Subordinated Notes must either (a) surrender such (i) Second Lien Notes to Luxco who will surrender such Second Lien Notes to the Second Lien Noteholder Trustee, or (ii) Subordinated Notes to Luxco who will surrender such Subordinated Notes to the Subordinated Note Trustee, or (b) submit evidence satisfactory to (i) the Second Lien Noteholder Trustee with respect to the Secured Lien Notes, and (ii) the Subordinated Note Trustee with respect to the Subordinated Notes. Any Holder that fails to do either (a) or (b) above shall be deemed to have forfeited all rights and Claims and may not participate in any distribution under the Committee's Plan.

## IX.
## LITIGATION, OBJECTIONS TO CLAIMS, AND DETERMINATION OF TAXES

## A. Litigation: Objections to Claims; Objection Deadline

Except as may be expressly provided otherwise in the Committee's Plan, the Reorganized Debtors shall be responsible for any objection to the allowance of any Claim, and the determination of Tax issues and liabilities.

As of the Effective Date, the Reorganized Debtors shall have exclusive authority to file objections, settle, compromise, withdraw, or litigate to judgment objections to Claims. Unless another date is established by the Bankruptcy Court (which may so act without notice or hearing) or is established by other provisions of the Committee's Plan, any objection to a Claim shall be Filed with the Bankruptcy Court and served on the Person holding such Claim within ninety days after the Effective Date (the "Objection Deadline"), provided that the Reorganized Debtors may seek extension(s) thereof subject to Bankruptcy Court approval.

In addition to any other available remedies or procedures with respect to Tax issues or liabilities, the Reorganized Debtors, at any time, may utilize (and receive the benefits of) section 505 of the Bankruptcy Code with respect to: (1) any Tax issue or liability relating to an act or event occurring prior to the Effective Date or (2) any Tax liability arising prior to the Effective

Date.  If the Reorganized Debtors utilize section 505(b) of the Bankruptcy Code: (1) the Bankruptcy Court shall determine the amount of the subject Tax liability in the event that the appropriate governmental entity timely determines a Tax to be due in excess of the amount indicated on the subject return and (2) if the prerequisites are met for obtaining a discharge of Tax liability in accordance with section 505(b) of the Bankruptcy Code, the Reorganized Debtors shall be entitled to such discharge, which shall apply to any and all Taxes relating to the period covered by such return.

**B.**     **Temporary or Permanent Resolution of Disputed Claims**

The Reorganized Debtors may request, at any time prior to the Effective Date or on and after the Effective Date, that the Bankruptcy Court estimate any contingent or unliquidated Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, irrespective of whether any party has previously objected to such Disputed Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain jurisdiction to estimate any contingent or unliquidated Disputed Claim at any time during litigation concerning any objection to the Disputed Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent or unliquidated Disputed Claim, that estimated amount would constitute either the Allowed amount of such Disputed Claim or a maximum limitation on such Disputed Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Disputed Claim, the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on account of such Disputed Claim.   In addition, the Reorganized Debtors may resolve or adjudicate any Disputed Claim in the manner in which the amount of such Claim, Interest, or Administrative Expense and the rights of the Holder of such Claim, Interest, or Administrative Expense would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced.  All of the aforementioned objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another.

**C.**     **Release of Avoidance Actions**

Each of the Debtors releases, waives and agrees not to prosecute or pursue any Avoidance Claims.

**D.**     **Preservation of Retained Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain and may exclusively enforce any Retained Rights of Action and the Confirmation Order shall be deemed a *res judicata* determination of such rights to retain and exclusively enforce such Retained Rights of Action.  The Retained Rights of Action may be asserted or prosecuted before or after solicitation of votes on the Committee's Plan or before or after the Effective Date.

Absent an express waiver or release set forth in the Committee's Plan, nothing in the Committee's Plan shall (or is intended to) prevent, estop, or be deemed to preclude the Reorganized Debtors from utilizing, pursuing, prosecuting, or otherwise acting upon all or any of their Retained Rights of Action and, therefore, no preclusion doctrine, including, without

limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches shall apply to such Retained Rights of Action upon or after Confirmation or Consummation.

# X.
## EFFECT OF CONFIRMATION AND RELATED PROVISIONS

### A.    Effect of Confirmation

#### 1.    Binding Effect of Plan

The provisions of the confirmed Plan shall bind the Debtors, the Reorganized Debtors, any entity acquiring property under the Committee's Plan, and any Creditor or Interest Holder, whether or not such Creditor or Interest Holder has Filed a proof of Claim or Interest in the Chapter 11 Cases, whether or not the Claim of such Creditor or the Interest of such Interest Holder is impaired under the Committee's Plan, and whether or not such Creditor or Interest Holder has accepted or rejected the Committee's Plan. All Claims and debts shall be as fixed and adjusted pursuant to the Committee's Plan. With respect to any taxes of the kind specified in Bankruptcy Code section 1146(c), the Committee's Plan shall also bind any taxing authority, recorder of deeds or similar official for any county, state, or governmental unit or parish in which any instrument related to the Committee's Plan or related to any transaction contemplated under the Committee's Plan is to be recorded.

### B.    Injunction

#### 1.    Generally

**Unless otherwise provided in the Committee's Plan or the Confirmation Order, all injunctions and stays provided for in the Chapter 11 Cases pursuant to sections 105 and 362 of the Bankruptcy Code or otherwise in effect on the Confirmation Date shall remain in full force and effect until the Effective Date. From and after the Effective Date, all Persons are permanently enjoined from, and restrained against, commencing or continuing in any court any suit, action, or other proceeding, or otherwise asserting any Claim or interest, (a) seeking to hold (i) the Reorganized Debtors, (ii) the Plan Proponent, (iii) the Backstop Purchaser; (iv) the Second Lien Noteholder Trustee; (v) the Subordinated Noteholder Trustee or (vi) the property of the Reorganized Debtors, liable for any Claim, obligation, right, interest, debt, or liability that has been satisfied, discharged or released pursuant the Committee's Plan.**

**From and after the Effective Date, the Agent, the Collateral Trustee and all Holders of Claims are permanently enjoined from and restrained against, commencing or continuing in any court any suit, action, or other proceeding, or otherwise asserting any Claim or Interest against the Non-Debtor Subsidiaries, except as provided under the New Term Loan. The Second Lien Noteholder Trustee, the Subordinated Note Trustee, the Second Lien Collateral Agent and the Collateral Trustee hereby release all Liens, the Second Lien Guarantees, and the Subordinated Note Guarantee, except for the Liens securing the First Lien Lender Secured Claims, which shall remain in effect for the sole purpose of securing the New Term Loan.**

2. **Injunction Related to Rights of Action and**
   **Terminated Claims, Administrative Expenses or Interests**

Except as provided in the Committee's Plan or in the Confirmation Order, as of the Confirmation Date, all Entities that have held, currently hold or may hold a Claim, Administrative Expense, Superpriority Claim, Interest, or other debt or liability that is stayed, Impaired, or terminated pursuant to the terms of the Committee's Plan are permanently enjoined from taking any of the following actions either (x) against the Plan Proponent, the Backstop Purchaser, the Second Lien Noteholder Trustee, the Subordinated Noteholder Trustee, any of the present or former First Lien Lender Parties, any of the present or former officers or directors of the Debtors, the Debtors or the Reorganized Debtors, or their property on account of all or such portion of any such Claims, Administrative Expenses, Superpriority Claims, Interests, debts, or liabilities that are stayed, Impaired, or terminated or (y) against any Person with respect to any Right of Action or any objection to a Claim, Administrative Expense, Superpriority Claim, or Interest, which Right of Action or objection, under the Committee's Plan, is waived, released, assigned or exclusively retained by any of the Debtors: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order, (c) creating, perfecting, or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability, or obligation due; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Committee's Plan.  To avoid any doubt, except as otherwise expressly noted in the Committee's Plan, nothing in the Committee's Plan or herein shall be construed or is intended to affect, enjoin, modify, release, or waive any claims, rights, and actions that a third party may have against a person other than the Plan Proponent, the Backstop Purchaser, the Second Lien Noteholder Trustee, the Subordinated Noteholder Trustee, any of the present or former First Lien Lender Parties, any of the present or former officers or directors of the Debtors, the Debtors or the Reorganized Debtors, provided that such claims, rights, and actions are wholly separate and exist independently from any claims, rights, and actions of the Estates.

3. **Exculpation**

As of and subject to the occurrence of the Effective Date, each of the Plan Proponent and its Representatives, the Backstop Purchaser, the Second Lien Noteholder Trustee, the Subordinated Noteholder Trustee, any present or former First Lien Lender Parties and their respective Representatives, the present and former directors and officers of the Debtors, the Reorganized Debtors and the members of the Committee (acting in such capacity), shall neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken, in connection with, or related to, the formulation, preparation, dissemination, implementation, administration, Confirmation or Consummation of the Committee's Plan or any contract, instrument, waiver, release or other agreement or document created or entered into, in connection with the Committee's Plan, or any other act taken or omitted to be taken in connection with the Chapter 11 Cases; provided, however, that the foregoing provisions of this subsection shall have no

effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

**C.**     **Debtor Release**

Each Debtor, for itself and its affiliates, respective successors, assigns, transferees, those officers and directors, acting in such capacities as of the Petition Date, agents, members, financial advisors, attorneys, employees, partners, affiliates, representatives, in each case in their capacity as such, shall be deemed to have released any and all claims and causes of action against the Plan Proponent, the Backstop Purchaser, any of the present or former First Lien Lender Parties, any of the present or former officers or directors of the Debtors, the Second Lien Noteholder Trustee, the Subordinated Noteholder Trustee and the Reorganized Debtors, and their respective officers, directors, managers, employees, agents, advisors, accountants, attorneys and representatives, and their respective property, arising prior to the Effective Date.  The Creditors' Committee is not aware of the existence of any Rights of Action that are the subject of the release described under this Article X.C.  As of the date of the Committee's Plan, the Creditors' Committee has not performed a formal investigation of the Rights of Action described in this Article X.C.

**D.**     **Third Party Release**

Each Creditor that does not elect to opt out of this release by checking the appropriate box on the ballot provided to such Creditor in connection with solicitation of such Creditors' vote to accept to reject the Committee's Plan, for itself and its respective successors, assigns, transferees, those officers and directors, acting in such capacities as of the Petition Date, agents, members, financial advisors, attorneys, employees, partners, affiliates, representatives, in each case in their capacity as such, shall, by virtue of its vote, be deemed to have released any and all claims and causes of action against the Plan Proponent, the Backstop Purchaser, any of the present or former First Lien Lender Parties, the Second Lien Noteholder Trustee, the Subordinated Noteholder Trustee, any of the present or former officers or directors of the Debtors and their affiliates, the Debtors and their affiliates, and the Reorganized Debtors, and their respective officers, directors, managers, employees, agents, advisors, accountants, attorneys and representatives, and their respective property, arising prior to the Effective Date.  The Creditors' Committee is not aware of the existence of any Rights of Action that are the subject of the release described under this Article X.D.  As of the date of the Committee's Plan, the Creditors' Committee has not performed a formal investigation of the Rights of Action described in this Article X.D.

**E.**     **Subsequent Discovery of Facts Does Not Affect Enforceability of Releases**

Each releasing party under Article X.C. and Article X.D. of the Committee's Plan shall be deemed to have granted the releases set forth herein, notwithstanding that it may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such party expressly waives any and all rights that it may have under any statute or common law principle, including section 1542 of the California Civil Code, which would limit the effect

of such releases to those Claims or causes of action actually known or suspected to exist at the time of Confirmation.  Section 1542 of the California Civil Code generally provides as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor." The Creditors' Committee is not aware of the existence of any Rights of Action that are the subject of the release described under this Article X.E.  As of the date of the Committee's Plan, the Creditors' Committee has not performed a formal investigation of the Rights of Action described in this Article X.E.

## XI.
## PENSION PLANS, OTHER RETIREE BENEFITS AND LABOR CONTRACTS

The Debtors are not obligated pursuant to section 1129(a)(13) of the Bankruptcy Code to pay any "retiree benefits" (as that term is defined in section 1114(a) of the Bankruptcy Code).

## XII.
## NO REGULATED RATE CHANGE WITHOUT GOVERNMENT APPROVAL

The Debtors do not charge any rates for purposes of section 1129(a)(6) that are regulated by any governmental regulatory commission with jurisdiction under applicable nonbankruptcy law.

## XIII.
## EXEMPTION FROM CERTAIN TRANSFER TAXES

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers by the Debtors or the Reorganized Debtors pursuant to the Committee's Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar Tax or governmental assessment.

## XIV.
## RETENTION OF JURISDICTION AND MISCELLANEOUS MATTERS

### A.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and any of the proceedings related to the Chapter 11 Cases pursuant to section 1142 of the Bankruptcy Code and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purpose and intent of the Committee's Plan are carried out.  Without limiting the generality of the foregoing, the Bankruptcy Court shall retain jurisdiction for the following purposes:

> 1.    establish the priority or secured or unsecured status of, allow, disallow, determine, liquidate, classify, or estimate any Claim, Administrative Expense or Interest (including, without limitation and by example only, determination of Tax issues or liabilities in accordance with section 505 of the Bankruptcy Code), resolve any objections to the allowance or priority of

Claims, Administrative Expense or Interests, or resolve any dispute as to the treatment necessary to reinstate a Claim, Administrative Expense or Interest pursuant to the Committee's Plan;

2.     grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Committee's Plan, for periods ending on or before the Effective Date;

3.     resolve any matters related to the rejection of any executory contract or unexpired lease to which any of the Debtors is a party or with respect to which any of the Debtors may be liable, and to hear, determine, and, if necessary, liquidate any Claims or Administrative Expenses arising therefrom;

4.     ensure that distributions to Holders of Allowed Claims, Administrative Expenses, or Interests are made pursuant to the provisions of the Committee's Plan, and to effectuate performance of the provisions of the Committee's Plan;

5.     decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending before the Effective Date or that may be commenced thereafter as provided in the Committee's Plan;

6.     enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Committee's Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Committee's Plan, the Disclosure Statement, or the Confirmation Order, except as otherwise provided in the Confirmation Order or in the Committee's Plan, including, without limitation, any stay orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

7.     resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Committee's Plan or the Confirmation Order;

8.     subject to the restrictions on modifications provided in any contract, instrument, release, indenture, or other agreement or document created in connection with the Committee's Plan, modify the Committee's Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Committee's Plan, the Disclosure Statement, or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Committee's Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument,

release, indenture or other agreement or document created in connection with the Committee's Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Committee's Plan, to the extent authorized by the Bankruptcy Code;

9. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Committee's Plan or the Confirmation Order;

10. consider and act on the compromise and settlement of any Claim against the Debtors;

11. enter such orders as may be necessary or appropriate in connection with the recovery of the assets of the Debtors wherever located;

12. hear and determine any motions or contested matters involving Tax Claims or Taxes either arising prior (or for periods including times prior) to the Effective Date or relating to the administration of the Chapter 11 Cases, including, without limitation (i) matters involving federal, state and local Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, (ii) matters concerning Tax refunds due for any period including times prior to the Effective Date, and (iii) any matters arising prior to the Effective Date affecting Tax attributes of the Debtors;

13. determine such other matters as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law;

14. enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings issued or entered in connection with the Chapter 11 Cases or the Committee's Plan;

15. remand to state court any claim, cause of action, or proceeding involving the Debtors that was removed to federal court in whole or in part in reliance upon 28 U.S.C. § 1334;

16. determine any other matters that may arise in connection with or relate to the Committee's Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Committee's Plan, the Disclosure Statement, or the Confirmation Order, except as otherwise provided in the Committee's Plan;

17. determine any other matter not inconsistent with the Bankruptcy Code; and

18. enter an order or final decree concluding the Chapter 11 Cases.

## B. Miscellaneous Matters

### 1. Headings

The headings used in the Committee's Plan are inserted for convenience only and neither constitute a portion of the Committee's Plan nor in any manner affect the construction of the provisions of the Committee's Plan.

### 2. Services by and Fees for Professionals and Certain Parties

Reasonable fees and expenses for the Professional Persons retained by the Debtors or the Committee for services rendered and costs incurred after the Petition Date and prior to the Effective Date will be fixed by the Bankruptcy Court after notice and a hearing and such fees and expenses will be paid by the Reorganized Debtors (less deductions for any and all amounts thereof already paid to such Persons with respect thereto) after a Final Order of the Bankruptcy Court approving such fees and expenses. Without limiting the Reorganized Debtors' obligations after the Effective Date under applicable law, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay from the Cash on hand of MSA, the reasonable fees and expenses of the Professional Persons thereafter incurred by the Reorganized Debtors related to: (a) the implementation or consummation of the Committee's Plan or (b) the prosecution of any objections to Claims, Administrative Expenses, or Interests.

### 3. Bar Date for Administrative Expenses

Requests for payment of all Administrative Expenses, other than for those for which a request and/or proof of Claim has previously been Filed, must be Filed and served on the Debtors and the United States Trustee no later than thirty days after the Effective Date. The Debtors shall have until sixty days after the Effective Date to bring an objection to a Timely Filed request for payment of an Administrative Expense. Nothing in the Committee's Plan shall prohibit the Debtors from paying Administrative Expenses in the ordinary course in accordance with applicable law during or after the Chapter 11 Cases, but after the Effective Date, the Reorganized Debtors' obligation to pay an Administrative Expense will depend upon the claimant's compliance with this section and such Administrative Expense being Allowed under the provisions of the Committee's Plan. Notwithstanding the foregoing provisions of this Section, but except as may be expressly provided in other sections of the Committee's Plan, Professional Persons or other entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered or expenses incurred after the Petition Date and prior to the Effective Date must file and serve, on all parties entitled to notice thereof, an application for final allowance of compensation and reimbursement of expenses in accordance with the various orders of the Bankruptcy Court establishing procedures for submission and review of such applications; provided that, if no last date is set in such procedures for filing such applications, they must be Filed no later than sixty days after the Effective Date and any objections to such applications must be made in accordance with applicable rules of the Bankruptcy Court.

4. **Notices**

All notices and requests in connection with the Committee's Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

**Co-Counsel for the Creditors' Committee:**

Howard A. Cohen, Esq.
Drinker Biddle & Reath LLP
1100 N. Market Street
Wilmington, DE 19801-1254
Tel: (302) 467-4213
Fax: (302) 467-4201

-and-

John K. Sherwood, Esq.
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 597-2538
Facsimile: (973) 597-2539

**Counsel for the Backstop Purchaser:**

Ira S. Dizengoff
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1096
Facsimile: (212) 872-1002

All notices and requests to any Person holding of record any Claim, Administrative Expense, or Interest shall be sent to such Person at the Person's last known address or to the last known address of the Person's attorney of record. Any such Person may designate in writing any other address for purposes of this Section of the Committee's Plan, which designation will be effective on receipt.

5. **Successors and Assigns**

The rights, duties and obligations of any Person named or referred to in the Committee's Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person.

## 6. **Severability of Plan Provisions**

If, prior to Confirmation, any nonmaterial term or provision of the Committee's Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Committee's Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination that each term and provision of the Committee's Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to their terms.

## 7. **No Waiver**

Neither the failure of the Debtors to list a Claim in the Debtors' Schedules; the failure of the Debtors to object to any Claim or Interest for purposes of voting; the failure of the Debtors to object to a Claim, Administrative Expense, or Interest prior to Confirmation or the Effective Date; the failure of the Debtors to assert a Retained Right of Action prior to Confirmation or the Effective Date; the absence of a proof of Claim having been Filed with respect to a Claim; nor any action or inaction of the Debtors or any other party with respect to a Claim, Administrative Expense, Interest, or Retained Right of Action other than a legally effective express waiver or release shall be deemed a waiver or release of the right of the Debtors or their successors or assigns, before or after solicitation of votes on the Committee's Plan or before or after Confirmation or the Effective Date, to (a) object to or examine such Claim, Administrative Expense, or Interest, in whole or in part or (b) assign to the Agent (and for the Agent to subsequently assign or exclusively assert, pursue, prosecute, utilize, otherwise act, or otherwise enforce) any Retained Rights of Action.

## 8. **Inconsistencies**

In the event the terms or provisions of the Committee's Plan are inconsistent with the terms and provisions of the exhibits to the Committee's Plan or documents executed in connection with the Committee's Plan, the terms of the Committee's Plan shall control.

## 9. **Plan Supplement**

The Plan Supplement and the documents contained therein shall be in form, scope and substance satisfactory to the Backstop Purchaser, and shall be filed with the Bankruptcy Court no later than to ten (10) days before the deadline for voting to accept or reject the Committee's Plan, provided that the documents included therein may thereafter be amended and supplemented, subject to the consent of the Backstop Purchaser, prior to execution, so long as no such amendment or supplement materially affects the rights of holders of Claims. The Plan Supplement and the documents contained therein are incorporated into and made a part of the Committee's Plan as if set forth in full herein.

# XV.
## CONDITIONS TO CONFIRMATION AND EFFECTIVENESS

### A.    Conditions Precedent to Plan Effectiveness

The Plan will not be consummated and the Effective Date will not occur unless and until (A) the Confirmation Order is in a form acceptable to the Plan Proponent and is entered by the Bankruptcy Court; (B) the Confirmation Order shall either be a Final Order or, if an appeal has been Filed, no stay has been obtained; (C) all conditions set forth in the Backstop Commitment Agreement shall have been satisfied; (D) the Offering shall have been fully funded; (E) all documents necessary to effectuate the release of the Liens, the Second Lien Guarantees, and the Subordinated Note Guarantee against the Debtors and Non-Debtor Subsidiaries, except for the Liens securing the First Lien Lender Secured Claims, which shall remain in effect for the sole purpose of securing the New Term Loan, shall have been fully executed and delivered; and (F) all distributions payable on the Effective Date hereunder shall have been fully paid in accordance with the terms hereof; (G) all necessary government approvals have been obtained; and (H) UBS, AG, Stamford Branch has been replaced as Agent and all fees and expenses incurred by UBS, AG, Stamford Branch in its capacity as Agent shall have been paid in full. The foregoing conditions, other than subparts (F) and (H) above, may be waived by the Plan Proponent (such waiver shall not require any notice, Bankruptcy Court order, or any further action).The foregoing conditions may be waived by the Plan Proponent (such waiver shall not require any notice, Bankruptcy Court order, or any further action).

### B.    Effect of Non-Occurrence of Conditions to Effective Date

Each of the conditions to the Effective Date must be satisfied or duly waived, as provided above, within thirty-five days after the Confirmation Date. If each condition to the Effective Date has not been satisfied or duly waived, as described above, within thirty-five days after the Confirmation Date, then upon motion by the Debtors made before the time that each of such conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order shall be vacated by the Bankruptcy Court. Notwithstanding the filing of such motion, however, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated for failure to satisfy a condition to the Effective Date, the Committee's Plan shall be deemed null and void in all respects.

# XVI.
## EFFECT OF CONFIRMATION

### A.    Binding Effect of Confirmation

Confirmation will bind the Debtors; all Holders of Claims, Administrative Expenses, Superpriority Claims, or Interests; and other parties in interest to the provisions of the Committee's Plan whether or not the Claim, Administrative Expense, Superpriority Claim, or Interest of such Holder is Impaired under the Committee's Plan and whether or not the Holder of

such Claim, Administrative Expense, Superpriority Claim, or Interest has accepted the Committee's Plan.

**B.**     **Good Faith**

Confirmation of the Committee's Plan shall constitute a finding that: (i) the Committee's Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code and (ii) all Persons' solicitations of acceptances or rejections of the Committee's Plan and the offer, issuance, sale, or purchase of a security offered or sold under the Committee's Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

**C.**     **No Limitations on Effect of Confirmation**

Nothing contained in the Committee's Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

## XVII.
## MODIFICATION OR WITHDRAWAL OF PLAN

**A.**     **Modification of Plan**

The Plan Proponent may seek to amend or modify the Committee's Plan at any time prior to its Confirmation in the manner provided by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise order, and except as otherwise set forth herein, the Plan Proponent reserves the right to amend the terms of the Committee's Plan or waive any conditions to its Confirmation, effectiveness or consummation if the Plan Proponent determines that such amendments or waivers are necessary or desirable to confirm, effectuate or consummate the Committee's Plan.

After Confirmation of the Committee's Plan, but prior to the Effective Date, the Plan Proponent may apply to the Bankruptcy Court, pursuant to section 1127 of the Bankruptcy Code, to modify the Committee's Plan. After the Effective Date, the Reorganized Debtors and the Plan Proponent may apply to remedy defects or omissions in the Committee's Plan or to reconcile inconsistencies in the Committee's Plan.

**B.**     **Withdrawal of Plan**

The Plan Proponent reserves the right to revoke and withdraw the Committee's Plan at any time prior to the Effective Date, in which case the Committee's Plan will be deemed to be null and void.

## XVIII.
## <u>CONFIRMATION REQUEST</u>

The Creditors' Committee requests that the Bankruptcy Court confirm the Committee's Plan and that it do so, if applicable, pursuant to section 1129(b) of the Bankruptcy Code notwithstanding the rejection of the Committee's Plan by any Impaired Class.

Official Committee of Unsecured Creditors:

By: /s/ Howard A. Cohen

**DRINKER BIDDLE & REATH LLP**
Howard A. Cohen, Esq.
1100 N. Market Street
Wilmington, DE 19801-1254
Tel: (302) 467-4213
Fax: (302) 467-4201

-and-

**LOWENSTEIN SANDLER PC**
John K. Sherwood, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 597-2538
Facsimile: (973) 597-2539

*As Co-Counsel for the Official Committee of Unsecured Creditors*

**Schedule 1**
**New Term Loan**

| | |
|---|---|
| Borrower: | Reorganized Luxco and Reorganized Finco. |
| Guarantors: | The following Reorganized Debtors: LLC, MSK, MSA, Holdco, Dutchco, MagnaChip Semiconductor Limited (UK), MagnaChip Semiconductor Inc. (Japan), MagnaChip Semiconductor Limited (Taiwan), MagnaChip Semiconductor Holding Company Limited (British Virgin Islands) and MagnaChip Semiconductor Limited (Hong Kong SAR). |
| Principal: | $0-61.75 million. |
| Maturity: | 4 years from the Effective Date. |
| Interest Rate: | LIBOR plus 1200 |
| Covenants: | Usual and customary affirmative and negative covenants, including but not limited to limitations on indebtedness, liens, restricted payments and disposition and investments. |
| Collateral: | First lien on substantially all assets of the Reorganized Debtors and the Non-Debtor Subsidiaries. |